# Exhibit 16

 

18 Low Avenue
Concord NH 03301
(603) 224-5591
aclu-nh.org

VIA EMAIL (james.p.gerry@nh.gov; Myles.B.Matteson@governor.nh.gov)

May 30, 2025

James P. Gerry  
Director of Policy and Finance  
Office of the Governor  
107 North Main Street  
Concord, NH 03301

Myles B. Matteson  
Legal Counsel  
Office of the Governor  
107 North Main Street  
Concord, NH 03301

Re: Sections 451 and 452 of HB2 Intending to Prohibit Diversity, Equity, and Inclusion

Dear Mr. Gerry and Attorney Matteson:

We write on behalf of the ACLU of New Hampshire and Disability Rights Center-NH to encourage the Governor's Office to work with the New Hampshire Senate to remove Sections 451 and 452 of HB2 because of the serious constitutional concerns that exist within their provisions. These sections, which are enclosed with this letter, intend to prohibit public entities and public schools from implementing, promoting, or engaging in "diversity, equity, and inclusion" initiatives, programs, training, or policies. The Senate Finance Committee is expected to vote on the full version of HB2 on June 3, 2025, with a full floor vote scheduled for June 5, 2025. Following June 5, 2025, we presume that a committee of conference will resolve differences between the bodies with respect to HB2's provisions.

As explained in more detail below, the provisions in Sections 451 and 452 raise serious constitutional concerns. Of course, if these sections are removed, nothing would prevent legislators in support of their provisions from presenting a similar bill during the next legislative session, outside the budget process, to ensure that the bill is fully vetted by subject matter experts, at which time there may be additional judicial guidance on the bill's legality.

Sections 451 and 452 suffer from a fundamental concern—namely, that their prohibition on implementing, promoting, or engaging in any "diversity, equity, and inclusion" initiatives is unconstitutionally vague and ambiguous, with public schools at risk under Section 452 of losing public funding for any "knowing[] or unknowing[]" failure to abide by the legislation's vague terms. Under the most recent amendment approved by the Senate Finance Committee, "diversity, equity, and inclusion" means "any program, policy, training or initiative that classifies individuals based on a characteristic identified under RSA 354-A:1 for the purposes of achieving demographic outcomes, rather than treating individuals equally under the law." What is covered under this language is far from clear, and _two New Hampshire federal courts have declared as unconstitutionally vague—either permanently or preliminarily—similar efforts seeking to ban "diversity, equity, and inclusion" instruction or trainings_. See *Nat'l Educ. Ass'n v. United States Dep't of Educ.*, No. 25-cv-091-LM, 2025 U.S. Dist. LEXIS 77874, __ F. Supp. 3d __ (D.N.H. Apr. 24, 2025) (issuing preliminary injunction blocking enforcement of the U.S. Department of Education's February 14, 2025, "Dear Colleague" letter against the plaintiffs, their members, and any entity that employs, contracts with, or works with one or more of plaintiffs or plaintiffs' member, where the Letter restricted discussions and programs on diversity, equity, and inclusion in educational institutions, and threatened to withhold federal funding for engaging in such efforts)[1]; *Local 8027 v. Edelblut*, No. 21-cv-1077-PB, 2024 U.S. Dist.

---
[1] *See also Am. Fed. of Teachers v. U.S. Dep't of Educ.*, No. SAG-25-628, 2025 U.S. Dist. LEXIS 77811, at *70, __ F. Supp. 3d __ (D. Md. Apr. 24, 2025) ("The Dear Colleague Letter of February 14, 2025 is stayed pursuant to 5 U.S.C. § 705 pending final resolution by this Court."); *NAACP v. U.S. Dep't of Educ.*, No. 25-cv-1120 (DLF), 2025 U.S. Dist. LEXIS 78302, at *25, __ F. Supp. 3d __ (D.D.C. Apr. 24, 2025) ("ORDERED that pending a further order by the Court, the defendants, as well as their

1




18 Low Avenue
Concord NH 03301
(603) 224-5591
aclu-nh.org

LEXIS 94052 (D.N.H. May 28, 2024) (holding that the prohibitions in a New Hampshire law "against teaching banned concepts are unconstitutionally vague," and that the law's provisions that discourage public school teachers from teaching and talking about race, gender, and sexual orientation contain "viewpoint-based restrictions on speech that do not provide either fair warning to educators of what they prohibit or sufficient standards for law enforcement to prevent arbitrary and discriminatory enforcement") (on appeal).

Sections 451 and 452 contain the same problems that exist in the February 14, 2025 Dear Colleague Letter that was preliminarily enjoined.  There, the U.S. District Court for the District of New Hampshire found that the plaintiffs were likely to succeed on their arguments that the Dear Colleague Letter is impermissibly vague because "it does not make clear . . . what the [federal] Department [of Education] believes constitutes a DEI program, or the circumstances in which the Department believes DEI programs run afoul of Title VI." *Nat'l Educ. Ass'n*, 2025 U.S. Dist. LEXIS 77874, at *58.  The Court found the sweep of the Letter particularly problematic and unlawful because the decision as to whether—and how—to enforce the DEI ban would be left to individual subjective judgments of different enforcers.  As a result, for example, "school teachers throughout the country are asking themselves" whether and how they can teach literature examining racism and European imperialism and are asked to guess, on pain of losing their positions, whether or not such instruction is still permitted.  *Id.* at *63-64.  Sections 451 and 452 are no different and similarly leave enforcement to the subjective assessments of the New Hampshire Department of Education in Section 452, without any process for a public school to challenge that Department's assessment and corresponding losses in public funding.

