# Exhibit 34

**DECLARATION OF NATIONAL EDUCATION ASSOCIATION-NEW HAMPSHIRE**

I, Rick Trombly, pursuant to 28 U.S.C. § 1746, declare the following:

1. The facts set forth in this declaration are based on my personal knowledge. If called as a witness, I could and would competently testify to the following matters under oath.

2. I am the Executive Director of National Education Association-New Hampshire ("NEA-NH"). I am authorized to provide this Declaration on behalf of the NEA-NH, which is a Plaintiff in this matter. I have held the position of Executive Director since May of 2012.

3. I make this Declaration to describe the effects that HB2 is having, and will continue to have, on NEA-NH and its members.

<b>Background on NEA-NH</b>

4. NEA-NH is one of the "founding ten" state education associations that formed the National Education Association in 1857. At that time, NEA-NH was called the New Hampshire Teachers Association.

5. As currently comprised, NEA-NH represents the majority of all public-school employees in New Hampshire and has more than 17,000 members.

6. NEA-NH seeks to strengthen and support public education, as well as serve their members' professional, political, economic, and advocacy needs.

7. NEA-NH members are public school educators including classroom teachers, and other certified professionals, education support personnel, instructors and staff at public higher education institutions, as well as students preparing for a teaching career, and those retired from the profession. NEA-NH members also include special education teachers who act on behalf of school districts to ensure that educational opportunities for students with disabilities are realized as required under state and federal law—obligations which conflict with HB2's anti-DEI provisions insofar as this instruction and these services classify students based on disability and seeking to "achieve" a "demographic outcome" for this group.

8. As noted above, NEA-NH members also include higher education instructors and faculty, including adjunct instructors and faculty members at Keene State College and law faculty at the University of New Hampshire Franklin Pierce School of Law. Undoubtedly, NEA-NH's higher education members will fear adverse action if they continue to assign readings, invite guest speakers, or engage in discussion and debate with students on anything that might be construed

1

to fall within these prohibited categories. NEA-NH has been in touch with two higher education members at the University of New Hampshire Franklin Pierce School of Law who engage in instruction and work that arguably impacts HB2 and who do not know how to comply with its provisions.  For example, discussion of race is critical to educating law students not only in the legacy of race in how the law has developed, but also how to effectively represent clients from diverse communities.  Students need to be sensitive to the lived experiences of those being represented.  Student-lawyers also, in some circumstances, need to be trained that race can be an important component of legal arguments based on precedent and that to not understand that is risking ineffective representation.  These educators also do not see how they can comply with both HB2 and ABA Standard 303(c), which requires law schools to "provide education to law students on bias, cross-cultural competency, and racism."  Given that their work intersects with HB2, these educators are concerned that they may be subjected to adverse employment action and/or their school's funding affected if they continue to assign readings, engage in discussions with students, provide instruction, student programming, or professional development, or otherwise operate their programs in ways that are or could be construed to be related to race, diversity, equity, or inclusion.

9.   In addition to advocating for education professionals, NEA-NH's mission is to unite our members and the nation to fulfill the promise of public education, to break down the barriers to racial equity, and to prepare every student to succeed in a diverse and interdependent world. To that end, NEA-NH's vision of a great public school for every child cannot be realized without adequate funding.  This is why NEA-NH has worked with the American Civil Liberties Union of New Hampshire to demand that the State meet its constitutional obligation to adequately fund public schools.[1] Any cuts or decrease in state funding to public schools can be devasting. NEA-NH also believes that all students have the human and civil right to quality public education, and that public education is vital to building respect for the worth, dignity, and equality of every individual in our diverse society.

10. NEA-NH operates in accordance with requirements of equity and inclusion as set out in civil rights laws as well as encouraging and educating members of NEA-NH on these issues.

---

[1] The American Civil Liberties Union of New Hampshire and NEA-NH filed a joint brief as amici curiae in <u>Contoocook Valley School District v. The State of New Hampshire</u>, Case No. 2024-0121, 2025 N.H. 29 (July 1, 2025).

NEA-NH has incorporated issues of race, diversity, equity and inclusion in its operations and has encouraged the same with respect to teaching, training and supporting all educators.

