# Exhibit 35

## DECLARATION OF MEMBER A

I, ▮▮▮▮▮▮▮, pursuant to 28 U.S.C. §1746, depose and say as follows:

1.    I am NEA Member A as identified in the Complaint.

2.    I am an 8ᵗʰ Grade Social Studies teacher in New Hampshire. I have been teaching for 26 years.

3.    I am a member of NEA-NH.

4.    I am offering this Declaration in my individual capacity and not on behalf of the District that employs me.

5.    I have been directly impacted and harmed by the passage of HB2, as I have experienced significant chill and confusion regarding my teaching practices in the upcoming school year for fear that my classroom instruction and discussions, which are part of a "program" under HB2, could be construed as violating HB2's anti-DEI prohibitions.

6.    In particular, I fear that my teaching will be considered as violating the law because of the ways my courses explore themes relevant to American history of oppression of certain groups, and because I elicit student discussions of (i) race, gender, religion, disability, and the historical discrimination of certain populations, and (ii) the relationship between this historical discrimination and current events. In light of the passage of HB2, I fear that by continuing my longstanding teaching practices, I may be subjected to complaints, investigation, discipline, or adverse employment action.

### Concerns regarding the language in HB2

7.    My role as a social studies teacher is to provide as complete and well-rounded of a history education as possible. I am passionate about education for everyone and have committed myself to continued learning and growth, and I regularly update my pedagogical practices and curriculum to ensure that students are engaged in learning history. This often involves having complex conversations with students of varying backgrounds and opinions. My students disagree with each other during discussions and may, at times, feel challenged and uncomfortable when confronting aspects of U.S. history, but this is all necessary to developing students' sense of critical thinking and logic. I do not shy away from classroom discussions regarding diversity, equity, and inclusion including discussions of race, gender, religion, and disability.

8.      To create an open learning environment, I foster inclusivity in my classroom to ensure that all voices are heard, and that my students practice respect and empathy to create a robust learning environment that helps them better transition into a diverse adult world.

9.      I have reviewed the language in HB2, and I find it confusing and vague. Specifically, I am confused regarding the vague language in HB2 of "programs" "initiatives" and "demographic outcomes," and I am unsure about whether I could be subject to adverse employment action for teaching "programs" or "initiatives" that accurately reflect our history regarding race, and gender-related topics. Social studies is a "program" of study. I am concerned that classroom discussions about matters of race, religion, and discrimination, which are important parts of teaching certain aspects of American history, could be construed to violate HB2's anti-DEI prohibitions.

10.     For example, it is imperative in this curriculum to be accurate. As such, I frequently discuss "demographic outcomes" as the term simply means the reality and makeup of human society (past and present) and how different groups have existed in American history. I instruct, in part, to achieve outcomes which could be perceived as premised on "demographics."

**Implications of HB2 and my ability to teach current Social Studies curriculum**

11.     HB 2 defines the terms "diversity, equity, and inclusion" as meaning "any program, policy, training, or initiative that classifies individuals based on" age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, national origin, or sexual orientation "for the purpose of achieving demographic outcomes, rather than treating individuals equally under the law." The term "demographic outcomes" is not defined in HB2.

12.     In my instruction regarding colonialism, the Civil War, and the Civil Rights movement, I address instances of labels and speech as a means of historical oppression of certain groups. I try to help students understand how words matter, which helps create a classroom environment that is welcoming for all students.

13.     For example, in the last two years after several instances of students using the "N word" in school, I incorporated instruction into my curriculum to educate White students on the historical use of the "N word" and the impact of this word on Black people today. This helps create a more welcoming learning environment for Black students. Undoubtedly, through this instruction I am aiming to improve and "achieve demographic outcomes" for these communities

of students. I am concerned that, given the vague language in HB2, I must cease this important instruction and avoid using these instances as a learning experience, informed by history, for my students for fear of violating the vague language in HB2.

14.    Similarly, HB2 impacts my ability to address historical and current antisemitism in the classroom. My curriculum focuses on the time period from the Civil War to the modern era to ensure that I include sufficient instruction on genocide and antisemitism as required by RSA 189:11, I-c (j), a New Hampshire law.

15.    Recently, one student drew a swastika in school, which was disturbing for Jewish and non-Jewish colleagues and students. Using this as a teachable moment for my students, I included this example in my instruction regarding the Holocaust. This instruction is designed to educate non-Jewish students about the experiences of Jewish people, and the weight of the use of certain symbols based on the historical experience of Jews. This could be construed as seeking to "achieve" a "demographic outcome" for students that fit these classifications. Now, I fear I may be in violation of the law if I continue this instruction insofar as the outcome here, educating non-Jewish students about hate symbols so that they better understand a Jewish person's experience, is premised on demographics.

16.    In addition, I also do not know how to comply simultaneously with HB2 and RSA 189:11, I-c(j) given the two laws conflict. RSA 189:11, I-c(j) requires me to instruct students regarding "[h]ow intolerance, bigotry, antisemitism, and national, ethnic, racial, or religious hatred and discrimination have evolved in the past, and can evolve, into genocide and mass violence, such as the Holocaust, and how to prevent the evolution of such practices." Complying with RSA 189:11, I-c(j) requires teaching about identity and "demographic outcomes." However, HB2 offers a confusing and contradictory prohibition, as the language prohibits teaching about identity and "demographic outcomes."

