# Exhibit 39

## DECLARATION OF CHRISTINE BOSTON

I, Christine Boston, pursuant to 28 U.S.C. § 1746, depose and say as follows:

1.      My name is Christine Boston. The facts set forth in this declaration are based on my personal knowledge. If called as a witness, I could and would competently testify to the following matters under oath.

2.      I am the Superintendent of Dover School District (School Administrative Unit 11). I have been in this position since July 1, 2025.  I was previously the Assistant Superintendent for the Dover School District—a role that I held since 2018.

3.      I also chair the New Hampshire School Administrators Association (NHSAA) equity committee, though I am not writing this declaration in that capacity.

4.      I was formerly the President of the New Hampshire Association of Special Education Administrators and I have served as an adjunct professor at Plymouth State University teaching Special Education Law.

5.      I was awarded the Special Education Administrator of the Year award by the New Hampshire Association of Special Education Administrators in 2019.

6.      I make this declaration to describe the effects that the anti-DEI provisions of House Bill 2 ("HB2") located at RSA 21-I:112-116 and RSA 186:71-77—and the New Hampshire Department of Education's ("NHDOE") subsequent directive in requiring certification of compliance with these provisions' requirements—are having and will continue to have on Dover School District.

### Background on the Dover School District

7.      The City of Dover was settled in 1623. It is the seventh oldest city in the United States and the fastest growing city in New Hampshire.

1

8.      Dover School District serves approximately 3,500 students. It has three elementary schools, one middle school, one high school, and a career technical center.

9.      Dover School District is governed by the Dover School Board.

10.      The goal of the Dover School District's educational system is to ensure that each student, regardless of background, has access to relevant and engaging learning experiences and curricula that they will need to thrive today and into the future.

11.      Dover School District's learning philosophy is that education can be the most powerful mechanism of social change. The District celebrates the individual differences students bring to an educational environment. For Dover School District, educational excellence results from producing work that others can use and helps learners develop a sense of self through engaging with the larger community.

12.      The District strives to produce learners who have critical thinking, collaboration, communication, character, and life skills. Dover School District endeavors for our students to become well-rounded individuals who are prepared for the challenges of the future. Our students learn to seek cultural understanding to enable them to work effectively and respectfully with diverse teams.

13.      The Dover School District received over $21,099,601.88  in state funds for the 2024-2025 academic year, which includes $18,344,078.13 in adequacy grants and SWEPT grants.  The district expects to receive $20,924,937.00 in state funds for the 2025-2026 academic year.

14.      Further, Dover School District received approximately $3.1 million for the 2024-25 academic year in direct federal funding grant support, which includes Titles I-IV and Individuals with Disabilities in Education Act ("IDEA") financial support.  This funding is

recurring based on qualifications. This federal public funding is given to the District through NHDOE, which acts as a "pass through" in distributing funds between the federal government and local school districts. For my District, this federal funding includes the following, with much of these funds used to directly benefit students with disabilities to ensure they achieve equitable outcomes:

- The largest source of federal funding for Dover School District is Title I, which supports students in high-poverty communities and low-income families. We use these funds to provide valuable reading and writing intervention to students and families at the District's elementary and middle schools. For example, we stocked a van with books that runs to high-poverty neighborhoods to give students books to read and host story time. During the summer, we hosted programming for eligible elementary and middle school students. We hosted enhanced family engagement events to make sure the forms for free and reduced lunch programs were accessible to parents who do not speak English or have limited literacy skills. We held monthly family engagement nights with math games or invited authors to speak in an effort to reach families who typically do not engage with the school and to demonstrate enrichment activities they can do at home to support their children's learning. In addition, we used this funding to provide professional development. We trained staff to support the academic, behavioral, mental, and socio-emotional wellbeing of students and emphasized the importance of positive behavior interventions and solutions. We sent Title I staff to the Granite State Literacy Summit to learn innovative literacy tools and strategies to enhance reading and writing instruction. Our Title I interventionists were trained to promote literacy development with their students. Finally, we increased our staffing to provide services to students who need extra assistance with reading, writing, and math.

- The Title III funds were used to serve our English Language ("EL") learners. Dover School District has EL teachers and paraprofessionals in all of its schools, supporting approximately 160 EL students. We used these funds to enrich and develop English language proficiency and help students meet state standards. We purchased instructional materials, provided professional learning for teachers, and supported language-building activities, such as field trips for EL students, and a summer program.

- The District used Title IV funds to create a district-wide sustainability plan for educational and racial equity, develop programming and to expand social-emotional learning opportunities, and to expand supports from a licensed drug and alcohol counselor to serve students. Our annual needs assessment indicated that we needed to focus on students' wellbeing. We introduced intense interventions to ensure our students are able to cope with anxiety and will pilot the Coping Cat, an evidence-based program that addresses mild to moderate anxiety in school age

3

children in the fall. This racial equity work is specifically designed to ensure that communities of color "achieve the demographic outcome" of succeeding in our District.

- Dover School District used IDEA funds to improve instructional practices for the inclusion of students with disabilities. We extended the school year through the summer for students who, without continuity of services, would fall behind over the summer and be unable to access their education in the fall. We hired occupational therapists to provide additional speech and occupational therapy so students with disabilities could be included in the general education setting. We hired three special education teachers and three special education administrators so we could fully serve our students with disabilities.

15.    I am aware of the anti-DEI provisions of HB2, which became effective on July 1, 2025. These provisions at RSA 21-I:112-116 and RSA 186:71-77 seek to prohibit the implementation, promotion, or engagement in "initiatives, programs, training, or policies" in public entities and public schools that are related to "diversity, equity, or inclusion" (or "DEI"). *See* RSA 21-I:113-14; RSA 186:72-73. In addition to its anti-DEI prohibitions, HB2 requires public schools to report any contracts that include DEI provisions to NHDOE. This report shall include contract descriptions, the specific-DEI provisions, and the total obligation of each contract. RSA 186:75, II. Public schools must "sign" and "certify" their report by "[n]o later than September 30, 2025." *See* RSA 186:75, II.

16.    In HB2, DEI is defined as "any program, policy, training, or initiative that classifies individuals based on a characteristic identified under RSA 354-A:1"—namely, age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion or national origin—"for the purpose of achieving demographic outcomes, rather than treating individuals equally under the law." *See* RSA 21-I:112, II; RSA 186:71, I. "Classif[ying] and "achieving demographic outcomes" are undefined under HB2. "Programs" and "initiatives" also are undefined terms in HB2, but seem to include "programs of study" which capture curricular instruction. "Promote" too is not defined.

17.     HB2 also seeks to label and ban certain undefined concepts like "implicit bias training," "critical race theory," and "DEI assessments" as "DEI-related." *See* RSA 21-I:113; RSA 186:72.

18.     The penalties imposed on districts like mine for a violation of HB2's anti-DEI provisions are significant, including for violations that are "unknowing."  If NHDOE believes that my district has violated any part of HB2's anti-DEI provisions, "either knowingly *or unknowingly*," NHDOE "*shall* immediately halt all sources of public funding to that public school, until such time as the school comes into compliance with all sections of this subdivision."  *See* RSA 187:77, I (emphasis added).  Further, NHDOE "*shall* notify the state treasurer if a public school is not in compliance with this subdivision, at which time the treasurer shall halt all forms of public funding to the school until the commissioner has certified the school [has] come into compliance with this subdivision."  *See* RSA 187:77, II (emphasis added).   In other words, for any violation—whether knowing or not—my district *shall* lose "all sources of public funding to that public school."   This includes the $4,182 per pupil base adequacy aid amount and other per pupil differentiated aid amounts (including for students who receive free or reduced meals, who are English language learners, and who receive special education services) that the state provides to school districts under RSA 198:40-a, II.  This presumably would also include federal "public funding."

19.     I am also aware that NHDOE has begun enforcing HB2's anti-DEI provisions and has not disavowed its enforcement as to my district or other districts.  On July 11, 2025, NHDOE wrote to all school districts, including mine, informing them that "each public school (as defined by RSA 186:71, II) must review all program, policy, training, or initiative to identify DEI-related provisions" and certify compliance by September 5, 2025.  NHDOE's certification form includes

language where the district must certify compliance "*under the pains and penalties of perjury* to the best of my knowledge and belief, that all of the information contained in this document is true, accurate and complete." *Id.* (emphasis added).  Thus, districts like mine must swear compliance "under the pains and penalties of perjury" with a law that can be violated "unknowingly."  This perjury language also raises the prospect of criminal liability under RSA 641:1 if a district like mine incorrectly believes that it has not implemented, promoted, or engaged in any DEI-related initiatives, training, assessments, or policies.

20.     NHDOE's July 11, 2025 letter to school districts provides no guidance as to what HB2's anti-DEI provisions mean beyond reciting the provisions of the law.

## Instruction at Dover School District

21.     Dover School District uses competency-based education, a system that ensures all students reach mastery of the content and skills at their own pace. Students have both voice and choice in creating their own pathways for learning. Competency-based learning prioritizes practical and authentic application and assessment.

22.     Instruction follows a Depth of Knowledge framework that considers how deeply students must know, understand, and be aware of what they are learning in order to attain and explain answers, outcomes, results and solutions.  It teaches students to transfer knowledge to other academic and real-world settings. At level one, students initially learn to recall and reproduce facts, including tasks to copy, compute, define, or recognize facts.  Level two focuses on developing students' skills and concepts and includes tasks like comparing, organizing, summarizing, predicting, and estimating. At level three, students engage in strategic thinking, which requires them to use evidence to make and justify their choices, such as solving non-routine problems, designing and conducting experiments, or analyzing characteristics of a genre.  Level four requires

the most complex cognitive effort, extended thinking. Students synthesize information from multiple sources or transfer knowledge from one domain to solve problems in another.

23.     We strive for all students to reach the highest levels of thinking through instruction, in a way that is developmentally appropriate, because that is where students develop the skills necessary to thrive in the world and higher education.

24.     Dover School District's best practices include the use of a variety of instructional strategies to meet the needs of diverse learners and the establishment of specific achievement goals, including resources to reduce achievement gaps.

### Principles of Diversity, Equity, and Inclusion at Dover School District

25.     Dover School District does not promote discrimination of any kind.  Discrimination conflicts with our values and approach to learning, and is prohibited by federal and state law.

26.     Dover School District provides relevant and engaging learning experiences and curricula to each student, which could violate HB2's anti-DEI provisions where such individualized instruction is for the purpose of "achieving demographic outcomes" and classifies students based on the groups listed in RSA 354-A:1.  The District celebrates the diversity of our student body, pursues equity to provide an individualized education, and creates inclusive learning environments. This commitment is required by the City of Dover school board and the State of New Hampshire. According to the Educational Equity Policy ACB of the Dover School District: "The ultimate goal of the Dover School District's educational system is to assure that each and every student, regardless of background, has access to relevant and engaging learning experiences and curricula that they will need in order to thrive today and into the future. This foundation will allow our students to become dynamic global citizens as they adapt to a rapidly changing world."

27.    Dover School District submits proposed curriculum to the school board for approval. One of the criteria considered by the school board is whether the curriculum is accessible, including whether it "contains appropriate content that is relevant to the diverse abilities and needs of the students" and whether it is "accessible to diverse students. Materials are available to support all learning needs." (attached as *Exhibit A*).

28.    Dover School District builds teacher capacity by sharing classroom practices and pedagogy on education and racial equity.  It supports the development of administrators' knowledge and skills. The District also coaches teachers on educational equity.

29.    It is incredibly important to our student body that we preempt discrimination in the educational environment. Our community is comprised of:

- Students with IEP's 16%

- Students with 504 Plans 8%

- Students who are BIPOC 8%

- Students who are Hispanic 6%

- Students who are English Language Learners  4%___.

30.    The District designed a plan to embrace educational equity as ensuring just outcomes for each student, raising marginalized voices, and challenging the imbalance of power and privilege.  The equity plan outlined five goals:

- Increase the equity literacy of teachers, administrators, and staff of the Dover School District.

- Improve the school culture in all schools to be inclusive, safe, and welcoming for all students, staff, and families.

- Ensure equitable achievement of all students through effective communication, instruction, and assessment practices.

- Expand family and community engagement in Dover Schools, especially families that have not been historically engaged.

- Recruit, retain, and promote a diverse mix of educators who are representative of the growing diversity in our schools and communities.

31.     Dover School District provides training to help staff understand equity.   For example, the District focused its opening day activities on equity and inclusion in 2023, including trainings by NH Outright, on support for LGBTQ+ students, Indigenous NH, and others.

32.     On April 10, 2025, Dover School District hosted its annual celebration of learning and diversity event for the entire K-12 community. Students, families, and community organizations were invited to share aspects of their culture or language through books, poetry, mt, clothing or traditional dress, dance, music, games, or food.

33.     For four consecutive years, Dover High School has been recognized by the Special Olympics New Hampshire with a Certificate of Inclusion as part of their Unified Champion Schools program.  The recognition affirmed Dover High School's commitment to students with and without intellectual disabilities.

34.     The Frances G. Hopkins School at Home Street collaborated with Northeast Passage to introduce adaptive sports opportunities. Students learned to use wheelchairs and engaged in inclusive play together. They learned about the Special Olympics and other opportunities for people of all abilities to play together.  Under HB2, these could be viewed as programs designed to "achieve" a "demographic outcome" to ensure (i) that students with disabilities are treated fairly, and (ii) that students without disabilities treat those with disabilities with the respect they deserve.

35.     Students at the middle and high schools in Dover School District have created groups to support each other.  For example, Dover High School has a Gender, Sexuality Alliance,

and the elementary school has a social justice group. All student groups are initiated by students, supervised by an adult, and open for any student to join. These groups are part of a large number of student-led affinity clubs and organizations, including the Cyber Patriot Club, Best Buddies, Chess, Fellowship of Christian Athletes, STEM and Stock Market Analysis.

**Impact of HB2's Anti-DEI Provisions on Dover School District**

36.     Dover School District discusses race, diversity, equity, and inclusion in ways that are appropriate for students' age and understanding.  HB2's vague ban on, for example, "critical race theory" and "any program, policy, training, or initiative that classifies individuals based on a characteristic identified under RSA 354-A:1"—namely, age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion or national origin—"for the purpose of achieving demographic outcomes, rather than treating individuals equally under the law" makes me question whether NHDOE and others could view the District's efforts to create relevant and engaging learning environments with well-rounded teachers and staff as violating HB2.  HB2 does not define "critical race theory," nor does HB2 offer specific guidance beyond its vague terms as to precisely what is (or is not) legal.

37.     HB2 limits instruction at every level. It has a chilling effect on teachers as they push students beyond rote memorization towards application of knowledge to novel situations. I cannot provide guidance to Dover School District staff about what NHDOE might view as violating HB2 given its vague terms.  Like with the federal government's February 14, 2025 Dear Colleague that we and others challenged in court, they are concerned because they don't know what instructional techniques or topics they can continue to use.

- At the lowest level of learning, recall and reproduction, teachers must consider whether the facts introduced could be considered within the bounds of HB2. Topics of "systemic and structural racism" naturally arise within the scope of classroom discussion in various courses, including many of the District's social studies and

English language arts courses. Because some instruction requires discussion of these topics, like the Civil Rights Movement/Jim Crow era and how this historical time period relates to today, I cannot tell what NHDOE would construe as impermissibly constituting "critical race theory" or "implicit bias."

- As students learn skills and concepts in level two, they often ask questions as they are processing information. Teachers have asked me whether they should respond or are required to ignore questions from students related to information taught in class. Grappling with information and developing curiosities is exactly what we want students to do at this stage, but teachers are chilled in their classroom interactions because they do not know if answering questions could violate HB2. For example, indigenous history is very important in the Dover community and taught in the District.  Because we must teach the mistreatment of Indigenous people to be accurate, I am worried that NHDOE could perceive this classroom discussion and instruction as violating HB2, especially insofar as this instruction "achieve[s] demographic outcomes" by helping White students understand this often forgotten history.

- At the higher levels, strategic and extended thinking, the teacher coaches students as they think critically to interpret and contextualize the instructional material. Students make real-time applications of the concepts they learn in class. For example, students in a history course may be tasked with comparing and contrasting the current political climate with the developments that immediately preceded the Civil War.  By encouraging students to analyze the similarities to the present, I fear that a teacher could be accused of making race-based classifications designed to "achieve demographic outcomes."  This level of critical thinking is exactly what we strive to reach with every student but teachers don't know if instruction involving race, diversity, equity, and education at the highest levels of learning is permissible after HB2. Outside of the tasks assigned by teachers, students engaged in higher level learning may ask questions about current events that lead to class discussion that could be considered appropriate after HB2.

- In order to follow HB2, teachers and administrators will likely need to water down the content of their courses and reduce students to the lowest levels of thinking, which does a disservice to students and is inconsistent with the goals of the Dover School District.

- We are tasked with creating engaged global citizens, but HB2 would not allow us to teach students how to engage in civil discourse around topics that NHDOE could interpret as impermissibly addressing race, diversity, equity, or inclusion. In school, students learn to consider various viewpoints and make conclusions based on evidence. This isn't just an academic skill; it is a life skill. Because of HB2, students may lose the ability to analyze material, increase their cognitive effort, and apply skills to novel situations. If so, learning environments will no longer be dynamic spaces for the student engagement that leads to academic success and real-world preparation.

11

- HB2 limits instruction on topics that fit squarely within our curriculum so teachers don't know if they can continue to teach this information. For example, teachers must discuss racism to contextualize the Civil War and the Jim Crow era. Would NHDOE consider this instruction as violating HB2, especially where such topics could be construed as "achieving demographic outcomes" by helping White students understand this history and promoting an environment where Black students have this specific history recognized? Instead of focusing on a developmentally appropriate way to present information, teachers now must question whether they can discuss the topic at all and attempt to predict if their instruction could be considered prohibited.

- Last year, Dover High School invited a Holocaust survivor to speak to students about her experience. The students learned so much from her lived experience; the event was much more impactful than simply reading about the Holocaust. I'm not sure if this event would run afoul of HB2 by "achieving demographic outcomes" through helping non-Jewish students understand this history while helping provide a greater sense of belonging for Jewish students who have this history acknowledged.

38. HB2 is difficult to apply because it conflicts with New Hampshire's requirements for instruction and the responsibilities of educators.

- New Hampshire law requires that we provide an "Adequate Public Education," which includes: "Knowledge of civics and government, economics, geography, history, and Holocaust and genocide education to enable them to participate in the democratic process and to make informed choices as responsible citizens." *See* RSA 193-E:2, IV. It also includes "Grounding in ... literature to enable them to appreciate our cultural heritage and develop lifelong interests and involvement in these areas." *See* RSA 193-E:2, V. Celebration of cultural history is central to Dover School District's approach, but I fear NHDOE would determine it violates HB2.

- Chapter Ed 300 of New Hampshire's Education Rules details the "Minimum Standards for Public School Approval." United States and New Hampshire history, government and civics, economics, personal finance, and world history are courses required for graduation. N.H. Code Admin. R. Ann. Ed 306.23(f)(3)(f). Students are required to learn through multiple perspectives; consider interactions and interdependence through multiple perspectives; and to examine engagement across differences of culture, race, and heritage. N.H. Code Admin. R. Ann. Ed 306.23(f)(3)(f). I worry that NHDOE could perceive the courses and approach to instruction mandated by New Hampshire as a contravention to HB2.

- The State of New Hampshire's Guiding Principles: The Code of Ethics for New Hampshire Educators articulates consideration of diversity, equity, and inclusion

12

principles as part of educators' "responsibility to practice within the educational profession according to the highest ethical standards .... " (attached as *Exhibit B*). Principle I outlines educators' responsibility and commitment to the education profession and colleagues, advising that the educator "communicates with colleagues in a clear, respectful, and culturally sensitive manner." *Id.* Principle II outlines educators' responsibility and commitment to the student, noting that the educator "communicates with students in a clear, respectful, and culturally sensitive manner." *Id.* Principle III describes educators' responsibility and commitment to the school community. *Id.* To fulfill this principle, the educator "commits to equality, equity, and inclusion of colleagues, staff, students, parents or guardians and other members of the school community; [and] respects diversity amongst colleagues, staff; students, parents or guardians, and other members of the school community." *Id.* Simply put, New Hampshire describes consideration of cultural sensitivity, diversity, equity, and inclusion as educators' responsibility, but I fear that NHDOE would now view this approach as illegal DEI under HB2.

39. Our school district maintains a number of policies adopted by our school board to prevent and combat discrimination and bullying in our schools. These policies include: AC - Nondiscrimination / Equal Opportunity, ACAA - Harassment and Sexual Harassment of Students, ACB - Educational Equity, ACE - Procedural Safeguards Nondiscirimination on the Basis of Handicap/Disability,  and JBAB - Transgender and Gender Non-Conforming. Any or all of these policies could be implicated by HB2.

40. Since its July 1, 2025 effective date, HB2 has already created fear and confusion amongst teachers who do not know what or how they may teach. I regularly receive questions from teachers wondering what is allowable.  Teachers have asked if they can still include books about Black or Indigenous history in their classroom library and if so, whether they can read these books aloud to students. I do not know what NHDOE will consider to be DEI.  Previously, prior to the court's injunction of the so-called "Divisive Concepts" ban, teachers expressed concerns about what they were able to instruct with respect to contemporaneous current events and how to respond to student inquiries in real time. I have heard concerns about trade books in the classroom that might include LGBTQ characters. We have prioritized learning materials that include

demographic representations to reflect the student body. HB2 will compound the confusion our educators have previously articulated.

41.    I am very scared that my educators will be subject to complaints and investigations as a result of HB2's vague terms, especially given the hostile climate that currently exists for educators and given how educators do not know what HB2 even means, thereby inhibiting their vital work.    Addressing these complaints will not only be costly and time intensive for my District's educators, but such complaints and investigations will also require this District to incur the expense and time of responding.    For example, we have received complaints about library materials in the past that reflect the diversity of our student body and I am concerned that these complaints will only become more frequent and more difficult to address.

42.    We would be forced to cut affinity groups like the Gender and Sexuality Alliance and Project Dreams (a group to support students of color), we would remove curricular and noncurricular reading materials that might implicate implicit bias or student diversity in the classroom and in the libraries, we would reduce training opportunities for staff, and English Language Learning programs and special education programs are likely at risk too.

43.    HB2 may conflict with or limit accommodations that could be provided to students with disabilities, including the following:

- Providing an American Sign Language interpreter only in settings where a Deaf student is present, and not providing interpreters in classrooms where no student requires them;
- Providing adaptive sports equipment only for students with physical disabilities who require such equipment;
- Modifying the standard grading policy with respect to attendance for a student who misses classes frequently to receive cancer treatment;
- Providing materials in Braille only for those students who are blind or low vision and can read Braille;
- Allowing a student with severe food allergies to collect their school lunch from a location separate from where standard lunches are served, to avoid any possible cross contamination;

- Modifying a general "no pets" policy at a school to permit a student to bring her service dog into the school;
- Providing an ASL interpreter for one Deaf student whose primary language is ASL, and providing a different Deaf student real-time captioning, rather than providing all Deaf students identical auxiliary aids and services.

44.     I fear that the Dover School District will lose teachers because of the confusion and fear caused by HB2.  In my experience, teachers who are new to the field or close to retirement are more inclined to leave the profession when they do not have certainty about what they can or cannot teach in the classroom. Teachers, especially newer teachers, do not feel supported by administration when their questions are not answered with specificity.  The District is already facing teacher shortages in general and special education as well as substitute teachers.

45.     Beyond instruction, HB2 limits Dover School District's ability to continue to create environments that are safe and affirming for students. Our commitment to equity is not abstract, it developed from our students' painful experiences and expressed interests.  Below are some examples:

- Over the course of three years, the Dover School District lost three students from one class to suicide. It was, and is, excruciating. As a result, we prioritize suicide prevention, including activities specifically targeted towards marginalized populations at higher risk to experience suicide. This includes providing services specifically targeted to students with mental disabilities.  We never want to lose another student to suicide and fear that NHDOE could consider the work we do to ensure the livelihood of students as DEI that is designed to "achieve a demographic outcome" for disabled students.

- In 2018, students at Dover High School sang a KKK-themed jingle threatening to "kill all the Blacks" during a lesson on post-Civil War reconstruction era lesson in a U.S. History course. The District addressed the matter with those directly involved. The shocking nature of this incident also began a broader discussion within Dover School District. A group of Black students joined together to create Project D.R.E.A.M. to pursue equity at school, holding conversations with other students and administrators about their experiences and the importance of considering various viewpoints. Project D.R.E.A.M. is a student founded group promoting Diversity & Respect for all students.  Ensuring that all students are welcome at Dover School District requires programs and partnerships that NHDOE may consider DEI.  Dover School District may no longer be able to continue Project

D.R.E.A.M., the student groups that support LGBTQIA students, and student groups committed to social justice or equity if NHDOE considers these activities to be DEI, especially insofar as these groups are intended to achieve the "demographic outcome" of promoting educational outcomes specifically for students of color and students from the LGBTQ community.

46.     We identify students for special education services by identifying them demographically and providing supports that they need. A multi-tiered system of supports (MTSS) is a proactive and preventative framework that integrates data and instruction to maximize student success from a strengths-based perspective. MTSS offers a framework for educators to engage in data-based decision making related to program improvement, high-quality instruction and intervention, and student engagement to ensure positive outcomes for districts, schools, teachers, and students. The MTSS framework is comprised of four essential components: screening, progress monitoring, multi-level prevention system, and data-based decision making.We have thirteen categories of students with disabilities that are intentionally grouped to identify interventions that can help these students achieve better learning outcomes.

47.     Dover School District recently spent $1.4 million from the Elementary and Secondary School Emergency Relief (ESSER III) Fund, allotted through the Coronavirus Aid Relief and Economic Security (CARES) Act, to update its elementary and middle school curriculum to reflect the diversity of its student body. The District considered various options to spend the ESSER III funds, including after school programs, but decided that updating curriculum would be the best investment because students could use the materials for years to come. Further, the federal United States Department of Education's guidance explicitly stated that the funds may be used to support the implementation of curriculum and instructional practices that were "culturally responsive," including for specific student groups (like English learners) impacted by

the pandemic.  (attached as *Exhibit C*, at 41). Therefore, the curriculum materials the District purchased included diversity. These materials provided elementary students with background knowledge that would provide a basis of understanding for instruction in middle and high school. If NHDOE considers this curriculum to be DEI, Dover School District will lose the value of this investment derived from "public funding."  The District does not have money in *its* budget to re-purchase an entire curriculum.

### Impact of the Loss of Funding on Dover School District

48.    On July 11, 2025, NHDOE wrote to all school districts, including mine, informing them that "each public school (as defined by RSA 186:71, II) must review all program, policy, training, or initiative to identify DEI-related provisions" and certify compliance ***by September 5, 2025***.  NHDOE's certification form includes language where the district must certify compliance "*under the pains and penalties of perjury* to the best of my knowledge and belief, that all of the information contained in this document is true, accurate and complete." *Id.*  (emphasis added).  In other words, HB2 and the NHDOE are requiring the District to imminently certify that the District is in compliance with HB2 or risk losing vital "public funding" that the District depends on.

49.    The conditions to state (and possibly federal) "public funding" imposed by HB2 and its certification requirement amount to coercion.  The conditions to public funds imposed by HB2 and its certification requirement coerce districts to comply, without any process, with NHDOE's unilateral view as to what may be prohibited under HB2 because the school district cannot meet its obligations to students without public funding.

50.    Unless HB2's anti-DEI provisions are voided, Dover School District will be irreparably harmed.

51.     The district cannot afford to lose state funding, which it uses for staffing, programs, and resources to meet student educational needs.  We would have to look at all expenses that are not contractual expenses (where funding is already committed) and the programs at risk would include field trips, alcohol and drug counseling, mental health counseling, and other programs that are not required by law. We would be forced to restrict general the curricular materials that we order. In the following year, we would be forced to cut staff.

52.     .  Taxes are capped in Dover because the City Charter includes a cap that restricts growth in our budget based on factors like the Consumer Price Index so we would not be able to bridge the gap in revenue with higher taxes. The same is true for the federal funds the District receives.  The loss of federal funds would be devastating and would be roughly equivalent to losing the entire staffing budget for one of our elementary schools.

53.     Without federal funding, I fear that the quality of education in Dover School District would suffer significantly. The average class size in our elementary schools would likely double, from 16 to 19 students per class to approximately 35 students per class. The District would no longer be able to provide any services that are not legally mandated, including the mental health services that our students need. Students may not be able to go on field trips anymore. Teacher attrition would likely increase. The loss of federal funds would be detrimental to our ability to maintain buildings and programs.

54.     I am proud that Dover School District produces students who are not only academic learners but dynamic global citizens adept at the skills they need to live in a diverse society. HB2, through its vaguely worded prohibitions, threatens the essence of what keeps our learning environment a place where all students and staff are welcomed and succeed.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 7th day of August, 2025.

_/s/ Christine Boston_____
Christine Boston

Exhibit A

# Dover School District

## Course-specific Curriculum Approval Criteria

| **Criteria # 1** | <u>**COMPETENCIES:**</u> | a. Competencies for the course are aligned to the scope and sequence of the courses in the department. | ○Yes ○No |
| | | b. Competencies emphasize application and development of important skills. | ○Yes ○No |
| **Criteria # 2** | <u>**STANDARDS:**</u> | a.   The curriculum aligns with state and national standards. | ○Yes ○No |
| **Criteria # 3** | <u>**INSTRUCTIONAL PLANNING:**</u> | a.   Instructional objectives are stated clearly in terms of standards and learning targets. | ○Yes ○No |
| | | Course includes explicit measurable, transferable learning objectives captured in the UbD template. | ○Yes ○No |
| | | Curriculum reflects evidence-based practices. | |
| | | Focus is on mastery and application of skills and knowledge more than "getting through the curriculum." | |
| | | Students are asked to solve real world and authentic challenges when appropriate. | |
| **Criteria # 4** | <u>**EXPECTATION OF LEARNING:**</u> | a.   The curriculum reflects a learning progression which<br>b.   promotes student self-direction and a strength-based approach. | ○Yes ○No<br>○Yes ○No<br>○Yes ○No |
| **Criteria # 5** | <u>**ACCESSIBILITY:**</u> | a.   The curriculum contains appropriate content that is relevant to the diverse abilities and needs of the students. | ○Yes ○No |
| | | b.   Curriculum materials allow teachers to offer students choice when learning. | ○Yes ○No |
| | | c.   The curriculum is accessible to diverse students. Materials are available to support all learning needs. | ○Yes ○No |
| **Criteria # 6** | <u>**ASSESSMENT:**</u> | a.The curriculum supports valid and varied formative and summative assessments. Assessments are created using Depth of Knowledge 3-4 to assess competency. | ○Yes ○No |
| | | Assessments focus on a variety of tasks that address multiple modalities. | ○Yes ○No |
| | | c. Students are required to apply their understanding, knowledge and skills for summative assessments. | ○Yes ○No |

*Revised 11/14/2022*

Exhibit B

# New Hampshire Code of Ethics for Educational Professionals

**Guiding Principles:  The Code of Ethics for New Hampshire Educators**

**Statement of Purpose**

A New Hampshire educator is entrusted by the state and the public with a responsibility to teach New Hampshire's children the skills and model the values that will make each child a knowledgeable, capable, and engaged member of a democratic society.  The educator accepts the responsibility to practice within the educational profession according to the highest ethical standards and aspires to continuously and consistently make decisions which are, first and foremost, within the best interests of the student.

This "Code of Ethics for New Hampshire Educators" is created as a set of guiding principles which articulate the responsibilities common to all members of the education profession.  The Code of Ethics is designed to provide guidance to educators in the decision making process involving their interactions with students, the school community, colleagues, parents, and the public.  The principles set forth in the Code of Ethics for New Hampshire Educators should be interpreted with reference to the context of the classroom, the learning community, and the educational profession.

This Code of Ethics for Educators is created upon the recognition that teaching is a profession.  As such, there is an acknowledgement within the educational field that The Code of Ethics for New Hampshire Educators is applicable to all aspects of an educator's life.

The Code of Ethics for educators establishes guidance for all school personnel and is not intended to be a basis for civil liability nor is it designed to be a basis for employment action.  The Code of Ethics for New Hampshire Educators establishes guidance for educators.

## Definitions

The term "student" as used in The Code of Ethics for New Hampshire Educators means an individual who is enrolled or participating in any class or program from preschool through grade-12 at any school or education institution. "Student" includes individuals through nine months after graduation.

## Principle I—Responsibility and Commitment to the Education Profession and Colleagues

The educator is committed to a high level of professional ethics at all times. As such, the educator is expected to uphold and adhere to laws, regulations, policies, and procedures which are relevant to the educational profession regardless of personal viewpoints. There is also a recognition that the decisions and actions that the educator makes, whether inside or outside of the school and classroom, may be reflective of ones' professional judgment.

In addition to holding oneself accountable to a high level of professional ethics, the educator encourages colleagues to meet the same high standards and to engage in discussions with appropriate colleagues on ethical matters.

In fulfillment of this principle, the educator:

- Values honesty and established commitments;
- Respects intellectual property and ownership rights when using or sharing materials such as lesson plans, research and assessment, curricula, syllabi, or gradebooks;
- Recognizes the possible impact and ramifications upon a colleague's professional reputation when speaking about a colleague in public and private communications;
- Communicates with colleagues in a clear, respectful, and culturally sensitive manner;
- Considers the ramifications of accepting or offering any gratuity, gift or favor which would influence or appear to influence ones' professional decisions; and
- Considers the ramifications of using institutional or professional privileges for personal or partisan advantage

## Principle II—Responsibility and Commitment to the Student

An educator holds a position which is imbued with public trust. As such, one of the educator's obligations is to ensure that each student is treated with dignity and respect. An educator also establishes and maintains appropriate verbal, physical, emotional and social boundaries with every student.

In fulfillment of this principle, the educator:

- Interacts with students within appropriate settings;
- Communicates with students in a clear, respectful, and culturally sensitive manner;

- Considers the potential implications and possible perception of accepting a gift from a student and considers the potential implications and possible perception of giving a gift to a student;
- Considers the ramifications and possible perceptions of entering into an adult relationship of any kind with a former student, including but not limited to, any potential harm to the former student, public perception, and the possible impact on the professional educator's career;
- Recognizes and respects confidential information acquired in the course of employment regarding individual student safety, education, health, and personal information of students and their families.

Principle III—Responsibility and Commitment to the School Community

The educator models effective relationships and communicates responsibly among members of the school community, while maintaining appropriate professional boundaries.  The educator acts in the best interests of all students by advocating for equitable educational opportunities and endeavoring to present facts with fidelity to the content and without distortion, bias or personal prejudice.

In fulfillment of this principle, the educator:

- Communicates with parents and guardians in a  respectful manner which represents students' best interests;
- Has an awareness and respect of the confidential nature of material received and communicated from a variety of audiences.
- Commits to equality, equity, and inclusion of colleagues, staff, students, parents or guardians and other members of the school community;
- Respects diversity amongst colleagues, staff, students, parents or guardians, and other members of the school community;
- Considers and recognizes the potential ramifications of having a personal relationship with colleagues, staff, students, parents, or guardians and other members of the school community in consideration of the role and the perception of the educator within the classroom and the community; and
- Recognizes that the professional educator often serves multiple roles within the school, as such must consider that the varied relationships have the potential to impair ones' objectivity.

Principle IV - Responsible and ethical use of technology as it relates to students, schools, and other educational professionals

Adopted by the State Board of Education June 13, 2018

The educator considers the impact of consuming, creating, distributing and communicating information through the use of any and all types of technology.

In fulfillment of this principle, the professional educator:

- Utilizes social media responsibly, transparently and primarily for the purpose of teaching and learning;
- Considers the ramifications and  public perception of using social media;
- Exercises prudence to establish and maintain appropriate professional boundaries of time and place in all electronic communications with students.

Adopted by the State Board of Education June 13, 2018

**Commissioner's Task Force on Educator Ethics**

**Membership**

Adam Marcoux (NH AFT)

Barrett Christina (NHSBA)

Carl Ladd (NHSAA)

Dean Cascadden (NHSAA), 2017

Diana Fenton (NHDOE)

Dianna Terrell (PSB), 2016

Doug Ley (NH AFT)

Frank Hoell (CTE), 2017

Gail Adams-Davis (NHASP)

Helen Honorow (NHSBE), 2016

Irv Richardson (NEA NH)

KimberlyYarlott (PSB)

Laura Waiselewski (CTE), 2016

Lorrain Tacconi-Moore (NHSAA)

Michael Perez (NHASP)

Nancy Morse (NEA NH)

Nicole Heimarck (NHDOE)

Phil Littlefield (NHSAA)

Suzanne Canali (CTE)

Virginia Clifford (NHDOE,) 2016

Adopted by the State Board of Education June 13, 2018

# New Hampshire Code of Conduct for Educational Professionals

Readopt with amendment Ed 501.01, effective 3-27-14 (Doc #10558), to read as follows:

Ed 501.01  Purpose.  The rules of this part implement the statutory responsibilities of the New Hampshire board of education to:

(a)  Develop and administer credential standards for educational personnel;

(b)  Develop continuing professional education requirements and prerequisites for the renewal or reinstatement of credential holders;

(c)  Develop and administer a code of conduct for all credential holders and to inform members of the public of the code of conduct applicable to credential holders;

(d)  Specify unprofessional conduct which justifies disciplinary sanctions against credential holders; and

(e)  Provide oversight of adjudicatory proceedings required for discipline of credential holders while providing such with fair hearing practices and rights of appeal.

