# Exhibit 40

## DECLARATION OF JOHN SHEA

I, John Shea, pursuant to 28 U.S.C. § 1746, depose and say as follows:

1.      I am the Superintendent of Schools for the Somersworth School District (SAU56), which educates students in Somersworth, New Hampshire.   Our district currently enrolls approximately 1,300 students.  I became superintendent in July 2024.  I also had previously served as principal of Somersworth High School.

2.      I have over 25 years of experience as an educator—including as an administrator, teacher, coach, and advisor.   This work has spanned the public, private, charter, college preparatory, alternative, and vocational sectors.  This work has been both throughout the United States and abroad.

3.      I have served as principal at Spaulding High School in Rochester, New Hampshire and as upper school director of Berwick Academy in Maine.  I recently served as the interim head of school of Cambridge Academy Ethiopia in Addis Ababa.  I have also previously served as a high school principal in New Delhi, India and in Panama City, Panama.  Further, I am the co-founder of the High Tech High Charter School in San Diego.

4.      I am certified in New Hampshire as a principal and superintendent, and have held this certification for over 15 years.

5.      I have earned an M.Ed. in leadership and policy studies from the University of Washington. I have earned an MBA from Harvard Business School. I also hold a Certificate of Advanced Graduate Study (CAGS) in school administration from the University of New Hampshire.

6.      The District received approximately $10.3 million in state funds for the 2024-25 fiscal year.  Of that $10.3 million, more than $9.1 million was in the form of the state adequacy

1

grant.  The remainder of the $10.3 million consisted of building aid, special education aid, CTC tuition and transportation funding, charter school special education differentiated aid, and Education Freedom Account phase out aid.  For the 2025-26 fiscal year, the District expects to receive approximately $10.1 million in state funds, with just under $9.1 million of that coming via the state adequacy grant.

7.      The Somersworth School District also directly received federal grants totaling just over $2 million for the 2024-25 fiscal year, which included IDEA (Individuals with Disabilities Education Act) grants, Title I grants (focused on students in high-poverty communities and low-income families), and Title II, III, and IV financial support. These grants are generally recurring based on year-to-year qualifications. The $2 million figure, however, for the 2024-25 year also included school safety grants and other nonrecurring (or periodically recurring) grants.  We are expecting less federal funding support for the 2025-26 academic year.

8.      It is my understanding that some portion of the funding we receive via the New Hampshire Department of Education (NHDOE) is federal funding that is being channeled through the state.  I am not certain precisely how much of that funding comes through federal sources.

9.      We cannot afford to lose our state and federal funding support. We are not an affluent community. We do not have a large property tax base. And, like all the other districts in New Hampshire, we must contend with the fact that our state government already provides proportionately less funding than any other state in the nation.  State aid (currently just over $10 million per year) represents almost 30% of our overall annual budget.  Losing this would be nothing short of catastrophic to our school district.  It would not be hyperbole to classify it as an existential threat.  I am not certain how we would—or if we could—comply with the many and varied school laws and regulations foundational to our operation under such a circumstance. Nor

do I believe that we could properly fulfill our mission to the children and families of our community (nor to our broader community itself) if stripped of close to 30% of our budget.

10.    I am aware of the anti-DEI provisions of House Bill 2 (HB2), which became effective on July 1, 2025.  These provisions at RSA 21-I:112-116 and RSA 186:71-77 seek to prohibit the implementation, promotion, or engagement in "initiatives, programs, training, or policies" in public entities and "public schools" that are related to "diversity, equity, or inclusion" (or "DEI").  *See* RSA 21-I:113-14; RSA 186:72-73.  In addition to its anti-DEI prohibitions, HB2 requires "public schools" to report any contracts that include DEI provisions to NHDOE.  This report shall include contract descriptions, the specific-DEI provisions, and the total obligation of each contract.  RSA 186:75, II.  "Public schools" must "sign" and "certify" their report by "[n]o later than September 30, 2025."  *See* RSA 186:75, II.

11.    In HB2, DEI is defined as "any program, policy, training, or initiative that classifies individuals based on a characteristic identified under RSA 354-A:1"—namely, age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, or national origin—"for the purpose of achieving demographic outcomes, rather than treating individuals equally under the law."  *See* RSA 21-I:112, II; RSA 186:71, I. "Classif[ying] and "achieving demographic outcomes" are undefined under HB2.  "Programs" and "initiatives" also are undefined terms in HB2, but seemingly must include "programs of study" and thus curriculum and instruction. In our District, the term "programs" regularly applies to "curricular programs," as well as almost everything else we do for students (athletic programs, arts programs, extracurricular programs, etc.).  "Promote" too is not defined.