Amplifying these unconstitutional ambiguities, Sections 451 and 452 go on to prohibit not just "DEI" initiatives, but also "DEI-*related*" initiatives, with no indication as to how "related" to "DEI" the initiative must be to be barred under the proposed legislation.  Furthermore—and relatedly—the bill goes on to ban "implicit bias training" and "critical race theory" in Proposed RSA 21-I:113 and Proposed RSA 186:72 without defining what these terms mean and how (or if) they even satisfy the underlying definition of "diversity, equity, and inclusion" in proposed RSA 21-I:112, II and Proposed RSA 186:71, I.  These ambiguities are enhanced further by the fact that principles related to diversity, equity, and inclusion are also included in many educator trainings and professional standards. For example, Principle III of the "guiding principles" in the New Hampshire Code of Ethics for Educational Professionals directs educators to "commit[ ] to equality, *equity, and inclusion* of colleagues, staff, students, parents or guardians and other members of the school community" and "respect[] *diversity* amongst colleagues, staff, students, parents or guardians, and other members of the school community."  (emphasis added).[2]  If this legislation were to pass, educators may have to choose between complying with either this legislation or their ethical responsibilities.

These unconstitutional ambiguities are also a concern outside the education context.  For example, would a police department engaging in training—consistent with last year's enactment of HB596[3]—to reduce racial profiling of Black people to alleviate racial disparities in policing[4] be covered under the legislation as a training seeking to "achieve a demographic outcome," as such training would be designed to ensure that Black people are not subjected

---

officers, employees, and agents, are PRELIMINARILY ENJOINED from implementing and enforcing the Certification. The Enjoined Defendants shall not require any entity or individual subject to the Certification to make any 'certification' or other representation or assurance pursuant to the Certification").

[2] *See* N.H. Code of Ethics for Educational Professionals, *available at* https://www.education.nh.gov/sites/g/files/ehbemt326/files/inline-documents/code-of-ethics-code-of-conduct.pdf.

[3] 2024 HB596 can be found here: https://gc.nh.gov/bill_status/legacy/bs2016/billText.aspx?sy=2024&id=543&txtFormat=pdf&v=current.

[4] Paul Cuno-Booth, "How Pretextual Traffic Stops by N.H. Police Disproportionately Affect Black and Latino Drivers," *NHPR* (May 17, 2022), https://www.nhpr.org/nh-news/2022-05-17/pretextual-traffic-police-stops-racial-disparities-black-latino-drivers-nh.




18 Low Avenue
Concord NH 03301
(603) 224-5591
aclu-nh.org

to racist police practices? This is unclear, and arguably would be covered. And if this training addresses the concept of implicit bias, then such a training likely would be in the crosshairs of this proposed legislation, as this concept is specifically called out. However, implicit bias is a concept regularly addressed in law enforcement trainings (including those conducted by the New Hampshire Department of Justice[5]) to help ensure that our enforcement of the laws is equal. Implicit bias trainings for law enforcement too were embraced by Governor Sununu and the Governor's Commission on Law Enforcement Accountability, Community and Transparency (LEACT), which recommended training on implicit bias and de-escalation—training that has subsequently occurred throughout New Hampshire.[6]

These unconstitutional ambiguities are exacerbated by the most recent amendment to Sections 451 and 452 from the Senate Finance Committee. The most recent amendment to the definition of "diversity, equity, and inclusion" replaces the language "based on race, sex, ethnicity, or other group characteristics" with "based on a characteristic identified under RSA 354-A:1." This change makes this proposed legislation even more incomprehensible. The characteristics identified under RSA 354-A:1 are "age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion or national origin." With this legislation's change to include "gender," would education programs designed to increase the representation of girls in STEM classes[7] be violative as seeking to "achieve a demographic outcome"? Indeed, such efforts to increase female representation, in some circumstances, could be mandated by Title IX of the Education Amendments of 1972 to address past gender discrimination[8], but arguably would now conflict with this legislation.

Further, would this legislation also deem illegal programs or instruction that discuss, for example, improving services for the elderly or young people (a classification based on "age") or those with "mental or physical disabilities"— including those experiencing mental health crises? Indeed, one of the foundational principles of disability law is the recognition that people with disabilities must be provided with reasonable accommodations, when necessary, to enable them to access and fully participate in school, work, and all aspects of community life. These foundational principles—which, in part, are derived from the Individuals with Disabilities Education Act (IDEA), Americans with Disabilities Act, (ADA), Section 504 of the Rehabilitation Act of 1973, Title VI of the Civil Rights Act of 1964, New Hampshire's Laws Against Discrimination (RSA 354-A), and various programs enacted through state and local

---

[5] *See* Implicit Bias Training Hosted by the New Hampshire Attorney General's Office on Nov. 20, 2020 (addressing concepts like "structural/systemic discrimination" and "white privilege" in slides 11-12, 33 of James McKim's presentation "Are You Your Implicit Bias?"); *see also* https://organizationalignition.com/event/implicit-bias-training.