11. NEA-NH is incorporated as a domestic non-profit under New Hampshire law, and it is headquartered in Concord, New Hampshire.

## Standing

12. NEA-NH has organizational standing. As explained in more detail below, HB2 impacts the ability of NEA-NH and its members to provide core educational and special education services and foster inclusive and equitable environments for students of every background. HB2's anti-DEI provisions have frustrated NEA-NH's mission of fulfilling the promise of public education, breaking down the barriers to racial equity, and preparing every student to succeed in a diverse and interdependent world. HB2's anti-DEI provisions have also frustrated NEA-NH's efforts to advocate for public school employees and advise, train and assist our members in employment matters and with questions related to licensure. Finally, the extreme and punitive remedy in HB2 —withholding public funding for public schools —impacts NEA-NH's mission to fulfill the promise of public education. In addition, NEA-NH has associational standing. NEA-NH's members adversely affected by HB2 would have standing to sue in their own right, the interests at stake in this lawsuit are germane to the NEA-NH's purpose, and neither the claims asserted nor the relief sought requires participation of the NEA-NH's individual members to adjudicate the claims.

## Impact of HB2 on NEA-NH and Its Members

13. HB2 harms NEA-NH and its members in multiple ongoing ways.

14. The language in HB2 has a direct and immediate impact on NEA-NH members, especially those who regularly wrestle with issues concerning disability, race, and other classifications in providing programmatic and special education services, as well as curricular instruction at colleges and universities. HB2 impacts these members who are confused about the language, who are unclear as to what they can teach, and who are fearful of arbitrary enforcement under the law. This fear of enforcement with respect to educators' own professional practices through state mechanisms is justified, especially given the New Hampshire Department of Education's July 11, 2025, letter to public school districts setting a compliance deadline of September 5, 2025. The vague language in the law provides no standards for educators and NEA-NH to determine what DEI-related "programs" or "initiatives" are prohibited or

3

permissible under the law. Nor are the terms "promotion" or "critical race theory" defined.
NEA-NH members engage in a variety of programs and initiatives to achieve "demographic
outcomes" every day as part of their professional practice and interactions with their colleagues
and their students. "Programs" even include "programs of study" which capture subject matter
areas and curricular instruction. Accordingly, NEA-NH members fear that, under HB2, their
professional *status quo* will result in discipline or the loss of funding for their institutions.

15. The education and political climate for NEA-NH members contributes to and informs
their fear and chill with respect to HB2. NEA-NH members are familiar with threats of
censorship, threats of loss of funding, and the resulting fear and confusion that can develop
causing a chill over classroom instruction. Members have experienced similar efforts by the state
legislature and with the state law invalidated by the U.S. District Court for the District of New
Hampshire in *Local 8027 v. Edelblut*, No. 21-CV-1077-PB, 2024 WL 2722254 (D.N.H. May 28,
2024). While that state law was in effect for nearly three years, our NEA-NH members felt its
chilling affects in their day-to-day professional activities both inside and outside of the
classroom.

16. NEA-NH members have also experienced the chill associated with the federal
government's attempt to enforce anti-DEI principles through its issuance of the February 14,
2025, Dear Colleague letter and subsequent guidance and enforcement efforts. *See National
Education Association et al v. US Department of Education et al*. No. 25-cv-091-LM; Opinion
No 2025 DNH 055 P. (D.N.H. April 24, 2024).

17. Now that HB2 has become law, educators have already expressed confusion and concerns
about how to comply with the vague language in HB2, while simultaneously complying with
their educational duties and state/federal laws relative to public education. They are fearful of
enforcement actions and adverse employment actions from districts who are afraid of losing
funding and who also have an obligation to enforce the law's prohibitions. Educators are on the
front lines, engaging in the program of classroom instruction. Under HB2, it is unclear to our
members and our organization what programs may be perceived as achieving a "demographic
outcome" and who makes that determination.