17.    Furthermore, my curriculum also includes the history of the Reconstruction era. In this unit, I include lessons on Juneteenth, the Civil Rights Act of 1866, and the Fourteenth and Fifteenth Amendments, leading up to the Black Codes, the founding of the KKK, the Jim Crow Era, and the Compromise of 1877, among other historical events. All of this history is directly tied to concepts of race, racism, and slavery. Active discussion and questions are encouraged in this unit and often White students will tell me they are horrified by some of the history in this country and have gained a better understanding of how history may impact a Black student's

perspective. Thus, my instruction on the Reconstruction era "achieves demographic outcomes."
Now, I fear that I may run afoul of HB2 by teaching accurate history and encouraging children to
expand their comfortable limits and understanding of how race, religion, gender and
discrimination have evolved in this country.

18.     Finally, discussions regarding disability often come up organically during my
instruction regarding the Civil War as students are often curious about the social and economic
fallout for amputees and during my instruction on the Civil Rights Movement, race and the
emergence of the Americans with Disabilities Act. I teach students about Ruby Bridges, a Black
child with advanced abilities who was forced to jump through significant procedural hoops, on
the basis of her race, to prove she could and should be able to attend a school comprised of her
White peers. My classroom discussion also addresses the Mendez case in California that was an
early fight against school segregation (rooted in the idea of correlating intellectual parity with
race). Finally, during our discussion of Indian Residential Schools, we discuss the ethnocentric
bias that assigned Native Americans with lower academic status or ability on the basis of color or
ethnicity. Lastly, I reference people with disabilities as a specific target of Nazi Pogroms in
World War II which often elicits a dialogue among my students about other historical instances
of disability being used to inform discriminatory objectives. Certainly, all of these discussions
involve an effort to achieve a demographic outcome as the purpose of such lessons is to dispel
any incorrect assumptions or conclusions that these practices or policies were based in truth or
somehow deserving. I fear that these types of important historical discussions in my classroom,
which help students learn from history to better understand the experience of disabled persons
and how disability has been manipulated for discriminatory animus, would violate the vague
language in HB2 and subject me to potential adverse employment action.

**Concerns about adverse employment actions and licensing**

19.     My instruction is directly impacted and there is real threat that I personally will be
subject to enforcement. It is my job to teach uncensored and accurate history to New Hampshire
Students to help them develop into informed, and compassionate scholars. I also strive, through
my instruction, to help students see the importance of inclusion and diversity in a modern society
and how we can learn from history to avoid future conflict. If I violate HB2, especially following
the New Hampshire Department of Education's July 11, 2025, enforcement letter to school districts
mandating compliance with HB2 by September 5, 2025, I have no doubt that I could face

investigation by my District, as well as potential discipline or adverse employment action. I also do not want to be the cause of my District losing important state funds as a result of my classroom instruction.

20.     With the passage of HB2, I am also fearful and concerned that a complaint will be made by a parent, administrator, student or colleague to the New Hampshire Department of Education that I have attempted to "achieve demographic outcomes" by providing an accurate instruction regarding American history, historical oppression of people of color in this country, hate speech, race, the history of women's liberation, and the Holocaust. I am concerned that, given the language of HB2, any effort to educate students of one group to understand the experience of another group invites a claim that my lessons violate the statute insofar as they "achieve" a "demographic outcome." I am concerned someone may accuse me of violating HB2 insofar as my instruction of students is perceived to teach students about historical lessons associated with race, gender, and discrimination of certain protected categories of people.  HB2 is so vague that it is ripe for false accusations that any instruction touching on race, gender, disability, diversity, equity and inclusion and efforts to help students relate history to the modern world, may be perceived as achieving an impermissible "demographic outcome."

21.     Moreover, as the school year approaches, I am now having to consider whether to make changes to my lesson plans in light of HB2.  As I mull adjustments to lesson plans, these changes would need to be drastic and burdensome due to HB2's vague and confusing language. These changes would be time-consuming and extremely disruptive to students, who look forward to learning and expect cohesive, organized lessons. If HB2 goes into effect, I would need to reevaluate all of my lesson plans that include examples from real life, the school community or other examples to make history come alive and question whether each lesson is an effort to "achieve" a "demographic outcome." I would need to collaborate on this effort with my colleagues and seek approval from my administrators, adding an additional burden to all involved. The quality of my teaching would suffer if I had to suddenly change plans, for example by having to skip instruction designed to provide a welcoming environment to students of color—instruction that could be perceived as "achieving demographic outcomes."

22.     Finally, I wish to have personally identifiable information concerning this declaration not made public.  Educators are constantly under attack both with the state and federal government. This "climate" makes me fearful that, if my name were to become public in

a lawsuit challenging the States's education policies, I could be harassed or experience unwarranted employment consequences.

I declare under penalty of perjury that the foregoing is true and correct.
Executed this 28th day of July, 2025.