Readopt with amendment Ed 501.02, effective 3-27-14 (Doc #10558), to read as follows:

Ed 501.02  Definitions.  Except where the context makes another meaning manifest, the following words shall have the meanings indicated when used in this chapter:

(a)  "Administrator" means the administrator of the bureau of credentialing;

(b)  "Authorization" means a document issued by the department giving permission for a person to serve in the role of a licensed educator prior to completing the licensure endorsement requirements for that role, or for a temporary period of time established by the document;

(c)  "Board" means the state board of education created by RSA 21-N:10;

(d)  "Bureau" means the bureau of credentialing, division of program support, department of education;

(e)  "Certificate" means the document issued when a credential holder meets full licensure requirements;

(f)  "Commissioner" means the commissioner, department of education;

(g)  "Credential" means any authorization or license issued by the bureau including, but not limited to, beginning educator license (BEL), experienced educator license (EEL), in process of licensure authorization (IPLA), intern authorization (IA), emergency authorization, statement of eligibility (SOE), paraeducator I & II, school nurse, and master teacher license (MTL);

(h)  "Credential holder" means any individual who holds a credential, as defined in Ed 501.02(g);

(i)  "Denial" means the refusal to grant credential to an applicant;

(j)  "Department" means the New Hampshire department of education;

(k)  "Director" means the director, division of program support;

(l)  "Division" means the division of program support;

(m)  "Educator" means any professional employee of any school district whose position requires certification by the state board pursuant to RSA 189:39.  Administrators, specialists, and teachers are included within the definition of this term;

(n)  "Emergency authorization" means the authorization issued by the bureau to a school district or school administrative unit to employ a non-credentialed educator to fill a vacancy as specified in Ed 504.04;

(o)  "Endorsement" means the specific subject area for which the credential is issued;

(p)  "Intern authorization" means the authorization granted to applicants pursuant to Ed 505.04, and Ed 505.05 to perform educational services while the plans are being implemented;

(q)  "License" means the document issued when a credential holder meets full licensure requirements;

(r)  "Licensure" means the official recognition by the board that an individual has met minimum requirements and is approved to practice in their endorsement area(s);

(s)  "Mentor" means a person who:

   (1)  Is appointed to provide assistance to an applicant for certification pursuant to Ed 505.04 or Ed 505.05; and

   (2)  Meets at least one of the following qualifications:

      a. Is a credential holder with 3 years of experience as an educator in the area of endorsement; or

      b.  Has experience equivalent to the experience requirement under a. above such as, but not limited to, involvement in a collegiate teacher preparation program;

(t)  "Professional conduct" means a set of established professional norms and behaviors as defined in Ed 510.01 through Ed 510.04 which extend beyond the workplace;

(u)  "Reprimand" means is a note to file of a credential holder for his or her conduct, which does not rise to the level of a suspension or revocation of a credential, which can be used in the event of a subsequent investigation;

(v)  "Revocation" means the department has permanently rescinded a credential from credential holder;

(w)  "Statement of eligibility" means a verification issued by the department of education that indicates that an individual has successfully met the entry requirements of an intern authorization for:

(1)  Pathway 4 certification as specified in Ed 505.04; or

(2)  Pathway 5 certification as specified in Ed 505.05;

(x)  "Suspension" means the department has rescinded a credential from credential holder for a specified period of time; and

(y)  "Student" means an individual who is enrolled or participating in any class or program from preschool through grade-12, or any "adult student" as specified in Ed 1102.01(f)(1), at any school or education institution except as otherwise noted in these rules.

Readopt with amendment Ed 502.01, effective 3-27-14 (Doc. #10558), to read as follows:

PART Ed 502  PUBLIC INFORMATION

Ed 502.01  Confidentiality of Credential Holder Certification Records.

(a)  Pursuant to RSA 91-A:5, V, the following limited credential status information shall be available to the general public, upon written or verbal request:

(1)  The name of the credential holder;

(2)  The individual's current credential status, including type of credential, expiration date of credential, and all endorsements;

(3)  The individual's suspension, if applicable, including effective dates of each suspension period, reason for the suspension, and revocation, if applicable; and

(4)  The school, if known or stated, where the credential holder is currently employed.

(b)  The provisions of this section shall not require the release of information related to:

(1)  Informal or formal investigations; or

(2)  Board or hearing officer records from adjudicatory proceedings involving the credential holder when such adjudicatory proceeding is not open to the public in accordance with Ed 200.

(c)  The complete record of a credential holder shall be released by the division upon written request to the following:

(1)  A party in an adjudicatory proceeding when:

a.  The credential holder is a party to the proceeding; and

b.  The credential holder's credential record is relevant to the proceeding;

(2)  A law enforcement agency when the agency is conducting a criminal investigation of the credential holder;

(3)  A certifying agency of another jurisdiction for:

    a.  Purposes of credentialing the credential holder in the other jurisdiction; or

    b.  An investigation of the credential holder by the other jurisdiction, when:

        1.  The credential holder was the subject of a formal investigation under Ed 511; or

        2.  Disciplinary action was taken against the credential holder by the board under Ed 511;

(4)  Board investigators or prosecutors; or

(5)  Persons to whom the credential holder has given a release.

(d)  The bureau shall report:

(1)  Any suspension or revocation to the credential holder's current superintendent of school in N.H. and The National Association of State Directors of Teacher Education and Certification (NASDTEC) educator identification clearing house; and

(2)  Any reprimand to the credential holder's current superintendent of school in N.H.;

(e)  The department shall maintain a list of all credential holders whose credential~~s has~~ *have* been revoked or who are under suspension, and such list shall be published on the department's website.

Readopt with amendment Ed 504.04, effective 1-17-14 (Doc. #10506), to read as follows:

Ed 504.04  <u>Emergency Authorization</u>.

(a)  The superintendent of schools shall request emergency authorization from the bureau, and the emergency authorization shall be granted provided that the requirements of paragraphs (b) through (e) are met. The applicant for the teaching position shall provide the information and documentation required in (c) and (e) below.

(b)  The bureau shall issue an emergency authorization applied for under (a) above if an emergency situation exists as determined by the local school district and the applicant for the teaching position has:

(1)  Paid the applicable application fee, provided in Ed 508.06(c); and

(2)  Filed with the bureau the information and documentation required in (c) and (e).

(c)  An applicant for a teaching position for whom a superintendent is requesting emergency authorization shall provide the following information or documents, unless it is specified below that the information is optional, on or with the form titled "Application for Emergency Authorization":

(1)  Social security number, unless the applicant chooses to have the department supply an alternative number, subject to the provisions of (d) and (e) below;

(2)  Date of birth;

(3)  Name;

(4)  Address;

(5)  Sex, which may be specified at the option of the applicant;

(6)  Telephone number;

(7)  Date of application;

(8)  Educational information, including the following:

    a.  Degree, if any;

    b.  Major;

    c.  State;

    d.  College or university;

    e.  Date degree granted; and

    f.  Transcript for each degree listed;

(9)  Educational employment record for the last 7 years including:

    a.  Dates;

    b.  State;

    c.  School district;

    d.  Position;

    e.  Assignment/subject;

    f.  Grade level;

    g.  Credential held;

    h.  Number of years of any public school experience;

    i.  Number of years of any non-public school experience; and

    j.  Copy of each teaching credential held in New Hampshire , other state, or both;

(10)  Whether the applicant ever held a New Hampshire credential and, if so, the year it expired and the name under which it was issued;

(11)  Whether the applicant has ever been convicted of a felony and, if so, an explanation;

(12)  Whether the applicant has ever had a teaching credential revoked or suspended and, if so, an explanation;

(13)  Whether the applicant has ever surrendered a teaching credential in any other state, and, if so, an explanation;

(14)  Whether the applicant has ever been subject of a finding of professional misconduct in New Hampshire, another state, or territory of the United States, or foreign country and, if so, an explanation; and

(15)  Identification of ethnic origin, which may be specified at the option of the applicant, including one of the following categories:

    a.  American Indian;

    b.  Asian/Pacific;

    c.  African-American/Non-Hispanic;

    d.  White/Non-Hispanic;

    e.  Hispanic;

    f.  Multi-ethnic; and

    g.  Other/do not wish to specify.

(d)  If an applicant provides a social security number under (c)(1) above, the social security number shall be used by the bureau for the purposes of generating data on teacher salaries or such other purposes as authorized by law including but not limited to RSA 161-B:11,VI-a.

(e)  If an applicant chooses to have the department supply an alternative number, the department shall use the teacher number generated by the electronic educator information system and it shall be used as specified in (b).

(f)  An emergency authorization shall be issued to the superintendent of schools for up to one school year and shall not be renewable.

Readopt with amendment and renumber Ed 504.041, effective 1-17-14 (Doc. #10506), as Ed 504.05, and renumber the remaining sections in Part Ed 504 so that, for example, Ed 504.05 becomes Ed 504.06, to read as follows:

Ed 504.05  In Process of Licensure Authorization (IPLA).

(a)  The applicant who is in process of licensure authorization (IPLA) shall sign the application acknowledging that all information contained on the application is true, accurate and complete to the best of the applicant's knowledge.

(b)  If a superintendent files an IPLA with the bureau, the bureau shall approve such filing, if the bureau finds that the applicant who is the subject of the IPLA:

(1)  Is in the process of certification;

(2)  Has submitted a completed application for certification; and

(3)  Has paid any applicable fees.

(c)  An approved IPLA shall be issued to the superintendent of schools for up to one school year and shall not be renewable.

Adopt Ed 510.01 – 510.04, cited and to read as follows:

PART Ed 510 CODE OF CONDUCT

Ed 510.01  <u>Principle 1—Responsibility to the Education Profession and Educational Professionals</u>.

(a)  In fulfilling responsibilities to the education profession and educational professionals, a credential holder shall exemplify honesty and integrity in the course of professional practice.

(b)  Unprofessional conduct shall include, but not be limited to:

(1) Discrimination against a fellow professional as specified in RSA 354-A:1;

(2) Failure to self-report within 5 business days if he or she has been arrested for any violation of offenses enumerated in RSA 189:13-a, V;

(3) Falsifying, fraudulently altering, or deliberately misrepresenting professional qualifications, including, but not limited to, degrees, academic awards, and related employment history when applying for a credential;

(4) Unlawful possession of a drug;

(5) Possessing, using, or being under the influence of alcohol or drugs not prescribed for the use of the credential holder when on school premises or at a school sponsored activity where students are present or may reasonably be expected to be present;

(6) Failure to notify the state at the time of application for credential of past criminal convictions, or of revocations or suspensions of a credential or license by New Hampshire or any other jurisdiction; and

(7) Falsifying or deliberately misrepresenting information submitted to the department in the course of an official inquiry, investigation, or both.

Ed 510.02  <u>Principle 2—Responsibility to Students</u>.

(a)  In fulfilling responsibilities to students a credential holder shall maintain a professional relationship with all students, both inside and outside the educational setting, and make reasonable efforts to protect students from conditions which are harmful to their health and safety.

(b)  Unprofessional conduct shall include, but not be limited to:

(1) Discrimination against a student as specified in RSA 354-A:1;

(2) Failure to provide appropriate supervision of students, pursuant to local school district policy adopted as specified in Ed 306.04, at school or school-sponsored activities or the failure to ensure the safety and well-being of students;

(3) Furnishing alcohol or illegal or unauthorized drugs to any students, or allowing or encouraging a student to consume alcohol or illegal or unauthorized drugs;

(4) Committing any of the following acts to any minor, or any student or prior student up to 10 months after the student's graduation, departure, or departure in cases as specified in Ed 1102.01(f)(1), including, but not limited to:

    a. Abuse, including, but not limited to physical and emotional abuse;

    b. Cruelty or any act of endangerment;

    c. Any sexual act with or from any student; and

    d. Harassment as defined by state or federal law or regulations;

(5) Soliciting or encouraging participation in a romantic or sexual relationship, whether written, verbal, or physical, with a student the credential holder knows or should know is a student or prior student up to 10 months after the student's graduation, departure, or departure in cases as specified in Ed 1102.01(f)(1); and

(6) Soliciting a student, or a former student up to 10 months after the student's graduation, departure, or departure in cases as specified in Ed 1102.01(f)(1), to engage in any illegal activity.

Ed 510.03    Principle 3—Responsibility to the School Community.

(a) In fulfilling the responsibilities to the school community a credential holder shall communicate responsibly among members of the school community, while maintaining appropriate professional boundaries.

(b) Unprofessional conduct shall include, but not be limited to:

(1) Discrimination against a parent or guardian of a student or other member of the community who is on the school property as specified in RSA 354-A:1;

(2) Accepting or soliciting gratuities, gifts, or favors for personal use or gain where there might be an actual or appearance of a conflict of interest. Gifts of a small amount shall not be deemed a conflict of interest;

(3) Misuse of funds intended for use by the school, to include funds which are collected from parents and students; and

(4) Intentionally altering or misrepresenting student assessments, assessment results, or official school records.

Ed 510.04    Principle 4—Responsible and Ethical Use of Technology

(a)  In fulfilling the responsibilities and ethical use of technology a credential holder shall consider the impact of consuming, creating, distributing, and communicating information through the use of any and all types of technology.

(b)  Unprofessional conduct shall include, but not be limited to:

(1)  Engaging in any activities as specified in Ed 510.02(b)(4)-(7) via electronic media with a student or former student up to 10 months after the student's graduation, departure, or departure as specified in Ed 1102.01(f)(1); and

(2)  Engaging in inappropriate communication with a student, or former student up to 10 months after the student's graduation, departure, or departure as specified in Ed 1102.01(f)(1) via electronic media.

(c)  For the purposes of this section, inappropriate communication shall be determined by considering:

(1)  The intent, timing, subject matter, and amount of communication; and

(2)  Whether:

a.  The communication made was covert in nature;

b.  The communication could reasonably be interpreted as solicitous, sexually explicit, or romantic in nature; and

c.  The communication involved discussion(s) of the physical or sexual attractiveness or the sexual activities or fantasies of either the credential holder or the student.

Readopt with amendment and renumber Ed 510.01, effective 2-23-12 (Doc #10089), as Ed 510.05 to read as follows:

Ed 510.05  Duty to Report.

(a)  Any credential holder shall report any suspected violation of the code of conduct following the school, school district, or SAU reporting procedures.

(b)  Each principal shall report to the superintendent of the school district or SAU where the principal is employed, the chief executive officer of a chartered public school or public academy, or the headmaster of a nonpublic school, if the principal has been notified of, or is personally aware that a credential holder has violated any of the rules of professional conduct as enumerated in Ed 510, which occurred on or off duty.

(c)  The superintendent, chief executive officer of a chartered public school or public academy, or headmaster of a nonpublic school, shall report any of the following to the office of credentialing:.

(1)  When a superintendent has knowledge that an credential holder, as defined in Ed 501.02(m), has been arrested and charged with an offense enumerated in RSA 189:13-a, V; and

(2)  When a superintendent has knowledge that a credential holder has violated the code of conduct as specified in Ed 510.01 through Ed 510.04.

(d)  If a credential holder suspects that a superintendent has violated the code of conduct, as specified in Ed 510.01 through Ed 510.04, or if a credential holder has made a report and believes the local reporting procedures have not been followed, the reporting credential holder shall notify the department directly.

(e)  Credential holders who have reason to suspect that a student has been, or is being, abused or neglected, shall report the same to:

(1)  His or her immediate supervisor, superintendent, or both; and

(2)  The department of health and human services, pursuant to RSA 169-C:29.

(f)  If the department has reason to suspect that any violation of the code of conduct enumerated in Ed 510.01 through Ed 510.04 was known by a credential holder and not reported, the department shall undertake an  investigation, as enumerated in Ed 511.01, against that credential holder as required by Ed 510.05(a), (b), or (c).

(g)  The office of credentialing shall open a case, as enumerated in Ed 511.01, in response to a report made pursuant to Ed 510.05(a), (b), (c), or (d) above.

Adopt Ed 511.01, cited and to read as follows:

PART Ed 511 INVESTIGATIONS AND DISCIPLINARY PROCEEDINGS

Ed 511.01    Complaints, Cases and Investigations.

(a)  A case shall be opened when a complaint of possible misconduct against a credential holder has come to the attention of the department either through direct reporting or other means.

(b)  After an initial review, if the department determines that a possible violation of the code of conduct, as specified in Ed 510.01 through 510.04, has occurred, an investigation shall be opened.

(c)  Investigations into allegations of unprofessional conduct, as specified in Ed 510.01 to Ed 510.04, shall not constitute a disciplinary hearing and shall not constitute an finding of misconduct against a credential holder.

(d)  Credential holders shall be notified in writing, via certified mail, that an investigation has been opened and the nature of the investigation and the status of the credential holder's credential pending the investigation.

(e) The credential holder's current superintendent shall be notified in writing by the department that an investigation has been opened, unless the notification compromises, or has the appearance of compromising, the investigation.

(f) Investigations shall be handled by the department.

(g) The department shall make every attempt to interview all people, including the credential holder, who might have information which might be relevant to the investigation.

(h) Investigations, including those based upon allegations in a complaint, shall be conducted on an ex parte basis.

(i) The department shall make every attempt to obtain any and all documentation which might be relevant to the investigation.

(j) Once the investigation is complete, the following procedures shall apply:

>   (1) The department shall create a report which documents the results of the investigation;

>   (2) If the investigation finds a credential holder in violation of a rule of the code of conduct as specified in Ed 510.01 through Ed 510.04, the department shall propose a form of discipline as follows:

>   >   a. Suspension;

>   >   b. Revocation; or

>   >   c. Reprimand; and

>   (3) The department shall determine the sanctions to be imposed after considering the presence of aggravating or mitigating circumstances as specified in Ed 511.01(j)(4)-(5);

>   (4) The following shall be considered aggravating circumstances:

>   >   a. The seriousness of the offense;

>   >   b. The credential holder's prior disciplinary record;

>   >   c. The credential holder's lack of willingness to cooperate with the department during an investigation;

>   >   d. Potential harm to public health and safety; and

>   >   e. The purpose of the rule violated;

>   (5) The following shall be considered mitigating circumstances:

>   >   a. Absence of a prior disciplinary record;

b.  The credential holder's willingness to cooperate with the department during an investigation;

c.  The credential holder's acknowledgment of his or her wrongdoing; and

e.  The purpose of the rule or statute violated;

(6)  The credential holder shall be notified in writing of any proposed discipline;

(7)  If no disciplinary sanction is proposed, the department shall notify the credential holder in writing that the investigation is closed.

(k)  Investigatory reports and all information gathered during the course of an investigation shall be confidential, with the following exceptions:

(1) The report shall be made available to the parties in any adjudicatory proceedings resulting therefrom; and

(2)  If further disciplinary proceedings are to be conducted as a result of the investigation, the department shall provide information gathered in the disciplinary investigation to the following:

a.  A law enforcement agency when the agency is conducting a criminal investigation of the credential holder;

b.  A certifying agency of another jurisdiction for:

1.  Purposes of certification of the credential holder in the other jurisdiction; or

2. An investigation of the credential holder by the other jurisdiction when:

(i)  The credential holder was the subject of a formal investigation under Ed 51θ1; or

(ii)  Disciplinary action was taken against the credential holder by the board pursuant to Ed 51θ1;

c.  Other states' licensing board investigators or prosecutors; and

d.  Expert witnesses or assistants retained by a prosecutor or investigator in the same related disciplinary matters.

Readopt with amendment and renumber Ed 510.03, effective 2-23-12 (Doc #10089), as Ed 511.02 to read as follows:

Ed 511.02 <u>Reprimand, Suspension, or Revocation</u>.

(a)  If the department determines that a credential holder has violated the code of conduct as specified in Ed 510.01 through Ed 510.04, and the credential holder agrees to the proposed disciplinary finding, the credential holder shall agree to a reprimand, suspension, or revocation.

(b)  All reprimands, suspensions, or revocations shall be documented in writing, and shall set out the terms of the discipline.  The credential holder shall receive a copy of the discipline in writing and a copy shall be placed in the credential holder's electronic credentialing file at the department once it is signed by all required parties, to include the credential holder.

(c)  Any credential holder whose credential is revoked or who voluntarily agrees to a revocation shall be prohibited from applying or reapplying for any other credential issued by the New Hampshire state board of education.

Readopt with amendment and renumber Ed 510.02, effective 2-23-12 (Doc #10089), as Ed 511.03 to read as follows:

Ed 511.03  <u>Disciplinary Hearings</u>.

(a)  If a credential holder does not agree with the proposed disciplinary finding as a result of an investigation as specified in Ed 511.01, a credential holder may request an adjudicatory hearing which shall commence pursuant to Ed 200 after the following:

(1)  Completion of an informal or formal investigation; and

(2)  Filing of a written report and recommendation pursuant to Ed 511.01(h).

(b)  The provisions of Ed 200 shall apply to all disciplinary hearings and ***such hearings*** shall commence not more than 15 days after the disciplinary finding.

Readopt with amendment and renumber Ed 510.04, effective 2-23-12 (Doc #10089), as Ed 511.04 to read as follows:

Ed 511.0~~4~~ <u>Status of a Credential Pending Completion of Disciplinary Proceeding</u>.

(a)  When the department receives information indicating that a credential holder has been arrested for one of the offenses enumerated in RSA 189:13-a, V, the credential holder's credential and any and all endorsements shall be immediately suspended pursuant to RSA 541-A:30, III.

(b)  The department shall notify the credential holder and the employing school district that the credential holder's credential has been suspended pending an investigation by the department.

(c)  In accordance with RSA 541-A:30, III, unless waived, an adjudicatory hearing shall commence within 10 working days after the suspension of the credential. Such hearings shall be governed by the process set forth in Ed 200.

Readopt with amendment and renumber Ed 511.03, effective 2-23-12 (Doc #10089), as Ed 511.05 to read as follows:

Ed 511.05 <u>Grounds for Reinstatement After Suspension</u>.

(a)  A credential which has been suspended shall be reinstated for one of the following reasons:

(1)  The period of the suspension has passed and any and all terms and conditions regarding possible reinstatement have been satisfied; and

(2)  A credential holder whose credential has been suspended demonstrates by clear and convincing evidence that he or she has corrected the deficiencies or conduct which led to the original suspension.

(b)  Upon reinstatement, the department may issue a credential which is limited in time, level, or scope or subject to other terms as the department deems necessary to include a reinstatement fee. If the credential is so limited, then the credential holder may appeal that decision using the process specified in Ed 200.

Change the Part heading and renumber Part Ed 511 as Part Ed 512 to read as follows:

PART Ed 512  DENIAL OF CERTIFICATION

Readopt with amendment and renumber Ed 508.07, effective 6-15-13 (Doc. #10362) as Ed 512.01, and renumber the existing Ed 512 and Ed 513 as Ed 513 and Ed 514, so that Ed 512.01 reads as follows:

Ed 512.01  <u>Denial of Credential</u>.

(a)  A credential application shall be denied by the board based on the following grounds:

(1)  Failure to meet the conditions for issuance of the license, endorsement, renewal, or reinstatement;

(2) The applicant has been charged pending disposition for, or convicted of any violation or attempted violation of any of the crimes enumerated in RSA 189:13-a, or has been convicted of any felony in any other state, territory, or country;

(4) The applicant is under investigation for, under suspension for, or has been revoked for a violation of the principles of professional conduct enumerated in Ed 510.01 through Ed 510.04; or

(5) The applicant is under investigation, under suspension, or has been revoked in any other state, jurisdiction, territory, or country.

(b)  An applicant aggrieved by the decision of the bureau to deny an application may file a petition for reconsideration along with supporting documentation to the director within 20 days after receipt of the denial decision.  If the petition for reconsideration is denied, the applicant may appeal the director's decision pursuant to RSA 21-N:11, III, and Ed 200.

**APPENDIX I**

| RULE | STATUTE |
|---|---|
| Ed 501 | RSA 186:8, II; RSA 189:39 |
| Ed 502 | RSA 186:11, X(a) |
| Ed 510 | RSA 186:11, X(a) |
| Ed 511 | RSA 186:11, X(a); RSA 189:14-a, (b) and (c) |
| Ed 512 | RSA 186:11, X(a) |

Exhibit C

**Frequently Asked Questions**

**Elementary and Secondary School Emergency Relief Programs
Governor's Emergency Education Relief Programs**



**U.S. Department of Education
Washington, D.C. 20202**

**December 7, 2022 Update\***

\*Update of May 2021 ESSER and GEER Use of Funds FAQs

# Frequently Asked Questions
# Elementary and Secondary School Emergency Relief (ESSER) Programs
# Governor's Emergency Education Relief (GEER) Programs

**Purpose of the Document**

The purpose of this document is to answer Frequently Asked Questions about how funding under the Elementary and Secondary School Emergency Relief (ESSER) Fund, including the American Rescue Plan ESSER (ARP ESSER) program, and the Governor's Emergency Education Relief (GEER) Fund may be used in response to the impact of the coronavirus disease 2019 (COVID-19) pandemic on students in pre-K–12 education.

Under ESSER, established in the Coronavirus Aid, Relief, and Economic Security (CARES) Act, Pub. L. No. 116-136 (March 27, 2020), and further funded under the Coronavirus Response and Relief Supplemental Appropriations (CRRSA) Act, 2021, Pub. L. No. 116-260 (December 27, 2020) and the American Rescue Plan (ARP) Act of 2021, Pub. L. No. 117-2 (March 11, 2021), the U.S. Department of Education (Department) awarded grants to State educational agencies (SEAs) for the purpose of providing local educational agencies (LEAs) that receive funds under part A of title I of the Elementary and Secondary Education Act of 1965 (ESEA), including charter schools that are LEAs, with emergency relief funds to address the impact the COVID-19 pandemic has had, and continues to have, on elementary and secondary schools across the Nation.

Under GEER, established in the CARES Act and further funded under the CRRSA Act, the Department awarded grants to Governors for the purpose of providing LEAs, institutions of higher education (IHEs), and other education-related entities with emergency support as a result of the COVID-19 pandemic. GEER funds for an LEA are intended to support its ability to continue to provide educational services to its students and to support the ongoing functionality of the LEA.

Other than statutory and regulatory requirements included in the document, such as those pursuant to the authorizing statute and other applicable laws and regulations, the contents of this document do not have the force and effect of law and are not meant to bind the public in any way. This document is intended only to provide clarity to the public regarding existing requirements under the law or agency policies. In addition, it does not create or confer any rights for or on any person.

This document contains examples of resources that are provided for the user's convenience. The inclusion of these resources is not intended to reflect their importance, nor is it intended to endorse any views expressed, or products or services offered, by these entities. These resources may include materials that contain the views and recommendations of various subject-matter experts as well as hypertext links, contact addresses and websites to information created and maintained by other public and private organizations. The opinions expressed in any of these materials do not necessarily reflect the positions or policies of the Department. The Department does not control or guarantee the accuracy, relevance, timeliness, or completeness of any outside information included in the materials that may be provided by these resources.

The Department may provide additional or updated information as necessary on the Department's websites:

- ARP ESSER: https://oese.ed.gov/offices/american-rescue-plan/american-rescue-plan-elementary-and-secondary-school-emergency-relief/
- CARES Act and CRRSA Act ESSER: https://oese.ed.gov/offices/education-stabilization-fund/elementary-secondary-school-emergency-relief-fund/
- CARES Act and CRRSA Act GEER: https://oese.ed.gov/offices/education-stabilization-fund/governors-emergency-education-relief-fund/

If you have questions that are not answered in this document, please e-mail ESSERF@ed.gov for questions related to ESSER or GEERF@ed.gov for questions related to GEER.

# Table of Contents

Table of Contents ............................................................................................................................4

Introduction ..................................................................................................................................10

Overview of ESSER and GEER Funds ........................................................................................10

A-1. What funds are covered in these FAQs? ...........................................................................11

*ESSER Formula Funds to LEAs* ............................................................................................12

A-2. How does an SEA allocate ESSER formula funds to LEAs? ...........................................12

A-3. How may an LEA use ESSER funds? ...............................................................................12

A-4. Does ARP ESSER include any new provisions for LEAs that ESSER I and ESSER II do not? ... 15

A-4.a. Are LEAs required to periodically review their ARP ESSER safe return to in-person instruction and continuity of services plans? (*New December 7, 2022*) ...................17

A-4.b. In meeting the ARP ESSER requirement to use at least 20 percent of its ARP ESSER allocation to address the academic impact of lost instructional time and address the disproportionate impact of COVID-19 on underserved populations, may an LEA include the costs associated with implementing an evidence-based strategy that advances this purpose? (*New December 7, 2022*)................17

A-5. Is there a deadline by which an SEA must award ESSER funds to LEAs?...................................17

A-6. May an SEA or a State legislature limit an LEA's use of ESSER formula funds? .......................17

A-7. May an SEA or a State legislature limit how long an LEA has to access or spend its ESSER formula funds? ..............................................................................................................18

*ESSER Funds Reserved at the SEA Level* ...........................................................................18

A-8. May an SEA reserve any ESSER I and II funds for the SEA's use? .............................................18

A-9. May an SEA reserve any ARP ESSER funds for the SEA's use?................................................18

A-10. What does it mean for a program to be evidence-based? .............................................................19

A-11. Must an SEA engage in meaningful consultation before determining how to use the ARP ESSER funds it reserves?..............................................................................................19

A-12. How may an SEA use its ESSER SEA Reserve funds? .............................................................20

*GEER* ...................................................................................................................................20

A-13. Which entities may receive emergency grants from a Governor through the GEER Fund? ........20

A-14. Is a Governor required to award GEER funds to each category of eligible entities (i.e., LEAs, IHEs, and education-related entities)? ....................................................................20

A-15. How may an LEA use GEER funds?..........................................................................................21

*Other Provisions* ................................................................................................................21

A-16. Do the requirements in the Uniform Guidance apply to ESSER and GEER Funds? ..................21

A-17. May ESSER and GEER funds be used in combination with ("braided with") other funding? ....22

A-18. Is there a "supplement not supplant" requirement for ESSER and GEER funds?......................22

A-19. Do CARES Act funds need to be obligated prior to obligating CRRSA Act and ARP Act funds? ..................................................................................................................................23

A-20. Do the Buy American Act provisions apply to ESSER and GEER?.............................................23

A-21. May ESSER and GEER funds be used to improve cybersecurity? ...............................................23

A-22. May an SEA or LEA use ESSER and GEER funds to develop or implement an innovative approach to providing instruction to accelerate learning and mitigate the effects of lost instructional time for those students most impacted by the COVID-19 pandemic?....................................................24

A-23. Which disposition rules must States and LEAs follow for equipment and supplies purchased with ESSER and GEER funds? (*New December 7, 2022*)................................................................................24

A-24. May an LEA or another subrecipient award subgrants with ESSER and GEER funds? (*New December 7, 2022*)................................................................................................................................25

B. Reopening Schools Safely and Promoting the Health and Safety of Students, Staff, and the School Community ..............................................................................................................................................26

B-1. What resources are available to support the safe reopening and sustained operations of schools? 26

B-2. Is COVID-19 testing for students and LEA staff an allowable use of ESSER and GEER funds? . 26

B-3. May ESSER and GEER funds be used to provide COVID-19 vaccinations to LEA teachers, staff, and eligible students?.................................................................................................................................27

B-4. May ESSER and GEER funds be used for personal protective equipment (PPE), cleaning and sanitizing materials, and related supplies necessary to maintain school operations during and after the COVID-19 pandemic? ..............................................................................................................................27

B-5. How might an LEA use ESSER and GEER funds to engage stakeholders to build confidence in an LEA's plan for safe return to in-person instruction and continuity of services? ....................................27

B-6. May ESSER and GEER funds be used for construction? (*Updated December 7, 2022*) ...............28

B-6.a. May a State determine the process for granting prior approval to an LEA to use ESSER or GEER funds for capital expenditures? (*New December 7, 2022*)............................................................30

B-6.b. What information does the Department need in order to consider a State's prior approval request for a State's capital expenditures? (*New December 7, 2022*) ...................................................................31

B-6.c. Is a grantee/subgrantee required to complete an environmental impact assessment under 34 CFR § 75.601 and the National Environmental Policy Act (NEPA) for a construction, renovation, or real property project supported by ESSER or GEER funds? (*New December 7, 2022*)................................32

B-6.d. What are grantee and subgrantee responsibilities under the requirements in section 106 of the National Historic Preservation Act? (*New December 7, 2022*) .............................................................32

B-6.e. What are the Federal reporting requirements associated with using ESSER and GEER funds to purchase land, construct a building, or make improvements to a building? (*New December 7, 2022*) ..33

B-7. May ESSER and GEER funds be used for renovation, including for such projects as making improvements to a school facility to improve indoor air quality (such as heating, ventilation, and air conditioning (HVAC) systems), and projects that would promote social distancing and safe in-person instruction? (*Updated December 7, 2022*) ...............................................................................................33

B-8. May an LEA use ESSER and GEER funds to purchase trailers or modular units?........................34

B-9. May an LEA use ESSER and GEER funds to renovate, remodel, or construct athletic facilities, such as swimming pools, playing fields, or sports stadiums? (*New December 7, 2022*)......................35

B-10. May ESSER and GEER funds be used to mitigate flood, tornado, and other natural disaster-related damage, including damage to buildings/infrastructure, technology, and equipment, to ensure that schools can open and safely remain open? (*New December 7, 2022*) ............................................35

B-11. May ESSER and GEER funds be used to support costs for utilities or gasoline? (*New December 7, 2022*) ........................................................................................................................... 36

B-12. May ESSER and GEER funds be used to pay student fees for activities such as art, music, and theater classes? (*New December 7, 2022*) ........................................................................... 36

B-13. May ESSER and GEER funds be used to provide students with safe, healthy, and supportive learning environments? (*New December 7, 2022*) ..................................................................... 36

B-14. May ESSER and GEER funds be used for the cost of purchasing and installing video systems for security purposes? (*New December 7, 2022*) ................................................................................. 37

C. Advancing Educational Equity in COVID-19 Response ......................................................................... 39

*Overall Equity Considerations* ................................................................................................................ 39

C-1. What should each State and LEA consider in order to ensure that ESSER and GEER funds are equitably allocated among schools? ........................................................................................................ 39

C-2. How may an LEA use ESSER and GEER funds to support students who have lost instructional time due to the COVID-19 pandemic? .................................................................................................... 40

C-3. How may an LEA use ESSER and GEER funds to support students' social, emotional, mental health, and academic needs, including by hiring support personnel such as nurses, counselors, and social workers? ......................................................................................................................................... 40

*Focusing on Student Groups Most Impacted by the Pandemic* ............................................................. 41

C-4. How may an LEA use ESSER and GEER funds to support English learners (also referred to as multilingual learners)? ............................................................................................................................ 41

C-4.a. In addition to the approaches described in FAQ C-4, how may ESSER and GEER funds support multilingual learners? (*New December 7, 2022*) ................................................................................... 42

C-4.b. In addition to the approaches described in FAQ C-4 and C-4.a., how may ESSER and GEER funds support family engagement for multilingual learners? (*New December 7, 2022*) ...................... 43

C-4.c. How may ESSER and GEER funds support assessments for multilingual learners? (*New December 7, 2022*) ................................................................................................................................. 43

C-5. How may an LEA use ESSER and GEER funds to support the needs of children with disabilities under the IDEA? ...................................................................................................................................... 44

C-6. How may an LEA use ESSER and GEER funds to support students with disabilities who are not IDEA-eligible but who receive services in accordance with a Section 504 plan? .................................. 48

C-7. How may ESSER and GEER funds be used to support students experiencing homelessness? ...... 48

C-8. How may an LEA use ESSER and GEER funds to serve children and youth in foster care? ........ 49

C-9. How may an LEA use ESSER and GEER funds to support migratory students? ........................... 50

C-10. How may ESSER and GEER funds support students who are in correctional facilities, including those who are served under the Title I, Part D programs for students who are neglected, delinquent, or at risk? ..................................................................................................................................................... 50

*Interventions and Strategies for Consideration* ................................................................................... 51

C-11. How may an LEA use ESSER and GEER funds to address chronic absenteeism? (*Updated December 7, 2022*) ................................................................................................................................. 51

C-11.a. How may ESSER and GEER funds be used to support early warning indicator systems? (*New December 7, 2022*) ................................................................................................................................. 52

C-12. How may an SEA or LEA use ESSER and GEER funds to improve its data systems and its transparency when reporting to the public? ................................................................................. 52

C-13. How may an LEA use ESSER and GEER funds to support full-service community schools? .... 53

C-14. How may ESSER and GEER funds be used to support mental health services for students and educators facing COVID-19 pandemic-related trauma? (*Updated December 7, 2022*) ........................ 54

C-15. How may an LEA use ESSER and GEER funds to support evidence-based literacy programs? . 56

C-16. May an LEA use ESSER and GEER funds to provide meals for students? (*Updated December 7, 2022*) ........................................................................................................................................... 57

C-16.a. May ESSER and GEER funds be used to cover the costs of waiving the outstanding school meals balance of a student from low-income backgrounds? (*New December 7, 2022*) ........................ 57

C-17. How may an LEA use ESSER and GEER funds to specifically support high school seniors? .... 57

C-18. May an LEA use ESSER and GEER funds to support students who graduated high school in the class of 2020 (and students who will graduate in 2021) who have not yet successfully transitioned to college or careers? ......................................................................................................................... 58

C-19. May an LEA use ESSER and GEER funds to support distance learning, including the purchase of educational technology for student use? ............................................................................................ 58

C-20. May an LEA use ESSER and GEER funds for a pre-kindergarten or other early childhood education program? ......................................................................................................................... 58

C-21. May ESSER and GEER funds be used to serve adults, including English learners, who are eligible to be served under the Adult Education and Family Literacy Act? ........................................... 59

C-22. May ESSER and GEER funds be used for career and technical education? ............................... 59

C-23. May ESSER and GEER funds be used to re-engage students who have not been able to participate in in-person and/or remote instruction during the COVID-19 pandemic? ............................ 60

C-23.a. May ESSER and GEER funds be used to provide incentive payments directly to parents and students to encourage students to attend school? (*New December 7, 2022*) ........................................... 60

C-24. May ESSER and GEER funds be used to implement community violence intervention strategies? .................................................................................................................................................... 60

*Summer Learning and Enrichment* ........................................................................................................ 61

C-25. What kinds of summer programs may ESSER and GEER funds support? .................................. 61

C-26. May ESSER and GEER funds be used for summer job or service-learning programs for high school students? ................................................................................................................................... 61

C-27. Do Federal procurement requirements permit noncompetitive procurements, if necessary, to enable an SEA or LEA to use ARP ESSER funds to operate a summer enrichment program in 2021? 61

D. Using ESSER and GEER Funds to Support Educators and Other School Staff .................................. 63

D-1. May ESSER and GEER funds be used to stabilize and support the educator workforce? (*Updated December 7, 2022*) ........................................................................................................................... 63

D-1.a. How may ESSER and GEER funds be leveraged with funding and initiatives of other Federal agencies to promote education workforce stability? (*New December 7, 2022*) ...................................... 64

D-2. May an LEA use ESSER and GEER funds to hire additional health support staff? ..................... 64

D-3. Must an entity that receives ESSER or GEER funds under the CARES Act or CRRSA Act continue to pay employees and contractors, to the greatest extent practicable, during the period of any disruptions or closures related to COVID-19? ........................................................................................ 65

D-4. May an LEA use ESSER and GEER funds to pay overtime to its salaried custodians and other staff in order to prepare for a safe reopening of schools and sustain safe school operations?...............65

D-5. May an LEA use ESSER and GEER funds to provide childcare services or instructional supervision to the children of teachers and other staff in order to enable them to return to their teaching or other school responsibilities?..........................................................................................................65

D-6. May an LEA use ESSER and GEER funds to provide "premium pay" or other additional compensation for teachers, principals, and other school personnel, including school nutrition staff and custodians?.................................................................................................................................................65

D-7. May an LEA that has experienced significant, unbudgeted increases in unemployment costs use ESSER and GEER funds to pay for those costs?......................................................................................65

E. Additional Fiscal Considerations.............................................................................................................67

*Timelines for Obligating Funds* ................................................................................................................67

E-1. What is the timeline for a Governor, SEA, or LEA to obligate funds under ESSER I and GEER I? (*Updated December 7, 2022*)................................................................................................................67

E-2. What is the timeline for a Governor, SEA, or LEA to obligate funds under ESSER II and GEER II? (*Updated December 7, 2022*) ......................................................................................................67

E-3. What is the timeline for an SEA or LEA to obligate funds under ARP ESSER? ..........................67

E-3.a. May an SEA establish a shorter period of availability for awards made from the ESSER State Reserve than the full period of availability under the applicable ESSER program? (*New December 7, 2022*) ....................................................................................................................................................68

E-3.b. When must ESSER I, ESSER II, ARP ESSER, GEER I, and GEER II funds be liquidated? (*New December 7, 2022*)...........................................................................................................................68

E-3.c. What happens to ESSER and GEER funds that are unobligated at the end of the Tydings Amendment deadline? (*New December 7, 2022*) ..............................................................................68

E-3.d. How long may ESSER or GEER-funded activities continue after the liquidation period? (*New December 7, 2022*)...........................................................................................................................68

*Administrative Funds and Indirect Costs* ...................................................................................................69

E-4. May a Governor or SEA reserve ESSER or GEER funds for administrative costs? ....................69

E-5. May an LEA use ESSER or GEER funds to defray the costs of administering the program?........70

E-6. May a Governor or SEA determine what constitutes a reasonable and necessary amount of funds necessary for an LEA to effectively administer the program?.................................................................70

E-7. May an SEA or LEA consolidate ESSER and GEER administrative funds? ................................70

E-8. May an LEA charge indirect costs to its ESSER or GEER Fund subgrant?.................................71

E-9. How might ESSER or GEER funds affect an SEA's or LEA's indirect cost recoveries? .............71

*Revenue Loss*..............................................................................................................................................71

E-10. May an SEA or LEA use ESSER and GEER funds to supplement or restore its "rainy day" fund rather than use the funds for specific purposes? ....................................................................................71

E-11. May ESSER and GEER funds be used to make up State revenue losses?...................................71

E-11.a. May ESSER and GEER funds be used to support local matching requirements under other Federal programs? (*New December 7, 2022*)...............................................................................72

*Fiscal Considerations for Other Programs* ...............................................................................................72

8

E-12. How does the use of ESSER and GEER funds to make up for State and/or local revenue losses impact IDEA's LEA Maintenance of Effort (MOE) requirement?........................................................72

E-13. How does the use of ESSER and GEER funds to make up for State revenue losses impact the IDEA's Maintenance of State Financial Support (MFS) requirement? ....................................................73

E-14. How does the use of ESSER and GEER funds to make up for State and/or local revenue losses impact the LEA MOE requirement in section 8521 of the ESEA?........................................................73

Appendix A -- Allocations.................................................................................................................75

Appendix B -- Related FAQs..............................................................................................................83

  Section 1: Vaccinations and Testing................................................................................................83

  Section 2: COVID-19 Testing Incentives Fact Sheet ......................................................................85

  Section 3: Student Transportation...................................................................................................87

  Section 4: Promoting Public Safety ................................................................................................89

  Section 5: Use of Funds to Prevent, Prepare for, or Respond to COVID-19.........................................95

# Introduction

The CARES Act, CRRSA Act, and ARP Act provide vital support to States, LEAs, and schools as they work to reopen schools safely, maximize in-person instructional time, and address the impact of the COVID-19 pandemic on students, educators, and families. These Frequently Asked Questions (FAQs) are intended to clarify allowable uses of funds and describe how these funds may be used to implement actionable strategies to meet the urgent needs of students and educators as LEAs and schools work to return to and safely sustain in-person instruction, address the educational inequities that have been exacerbated by the COVID-19 pandemic, and address students' social, emotional, mental health, and academic needs.