12.    HB2 also seeks to label and ban certain undefined concepts like "implicit bias training," "critical race theory," and "DEI assessments" as "DEI-related."  *See* RSA 21-I:113; RSA

186:72. The law also does not make clear how "related" to "DEI" a program must be for it to violate the law.

13.      The penalties imposed on districts like mine for a violation of HB2's anti-DEI provisions are significant, including for violations that are "unknowing." If NHDOE believes that my district has violated any part of HB2's anti-DEI provisions, "either knowingly *or unknowingly*," NHDOE "*shall* immediately halt all sources of public funding to that public school, until such time as the school comes into compliance with all sections of this subdivision." *See* RSA 187:77, I (emphasis added). Further, NHDOE "*shall* notify the state treasurer if a public school is not in compliance with this subdivision, at which time the treasurer shall halt all forms of public funding to the school until the commissioner has certified the school [has] come into compliance with this subdivision." *See* RSA 187:77, II (emphasis added). In other words, for any violation—whether knowing or not—my district *shall* lose "all sources of public funding to that public school." This includes the $4,182 per pupil base adequacy aid amount and other per pupil differentiated aid amounts (including for students who receive free or reduced meals, who are English language learners, and who receive special education services) that the state provides to school districts under RSA 198:40-a, II. This defunding threat presumably might also include federal "public funding" channeled through NHDOE. Furthermore, the funding we receive from the city of Somersworth (currently over $20 million annually and the lion's share of our budget) is, needless to say, also "public funding." I am curious if the state is also threatening to somehow stop the funding from our own community.

14.      I am also aware that NHDOE has begun enforcing HB2's anti-DEI provisions and has not disavowed its enforcement as to my district or other districts. On July 11, 2025, NHDOE wrote to all school districts, including mine, informing us that "each public school (as defined by

RSA 186:71, II) must review all program, policy, training, or initiative to identify DEI-related provisions" and certify compliance by September 5, 2025. NHDOE's certification form includes language where the district must certify compliance "*under the pains and penalties of perjury* to the best of my knowledge and belief, that all of the information contained in this document is true, accurate and complete." *Id.* (emphasis added). Thus, districts like mine must swear compliance "under the pains and penalties of perjury" with a law that can be violated "unknowingly." This perjury language also raises the prospect of criminal liability under RSA 641:1 if a district like mine incorrectly believes that it has not implemented, promoted, or engaged in any DEI-related initiatives, training, assessments, or policies.

15.    NHDOE's July 11, 2025 letter to school districts provides no guidance as to what HB2's anti-DEI provisions mean beyond reciting the provisions of the law.

16.    HB2 vaguely defines "DEI" and does not offer specific guidance as to precisely what is (or is not) legal. And, as one of the most diverse districts in New Hampshire, I am especially concerned about HB2's impact given our District's longstanding commitment to diversity, equity, and inclusion.

17.    Diversity, equity, and inclusion are independent but connected ideas that are core values here in the Somersworth School District. These values are not a standalone program or limited to a practice or policy; rather, they are who we are as a community in Somersworth. We do not have any particular programs, policies, or practices specifically labeled "DEI." Diversity, equity, and inclusion were fundamental values in our school district—and in our community— long before the murders of Eric Garner, Michael Brown, Tamir Rice, George Floyd, and the racial justice reckoning that emerged in their wake. And these values still are fundamental values in the

Somersworth School District today.  Regardless of whether we use the specific term "DEI," these values are—and have been—baked into the fabric of so much of what our District does.

18.     It should go without saying that our District does not promote any kind of illegal discrimination.  Nondiscrimination is fundamental to how we operate—and it would be even without federal or state law.  However, given HB2's vague position that unlawful diversity, equity, and inclusion programs include "critical race theory," "DEI assessments," and programs/initiatives "that classif[y] individuals based on a characteristic identified under RSA 354-A:1"—namely, age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, or national origin—"for the purpose of achieving demographic outcomes," I am concerned that NHDOE could view goals central to the District's work as themselves violative of HB2.

19.     The mission of the Somersworth School District is "to inspire all students to excel, to develop a thirst for knowledge, and to teach the essential skills necessary to be caring, contributing, and responsible individuals in an ever-changing world."  In fulfilling this mission, our District is committed to providing an inclusive and complete education, as well as to eliminating gaps in opportunities and barriers to access—gaps which may sometimes correlate with, for example, a student's race, gender, gender identity, or disability.