[6] *See* https://www.governor.sununu.nh.gov/accountability; *see also* https://www.governor.sununu.nh.gov/sites/g/files/ehbemt336/files/inline-documents/sonh/20210830-leact-recommendations-completed-and-in-progress-final.pdf (noting in Sept. 2, 2021 LEACT Tracking Report completion of the following: "1-B. Mandate NH PSTC training on implicit bias and cultural responsiveness, ethics and de-escalation"; "2. Encourage all law enforcement agencies to require implicit bias and cultural responsiveness, ethics and de-escalation training"; and "18. Require implicit bias training for all prosecutors, criminal defense attorneys and judges."); https://www.governor.sununu.nh.gov/sites/g/files/ehbemt336/files/inline-documents/sonh/060921-dashboard.pdf (noting in LEACT May 2021 Dashboard that "State Police completed additional training on de-escalation and is in progress on training on ethics and implicit bias").

[7] *See* Tara P. Nicola, "STEM Gender Gaps Significant Among Gen Z," *Gallup Blog* (Dec. 5, 2023), https://news.gallup.com/opinion/gallup/544772/stem-gender-gaps-significant-among-gen.aspx#:~:text=Women%20make%20up%20half%20of,fields%20such%20as%20computer%20science ("Female Gen Z youth report learning about fewer technical STEM concepts in their middle and high school coursework than their male counterparts do.").

[8] *See* Matthew McLaughlin, "Can Title IX Change STEM Culture," *Nat'l Soc'y of Pro. Eng'rs* (May 2017), https://www.nspe.org/career-growth/pe-magazine/may-2017/can-title-ix-change-stem-culture.

3



18 Low Avenue
Concord NH 03301
(603) 224-5591
aclu-nh.org



legislation—are in conflict with this proposed legislation.[9]  Accordingly, any programs, training, or policies of a public body or school seeking to advance these principles designed to improve outcomes—and may be required to comply with federal law—for people with disabilities and other demographic groups may now be covered under this legislation.

Section 452 presents another potential constitutional problem.  Because the definition of "public school" includes any "institution of higher education," the legislation's prohibitions cover public colleges and universities, and thus may even cover college-level academic instruction that could be deemed an engagement of a "DEI-related initiative/activity" or "critical race theory."  This violates the First Amendment insofar as it constitutes a viewpoint-based restriction on what can be taught in public college and university classrooms.  *See Nat'l Educ. Ass'n*, 2025 U.S. Dist. LEXIS 77874, at *85-85 ("plaintiffs are likely to succeed on the merits of their First Amendment claim with respect to NEA's members in higher education").

Lastly, we highlight that the House of Representatives inserted Sections 451 and 452 in HB2 without a public hearing.  And, while in the Senate, Sections 451 and 452 have not had a public hearing where the sole focus was on their provisions, as the hearings to date have been through the omnibus HB2 budget "trailer" process.  Indeed, there are multiple technical issues with Sections 451 and 452 that normally would have been discussed and vetted through the public hearing process, where subject matter experts from the public and legislature would be given a meaningful opportunity to provide feedback.  That process did not occur here.  As an example of one technical (but important) issue, the definition of "public school" in Section 452 materially—and more expansively—differs from how a "public school" is defined elsewhere in New Hampshire law (*see* Ed. 401.01(f)).  Indeed, the definition of "public school" in Section 452 may even include *private* schools that both receive public Education Freedom Account funds and engage in religious instruction.  This issue, among others, demonstrates that this legislation should not become law.

For these reasons, we urge the Governor's Office to work with the New Hampshire Senate to remove Sections 451 and 452 of HB2.  Thank you for your attention to this matter.

Sincerely,

*/s/ Gilles Bissonnette*  
Gilles Bissonnette  
ACLU-NH Legal Director

*/s/ Jennifer Eber*  
Jennifer Eber  
Disability-Rights Center-NH, Litigation Director

cc: Richard Lehmann, Esq., Senate Counsel (rick@nhlawyer.com)  
Samuel Garland, Esq., Senior Assistant Attorney General (samuel.rv.garland@doj.nh.gov)  
Sean Locke, Esq., Senior Assistant Attorney General (sean.r.locke@doj.nh.gov)

Enclosure (Sections 451 and 452 of HB2)

---

[9] Further, National Alliance on Mental Illness (NAMI) New Hampshire has raised concerns that this proposed legislation could impact the delivery of the nationally recognized gold-standard Crisis Intervention Team training that provides first responders with resources and skills to ensure safe responses to people experiencing mental health crises.  Not only might this proposed legislation impede the ability for agencies to contract for the delivery of this training, but also for agencies who send first responders to the forty-hour, week-long training to fund the required backfill while those responders are in class.