18. Members of NEA-NH are directly subjected to the anti-DEI provisions of HB2. For
example, NEA-NH Member A teaches 8th Grade Social Studies in New Hampshire, including
United States history from the Civil War to modern day. Member A, as an educator that teaches

4

as part of a "program," is concerned that classroom discussions about matters of race, religion, and discrimination (which are important parts of teaching certain aspects of American history) could be construed to violate HB2's anti-DEI prohibitions, leaving Member A vulnerable to allegations that Member A and Member A's district has violated the law. For example, instruction addressing instances of use of the "N word" could be negatively impacted, as such instruction educates White students on the impact of that word on Black people and helps create a more welcoming environment for Black students. Through this instruction Member A is aiming to improve and "achieve demographic outcomes" for these communities. Similarly, HB2 impacts Member A's ability to address antisemitism in instruction. When one student drew a swastika in school, this triggered instruction on the Holocaust designed to help, in part, educate non-Jewish students about the experiences of Jewish people—an outcome which is premised on demographics. Member A also does not know how to comply with RSA 189:11, I-c(j)—which requires instruction on "[h]ow intolerance, bigotry, antisemitism, and national, ethnic, racial, or religious hatred and discrimination have evolved in the past, and can evolve, into genocide and mass violence, such as the Holocaust, and how to prevent the evolution of such practices"—in light of HB2. Complying with RSA 189:11, I-c(j) requires teaching about identity and demographic outcomes but HB2 effectively says that Member A cannot do so.

19. NEA-NH Member B teaches high school Social Studies, Geography and World Cultures, United States History, Sociology and Street Law. Member B, an educator that teaches as part of a "program," is concerned that classroom discussions involving the civil rights movement, current events, and structural racism could risk violating HB2's ambiguous terms and fears that someone could view Member B as "promoting" "critical race theory" or DEI-related ideas that are designed to "achieve demographic outcomes." Member B teaches in a school district with a diverse population with many new American communities. Member B is concerned that providing accommodations to ensure success for these populations may be perceived as using a "DEI-related" classification to "achieve a demographic outcome" for minority students. Member B also has concerns related to current curriculum and the impact on Member B's ability to teach Social Studies. Member B discusses systemic racism and historical oppression of certain groups in United States History as part of the program of study regarding the Reconstruction Era and the Civil Rights Movement. These discussions open students' minds to how structural racism has impacted modern society, as well as helping students learn from examples in history of

oppression to create a more inclusive environment for different groups within the classroom. Member B is concerned that efforts to use history to help students understand the experience of communities of color, for example, could be construed as "achieving a demographic outcome."

20. NEA-NH Member C teaches high school Science. Member C, an educator that teaches as part of a "program," is concerned that developing parallel curricula for students with special needs could violate the vague language of HB2 and put Member C in an untenable position of having to choose between violating state and federal special education laws which could lead to discipline, and investigation through the Department of Education and violating the vague language in HB2 which could lead to discipline, investigation and the loss of funding to Member C's District. Member C is concerned that they could violate HB2 by providing alternative testing for a child with a dyslexia diagnosis and low literacy levels as this could be construed as "achieving demographic outcomes." Member C is concerned about violating FERPA if Member C is questioned about accommodations provided to disabled students and whether those accommodations, on the basis of disability, are "achieving demographic outcomes" in violation of HB2. Finally, Member C is deeply concerned that district contracts with third parties who promote inclusive athletics, such as the Special Olympics, could be impacted and eliminated under the vague language of HB2. Member C is involved in such initiatives and programs as a coach in their district and these initiatives achieve "demographic outcomes," namely including disabled children in sports that are traditionally only available to non-disabled peers.

21. Additionally, educators are often professionally or legally obligated to implement programs or instruct students on approaches that ensure inclusivity, accessibility, and demographic outcomes especially for students who are disabled or multi-lingual learners. Many of our members are special education teachers and paraprofessionals whose core job duties involve ensuring that students with disabilities are integrated with non-disabled peers which is a demographic outcome.

22. HB2 has also forced NEA-NH to divert its organizational resources to identify and counteract the law's impermissibly vague restrictions, and it has frustrated NEA-NH's mission and efforts to advocate for public school employees and working towards a common goal to fulfill the promise of public education that will prepare the children of New Hampshire to succeed in a diverse and interdependent world.