The document is divided into the following sections:

A. Overview of ESSER and GEER funds.
B. Reopening schools safely and promoting the health and safety of students, staff, and the school community.
C. Advancing educational equity in COVID-19 response.
D. Using ESSER and GEER funds to support educators and other school staff.
E. Additional fiscal considerations.

The technical appendix (Appendix A) addressing how an SEA must make formula subgrants to LEAs under ARP ESSER and ESSER II is included at the end of this document.

The Department encourages States and LEAs to use the funds described in this document to safely reopen schools, maximize in-person instructional time for all students, and provide opportunities to address the impacts of lost instructional time resulting from the COVID-19 pandemic. When making decisions about how to use ESSER and GEER funds, States and LEAs are encouraged to take into consideration how the funds can be used to address inequities, including focusing supports and services on students from low-income families, students of color, students with disabilities, English learners, students experiencing homelessness, children and youth in foster care, migratory students, children who are incarcerated, and other underserved students who have been disproportionately impacted by the pandemic.

The **December 2022** update notes the questions that have been updated and those which are new. Not noted are some small technical and editorial changes that have been made to other questions, including updated links to resources that have become available since the May 2021 Use of Funds FAQs were issued. The December 2022 update also includes a new Appendix B of previously published standalone ESSER and GEER FAQs. Other useful information on the ESSER and GEER programs, including States' certifications and agreements, allocation amounts, State plans, and Fact Sheets, can be found on the ESSER and GEER websites. The Deadlines and Announcements page also includes grant administration and policy guidance sent via the Department's Grants administration platform (G5). Finally, we want to highlight that while ESSER or GEER funds may continue to be used to maintain safe, in-person learning for all students, some strategies and approaches for doing so have changed over time as recommendations have evolved. This document continues to reflect permitted uses of funds over the course of the ESSER and GEER programs and provide transparency to help stakeholders, including parents, understand the use of ESSER and GEER funds starting on March 13, 2020, and going forward.

## Overview of ESSER and GEER Funds

Generally, in determining whether an activity is an allowable use of funds, a State or LEA must determine:

- Is the use of funds intended to prevent, prepare for, or respond to the COVID-19 pandemic, including its impact on the social, emotional, mental health, and academic needs of students?[1]
- Does the use of funds fall under one of the authorized uses of ESSER or GEER funds?
- Is the use of funds permissible under the Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards (Uniform Guidance, 2 CFR Part 200)? In particular, is it necessary and reasonable for the performance of the ESSER or GEER award?

These Federal emergency resources are available for a wide range of activities to address diverse needs arising from or exacerbated by the COVID-19 pandemic, or to emerge stronger post-pandemic, including responding to students' social, emotional, mental health, and academic needs and continuing to provide educational services as States, LEAs, and schools respond to and recover from the pandemic. Some uses of these funds may be directly focused on health and safety—such as improving ventilation and implementing prevention strategies that are, to the extent practicable, consistent with the Centers for Disease Control and Prevention (CDC) guidance. Other allowable uses may be focused on meeting the social, emotional, mental health, and academic needs of students. That could be through preventing teacher layoffs; providing accelerated learning opportunities; implementing rigorous curricula; funding additional counselors, school nurses, and school psychologists; increasing the number of full-service community schools; conducting any activities allowed under a number of Federal education programs (see FAQ A-3); and implementing many other allowable uses as illustrated in this document.

Allocating resources in ways that advance equity and ensuring they are adequate for providing the opportunities and supports students need to succeed are particularly important as we recover from the disproportionate impact of the COVID-19 pandemic on communities of color and communities experiencing poverty. Addressing the many dimensions of resource equity—including equitable and adequate school funding; access to a well-rounded education; well-prepared, effective, and diverse educators and staff; and integrated support services—can begin to mitigate the impact of COVID-19 on schools and students and can close long-standing gaps in educational opportunity.

### A-1. What funds are covered in these FAQs?

These FAQs address five programs in the Education Stabilization Fund (ESF) to prevent, prepare for, and respond to the COVID-19 emergency:

- "ESSER I": The ESSER Fund established in the CARES Act.
- "ESSER II": The additional funding for ESSER provided in the CRRSA Act.
- "ARP ESSER": The additional funding for ESSER provided in the ARP Act.
- "GEER I": The GEER Fund established in the CARES Act.
- "GEER II": The additional funding for GEER provided in the CRRSA Act.

References to ESSER apply to ESSER I, ESSER II, and ARP ESSER. References to GEER apply to GEER I and GEER II.

---

[1] See Appendix B, Section 5 for more information on what it means to "prevent, prepare for, or respond to COVID-19."

**Please note** that GEER funds may be used for childcare, pre-K-12 education, adult education, and higher education support. However, these FAQs are mainly focused on the use of GEER funds for pre-K-12 education. We also acknowledge that GEER and ESSER SEA Reserve funds may be awarded to entities other than LEAs.[2] However, because the vast majority of funds under the CARES Act, CRRSA Act, and ARP Act are awarded to LEAs and LEAs are the entities responsible for reopening schools safely and addressing educational needs impacted by the COVID-19 pandemic, this guidance focuses primarily on LEA uses of ESSER and GEER funds. It should be noted that GEER and ESSER SEA Reserve funds may be used for all of the allowable activities outlined in this guidance.

### *ESSER Formula Funds to LEAs*

### A-2. How does an SEA allocate ESSER formula funds to LEAs?

Each SEA must allocate at least 90 percent of the ESSER funds it receives as subgrants to LEAs in proportion to the amount of funds each LEA received under part, A of title I of the ESEA in the most recent fiscal year (FY)—i.e., FY 2019 (ESSER I) or FY 2020 (ARP ESSER and ESSER II). (For more information on allocating funds to LEAs under ARP ESSER and ESSER II, see the Technical Appendix at the end of this document.)

### A-3. How may an LEA use ESSER funds?

An LEA may use ESSER funds for the broad range of activities listed in section 18003(d) of the CARES Act, section 313(d) of the CRRSA Act, and section 2001(e) of the ARP Act. Although the lists of allowable uses of funds are not identical, any of the ESSER funds (ESSER I, ESSER II, or ARP ESSER) may be used to support all of the allowable uses of funds listed in any of the ESSER programs. We have consolidated below the three ESSER programs' lists of allowable uses of funds.

The activities that are listed in section 18003(d) of the CARES Act, section 313(d) of the CRRSA Act, and section 2001(e) of the ARP Act that an LEA may support with ESSER funds are:

1. Any activity authorized by the ESEA, including the Native Hawaiian Education Act and the Alaska Native Educational Equity, Support, and Assistance Act (20 U.S.C. 6301 et seq.).

2. Any activity authorized by the Individuals with Disabilities Education Act (IDEA) (20 U.S.C. 1400 et seq.).

3. Any activity authorized by the Adult Education and Family Literacy Act (AEFLA) (29 U.S.C. 3271 et seq.).

4. Any activity authorized by the Carl D. Perkins Career and Technical Education Act of 2006 (Perkins V) (20 U.S.C. 2301 et seq.).

5. Any activity authorized by subtitle B of title VII of the McKinney-Vento Homeless Assistance Act (McKinney-Vento) (42 U.S.C. 11431 et seq.).[3]

---

[2] See FAQ A-13 for a description of eligible entities under the GEER program.
[3] This activity is not explicitly listed in the ARP Act but is still an allowable use of ARP ESSER funds.

6. Coordinating preparedness and response efforts of LEAs with State, local, Tribal, and territorial public health departments, and other relevant agencies, to improve coordinated responses among such entities to prevent, prepare for, and respond to COVID-19.

7. Providing principals and other school leaders with the resources necessary to address the needs of their individual schools.[4]

8. Activities to address the unique needs of low-income children or students, students with disabilities,[5] English learners, racial and ethnic minorities, students experiencing homelessness, and children and youth in foster care, including how outreach and service delivery will meet the needs of each population.

9. Developing and implementing procedures and systems to improve the preparedness and response efforts of LEAs.

10. Training and professional development for staff of the LEA on sanitation and minimizing the spread of infectious diseases.

11. Purchasing supplies to sanitize and clean the facilities of the LEA, including buildings operated by such LEA.

12. Planning for, coordinating, and implementing activities during long-term closures, including providing meals to eligible students, providing technology for online learning to all students, providing guidance for carrying out requirements under the IDEA and ensuring other education services can continue to be provided consistent with all Federal, State, and local requirements.

13. Purchasing educational technology (including hardware, software, and connectivity) for students who are served by the LEA that aids in regular and substantive educational interaction between students and their classroom instructors, including low-income students and students with disabilities, which may include assistive technology or adaptive equipment.

14. Providing mental health services and supports, including through the implementation of evidence-based full-service community schools.[6]

15. Planning and implementing activities related to summer learning and enrichment and supplemental after-school programs, including providing classroom instruction or online learning during the summer months and addressing the needs of low-income students, students with

---

[4] This activity is not explicitly listed in the ARP Act but is still an allowable use of ARP ESSER funds.

[5] As used in this document, students with disabilities refers to children with disabilities as defined in section 602(3) of the IDEA; 34 CFR § 300.8) and students who meet the definition of disability in section 705(9)(B) of the Rehabilitation Act of 1973; see also 34 CFR § 104.3(j)). Although the CARES, CRRSA, and ARP Acts use the term, "children with disabilities" with respect to the allowable activity of providing activities to address the unique needs of certain groups of students, ESSER funds may be used to support students with disabilities under both the IDEA and section 504 of the Rehabilitation Act of 1973. In some instances, this document refers to children with disabilities where the CARES, CRRSA, or ARP Acts use that term to set forth a requirement. However, even in instances where the CARES, CRRSA, or ARP Acts require funds to be used for children with disabilities, an SEA or LEA may also use its ESSER funds to support students with disabilities under section 504.

[6] The reference to full-service community schools is only in the ARP Act, but ESSER I and ESSER II funds may also be used for that purpose. Please note that, as described later in this document, ESSER funds can be used to hire a broad range of professionals who deliver mental health services and supports, including but not limited to nurses, counselors, psychologists, and social workers.

disabilities, English learners, migrant students, students experiencing homelessness, and children and youth in foster care.

16. Addressing the academic impact of lost instructional time[7] among an LEA's students, including low-income students, students with disabilities, English learners, racial and ethnic minorities, students experiencing homelessness, and children and youth in foster care, including by—

    a. Administering and using high-quality assessments that are valid and reliable to accurately assess students' academic progress and assist educators in meeting students' academic needs, including through differentiating instruction.
    b. Implementing evidence-based activities to meet the comprehensive needs of students.
    c. Providing information and assistance to parents and families on how they can effectively support students, including in a distance learning environment.
    d. Tracking student attendance and improving student engagement in distance education.[8]

17. School facility repairs and improvements to enable operation of schools to reduce risk of virus transmission and exposure to environmental health hazards, and to support student health needs.

18. Inspection, testing, maintenance, repair, replacement, and upgrade projects to improve the indoor air quality in school facilities, including mechanical and non-mechanical heating, ventilation, and air conditioning systems, filtering, purification and other air cleaning, fans, control systems, and window and door repair and replacement.

19. Developing strategies and implementing public health protocols including, to the greatest extent practicable, policies in line with guidance from the CDC for the reopening and operation of school facilities to effectively maintain the health and safety of students, educators, and other staff.[9]

20. Other activities that are necessary to maintain the operation of and continuity of services in the LEA and continuing to employ existing staff of the LEA.[10]

In determining how to prioritize its funds, an LEA should consider how to use those funds to safely reopen schools for full-time instruction for all students, maintain safe in-person operations, advance educational equity, and build capacity. An LEA may provide services directly or enter into an agreement (e.g., a contract or interagency agreement consistent with procurement requirements or otherwise legally authorized) for allowable activities under ESSER. An LEA is not authorized to award subgrants with ESSER funds.

---

[7] For the purposes of this guidance document, the term "academic impact of lost instructional time" is used in place of "learning loss" experienced by students as a result of the COVID-19 pandemic, as referenced in the ARP Act and the CRRSA Act.

[8] This activity, as well as the next two, are not explicitly listed in the CARES Act but are still allowable uses of ESSER I funds.

[9] This activity is only listed in the ARP Act but is an allowable use of ESSER I and ESSER II funds.

[10] As described later in this document, this includes using ESSER funds to avoid layoffs.

**A-4. Does ARP ESSER include any new provisions for LEAs that ESSER I and ESSER II do not?**

Yes. The ARP ESSER statute and interim final requirements include several new provisions for LEAs to support school reopening, safe school operations, and support for students:

- **Safe Return to In-Person Instruction and Continuity of Services**. Section 2001(i) of the ARP Act requires an LEA that receives ARP ESSER funds to develop and make publicly available on the LEA's website, within 30 days after receiving its allocation, a plan for the safe return to in-person instruction and continuity of services. Prior to making the plan publicly available, the LEA must seek public comment on the plan and take such comments into consideration when developing the plan. Under the interim final requirements, an LEA plan for safe return to in-person instruction and continuity of services must describe how the LEA will maintain the health and safety of students, educators, and other staff and the extent to which it has adopted policies, and a description of any such policies, on each of the prevention and mitigation strategies recommended by the CDC. [11]The plan must also describe how an LEA will ensure continuity of services, which must address students' academic needs and students' and staff social, emotional, mental health, and other needs, and which may include student health and food services. In addition, the LEA must regularly, but no less frequently than every six months (taking into consideration the timing of significant changes to CDC guidance on reopening schools), review and, as appropriate, revise its plan for the safe return to in-person instruction and continuity of services, and must seek and take public input into account in determining whether and what revisions are necessary. An LEA that developed a school reopening and continuity of services plan prior to the date of enactment of the ARP Act and that meets the above requirements for public comment will be deemed in compliance but, within no more than six months, the LEA must review and, if necessary, revise the plan to meet the requirements of the interim final requirements.

- **Reservation to Address the Academic Impact of Lost Instructional Time**. Section 2001(e)(1) of the ARP Act requires an LEA to reserve not less than 20 percent of its ARP ESSER allocation to address the academic impact of lost instructional time through the implementation of evidence-based interventions (e.g., providing intensive or high-dosage tutoring or accelerating learning; see FAQ A-10 for a definition of evidence-based), such as summer learning or summer enrichment, extended day, comprehensive after-school programs, or extended school year programs, and ensure that the interventions implemented respond to students' social, emotional, mental health, and academic needs and address the disproportionate impact of COVID-19 on students from low-income families, students of color, children with disabilities, English learners, migratory students, students experiencing homelessness, and children and youth in foster care. While ESSER I and ESSER II funds may also be used for these purposes, an LEA is <u>not</u> required to set aside a specific amount of ESSER I and ESSER II funds to address the academic impact of lost instructional time. Effective strategies to address the impact of lost instructional time are further

---

[11]  Specifically, the LEA plan must address the extent to which it has adopted policies, and a description of any policies, on each of the CDC's recommendations on: universal and correct wearing of masks; modifying facilities to allow for physical distancing (e.g., use of cohorts/podding); handwashing and respiratory etiquette; cleaning and maintaining healthy facilities, including improving ventilation; contact tracing in combination with isolation and quarantine, in collaboration with the State, local, territorial, or Tribal health departments; diagnostic and screening testing; efforts to provide vaccinations to school communities; appropriate accommodations for students with disabilities with respect to health and safety policies; and coordination with State and local health officials.

described in Volume 2 of the Department's COVID-19 Handbook available at: https://www2.ed.gov/documents/coronavirus/reopening-2.pdf.

- **Maintenance of Equity for High-Poverty Schools**. Section 2004(c) of the ARP Act stipulates that an LEA, as a condition of receiving ARP ESSER funds, may not, in FY 2022 or 2023:
  - o Reduce the combined State and local per-pupil funding for any high-poverty school served by the LEA by an amount that exceeds the total reduction in LEA funding (from combined State and local funding), if any, for all schools served by the LEA in such fiscal year divided by the number of children enrolled in all schools served by the LEA in such fiscal year; or
  - o Reduce the number of full-time-equivalent (FTE) staff per-pupil in any high-poverty school by an amount that exceeds the total reduction in the number of FTEs per-pupil, if any, in all schools served by the LEA in such fiscal year divided by the number of children enrolled in all schools served by the LEA in such fiscal year.

  A "high-poverty school" means a school in the highest quartile of schools served by an LEA based on the percentage of economically disadvantaged students served. More information can be found on the Department's Maintenance of Equity website: https://oese.ed.gov/offices/education-stabilization-fund/elementary-secondary-school-emergency-relief-fund/maintenance-of-equity/ .

- **LEA Plan for Use of ARP ESSER Funds**. Under the interim final requirements, each LEA that receives ARP ESSER funds must develop a plan for its use of ARP ESSER funds and submit it to the SEA within a reasonable timeline determined by the SEA. The plan must contain, at a minimum, the extent to which and how the funds will be used to implement prevention and mitigation strategies that are, to the extent practicable, consistent with CDC guidance; how the LEA will use the funds it reserves under section 2001(e)(1) of the ARP Act to address the academic impact of lost instructional time; how the LEA will use its remaining ARP ESSER funds; and how the LEA will ensure the interventions it implements will respond to the social, emotional, mental health, and academic needs of all students and particularly those students disproportionately impacted by the COVID-19 pandemic. In developing its plan, an LEA must engage in meaningful consultation with stakeholders including students; families; school and district administrators (including special education administrators); and teachers, principals, school leaders, other educators, school staff, and their unions. An LEA must also engage in meaningful consultation with each of the following to the extent present in or served by the LEA: Tribes; civil rights organizations (including disability rights organizations); and stakeholders representing the interests of children with disabilities, English learners, children experiencing homelessness, children and youth in foster care, migratory students, children who are incarcerated, and other underserved students. An LEA should translate relevant materials and obtain the services of interpreters, as needed, to engage its English learners and families with limited English proficiency. An LEA must provide the public the opportunity to provide input on the development of the plan, take such input into account, and post the LEA ARP ESSER plan on its website.

  The interim final requirements, which contain information on the LEA plan, can be accessed at: https://www.federalregister.gov/public-inspection/2021-08359/american-rescue-plan-act-elementary-and-secondary-school-emergency-relief-fund.

16

**A-4.a. Are LEAs required to periodically review their ARP ESSER safe return to in-person instruction and continuity of services plans? (*New December 7, 2022*)**

Yes. Under ARP ESSER requirements, an LEA receiving an allocation of funds through the ARP ESSER formula was required to develop a safe return to in-person instruction and continuity of services plan and to regularly, but no less frequently than every six months throughout the program period, review and, as appropriate, revise that plan. An LEA must seek and take public input into account in determining whether and what revisions are necessary. If, after conducting the review and taking into account public input, the LEA may determine that no revisions are necessary. As with all decisions related to ESSER funds, an LEA should be transparent and communicate to the public its determination that revisions are not necessary.

**A-4.b. In meeting the ARP ESSER requirement to use at least 20 percent of its ARP ESSER allocation to address the academic impact of lost instructional time and address the disproportionate impact of COVID-19 on underserved populations, may an LEA include the costs associated with implementing an evidence-based strategy that advances this purpose? (*New December 7, 2022*)**

Yes, the cost of providing services to students to address the academic impact of lost instructional time and address the disproportionate impact of COVID-19 on underserved populations may include reasonable and necessary activities to help implement an evidence-based strategy for advancing this purpose. For example, such costs might include expenses associated with professional development, cleaning the space where a program is held, providing snacks or meals to students who are staying at school late to participate in the enrichment activity, or transportation.

**A-5. Is there a deadline by which an SEA must award ESSER funds to LEAs?**

Yes. An SEA must award ESSER I and ESSER II funds within one year of receiving the award, pursuant to section 18003(f) of the CARES Act and section 313(g) of the CRRSA Act. Given that these funds are intended to address urgent needs arising from the COVID-19 pandemic, SEAs are urged to award funds to LEAs as expeditiously as possible.

Pursuant to section 2001(d)(2) of the ARP Act, an SEA must award ARP ESSER funds in an expedited and timely manner and, to the extent practicable, not later than 60 days after the SEA receives the award. An SEA that is not able to allocate such funds within 60 days because it is not practicable (e.g., because of pre-existing State board approval requirements) must provide an explanation to the Department within 30 days of receiving each portion of its ARP ESSER funds, including a description of specific actions the SEA is taking to provide ARP ESSER funds to LEAs in an expedited and timely manner and the SEA's expected timeline for doing so.

If an SEA does not award ESSER I, ESSER II, or ARP ESSER funds within one year of receipt, it must return the funds to the Department for reallocation.

**A-6. May an SEA or a State legislature limit an LEA's use of ESSER formula funds?**

No. Section 18003(d) of the CARES Act, section 313(d) of the CRRSA Act, and section 2001(e)(2) of the ARP Act permit an LEA to use ESSER funds for a broad range of allowable activities. Each section authorizes an LEA to use ESSER funds "for any of the following" activities. Accordingly, neither an SEA nor a State legislature has the authority to limit an LEA's use of ESSER formula funds. An SEA may require LEAs to include information in their applications about how they intend to use the funds,

17

consistent with the SEA's regular practices or State law, as long as it does not limit how the LEAs use their funds.

### A-7. May an SEA or a State legislature limit how long an LEA has to access or spend its ESSER formula funds?

No. Under the statute, LEAs are authorized to obligate funds throughout the period of availability of those funds and, consistent with cash management requirements (e.g., the Cash Management Improvement Act (CMIA) and the Uniform Guidance requirements), draw down funds in accordance with their needs.

### *ESSER Funds Reserved at the SEA Level*

### A-8. May an SEA reserve any ESSER I and II funds for the SEA's use?

Yes. An SEA may retain up to 10 percent of its ESSER I and ESSER II funds (the "SEA Reserve") to address emergency needs, as determined by the SEA, resulting from the COVID-19 pandemic, which may be addressed through the use of subgrants or contracts. An SEA may reserve ½ of 1 percent or less of its total ESSER I and ESSER II allocations for administrative costs, including both direct and indirect administrative costs. This reservation must come from the SEA Reserve. (See FAQs E-4 through E-9 for more information on administrative funds.) Unlike ARP ESSER funds (see FAQ A-9), however, an SEA is not required to retain any ESSER I or ESSER II funds at the State level.

### A-9. May an SEA reserve any ARP ESSER funds for the SEA's use?

Yes. In fact, under section 2001(f) of the ARP Act, an SEA is required to reserve ARP ESSER funds for three State-level reservations for evidence-based activities and interventions (see FAQ A-10) that respond to students' social, emotional, mental health, and academic needs and address the disproportionate impact of COVID-19 on students from low-income families, students of color, English learners, children with disabilities, students experiencing homelessness, children and youth in foster care, and migratory students.[12]

- **The academic impact of lost instructional time.** Not less than 5 percent of the State's grant must be reserved to carry out, directly or through subgrants or contracts, activities to address the academic impact of lost instructional time by supporting the implementation of evidence-based interventions.
- **Summer enrichment**. Not less than 1 percent of the State's grant must be reserved to carry out, directly or through subgrants or contracts, the implementation of evidence-based summer enrichment programs.
- **After-school programs**. Not less than 1 percent of the State's grant must be reserved to carry out, directly or through subgrants or contracts, the implementation of evidence-based comprehensive after-school programs.

In addition, not more than ½ of 1 percent of the State's total ARP ESSER award may be reserved for administrative costs. The remainder, if any, of funds not allocated to LEAs or reserved for mandatory set-

---

[12] ARP ESSER funds are being made available to SEAs in two portions: the first, totaling two-thirds of an SEA's allocation, was made available on March 24, 2021; the second, constituting the remaining one-third of an SEA's allocation, will be made available after the Department approves a State plan submitted by the SEA. All percentages apply to an SEA's total ARP ESSER allocation, and may be reserved from either or a combination of both portions of its ARP ESSER award.

asides or administrative costs (up to 3 percent, depending on the amount otherwise reserved) may be used for emergency needs as determined by the SEA to address issues responding to COVID-19.

## A-10. What does it mean for a program to be evidence-based?

The ARP Act defines the term "evidence-based" as having the meaning in section 8101(21) of the ESEA. Accordingly, "evidence-based" includes several tiers of evidence. Specifically, "evidence-based," when used with respect to a State, LEA, or school activity, means an activity, strategy, or intervention that:

- Demonstrates a statistically significant effect on improving student outcomes or other relevant outcomes based on—
  - Strong evidence from at least one well-designed and well-implemented experimental study ("tier 1");
  - Moderate evidence from at least one well-designed and well-implemented quasi-experimental study ("tier 2"); or
  - Promising evidence from at least one well-designed and well-implemented correlational study with statistical controls for selection bias ("tier 3"); or

- Demonstrates a rationale based on high-quality research findings or positive evaluation that such activity, strategy, or intervention is likely to improve student outcomes or other relevant outcomes and includes ongoing efforts to examine the effects of such activity, strategy, or intervention ("tier 4").

Given the novel context created by the COVID-19 pandemic, an activity need not have generated such evidence *during the COVID-19 pandemic* to be considered evidence-based. The Department's What Works Clearinghouse (available at https://ies.ed.gov/ncee/wwc/) identifies the tier of evidence that reviewed studies meet, as applicable. As part of the "demonstrates a rationale (tier 4)" level of evidence, grantees may develop and use approaches that are novel, if they are consistent with theoretical and empirical findings from research and the grantee will continue to review the effects of the practice to build the evidence base. Developing a logic model can help to demonstrate a rationale. Logic model resources are available at https://ies.ed.gov/ncee/edlabs/regions/pacific/elm.asp. An SEA should consider using funds to provide technical assistance to its LEAs on identifying and implementing evidence-based interventions. SEAs can also review the Department's guidance on using evidence, which can be found here: https://www2.ed.gov/policy/elsec/leg/essa/guidanceuseseinvestment.pdf. Finally, SEAs should make use of the federally funded Comprehensive Center network.

## A-11. Must an SEA engage in meaningful consultation before determining how to use the ARP ESSER funds it reserves?

Yes. Each SEA is required to submit to the Department a State Plan for ARP ESSER funds (ARP ESSER State Plan) that includes, among other requirements, a description of how it will use the funds it reserves. As required in the interim final requirements, an SEA must engage in meaningful consultation with stakeholders, and provide the public the opportunity to provide input, in the development of the plan. Specifically, in the development of its ARP ESSER State Plan, an SEA must engage in meaningful consultation with stakeholders including, but not limited to, students; families; Tribes (if applicable); civil rights organizations (including disability rights organizations); school and district administrators (including special education administrators); superintendents; charter school leaders (if applicable), teachers, principals, school leaders, other educators, school staff, and their unions; and stakeholders representing the interests of children with disabilities, English learners, children experiencing homelessness, children in foster care, migratory students, children who are incarcerated, and other

19

underserved students. An SEA should translate relevant materials and obtain the services of interpreters, as needed, to engage its English learners as well as families and other stakeholders with limited English proficiency.

## A-12. How may an SEA use its ESSER SEA Reserve funds?

SEA Reserve funds (including funds not allocated to LEAs or set aside for mandatory activities under the ARP Act) may be used to address emergency needs resulting from the COVID-19 pandemic as determined by an SEA. The statute provides broad flexibility to the SEA in the use of its SEA Reserve funds. The SEA Reserve funds may be used by the SEA for any of the LEA ESSER allowable uses of funds and for other activities related to preventing, preparing for, and responding to COVID-19. An SEA might determine, for example, that SEA salaries and other supports are an emergency need in response to the COVID-19 pandemic that could be covered under the SEA Reserve. An SEA might also decide, based on its needs, to reserve less for administration in order to retain more SEA Reserve funds to address emergency needs or, under ARP ESSER, to retain more for the required reservations for addressing the academic impact of lost instructional time, summer enrichment programs, and after-school programs.

An SEA may make subgrants or enter into contracts with a wide range of entities, including LEAs and organizations serving students and families, from its SEA Reserve. An SEA may also use funds to provide technical assistance to LEAs around implementing evidence-based interventions to address the impact of lost instructional time. Support provided to LEAs or other entities under the SEA Reserve may be made on a competitive or formula basis. If an SEA awards funds to LEAs or other entities through subgrants, the SEA must carry out the requirements for a pass-through entity described in 2 CFR § 200.331. If an SEA awards funds through a contract to an LEA or other entity, the SEA must follow the State's procurement process as required by 2 CFR § 200.317.

### *GEER*

## A-13. Which entities may receive emergency grants from a Governor through the GEER Fund?

A Governor may provide subgrants to LEAs and IHEs within the State that have been "most significantly impacted by coronavirus" to support their ability to continue providing educational services to their students and to support the "on-going functionality" of these entities. In addition, a Governor may use GEER funds to provide support through a subgrant or a contract to other LEAs, IHEs, and education-related entities that the Governor "deems essential" for carrying out emergency educational services, providing childcare and early childhood education, providing social and emotional support, and protecting education-related jobs. An "education-related entity" is a governmental, nonprofit, or for-profit entity within the State that provides services that support preschool, elementary, secondary, or higher education. For examples of such entities, see question A-4 in *Frequently Asked Questions about the Governor's Emergency Education Relief Fund (GEER Fund)* available at: https://oese.ed.gov/files/2020/07/FAQs-GEER-Fund.pdf.

## A-14. Is a Governor required to award GEER funds to each category of eligible entities (i.e., LEAs, IHEs, and education-related entities)?

No. A Governor has wide discretion in determining the entities in the State that will receive GEER funds. A Governor may choose to fund only LEAs, only IHEs, only education-related entities, or any combination of eligible entities.

### A-15. How may an LEA use GEER funds?

Under section 18002(c) of the CARES Act and section 312(c) of the CRRSA Act, a Governor may determine whether to award GEER funds to LEAs, as well as identify specific uses of the funds within the broad parameters in the law. Beyond any such restrictions imposed by a Governor, an LEA that receives GEER funds may use its award to support a broad range of activities to prevent, prepare for, and respond to the COVID-19 pandemic, including those activities allowed under ESSER. (See FAQ A-3.) An LEA may provide services directly or enter into an agreement (e.g., a contract or interagency agreement consistent with procurement requirements or otherwise legally authorized) for allowable activities under GEER. An LEA is not authorized to award subgrants with GEER funds.

### *Other Provisions*

### A-16. Do the requirements in the Uniform Guidance apply to ESSER and GEER Funds?

Yes. The requirements in the Uniform Guidance apply to expenditures of ESSER and GEER funds. Below are some important Uniform Guidance requirements to keep in mind.

**Cost Principles.** Specific uses of ESSER or GEER funds must comply with the Cost Principles in subpart E of 2 CFR Part 200 of the Uniform Guidance. This requires, among other things, that every grant expenditure be necessary and reasonable to carry out the performance of the award. (See 2 CFR §§ 200.403-200.404.) Consistent with requirements in the Cost Principles, all expenditures must be properly documented. (See 2 CFR § 200.403(g).)

**Pre-award Costs.** The Uniform Guidance at 2 CFR § 200.458 specifies that pre-award costs, i.e. those costs incurred prior to the effective date of the Federal award or subaward, are only allowable with prior written approval. The Department has authorized (i.e., provided prior written approval) that ESSER and GEER funds may be used for pre-award costs dating back to March 13, 2020, when the national emergency was declared.

**Time Distribution Records.** The Uniform Guidance requirements related to documenting personnel expenses at 2 CFR § 200.430(i) apply. Except as described in the paragraph below, this would mean that an LEA maintains the records it generally maintains for salaries and wages, including for employees in leave status, as long as payments to employees in leave status are made consistent with grantee policies and procedures that apply to all employees, whether they are paid with Federal or other funds. (For more information on paying employees in leave status, see the Department Fact Sheet at: https://www2.ed.gov/documents/coronavirus/factsheet-fiscal- questions.pdf.)

An LEA must maintain time distribution records (sometimes called "time and effort" reporting) only if an individual employee is splitting his or her time between activities that may be funded under ESSER or GEER and activities that are not allowable under the applicable program. However, it is likely there will be very few situations in which an employee of an LEA would perform multiple activities where some are not allowable under ESSER or GEER, and thus would be required to maintain time distribution records, given that an LEA is authorized to use funds on "activities that are necessary to maintain the operation of and continuity of services in [an LEA] and continuing to employ existing staff of the [LEA]" in order to "prevent, prepare for, and respond to" the COVID-19 pandemic.

**Cash Management.** ESSER and GEER grantees, in their role as stewards of Federal funds, must comply with the requirements under the CMIA (implementing regulations at 31 CFR Part 205) and the Uniform Guidance (2 CFR Part 200). In particular, the CMIA requires that a State "limit the amount of funds transferred to the minimum required to meet the State's actual and immediate cash needs." (See 31 CFR

§ 205.11(b).) In addition, subgrantees, including LEAs, must minimize the time elapsing between the transfer of funds from the State and disbursement by the subgrantee. (See 2 CFR § 200.305(b).)

**Construction.** Approved construction projects must comply with applicable Uniform Guidance requirements, as well as the Department's regulations regarding construction at 34 CFR § 76.600. As is the case with all remodeling or construction contracts using laborers and mechanics financed by Federal education funds, an LEA that uses ESSER or GEER funds for minor remodeling, renovation, repair, or construction contracts over $2,000 must meet all Davis-Bacon prevailing wage requirements and include language in the contracts that all contractors or subcontractors must pay wages that are not less than those established for the locality of the project (prevailing wage rates). (See 20 U.S.C. 1232b Labor Standards.) (See also FAQ B-6.)

**Prior Approval.** In addition to pre-award costs discussed above, the Uniform Guidance at 2 CFR § 200.407 requires prior written approval from either the Department or the State (Governor or SEA, as applicable) for certain costs, such as the purchase of real property; equipment and other capital expenditures; entertainment costs; and travel costs.