20.     The District has many goals for its schools and students—one of which is to increase equitable opportunities and to ensure that a student's demographic characteristics do not limit a student's success in school and life.  This work has included providing inclusive educational opportunities for the District's robust immigrant communities, providing "English for Speakers of Other Languages" (ESOL) services, and ensuring that high school students enrolled in various courses are appropriately provided meaningful opportunities for full and complete discussions on

relevant historical and contemporary matters—including topics involving race and gender. Providing equitable opportunity for all students also includes providing free and reduced meals for students who qualify—based, needless to say, on household income.

21.     Equitable opportunity for all students includes the provision of appropriate services, accommodations, and modifications (per relevant law) for students with disabilities and learning differences. In other words, equity and inclusion are the core of special education. But, under HB2, this work, however, may be perceived as seeking to "achieve demographic outcomes" for students with disabilities. There are other laws and regulations that require us to provide these services, and these conflict with HB2. Moreover, I struggle to understand what precisely might be the meaningful difference, if there is one at all, between (a) providing a service to multiple disabled students as part of a common program to increase the educational opportunities for each of these students individually (which we are required to do by law) and (b) a "program" that classifies individuals based on disability "for the purpose of achieving a demographic outcome" for students with disabilities (which is now barred under HB2). Just as we measure and review how students are performing as a whole to evaluate the effectiveness of our schools, we regularly do the same in looking at how special needs students are performing as a whole to ensure we are providing services effectively.

22.     Moreover, in seeking to ensure that our District's students from immigrant communities have equal access to educational opportunities, we engage in specific outreach to these communities to ensure that their needs are met and they are aware of the opportunities that this District has to offer. These include our ESOL programs, as well as the evening events offered several times a year for ESOL students and their families. The goal of these events, for ESOL students and their families, is inclusiveness—to make sure that these students (who often come

7

from immigrant communities) feel welcome and at home.  We want these students to bring their families into the school so that they know that we can be a resource for them.  These interactions increase engagement and connection with the school when language can sometimes be an obstacle for this engagement. And no one is excluded from attending these evening events. We also allow share our school facilities and campuses to host events such as an annual fall festival centered around a local immigrant community. Everyone is welcome; no one is excluded. We view welcoming these communities (and all communities) as integral to our work.  I am concerned that this work could be perceived as seeking to "achieve demographic outcomes" for students based on national origin.  Simply put, the District endeavors to engage immigrant students and families to make sure they feel welcome in the District—services that could be construed as violating the HB2.

23.     It is also difficult for me to apply HB2 to curriculum choices that my District has to regularly make, especially as we gear up for the coming 2025-26 academic year.  As set forth in New Hampshire law, the criteria for an "Adequate Public Education" includes the following: "Knowledge of civics and government, economics, geography, history, and Holocaust and genocide education to enable them to participate in the democratic process and to make informed choices as responsible citizens." *See* RSA 193-E:2, IV. It also includes "Grounding in … literature to enable them to appreciate our cultural heritage and develop lifelong interests and involvement in these areas." *See* RSA 193-E:2, V.  Chapter Ed 300 of New Hampshire's Education Rules also addresses the "Minimum Standards for Public School Approval."  Under these rules, which were adopted on December 12, 2024, graduation requirements in social studies—which includes United States and New Hampshire history, government and civics, economics, personal finance, and world history—shall require students to demonstrate and apply competencies in:

1.  Understanding the history of the United States *through multiple perspectives*, including founding principles and *the on-going struggle to realize those principles*."; …

3.  Understanding processes of civic engagement in a democratic society, *including tolerance and well-mannered engagement across differences of perspective, philosophy, culture, race, and heritage*;

4.  Understanding important events marking world history and *how those events have shaped cultural, political, and other aspects of civilization through multiple perspectives*; …

8.  Researching, inquiring, analyzing, and explaining historical, civic, government, geographic, and economic developments including *interaction and interdependence through multiple perspectives*."

N.H. Code Admin. R. Ann. Ed 306.23(f)(3)(f) (emphasis added).