6

23. With respect to advocating for public school employees, NEA-NH provides services to members by assisting with collective bargaining of contracts with local school districts, job security, termination of employment, discipline, evaluation, and academic freedom. These are bargained for concepts. NEA-NH cannot properly advise its membership as to how, or if, they need to adjust their collective bargaining agreements to account for the language of HB2 considering these are agreements or contracts with public entities.

24. NEA-NH also advises members regarding issues related to the parameters of employee discipline and with the New Hampshire Educator Code of Conduct which applies to certified public employees, and what actions may result in investigation and a finding of misconduct by the New Hampshire Department of Education. Given the vague terms and prohibitions in HB2, NEA-NH is unable to sufficiently advise members regarding whether and when their instruction, programs or DEI-related discussions may rise to the level of violating HB2 which, in turn, would undoubtedly lead to investigation of the employee by their district and potential adverse employment action. Further, NEA-NH is unable to advise members regarding whether and when their instruction, programs or DEI-related discussions may rise to a level of referral for investigation by the New Hampshire Department of Education given that the Code of Conduct, Ed 510.03 discusses prohibited discrimination under RSA 354-A:1, and HB2 implies that DEI-related programs, informed by a category in RSA 354-A:1 and aimed at "achieving demographic outcomes," is prohibited. In addition, the language in the Code of Conduct is broad, which leaves NEA-NH concerned regarding how to advise members about what conduct that may violate the vague language of HB2 may be deemed as violating responsibility to students, the community or implicate professionalism.

25. This is a real concern. Not only do HB2's prohibitions raise the prospect of employment consequences from a district that is obligated to enforce it, but the New Hampshire Department of Education has taken a broad view of its powers under the Code of Conduct. Indeed, the Department has gone so far as to assert that some education statutes that lack enforcement authority (like RSA 186:11, IX-c requiring school district adopt policies concerning objectionable course materials) are nonetheless enforceable by Department against individual educators through the Educator Code of Conduct at N.H. Code Admin. R. Ed 510.02(b)(2) insofar as violations of such statutes violate the Code's "[f]ailure to provide appropriate supervision of students" provisions. There is no reason to believe that the Department's position

would not extend to HB2's prohibitions.  Accordingly, NEA-NH's members have a clear reason to fear that HB2 will be enforced to reach their own professional practices through state mechanisms, especially given the Department's July 11, 2025, letter to school districts, and the Departments broad extension of the Code of Conduct.

26. Further, NEA-NH provides its members with the benefit of extensive professional development programming which will be affected by HB2's vague terms and prohibitions. For example, NEA-NH engages members in an annual professional development and leadership program which typically spans a week during the summer. During this programming, members are trained on a variety of topics, including the New Hampshire Code of Conduct, what conduct in the classroom may give rise to employment discipline and other topics to avoid liability in schools and comply with federal, state and local laws. This year, NEA-NH is also coordinating a presentation involving special education law. NEA-NH has already received questions regarding whether books that highlight concepts of race, diversity, equity and inclusion, could be construed as an effort to "achieve demographic outcomes which may violate the law." NEA-NH has also received questions regarding whether, as noted above, educators can continue initiatives such as the Special Olympics and what accommodations educators can make for students with special education needs as required by state and federal law without running afoul of HB2 and its apparent prohibition on "achieving demographic outcomes" for students with disabilities.  Due to the vague and confusing prohibitions in HB2, NEA-NH is impaired in its ability to counsel members on steps to take to comply with the law. NEA-NH will need to divert resources to develop appropriate training, guidance and ensure it can advise members to the best of its ability regarding compliance with HB2.

27. NEA-NH's members cannot continue to deliver the quality of instruction, programming, and professional development that their school communities deserve without "public funds" under HB2, which includes state (and possibly even federal) funds.  NEA-NH members have invested in practicing their profession in compliance with state and federal law, including in their own training and professional development, in designing their courses and curriculum, and otherwise.  HB2 makes this work impossible because of its vague terms and onerous financial penalties.

I declare under penalty of perjury that the foregoing is true and correct.

Executed the _5_ of August, 2025

Rick Trombly