## A-17. May ESSER and GEER funds be used in combination with ("braided with") other funding?

Yes. ESSER and GEER funds may be used in combination with, but not blended with, funding under ESEA, IDEA, AEFLA, Perkins V, and McKinney-Vento, or any other education funds. Therefore, an SEA or LEA may use ESSER and GEER funds to expand participation in an activity or services it is currently conducting or plans to conduct under these programs.

"Braiding" funds occurs when different funding streams are used together to leverage the support provided for different needs for educators and students while maintaining documentation to support the charging and allocation of costs to multiple separate funding streams or programs. As specified in the Uniform Guidance at 2 CFR § 200.405(d), if a cost benefits two or more projects or activities in proportions that can be determined without undue effort or cost, the cost must be allocated to the programs or activities based on the proportional benefit. Additionally, each funding stream maintains its identity and continues to be subject to the relevant statutory requirements, including eligibility criteria and scope of authorized activities. With the exception of consolidating administrative funds (see FAQ E-7) or consolidating funds in a schoolwide program (see *Supporting School Reform by Leveraging Federal Funds in a Schoolwide Program* (September 2016) at: https://www2.ed.gov/policy/elsec/leg/essa/essaswpguidance9192016.pdf), ESSER and GEER funds do not lose their individual identity when braided.

## A-18. Is there a "supplement not supplant" requirement for ESSER and GEER funds?

No. The ARP Act, the CRRSA Act, and the CARES Act, however, include detailed provisions requiring States to maintain effort for elementary and secondary education and higher education. (See the Department's Guidance on Maintenance of Effort Requirements and Waiver Request.) Maintenance of effort provisions are designed to keep States from substantially reducing their support for K–12 education and higher education. While these Acts do not address maintenance of effort requirements associated with other Federal funds, such as those for IDEA and ESEA, States and LEAs must be mindful that these requirements continue to apply.

In addition, the ARP Act includes Maintenance of Equity requirements for both States and LEAs. More information on the Maintenance of Equity requirements, including FAQs and Final Requirements, can be

found on the Department's Maintenance of Equity website: https://oese.ed.gov/offices/education-stabilization-fund/elementary-secondary-school-emergency-relief-fund/maintenance-of-equity/.

### A-19. Do CARES Act funds need to be obligated prior to obligating CRRSA Act and ARP Act funds?

No. All three funding streams are available now to meet the needs of students; however grantees should be mindful that each funding stream has a different period of fund availability. (See FAQs E-1, E-2, and E-3.)

### A-20. Do the Buy American Act provisions apply to ESSER and GEER?

The Buy American Act does not apply to the ESSER or GEER grants. However, awards made under the CRRSA Act and ARP Act (i.e., ESSER II, GEER II, and ARP ESSER awards) are subject to 2 CFR § 200.322, a new regulation that applies to Federal grants made after November 12, 2020. It establishes domestic preferences for procurements under Federal grants that are subject to the Uniform Guidance. The text of the regulation follows:

2 CFR § 200.322 Domestic preferences for procurements.
(a) As appropriate and to the extent consistent with law, the non-Federal entity should, to the greatest extent practicable under a Federal award, provide a preference for the purchase, acquisition, or use of goods, products, or materials produced in the United States (including but not limited to iron, aluminum, steel, cement, and other manufactured products). The requirements of this section must be included in all subawards including all contracts and purchase orders for work or products under this award.
(b) For purposes of this section:
(1) "Produced in the United States" means, for iron and steel products, that all manufacturing processes, from the initial melting stage through the application of coatings, occurred in the United States.
(2) "Manufactured products" means items and construction materials composed in whole or in part of nonferrous metals such as aluminum; plastics and polymer-based products such as polyvinyl chloride pipe; aggregates such as concrete; glass, including optical fiber; and lumber.

### A-21. May ESSER and GEER funds be used to improve cybersecurity?

Yes. If a school, LEA, or State is improving cybersecurity to better meet educational and other needs of students related to preventing, preparing for, or responding to COVID-19, it may use ESSER or GEER funds. For example, if an LEA needs to increase its use of technology, such as for potential temporary shifts to hybrid learning if COVID-19 cases arise, expanded cybersecurity needs to facilitate that activity may also be addressed using ESSER or GEER funds.

**A-22. May an SEA or LEA use ESSER and GEER funds to develop or implement an innovative approach to providing instruction to accelerate learning and mitigate the effects of lost instructional time for those students most impacted by the COVID-19 pandemic?**

Yes. An SEA or LEA may use ESSER and GEER funds to develop or implement an innovative approach to providing instruction to accelerate learning and mitigate the effects of lost instructional time for students most impacted by the COVID-19 pandemic.

To the extent an innovative approach is evidenced-based, an LEA may use the ARP ESSER funds it reserves to implement the innovative approaches to address the impact of lost instructional time. As described in FAQ A-10, one of the tiers of evidence included in the definition of "evidence-based" refers to an approach that "demonstrates a rationale based on high-quality research findings or positive evaluation that such activity, strategy, or intervention is likely to improve student outcomes or other relevant outcomes"; and includes "ongoing efforts to examine the effects of such activity, strategy, or intervention." This could include emerging technology-based or technology-enabled approaches, including educational technology platforms, that meet this definition.

**A-23. Which disposition rules must States and LEAs follow for equipment and supplies purchased with ESSER and GEER funds? (*New December 7, 2022*)**

What follows is key information for States and LEAs regarding the disposition of supplies and equipment purchased with ESSER or GEER funds.

**Definition of Equipment**: Under 2 C.F.R. § 200.1, *equipment* is defined as tangible personal property (including information technology systems) having a useful life of more than one year and a per-unit acquisition cost that equals or exceeds the lesser of the capitalization level established by the non-Federal entity for financial statement purposes or $5,000.

**Definition of Supplies**: Under 2 C.F.R. § 200.1, *supplies* is defined as all tangible personal property that is not equipment. A computing device is a supply if the acquisition cost is less than the lesser of the capitalization level established by the non-Federal entity for financial statement purposes or $5,000, regardless of the length of its useful life.

**Continued Use of Equipment or Supplies beyond the Period of Performance**: Equipment and supplies purchased with ESSER or GEER funds may be used by States or LEAs for the authorized purposes of the ESSER or GEER program, respectively, during the period of performance (i.e., through September 30, 2022 for ESSER I and GEER I; through September 30, 2023, for ESSER II and GEER II; or September 30, 2024, for ARP ESSER) or until the equipment and supplies are no longer needed for the purposes of the ESSER or GEER program. (See 2 C.F.R. §§ 200.313(a)(1), (c)(1) and 200.314(a)). If the equipment or supplies are no longer needed for purposes of the ESSER or GEER program, a State or LEA may, in preferential order, continue to use the equipment and supplies to the extent they are needed for allowable purposes under another Federal education program in which the State or LEA participates, such as a program under the Elementary and Secondary Education Act of 1965 or the Individuals with Disabilities Education Act. The State or LEA may then use the equipment or supplies for a Federal program of another Federal awarding agency. (See 2 C.F.R. §§ 200.313(c) and 200.314(a)).

**Disposition of *Equipment* that Is No Longer Needed by a *State***: For States that used ESSER or GEER funds to purchase equipment and find that the item is not needed for authorized purposes under ESSER or GEER or for any of the State's other Federal programs, a State must dispose of the equipment in

accordance with State laws and procedures. (2 C.F.R. § 200.313(b)).

**Disposition of *Equipment* that Is No Longer Needed by an *LEA***: LEAs that used ESSER or GEER funds to purchase equipment and find that the item is not needed for authorized purposes under ESSER or GEER or for any of the LEA's other Federal programs, and where the equipment has a current per unit fair market value of $5,000 or less, may be retained, sold, or otherwise disposed of without additional responsibility to the Department. If an item of equipment has a current per unit fair market value in excess of $5,000, the LEA may retain or sell the equipment. In this case, the Department is entitled to an amount calculated by multiplying the current fair market value or proceeds from the sale by the Department's share or proportion of the cost of the original purchase. (2 C.F.R. § 200.313(e)).

**Disposition of *Supplies* that Are No Longer Needed by a State or by an LEA***: Supplies that cost less than $5,000 per unit vest in the State or LEA upon acquisition. If there is a residual inventory of supplies that are not needed and the unneeded supplies exceed $5,000 in total aggregate value, the State or LEA may retain or sell the supplies but, in either case, must compensate the Department for its share. The amount of compensation must be computed in the manner required for equipment under 2 C.F.R. § 200.313(e)(2). The aggregate value of unneeded supplies is their fair market value at the time of disposition. Given that disposition may occur at different times (for example, some supplies may be needed longer than others, a State or LEA may calculate the total aggregate value when disposition occurs—e.g., at the end of each year for which supplies are disposed.

A State or LEA must make a good faith effort to sell unneeded supplies purchased with ESSER or GEER funds in accordance with 2 C.F.R. § 200.314(a) and document its efforts. If a State or LEA cannot find a buyer and cannot use the supplies itself, the State or LEA has no further obligation to the Department.

**Using ESSER and GEER Administrative Funds to Support Disposition Costs**: ESSER or GEER funds reserved by a State or LEA for administrative activities may support costs associated with the disposition of supplies and equipment (e.g., storage units to house ESSER or GEER equipment and supplies that are unneeded) during the program period. However, ESSER and GEER administrative funds are not available beyond the period of performance as noted above. As a result, there are no ESSER or GEER funds available to pay for disposition costs after the period of performance ends.

## A-24. May an LEA or another subrecipient award subgrants with ESSER and GEER funds? (*New December 7, 2022*)

No. There is no authority in the CARES, CRRSA, or ARP Acts for a subrecipient to award subgrants with their ESSER or GEER funds. Only the SEA (for ESSER) or the Governor (for GEER) is authorized to award subgrants. Given the unique structure of the GEER Fund and varying internal State fiscal processes, those administering the GEER program should contact the State's dedicated Department mailbox [State.oese@ed.gov] with any questions regarding subrecipient awards with GEER funds within the State. LEAs or other subrecipients may enter into contracts for services (see FAQ A-3).

## B. Reopening Schools Safely and Promoting the Health and Safety of Students, Staff, and the School Community

### B-1. What resources are available to support the safe reopening and sustained operations of schools?

ESSER and GEER funds may be used to develop strategies and implement public health protocols including, to the greatest extent practicable, policies in line with guidance from the CDC for the reopening and operation of school facilities to effectively maintain the health and safety of students, educators, and other staff. CDC's operational strategy can be found at: https://www.cdc.gov/coronavirus/2019-ncov/community/schools-childcare/operation-strategy.html. Volume 1 of the Department's COVID-19 Handbook on school reopening can be found at: https://www2.ed.gov/documents/coronavirus/reopening.pdf.[13] Volume 2 of the Department's COVID-19 Handbook on school reopening and meeting all students' needs can be found at: https://www2.ed.gov/documents/coronavirus/reopening-2.pdf.

In addition, the Federal Emergency Management Agency (FEMA) is offering reimbursement for work conducted to safely open and operate Public Assistance-eligible facilities under the COVID-19 emergency and major disaster declarations from January 21, 2021, to September 30, 2021. Eligible work includes: face coverings and personal protective equipment (PPE); cleaning and disinfection; COVID-19 diagnostic testing, screening and temperature scanning; and signage for social distancing. More information about FEMA's Safe Opening and Operation policy can be found here. FEMA has also developed a COVID-19 Education Resource Roadmap, and other topical resource roadmaps, to help school systems address challenges and identify funding solutions for delivering educational services during the COVID-19 pandemic. The resource roadmaps can be accessed at: https://www.fema.gov/media-collection/resource-roadmaps.

States and LEAs may also use ESSER and GEER funds, consistent with Federal civil rights laws, for a range of evidence-based strategies that increase public safety for young people. More information about using Federal resources on strategies to reduce violence and enhance public safety to the benefit of their students, families, and communities, as part of their efforts to recover from the pandemic can be found here: 21-0130-ARP-Public-Safety-ED-FAQ-06-16-2021.pdf

### B-2. Is COVID-19 testing for students and LEA staff an allowable use of ESSER and GEER funds?

Yes. Because ESSER and GEER funds may be used for public health protocols including, to the greatest extent practicable, policies in line with guidance from the CDC for the reopening and operation of school facilities to effectively maintain the health and safety of students, educators, and other staff, providing

---

[13]As more information becomes available, both the CDC and the Department will be updating documents. Therefore, SEA, LEA, and school officials are encouraged to periodically visit the CDC website at: https://www.cdc.gov/coronavirus/2019-ncov/community/schools-childcare/index.html and the Department's website at: https://www.ed.gov/coronavirus/documents to check for new and revised resources that can assist in safely reopening schools.

COVID-19 testing is an allowable use of ESSER and GEER funds. See Appendix B, Sections 1 and 2 for more information on COVID testing.

SEAs and LEAs should consult with State and local health officials to ensure the adequacy of any SEA or LEA COVID-19 testing program and that testing procedures comply with all applicable laws and requirements including those related to privacy, including the Family Educational Rights and Privacy Act (FERPA) and Protection of Pupil Rights amendment (PPRA), and the confidentiality of information requirements under Part B and Part C of the IDEA.

Please note that the Department of Health and Human Services separately provided $10 billion under the ARP Act to States as Epidemiology and Laboratory Capacity for Prevention and Control of Emerging Infectious Diseases (ELC) Reopening Schools awards to support the implementation of COVID-19 testing programs, as recommended by the CDC, in K-12 schools. This funding was deployed quickly through State health departments in order to help LEAs safely reopen schools in the remaining months of school year 2020-2021, during summer activities, and in the subsequent school year. State and local health departments will provide technical assistance to LEAs and schools in establishing COVID-19 testing programs. More information on the program can be found at: https://www.cdc.gov/ncezid/dpei/pdf/guidance-elc-reopening-schools-508.pdf.

## B-3. May ESSER and GEER funds be used to provide COVID-19 vaccinations to LEA teachers, staff, and eligible students?

Yes. Because ESSER and GEER funds may be used to implement public health protocols including, to the greatest extent practicable, policies in line with guidance from the CDC for the reopening and operation of school facilities to effectively maintain the health and safety of students, educators, and other staff, providing COVID-19 vaccinations is an allowable use of ESSER and GEER funds. Allowable vaccination outreach efforts in general could include activities to create awareness and build confidence, facilitate clinics, and provide incentives such as paid time off for staff to get vaccinated. In cases where administrative fees are required to obtain a vaccination, ESSER or GEER funds may be used to offset the cost as long as the cost is reasonable. See Appendix B, Section 1 for more information on vaccinations.

## B-4. May ESSER and GEER funds be used for personal protective equipment (PPE), cleaning and sanitizing materials, and related supplies necessary to maintain school operations during and after the COVID-19 pandemic?

Yes. Purchasing PPE, cleaning and sanitizing materials, portable air purifiers, and emergency supplies necessary to adequately respond to COVID-19 are allowable uses of ESSER and GEER funds. These costs are consistent with the statutory purposes of the programs "to prevent, prepare for, and respond to" COVID-19, and LEAs are specifically authorized to use funds for such activities.

## B-5. How might an LEA use ESSER and GEER funds to engage stakeholders to build confidence in an LEA's plan for safe return to in-person instruction and continuity of services?

Section 2001(i) of the ARP Act requires an LEA that receives ARP ESSER funds to develop, within 30 days of receiving the funds, a plan for the safe return to in-person instruction and continuity of services. Prior to issuing the plan, the LEA must seek public input and take those comments into consideration in developing the plan. (See FAQ A-4.)

An LEA may use ESSER and GEER funds to engage the public on the development of the safe return to in-person instruction plan and for conducting active and sustained engagement with the school community. This includes using funds to cover the costs of conducting ongoing outreach, paying for translating and interpreting services as needed to ensure effective communication with individuals with limited English proficiency, providing reasonable accommodations such as interpreters and written materials in alternate formats for individuals with disabilities upon request, holding public meetings (including virtually), and conducting surveys of families, students, educators, and other staff to better understand their perceptions, needs, and concerns.

As schools and districts work to develop and implement strategies to safely reopen schools, engagement with educators, facility staff, families, and the school community is key. A successful school reopening strategy requires engaging the entire school community (specifically including underserved students and families and parents of students with disabilities or local special education advisory committees) to promote confidence and demonstrate inclusivity and identify any barriers to participating in in-person or hybrid instruction, in addition to broadly engaging education stakeholders to support actions that will lead to a safe learning environment for all educators, staff, and students.

As the CDC operational strategy notes, "the absence of in-person educational options may disadvantage children from low-resourced communities, which may include large representation of racial and ethnic minority groups, English learners, and students with disabilities. Plans for safe delivery of in-person instruction in K-12 schools must consider efforts to promote fair access to healthy educational environments for students and staff. Thus, essential elements of school reopening plans should take into account the communities and groups that have been disproportionately affected by COVID-19 infections and severe outcomes."

For additional considerations, see the Supporting Ongoing Engagement with Educators, Families, and the School Community section in the ED COVID-19 Handbook Volume 1: Strategies for Safely Reopening Elementary and Secondary Schools.

As noted in FAQ A-4, an LEA is also required to develop a plan for use of ARP ESSER funds that is distinct from the plan for the safe return to in-person instruction and continuity of services. Under the Interim Final Requirements of April 22, 2021, an LEA must, in developing its plan for use of ARP ESSER funds, engage in meaningful consultation as described in FAQ A-4 above. An LEA may use its ARP ESSER funds for that required stakeholder engagement for the plan for the use of ARP ESSER funds as well as the stakeholder engagement and consultation for the LEA's plan for the safe return to in-person instruction and continuity of services. An LEA should translate relevant materials and obtain the services of interpreters, as needed, to engage its English learners and families with limited English proficiency (which may be done using ESSER funds).

## B-6. May ESSER and GEER funds be used for construction? (*Updated December 7, 2022*)

Construction is authorized under Title VII of the ESEA (Impact Aid) and therefore is an allowable use of GEER and ESSER funds under sections 18002(c)(3) and 18003(d)(1) of the CARES Act, sections 312(c)(3) and 313(d)(1) of the CRRSA Act, and section 2001(e)(2) of the ARP Act. The broad Impact

Aid definition of "construction" includes new construction as well as remodeling, alterations, renovations, and repairs under which many activities related to COVID-19 would likely fall.[14]

However, the Department strongly discourages LEAs from using ESSER or GEER funds for new construction because this use of funds may limit an LEA's ability to support other essential needs or initiatives. Extensive remodeling, renovation, and new construction are often time-consuming, which may not be workable under the shorter timelines associated with ESSER and GEER funds. These types of activities are also subject to a number of additional Federal requirements, as detailed below.

While construction is generally allowable, it is the responsibility of a Governor, SEA, LEA, or other subgrantee to assure that individual costs:

1)  Comply with the Cost Principles in subpart E (e.g., the cost must be "necessary and reasonable" (2 CFR §§ 200.403-200.404));
2)  Meet the overall purpose of the CARES, CRRSA, or ARP Act programs, which is "to prevent, prepare for, and respond to" COVID-19; and
3)  Are consistent with the proper and efficient administration of those programs.

Under these general principles, construction activities, including renovations or remodeling, that are necessary for an LEA to prevent, prepare for, and respond to COVID-19 could be permissible, though the burden remains on grantees and subgrantees to maintain the appropriate documentation that supports the expenditure.

As noted above, an LEA using ESSER or GEER funds for remodeling, renovation, and new construction must comply with additional Federal requirements. For example, these projects require prior written approval by an LEA's SEA or Governor (or the Department for State projects). (See Title VII of the ESEA and 2 CFR § 200.439(b).) Approved construction projects (i.e., remodeling, renovation, and new construction) also must comply with applicable Uniform Guidance requirements, Davis-Bacon prevailing wage requirements,[15] and all of the Department's applicable regulations regarding construction at 34 CFR §§ 76.600 and 75.600-75.618. Some of the relevant part 75 requirements that must be considered before a new construction project is initiated include[16]:

1)  Has the grantee considered the probable effects of proposed construction on any district, site, building, or structure that is included or eligible for inclusion in the National Register of Historic Places (34 CFR § 75.602)? See question B-6.d. for more information on the National Historic Preservation Act.
2)  Does the grantee have title or other interest in the site, including right of access, that is sufficient to ensure that the grantee will have use and possession of the facility for 50 years or the useful life of the facility, whichever is longer (34 CFR § 75.603)?

---

[14] The Impact Aid program statute defines "construction" as "(A) the preparation of drawings and specifications for school facilities; (B) erecting, building, acquiring, altering, remodeling, repairing, or extending school facilities; (C) inspecting and supervising the construction of school facilities; and (D) debt service for such activities." ESEA section 7013(3), 20 U.S.C. § 7713(3).

[15] As is the case with all construction contracts using laborers and mechanics financed by Federal education funds, an LEA that uses ESSER or GEER funds for minor remodeling, renovation, repair, or construction contracts over $2,000 must meet all Davis-Bacon prevailing wage requirements and include language in the contracts that all contractors or subcontractors must pay wages that are not less than those established for the locality of the project (prevailing wage rates). (See 20 U.S.C. § 1232b Labor Standards.)

[16] The National Environmental Policy Act does not apply to ESSER and GEER construction projects. The previous version of this FAQ errantly noted that an environmental impact assessment is required. See FAQ B-6c. for more information.

3) Can the grantee begin the approved construction in a reasonable time period and have the final plans been approved before the construction is advertised or placed on the market for bidding (34 CFR § 75.605)?

4) Can a grantee complete the project in a reasonable time period and consistent with the approved plans and specifications (34 CFR § 75.606)?

5) Is the construction functional, economical, and not elaborate in design or extravagant in the use of materials as compared to other facilities in the State or other applicable geographic area (34 CFR § 75.607)?

6) Do the grantee's plans and designs for the facilities comply with applicable Federal, State, and local health and safety standards, as well as Federal requirements regarding access by persons with disabilities (34 CFR §§75.609 and 75.610)?

7) Does the grantee have sufficient operational funds to operate and maintain the facility once the construction is complete and will the grantee operate and maintain the facility in accordance with all applicable Federal, State, and local requirements (34 CFR §§ 75.614 and 75.615)?

8) Has the grantee filed a notice of Federal interest that must be executed on property when ESSER or GEER funds are used to purchase land, construct a building, or make improvements to a building on leased property (OMB Standard Form 424D)?

An SEA or Governor may use other State agencies (such as Public Works or similar offices) to assist with approvals and management of ongoing projects. However, ultimately as the grantee, an SEA or Governor is responsible for ensuring that its LEA grantees are meeting all applicable requirements that are detailed in 34 CFR §§ 75.600-75.618, as well as in OMB Standard Forms 424B and D (Assurances for Non-Construction and Construction Programs, https://apply07.grants.gov/apply/forms/sample/SF424D-V1.1.pdf ), including the assurances relating to labor standards; flood hazards; historic preservation; health and safety; energy conservation; and coastal barrier resources. (See FAQ A-17 for additional Uniform Guidance information.)

Finally, if ESSER or GEER funds are used for construction, grantees and subgrantees should also be aware that real property and equipment acquired or improved under a Federal award must be appropriately insured, and grantees must consult with the Department on disposition instructions in the event that the property or equipment is no longer needed. See, e.g., 2 CFR §§ 200.310-200.313.

## B-6.a. May a State determine the process for granting prior approval to an LEA to use ESSER or GEER funds for capital expenditures? (*New December 7, 2022*)

Yes. As noted in FAQ B-6, capital expenditures projects require prior written approval by an LEA's SEA or Governor (or the Department for State projects). (2 CFR § 200.439(b).) Neither the Department nor the Uniform Guidance specifies an SEA process for granting prior approval to an LEA to use ESSER funds for capital expenditures such as minor remodeling or construction (including HVAC projects). Therefore, an SEA has the flexibility to establish its own reasonable and expeditious process that ensures expenditures meet applicable statutory and regulatory requirements, including those in subpart E of the Uniform Guidance (2 CFR part 200). For example, an SEA could:

- Use or modify existing prior approval procedures from other Federal programs;
- Consider using a building expert (e.g., engineer, inspector, architect) who knows applicable Federal, State, and local requirements to assist with its review of prior approval requests. The expert could be acquired on a limited basis through procurement or an agreement with another State agency with authority over facilities;

- Develop a checklist of items that an LEA seeking prior approval should provide, which could include:
    - How the need for the repair, construction, or modernization prevents, prepares for, or responds to the COVID-19 pandemic;
    - The name of the school facility the LEA is proposing to repair, construct, or modernize;
    - Identification of the LEA's interest in, or authority over, the school facility involved, such as an ownership interest or a lease arrangement;
    - Sources and amounts of funds available for the proposed project;
    - A statement signed by an appropriate, independent local official affirming that:
        - The renovation or construction project meets applicable Federal, State, and local requirements with respect to health and safety, environmental standards, Historic Preservation, and other requirements (see FAQ B-6 and 34 CFR part 75); and
        - The renovation or construction is necessary (e.g., any deficiency associated with the renovation or construction threatens the health and safety of facility occupants or prevents the use of the facility).
        - An appropriate local official may include a local building inspector, a licensed architect, or a licensed structural engineer.
    - A cost estimate and other details needed to support the reasonableness and allowability of the expenditure under the applicable statute (e.g., ARP Act) and cost principles in the Uniform Guidance (e.g., the original construction date and the dates and descriptions of any other major renovations of the facility); and
    - Applicable assurances and certifications (see FAQ B-6 for applicable requirements that must be met for any renovation or construction project).

Under applicable Department requirements, State prior approval is recommended, but not required, before LEA bidding is advertised. State approval may come at any point in the project timeline until the point that reimbursement using ESSER or GEER funds occurs. Ideally, the State review process is complete as soon as possible on a project's timeline, but a State may utilize this flexibility at any point in the project process.

### B-6.b. What information does the Department need in order to consider a State's prior approval request for a State's capital expenditures? (*New December 7, 2022*)

As noted above, a State (SEA or Governor) as the pass-through agency is responsible for granting prior approval to subgrantees for capital expenditures. However, if a State is using ESSER or GEER funds it reserves at the State level for a capital expenditure, the State, under the Uniform Guidance, must seek prior approval from the Department for its expenditures. In general, for State projects, a State's prior approval request should include detailed information on the project or capital equipment purchase; how the project or purchase will prevent, prepare for, or respond to COVID-19; a timeline for the project; and a budget. A State must obtain prior approval of the final working drawings and specifications from the Department before a construction project is advertised or placed on the market for bidding (34 CFR § 75.605). State prior approval requests should be submitted to the Department via the State's dedicated Department mailbox [State.oese@ed.gov].

**B-6.c. Is a grantee/subgrantee required to complete an environmental impact assessment under 34 CFR § 75.601 and the National Environmental Policy Act (NEPA) for a construction, renovation, or real property project supported by ESSER or GEER funds? (*New December 7, 2022*)**

No. The Department does not exercise control over the use of the funds for any individual project as long as the project continues to meet all statutory and other applicable requirements (such as the Uniform Guidance and the Department's administrative regulations). As a result, construction, renovation, or real property projects supported by ESSER or GEER grants are not considered a "major Federal action" under NEPA and are not subject to 34 CFR § 75.601.

While NEPA environmental impact assessments are not applicable, the Department strongly encourages grantees to require some type of environmental assessment for projects that involve breaking new ground, such as projects to expand the size of an existing building or replace an outdated building. This may already be required by State law and would help to assess any potential environmental ramifications of expanding or replacing school facilities and ensuring compliance with local or other environmental requirements.

**B-6.d. What are grantee and subgrantee responsibilities under the requirements in section 106 of the National Historic Preservation Act? (*New December 7, 2022*)**

Section 106 of the National Historic Preservation Act of 1966 (NHPA) requires Federal agencies to consider the effects on historic properties of projects they carry out, assist, fund, permit, license, or approve. If a Federal or federally-assisted project has the potential to affect historic properties, a section 106 review will take place. Section 106 gives the Advisory Council for Historic Preservation, interested parties, and the public the chance to weigh in on these matters before a final decision is made. Consistent with those requirements, ESSER and GEER grantees and subgrantees are expected to assess the probable effects of any proposed construction on any district, site, building, or structure that is included or eligible for inclusion in the National Register of Historic Places.

Grantees will consult with the Department for State projects. Consistent with 34 CFR § 76.600(b) and (c), a State is authorized to perform the Department's functions for its subgrantees when complying with certain section 106 requirements. This authorization applies to section 106 historic property reviews with respect to projects that are funded in whole or in part with ESSER or GEER funds.

The State may consult with the State Historic Preservation Officer (SHPO) and Tribal Historic Preservation Officer (THPO) to initiate the section 106 review process, identify and evaluate historic properties, and assess effects. The Department remains responsible for participating in the consultation process when:
- The State determines that "Criteria of Adverse Effect" apply to an undertaking;
- There is a disagreement between the State and the SHPO/THPO regarding identification and evaluation, and/or assessment of effects;
- There is an objection from consulting parties or the public regarding findings, determinations, the implementation of agreed upon provisions, or either the consulting parties or the public's involvement in a section 106 review; or
- There is the potential for a foreclosure situation or anticipatory demolition as specified in section 110(k) of the NHPA.

**B-6.e. What are the Federal reporting requirements associated with using ESSER and GEER funds to purchase land, construct a building, or make improvements to a building? (*New December 7, 2022*)**

There are three sets of reporting requirements for States and LEAs that use ESSER or GEER funds to purchase land, construct a building, or make improvements to a building. The first is to record the Federal interest in the title of real property and include a covenant in the title of real property acquired in whole or in part with Federal assistance funds to assure nondiscrimination during the useful life of the project. In addition, as part of the grant award assurances for ESSER I, ESSER II, and ARP ESSER, and GEER I and GEER II, the chief state school officer for ESSER and the Governor for GEER assured that the SEA would comply with OMB Standard Forms 424B and D (Assurances for Non-Construction and Construction Programs). OMB Standard Form 424D states, among other things, that the grantee:

- Will not dispose of, modify the use of, or change the terms of the real property title, or other interest in the site and facilities without permission and instructions from the awarding agency.
- Will record the Federal interest in the title of real property in accordance with awarding agency directives and will include a covenant in the title of real property acquired in whole or in part with Federal assistance funds to assure nondiscrimination during the useful life of the project.

The second reporting requirements are those in the Uniform Guidance that are triggered when Federal funds are used to acquire or improve real property. For example, see, 2 CFR §§ 200.310-200.313, which provide more detail on consulting with the Department when the property is modified or disposed of, including the conditions under which the Federal government must be compensated when property is sold. Finally, annually States must report to the Department and LEAs must report to the State/SEA (pass-through agency) on the status of the real property for at least the first 15 years see, e.g., 2 CFR §200.330.

**B-7. May ESSER and GEER funds be used for renovation, including for such projects as making improvements to a school facility to improve indoor air quality (such as heating, ventilation, and air conditioning (HVAC) systems), and projects that would promote social distancing and safe in-person instruction? (*Updated December 7, 2022*)**

Yes. ESSER and GEER funds may be used to make necessary improvements, for example to improve air quality and support social distancing, so that teachers and students may safely continue in-person instruction. As is the case with all activities charged to ESSER or GEER, costs must be reasonable and necessary to meet the overall purpose of the program, which is "to prevent, prepare for, and respond to" COVID-19. (See 2 CFR §§ 200.403-200.404.) Therefore, renovation or remodeling activities that are necessary for an LEA to prevent, prepare for, or respond to COVID-19 would be permissible. This might include renovations that would permit an LEA to clean effectively (e.g., replacing old carpet with tile that could be cleaned more easily) or create a learning environment that could better sustain social distancing (e.g., bringing an unused wing of a school into compliance with fire and safety codes in order to reopen it to create more space for students to maintain appropriate social distancing). This might also include, for example, as noted in section 2001(e)(2)(O)-(P) of the ARP Act:

- School facility repairs and improvements to enable schools to reduce the risk of virus transmission and exposure to environmental health hazards, and to support student health needs.
- Inspection, testing, maintenance, repair, replacement, and upgrade projects to improve the indoor air quality in school facilities, including mechanical and non-mechanical heating, ventilation, and air conditioning systems, filtering, purification and other air cleaning, fans, control systems, and window and door repair and replacement. Please see the Department's July 2021 guide to

Improving Ventilation in Schools, Colleges, and Universities to Prevent COVID-19 for additional guidance.

As noted in FAQ B-6, these projects are also subject to prior written approval by a Governor or SEA (or the Department for State projects) and applicable Uniform Guidance requirements, Davis-Bacon prevailing wage requirements, and any of the Department's applicable regulations regarding construction at 34 CFR §§ 76.600 and 75.600-75.618. In implementing any allowable ESSER or GEER activity, a grantee or subgrantee must follow all applicable Federal, State, and local standards and policies (e.g., building codes or specifications for HVAC systems), which may be consistent with standards identified by the Environmental Protection Agency (EPA), Centers for Disease Control (CDC), or World Health Organization. If an LEA uses funds for HVAC systems, under 34 CFR § 75.616(c), the American Society of Heating, Refrigeration and Air Conditioning Engineers (ASHRAE) standards apply. Please note that, for the purpose of HVAC projects supported by Department COVID relief funds, the Department has indicated that projects should meet the current ASHRAE standards, as noted above in the improving ventilation factsheet (issued July 2021). A State, SEA, or LEA might also consider using ESSER or GEER funds to establish a program for assessing and improving HVAC systems. Such a program could also require verification that proper ventilation is occurring, such as through the use of carbon dioxide ($CO_2$) monitors.

Some HVAC upgrades may constitute "minor remodeling" and the Department's applicable regulations regarding construction at 34 CFR §§ 76.600 and 75.600-75.618 would not apply. "Minor remodeling" means minor alterations in a previously completed building. The term also includes the extension of utility lines, such as water and electricity, from points beyond the confines of the space in which the minor remodeling is undertaken but within the confines of the previously completed building. The term does not include permanent building construction, structural alterations to buildings, building maintenance, or repairs. Minor remodeling projects that constitute capital assets under the Uniform Guidance still require prior approval consistent with 2 CFR § 200.439. See FAQs B-6.a, B-6.b for more information on prior approval.

The EPA has a variety of publications that can assist education leaders in improving the indoor air quality in schools. EPA resources on indoor air quality in schools can be accessed at: https://www.epa.gov/iaq-schools. The EPA has information available at: https://www.epa.gov/coronavirus/air-cleaners-hvac-filters-and-coronavirus-covid-19 on some indoor air filtration devices that use bipolar ionization technology, which has the potential to create ozone. EPA states that ozone generators should not be used in occupied spaces. If choosing to use a device that incorporates bipolar ionization technology, EPA recommends using a device that meets UL 2998 standard certification (Environmental Claim Validation Procedure (ECVP) for Zero Ozone Emissions from Air Cleaners) and notes that there are many air cleaning devices that do not use bipolar ionization. EPA's Clean Air in Buildings Challenge includes a set of guiding principles and best practices to assist building owners and operators with reducing risks from airborne viruses and other contaminants indoors. In addition, the CDC provides information on improving ventilation in schools at: https://www.cdc.gov/coronavirus/2019-ncov/community/schools-childcare/ventilation.html and in buildings at: https://www.cdc.gov/coronavirus/2019-ncov/community/ventilation.html.

## B-8. May an LEA use ESSER and GEER funds to purchase trailers or modular units?

Yes. Under 2 CFR § 200.33, "equipment" means "tangible personal property (including information technology systems) having a useful life of more than one year and a per-unit acquisition cost which equals or exceeds the lesser of the capitalization level established by the non-Federal entity for financial statement purposes, or $5,000." Generally, a trailer or modular unit meets this definition. Accordingly, an LEA may use ESSER and GEER funds to purchase trailers or modular units if such purchases are

necessary to create additional safe learning spaces due to the COVID-19 pandemic (e.g., for more effective social distancing consistent with CDC guidance) (see section 2001(e)(2)(Q) of the ARP Act). In addition, the use of grant funds to purchase equipment is subject to 2 CFR § 200.439(b), which requires the LEA to obtain prior written approval from the Governor or SEA. As with all costs, they must be reasonable and necessary. In the case of such large purchases, it may be beneficial for the LEA to do a cost analysis under 2 CFR § 200.318(d) comparing the cost of buying trailers and modular units with the cost of leasing, for example.

When selecting which students will receive services in trailers or modular units, an LEA should ensure that decisions are made consistent with applicable civil rights requirements and that certain subgroups are not disproportionately educated in trailers or modular units, especially if being educated in the trailers or modular units limits access to other students, activities, or services within the school or in any way contributes to tracking or within-school segregation.

### B-9. May an LEA use ESSER and GEER funds to renovate, remodel, or construct athletic facilities, such as swimming pools, playing fields, or sports stadiums? (*New December 7, 2022*)

This would not be an allowable use of funds unless there is a connection between the expenditure and preventing, preparing for, or responding to COVID-19, considering the specific facts and circumstances of a project. Expenditures of ESSER or GEER funds must meet the overall purpose of the CARES, CRRSA, or ARP Act programs. In addition, the Department discourages LEAs from using these funds for new construction, as this use of funds limits an LEA's ability to meet other, more pressing needs related to the pandemic's impact on learning and the emotional and mental health and well-being of our children and youth. It is the responsibility of the grantee and subgrantee to ensure that, among other Federal requirements, any project is targeted to the overall purpose of the ESSER or GEER program, which is "to prevent, prepare for, and respond to" COVID-19. It is unclear, for example, how constructing a swimming pool is related to the pandemic or otherwise allowable under the CARES, CRRSA, or ARP Act.