24.    New Hampshire's promulgated "k-12 Social Studies New Hampshire Curriculum Framework" (last approved by the N.H. DOE in July 2006) also sets forth specific topics ("Strands") in Civics, Economics, Geography, New Hampshire and United States History, and World History and Contemporary Issues, that must be taught for each grade level.    *See* K-12    Social    Studies    New    Hampshire    Curriculum    Framework, https://www.education.nh.gov/sites/g/files/ehbemt326/files/inline-documents/standards-socialstudies-framework.pdf (June 2006) (last accessed July 30, 2025).  The framework sets forth a set of standards for teaching social studies to different grade levels so that students have "knowledge and skills needed to participate intelligently and responsibly in our ongoing democratic experiment and in an interdependent world." *Id.* at 5.  To that end, the New Hampshire guide states that "[a]n effective study of social studies must focus on conceptual frameworks and themes rather than solely an examination of facts."  *Id*.  For example, themes for U.S. History topics include: "slavery; racism; 'Jim Crow'; Darwinism; eugenics." *Id.* at 11.  For grades 9-12 and grades 7-8, respectively, students should be analyzing the impact of various labor systems,

including "slavery, the medieval guilds, or wage labor" or how "suffrage expanded to various groups of citizens" (like African Americans and women). *Id.* at 100, 62.

25.     Further, as required under state law, the District currently offers instruction and curriculum under RSA 189:11, I-c(j) addressing "[h]ow intolerance, bigotry, antisemitism, and national, ethnic, racial, or religious hatred and discrimination have evolved in the past, and can evolve, into genocide and mass violence, such as the Holocaust, *and how to prevent the evolution of such practices*." (emphasis added).

26.     While we believe that our implementation of these laws and rules are nondiscriminatory, HB2 can be read to constrain or restrain this instruction and hamper the District's efforts to fully implement this curriculum as required elsewhere by state law. Again, graduation requirements in social studies require a demonstration of an understanding of history "through multiple perspectives, including founding principles and the on-going struggle to realize those principles," as well as "tolerance and well-mannered engagement across differences of perspective, philosophy, culture, race, and heritage." N.H. Code Admin. R. Ann. Ed 306.23(f)(3)(f). And, under RSA 189:11, I-c(j), educators in New Hampshire and our District are supposed to discuss not only the evolution of how racism and bigotry have evolved in the past, but also "how to prevent the evolution of such practices." I fear that classroom discussions on the evolution of racism or bigotry, as required by New Hampshire law (*see* RSA 189:11, I-c(j)), could be construed under HB2 as a "DEI" "program" of instruction designed to "achieve demographic outcomes," particularly to ensure that non-Jewish students are sensitive to the historic discrimination Jewish groups have suffered.

27.     As part of any such discussions designed to comply with these curriculum requirements, it is also not hard to imagine that a discussion of remedies for past discrimination

(like reparations) may take place, but I fear that this instruction could be viewed as being barred as instruction as part of (or "promotion" of) a "program" designed for "achieving demographic outcomes" for students of color under HB2.  This is just one of countless possible examples.

28.    These concerns are compounded by the fact, as noted earlier, that, on July 11, 2025, NHDOE wrote to all school districts, including mine, requiring districts to certify compliance by September 5, 2025 "_under the pains and penalties of perjury_ to the best of my knowledge and belief, that all of the information contained in this document is true, accurate and complete."  I am being asked to swear compliance "under the pains and penalties of perjury" to a law that is vague and unclear, that is at odds with other public education laws, and that could be violated "unknowingly."  And if I fail to certify or make any mistakes in the certification as to whether the District is in compliance, we risk losing vital state and federal "public funds" that are absolutely core to the District's operations. If city/municipal "public funds" were also included, the result would be the collapse of our entire district.

29.    The conditions set to continue receiving state (and possibly federal or municipal) "public funding" imposed by HB2 and its certification requirement amount to coercion, as this certification requirement coerces districts to comply, without any process, with NHDOE's unilateral view as to what may be prohibited under HB2.

30.    Unless HB2 is voided, the District will be irreparably harmed. Right now, HB2 makes decisions and planning about District programs, policies, practices, curriculum, and instruction unclear, impractical, and confusing.  And it asks us to make choices that compromise our community's fundamental values and that are at odds with the very principles of universal public education. HB2 also harms the District through the prospect of losing significant and critical public funding.

31.     I am also seriously concerned that my educators will be subject to unjustified complaints and investigations as a result of HB2's vague terms, especially given the hostile climate that currently exists for educators and given how incomprehensible HB2 is, thereby inhibiting their vital work. Investigating and addressing any such complaints would be unnecessarily costly and time intensive for my District—at a time when resources are already so tight.

32.     Somersworth is a special community. It is gritty and resilient. It is diverse in so many ways. And it is proud and inclusive. HB2, through its ambiguities and lack of clarity, prevents me from fairly understanding what our District can and cannot do. I feel that it is important for our community to challenge this action to ensure that the students of Somersworth receive the inclusive education and equitable opportunities that they deserve.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 6th day of August, 2025.


*/s/ John Shea*
John Shea