### B-10. May ESSER and GEER funds be used to mitigate flood, tornado, and other natural disaster-related damage, including damage to buildings/infrastructure, technology, and equipment, to ensure that schools can open and safely remain open? (*New December 7, 2022*)

Yes, in limited circumstances, if such use is consistent with the primary purpose of ESSER and GEER funds to assist States and LEAs in preventing, preparing for, and responding to COVID-19. However, the SEAs and LEAs may want to take advantage of any available funding, including through FEMA's Public Assistance program or the Department's Project SERV. Many, if not all, costs incurred following a natural disaster may be covered by insurance or with funding received through FEMA's Public Assistance program. To the extent there are activities that are necessary to meet students' needs in response to the pandemic, including needs exacerbated by a recent natural disaster, ESSER or GEER funds may be used to cover the costs consistent with the ESSER or GEER allowability considerations (i.e., allowable under the statute and consistent with the Uniform Guidance). For example, ARP ESSER specifically provides that an LEA may use ESSER funds for "school facility repairs and improvements to reduce risk of virus transmission and exposure to environmental health hazards, and to support student health needs" (section 2001(e)(2)(O) of the ARP Act). To the extent that a natural disaster has caused damage to school infrastructure and buildings that would increase the risk of virus transmission or impact in-person learning, such as flood or fire damage, then ESSER or GEER funds may be used to cover the costs of activities to reduce that risk. It is important for an LEA to maintain documentation and written

justification as to how uses of ESSER or GEER funds are related to the COVID-19 response, particularly where costs are closely associated with damage from a natural disaster.

### B-11. May ESSER and GEER funds be used to support costs for utilities or gasoline? (*New December 7, 2022*)

Generally, ESSER or GEER funds may be used to support activities that are necessary to maintain the operation and continuity of services in the LEA as schools and students recover from the pandemic.  For example, there may be instances where the use of funds to support this type of cost would be acceptable, such as in a case where an LEA has incurred additional expenses for utilities due to efforts related to improving indoor air quality. The costs must be reasonable and otherwise consistent with the Uniform Guidance (2 CFR §§ 200.403-200.405).

### B-12. May ESSER and GEER funds be used to pay student fees for activities such as art, music, and theater classes? (*New December 7, 2022*)

Yes, under certain circumstances. Because ESSER or GEER funds may be used to support activities addressing the unique needs of students from low-income backgrounds, students with disabilities, English learners, students of color, students experiencing homelessness, and children and youth in foster care, and help students recover from the pandemic an LEA may use ESSER or GEER funds to pay fees, including outstanding balances, to help ensure equitable access to programs that meet students' social, emotional, mental health, and academic needs. Alternatively, an LEA could use ESSER or GEER funds to support such activities for all students, such that no fee is charged.

### B-13. May ESSER and GEER funds be used to provide students with safe, healthy, and supportive learning environments? (*New December 7, 2022*)

The primary purpose of ESSER and GEER funds is to assist States and LEAs in preventing, preparing for, and responding to the COVID-19 pandemic. To the extent there are safety and supportive measures and activities that are necessary to meet students' health and well-being and other needs in response to the pandemic, ESSER or GEER funds may be used to cover the costs consistent with allowable uses of ESSER and GEER funds under the statutes and consistent with the Uniform Guidance, as noted earlier in these FAQs. As with all uses of funds, the grantee is responsible for ensuring that the use of funds supports the overall purpose of the CARES, CRRSA, or ARP Act programs, which is "to prevent, prepare for, and respond to" COVID-19.

In all cases, the Department strongly recommends that States and LEAs focus on evidence-based practices that promote safe, healthy, and supportive learning environments. A comprehensive approach should include efforts specific to:

- Implementing Multi-Tiered Systems of Support (e.g., Positive Behavioral Interventions and Supports), and other early intervention strategies.
- Providing integrated behavioral and mental health supports to educators and staff (e.g., hiring certified mental health professionals and behavior specialists).
- Working collaboratively with a diverse multidisciplinary team trained in youth development to create emergency plans and training exercises.
- Increasing professional development opportunities for faculty, staff, and community partners, particularly around trauma-informed care and culturally and linguistically inclusive responses.

- Ensuring that prevention, protection, mitigation, response, and recovery activities consider the evidence base and are implemented in ways that respond to underserved students, protect students' rights, and demonstrate respect for students' dignity and potential.

In supporting efforts to address the mental health needs of students, we suggest States and LEAs review the effective strategies that the Department has identified in our guidance on Supporting Child and Student Social, Emotional, Behavioral, and Mental Health Needs, in Strategies for Using American Rescue Plan Funding to Address the Impact of Lost Instructional Time, in Volume 2 of the ED COVID-19 Handbook, or on the fact sheet regarding Supporting the Mental Health Needs of All Students with American Rescue Plan Funds.

## B-14. May ESSER and GEER funds be used for the cost of purchasing and installing video systems for security purposes? (*New December 7, 2022*)

There may be limited circumstances where purchasing and installing such a system, consistent with applicable law, is permissible, since ESSER or GEER funds may be used by an LEA for the purpose of promoting safe and secure schools. As with all uses of funds, the grantee is responsible for ensuring that the use of funds supports the overall purpose of the CARES, CRRSA, or ARP Act programs, which is to prevent, prepare for, and respond to COVID-19.

To the extent that video systems capture student and staff behavior, whether intentionally or incidentally, there may be additional requirements and considerations as discussed below.

**Privacy Considerations.** LEA officials are regularly asked to balance the interests of safety and privacy for students, consistent with applicable law. For example, while the Family Educational Rights and Privacy Act (FERPA) (20 U.S.C. § 1232g; 34 CFR part 99) generally prohibits educational agencies and institutions from disclosing personally identifiable information from a student's education records absent written consent from parents or eligible students (age 18 or older or attending a postsecondary institution at any age), there are exceptions to the general consent requirement that can help schools and LEAs to take steps to maintain school safety. Images of students captured on video systems that are maintained by a school official may or may not be considered "education records" subject to FERPA. For more information, *see* "FAQs on Photos and Videos under FERPA" at https://studentprivacy.ed.gov/faq/faqs-photos-and-videos-under-ferpa. Images of students captured on video systems that are maintained by the school's law enforcement unit are generally not considered "education records" under FERPA, and, therefore, may not be subject to FERPA's requirements. For more information, *see* "School Resource Officers, School Law Enforcement Units, and the Family Educational Rights and Privacy Act (FERPA)" at https://studentprivacy.ed.gov/sites/default/files/resource_document/file/SRO_FAQs.pdf.

The use of video systems may raise other privacy concerns. Accordingly, the LEA should consider several questions before deciding to use video systems, including where the cameras are located, who has access to the images, how the images will be used, and how long the images will be retained. As a best practice, LEAs should only collect, use, and retain the minimum amount of personally identifiable information that is relevant and necessary to accomplish an authorized purpose. LEA officials should consult with their legal counsel to determine whether any Federal or State laws may be applicable.

Further, consideration needs to be given to the places in which individuals would enjoy a reasonable expectation of privacy to avoid violating such expectations. Applicable State law should be considered because the use of video systems may give rise to legal obligations regarding access to and disclosure of any recordings, as well as their retention and disposition. These issues should be considered in advance of developing a policy on the use of video systems. For example, it would be helpful to consider whether

37

images of individuals can be blurred or redacted before providing access to or disclosing any recordings to protect the privacy of those individuals.

**Civil Rights Considerations.** Federal civil rights laws enforced by the Department's Office for Civil Rights require an LEA that receives Federal financial assistance not to discriminate based on race, color, national origin, sex (including sexual orientation and gender identity), disability, and age in their programs and activities.[17] An LEA's nondiscrimination obligations apply to the conduct of school staff and other persons with whom the school has a contractual or other arrangement, including security staff, private security, and school law enforcement officers. The LEA has a responsibility not to discriminate when conducting surveillance and other security or safety activities using video systems.

Specifically, an LEA must ensure nondiscrimination in decisions to obtain and use such equipment, including where to place such devices to ensure such surveillance does not treat students unnecessarily differently on the basis of race, color, national origin, sex, disability or age or have an unjustified discriminatory impact on these bases; and must ensure the videos and related information are not used in a discriminatory manner.

**Additional Policy Considerations.** If an LEA chooses to use a video system, it should have a clearly established policy on the use of video systems on school property. As a best practice, the LEA should develop the policy surrounding the use of video systems in consultation with students, their families, and school-based staff, so that uses of the video systems are widely understood and privacy concerns are more fully considered in the development of the policy.

The policy should effectively address privacy and civil liberties issues and provide fair notice to students and their families, staff, and visitors that on-campus video systems are in place. At a minimum, the policy should: (a) describe the purposes for which video systems are used on school property (b) address the placement of the cameras to ensure that cameras are not placed in any areas where there is a reasonable expectation of privacy; (c) notify staff and students through staff and student/parent handbooks and signage (in accessible formats) that on-campus video systems may be present on school property and on vehicles used for school-provided transportation, along with the purposes of the surveillance equipment, as set forth above; and (d) state whether the video recordings may become a part of a student's education record or a staff member's personnel record and under what conditions, the process for disputing the inclusion of such recordings as part of any record, and, if applicable, how it is maintained consistent with local, State, and Federal laws such as FERPA.

The LEA must comply with all applicable laws related to record maintenance and retention. The LEA policy should also include reasonable procedures intended to preserve data related to a known incident that involves injury to students, staff, or members of the public or damage to property, or that involves any potential violation of the law or LEA policies, procedures, or rules of conduct. Depending on relevant facts, the use of video systems in classrooms may raise concerns regarding the potential application of other Federal or State laws. LEA officials should consult with their counsel to determine whether any such laws are applicable.

---

[17]These Federal laws include: Title VI of the Civil Rights Act of 1964, which prohibits discrimination based on race, color, or national origin; Title IX of the Education Amendments of 1972, which prohibits sex discrimination; Section 504 of the Rehabilitation Act of 1973 and Title II of the Americans with Disabilities Act of 1990, which prohibit disability discrimination (the U.S. Department of Education shares responsibility with the U.S. Department of Justice for enforcing Title II, which applies to public entities, regardless of whether they receive Federal financial assistance); and the Age Discrimination Act of 1975, which prohibits age discrimination. Applicable State laws may prohibit discrimination in additional areas.

# C. Advancing Educational Equity in COVID-19 Response

*Overall Equity Considerations*

## C-1. What should each State and LEA consider in order to ensure that ESSER and GEER funds are equitably allocated among schools?

SEAs and LEAs should establish practices that ensure all students are provided resources that establish equitable opportunities to learn. Resource equity means that schools serving larger proportions of historically underserved groups of students—including students from low-income families, students of color, English learners, students with disabilities, and students experiencing homelessness—require more funding, depending upon the needs of the students at a particular school. In addition, resource allocation decisions should recognize that certain student populations and school communities have been disproportionately impacted by the pandemic and ensure resource equity, including through allocating funding to provide more intensive social, emotional, mental health, and academic services as needed on return to in-person learning.

Because ESSER funds are distributed to LEAs in proportion to the amount each LEA received under part A of title I of the ESEA in the most recent fiscal year, ESSER is already targeted to LEAs with concentrations of students from low-income families. Although an LEA may use ESSER funds for any school under the supervision of the LEA, ESSER funds may also be targeted on those schools that are eligible for or participate in part A of title I. ESSER funds can be further focused by the LEA to advance educational equity by only serving those schools operating schoolwide programs. (To qualify for a Title I schoolwide program, at least 40 percent of the students enrolled must come from low-income families, unless a school receives a waiver from the SEA under section 1114(a)(1)(B) of the ESEA.)

Under GEER, consistent with section 18002(c)(1) of the CARES Act and section 312(c)(1) of the CRRSA Act, a Governor may provide emergency support to LEAs that the SEA determines have been "most significantly impacted" by the COVID-19 pandemic. The SEA has substantial flexibility in making this determination and might consider, among other things:

- The percentage of families in the LEA with incomes below the poverty line;
- The percentage of students in an LEA that represent underserved populations (e.g., students with disabilities, English learners, students experiencing homelessness, children and youth in foster care, migratory students, children who are incarcerated);
- The projected number of days that the LEA was unable to provide in-person instructional services as a result of the COVID-19 pandemic;
- Unemployment data for the geographic area in which the LEA is located; and
- The extent to which the LEA is located in a geographic area in which a significant number or percentage of individuals have tested positive for or been significantly affected by the COVID-19 pandemic.

When determining how to allocate GEER funds within an LEA, an LEA might also balance similar considerations in order to effectively target GEER funds to advance educational equity.

**C-2. How may an LEA use ESSER and GEER funds to support students who have lost instructional time due to the COVID-19 pandemic?**

SEAs and LEAs must reserve a portion of their ARP ESSER funds to address the academic impact of lost instructional time. Specifically, section 2001(f)(1) of the ARP Act requires an SEA to reserve not less than 5 percent of the State's grant to carry out, directly or through subgrants or contracts, activities to address the academic impact of lost instructional time by supporting the implementation of evidence-based interventions. Similarly, section 2001(e)(1) of the ARP Act requires each LEA to reserve not less than 20 percent of its ARP ESSER allocation to address the academic impact of lost instructional time. Please note that these reserves are only minimum requirements; spending a larger share of funds for this purpose is allowable and may be necessary to address the needs of students.

The interventions implemented through these reservations must be evidence-based (see FAQ A-10) and may include such activities as summer learning or summer enrichment, extended day, comprehensive after-school programs, tutoring, extended school year programs, and innovative approaches to providing instruction to accelerate learning. Further, SEAs and LEAs must ensure that the interventions implemented respond to students' social, emotional, mental health, and academic needs and address the disproportionate impact of the COVID-19 pandemic on students from low-income families, students of color, children with disabilities, English learners, migratory students, students experiencing homelessness, and children and youth in foster care.

ESSER and GEER funds may also be used to provide a variety of activities and supports to help improve the achievement of students to address the impact of lost instructional time due to the COVID-19 pandemic. For example, funds may be used for costs associated with evidence-based approaches to accelerating learning, high-dose tutoring, leveraging technology to provide embedded assessment and differentiated instruction, diagnostic and curriculum-embedded assessments, and extending the school day or year to provide additional time for student learning, enrichment, and support. These costs may include supplementing the salaries of educators and other qualified personnel to perform additional services. ESSER and GEER funds may also be used to support the costs associated with hiring additional teachers and teacher aides to provide intensive support to students. ESSER and GEER funds may further be used to provide professional development to educators on research-based strategies for meeting students' academic, social, emotional, mental health, and college, career, and future readiness needs, including strategies to accelerate learning without remediation or tracking.

For more information on using ESSER and GEER funds to address the academic impact of lost instructional time for students with disabilities eligible under IDEA, see FAQ C-5.

Effective strategies to address lost instructional time are further described in Volume 2 of the Department's COVID-19 Handbook, which is available at: https://www2.ed.gov/documents/coronavirus/reopening-2.pdf.

**C-3. How may an LEA use ESSER and GEER funds to support students' social, emotional, mental health, and academic needs, including by hiring support personnel such as nurses, counselors, and social workers?**

An LEA may use ESSER and GEER funds, including the 20 percent of ARP ESSER funds set aside to address the academic impact of lost instructional time, to support students' social, emotional, mental health, and academic needs, including by implementing school-wide strategies that enhance supports and interventions for students as well as targeted assistance for students who need such supports. For example, an LEA might hire additional personnel to prioritize student well-being and health by increasing

40

student access to teachers, nurses, counselors, social workers, and other support personnel (including teachers' aides and paraprofessionals). An LEA might also address the needs of students arising from the COVID-19 pandemic by using ESSER and GEER funds to implement or expand arts programs, such as music programs, including purchasing instruments; expand sports programming so more students can participate; or initiate clubs, such as a robotic or STEM club.

LEAs should also work to ensure that schools are implementing instructional practices that are culturally responsive and that incorporate trauma-informed pedagogy in response to the COVID-19 pandemic. For example, LEAs with high concentrations of English learners may hire additional bilingual staff to address the social, emotional, mental health, and academic needs of English learners. ESSER and GEER funds may be used to support implementation of curriculum, including related professional development.

As noted in FAQs A-4 and A-9, in implementing evidence-based strategies to address the academic impact of lost instructional time through the ARP ESSER required reservation of funds, SEAs and LEAs must respond to students' social, emotional, mental health, and academic needs and address the disproportionate impact of the COVID-19 pandemic on students from low-income families, students of color, English learners, children with disabilities, migratory students, students experiencing homelessness, and children and youth in foster care.

Effective strategies to support student social, emotional, mental health, and academic development are further described in Volume 2 of the Department's COVID-19 Handbook available at: https://www2.ed.gov/documents/coronavirus/reopening-2.pdf.

### *Focusing on Student Groups Most Impacted by the Pandemic*

Please note that the following FAQs provide examples of allowable uses of ESSER and GEER funds for specific groups of students. To the extent that these groups are also served by other Federal education programs, uses of funds under those programs, which are governed by specific programmatic requirements, may be more restrictive. The examples provided below with respect to one student group may also be implemented with respect to other student groups if the LEA determines it is necessary and reasonable to do so.

## C-4. How may an LEA use ESSER and GEER funds to support English learners (also referred to as multilingual learners)?

In order to address the needs of English learners, an LEA may use ESSER and GEER funds to address the impact of lost instructional time and services, support culturally responsive instruction, and support family engagement activities.

To address the impact of lost instructional time, an LEA may use ESSER and GEER funds for a variety of activities, including:
- Extended-day and/or extended-year activities designed to recover lost instructional time as a result of the pandemic, including costs associated with transportation services to support English learners' access to these services.
- Providing language accommodations for English learners to increase their access to content, and/or their participation in programs and services.
- Activities that respond to the social and emotional learning needs of English learners, including professional development for teachers to support English learners—e.g., how to provide a welcoming, nurturing, and supportive learning environment whatever the learning mode; and strategies that increase student collaboration and enhance classroom community.

41

- Hire additional bilingual staff (including certified bilingual education teachers) to address the social, emotional, mental health, and academic needs of English learners.

To address and promote culturally responsive practices that leverage the assets of English learners and provide the essential scaffolds and supports, an LEA may use ESSER and GEER funds to provide professional development for staff (including administrators, teachers, counselors, and other student services staff) that is focused on meeting the unique needs of English learners. For example, an LEA may use ESSER and GEER funds to provide professional learning:

- For content teachers on implementation of strategies to provide meaningful access to the content, to promote English language development, and to offer language accommodations during instruction in a variety of modes;
- For all teachers on formative assessment strategies to monitor the progress of English learners in content and language instruction;
- For counselors and student service staff on asset-based scheduling practices that support meaningful access to core content classes;
- For administrators and teachers on vertical articulation and collaboration practices to support the successful transition of English learners in critical stages such as grades K-1, 5-6, and 8-9;
- Technology specifically focused on helping English learners access remote instruction or other tools that will help them better access the curriculum and provide enrichment; and
- PPE that helps facilitate language instruction (i.e., transparent masks).

To address and promote family engagement and dual capacity building for staff and families of English learners, an LEA may use ESSER and GEER funds to provide:

- Outreach to families of English learners during the COVID-19 pandemic that includes them as partners in education. For example, an LEA might provide support to help parents navigate online platforms, track student progress, and seek help/resources when needed. This may also include using ESSER and GEER funds for translation and interpretation services. The Department's Fact Sheet: Providing Services to English Learners During the COVID-19 Outbreak is a helpful tool that outlines States' responsibilities to English learners and their parents.
- Translation services to assist with communication around the COVID-19 pandemic, for example related to effective prevention and mitigation strategies, test screening, remote learning, and opportunities to address lost instructional time.

## C-4.a. In addition to the approaches described in FAQ C-4, how may ESSER and GEER funds support multilingual learners? (*New December 7, 2022*)

SEAs and LEAs may use ESSER or GEER funds to support social, emotional, and academic needs of multilingual learners or immigrant children or youth in response to and recovery from the COVID-19 pandemic. In addition, funds may be used to address long-standing inequities that have been exacerbated by the pandemic, Funds may be expended for a wide range of activities including:

- Supporting the development or expansion of multilingual instructional programs, including programs that provide instruction in Native American languages.
- Supporting an increase in available learning and enrichment time, such as through extended day, week, or year programs, or additional out-of-school time (e.g., during school breaks).
- Supporting services to meet increased needs of immigrant children or youth including by providing a whole child approach.
- Assessing individual student needs and tailoring supports to unique circumstances.
- Providing professional development to educators and others who provide additional supports, such as tutors, to ensure instruction and enrichment are evidence-based and culturally and

linguistically responsive, including by ensuring students learn listening, speaking, reading, and writing skills in an integrated manner in all languages they are studying.

- Supporting collaboration between teachers and others providing additional instruction to integrate multilingual learners' experiences or to ensure continuity of instruction between the regular school day and any additional out-of-school learning time.
- Recruiting, preparing, and developing multilingual educators and staff, including through pathway programs such as high-quality residencies, grow your own programs, and registered apprenticeships.
- Providing teacher candidates with additional financial support such as stipends, loan forgiveness, and service scholarship programs.
- Supporting existing educators and staff in adding bilingual or other specialized certifications that support multilingual learners, including by covering the costs associated with earning those additional certifications.
- Supporting or expanding programs that offer a seal of biliteracy to recognize students who demonstrate proficiency in multiple languages.[18]
- Supporting the development or expansion of digital literacy programs for multilingual students, families, and caregivers.

### C-4.b. In addition to the approaches described in FAQ C-4 and C-4.a., how may ESSER and GEER funds support family engagement for multilingual learners? (*New December 7, 2022*)

In addition to the approaches described in FAQ C-4 and C-4.a, ESSER or GEER funds may support family engagement for multilingual learners or immigrant children or youth as part of the effort to address the impact of lost instructional time and to address the unique needs of multilingual learners arising from the pandemic. Such investments may help families of multilingual learners become more fully aware of the range of programs, courses of study, and supports that can help their students overcome obstacles created and exacerbated by the pandemic and succeed in academic coursework. For example, ESSER or GEER funds may be used to expand outreach and community engagement with local organizations that serve multilingual learners and to expand an LEA's multilingual social media and online presence to ensure families have accurate, up-to-date information about learning opportunities. As described in FAQ C-4, ESSER or GEER funds may also be used to provide translation and interpretation services.

In establishing or expanding such programs, SEAs, LEAs, and schools should engage communities to support needs assessment, program design and development, and implementation, all of which may be allowable uses of ESSER and GEER funds. ESSER or GEER funds may also be used to assist families in understanding their students' linguistic development in each language and how they can support multilingual learning at home.

### C-4.c. How may ESSER and GEER funds support assessments for multilingual learners? (*New December 7, 2022*)

ESSER or GEER funds may be used to develop, improve, and administer assessments for English learners, including formative, diagnostic, interim, and summative assessments as part of a school's and

---

[18] To further align with statewide biliteracy efforts, an SEA may amend its consolidated State plan under the ESEA to modify its School Quality or Student Success indicators under its statewide accountability and improvement system, consistent with the requirements under ESEA section 1111(c)(4)(B)(v), to include a new measure in its methodology that rewards schools for successful programs, such as a measure based on students earning a seal of multiliteracy.

LEA's efforts to quantify and address the impact of lost instructional time that resulted from the pandemic. This may include developing assessments in a language and form most likely to yield accurate and reliable information on what students know and can do, consistent with ESEA section 1111 and 34 CFR § 200.6,[19] and may also include developing and administering assessments in a Native American language.[20] ESSER or GEER funds may support development of assessments for multilingual learners or = immigrant children or youth that include projects, portfolios, and extended performance tasks that measure a full range of higher-order thinking skills and that are culturally and linguistically responsive in their design and implementation.[21]

ESSER or GEER funds may also be used to ensure families understand the results of any assessments, such as by ensuring score reports and other information are available in an accessible language and format consistent with 34 CFR § 200.8.

## C-5. How may an LEA use ESSER and GEER funds to support the needs of children with disabilities under the IDEA?

As described in FAQs A-3 and A-15, ESSER and GEER funds may be used for any activity authorized by the IDEA.[22] LEAs should consider what services are needed to meet the needs of children with disabilities, including children who are English learners. In an Office of Special Education Programs (OSEP) question and answer document issued on September 28, 2020, OSEP reiterated the Department's long-standing position that under Part B of the IDEA, no matter what primary instructional delivery approach is chosen, SEAs, LEAs, and individualized education program (IEP)

---

[19] To meet its requirement to administer annual statewide summative assessments, a State must assess, using assessments written in English, the achievement of an English learner in meeting the State's reading/language arts academic standards if the student has attended schools in the United States, excluding Puerto Rico and, if applicable, students in Native American language schools or programs consistent with 34 CFR § 200.6(j), for three or more consecutive years, except that an LEA may determine, on a case-by-case basis, to assess a student in a language other than English for a period that does not exceed two additional years if doing so would likely yield more accurate and reliable information. Nevertheless, an SEA or LEA may also assess students in other languages and may assess students in other content areas in languages other than English, as appropriate. An SEA, LEA, or school may use formative and interim assessments in any appropriate language and may use ESSER or GEER funds to develop them.

[20] Where Native American language assessments are used to meet the annual statewide summative assessment requirements, they must be completed in a manner consistent with 34 CFR § 200.6(j).

[21] The statewide summative assessments required by ESEA section 1111(b)(2)(B)(vi) may be partially delivered in the form of portfolios, projects, or extended performance tasks. There are no ESEA requirements related to any additional formative, diagnostic, or interim assessments an LEA or SEA may elect to administer that are not used to meet the requirements to administer a statewide summative assessment.

[22] IDEA, 20 U.S.C. § 1400 et seq., consists of three parts: IDEA Part B includes requirements for formula grants to assist States in making available a free appropriate public education in the least restrictive environment to eligible children with disabilities in mandatory age ranges. Entitlement to a free appropriate public education (FAPE) begins at a child's third birthday and could last until the 22nd birthday, depending on State law or practice. IDEA Part B consists of the Grants to States Program authorized by IDEA section 611(f) for children with disabilities aged three through 21 and the Preschool Grants Program authorized by IDEA section 619(g) for children with disabilities aged three through five. IDEA Part C consists of the Grants for Infants and Families Program authorized by IDEA section 643(c) for making formula grants to assist States in providing early intervention services to infants and toddlers from birth through age two and their families (and at the State's option beyond age three until the school year following the child's third, fourth, or fifth birthday). IDEA Part D sections 650 through 682 includes provisions for making discretionary grants to support State personnel development, technical assistance and dissemination, technology, and parent-training and information centers.

Teams remain responsible for ensuring that a free appropriate public education (FAPE)[23] is provided to all children with disabilities. Regardless of whether an SEA has provided explicit guidance on using ESSER or GEER funds, SEAs and LEAs may use these funds to provide additional instruction and services to children with disabilities, often referred to as compensatory services,[24] to address lost instructional time. A child's IEP Team would be required to make an individualized determination whether and to what extent compensatory services may be needed, consistent with applicable requirements, including to make up for any skills that may have been lost. See OSEP's questions and answers document issued on March 12, 2020. Similarly, States may use ESSER and GEER funds to make available early intervention services to those who were not provided such services consistent with a child's individualized family services plan (IFSP) as a result of disruptions in services due to the COVID-19 pandemic.[25]

In addition to the services outlined throughout this document, ESSER and GEER funds may be used for the following purposes consistent with the IDEA for children with disabilities. Please note that this is not an exhaustive list.

Services to support struggling learners under section 613(f) of IDEA Part B:

- Providing comprehensive coordinated early intervening services (CEIS) for children not currently identified as needing special education or related services, but who need additional academic and behavioral support to succeed in a general education environment, including:
  - Professional development (which may be provided by entities other than LEAs) for teachers and other school staff to enable such personnel to deliver scientifically based academic and behavioral interventions, including scientifically based literacy instruction, and, where appropriate, instruction on the use of adaptive and instructional software; and
  - Providing educational and behavioral evaluations, services, and supports, including scientifically based literacy instruction.

Services to support children with disabilities age 3-21 under section 611 of IDEA Part B:

- Providing support and direct services for children with disabilities, including technical assistance, personnel preparation, and professional development and training;
- Implementing child find policies and procedures, including ensuring identification, location, and evaluation of children who may need special education and related services including underserved groups, such as children experiencing homelessness, migratory children, and highly mobile children;
- Eliminating evaluation backlogs;[26]
- Addressing the loss of instructional time and loss of skills for children with disabilities, and determining on an individual basis, in accordance with applicable requirements, by the IEP Team

---

[23] FAPE is defined in 34 CFR § 300.17 as special education and related services that: (a) are provided at public expense, under public supervision and direction, and without charge; (b) meet the standards of the SEA, including the requirements of IDEA Part B; (c) include an appropriate preschool, elementary school, or secondary school education in the State involved; and (d) are provided in conformity with an IEP that meets the requirements of 34 CFR §§ 300.320 through 300.324. See also 20 U.S.C. § 1401(9).

[24] Some States refer to these services as "recovery services" due to the COVID-19 pandemic, although IDEA does not use this term.

[25] State lead agencies other than SEAs may also use ESSER and GEER funds through an interagency agreement or other written method with the SEA or Governor's office.

[26] Activities may include contracting with additional evaluators to address backlogs, or the implementation of valid assessment or evaluation tools and instruments that can be administered reliably using a virtual platform, if necessary.

whether compensatory services may be needed for a child with a disability who was unable to receive FAPE as a result of school closures or other disruptions in services due to the COVID-19 pandemic;

- Providing extended-school-year services as determined on an individual basis by a child's IEP Team to be necessary to provide FAPE to the student;
- Monitoring, enforcement, complaint investigations, and the mediation process, including providing for the costs of mediators and support personnel;
- Providing positive behavioral interventions and supports and mental health services for children with disabilities;
- Improving the use of technology in the classroom and/or in a remote setting for children with disabilities to enhance learning;
- Supporting the use of technology, including technology with universal design principles and assistive technology devices, to maximize accessibility to the general education curriculum for children with disabilities;
- Implementing transition programs, including coordination of services with agencies involved in supporting the transition of children with disabilities to postsecondary activities;
- Assisting LEAs in meeting personnel shortages including by hiring additional personnel to provide special education and related services and reducing caseloads in key areas;
- Supporting capacity-building activities and improving the delivery of services by LEAs to improve results for children with disabilities;
- Developing programming for children with disabilities who have been expelled from school, children with disabilities in correctional facilities, children enrolled in State-operated or State-supported schools, and children with disabilities in charter schools; and
- Increasing the number of high-need children with disabilities funded under a State's high-cost fund.

<u>Services to support preschoolers with disabilities aged 3 through 5 under section 619 of IDEA Part B</u>:

In addition to the activities listed above, as appropriate, ESSER and GEER funds may be used in:

- Implementing child find policies and procedures, including ensuring identification, location, and evaluation of children who may need special education and related services including underserved groups, such as children experiencing homelessness, addressing evaluation backlogs resulting from school closures, including eligibility determinations for children transitioning from the State's IDEA Part C program;
- Assisting LEAs in personnel shortages by hiring additional early childhood special education and related services providers;
- Assisting LEAs in meeting personnel training needs for preschool staff;
- Costs related to safely providing FAPE across a variety of preschool settings;
- Providing developmentally appropriate positive behavioral interventions and supports and mental health services for preschoolers with disabilities; and
- Implementing transition activities, including coordination with the Part C program on the transition of children exiting Part C, and planning of services with schools for preschoolers entering kindergarten.

Services under IDEA Part C:

- Providing early intervention services to infants and toddlers with disabilities and their families;
- Supporting IDEA Part C personnel including service coordinators through technical assistance, personnel preparation, use of alternative delivery methods, and professional development and training;
- Implementing the State's child find system with a specific emphasis on addressing related issues of equity for historically underserved populations through outreach and coordination with child find partners, referral sources, and other Federal programs for infants and toddlers and expanding referral sources through training and education.
- To make available early intervention services to those infants and toddlers with disabilities and their families that were not provided such services consistent with a child's IFSP as a result of public agency closures and/or other disruptions in services as a result of the COVID-19 pandemic.
- Addressing any 45-day timeline backlogs including the child and family assessment and evaluation of the child to determine eligibility;
- Improving the use of technology to deliver IDEA Part C services and improve use of tele-intervention by early intervention service (EIS) providers;
- Providing developmentally appropriate positive behavioral interventions and supports and mental health services for infants and toddlers with disabilities and their families;
- Implementing early childhood transition, including coordinating with the Part B preschool program and the SEA;
- Assisting EIS providers and programs in meeting personnel training needs and provider shortages through hiring addition EIS and related service providers;
- Monitoring and enforcing IDEA requirements, and conducting dispute resolution (including complaint investigations and conducting mediations); and
- Conducting outreach to parents and families of infants and toddlers with disabilities.

Services under IDEA Part D:

States may choose to contract with existing IDEA Part D grantees to provide additional services, consistent with the scope of work funded under the specific grant program, to support children with disabilities. Examples include, but are not limited to, providing additional funding for:

- State-specific services provided by the State's Parent Training and Information Center or Community Parent Resource Center;
- State-specific professional development services provided by the State's State Personnel Development Grant, if applicable;
- State-specific services provided by Part D technical assistance center grantees such as the Center on Positive Behavioral Interventions and Supports, the National Center on Intensive Intervention, the National Deaf Center, etc.;
- Personnel preparation programs focused on increasing the number of qualified special education teachers, related services providers, and faculty; and
- Additional State-specific services provided by Part D technology centers to enhance access to instruction.

**C-6. How may an LEA use ESSER and GEER funds to support students with disabilities who are not IDEA-eligible but who receive services in accordance with a Section 504 plan?**

Under section 504 of the Rehabilitation Act of 1973 (Section 504), a recipient that operates a public elementary or secondary education program must provide FAPE to all qualified students with disabilities in the recipient's jurisdiction, regardless of the severity of the student's disability. See 34 CFR §§ 104.33-104.36. An appropriate education under Section 504 includes the provision of regular or special education and related aids and services that are designed to meet the individual educational needs of students with disabilities as adequately as the needs of nondisabled students are met and are based on adherence to requirements governing least restrictive setting, evaluation and placement, and procedural safeguards. Specialized instruction and services necessary to ensure FAPE under Section 504 must be provided at no cost to parents. ESSER and GEER funds may be used for the provision of required educational and related aids and services determined necessary to ensure the provision of FAPE to students with disabilities who are not eligible under IDEA but receive services in accordance with a Section 504 plan. In addition, ESSER and GEER funds may be used to provide additional instruction and services to students with Section 504 plans who are not IDEA-eligible, often referred to as compensatory services, to make up for any skills that might have been lost if it is individually determined in accordance with respective applicable standards that the student was unable to receive FAPE as a result of the closure of school buildings or other disruption in services as a result of the COVID-19 pandemic.

**C-7. How may ESSER and GEER funds be used to support students experiencing homelessness?**

ESSER and GEER funds may be used for services and interventions specifically tailored to meet the needs of students experiencing homelessness[27] including, for example:

- Outreach and service delivery;
- Mental health services and positive behavioral interventions and supports; and
- Planning and implementing summer learning and after-school programs addressing the needs of students experiencing homelessness.

An LEA may use ESSER and GEER funds to ensure that all students experiencing homelessness are identified and fully participate in school on the same basis as their peers through, for example, outreach, training, and community collaborations. For example, an LEA may use ESSER and GEER funds for the following purposes:

- To increase the FTE hours of the homeless liaison designated under McKinney-Vento;
- To assign building-level contacts (particularly in highly impacted schools);
- To increase specialized support staffing, such as counselors, social workers, and others who are specifically trained in outreach and services for students experiencing homelessness; and
- To provide transportation services to ensure access to after-school or summer learning and enrichment programs.

---

[27] ESSER I, ESSER II, GEER I, and GEER II funds are specifically authorized to be used for activities authorized under McKinney-Vento. Although ARP ESSER funds are not specifically authorized for that purpose, they may be used for any activity allowable under the Impact Aid program under Title VII of the ESEA, which includes allowable activities under McKinney-Vento.

An LEA should coordinate the use of ESSER and GEER funds with other education funds used to support homeless students such as McKinney-Vento and part A of title I of the ESEA to ensure a comprehensive approach to meeting those students' needs.

Please note that ESSER and GEER funds should be used to address the specific needs of students experiencing homelessness, just as they are intended to meet the needs of other underserved groups of students and other groups of students most impacted by the COVID-19 pandemic. The ARP Act also includes an additional $800 million to support the needs of students experiencing homelessness, and these resources should be additive to the supports and services provided under ESSER and GEER.

## C-8. How may an LEA use ESSER and GEER funds to serve children and youth in foster care?

The COVID-19 pandemic has caused unique challenges for students in foster care and their caregivers. For example, the pandemic has caused increased disruptions in students' living placements and, as a result, school placements; students often have inconsistent access to schoolwork and classes, as foster and kinship caregivers often have limited access to and knowledge about the technology needed for virtual instruction; and schools face challenges in providing the supplemental education services required by students in foster care.

ESSER and GEER funds may be used broadly to address the needs of students in foster care during the COVID-19 pandemic. As a result, LEAs have considerable flexibility in using ESSER and GEER funds to address the unique needs of students in foster care. While specific uses of funds depend on the local context and the unique needs of students and caregivers, ESSER and GEER funds might be used to support the following activities:

- Transporting students in foster care to their respective schools of origin where LEAs are offering in-person learning, hybrid learning, or supplemental instruction/coaching opportunities;
- Purchasing technology (including laptops, Wi-Fi hotspots, or tablets) that enable students in foster care to consistently access instruction;
- Providing academic supports—including tutoring or supplemental instructional opportunities—to meet the unique learning needs of students in foster care;
- Helping students and/or caregivers meet their basic needs, including access to meals and hygienic supplies (such as masks or hand sanitizer); and
- Meeting rising mental health and behavioral needs (for example, contracting with community mental health providers to support students virtually and/or on-site at school).

LEAs should coordinate with State and local child welfare agencies to identify and streamline, where possible, the supports provided to students in foster care and their caregivers. As always, intentional coordination between educational agencies and child welfare agencies remains essential to supporting students in foster care and their caregivers during the COVID-19 pandemic.

**C-9. How may an LEA use ESSER and GEER funds to support migratory students?**

ESSER and GEER funds may be used to address needs of migratory children by providing support such as:

- Supplemental instruction to address the academic impact of lost instructional time, provided through before- and after-school programs, weekend programs, or summer programs;
- Facilities for students to access a reliable internet connection needed for remote learning;
- Fees that might be required to access drop-in centers operated by community organizations;
- Transportation of migratory children to school or drop-in centers and other facilities where students may access necessary technology and/or instructional support;
- Staff to assist migratory students in their homes during school hours with schoolwork and provide technology support as needed;
- Staff to go to housing sites to provide high school equivalency instruction for migratory out-of-school youth;
- Provision of childcare and/or early childhood education programs for younger migratory children who would otherwise be cared for by older, school-age siblings during school hours due to their parent/guardian(s)'s employment as an essential worker;
- Providing information and assistance, including interpreters and translated information, to parents and families on how they can effectively support their migratory children, including in a distance-learning environment;
- Mental health services and other forms of social, emotional, and behavioral support for migratory children;
- Outreach and information for migratory families to help them access COVID-19 testing and vaccines, including provision of transportation, interpreters, and translated information as needed; and
- Outreach activities to help ensure migratory children are enrolled in school, attend regularly, and are engaged in online learning.

**C-10. How may ESSER and GEER funds support students who are in correctional facilities, including those who are served under the Title I, Part D programs for students who are neglected, delinquent, or at risk?**

The COVID-19 pandemic has presented unique challenges in providing educational services in secure correctional facilities. ESSER and GEER funds may be used in a variety of ways to support these students, just as they may be used in regular school settings. For example, ESSER and GEER funds could be used to support distance learning through technology and broadband improvements, and professional development for educators on the effective use of technology. Funds could also support technology to allow youth to meet virtually with family and meet with personnel to address students' academic, social, emotional, behavioral, and mental health needs due to the COVID-19 pandemic; to improve on-site library resources; and provide instructional supports that address lost instructional time, such as high-quality tutoring or leveraging technology for formative and diagnostic assessment and differentiated instruction. Funds could be used for materials and services that support postsecondary education access and career development and job placement, which might also have been impacted due to the COVID-19 pandemic. ESSER and GEER funds could also be used for materials and services that support adult and career and technical education in correctional facilities. This includes integrated education and training programs, career pathway initiatives, pre-apprenticeships, apprenticeships, postsecondary education

access and career development and job placement, which all might have been impacted due to the COVID-19 pandemic.

*Interventions and Strategies for Consideration*

## C-11. How may an LEA use ESSER and GEER funds to address chronic absenteeism? (*Updated December 7, 2022*)

ESSER or GEER funds may be used to implement data-driven strategies to address chronic absenteeism that has increased as a result of the COVID-19 pandemic. Allowable uses include outreach to students and families; accelerating learning for students with significant amounts of lost instructional time during the COVID-19 pandemic; and other intensive social, emotional, mental health, and academic supports.

ESSER or GEER funds may be used to support efforts to locate and reengage students who are chronically absent and to work with students and families to address underlying needs or barriers that are causing chronic absenteeism as schools recover from the pandemic. This may include personal outreach by educators and support staff and providing linguistically inclusive information at community sites and online. ESSER or GEER funds may support stipends or other additional compensation for teachers who spend time outside their regular working hours to locate and reengage students who are chronically absent. ESSER or GEER funds may further support students experiencing homelessness, such as by increasing support for liaisons who support the population. Similarly, ESSER or GEER funds may augment support for students from migratory families; for example, program staff who work with these students may need flexible work hours during the week, weekends, nights, and in the summer to canvas the community in search of agricultural workers and to visit families in their homes. ESSER or GEER funds may also be used to match students with mentors and rapidly contact families to identify and overcome barriers to regular attendance.

An LEA may not provide direct monetary rewards to students or families for school attendance; however, ESSER or GEER funds may be used to develop and pay for recognition programs that encourage student attendance (e.g., rewarding strong or improved attendance through eligibility to participate in special events for a class) (see FAQ C-23.a). ESSER or GEER funds may be used to build community partnerships with homeless shelters, local social service agencies, and local media and transit authorities, which can help students attend school regularly and disseminate reminders about the importance of regular attendance. These and other approaches may be especially important in supporting students experiencing homelessness. For additional resources on addressing chronic absenteeism among students experiencing homelessness, please see the National Center for Homeless Education's resources on the topic. Effective strategies to address chronic absenteeism and reengage students are further described in Volume 2 of the Department's COVID-19 Handbook available at: https://www2.ed.gov/documents/coronavirus/reopening-2.pdf.

ESSER or GEER funds may also be used to address the impacts of chronic absenteeism and to help leaders take action to reduce it. For example, ESSER or GEER funds may be used to provide additional social, emotional, mental health, and academic support during school breaks or before and after school. Actions to address chronic absenteeism may include tiered practices such as:

- Foundational strategies that support the entire school community and make schools welcoming learning environments;
- Practices to prevent absenteeism, such as predictable routines and clear communication;
- Actions that support students at greater risk of chronic absenteeism or who meet the lower boundaries of the definition of chronically absent, such as individualized outreach and support or home visits; and

- Case management and related supports for students who have missed the most instruction.

In addition, to guide LEA decision-making around which strategies to implement, ESSER and GEER funds may be used to develop data quality systems that will assist in:

- Establishing a common definition of what constitutes a day of attendance across all modes of instruction, including in-person, remote, virtual synchronous, and asynchronous;
- Tracking daily attendance and determining whether absences occur during in-person, or, if used, remote learning (whether synchronous or asynchronous) settings;
- Monitoring and publishing disaggregated data on the number of students who are absent 10 percent or more of the time;
- Conducting research and analyzing data to determine which attendance metrics are associated with lower academic performance in distance or hybrid learning; and creating early warning systems based on key student indicators, including chronic absenteeism, credit accumulation, course grades, and discipline rates, to identify students at risk of dropping out of school. (For additional information, see FAQ C-11a.)

## C-11.a. How may ESSER and GEER funds be used to support early warning indicator systems? (*New December 7, 2022*)

ESSER or GEER funds may be used to develop and implement early warning indicator (EWI) systems, which can track attendance, assignment or course completion and credit accumulation, grades, and discipline rates. These data can be examined frequently (e.g., monthly) and used to inform targeted engagement strategies in response to these data. When viewed at the classroom and student level, these data can strengthen a school's ability to provide specific, timely interventions (including support for educators where needed), which is crucial to addressing the impact of lost instructional time due to the pandemic.

States and LEAs may also collect data on the successful transitions of students from pre-school to elementary school, elementary school to middle school, middle school to high school, and high school to postsecondary education. For example, schools may use on-track indicators to assess how well students transition into high school so that the schools may provide additional supports as needed. Using information from the EWI, schools may want to consider implementing or enhancing multi-tiered systems of support that typically include: (1) school-wide supports; (2) progress monitoring; (3) tiered systems of academic and social, emotional, and behavioral interventions; and (4) evidence-based instructional and behavioral interventions.

LEAs may also use ESSER or GEER funds to create well-designed student surveys, which can be particularly helpful when used in advance of and during these transitions. Survey results can be incorporated into the EWI to provide important information to educators on how students are feeling about these transitions and where additional support might be needed. Note that surveys must be utilized in compliance with the Protection of Pupil Rights Amendment (PPRA). Funds can also be used to provide professional development to educators on how to analyze and use the data to identify the appropriate intervention and monitor its effectiveness.

## C-12. How may an SEA or LEA use ESSER and GEER funds to improve its data systems and its transparency when reporting to the public?

It is important that parents, educators, and the public have accurate and meaningful information about how students are learning during and after the pandemic and what learning opportunities are available. In

addition to their primary purposes of ensuring that schools can reopen safely and addressing students' social, emotional, mental health, and academic development, ESSER and GEER funds may be used for data collection and the creation of State- or LEA-level data dashboards that provide public reporting when the reporting is related to the COVID-19 pandemic (e.g., establishing new collections or dashboards that specifically address lost instructional time)—disaggregated to the greatest extent possible by race/ethnicity, economic status, English learner status, disability status, homelessness status, and other factors—on critical measures including:

- School instructional offerings by modality (e.g., open full-time in-person for all students, remote option available for all students);
- Student enrollment rates by school and by instructional modality (open for full-time in-person instruction, open for hybrid instruction, and fully remote learning);
- Student attendance rates by school and by instructional modality;
- Chronic absenteeism rates by school and by instructional modality;
- Rate of student participation logging into remote learning for students in fully remote or hybrid learning environments by school;
- The average number of hours of live instruction by grade span (for students in fully remote or hybrid learning environments) by school by month;
- A measure of students and educators who have adequate technology (devices and high-speed internet access) for remote instruction;
- A measure of the distribution of school meals by school;
- Reporting on impacts of the COVID-19 pandemic on States' collection of data for the State Performance Plans and Annual Performance Reports as required by section 616 of the IDEA;
- Other opportunity-to-learn indicators such as discipline rates, access to advanced coursework, teacher turnover and quality data (e.g., experience, certification, access to professional learning); access to counselors, social workers, psychologists, and nurses; and
- Student learning across multiple measures, including assessments.

SEAs and LEAs may also use administrative funds for this purpose.

## C-13. How may an LEA use ESSER and GEER funds to support full-service community schools?

An LEA may use ESSER and GEER funds to provide services and supports to students and families through evidence-based, full-service community schools. The ARP Act defines a full-service community school as it is defined in section 4622 of the ESEA: a public elementary school or secondary school that (A) participates in a community-based effort to coordinate and integrate educational, developmental, family, health, and other comprehensive services through community-based organziations and public and private partnerships; and (B) provides access to such services in school to students, families, and the community, such as access during the school year (including before-and after-school hours and weekends), as well as during the summer. Evidence-based community school approaches include integrated student supports, active family and community engagement, expanded learning time opportunities, and collaborative leadership and practices. Using ESSER or GEER funds to support full-service community schools can help support students' social, emotional, mental health, and academic development and other basic needs. Additionally, LEAs may utilize funds in the development or expansion of in-school student support centers that provide mentoring, counseling, and social and emotional learning supports to students in individual or group sessions.

**C-14. How may ESSER and GEER funds be used to support mental health services for students and educators facing COVID-19 pandemic-related trauma? (*Updated December 7, 2022*)**

Addressing the mental health needs of students is an important goal of the ARP ESSER program. ESSER or GEER funds may be used to provide mental health services and supports for students and their families, educators, and staff who have mental health needs related to or exacerbated by the COVID-19 pandemic. The Department recognizes the widespread impact of the COVID-19 pandemic on mental health, and the particularly extensive effects of COVID-19 on youth mental health (see, for example, the Surgeon General's Advisory on Protecting Youth Mental Health at https://www.hhs.gov/sites/default/files/surgeon-general-youth-mental-health-advisory.pdf and the CDC's study on youth mental health threats at https://www.cdc.gov/media/releases/2022/p0331-youth-mental-health-covid-19.html).

ESSER or GEER funds may therefore support mental health services in three key areas: (1) improving access to high-quality mental health care; (2) improving communication and transparency about mental health supports with the wider school community; and (3) implementing and integrating evidence-based approaches to social, emotional, and mental well-being.

Specific strategies within each of these three categories are discussed below:

<u>**Improve Access to High-Quality Mental Health Care**</u>

- **Create a positive, accessible process** for students, educators, and staff to seek help and support. This process may include increasing mental health resources and support on school campuses and awareness of those resources and services. Taking a whole-school approach to wellness can also create a more positive process for seeking support and services. Mental health literacy training for educators and staff can also be effective in helping them facilitate students obtaining mental health supports inside school buildings and in the community.
- **Use early intervention strategies**. Early interventions conducted by mental health staff are associated with positive academic and developmental outcomes, including fewer disciplinary encounters, increased engagement, and elevated graduation rates.
- Ensure there is **sufficient access to high-quality mental health staff** (e.g., psychologists, counselors, social workers, and well-trained behavior specialists) within school buildings. ESSER or GEER funds may be used to **hire additional staff**, develop plans for leveraging multiple Federal and State funding streams to increase access to mental health staff, prioritize activities that build local capacity to sustain services, and develop comprehensive evaluation plans for adjusting supports based on data. ESSER or GEER funds may also be used to establish processes and systems to bill Medicaid for health services, as eligible, including hiring or contracting with staff to do this work.
- **Reduce negative attitudes and beliefs** associated with seeking mental health support by providing more information on mental health challenges and supports available, investing in professional development of school staff, offering tele-mental health options, actively engaging students in health decisions, and actively engaging the wider school community (e.g., holding regular meetings about resources and making practice changes based on community feedback).
- Provide students **equitable access to mental health services that are welcoming and inclusive** with regard to race, ethnicity, culture, language, disability, and for students who identify as LGBTQI+. This can include increasing the number of professionals who can provide services in languages in addition to English and the diversity of school counselors, mental health professionals, social workers, psychologists, nurses, and other integrated support staff in a

manner consistent with applicable law, including the civil rights laws enforced by the Department. ESSER or GEER funds may support efforts to increase diversity in school-based mental health services providers by offering loan forgiveness or service scholarships, creating career pathways (including beginning in high schools), and creating or strengthening LEA partnerships with Historically Black Colleges and Universities (HBCUs), Tribal Colleges and Universities (TCUs), and Minority Serving Institutions (MSIs).

**Improve Communication and Transparency about Mental Health Supports with the Wider School Community**

- **Use accessible language** and ensure that all school materials and mental health personnel communicate in a language understood by multilingual families and students and accessible to persons with disabilities. Public schools are obligated to ensure meaningful communication with parents with limited English proficiency (LEP) in a language they can understand.[28] Public schools must also ensure that communications with families and students with disabilities are as effective as communications with others.[29] Accessibility for a person with a disability also extends to a public school's web content, as discussed in the Department of Justice's recent guidance on web accessibility. Schools may use ESSER or GEER funds to meet or go beyond these legal obligations to ensure all students and families are able to access mental health resources at school.
- **Establish a home visit program and provide support** and time for educators and/or mental health professionals to perform home visits and meetings with families and guardians.
- **Increase awareness of available school and LEA human resources support** for all staff, including where to find mental health support and who to contact and when.
- **Leverage local wellness resources** from local health departments, community partners, or others to provide services to students, teachers, and staff remotely or in person.

**Implement and Integrate Evidence-Based Approaches to Social, Emotional, and Mental Well-Being**

- **Administer and analyze school climate and other surveys** to determine areas of improvement for educators, students, families, and communities and monitor progress in areas of need.
- **Analyze and use existing data** on attendance, academic success, and discipline to identify students in need of additional supports and guide improvements.
- **Create student-teacher advisory groups** and provide professional development to educators leading these groups. School leaders can build time into the schedule for these groups to regularly meet to build strong teacher-student relationships and improve school engagement.

---

[28] Title VI of the Civil Rights Act of 1964 requires school districts to ensure English learner students can meaningfully participate in all programs and activities of the school district, including counseling services, to ensure meaningful communication with LEP parents in a language they can understand, and to adequately notify LEP parents of information about any program, service, or activity of a school district or SEA that is called to the attention of English Speaking parents. See e.g., U.S. Department of Education and U.S. Department of Justice, "Dear Colleague Letter: English Learner Students and Limited English Proficient Parents," (Jan. 7, 2015), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-el-201501.pdf.

[29] Section 504 of the Rehabilitation Act of 1973 protects qualified individuals with disabilities from discrimination on the basis of disability by entities that receive Department Federal financial assistance. Subtitle A of Title II of the Americans with Disabilities Act protects qualified individuals with disabilities from discrimination on the basis of disability in services, programs, and activities provided by State and local government entities, regardless of whether or not those entities receive Federal financial assistance.

- **Implement and integrate evidence-based practices within a Multi-Tiered System of Support (MTSS).** An MTSS approach, including professional development, can help create a positive, safe, affirming, and welcoming school environment; build strong relationships between students and staff; establish consistent routines; promote and reinforce positive expectations; inform rigorous, engaging, and culturally and linguistically inclusive instruction; and provide clear and supportive feedback to students.
- **Develop and implement fair discipline policies that emphasize preventive practices and strategies** that help address social, emotional, and mental health needs, such as restorative justice programs that are culturally and linguistically responsive and support the social and emotional well-being of all students.
- **Provide professional development to all staff** on how they can support the well-being of students within their specific roles, recognize and value student diversity, and specifically affirm populations who have experienced inequities to ensure mental health supports build on students' strengths and are welcoming and inclusive.
- **Expand full-service community schools**, which provide and better integrate academic, social, and health care services for students and students' family members.

ESSER and GEER funds may also be used to evaluate students who may have a disability under IDEA and Section 504, including those who have mental health-related needs as a result of their disability, or to provide equipment, services, and supports that are individually determined as necessary to provide FAPE to an eligible student (commonly referred to as related services)[30] under IDEA or Section 504, as applicable. Please ~~also~~ refer to section I in volume 2 of the Department's COVID-19 Handbook.

Additional information about supporting student mental health is available at https://www2.ed.gov/documents/students/supporting-child-student-social-emotional-behavioral-mental-health.pdf. More information on providing safe and supportive learning environments, including addressing student and educator mental health, is available from the National Center on Safe and Supportive Learning Environments at https://safesupportivelearning.ed.gov. More information on improving school climate and school safety through the implementation of positive behavioral interventions and supports is available from the Center on Positive Behavioral Interventions and Supports at https://www.pbis.org/.

## C-15. How may an LEA use ESSER and GEER funds to support evidence-based literacy programs?

As noted in FAQs A-4 and A-9, SEAs and LEAs must implement evidence-based strategies to address the academic impact of lost instructional time through the required ARP ESSER reservation of funds. Many parents and educators are especially concerned about the loss of in-person instructional time on students' early literacy skills. ESSER and GEER funds may be used to support comprehensive State and local literacy programs that are needed due to the COVID-19 pandemic (e.g., to address loss of literacy skills as a result of the pandemic). It is important that LEAs invest in evidence-based practices to support learners, including in early literacy, whether they are learning remotely or in person. SEAs and LEAs may also use ESSER and GEER funds for multi-tiered systems of support for English learners and to provide specially designed instruction for students with disabilities for literacy development and language acquisition. Funds may also be used for parent training and family literacy services in the use of early learning strategies that bring in the child's environment and experiences to promote literacy skills. Effective

---

[30] See the definition of "related services" in the IDEA at 20 U.S.C. 1401(26) and 34 CFR § 300.34; see also Appendix A to 34 CFR part 104 at ¶ 23. Possible related services include psychological services, school health and school nurse services, social work services in schools, counseling services, parent counseling and training, and medical services provided by a licensed physician for diagnostic and evaluation purposes only.

strategies to support student learning are further described in Volume 2 of the Department's COVID-19 Handbook available at: https://www2.ed.gov/documents/coronavirus/reopening-2.pdf.

### C-16. May an LEA use ESSER and GEER funds to provide meals for students? (*Updated December 7, 2022*)

Yes, under certain circumstances. Typically, an LEA has other means of providing ~~for~~ food services, such as through the U.S. Department of Agriculture (USDA) or other Federal programs. As a result, the Department encourages LEAs to use those Federal funds with the specific purpose of providing food services to students prior to using ESSER or GEER funds for this purpose. However, if such funding is not available, or additional funds are necessary, an LEA may use ESSER or GEER funds to provide meals if the need arises from or relates to recovery from the pandemic. For example, ESSER or GEER funds could be used to increase food service staff capacity; cover additional labor costs associated with serving meals to students during the pandemic; or support COVID-19 pandemic-related expenses, such as school meal service equipment/supplies, meal packaging, and transportation services.

Please note that, since 2020, the USDA has provided nationwide flexibilities and waivers consistent with its existing authority and new legislation, including the recent Keep Kids Fed Act of 2022, which extends certain flexibilities to summer 2022 and through school year 2022-2023. Using this flexibility, USDA will be able to provide temporary, higher reimbursement rates for school lunches and breakfasts served, as well as meals and snacks served in the Child and Adult Care Food Program.[31]

### C-16.a. May ESSER and GEER funds be used to cover the costs of waiving the outstanding school meals balance of a student from low-income backgrounds? (*New December 7, 2022*)

To the extent a low-income family's ability to pay for school meals has been impacted by the COVID-19 pandemic, an LEA may use ESSER or GEER funds to cover the student's school lunch balance. As noted in FAQ C-16, the Department encourages the LEA to first utilize funding and flexibilities provided by USDA in addressing the costs associated with providing school meals.

### C-17. How may an LEA use ESSER and GEER funds to specifically support high school seniors?

ESSER and GEER funds may be used to assist high school seniors with post-high school planning, including the additional costs to schools of providing these supports to students in a fully in-person, hybrid, or remote environment. For example, ESSER and GEER funds may be used to pay college application fees for low-income students or to support the salaries of additional counselors to assist students with exploring options for careers and postsecondary study, navigating the college application process, completing the Free Application for Federal Student Aid (FAFSA), and conducting parental and student information sessions. Funds may also be used for stipends or incentives for educators taking on additional responsibilities to provide post-high school planning for high school seniors, consistent with 2 CFR § 200.430(f) (i.e., incentive pay is given pursuant to an established plan, which could be established in response to the COVID-19 pandemic). Funds may also be used to support summer bridge programs to help students make the successful transition to postsecondary education, training, pre-apprenticeship, registered apprenticeship, or other career pathway programs. Finally, ESSER and GEER funds may be used for transition services for high school seniors with an IEP to facilitate their transition from school to post-school activities.

---

[31] For more information see https://www.fns.usda.gov/cn/flexibilies-summer-22-sy-22-23.

**C-18. May an LEA use ESSER and GEER funds to support students who graduated high school in the class of 2020 (and students who will graduate in 2021) who have not yet successfully transitioned to college or careers?**

Yes. Consistent with Perkins V, an LEA may use ESSER and GEER funds to support former students who graduated high school in the class of 2020 or who will graduate in 2021 (i.e., during the pandemic) but have not yet successfully transitioned to college or careers. For example, an LEA may provide college or career counseling, assistance with college applications or entry into job training programs, job training, postsecondary counseling and related services, including for associate and baccalaureate degree programs, and financial literacy.

**C-19. May an LEA use ESSER and GEER funds to support distance learning, including the purchase of educational technology for student use?**

Yes. An LEA may use ESSER and GEER funds for activities that support distance education and promote long-term improvements in technology infrastructure and operations and their effective use. These activities might include providing online learning to all students, including students with disabilities, English learners, students experiencing homelessness, and students in foster care; and training educators in the effective implementation of online learning. To support the continuity of learning, an LEA may use ESSER and GEER funds to purchase educational technology for student and educator use, including:

- Mobile technology devices such as tablets and laptops;
- Providing off-campus access to reliable, high-speed internet for students and teachers through the purchase of internet-connected devices/equipment, mobile hotspots, wireless service plans, or installation of Community Wi-Fi Hotspots, especially in underserved communities;
- Teleconferencing applications or programs;
- Software/online/virtual programs, screen capture/recording software, online/virtual cultural curriculum/programs, online/virtual tutoring curriculum/programs, learning management systems;
- Technology accessories, such as headphones, speakers, laptop cameras; and
- Assistive technology devices,[32] such as dedicated communication devices and applications for text-to-speech, graphic organizers, or word prediction.

Supporting distance learning requires the effective use of technology by educators. Funding may also be used to provide professional development, including through professional learning communities, to support educators in effectively using technology to provide meaningful learning opportunities for students that are aligned with grade-level expectations. Funds may also be used to support other school personnel such as speech therapists, counselors, and social workers, to effectively provide student services virtually as needed.

**C-20. May an LEA use ESSER and GEER funds for a pre-kindergarten or other early childhood education program?**

Yes. Because an early childhood education program is an allowable use of funds under the ESEA and IDEA, it is allowable under ESSER and GEER. An "early childhood education program" is (1) a Head Start program or an Early Head Start program carried out under the Head Start Act (42 U.S.C. 9831 et

---

[32] IDEA defines "assistive technology device" as any item, piece of equipment, or product system, whether acquired commercial off the shelf, modified, or customized, that is used to increase, maintain, or improve the functional capabilities of a child with a disability. The term does not include a medical device that is surgically implanted, or the replacement of such device. 34 CFR § 300.5.

seq.), including a migrant or seasonal Head Start program, an Indian Head Start program, or a Head Start program or an Early Head Start program that also receives State funding; (2) a State licensed or regulated child care program; or (3) a program that serves children from birth through age six that addresses the children's cognitive (including language, early literacy, and early mathematics), social, emotional, and physical development; and is either: a State prekindergarten program; a program authorized under section 619 or Part C of the IDEA (see FAQ C-5); or a program operated by an LEA. (See section 8101(16) of the ESEA.) In addition, ESSER funds may be used for other activities that are necessary to maintain the operation of and continuity of services in LEAs and continuing to employ existing staff of the LEA. As a result, ESSER funds could be used to prevent layoffs or service cuts to existing LEA early childhood education programs.

### C-21. May ESSER and GEER funds be used to serve adults, including English learners, who are eligible to be served under the Adult Education and Family Literacy Act?

Yes. An LEA may use ESSER and GEER funds for any activity authorized by the Adult Education and Family Literacy Act (AEFLA), which is Title II of the Workforce Innovation and Opportunity Act. These activities could include:

- Conducting outreach activities to re-enroll eligible adults who may have discontinued their attendance due to the COVID-19 pandemic;
- Providing career counseling for eligible adults who suffered job loss as a result of the COVID-19 pandemic;
- Purchasing technology (including laptops, Wi-Fi hotspots, or tablets) that enable adult learners to access virtual instruction;
- Professional development for adult education instructors in the effective implementation of online learning;
- Providing instruction to improve digital literacy of adult learners, including English learners, to improve digital access and inclusion;
- Assessing the skills and educational progress of adult learners using virtual assessment tools; and
- Accessing PPE and cleaning and disinfecting classrooms used during the regular school day so that they may be used for adult education and literacy activities in the evening.

### C-22. May ESSER and GEER funds be used for career and technical education?

Yes. An LEA may use ESSER and GEER funds for any activity authorized by Perkins V. These activities could include, for example:

- Updating the comprehensive local needs assessment required by section 134(c) of Perkins V to reflect changes in the labor market caused by the COVID-19 pandemic;
- Providing ridesharing services to transport students to shared-time area career and technical education centers or work-based learning opportunities;
- Adjusting curriculum to account for the academic impact of lost instructional time or to cover technical skills that could not be addressed during remote instruction;
- Providing professional development on the delivery of remote classroom instruction and virtual or remote work-based learning opportunities;
- Purchasing remote test-proctoring services so that students can participate remotely in assessments for industry-recognized credentials;
- Implementing simulated work-based learning or school-based enterprises to replace work-based learning opportunities that are no longer available in the community due to the COVID-19 pandemic;

- Providing support to low-income students for college application fees; and
- Supporting students who graduated high school in the class of 2020 and students who will graduate in the class of 2021 (i.e., during the pandemic) but have not yet successfully transitioned to college or careers by providing, for example, college or career counseling, assistance with college applications, entry into job training programs, and financial literacy.

### C-23. May ESSER and GEER funds be used to re-engage students who have not been able to participate in in-person and/or remote instruction during the COVID-19 pandemic?

Yes. LEAs should identify opportunities to re-engage students whose schools have not been successful in engaging them during the COVID-19 pandemic. LEAs may use indicators such as chronic absenteeism (during in-person and/or remote instruction) to identify students in need of targeted support and services, as well as more generally identifying which students have lost the greatest number of in-person instructional days since the beginning of the COVID-19 pandemic. ESSER and GEER funds may be used to provide academic, social, emotional, behavioral, and, in particular, mental health supports to address the impacts of isolation during this period. In addition, ESSER and GEER funds may be used to conduct child find activities to identify, locate, and evaluate students who are suspected of having disabilities and need special education and related services under the IDEA. ESSER and GEER funds may also support broader activities that re-engage disconnected youth and reduce community violence in places where the COVID-19 pandemic has exacerbated inequities, leading to increases in the number of disconnected youth and violence. This may include summer learning and enrichment programming targeted towards the needs of high school students most likely to be impacted by community violence.

### C-23.a. May ESSER and GEER funds be used to provide incentive payments directly to parents and students to encourage students to attend school? (*New December 7, 2022*)

No. Using ESSER or GEER funds to pay students or families for undertaking a mandatory activity, such as attending school, or to pay family members to ensure the students attend school, is not an allowable use of ESSER or GEER funds. However, there are many possible uses of ESSER and GEER funds to support programs intended to help students stay in school and/or transition to postsecondary education, including many outlined in these FAQs (e.g., FAQs C-11 and C-23).

### C-24. May ESSER and GEER funds be used to implement community violence intervention strategies?

Yes. Community violence intervention (CVI) strategies address students' social, emotional, mental health, and academic development and are especially important in the context of the disproportionate impact of the COVID-19 pandemic on previously underserved groups of students.

Purposeful strategies to re-engage disconnected youth through youth violence reduction programs, mentorship, and strengthening youth skills through workforce engagement and training also have the potential to reduce community violence. Effective strategies are further described in Volume 2 of the Department's COVID-19 Handbook available at: https://www2.ed.gov/documents/coronavirus/reopening-2.pdf.

Additional information on CVI strategies and investments is included in the Administration's Fact Sheet available at: https://www.whitehouse.gov/briefing-room/statements-releases/2021/04/07/fact-sheet-more-details-on-the-biden-harris-administrations-investments-in-community-violence-interventions/.

*Summer Learning and Enrichment*

## C-25. What kinds of summer programs may ESSER and GEER funds support?

ESSER and GEER funds may provide broad support for summer learning and enrichment programs. Given that this summer affords students a critical opportunity, LEAs should consider a variety of options for procuring summer services with ESSER and GEER funds, including programs run by non-profit or community organizations as well as those run by the LEA. Effective summer programming can address students' social, emotional, mental health, and academic needs through a combination of activities that include strong partnerships with community-based organizations and other summer providers, including summer camps. These partnerships can help to sustain these programs and can also support programs in rural and remote communities. States and LEAs should maximize enrollment in summer programs, with a particular focus on underserved students and students most impacted by the COVID-19 pandemic, including providing transportation and meal services. Programs should target students of all ages, including high school students, and can include work-based or service-learning opportunities or summer bridge programs to support successful educational transitions.

Moreover, an SEA must reserve at least 1 percent of its total ARP ESSER allocation for evidence-based summer enrichment programs, and LEAs must reserve at least 20 percent of their ARP ESSER funds to address the academic impact of lost instructional time through the implementation of evidence-based interventions, which may include summer programs, particularly to address the disproportionate impact of the COVID-19 pandemic on underserved student subgroups.

Evidence-based summer learning and enrichment programs are further described in Volume 2 of the Department's COVID-19 Handbook available at: https://www2.ed.gov/documents/coronavirus/reopening-2.pdf.

## C-26. May ESSER and GEER funds be used for summer job or service-learning programs for high school students?

Yes. As part of State and LEA efforts to mitigate lost instructional time due to the COVID-19 pandemic, ESSER and GEER funds may be used to support summer learning and enrichment programs that provide training, work-based learning, and jobs to high school students. Funds may be used both to support the training that high school students receive and to supplement the pay provided to students by employers that participate in the summer jobs program. Funds may also be used to support service learning or other volunteer opportunities for high school students.

## C-27. Do Federal procurement requirements permit noncompetitive procurements, if necessary, to enable an SEA or LEA to use ARP ESSER funds to operate a summer enrichment program in 2021?

Yes. Under the Uniform Guidance in 2 CFR § 200.317, an SEA, "[w]hen procuring property and services under a Federal award, must follow the same policies and procedures it uses for procurements from its non-Federal funds." Thus, an SEA is authorized under the Uniform Guidance to use any authority provided for in its State procurement policies and procedures that allows for noncompetitive procurements. For example, if an SEA has flexibility under its State procurement procedures to allow a sole source contract, particularly during an emergency such as the COVID-19 pandemic, the SEA may procure contracts with ARP ESSER funds in accordance with that flexibility.

Under the Uniform Guidance, all other non-Federal entities, including LEAs, must follow the procurement provisions in 2 CFR §§ 200.318 through 200.327. Under 2 CFR § 200.320(c), an LEA may, to the extent doing so is consistent with its policies and procedures, use noncompetitive procurement if any of the following conditions are met:

1. The acquisition of property or services, the aggregate dollar amount of which does not exceed the micro-purchase threshold ($50,000);
2. The item is available only from a single source;
3. The public exigency or emergency for the requirement will not permit a delay resulting from publicizing a competitive solicitation;
4. The Federal awarding agency or pass-through entity expressly authorizes a noncompetitive procurement in response to a written request from the non-Federal entity; or
5. After solicitation of a number of sources, competition is determined inadequate.

Consistent with 2 CFR § 200.320(c)(3), an LEA may determine that its response to the COVID-19 pandemic qualifies as a public exigency or emergency that does not permit the delay that would result from competitive bidding. Under these circumstances, and to the degree doing so is consistent with its own policies and procedures, an LEA could use noncompetitive procurement. The LEA should consult with its SEA before using this authority. Also, under 2 CFR § 200.320(c)(4), an SEA, to the extent doing so is consistent with its State procurement policies and procedures, may authorize an LEA to use noncompetitive procurement in response to a written request. In the alternative, the Department may grant similar flexibility.

# D. Using ESSER and GEER Funds to Support Educators and Other School Staff

## D-1. May ESSER and GEER funds be used to stabilize and support the educator workforce? (*Updated December 7, 2022*)

Yes. ESSER or GEER funds may be used to stabilize and support the educator workforce, including implementation of both short- and long-term strategies to address educator shortages to help ensure continuity of operations. Funds may also be used to hire and expand student access to a well-prepared, diverse educator workforce. Examples of specific strategies that could be employed to stabilize and support the educator workforce include:

- **Increasing educator and staff compensation** by offering hiring and retention bonuses, working toward permanent salary increases, providing premium pay, and leveraging flexibilities to bring retired educators back to the classroom or retain current staff eligible for retirement.[33]
- **Building and maintaining a cadre of high-quality substitute teachers** by strengthening recruitment and training programs and increasing compensation. To create stability and certainty and promote learning recovery, substitute teachers can be assigned to a single school for a full school year. ESSER or GEER funds may also be used to remove barriers so that retirees or those licensed in another state can serve as substitutes or paraprofessionals.
- **Expanding and improving support for educator and staff well-being** by providing supported time for debrief sessions and peer-to-peer support, increasing access to mental health supports and communicating the availability of those mental health supports, reducing educator workloads by ensuring staff planning time is scheduled into work hours, and using flexible and creative scheduling to promote educator collaboration. Supporting educators also means acknowledging the extraordinary workload presented by the pandemic and pandemic recovery efforts; LEAs can respond by using ESSER or GEER resources to increase the availability of qualified adults and personnel to support educators, students, and staff. For example, LEAs can partner with institutions of higher education, community-based organizations, nonprofit organizations, and businesses to provide additional support for educators and students through teaching candidates and well-trained volunteers and other additional staff. The Department launched the National Partnership for Student Success, a public-private partnership, to help increase the number of tutors, mentors, student success coaches, postsecondary transition coaches and integrated student support coordinators to help students get back on track, which can help stabilize and support the educator workforce while building the pipeline of future teachers. ESSER and GEER funds may be used to meet AmeriCorps matching requirements; AmeriCorps members may in turn serve as tutors, mentors and student success coaches, assist with additional administrative responsibilities resulting from the pandemic, and provide creative enrichment opportunities. For more information on using Department funds to meet AmeriCorps matching requirements, please see https://www2.ed.gov/policy/fund/guid/americorps-matching-letter.pdf?src=grants-page. In addition, the Department launched the Engage Every Student initiative to help expand high-quality out-of-school time learning opportunities, which ESSER and GEER can support.
- **Investing in the educator pipeline** through loan forgiveness, grants, a variety of educator preparation programs (e.g., grow-your-own initiatives, teacher residency programs, teacher apprenticeships), or service scholarship programs to support pathways into the profession and encouraging newly certified teachers to commit to teaching in high-need areas and subjects. In so

---

[33] The Internal Revenue Service issued FAQs clarifying that, in some instances, retirees can return to work and still receive their pensions or remain on the job and begin receiving pension payments, where pension plans permit such approaches (pension plans can also be amended to create these incentives). For additional information, please see https://www.irs.gov/newsroom/coronavirus-related-relief-for-retirement-plans-and-iras-questions-and-answers.

doing, State, LEA, and higher education leaders can answer the Call to Action to use pandemic relief funds to grow the education profession and help students recover. ESSER or GEER funds, alone or in combination with Higher Education Emergency Relief funds, can support partnerships with educator preparation programs to expand opportunities for extensive clinical experience to teaching candidates, including leveraging candidates to provide additional support to students and address the impact of lost instructional time.

ESSER or GEER funds may also be used to recruit, hire, and retain a diverse school staff, including through high-quality induction, and mentoring programs. ESSER or GEER funds may also be used to provide teachers professional learning opportunities on strategies for learning recovery.

In using these funds, an LEA should consider how to build short- and long-term capacity and sustain its efforts after the funding is no longer available.

Additional information on evidence-based approaches to stabilizing the educator workforce are described in Volume 2 of the Department's COVID-19 Handbook available at: https://www2.ed.gov/documents/coronavirus/reopening-2.pdf, at https://www2.ed.gov/documents/coronavirus/arp-teacher-shortages.pdf, and in Secretary Cardona's December 2021 letter on the topic at https://oese.ed.gov/files/2021/12/21-0414.DCL_Labor-Shortages.pdf.

### D-1.a. How may ESSER and GEER funds be leveraged with funding and initiatives of other Federal agencies to promote education workforce stability? (*New December 7, 2022*)

In general, ESSER or GEER funds may be used in combination with other Federal funds, so long as separate documentation and cost allocation is maintained for separate funding streams or programs. For additional information on using ESSER and GEER funds along with other Federal funds, see FAQ A-17.

Steps taken by other Federal agencies to promote education workforce stability include:

- As described above in FAQ D-1, the Internal Revenue Service issued FAQs clarifying that, in some instances, retirees can return to work and still receive their pensions or remain on the job and begin receiving pension payments, where pension plans permit such approaches (pension plans can also be amended to create these incentives). For additional information, please see https://www.irs.gov/newsroom/coronavirus-related-relief-for-retirement-plans-and-iras-questions-and-answers.
- The Department of Labor recently approved the first registered apprenticeship programs for teaching, which expand options for "grow your own" and residency programs that allow candidates to be paid while they gain clinical experience and complete coursework leading to full certification. ESSER and GEER funds may support the development and implementation of such programs.
- To stabilize the school bus driver workforce, ESSER or GEER funds could be used to recruit, train, and pay for commercial licensing of new school bus drivers.

### D-2. May an LEA use ESSER and GEER funds to hire additional health support staff?

Yes. ESSER and GEER funds may be used to hire new counselors, nurses, social workers, and other health support staff to help students and staff with their emotional and physical well-being and help students and staff deal with the impact of the COVID-19 pandemic. An LEA should consider how to use

the funds in ways that will build its short- and long-term capacity and be sustained after the funding is no longer available.

**D-3. Must an entity that receives ESSER or GEER funds under the CARES Act or CRRSA Act continue to pay employees and contractors, to the greatest extent practicable, during the period of any disruptions or closures related to COVID-19?**

Yes. SEAs, LEAs, and any other entity that receives ESSER I, ESSER II, or GEER funds must assure that they will continue to pay employees and contractors during COVID-19 pandemic-related disruptions or closures to the greatest extent practicable. There is no similar requirement in the ARP Act; however, ARP ESSER funds may be used to continue to pay employees and contractors. In addition, ESSER and GEER funds may be used to hire new staff and to avoid staff layoffs. See FAQ A-16 for information on requirements related to documentation for personnel expenses in the Uniform Guidance (2 CFR § 200.430(i)).

**D-4. May an LEA use ESSER and GEER funds to pay overtime to its salaried custodians and other staff in order to prepare for a safe reopening of schools and sustain safe school operations?**

Yes. Paying custodians or other staff overtime to safely reopen schools and to keep the schools safely open is allowable under ESSER and GEER.

**D-5. May an LEA use ESSER and GEER funds to provide childcare services or instructional supervision to the children of teachers and other staff in order to enable them to return to their teaching or other school responsibilities?**

Yes. An LEA may use ESSER and GEER funds for the costs associated with providing childcare and instructional supervision to children of teachers and staff, so long as certain conditions are met. For example, an LEA might contract with a daycare provider to make spaces available for teachers with young children whose regular daycare services are unavailable due to the COVID-19 pandemic so that those teachers can continue to provide educational services to students. An LEA might also provide a retention incentive to teachers with young children that could offset the cost for childcare in order to retain those teachers, which is an allowable use of funds under part A of title II of the ESEA, if teacher retention is a challenge due to the COVID-19 pandemic.

**D-6. May an LEA use ESSER and GEER funds to provide "premium pay" or other additional compensation for teachers, principals, and other school personnel, including school nutrition staff and custodians?**

Yes. Premium pay must be reasonable and necessary and consistent with 2 CFR § 200.430(f), and given pursuant to an established plan (which could be established in response to the COVID-19 pandemic), consistent with applicable collective bargaining agreements and other relevant policies and requirements.

**D-7. May an LEA that has experienced significant, unbudgeted increases in unemployment costs use ESSER and GEER funds to pay for those costs?**

Yes. An LEA may use ESSER or GEER funds to pay for unemployment costs if necessary. However, an LEA may want to consider alternate sources of funding for the unemployment expenses, and use ESSER and GEER funds for more traditional education uses to prevent, prepare for, or respond to the COVID-19

pandemic. Additionally, as with all grant activities, the use of funds must meet all applicable Uniform Guidance requirements, and be reasonable and necessary to meet the purpose of the programs.

# E. Additional Fiscal Considerations

### *Timelines for Obligating Funds*

### E-1. What is the timeline for a Governor, SEA, or LEA to obligate funds under ESSER I and GEER I? (*Updated December 7, 2022*)

A Governor, SEA, or LEA, as applicable, has until September 30, 2022, to obligate ESSER I and GEER I funds; this includes the 12-month Tydings Amendment period. (Note that the timeline for obligating funds is distinct from the timeline for a State to award funds within one year of receipt or return them to the Department for reallocation (sections 18002(d) and 18003(f) of the CARES Act).) For additional information on awarding and obligating funds, please see Question 10 in the ESSER FAQs available at: https://oese.ed.gov/files/2020/05/ESSER-Fund-Frequently-Asked-Questions.pdf and Question A-19 in the GEER FAQs available at: https://oese.ed.gov/files/2020/10/FAQs-GEER-Fund.pdf. Although funds must be obligated by September 30, 2022, grant activities carried out through a valid obligation of funds may continue beyond that date. Under 2 CFR § 200.344(a), ESSER and GEER funds must be liquidated within 120 calendar days of the end of the performance period. See FAQ E-3.d. for more information.

### E-2. What is the timeline for a Governor, SEA, or LEA to obligate funds under ESSER II and GEER II? (*Updated December 7, 2022*)

A Governor, SEA, or LEA, as applicable, has until September 30, 2023, to obligate ESSER II and GEER II funds; this includes the 12-month Tydings Amendment period. (Note that the timeline for obligating funds is distinct from the timeline for a State to award funds within one year of receipt or return them to the Department for reallocation (sections 312(f) and 313(g) of the CRRSA Act).) For additional information on awarding and obligating funds, please see Question 10 in the ESSER FAQs available at: https://oese.ed.gov/files/2020/05/ESSER-Fund-Frequently-Asked-Questions.pdf and Question A-19 in the GEER FAQs available at: https://oese.ed.gov/files/2020/10/FAQs-GEER-Fund.pdf. Although funds must be obligated by September 30, 2023, grant activities carried out through a valid obligation of funds may continue beyond that date. Under 2 CFR § 200.344(a), ESSER and GEER funds must be liquidated within 120 calendar days of the end of the performance period. See FAQ E-3.d. for more information.

### E-3. What is the timeline for an SEA or LEA to obligate funds under ARP ESSER?

An SEA or LEA has until September 30, 2024, to obligate the ARP ESSER funds it receives. This includes the 12-month Tydings Amendment period. Although funds must be obligated by September 30, 2024, grant activities carried out through a valid obligation of funds may continue beyond that date. Under 2 CFR § 200.344(a), ESSER funds must be liquidated within 120 calendar days after the end of the performance period (September 30, 2024).

Note that the timeline for obligating funds is distinct from the timeline for an SEA to make allocations to LEAs. Section 2001(d)(2) of the ARP Act requires an SEA to make allocations to LEAs in an expedited and timely manner and not later than 60 days after receipt of its award, to the extent practicable.

Additionally, the ARP Act requires that an SEA award its ARP ESSER funds within one year of receipt or return them to the Department for reallocation (section 2001(g) of the ARP Act). With respect to funds that an SEA must allocate to LEAs, an SEA will have met the requirement to award the funds within one year by meeting the requirement in section 2001(d)(2) of the ARP Act to make allocations to LEAs, in an expedited and timely manner and, to the extent practicable, not later than 60 days after receipt of its

award. For funds that an SEA reserves, the SEA must, within one year of receiving the funds, award the funds through grants or contracts or by retaining funds to provide direct services. For additional information on awarding and obligating funds, please see Question 10 in the ESSER FAQs available at: https://oese.ed.gov/files/2020/05/ESSER-Fund-Frequently-Asked-Questions.pdf.

### E-3.a. May an SEA establish a shorter period of availability for awards made from the ESSER State Reserve than the full period of availability under the applicable ESSER program? (*New December 7, 2022*)

Yes, an SEA may establish a period of availability for ESSER State Reserve funds, including funds that are awarded to LEAs from the SEA's State Reserve, that is shorter than the full period of availability. For ESSER funds awarded through the formula, by contrast, LEAs must be given the full period of availability to obligate the funds.

### E-3.b. When must ESSER I, ESSER II, ARP ESSER, GEER I, and GEER II funds be liquidated? (*New December 7, 2022*)

Grantees and subgrantees, by regulation, must liquidate funds within 120 calendar days after the program's obligation date (see FAQs E-1, E-2, and E-3) per 2 CFR § 200.344(b). If ESSER I and GEER I funds are properly obligated by September 30, 2022, but liquidation becomes an issue after the obligation deadline, the Department may approve liquidation extension requests on a case-by-case basis upon written request of an SEA or Governor grantee, in accordance with 2 CFR § 200.344(b). If approved, an ESSER I or GEER I grantee may have up to 18 months beyond the end of the obligation period to liquidate funds, although longer requests may be considered for construction or extraordinary circumstances. Under a liquidation extension, the delivery of goods and some services may continue through the end of the liquidation period, so long as a timely and valid obligation had been made pursuant to 34 CFR § 76.707. Because the ESSER II and GEER II obligation period does not end until September 30, 2023, and the ARP ESSER obligation period does not end until September 30, 2024, the Department strongly encourages States and LEAs to obligate and liquidate ESSER II, GEER II, and ARP ESSER funds with urgency on activities that will support students' academic recovery and mental health needs. The Department will determine any process for submitting a Liquidation Extension Request for ESSER II, GEER II, and ARP ESSER funds at a later date.

### E-3.c. What happens to ESSER and GEER funds that are unobligated at the end of the Tydings Amendment deadline? (*New December 7, 2022*)

The Department is not able to extend the statutory obligation deadline. Therefore, if the grantee (SEA or Governor) or any subgrantee is unable to obligate ESSER or GEER funds by the obligation deadline for each program (see FAQs E-1, E-2, and E-3 for the obligation deadlines), then the grantee will not be able to liquidate these funds. These unobligated funds will no longer be available to the grantee or subgrantee and will lapse and return to the U.S. Treasury.

### E-3.d. How long may ESSER or GEER-funded activities continue after the liquidation period? (*New December 7, 2022*)

As a preliminary matter, grantees and subgrantees should keep in mind that ESSER and GEER funds are emergency funds that are intended to be utilized in a timely manner to carry out activities to prevent, prepare for, or respond to COVID-19, including its impact on students. Further, a grantee or subgrantee must obligate ESSER or GEER funds within the period of availability and must liquidate those

obligations within 120 days of the end of the period of availability (2 C.F.R. § 200.344(b) (or within the approved period for a liquidation extension).

Generally, it is not good stewardship of Federal funds or prudent business practice to prepay for services that will extend many years into the future. However, under limited circumstances where a grantee or subgrantee timely obligates ESSER or GEER funds, ESSER- or GEER-funded activities may continue for a reasonable time beyond the liquidation period (including an approved late liquidation period).

Factors impacting how long ESSER- or GEER-funded activities may extend past the liquidation period include:
- Whether the funds were properly obligated and liquidated in a timely manner;
- Whether the activities would be allowed to extend beyond the liquidation period under applicable State and local procurement rules (i.e., a State or LEA must follow the same policies and procedures it uses for procurements from its non-Federal funds) (see 2 CFR §§ 200.317 through 200.327, 200.403(c));
- Whether the extended activities constitute a reasonable and necessary use of Federal funds; and
- Whether prudent business practices (2 CFR § 200.404(b) & (d)) and internal controls (which generally limit prepayment) would support the continued activities for the length of time proposed.

Grantees and subgrantees must obligate funds by each program's deadline, which means that if a grantee or subgrantee enters into a contract for activities that continue past the date of obligation and the contractor does not provide the services, the grantee or subgrantee may not enter into a new contract or obligate those funds for a different allowable use. Instead, those funds that were obligated for services that were not delivered will remain unused and will be returned to the U.S. Treasury.

Because ESSER and GEER are State-administered programs, the SEA or Governor determines whether activities extending past the liquidation period are allowable under the circumstances. For example, an SEA may determine that it is reasonable and necessary under 2 CFR §§ 200.403-200.404 for an LEA to enter into a multi-year software licensing contract with a vendor during the period of availability of ARP ESSER funds and to pay for the entirety of the software license within the liquidation period. However, under the contract, the vendor would continue to provide the services (i.e., software and technical support) for some time after the funds had been liquidated.

Please note that the SEA, LEA, or subgrantee would be responsible for returning to the Federal government the cost of any services that were paid with Federal funds but not received. **Under no circumstances may services extend beyond the date on which funds revert to the U.S. Department of Treasury (31 USC § 1552), which occurs four years after the obligation deadlines referenced in FAQs E-1, E-2, and E-3.** However, nothing prevents an SEA or LEA from continuing successful activities or services with non-ESSER/GEER funding.

### *Administrative Funds and Indirect Costs*

## E-4. May a Governor or SEA reserve ESSER or GEER funds for administrative costs?

Yes. An SEA may reserve ½ of 1 percent or less of its total ESSER allocation for administrative costs, including both direct and indirect administrative costs. This reservation must come from the portion of funds not required to be allocated to LEAs under the formula and is not subject to the requirement that funds be "awarded" within one year of receipt. Funds for administrative costs under ESSER I remain available to the SEA for obligation through September 30, 2022, while funds for administrative costs

under ESSER II remain available to the SEA for obligation through September 30, 2023, and funds for administrative costs under ARP ESSER remain available to the SEA for obligation through September 30, 2024.

A Governor may charge as an expense to the GEER fund an amount that is reasonable and necessary to effectively administer the program consistent with cost principles in the Uniform Guidance. Administrative costs include costs (direct and indirect) involved in the proper and efficient performance and administration of the GEER fund. However, to maximize the funds available for services to students and the public, the Department encourages each Governor and subgrantee to minimize the amount of administrative costs charged to the program. Funds for administrative costs under GEER I remain available to the Governor for obligation through September 30, 2022, while administrative costs under GEER II remain available to the Governor for obligation through September 30, 2023.

### E-5. May an LEA use ESSER or GEER funds to defray the costs of administering the program?

Yes. An LEA may charge as an expense to the ESSER or GEER fund an amount that is reasonable and necessary to effectively administer the program consistent with the cost principles in the Uniform Guidance. Administrative costs include costs (direct and indirect) involved in the proper and efficient performance and administration of ESSER or GEER funds. For example, an LEA may use ESSER funds to hire personnel to assist in the planning, implementation, and oversight of ESSER fund activities.

### E-6. May a Governor or SEA determine what constitutes a reasonable and necessary amount of funds necessary for an LEA to effectively administer the program?

Yes. As part of its oversight of the GEER and ESSER funds, a Governor or SEA may determine the amount of ESSER or GEER funds an LEA may use for administration. For example, an SEA or Governor may establish a maximum percentage of funds that an LEA may use to administer the program, absent a demonstration by the LEA that it needs additional funds for administration.

### E-7. May an SEA or LEA consolidate ESSER and GEER administrative funds?

Yes. Sections 8201(a) and 8203(a) of the ESEA permit SEAs and LEAs, respectively, to consolidate administrative funds under certain ESEA programs. The Secretary may designate additional programs from which administrative funds may be consolidated.

Under that authority, the Department designated ESSER I, ESSER II, ARP ESSER, GEER I, and GEER II funds and the Emergency Assistance to Non-Public Schools (EANS) programs (authorized under both the CRRSA Act and the ARP Act) as programs under which an SEA or LEA, as applicable, may consolidate administrative funds.

An SEA may consolidate administrative funds under two or more of the ESSER I, ESSER II, and ARP ESSER funds, the EANS program, and the GEER I and GEER II funds without also consolidating other ESEA program administrative funds, as long as the SEA can demonstrate that the majority of its resources are derived from non-Federal sources.

Specifically, an SEA may consolidate the ½ of 1 percent of its ESSER I, ESSER II and ARP ESSER funds able to be reserved for State administration, the amount of EANS funds available for State administration, and, if the SEA is administering a portion of the GEER I or GEER II funds on behalf of the Governor, a reasonable and necessary amount of those funds. If the SEA consolidates administrative

funds under these programs, it is not required to keep separate records for how it uses those administrative funds.

Consolidated administrative funds may be used to administer the programs included in the consolidation as well as for administrative activities designed to enhance the effective and coordinated use of funds under programs included in the consolidation.

An LEA may consolidate administrative funds under the ESSER I, ESSER II, ARP ESSER, GEER I, and GEER II funds with the approval of the SEA to administer the programs included in the consolidation and, as is the case with the consolidated State administrative funds, for administrative activities designed to enhance the effective and coordinated use of funds under programs included in the consolidation.

### E-8. May an LEA charge indirect costs to its ESSER or GEER Fund subgrant?

Yes. Indirect costs and rates must comply with the Uniform Guidance and the Department's administrative regulations. (See 34 CFR §§ 76.560-76.563 on indirect costs.) Because the ESSER and GEER funds do not have a supplanting prohibition, an LEA may use its unrestricted indirect cost rate.

### E-9. How might ESSER or GEER funds affect an SEA's or LEA's indirect cost recoveries?

To obtain indirect cost recoveries, an SEA or LEA is allowed to apply its currently negotiated indirect cost rate to obligations incurred under ESSER or GEER. The negotiated indirect cost rate for the current fiscal year is based on actual cost information from a prior fiscal year. Therefore, applying the currently negotiated indirect cost rate to the increased funding under ESSER or GEER (which was not considered in the indirect cost rate calculation) could result in an over-recovery of indirect costs in the current period. Such an over-recovery will be adjusted in a future fiscal year, thereby reducing indirect cost recoveries during that future period. To avoid a future compounding effect of fewer program dollars and reduced indirect costs, the Department recommends that an SEA or LEA closely monitor the potential impact of ESSER and GEER funds on its indirect cost recoveries and consider making appropriate adjustments during the current period (i.e., by potentially recovering less funding for indirect costs in the current period). Those adjustments will reduce the dollar impact in future years and allow for stability in future budgets. Additional information about indirect costs can be found at https://www2.ed.gov/about/offices/list/ocfo/intro.html.

### *Revenue Loss*

### E-10. May an SEA or LEA use ESSER and GEER funds to supplement or restore its "rainy day" fund rather than use the funds for specific purposes?

No. An SEA's or LEA's transfer of ESSER or GEER funds to its "rainy day" fund would not constitute an "obligation" of the funds. The SEA or LEA must obligate ESSER I and GEER I funds for specific allowable activities by September 30, 2022. Similarly, the SEA or LEA must obligate ESSER II and GEER II funds for specific allowable activities by September 30, 2023 and must obligate ARP ESSER funds for specific allowable activities by September 30, 2024.

### E-11. May ESSER and GEER funds be used to make up State revenue losses?

Any use of ESSER or GEER funds must be "to prevent, prepare for, and respond to" the COVID-19 pandemic. This means that ESSER and GEER funds may be used to bridge budget shortfalls if the deficit

is related to the COVID-19 pandemic and the ESSER and GEER funds are needed for education-related expenses.

However, the CARES Act, CRRSA Act, and ARP Act include detailed provisions requiring States to maintain effort for elementary and secondary education and higher education, which are designed to keep States from substantially reducing their support for K–12 education and higher education (see the Department's Guidance on Maintenance of Effort Requirements and Waiver Request). The ARP Act also includes important Maintenance of Equity requirements for both States and LEAs. More information on the Maintenance of Equity requirements, including FAQs and Final Requirements, can be found on the Department's Maintenance of Equity website: https://oese.ed.gov/offices/education-stabilization-fund/elementary-secondary-school-emergency-relief-fund/maintenance-of-equity/.

Additionally, SEAs and LEAs should be mindful that existing maintenance of effort requirements for other Federal programs, such as Title VIII of the ESEA and IDEA, continue to apply. (See E-12 and E-14.) As with other Federal funds, ESSER and GEER funds are excluded from these maintenance of effort calculations.

### E-11.a. May ESSER and GEER funds be used to support local matching requirements under other Federal programs? (*New December 7, 2022*)

Generally, no. Federal funds may not be used to meet a matching requirement unless the Federal statute authorizing those funds specifically provides that they may be applied to matching or cost-sharing requirements of another Federal program. The CARES, CRRSA, and ARP Acts do not provide specific authority to use ESSER or GEER funds as a match for any other Federal programs. See the Uniform Guidance provision on matching at 2 C.F.R. § 200.306(b)(5). However, ESSER or GEER funds may be used for cost-sharing or matching for the AmeriCorps program because the AmeriCorps statute authorizes the use of Federal funds for the match; for more information, see: https://www2.ed.gov/policy/fund/guid/americorps-matching-letter.pdf?src=grants-page.

### *Fiscal Considerations for Other Programs*

### E-12. How does the use of ESSER and GEER funds to make up for State and/or local revenue losses impact IDEA's LEA Maintenance of Effort (MOE) requirement?

IDEA contains an LEA MOE requirement in addition to the State MOE requirements in the CARES Act, CRRSA Act, and ARP Act, and the State and LEA maintenance of equity requirements in the ARP Act. Under section 613(a)(2)(A)(iii) of IDEA and 34 CFR § 300.203, an LEA must both: (1) budget, for the education of children with disabilities, at least the same amount as the LEA spent for that purpose from the same source (either local funds or a combination of State and local funds, on an aggregate or per capita basis) in the most recent fiscal year for which information is available; and (2) expend, for the education of children with disabilities, at least the same amount as the LEA spent for that purpose from the same source (either local funds or a combination of State and local funds, on an aggregate or per capita basis) for the preceding fiscal year. Under IDEA, these budget and expenditure requirements for LEA MOE are termed "eligibility" and "compliance" standards, respectively. While IDEA does not provide for MOE waivers, there are exceptions and an adjustment to the LEA MOE requirements that may allow an LEA to reduce its MOE budget and expenditures below the level of expenditures for the education of children with disabilities made by the LEA for the appropriate comparison year (the most recent fiscal year for which information is available (for the eligibility standard) and the preceding fiscal year (for the compliance standard)). (See 34 CFR §§ 300.204 and 300.205.)

For the purposes of the IDEA, CARES Act, CRRSA Act, and ARP Act funds are considered Federal funds and may not replace State and local funds in LEA MOE calculations. As a result, if an LEA uses CARES Act, CRRSA Act, or ARP Act funds to replace State or local funding for the education of children with disabilities, this may result in a failure of the LEA to meet the budget and/or expenditure requirements for LEA MOE under IDEA. If an LEA fails to meet the MOE budget requirement, the LEA is not eligible for an IDEA Part B subgrant. If the LEA fails to meet the MOE expenditure requirement, then the <u>SEA</u> is liable in a recovery action to return non-Federal funds to the Department in an amount equal to the amount of the LEA's MOE shortfall or the amount of the LEA's IDEA Part B subgrant in that fiscal year, whichever is lower. SEAs may, but are not required to, seek reimbursement from the LEA that failed to meet MOE.

OSEP funds a technical assistance center to assist States with the LEA MOE reporting and underlying requirements, the Center for IDEA Fiscal Reporting (https://cifr.wested.org/resources/lea-moe/).

### E-13. How does the use of ESSER and GEER funds to make up for State revenue losses impact the IDEA's Maintenance of State Financial Support (MFS) requirement?

IDEA contains a separate State MFS requirement in addition to the maintenance of effort requirements in the CARES Act, CRRSA Act, and ARP Act. Under IDEA section 612(a)(18)(A), "a State must not reduce the amount of State financial support for special education and related services for students with disabilities, or otherwise made available because of the excess costs of educating those children, below the amount of that support for the preceding fiscal year." (34 CFR § 300.163(a).) For the purposes of IDEA, CARES Act, CRRSA Act, and ARP Act funds are considered Federal funds and may not replace State funds in MFS calculations. Replacing State appropriations for special education and related services with CARES Act, CRRSA Act, and ARP Act funds could result in a reduction of the State's amount of State financial support made available for special education and related services below the level for the preceding fiscal year. This would likely trigger an MFS shortfall under IDEA and potentially result in a reduction of IDEA Part B funds in a future grant equal to the amount of the shortfall. (34 CFR § 300.163(b).)

Part B of the IDEA allows the Secretary to waive the MFS requirement for one year at a time under 34 CFR § 300.163(c)(1) if granting a waiver would be equitable due to exceptional or uncontrollable circumstances such as a natural disaster or a precipitous and unforeseen decline in the financial resources of the State.

OSEP funds a technical assistance center to assist States with the MFS reporting and underlying requirements, the Center for IDEA Fiscal Reporting, https://cifr.wested.org/resources/mfs/.

### E-14. How does the use of ESSER and GEER funds to make up for State and/or local revenue losses impact the LEA MOE requirement in section 8521 of the ESEA?

Section 8521 of the ESEA contains an LEA MOE requirement applicable to covered ESEA programs in addition to the State MOE requirements in the CARES Act, CRRSA Act, and ARP Act, and the State and LEA maintenance of equity requirements in the ARP Act. Under section 8521 and 34 CFR § 299.5, an LEA's expenditures for the provision of free public education in the preceding fiscal year may not be less than 90 percent of its expenditures in the second preceding fiscal year, determined either by the LEA's combined fiscal effort per student or its aggregate expenditures of State and local funds. CARES Act, CRRSA Act, and ARP Act funds are Federal funds and may not replace State and local funds in LEA MOE calculations. As a result, if an LEA uses CARES Act, CRRSA Act, and ARP Act funds to replace

State or local funding to provide free public education, the LEA may fail to meet MOE under section 8521. Absent a waiver of the MOE requirement, an SEA must reduce an LEA's allocation for each covered program by the amount the LEA failed to meet MOE.

The Department may waive the MOE requirement in section 8521 of the ESEA if it determines a waiver would be equitable due to exceptional or uncontrollable circumstances or a precipitous decline in the financial resources of an LEA. If an LEA experienced a precipitous decline in State and local resources caused by the COVID-19 pandemic, that could warrant the Department's granting an MOE waiver. With respect to exceptional or uncontrollable circumstances, the statute includes the example of a natural disaster or a change in the organizational structure of the LEA. In addition to these two examples, there may be other instances of exceptional or uncontrollable circumstances that might warrant when a waiver would be granted, such as a significant reduction in expenditures of State and local funds due to temporary closures or changes in onsite operations caused by the COVID-19 pandemic.

# Appendix A -- Allocations

**MAKING ELEMENTARY AND SECONDARY SCHOOL EMERGENCY RELIEF FORMULA SUBGRANTS TO LEAS UNDER THE AMERICAN RESCUE PLAN ACT AND CORONAVIRUS RESPONSE AND RELIEF SUPPLEMENTAL APPROPRIATIONS ACT, 2021**

This technical appendix has been prepared for the benefit of State administrators who are tasked with making formula subgrants to LEAs under the American Rescue Plan (ARP) Act's Elementary and Secondary School Emergency Relief (ARP ESSER) and under the Coronavirus Response and Relief Supplemental Appropriations (CRRSA) Act, 2021's Elementary and Secondary School Emergency Relief component (ESSER II).[34]

## ARP ESSER and ESSER II Requirements

A State educational agency (SEA) must allocate at least 90 percent of its total ESSER II grant and ARP ESSER grant by formula to LEAs. The SEA must determine each LEA's ESSER II allocation and ARP ESSER allocation in proportion to the amount of funds the LEA received under part A of title I of the Elementary and Secondary Education Act of 1965 (ESEA) in the most recent fiscal year (section 313(c) of the CRRSA Act and section 2001(d)(1) of the ARP Act, respectively).

## Title I, Part A Subgrants to LEAs

For the purpose of allocating ARP ESSER and ESSER II funds to LEAs, the following points regarding Title I, Part A subgrants apply:

- Federal fiscal year (FY) 2020 Title I, Part A subgrants that were awarded by each SEA to LEAs for the 2020-2021 school year are the most recent Title I, Part A funds on which an SEA bases ESSER II and ARP ESSER subgrants. Therefore, with the exception of Step 6 below relating to new or significantly expanded charter school LEAs in school year 2021-2022, an SEA has the data needed to calculate ESSER II and ARP ESSER LEA allocations because the SEA has already determined the fiscal year (FY) 2020 Title I, Part A LEA subgrant amounts.

- FY 2020 Title I, Part A subgrants are those that each SEA determined under Title I, Part A, Subpart 2: that is, the aggregate of basic grants, concentration grants, targeted grants, and education finance incentive grants for which each LEA was eligible after the SEA adjusted, in accordance with the regulations in 34 CFR §§ 200.70-200.75[35] and 200.100,[36] the LEA allocations on the Census list

---

[34] Guidance for the CARES Act allocations ("ESSER I") was included in the Technical Appendix in the ESSER FAQs.
[35] The regulations in 34 CFR §§ 200.70-200.75 address adjusting for LEAs that are not on the Census list (such as charter school LEAs), applying the hold harmless after adjusting for LEAs that are not on the Census list, alternative allocations for LEAs under 20,000 total population, and special procedures for calculating concentration grants in small States, available at: https://www.ecfr.gov/cgi-bin/text-idx?SID=ea8f771199b0aa9a1f068857ea552084&mc=true&node=sg34.1.200_169.sg5&rgn=div7.
[36] The regulations in 34 CFR § 200.100 address an SEA's reservation of funds for school improvement under ESEA section 1003, including application of the special rule in section 1003(h); funds for State administration under ESEA

calculated by the Department.[37] regulations in 34 CFR §§ 200.70-200.75[38] and 200.100,[39] the LEA allocations on the Census list calculated by the Department.[40]

- The following <u>are not part of</u> FY 2020 Title I, Part A LEA subgrant amounts an SEA uses to calculate ESSER LEA allocations:
  - FY 2017, FY 2018, or FY 2019 carryover funds.
  - Funds reallocated to an LEA by the SEA under ESEA section 1126(c).
  - Funds an LEA received under ESEA section 1003 for school improvement.
  - Funds an LEA received under ESEA section 1003A for direct student services.
  - Funds an LEA received to carry out Title I, Part D, Subpart 2 (i.e., funds generated by children in local institutions for delinquent children).
  - Reductions to an LEA's FY 2020 Title I, Part A subgrant due to a failure to meet the ESEA's maintenance of effort requirements in the preceding fiscal year and at least once in the five immediately preceding fiscal years.
  - Any adjustments from FY 2019 that an SEA made to FY 2020 Title I, Part A subgrant amounts.
  - FY 2020 Title I, Part A funds that an LEA declined.

## Steps to Calculate ARP ESSER Subgrants and ESSER II Subgrants to LEAs

***Note to users: as the same requirements apply to determining ESSER II and ARP ESSER subgrants, for clarity and space limitations the tables presented in the steps below refer to "ARP ESSER." (The same information applies to ESSER II.)***

These steps describe the procedures an SEA follows to calculate the ESSER II LEA allocations and ARP ESSER LEA allocations. An SEA can complete Steps 1 through 5 in order to make ESSER II subgrants and ARP ESSER subgrants to existing eligible LEAs; the SEA completes Step 6 once it has determined whether any new charter school LEAs have opened for school year 2021-2022 or any existing charter school LEAs have significantly expanded for school year 2021-2022 (e.g., during the fall of 2021). (See ESEA section 4306). An example follows each step, with a combined example for Steps 2 and 3.

---

[37] section 1004; and funds for direct student services under ESEA section 1003A, available at https://www.ecfr.gov/cgi-bin/text-idx?SID=ea8f771199b0aa9a1f068857ea552084&mc=true&node=se34.1.200_1100&rgn=div8.

[37] Additional information on the SEA adjustment process to determine LEA Title I, Part A subgrants is provided on pages 2-10 in the Department's nonregulatory guidance on ESSA fiscal changes, available at: https://oese.ed.gov/files/2020/02/essaguidance160477-1.pdf.

[38] The regulations in 34 CFR §§ 200.70-200.75 address adjusting for LEAs that are not on the Census list (such as charter school LEAs), applying the hold harmless after adjusting for LEAs that are not on the Census list, alternative allocations for LEAs under 20,000 total population, and special procedures for calculating concentration grants in small States, available at: https://www.ecfr.gov/cgi-bin/text-idx?SID=ea8f771199b0aa9a1f068857ea552084&mc=true&node=sg34.1.200_169.sg5&rgn=div7.

[39] The regulations in 34 CFR § 200.100 address an SEA's reservation of funds for school improvement under ESEA section 1003, including application of the special rule in section 1003(h); funds for State administration under ESEA section 1004; and funds for direct student services under ESEA section 1003A, available at https://www.ecfr.gov/cgi-bin/text-idx?SID=ea8f771199b0aa9a1f068857ea552084&mc=true&node=se34.1.200_1100&rgn=div8.

[40] Additional information on the SEA adjustment process to determine LEA Title I, Part A subgrants is provided on pages 2-10 in the Department's nonregulatory guidance on ESSA fiscal changes, available at: https://oese.ed.gov/files/2020/02/essaguidance160477-1.pdf.

<u>Step 1</u>: The SEA determines the total amount of ESSER II and ARP ESSER funds it has available to allocate to LEAs through the respective ESSER II and ARP ESSER formulas by:

- Determining the amount of:
  - ESSER II funds it will retain for the SEA Reserve under section 313(e) of the CRRSA Act (a maximum of 10 percent of its total grant, including funds for State administration).
  - ARP ESSER funds it will retain for the SEA Reserve under section 2001(f) of the ARP Act (a maximum of 10 percent of its total grant, including funds for State administration and the required SEA reservations).
- Subtracting the:
  - ESSER II SEA Reserve amount from the SEA's total ESSER II allocation to determine the total amount available for LEA subgrants.
  - ARP ESSER SEA Reserve amount from the SEA's total ARP ESSER allocation to determine the total amount available for ARP ESSER LEA subgrants.
- If a State has charter school LEAs, subtracting from the total amount of:
  - ESSER II funds available for LEA subgrants a reasonable amount to retain for new charter school LEAs or charter school LEAs that will significantly expand in school year 2021-2022 consistent with ESEA section 4306.
  - ARP ESSER funds available for LEA subgrants a reasonable amount to retain for new charter school LEAs or charter school LEAs that will significantly expand in school year 2021-2022 consistent with ESEA section 4306.

(Temporarily retaining funds from the total amount of ESSER II and ARP ESSER funds available for LEA subgrants for new charter school LEAs or charter school LEAs that will significantly expand in school year 2021-2022 will reduce the likelihood that an SEA will have to reduce the ESSER II and ARP ESSER subgrants of other LEAs once the SEA has the data to calculate the ESSER II and ARP ESSER subgrants of such charter school LEAs. See Step 6b.)

<u>Example of Step 1</u>

| Row | Category | Amount |
|---|---|---|
| *Row 1* | SEA's ARP ESSER Allocation | $80,000,000 |
| *Row 2* | ARP SEA Reserve *(10 percent of Row 1)* | $8,000,000 |
| *Row 3* | Amount of ARP ESSER funds for LEA subgrants *(Row 1 minus Row 2)* | $72,000,000 |
| *Row 4* | Funds retained for new/significantly expanded charter school LEA subgrants | $1,000,000 |
| *Row 5* | **Total amount available to allocate to LEAs** *(Row 3 minus Row 4)* | **$71,000,000** |

<u>Step 2</u>: The SEA identifies each LEA's FY 2020 Title I, Part A subgrant amount (as described above under "Title I, Part A Subgrants to LEAs").

Step 3: The SEA adds the FY 2020 Title I, Part A LEA subgrants to determine the total amount of FY 2020 Title I, Part A subgrants.

## Example of Step 2 and Step 3

| Step | LEA operating in school year 2020-2021 | FY 2020 Title I, Part A subgrant amount |
|------|----------------------------------------|-----------------------------------------|
| 2 | LEA 1 | $10,904,500 |
| 2 | LEA 2 | $13,694,277 |
| 2 | LEA 3 (charter LEA) | $257,479 |
| 2 | LEA 4 (charter LEA) | $332,050 |
| 2 | LEA 5 | $5,771,821 |
| 2 | LEA 6 | $0 |
| 2 | LEA 7 | $3,765,959 |
| 2 | LEA 8 | $26,852,135 |
| 2 | LEA 9 | $2,449,979 |
| 2 | LEA 10 | $25,971,800 |
| 3 | **Total** | **$90,000,000** |

Step 4: The SEA divides each LEA's Title I, Part A subgrant amount (Step 2) by the total amount of FY 2020 Title I, Part A subgrants (Step 3) to determine the proportion of the ESSER II and ARP ESSER formula funds that each LEA receives.

## Example of Step 4

| LEA operating in school year 2020-2021 | LEA's FY 2020 Title I, Part A subgrant amount *(From Step 2)* | Total amount of FY 2020 Title I, Part A LEA subgrants *(From Step 3)* | Proportion of the ARP ESSER formula funds that the LEA receives *(Step 2 divided by Step 3)* |
|---|---|---|---|
| LEA 1 | $10,904,500 | $90,000,000 | 0.1212 |
| LEA 2 | $13,694,277 | $90,000,000 | 0.1522 |
| LEA 3 (charter LEA) | $257,479 | $90,000,000 | 0.0029 |
| LEA 4 (charter LEA) | $332,050 | $90,000,000 | 0.0037 |
| LEA 5 | $5,771,821 | $90,000,000 | 0.0641 |
| LEA 6 | $0 | $90,000,000 | 0.0000 |
| LEA 7 | $3,765,959 | $90,000,000 | 0.0418 |
| LEA 8 | $26,852,135 | $90,000,000 | 0.2984 |
| LEA 9 | $2,449,979 | $90,000,000 | 0.0272 |
| LEA 10 | $25,971,800 | $90,000,000 | 0.2886 |

Step 5: The SEA multiplies the proportion identified in Step 4 by the portion of its ESSER II and ARP ESSER funds that it will immediately distribute by formula as determined in Step 1 to calculate each LEA's ESSER II subgrant and ARP ESSER subgrant.

Example of Step 5

| LEA operating in school year 2020-2021 | Proportion of the ARP ESSER formula funds that the LEA receives *(From Step 4)* | Total amount of ARP ESSER funds available to allocate to LEAs *(from Step 1)* | ARP ESSER LEA subgrant *(Amount determined in Step 1 multiplied by Step 4)* |
|---|---|---|---|
| LEA 1 | 0.1212 | $71,000,000 | $8,602,439 |
| LEA 2 | 0.1522 | $71,000,000 | $10,803,263 |
| LEA 3 (charter LEA) | 0.0029 | $71,000,000 | $203,122 |
| LEA 4 (charter LEA) | 0.0037 | $71,000,000 | $261,951 |
| LEA 5 | 0.0641 | $71,000,000 | $4,553,325 |
| LEA 6 | 0.0000 | $71,000,000 | $0 |
| LEA 7 | 0.0418 | $71,000,000 | $2,970,923 |
| LEA 8 | 0.2984 | $71,000,000 | $21,183,351 |
| LEA 9 | 0.0272 | $71,000,000 | $1,932,761 |
| LEA 10 | 0.2886 | $71,000,000 | $20,488,865 |
| **Total** | | | **$71,000,000** |

Step 6: The SEA recalculates the ESSER II LEA allocations and ARP ESSER LEA allocations after it determines whether there are any new charter school LEAs or any existing charter school LEAs that significantly expanded for school year 2021-2022 in accordance with the definition of "significant expansion of enrollment" in 34 CFR § 76.787.[41]

Step 6a (applies only if for school year 2021-2022 there are no new charter school LEAs or charter school LEAs that significantly expanded in a State): The SEA allocates the amount it retained under Step 1 for potential new charter school LEAs to the LEAs to which it made ESSER II subgrant allocations and ARP ESSER subgrant allocations in proportion to those amounts.

---

[41] An SEA will implement Step 6 after the SEA determines whether there are any new charter school LEAs or charter school LEAs that significantly expanded for school year 2021-2022 based on receiving written notification from a charter school LEA at least 120 days prior to the date the school is scheduled to open or significantly expand. (See 34 CFR§ 76.788). Thus, this step likely will not occur until fall 2021.

Example of Step 6a

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 |
|---|---|---|---|---|---|
| **LEA operating in school year 2020-2021** | **Proportion of ARP ESSER formula funds that the LEA receives** *(From Step 4)* | **Initial ARP ESSER LEA subgrant** *(From Step 5)* | **Amount SEA retained for new or significantly expanded charter LEAs** *(from Step 1)* | **ARP ESSER LEA allocation of retained amount** *(Column 4 multiplied by Column 2)* | **Revised ARP ESSER LEA subgrant** *(Column 3 plus Column 5)* |
| LEA 1 | 0.1212 | $8,602,439 | $1,000,000 | $121,161 | $8,723,600 |
| LEA 2 | 0.1522 | $10,803,263 | $1,000,000 | $152,159 | $10,955,422 |
| LEA 3 (charter LEA) | 0.0029 | $203,122 | $1,000,000 | $2,861 | $205,983 |
| LEA 4 (charter LEA) | 0.0037 | $261,951 | $1,000,000 | $3,689 | $265,640 |
| LEA 5 | 0.0641 | $4,553,325 | $1,000,000 | $64,131 | $4,617,456 |
| LEA 6 | 0.0000 | $0 | $1,000,000 | $0 | $0 |
| LEA 7 | 0.0418 | $2,970,923 | $1,000,000 | $41,844 | $3,012,767 |
| LEA 8 | 0.2984 | $21,183,351 | $1,000,000 | $298,357 | $21,481,708 |
| LEA 9 | 0.0272 | $1,932,761 | $1,000,000 | $27,222 | $1,959,983 |
| LEA 10 | 0.2886 | $20,488,865 | $1,000,000 | $288,576 | $20,777,441 |
| **Total** | | **$71,000,000** | | **$1,000,000** | **$72,000,000** |

Step 6b (applies only if for school year 2021-2022 there are new charter school LEAs or charter school LEAs that significantly expanded in a State): The SEA recalculates its ESSER II LEA allocations and ARP ESSER LEA allocations based on the total amount available for LEA subgrants in order to determine the ESSER II subgrant amounts and ARP ESSER subgrant amounts for a new charter school LEA or a significantly expanded charter school LEA and makes any necessary adjustments to the ESSER II LEA subgrants and ARP ESSER LEA subgrants that the SEA already awarded based on the calculations described in Steps 1 through 5.

As background, for a newly opened charter school LEA or a charter school LEA that significantly expands for school year 2021-2022, an SEA does not have an actual FY 2020 Title I, Part A subgrant amount for the LEA that reflects either status. ESEA section 4306(a), however, requires, with respect to any funds that the Department allocates to States on a formula basis (including ESSER II and ARP ESSER), a State to:

> [T]ake such measures as are necessary to ensure that every charter school receives the Federal funding for which the charter school is eligible not later than [five] months after the charter school first opens, notwithstanding the fact that the identity and characteristics of the students enrolling in that charter school are not fully and completely determined until that charter school actually opens. The measures similarly shall ensure that every charter school expanding its enrollment in any subsequent year of operation receives the Federal funding for which the charter school is eligible not later than [five] months after such expansion.

In order to comply with ESEA section 4306(a), an SEA must determine an ESSER II LEA subgrant allocation and ARP ESSER LEA subgrant allocation for a new or significantly expanded charter school in

school year 2021-2022 by deriving what the charter school LEA's FY 2020 Title I, Part A allocation would have been based on the characteristics of the charter school LEA's students in school year 2021-2022. As detailed in the next paragraph, an SEA already derives this amount for calculating FY 2021 Title I, Part A allocations to comply with ESEA section 4306(c).

Independent of the CRSSA Act and ARP Act, as part of calculating a new or significantly expanded charter school LEA's FY 2021 Title I, Part A allocation, ESEA section 4306(c) requires an SEA, for purposes of implementing the Title I, Part A hold-harmless protections in ESEA sections 1122(c) and 1125A(f)(3) for a newly opened or significantly expanded charter school LEA, to derive a hold-harmless base under each Title I, Part A formula for FY 2020 that reflects the new or significantly expanded enrollment of the charter school LEA.[42] Therefore, in order to calculate the ESSER II allocation and ARP ESSER allocation of a new or significantly expanded charter school LEA, an SEA will consider such an LEA's FY 2020 Title I, Part A allocation as the sum of its hold harmless base under each Title I, Part A formula that the SEA calculates for FY 2021 Title I, Part A allocations in accordance with ESEA section 4306(c). An example of calculating the ESSER II allocation and ARP ESSER allocation for a new or significantly expanded charter school LEA and adjusting the ESSER II subgrants and ARP ESSER subgrants an SEA already made (as shown in Steps 1-5) follows on the next page.

---

[42] For more information on ESEA section 4306(c) see pages 4-7 in the Department's nonregulatory guidance on ESSA fiscal changes, available at: https://www2.ed.gov/policy/elsec/leg/essa/essaguidance160477.pdf.

Example of Step 6b

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 | Column 7 |
|---|---|---|---|---|---|---|
| **LEA** | **Initial ARP ESSER LEA subgrant** *(From Step 5)* | **FY 2020 Title I, Part A subgrant amount or ESEA Section 4306(c) FY 2020 derived Title I, Part A hold harmless base\*** | **LEA proportion of Column 3 total** *(Column 3 LEA amount divided by Column 3 total)* | **Total amount for LEA subgrants** *(from Step 1)* | **Revised ARP ESSER LEA subgrant** *(Column 5 multiplied by Column 4)* | **Difference between revised ARP ESSER LEA subgrant and initial subgrant** *(Column 6 minus Column 2)* |
| LEA 1 | $8,602,439 | $10,904,500 | 0.1209 | $72,000,000 | $8,704,257 | $101,818 |
| LEA 2 | $10,803,263 | $13,694,277 | 0.1518 | $72,000,000 | $10,931,130 | $127,867 |
| **LEA 3** *(significantly expanded charter LEA in school year 2020-2021)* | $203,122 | *$357,479\** | 0.0040 | $72,000,000 | $285,349 | $82,227 |
| LEA 4 (charter LEA) | $261,951 | $332,050 | 0.0037 | $72,000,000 | $265,051 | $3,100 |
| LEA 5 | $4,553,325 | $5,771,821 | 0.0640 | $72,000,000 | $4,607,219 | $53,894 |
| LEA 6 | $0 | $0 | 0.0000 | $72,000,000 | $0 | $0 |
| LEA 7 | $2,970,923 | $3,765,959 | 0.0418 | $72,000,000 | $3,006,087 | $35,164 |
| LEA 8 | $21,183,351 | $26,852,135 | 0.2977 | $72,000,000 | $21,434,077 | $250,726 |
| LEA 9 | $1,932,761 | $2,449,979 | 0.0272 | $72,000,000 | $1,955,637 | $22,876 |
| LEA 10 | $20,488,865 | $25,971,800 | 0.2879 | $72,000,000 | $20,731,370 | $242,505 |
| **LEA 11** *(new charter LEA in school year 2020-2021)* | $0 | *$100,000\** | 0.0011 | $72,000,000 | $79,823 | $79,823 |
| **Total** | **$71,000,000** | **$90,200,000\*\*** | | | **$72,000,000** | **$1,000,000** |

\*Figure is the derived FY 2020 Title I, Part A hold harmless base that the SEA calculates in accordance with ESEA section 4306(c) for a charter school LEA that opens or significantly expands for school year 2021-2022.

\*\*Figure does not equal the actual total of FY 2020 Title I, Part A subgrants from Step 2 due to the SEA's deriving hold harmless bases for the new and significantly expanded charter school LEAs, as required by ESEA section 4306(c).

# Appendix B -- Related FAQs

# Section 1: Vaccinations and Testing

### Use of Funds for COVID-19 Vaccinations and Testing

Listed below are frequently asked questions about acceptable uses of ESSER and GEER funds[43] to State educational agencies (SEAs) and local educational agencies (LEAs) to support COVID-19 vaccinations and testing.

Other than statutory and regulatory requirements included in the document, the contents of this guidance do not have the force and effect of law and are not meant to bind the public. This document is intended only to provide clarity to the public regarding existing requirements under the law or agency policies.

## 1. May ESSER and GEER funds be used to provide COVID-19 vaccinations to teachers, staff, and eligible students?

Yes. Because ESSER and GEER funds may be used to implement public health protocols, including, to the greatest extent practicable, policies in line with guidance from the Centers for Disease Control and Prevention (CDC) for the reopening and operation of school facilities to effectively maintain the health and safety of students, educators, and other staff, providing COVID-19 vaccinations is an allowable use of ESSER and GEER funds. Allowable vaccination outreach efforts in general could include activities to create awareness and build confidence, facilitate clinics, and provide incentives such as paid time off for staff to get vaccinated. In cases where administrative fees are required to obtain a vaccination, ESSER or GEER funds may be used to offset the cost as long as the cost is reasonable.

## 2. Is COVID-19 testing for students and school staff an allowable use of ESSER and GEER funds?

Yes. Because ESSER and GEER funds may be used for public health protocols, including, to the greatest extent practicable, policies in line with guidance from the CDC for the reopening and operation of school facilities to effectively maintain the health and safety of students, educators, and other staff, providing COVID-19 testing is an allowable use of ESSER and GEER funds.

SEAs and LEAs should consult with State and local health officials to ensure the adequacy of any SEA or LEA COVID-19 testing program and that testing procedures comply with all applicable laws and requirements, including those related to privacy, including the Family Educational Rights and Privacy Act (FERPA) and Protection of Pupil Rights Amendment (PPRA), and the confidentiality of information requirements under Part B and Part C of the Individuals with Disabilities Education Act (IDEA). Please note that the Department of Health and Human Services separately provided $10 billion under the ARP Act to States as Epidemiology and Laboratory Capacity for Prevention and Control of Emerging Infectious Diseases (ELC) Reopening Schools awards to support the implementation of COVID-19 testing programs, as recommended by the CDC, in K-12 schools. This funding was deployed quickly through State health departments in order to help LEAs safely reopen schools in the remaining months of school year 2020-2021, during summer activities, and in the subsequent school year. State and local health departments will

---

[43] For purposes of this document, references to ESSER and GEER funds include funds awarded under the Coronavirus Aid, Relief, and Economic Security (CARES) Act (ESSER I and GEER I); the Coronavirus Response and Relief Supplemental Appropriations (CRRSA) Act (ESSER II and GEER II); and the American Rescue Plan (APR) Act (ARP ESSER).

provide technical assistance to LEAs and schools in establishing COVID-19 testing programs. More information on the program can be found at: www.cdc.gov/ncezid/dpei/pdf/guidance-elc-reopening-schools-508.pdf.

# Section 2: COVID-19 Testing Incentives Fact Sheet

## Fact Sheet: Using American Rescue Plan Act funding to provide incentives for participation in school-based COVID-19 screening testing

**A local educational agency (LEA) may use American Rescue Plan Act Elementary and Secondary School Emergency Relief (ARP ESSER) funds to provide incentives to parents or guardians whose children participate in school-based COVID-19 screening testing.[44]**

According to the Centers for Disease Control and Prevention (CDC), screening testing identifies infected people, including those with or without symptoms (or before development of symptoms) who may be contagious, so that measures can be taken to prevent further transmission.  In K-12 schools, screening testing can help promptly identify and isolate cases, allow schools to quarantine those who may have been exposed to COVID-19 and who are not fully vaccinated, and identify clusters to reduce the risk of interruptions to in-person education.[45]

An LEA may use ARP ESSER funds—as well as other Federal pandemic recovery resources for early childhood, elementary, and secondary education in the Education Stabilization Fund[46]—to provide reasonable incentives to parents or guardians whose children participate in school-based COVID-19 screening testing in order to increase the number of participants in the program.

Providing reasonable incentives to parents or guardians whose children participate in school-based COVID-19 screening testing is an allowable use of funds because it is a strategy that an LEA may implement in alignment with CDC guidance on screening testing to promptly identify COVID-19 cases, clusters, and outbreaks, which will help reduce transmission within schools.  Increasing the number of students who participate in school-based testing programs will increase the effectiveness and impact of these programs.

To the extent practicable, LEAs should provide written information about COVID-19 testing incentives in a language that parents and guardians can understand.  If it is not practicable to provide written translations to a parent or guardian with limited English proficiency, information about COVID-19 testing incentives should be orally translated for such parent or guardian.  In addition, LEAs should provide the information using auxiliary aids and services and in an alternative format accessible to a parent or guardian who is an individual with a disability under Section 504 of the Rehabilitation Act of 1973.

Any incentives that an LEA provides with ESSER and Governor's Education Emergency Relief (GEER) funds must meet the requirements in 2 CFR Part 200, including the requirement that the amount of the incentive be reasonable and necessary, and any other applicable laws or requirements (e.g., incentives may not involve alcohol under 2 CFR § 200.423, may not violate applicable privacy and parental consent laws).  For example, an LEA might provide a nominal gift card or any other allowable incentive that is reasonable in size and scope and likely to lead to an increase in the rate of participation by providing the incentive to each family that opts in or chooses not to opt out of a school-based COVID-19 testing program.

---

[44] Other than statutory and regulatory requirements included in the document, the contents of this guidance do not have the force and effect of law and are not meant to bind the public. This document is intended only to provide clarity to the public regarding existing requirements under the law or agency policies.

[45] See:  www.cdc.gov/coronavirus/2019-ncov/community/schools-childcare/k-12-guidance.html.

[46] The Education Stabilization Fund includes Elementary and Secondary School Emergency Relief (ESSER) and Governor's Emergency Education Relief (GEER) funds awarded under the Coronavirus Aid, Relief, and Economic Security (CARES) Act (ESSER I and GEER I); the Coronavirus Response and Relief Supplemental Appropriations (CRRSA) Act, 2021 (ESSER II and GEER II); and the ARP Act (ARP ESSER).

GEER I and GEER II funds may also support school-based COVID-19 screening testing efforts in State and local public pre-kindergarten programs that may include testing programs located in schools or community-based pre-kindergarten/early childhood education settings.

# Section 3: Student Transportation

## Use of Funds for Student Transportation

Listed below are frequently asked questions (FAQs) about allowable uses of ESSER and GEER funds by State educational agencies (SEAs) and local educational agencies (LEAs) for transportation, including to address the current regional and national challenges with hiring and retaining a sufficient number of school bus drivers. These FAQs are intended to supplement the transportation related questions in the ESSER and GEER Use of Funds Guidance published in May 2021, specifically FAQs C-4, C-7, C-9, and C-25.

Other than statutory and regulatory requirements included in the document, the contents of this guidance do not have the force and effect of law and are not meant to bind the public. This document is intended only to provide clarity to the public regarding existing requirements under the law or agency policies.

### 1. **May an SEA or LEA use ESSER or GEER funds to provide transportation for students to and from school?**

Yes. Supporting or providing transportation services for students is an allowable use of funds under ESSER and GEER as long as the need is related to COVID-19 (e.g., to support daily attendance at school to address the impact of lost instructional time) and the cost is reasonable and necessary. This could include, but is not limited to, transportation services provided directly by the school district; the cost of public transportation services (e.g., bus or subway fare); taxis, rideshare apps, or other driving services; or compensation to parents for providing transportation services for their children (see Question 4).

### 2. **May an LEA use ESSER or GEER funds to provide transportation for students participating in after-school learning and enrichment activities provided by the LEA?**

Yes. If activities take place away from the school or after regular transportation home has occurred and are intended to address student needs related to COVID-19 (e.g., to address the impact of lost instructional time), and the cost is reasonable and necessary, transportation may be an allowable use of ESSER or GEER funds. For example, an LEA may provide before- and after-school learning and enrichment activities for students including, for example, high dosage evidence-based tutoring to address the academic impact of lost instructional time, and other activities that address the social, emotional, mental health, and academic needs of students, including extended school year (ESY) or other compensatory and related services for eligible students under the Individuals with Disabilities Education Act. Reasonable and necessary costs of transportation to and from such activities would be an allowable use of ESSER and GEER funds.

### 3. May an SEA or LEA use ESSER or GEER funds to address a shortage of school bus drivers due to the pandemic?

Yes. For example, an LEA may use ESSER or GEER funds for retention bonuses for current bus drivers, for salary increases, or for the cost of hiring additional bus drivers to address the shortage of bus drivers due to the pandemic. Similarly, if an LEA is operating more bus routes due to physical distancing, funds may be used to hire additional bus drivers. In addition, funds may be used to pay for the costs associated with obtaining a commercial driver's license for new bus drivers, including the required training.

### 4. May an LEA facing a shortage of school bus drivers use ESSER or GEER funds to compensate parents or guardians for transporting their students to and from school?

Yes. ESSER or GEER funds may be used to reimburse parents or guardians for transportation costs or to offer a stipend for transportation costs, as long as they are reasonable and necessary. This type of program may be appropriate to sustain in-person instruction if an LEA is experiencing challenges hiring and/or retaining the school bus drivers necessary to accommodate the LEA's transportation needs.

Before compensating parents or guardians for transportation costs, an LEA must develop clear, objective procedures that, in addition to other relevant factors, consider: the number of days of transportation provided for in-person attendance; documentation of the travel costs to ensure that the compensation is used only for transportation-related expenses; and a process to account for any ESSER or GEER funds that were paid to parents or guardians but not used for transportation costs.

# Section 4: Promoting Public Safety

## How American Rescue Plan Funds Can Prevent and Respond to Crime and Promote Public Safety

The American Rescue Plan (ARP) Act of 2021 includes nearly $122 billion in resources for State educational agencies (SEAs) and local educational agencies (LEAs) through the ARP's Elementary and Secondary School Emergency Relief (ESSER) Fund that can be used to address student needs resulting from and exacerbated by the pandemic. SEAs and LEAs may use these funds to return to and maximize in-person instructional time and address the social, emotional, mental health, and academic needs of students, including violence prevention and intervention in schools. Previous rounds of ESSER relief funding included in the Coronavirus Aid, Relief, and Economic Security (CARES) Act and the Coronavirus Response and Relief Supplemental Appropriations (CRRSA) Act, 2021, as well as Governor's Emergency Education Relief (GEER) funding, may also be used for this purpose.[47]

States and LEAs may use these funds, consistent with Federal civil rights laws, for a range of evidence-based strategies that increase public safety for young people. Young people—especially Black and Brown young people—are disproportionately injured and killed in acts of violence; gun violence, in particular, has risen since the coronavirus disease 2019 (COVID-19) pandemic began.[48] Investing in violence prevention and intervention strategies is particularly important given that so many students and their families have experienced trauma—whether through the death of a loved one, hunger, loss of income, homelessness, social isolation, or other stressors—over the course of the pandemic.

This document complements and should be read together with the Department's Frequently Asked Questions document on Elementary and Secondary School Emergency Relief Programs and Governor's Emergency Education Relief Programs, which provides more detailed information on the underlying requirements related to uses of funds under the ESSER and GEER programs.

The Administration urges SEAs and LEAs to consider using their Federal resources on strategies to reduce violence and enhance public safety, as described below, to the benefit of their students, families, and communities, as part of their efforts to recover from the pandemic.

---

[47] Other than statutory and regulatory requirements included in the document, such as those pursuant to the authorizing statute and other applicable laws and regulations, the contents of this document do not have the force and effect of law and are not meant to bind the public. This document is intended only to provide clarity to the public regarding existing requirements under the law or agency policies. In addition, it does not create or confer any rights for or on any person. This document contains examples of resources that are provided for the user's convenience. The inclusion of these resources is not intended to reflect their importance, nor is it intended to endorse any views expressed, or products or services offered, by these entities.

[48] Educational Fund to Stop Gun Violence and Coalition to Stop Gun Violence. (2021). A Public Health Crisis Decades in the Making: A Review of 2019 CDC Gun Mortality Data. Available: http://efsgv.org/2019CDCdata; Rosenfeld, Richard, Thomas Abt and Ernesto Lopez. Pandemic, Social Unrest, and Crime in U.S. Cities: 2020 Year-End Update. Washington, D.C.: Council on Criminal Justice, January 2021, https://cdn.ymaws.com/counciloncj.org/resource/resmgr/covid_commission/Year_End_Crime_Update_Design.pdf; Rosenfeld, Richard and Ernesto Lopez. Pandemic, Social Unrest, and Crime in U.S. Cities: March 2021 Update. Washington, D.C.: Council on Criminal Justice, May 2021, https://covid19.counciloncj.org/2021/05/21/impact-report-covid-19-and-crime-4/.

**Question:** How may ARP ESSER and other ESSER and GEER funds be used to prevent and respond to violence and to increase public safety this summer and beyond?

Within the parameters discussed below, ARP ESSER funds, as well as other ESSER and GEER funds, may be used to help students and disconnected youth[49] through the following public safety strategies:

- ✓ Community violence intervention (CVI) programs
- ✓ Summer and year-round programs that provide job training and work-based learning experience for students, including formerly incarcerated students, and disconnected youth who live in communities most impacted by high levels of violence
- ✓ Summer education and enrichment programs, including summer camp
- ✓ Wraparound services—such as medical care, mental health and substance use disorder care, and nutrition support—for students and their families, including hiring support personnel for schools such as nurses, school counselors, and social workers
- ✓ Establishing or expanding full-service community schools
- ✓ Reengaging students who became disconnected from school during the pandemic to help them transition to career or postsecondary education programs

## 1. Community Violence Intervention[50]

ESSER and GEER funds may be used to implement CVI strategies, which address students' social, emotional, mental health, and academic development and are especially important in the context of the disproportionate impact of the COVID-19 pandemic on historically underserved groups of students (e.g., students from low-income families, students of color, students with disabilities, English learners, students experiencing homelessness, children and youth in foster care, migratory students, and children who are incarcerated). Purposeful strategies to re-engage disconnected youth through youth violence reduction programs, mentorship, and strengthening youth skills through workforce engagement and training also have the potential to reduce community violence.

---

[49] As used in this document, the term "disconnected youth" means "out-of-school youth" as that term is defined in the Carl D. Perkins Career and Technical Education Act of 2006 (Perkins V) (20 U.S.C. § 2302(35)). That section defines the term by reference to 29 U.S.C. § 3102, which in turn refers to 29 U.S.C. § 3164, which provides the following definition in paragraph (a)(1)(B): The term "out-of-school youth" means an individual who is—

(i) Not attending any school (as defined under State law);

(ii)     Not younger than age 16 or older than age 24; and

(iii)    One or more of the following:

(I) A school dropout.

(II)     A youth who is within the age of compulsory school attendance, but has not attended school for at least the most recent complete school year calendar quarter.

(III)    A recipient of a secondary school diploma or its recognized equivalent who is a low-income individual and is— (aa) Basic skills deficient; or

(bb) An English language learner.

(IV)     An individual who is subject to the juvenile or adult justice system.

(V)      A homeless individual (as defined in section 12473(6) of title 34), a homeless child or youth (as defined in section 11434a(2) of title 42), a runaway, in foster care or has [1] aged out of the foster care system, a child eligible for assistance under section 677 of title 42, or in an out-of-home placement.

(VI)     An individual who is pregnant or parenting.

(VII)    A youth who is an individual with a disability.

(VIII)   A low-income individual who requires additional assistance to enter or complete an educational program or to secure or hold employment.

[50] See ESSER and GEER Use of Funds FAQ C-24.

Examples of mentorship, counseling, and other relevant programs are described in Volume 2 of the Department's COVID-19 Handbook available at: https://www2.ed.gov/documents/coronavirus/reopening-2.pdf.

More details on the Administration's efforts to support CVI strategies can be found here: http://www.whitehouse.gov/briefing-room/statements-releases/2021/04/07/fact-sheet-more-details-on-the- biden-harris-administrations-investments-in-community-violence-interventions/.

## 2. Summer and Year-Round Work-Based Learning[51]

ESSER and GEER funds may be used for summer and year-round work-based or service-learning programs for high school students as part of State and LEA efforts to engage students, including disconnected youth. This includes programs that provide workforce readiness training, apprenticeship or pre-apprenticeship opportunities, internships, skills development, placement services, and/or coaching and mentoring. Funds may be used both to support the training that high school students receive and to supplement the pay (e.g., by providing stipends) to students who participate in the summer and year- round work-based learning program. Funds may also be used to support service-learning or other volunteer opportunities for high school students, including transportation and meals if not covered through U.S. Department of Agriculture (USDA) programs and flexibilities.

Summer and year-round programs that provide stipends for training and/or work-based learning experiences targeted primarily to students who are formerly incarcerated or otherwise involved in the criminal or juvenile justice system, or who live in communities experiencing high levels of violence, may also be supported with ESSER and GEER funds.

## 3. Summer Enrichment Programs for Students[52]

ESSER and GEER funds may support summer learning and enrichment programs. Ensuring young people are connected to education and communities of support is critical to violence prevention. Given that this summer affords students a critical opportunity to reconnect with their peers and engage in learning, LEAs should consider a variety of options for procuring summer opportunities with ESSER and GEER funds, including programs run by non-profit or community organizations as well as those run by the LEA.

Effective summer programming can accelerate learning and address students' social, emotional, mental health, and academic needs through a combination of activities that include strong partnerships with community-based organizations and other summer providers, including summer camps. These partnerships can help to sustain these programs and can also support programs in rural and remote communities.

Consistent with the President's call for all communities to provide high-quality summer learning and engagement opportunities for their students, communities should maximize enrollment in summer programs, with a particular focus on underserved students and students most impacted by the COVID-19 pandemic, including providing transportation and meal services. Programs should target students of all ages, including high school students, and can include work-based internships or service-learning opportunities and/or summer bridge programs to support successful educational transitions. LEAs should particularly identify opportunities to re-engage students whose schools have not been successful

---

[51] See ESSER and GEER Use of Funds FAQ C-26.

[52] See ESSER and GEER Use of Funds FAQ C-25.

in engaging them during the COVID-19 pandemic, and to specifically address the needs of students with disabilities in this context. LEAs may use indicators such as chronic absenteeism (during in-person and/or remote instruction) to identify students in need of targeted support and services, as well as more generally identifying which students have lost the greatest number of in-person instructional days since the beginning of the COVID-19 pandemic.

Moreover, an SEA must reserve at least 1 percent of its total ARP ESSER allocation for evidence-based summer enrichment programs, and LEAs must reserve at least 20 percent of their ARP ESSER funds to address the academic impact of lost instructional time[53] through the implementation of evidence-based interventions, which may include summer programs, particularly to address the disproportionate impact of the COVID-19 pandemic on historically underserved student subgroups.

Evidence-based summer learning and enrichment programs are further described in Volume 2 of the Department's COVID-19 Handbook available at: https://www2.ed.gov/documents/coronavirus/reopening-2.pdf.

### 4. Wraparound Support Services[54]

ESSER and GEER funds may be used to provide social, emotional, mental health, and academic supports to address the impacts of isolation during the pandemic, which may include, for example, supports to address students' behavioral, medical, and other needs related to substance use disorder. ESSER and GEER funds may also support broader activities that re-engage disconnected youth and reduce community violence in places where the COVID-19 pandemic has exacerbated inequities, leading to increases in the number of disconnected youth and incidents of violence. GEER funds may further be used to fund social, emotional, and mental health support activities determined to be essential by the Governor of each State.

Eligible uses of ESSER and GEER funds include:

- Hiring support personnel in schools such as nurses, school counselors, and social workers. An LEA may use ESSER and GEER funds, including the 20 percent of ARP ESSER funds set aside to address the academic impact of lost instructional time, to support students' social, emotional, mental health, and academic needs, including by implementing school-wide strategies that enhance supports and interventions for students as well as targeted assistance for students who need such supports. This includes hiring support personnel such as nurses, school counselors, social workers, and other support personnel, which could include individuals trained in violence intervention and trauma-informed care as well as individuals trained in responding to substance use disorder.

- Implementing or expanding arts programs, such as music programs, including by purchasing instruments; expanding sports programming so more students can participate; and initiating clubs, such as a robotic or STEM club.

---

[53] For the purposes of this guidance document, the term "academic impact of lost instructional time" is used in place of "learning loss" experienced by students as a result of the COVID-19 pandemic, as referenced in the ARP Act.

[54] See ESSER and GEER Use of Funds FAQs C-3, C-4, and C-16.

- Providing community-based mental health and substance use disorder programs to students and their families that deliver evidence-based psychotherapy, crisis support services, and/or recovery support.

- Ensuring that schools are implementing instructional practices that are culturally responsive and that incorporate trauma-informed pedagogy in response to the COVID-19 pandemic. For example, LEAs with high concentrations of English learners may hire additional bilingual staff to address the social, emotional, mental health, and academic needs of English learners. ESSER and GEER funds may be used to support implementation of curriculum, including related professional development.

- Providing meals for students. Typically, an LEA has other means of providing for food services, such as through the USDA or other Federal programs. As a result, the Department encourages LEAs to use those Federal funds with the specific purpose of providing food services to students prior to using ESSER or GEER funds for this purpose. USDA has provided nationwide flexibilities and many flexibilities have been extended through school year 2021-2022 (see: https://www.fns.usda.gov/disaster/pandemic/cn-2021-22-waivers-and-flexibilities). Additionally, the ARP Act expands the Pandemic Electronic Benefit Transfer (P-EBT) program to any school year in which there is a public health emergency designation as well as during summer months.

In implementing evidence-based strategies to address the academic impact of lost instructional time through the ARP ESSER required reservation of funds, SEAs and LEAs must respond to students' social, emotional, mental health, and academic needs and address the disproportionate impact of the COVID-19 pandemic on students from low-income families, students of color, English learners, students with disabilities, migratory students, students experiencing homelessness, and children and youth in foster care.

Effective strategies to support student social, emotional, mental health, and academic development are further described in Volume 2 of the Department's COVID-19 Handbook available at: https://www2.ed.gov/documents/coronavirus/reopening-2.pdf.

## 5. Full-Service Community Schools[55]

Community schools provide a range of services to students and their families, including through leveraging partnerships with non-profits and community-based organizations, that are effective parts of comprehensive community violence prevention strategies. An LEA may use ESSER and GEER funds to provide services and supports to students and families through evidence-based, full-service community schools.

The ARP Act defines a full-service community school as it is defined in section 4622(2) of the Elementary and Secondary Education Act, as amended: a public elementary school or secondary school that (A) participates in a community-based effort to coordinate and integrate educational, developmental, family, health, and other comprehensive services (which could include nutritional services) through community-based organizations and public and private partnerships; and (B) provides access to such services in school to students, families, and the community, such as access during the school year (including before- and after-school hours and weekends), as well as during the

---

[55] See ESSER and GEER Use of Funds FAQ C-13.

summer. Evidence-based community school approaches include integrated student supports, active family and community engagement, expanded learning time opportunities, and collaborative leadership and practices.

Using ESSER or GEER funds to support full-service community schools can help support students' social, emotional, mental health, and academic development. Additionally, LEAs may utilize funds in the development or expansion of in-school student support centers that provide mentoring, counseling, support for substance use disorders, and social and emotional learning supports to students in individual or group sessions.

### 6. Connecting Young People with Careers and Postsecondary Education Opportunities[56]

ESSER and GEER funds may be used to support students who graduated high school or left school in 2020 and 2021 who have not yet successfully transitioned to college or careers. Consistent with the Carl D. Perkins Career and Technical Education Act of 2006, as amended by the Strengthening Career and Technical Education for the 21st Century Act (Perkins V), an LEA may use ESSER and GEER funds to support former students who graduated high school in the class of 2020 or who will graduate in 2021 (i.e., during the pandemic) but have not yet successfully transitioned to college or careers.

For example, consistent with the requirements of Perkins V, an LEA may provide postsecondary education counseling and related support services, including for associate and baccalaureate degree programs, financial literacy, summer bridge programs, and pre-apprenticeship or registered apprenticeship; assistance with college applications; career information, advising, and navigation supports; career exposure activities and career readiness preparation, including resume development, employability skills training, mock interviews, and other readiness strategies; subsidized or unsubsidized summer or year-round work-based learning experiences, such as job shadows, internships, and other job training programs; assistance with identifying, applying for, and entering job training programs; and subsidized job training and industry-recognized credential

---

[56] See ESSER and GEER Use of Funds FAQ C-18.

## Section 5: Use of Funds to Prevent, Prepare for, or Respond to COVID-19

## Use of Funds to Prevent, Prepare for, and Respond to the COVID-19 Pandemic

The below frequently asked question (FAQ) is about allowable uses of ESSER and GEER funds by State educational agencies (SEAs) and local educational agencies (LEAs). This FAQ is intended to supplement the questions in the ESSER and GEER use of funds guidance published in May 2021.

ESSER and GEER funds offer schools and communities an opportunity to respond to the pandemic and ensure that our education system is even stronger than before. The U.S. Department of Education (Department) is committed to continuing to support SEAs and LEAs in deploying these resources to respond with urgency to meet a wide array of needs of the Nation's students.

Other than statutory and regulatory requirements included in the document, the contents of this guidance do not have the force and effect of law and are not meant to bind the public. This document is intended only to provide clarity to the public regarding existing requirements under the law or agency policies.

**What does it mean for ESSER and GEER funds to prevent, prepare for, and respond to the COVID-19 pandemic?**

ESSER and GEER funds are part of the Education Stabilization Fund established by Congress. The purpose of the Education Stabilization Fund generally is to "prevent, prepare for, and respond to" COVID-19.  As described in greater detail in the ESSER and GEER use of funds guidance, ESSER and GEER funds may be used for a wide range of activities, including:

- Supporting physical health and safety, such as developing strategies and implementing public health protocols including, to the greatest extent practicable, policies in line with guidance from the Centers for Disease Control and Prevention (CDC)
- Meeting students' social, emotional, mental health, academic, and other needs; and
- Operational continuity and other allowed uses.

In response to the pandemic, ESSER and GEER funds offer the opportunity to make educational systems better for students, educators, staff, schools, and their communities post-pandemic. The Department encourages SEAs and LEAs to think holistically about their response to COVID-19 in order to address the impact of lost instructional time from the pandemic on all students and to address pre-existing challenges that, if left unaddressed, will impede recovery from the pandemic.

As stated in the *Overview* of the ESSER and GEER use of funds guidance: "These Federal emergency resources are available for a wide range of activities to address diverse needs <u>arising from or</u> <u>exacerbated by</u> the COVID-19 pandemic, <u>or to emerge stronger post-pandemic</u>, including responding to students' social, emotional, mental health, and academic needs and continuing to provide educational services as States, LEAs, and schools respond to and recover from the pandemic" [emphasis added].

For example, the Department has advised that allowable approaches to prevent, prepare for, and respond to the pandemic could include, but are not limited to, the following activities:

- Addressing students' social, emotional, mental health, and academic needs, including addressing inequities that were worsened by the pandemic, through activities such as providing mental health services and supports to students (including those who experienced trauma before the pandemic), programs to re-engage students (including addressing factors that contributed to student disengagement before the pandemic), continuing to address issues of digital equity and access, and implementing rigorous curricula across P-12 schools.
- Ensuring that students have access to the teachers and other critical staff they need to support their success by hiring additional educators and school staff and improving compensation to recruit and retain educators and school staff.
- Sustaining and expanding existing summer learning and enrichment programming or early childhood education programs.
- Creating or improving existing data systems and collection to identify and respond in a timely manner to student needs in light of the pandemic.
- Supporting the needs of children with disabilities, including infants and toddlers with disabilities and children with disabilities who are English learners, under the Individuals with Disabilities Education Act, such as by eliminating evaluation backlogs and providing support and direct services for children with disabilities, including technical assistance, personnel preparation, and professional development and training.
- Providing educational and related services to students with disabilities under Section 504 of the Rehabilitation Act of 1973 who are not eligible for services under IDEA but receive services in accordance with a 504 plan. This includes, but is not limited to, providing additional instruction and services to students with disabilities under Section 504 of the Rehabilitation Act, often referred to as compensatory services, to make up for any skills that might have been lost if it is individually determined that the student was unable to receive a free appropriate education as a result of the closure of school buildings or other disruption in services as a result of the COVID-19 pandemic.
- Maintaining healthy facilities, which could include addressing pre-existing or new ventilation, roofing, and plumbing needs, or other needs that may inhibit healthy learning environments during full-time in-person learning. This might include roof repairs or replacement; reducing lead exposure in water; or mold, radon, and asbestos remediation, as well as facility updates (such as upgrading science labs) to address the impact of lost instructional time.

These and additional examples of allowable uses of funds may be found throughout Department resources, including:

- *American Rescue Plan Elementary and Secondary School Emergency Relief (ARP ESSER) Guidance Documents and Frequently Asked Questions (FAQs)*, available at: https://oese.ed.gov/offices/american-rescue-plan/american-rescue-plan-elementary-and-secondary-school-emergency-relief/resources.
- *Strategies for Using American Rescue Plan Funding to Address the Impact of Lost Instructional Time*, available at: https://www2.ed.gov/documents/coronavirus/lost-instructional-time.pdf.
- *COVID-19 Handbook Vol. 2: Roadmap to Reopening Safely and Meeting All Students' Needs*, available at: https://www2.ed.gov/documents/coronavirus/reopening-2.pdf.
- *Frequently Asked Questions: Using American Rescue Plan Funding to Support Full-Service Community Schools & Related Strategies*, available at: 21-0138-ARP-Community-Schools-OMB- and-OS-Approved-071421-1.pdf (English) and https://oese.ed.gov/files/2021/11/21-

0138-ARP- Community-Schools-OMB-and-OS-Approved-071421-1_SPA.508dh.pdf
(Spanish).

- *How American Rescue Plan Funds Can Prevent and Respond to Crime and Promote Public Safety*, available at: https://oese.ed.gov/files/2021/06/21-0130-ARP-Public-Safety-ED-FAQ-06-16- 2021.pdf.

- *Letter to Chief State School Officers and School Superintendents from Secretary Cardona About the Importance of Using ARP ESSER and Other Federal Resources to Address Educator Shortages,* available at: https://oese.ed.gov/files/2021/12/21-0414.DCL_Labor-Shortages.pdf.

ESSER and GEER grantees are welcome to email their State mailbox with specific use of funds questions at [state].oese@ed.gov. LEAs that have questions about uses of funds should first reach out to their SEA for assistance.