# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW HAMPSHIRE

NATIONAL EDUCATION
ASSOCIATION-NEW HAMPSHIRE;
OYSTER RIVER COOPERATIVE
SCHOOL DISTRICT; DOVER SCHOOL
DISTRICT; SOMERSWORTH SCHOOL
DISTRICT; GRANTHAM SCHOOL
DISTRICT; DOTTIE MORRIS; JAMES
T. MCKIM, JR.; and NEW HAMPSHIRE
OUTRIGHT,

     Plaintiffs,

  v.

JOHN M. FORMELLA, in his official
capacity only as the Attorney General of
the State of New Hampshire;

CAITLIN DAVIS, in her official capacity
only as the Commissioner of the New
Hampshire Department of Education;

CHARLIE ARLINGHAUS, in his official
capacity only as the Commissioner of the
New Hampshire Department of
Administrative Services; and

MONICA MEZZAPELLE, in her official
capacity only as the State Treasurer of
New Hampshire,

     Defendants.

Case No.: 1:25-cv-293

**PLAINTIFFS' MEMORANDUM OF LAW
IN SUPPORT OF THEIR EMERGENCY
MOTION FOR PRELIMINARY
INJUNCTION**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION…………………………………………………………………...1

BACKGROUND…………………………………………………………………...10

ARGUMENT……………………………………………………………………16

I.     Plaintiffs are Likely to Succeed on the Merits………………………………...16

     A.     Plaintiffs are Likely to Succeed on the Merits of Their Claim that HB2 Violates the Fourteenth Amendment's Prohibition on Vagueness (Count I)……………...16

          1.     HB2 is Devoid of Objective Guidelines, and Educators are Left Without Notice and Chilled in Their Ability to Educate Consistent With the Standards of Their Profession and Other State and Federal Regulations..17

          2.     HB2's Arbitrary Enforcement and Lack of a Scienter Requirement…….30

     B.     Plaintiffs are Likely to Succeed on the Merits of their First Amendment Claim (Count II)……………………………………………………………………...34

     C.     Plaintiffs are Likely to Succeed on the Merits of their Pre-emption Claim, as HB2 Conflicts with Foundational Disability Civil Rights Laws (Count III)…………37

          1.     HB2 Conflicts with the ADA and Section 504………………………..40

               a.     The ADA and Section 504 Require Schools to Treat Disabled Individuals Differently……………………………………………...41

               b.     The ADA and Section 504 Require Schools to Implement Systems to Achieve "Demographic Outcomes"…………………………...44

          2.     HB2 Conflicts with the IDEA…………………………………………46

               a.     The IDEA Requires Identifying Disabled Students and Providing Individualized Education Plans that Treat Them Differently……46

               b.     The IDEA Requires Data Collection and Reporting to Achieve "Demographic Outcomes"………………………………………48

II.     Plaintiffs Suffer Irreparable Harm Because of HB2……………………………...49

III.     The Balance of Hardships Tilts in Plaintiffs' Favor and Relief Would Benefit the Public…………………………………………………………………………60

## INTRODUCTION

"The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967). Our schools cannot fulfill their role as the nation's "nurseries of democracy," *Mahanoy Area Sch. Dist. v. B.L. ex rel. Levy*, 594 U.S. 180, 190 (2021), without teaching students about the world, including the historical and lived experiences of people of different races, genders, and abilities. Providing inclusive and expansive educational opportunities strengthens school communities and prepares all students to succeed in a pluralistic democratic society. An inclusive education means ensuring that students with disabilities receive the access to which they are entitled under federal law. An inclusive education means ensuring that transgender students are protected from discrimination. An inclusive education means ensuring that girls are provided meaningful sports opportunities. In New Hampshire, the State has called into question all of these vital—and legally mandated—practices that foster a learning environment where every student can thrive.

Effective July 1, 2025, New Hampshire enacted RSA 21-I:112–16 and RSA 186:71–77 in House Bill 2 ("HB2") purporting to prohibit the implementation or "promot[ion]" of, or engagement in, "initiatives, programs, training, or policies" in public entities and "public schools" that are "related" to "diversity, equity, or inclusion" (or "DEI"). *See* RSA 21-I:112–14; RSA 186:71–73. A "public school" is broadly defined as "any school, academic institution, or institution of higher education in this state supported by public funds." *See* RSA 186:71, II. "DEI" is defined as "any program, policy, training, or initiative that classifies individuals based on a characteristic identified under RSA 354-A:1"—namely, age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, or national origin—"for the purpose of achieving demographic outcomes, rather than treating

1

individuals equally under the law." *See* RSA 21-I:112, II; RSA 186:71, I.  "Classif[ying]" and "achieving demographic outcomes" are undefined under HB2.  The law does not define how "related" to "DEI" a program must be before it becomes unlawful.  HB2 also seeks to categorically ban "implicit bias training," "critical race theory," and "DEI assessments," each of which is undefined, leaving educators and public employees to guess what is covered.  The law does not provide any provision authorizing state agencies to interpret its terms through rulemaking.  This law is attached as *Exhibit 1*.[1]

As with other prior state and federal efforts to ban "DEI" that have been either preliminarily or permanently found to be constitutionally defective, HB2's definition of "DEI as a concept is broad: one can imagine a wide range of viewpoints on what the values of diversity, equity, and inclusion mean when describing a program or practice." *Nat'l Educ. Ass'n v. United States Dep't of Educ.*, No. 25-cv-091-LM, 2025 U.S. Dist. LEXIS 77874, at *61, __ F. Supp. 3d __, (D.N.H. Apr. 24, 2025) (McCafferty, C.J.); *see also Local 8027, AFT-N.H. v. Edelblut*, No. 21-cv-1077-PB, 2024 U.S. Dist. LEXIS 94052, at *12 (D.N.H. May 28, 2024) (holding that the prohibitions in a New Hampshire law "against teaching banned concepts are unconstitutionally vague") (Barbadoro, J.) (appeal filed July 26, 2024; 1st Cir. argued Apr. 8, 2025).[2]  In addition to HB2's

---

[1] All references in this memorandum to "Exhibits" are to the exhibits accompanying the Declaration of Gilles Bissonnette in Support of Plaintiffs' Emergency Motion for a Preliminary Injunction.

[2] *See also Miss. Ass'n of Educators v. Bd. of Trs. of State Insts. of Higher Learning*, No. 3:25-cv-00417-HTW-LGI, 2025 U.S. Dist. LEXIS 140078, at *8 (S.D. Miss. July 22, 2025) (granting temporary restraining order with respect to Mississippi law imposing "restrictions on Mississippi public institutions of education, prohibiting speech and programming related to so-called 'divisive concepts,'" with withdrawal of all state funding after two violations); *AFT v. Dep't of Educ.*, No. SAG-25-628, 2025 U.S. Dist. LEXIS 77811, at *70, __ F. Supp. 3d __ (D. Md. Apr. 24, 2025) ("The Dear Colleague Letter of February 14, 2025 is stayed pursuant to 5 U.S.C. § 705 pending final resolution by this Court."); *NAACP v. United States Dep't of Educ.*, No. 25-cv-1120 (DLF), 2025 U.S. Dist. LEXIS 78302, at *25, __ F. Supp. 3d __ (D.D.C. Apr. 24, 2025) ("ORDERED that pending a further order by the Court, the defendants, as well as their officers, employees, and agents, are PRELIMINARILY ENJOINED from implementing and enforcing the Certification."); *Pernell v. Fla. Bd. of Governors of State Univ. Sys.*, 641 F. Supp. 3d 1218, 1287 (N.D. Fla. 2022) (preliminarily enjoining Florida's H.B. 7's prohibition on college instruction in part because it was "impermissibly vague"), *appeal filed and stay of injunction denied*, Nos. 22-13992-J, 22-13994-J, 2023 U.S. App. LEXIS 6591 (11th Cir. Mar. 16, 2023); *Honeyfund.com, Inc. v. DeSantis*, 622 F. Supp. 3d 1159, 1180–84 (N.D. Fla. 2022) (enjoining, in part, on vagueness grounds a Florida law that sought to bar employers from holding mandatory meetings for their

unconstitutional ambiguities, it also violates the First Amendment rights of academics and educators in these settings by discriminating against specific viewpoints—including viewpoints that "promote" "critical race theory," "implicit bias training," or viewpoints that "classify" groups to "achieve demographic outcomes" for these groups—that are part of a "program" or "initiative." RSA 21-I:112–13; RSA 186:71–72.  Courts, including in New Hampshire, have preliminarily or temporarily enjoined similar restrictions.  *See Nat'l Educ. Ass'n*, 2025 U.S. Dist. LEXIS 77874, at *84–85 ("[P]laintiffs are likely to succeed on the merits of their First Amendment claim with respect to NEA's members in higher education."); *Miss. Ass'n of Educators v. Bd. of Trs. of State Insts. of Higher Learning*, No. 3:25-cv-00417-HTW-LGI, 2025 U.S. Dist. LEXIS 140078, at *13– 15, 20 (S.D. Miss. July 22, 2025) (issuing temporary restraining order, in part, on First Amendment grounds where divisive concepts law impacted public colleges).  These prohibitions at institutions of higher education impact Plaintiff Dr. Dottie Morris, who discusses implicit bias concepts in her work at Keene State College ("KSC"), and members of Plaintiff National Education Association-New Hampshire ("NEA-NH") who teach at the University of New Hampshire Franklin Pierce School of Law ("UNH Law"), which must comply with American Bar Association ("ABA") Standard 303(c)'s requirement to "provide education to law students on bias, cross-cultural competency, and racism."[3]

---

employees if those meetings endorsed viewpoints that the state found offensive), *aff'd*, 94 F.4th 1272, 1283 n.6 (11th Cir. 2024) (declining to address vagueness claim); *Black Emergency Response Team v. Drummond*, 737 F. Supp. 3d 1158 (W.D. Okla. 2024) (preliminarily enjoining portions of similar state law) (appeal filed July 16, 2024); *Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*, 508 F. Supp. 3d 521, 529, 543–45 (N.D. Cal. 2020) (holding unconstitutional an executive order that prohibited the promotion of "divisive concepts" within federal trainings, including the idea that "the United States is fundamentally racist or sexist").

[3] ABA Standards and Rules of Procedure for Approval of Law Schools 2022-2023, Standard 303(c) (Am. Bar Ass'n 2022); *see also* Neil W. Hamilton and Louis D. Bilionis, *Revised ABA Standards 303(b) and (c) and the Formation of a Lawyer's Professional Identity, Part 1: Understanding the New Requirements*, National Association for Law Placement, Inc. Bulletin (Mar. 2022), https://www.nalp.org/revised-aba-standards-part-1.

The penalties for a violation of HB2's terms are massive.  For any violation—*even an "unknowing" one*—public schools *shall* lose "all sources of public funding to that public school[.]"  *See* RSA 187:77.  As one New Hampshire district court has concluded in a similar case, this lack of scienter is fatal.  *See Local 8027, AFT-N.H.*, 2024 U.S. Dist. LEXIS 94052, at *40 ("Because teachers can be found to have crossed that indistinct line without any finding of scienter, the vagueness of the Amendments is compounded rather than mitigated.").  HB2 imposes these penalties all while providing no process—let alone process that is due—to contest the unilateral decision of NHDOE that a "knowing" or even an "unknowing" violation has occurred.  With critical funding in the balance, NHDOE serves as the judge, jury, and executioner as to whether all "public funding" is revoked.

Because a violation can occur "unknowingly," HB2 creates a situation where every person that speaks for a school district exposes the district and its public funding to risk.  With millions of dollars and the fate of public education at risk, the stakes could not be higher for school districts, their educators, and their students if an educator "unknowingly" runs afoul of HB2.  As one court recently explained, "[t]he chilling effect is compounded in the academic context, where the fear of losing state funding compels institutions to over-correct in ways that suppress constitutionally protected speech censorship."  *See Miss. Ass'n of Educators*, 2025 U.S. Dist. LEXIS 140078, at *13.  This is precisely the problem with HB2.

"Public funding" under HB2 also is broad and includes state funds, and possibly even federal funds where NHDOE acts as a "pass through" in distributing these funds to public school districts.  Only "public schools" are subject to these penalties in the event of a violation; other "public entities" are excluded from these funding penalties.  *Compare* RSA 186:77 *with* RSA 21-I:112–17.  For public school districts, the state funds that hang in the balance include the $4,182

per pupil base adequacy aid amount and other per pupil differentiated aid amounts (including for students who receive free or reduced meals, who are English language learners, and who receive special education services) that the state provides to school districts under RSA 198:40-a, II.[4] This can amount to millions of dollars for an individual public school district. Statewide, this amount on the line collectively could be over $1 billion according to one estimate. *See Exhibit 5* (N.H. School Funding Fairness Project, "Vague Language in Budget Threatens State Funding for Schools" (June 13, 2025)). Yet disbursement of these state funds to public school districts is not optional or conditional; the State is obligated to disburse these funds so districts can provide an adequate education consistent with Part II, Article 83 of the New Hampshire Constitution.

For public and private colleges and universities in New Hampshire, too, the funding penalties are significant. The amount of annual state funds at stake includes millions of dollars the State provides public colleges and universities to support operating costs.[5] Also at stake is at least $22 million in UNIQUE Program state scholarships (both Annual and Endowment)[6]

---

[4]    *See* NHDOE, *FY 2025 Adequate Education Aid* (2025), https://www.education.nh.gov/sites/g/files/ehbemt326/files/inline-documents/sonh/fy2025-adequacy-grants-explained-september-2024.pdf.

[5] Under the previous budget that ended in June 2025, the University System of New Hampshire ("USNH") received $95 million in state aid per year, though the legislature recently reduced that amount in the current budget for 2026 and 2027. *See* Ian Lenehan, *UNH, Other Public Colleges Could Lose Tens of Millions in State Budget Cuts*, Granite State News Collaborative (April 3, 2025), https://www.nhpr.org/education/2025-04-03/unh-usnh-university-system-new-hampshire-budget-cuts-state-funding ("USNH receives $95 million in state aid per year under the current state budget, according to USNH spokesperson Lisa Thorne."). Under the current budget that the legislature enacted in June 2025, two-year funding was cut by about $17.5 million. *See* Josh Rogers, *Funding Losses and Declining Enrollment Prompt UNH to Seek $17.5 Million in Fresh Cuts*, NHPR (July 2, 2025), https://www.nhpr.org/nh-news/2025-07-02/unh-budget-cuts-funding-losses-declining-enrollment.

[6] According to the University of New Hampshire, "[t]he UNIQUE programs provide increased, equal access and choice for deserving, high-need New Hampshire residents seeking the benefits of postsecondary education at a New Hampshire institution." *See* University of New Hampshire, College of Professional Studies, *Federal and State Grant*, https://cps.unh.edu/online/tuition-aid/types-aid/federal-state-grants (last visited July 31, 2025). For the UNIQUE Endowment Program, the annual award is up to $2,000 per semester. To be eligible, the student must, among other things, be a New Hampshire resident, have financial need, and meet certain academic progress requirements. *Id.* For the UNIQUE Allocation Program, the annual award is up to $1,250 per semester based on available funding. To be eligible, the student must, among other things, also be a New Hampshire resident, have financial need, and meet certain academic progress requirements. *Id.*

disbursed through June 30, 2025 and over $2 million in Governor's Scholarship Program[7] state funds disbursed in fiscal year 2025; both funding programs constitute "public funding" according to NHDOE.[8]  *See Exhibit 3* (NHDOE July 17, 2025 Letter and College/University Report List).  In other words, HB2 appears to condition state scholarship aid to New Hampshire-resident students on their college complying with HB2.  If the college does not comply (even unknowingly), HB2 appears to cruelly rip away that student's aid through no fault of the student.

HB2's anti-DEI provisions create immediate and irreparable injuries for Plaintiff educators and trainers.  Plaintiffs Dr. Dottie Morris and NEA-NH higher education members are chilled in their college and law school classrooms and academic work.  In K–12 schools, educators are left scrambling with the impossible task of applying state requirements for teaching history or critical thinking skills and the contradictory prohibitions of HB2 as the school year is set to begin.  These educators risk baseless investigations, employment consequences, the possible revocation of teaching licenses, and loss of their profession.  And Plaintiff School Districts themselves risk losing millions of dollars in public funding that are critical for their ability to educate and support their communities.  Plaintiffs James T. McKim, Jr., Dr. Dottie Morris, and New Hampshire Outright—all of whom conduct trainings addressing implicit bias and diversity, equity, and inclusion principles in various contexts—are unsure how to conform their trainings to what is prohibited under HB2.  They too risk investigation and complaints, as well as the pass-through effect of loss of funds for the public schools they serve.  Plaintiffs James T. McKim and New

---

[7] According to the New Hampshire State Treasurer, "[t]he Governor's Scholarship Program provides scholarships of up to $2,000 a year to eligible New Hampshire students toward the cost of a postsecondary educational or training program."  *See* N.H. State Treasury, *Governor's Scholarship Program*, https://www.nh.gov/treasury/scholarship-program/index.htm (last visited July 31, 2025).  Requirements of the Governor's Scholarship Program are described in RSA 195-H:13.

[8] The UNIQUE Scholarship Program and the Governor's Scholarship Program are managed by an advisory commission, which includes as a member Defendant State Treasurer Monia Mezzapelle.  *See* N.H. State Treasury, *College Tuition Savings Plan Advisory Commission*, https://www.nh.gov/treasury/college-savings/advisory-commission.htm (last visited Aug. 10, 2025).

Hampshire Outright already have had school districts, which understandably are concerned about the risk and consequences of violating the law, revoke training opportunities since the enactment of HB2.  If HB2 is allowed to remain in effect, these injuries will persist.

HB2's provisions also directly contradict federal and state civil rights laws that guarantee integration and inclusion (particularly for individuals with disabilities).  School districts and NEA-NH members who are special educators, in particular, are unsure how to comply with HB2's requirements while also complying with their obligations under federal law to provide services for students with disabilities.  HB2 specifically incorporates "physical or mental disability" into its definition, thereby prohibiting public schools from "classify[ing]" people with disabilities "for the purpose of achieving demographic outcomes."  Based on the dictionary definitions of these terms, HB2 prohibits schools from considering a person's disability for the purpose of achieving disability-related outcomes.  But federal disability rights laws—including the Americans with Disabilities Act ("ADA"), Section 504 of the Rehabilitation Act ("Section 504"), and the Individuals with Disabilities Education Act ("IDEA")—*require* exactly the conduct that HB2 *prohibits*: (i) identifying (or "classifying" under HB2) students with disabilities; and (ii) providing accommodations, services, and supports to disabled students (or "implementing programs or initiatives" that treat disabled students differently instead of "equally" under HB2) in order to achieve disability-based outcomes, such as access, participation, inclusion, and integration (or "achieving demographic outcomes" for disabled students under HB2).  The concepts of individualized education plans and reasonable accommodations are foundational to disability rights laws.  These concepts are, at their core, about addressing the individualized needs of specific disabled people—namely, providing individualized services, accommodations, and supports that, by definition, are not provided to others.  Thus, under HB2's artificial dichotomy between

"demographic outcomes" or "treating individuals equal under the law," nearly all compliance with disability rights laws could be considered in the former, prohibited category.

HB2's threats are made that much more concrete by NHDOE's robust enforcement, which has included the publication of letters on July 11, 2025 and July 17, 2025, respectively, directed to K–12 public school districts and public/private colleges that receive "public funds" demanding and/or requesting a certification of compliance with the law under the pains and penalties of perjury ***by September 5, 2025***.  *See* *Exhibit 2* (NHDOE July 11, 2025 Letter to public school districts stating that certifications "shall be submitted to NHED no later than September 5, 2025"); *Exhibit 3* (NHDOE July 17, 2025 Letter to higher education leaders "requesting submissions by September 5, 2025" to permit NHDOE "to compile the results and meet its statutory reporting requirement to the legislature of October 1, 2025").  NHDOE also recently established a website that publishes NHDOE's enforcement efforts, which schools have been directed to submit certifications, which schools have returned certifications, and the contents of the returned certifications.[9]  In addition to this enforcement by NHDOE—and apart from HB2's funding penalties for "public schools"—school districts themselves have an independent obligation to enforce the blanket "DEI-related" prohibitions in RSA 21-I:113 and RSA 186:72, including against individual educators.  Furthermore, on July 23, 2025, Defendant New Hampshire Department of Administrative Services directed state agencies to identify all contracts that include DEI-related provisions and submit that information to the Department by October 1, 2025.  *See* *Exhibit 4* (July 23, 2025 Department of Administrative Services Email).

---

[9] *See* NHDOE, *Prohibition on Diversity, Equity, and Inclusion in Public Schools*, https://www.education.nh.gov/who-we-are/deputy-commissioner/office-governance/legislation/prohibition-diversity-equity-and-inclusion-public-schools.

HB2 infringes on Plaintiffs' legal rights, causing immediate and irreparable injury which cannot be outweighed by any legitimate governmental interest. As the United States District Court for the District of New Hampshire has explained, prohibiting diversity, equity, or inclusion, requiring certification, and threatening enforcement actions for violations combine to threaten "the 'supremely precious' yet 'delicate and vulnerable' nature of the right to free speech in our country," *Nat'l Educ. Ass'n*, 2025 U.S. Dist. LEXIS 77874, at *56 (quoting *NAACP v. Button*, 371 U.S. 415, 433 (1963)), particularly given that these prohibitions "sweep in a wide swath of conduct while leaving individual enforcement decisions to the subjective determinations of enforcement authorities." *Id.* at *60 (citing *Kolender v. Lawson*, 461 U.S. 352, 353–54 (1983)). In passing and enforcing HB2, New Hampshire has failed to adhere to these principles. Accordingly, preliminary injunctive relief is warranted as to Counts I (Fourteenth Amendment Due Process/Vagueness), II (First Amendment), and III (Pre-emption) in their Complaint for Declaratory and Injunctive Relief. *See* Compl. ¶¶ 204–39, ECF No. 1.

Given that NHDOE is demanding that public school districts certify compliance with HB2's provisions under the pains and penalties of perjury ***by September 5, 2025***, Plaintiffs seek a decision on this motion by ***September 4, 2025***. If this Court is unable to issue a preliminary injunction decision by September 4, 2025, Plaintiffs respectfully request that this Court issue a temporary restraining order enjoining enforcement of HB2's anti-DEI provisions while Plaintiffs' Motion for Preliminary Injunction remains pending. *See Miss. Ass'n of Educators*, 2025 U.S. Dist. LEXIS 140078, at *6–8 (discussing differences between temporary restraining orders and preliminary injunctions, and noting that "[c]ourts often analyze the two requests together when filed simultaneously, as the legal tests for both a TRO and Preliminary Injunction are similar").

# BACKGROUND

The anti-DEI provisions in HB2—which is the policy trailer bill accompanying the state budget—were the product of a rushed and unvetted legislative process. There was no public hearing dedicated specifically to HB2's anti-DEI provisions. These provisions did not originate, as is customary, as a standalone bill considered at the beginning of a legislative session by a policy committee with the benefit of stakeholder and expert feedback. These provisions were not heard by policy specialists at the House or Senate Education Committees. Rather, the House Finance Committee rushed a vote to approve these anti-DEI provisions—which were initially intended to be modeled after President Trump's January 20, 2025 Executive Order 14151[10]—on the eve of the deadline when that Committee needed to finalize HB2 for full consideration before the House of Representatives. Moreover, during this budget process, the legislature was repeatedly told that

---

[10] Executive Order 14151, in part, directed all executive branch agencies to "terminate . . . 'equity-related' grants or contracts." Exec. Order No. 14151, *Ending Radical and Wasteful Government DEI Programs and Preferencing*, Executive Order of January 20, 2025, 90 Fed. Reg. 8339, 8339 (Jan. 29, 2025), *available at* https://www.whitehouse.gov/presidential-actions/2025/01/ending-radical-and-wasteful-government-dei-programs-and-preferencing/; https://public-inspection.federalregister.gov/2025-01953.pdf.

HB2's anti-DEI proposal also may have been influenced by Executive Order 14173, which was signed on January 21, 2025 and entitled "Ending Illegal Discrimination and Restoring Merit-Based Opportunity." This Order (i) directed all executive agencies to "include in every contract or grant award" a certification, enforceable through the False Claims Act, that the contractor and grantee "does not operate any programs promoting DEI that violate any applicable Federal antidiscrimination laws," and (ii) directed the Attorney General to take "appropriate measures to encourage the private sector to end illegal discrimination and preferences, including DEI," to "deter" such "programs or principles," and to "identify . . . potential civil compliance investigations" to accomplish such "deter[rence]." Exec. Order No. 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, Executive Order of January 21, 2025, 90 Fed. Reg. 8633, 8634–35 (Jan. 31, 2025), *available at* https://www.whitehouse.gov/presidential-actions/2025/01/ending-illegal-discrimination-and-restoring-merit-based-opportunity/; https://www.govinfo.gov/app/details/FR-2025-01-31/2025-02097.

Executive Orders 14151 and 14173 have been the subject of extensive litigation. *See, e.g., Am. Pub. Health Ass'n v. NIH*, No. 25-10787-WGY, 2025 U.S. Dist. LEXIS 125988, at *19 (D. Mass. July 2, 2025) ("EO 14151 does not define DEI. Additionally, and pertinent here, EO14151 directs each federal agency head to 'terminate, to the maximum extent allowed by law, all 'equity-related' grants or contracts' within 60 days. This too has broad, undefined contours."); *San Francisco A.I.D.S. Found. v. Trump*, No. 25-CV-01824-JST, __ F. Supp. 3d __, 2025 U.S. Dist. LEXIS 109281, at *66 (N.D. Cal. June 9, 2025) (appeal filed Aug. 7, 2025) ("The vagueness of the term 'equity-related' grants or contracts invites arbitrary and discriminatory enforcement and does not provide sufficient notice to grantees as to what types of speech or activity they must avoid to prevent termination of their grants or contracts—compelling grantees and grant applicants to steer far too clear of the forbidden area of anything related to the broad and undefined term of 'equity.'") (cleaned up).

these provisions were vague and conflicted with federal disability laws.  The legislature passed it anyway.  The result of this slapdash legislative process is that NHDOE's new commissioner—who was sworn in on August 4, 2025—has now unfortunately been saddled with the unenviable task of being compelled to enforce a law that is incomprehensible.  The legislative history can be found at *Exhibits 7–17* and is discussed in the Complaint (ECF No. 1) at paragraphs 119–148.

HB2's anti-DEI provisions purport to prohibit the implementation or "promot[ion]" of, or engagement in, "initiatives, programs, training, or policies" in public entities and "public schools" that are "related" to "diversity, equity, or inclusion" (or "DEI").  *See* RSA 21-I:112–14; RSA 186:71–73.  For starters, the breadth of the definition of "public schools" is broad.  A "public school" is broadly defined as "any school, academic institution, or institution of higher education in this state supported by public funds."  *See* RSA 186:71, II.[11]  This means that HB2 applies not only to public school districts serving students in grades K–12, but also to private (including religious) K–12 schools that receive "public funds," including through Education Freedom Accounts ("EFAs").[12]  HB2 further applies to public colleges and universities in New Hampshire. This includes UNH Law and the University of New Hampshire ("UNH").

---

[11] Significantly, HB2's definition of "public school" is materially different—and more expansive—than how a "public school" is defined elsewhere in New Hampshire law.  *See* N.H. Code Admin. R. Ed 401.01(f) ("'Public school' means a school which is established and operated by a school district, maintained primarily by public funds, and administered by a school board whose members are elected as provided under the laws of the state of New Hampshire.").

[12] During the 2022-23 academic year, the top ten private school recipients of EFA funds included the following: Laconia Christian Academy; Concord Christian Academy; Portsmouth Christian Academy; Mount Royal Academy, Inc.; Trinity Christian School-Concord; Trinity High School; Dublin Christian Academy, Inc.; Claremont Christian Academy; St. Joseph Regional School Keene; and Cardinal Lacroix Academy.  *See* Jeremy Margolis, *Inside EFAs: A Quarter of All Education Freedom Account Tuition Dollars Went to Five Christian Schools, Monitor Analysis Finds*, Concord Monitor (Dec. 19, 2024), https://www.concordmonitor.com/education-freedom-account-funding-analysis-new-hampshire-tuition-religious-schools-58220424; *see also* Ethan Dewitt and William Skipworth, *Ayotte Signs Universal EFA Bill, Parental Bill of Rights*, N.H. Bulletin (June 10, 2025), https://newhampshirebulletin.com/2025/06/10/ayotte-signs-universal-efa-bill-parental-bill-of-rights/; Kevin Landrigan, *EFA Enrollment Nearly Doubles, Hits Cap in New Law*, Union Leader (Aug. 4, 2025), https://www.unionleader.com/news/education/efa-enrollment-nearly-doubles-hits-cap-in-new-law/article_1bf9793f-0634-4528-8638-c8faf670ca61.html?block_id=868819.

Significantly, HB2's "public school" definition also means that the law, in unprecedented fashion, applies to private (including religious) colleges and universities in New Hampshire that are "supported by public funds."  Consistent with this interpretation, on July 17, 2025, Defendant NHDOE directed a letter to both public _and private_ colleges and universities in New Hampshire— including Dartmouth College, Southern New Hampshire University, Saint Anselm College, and Thomas More College of Liberal Arts, among others—demanding compliance with HB2 on the ground that these institutions "receive[] public support" through state-funded scholarships provided to students under the UNIQUE Program (both Annual and Endowment) and the Governor's Scholarship Program.  _See Exhibit 3_ (NHDOE July 17, 2025 Letter and College/University Report List).[13]  While NHDOE has decided to aggressively enforce HB2 against private (including religious) colleges and universities that receive public funds through state scholarship grants, NHDOE apparently is _not_ enforcing HB2 against private K–12 institutions (including religious schools) that receive public funds through EFAs based on NHDOE's website.[14]  This inconsistent interpretation highlights how HB2 can be arbitrarily applied at the whims of enforcers.

---

[13] In the context of private colleges and universities in particular, HB2's anti-DEI provisions suffer from the glaring problem that the State is conditioning receipt of "public funds" through state scholarship grants for individual New Hampshire-resident students attending these private institutions on these institutions (i) agreeing across the board to not implement, promote, or engage in any "DEI-related" initiatives, programs, training, or policies, and (ii) agreeing across the board to not enter into, or renew, any contract that includes "DEI-related" provisions.  _See_ RSA 186:72-73. In other words, HB2 demands that a private college receiving state scholarship funds wholesale refrain from engaging in, or associating with, speech that espouses certain viewpoints, even where this speech is untethered to the actual state funding received.  This is a classic unconstitutional burden on the private colleges' First Amendment rights where the State "seek[s] to leverage funding to regulate speech outside the contours of the program itself."  _See Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc._, 570 U.S. 205, 214–15 (2013); _see also Santa Cruz Lesbian & Gay Cmty. Ctr._, 508 F. Supp. 3d at 542.
[14] _See_ NHDOE, _Prohibition on Diversity, Equity, and Inclusion in Public Schools_, https://www.education.nh.gov/who-we-are/deputy-commissioner/office-governance/legislation/prohibition-diversity-equity-and-inclusion-public-schools.

HB2's "DEI-related" prohibitions do not just apply to "public schools"; these prohibitions also independently apply to any "public entity" (which also would include public K-12 school districts). *See* RSA 21-I:113–14. In other words, HB2 includes "programs" and "initiatives"— which are undefined terms—of "public entities" like public libraries, Defendant NHDOJ, Defendant NHDOE, the state police, the Police Standards and Training Council ("PSTC"), every police department in New Hampshire, municipalities, and the Department of Health and Human Services, among many others.

The effects of HB2 were immediate. Out of fear of losing public funds, educational institutions immediately began changing their practices in an effort to comply with HB2. Plaintiff Dr. Dottie Morris had her title changed by KSC from Associate Vice President for Institutional Equity and Diversity to Associate Vice President for Community and Belonging, and she immediately began discussing with colleagues the ways in which HB2 would change her equity work and her course instruction. *Exhibit 42* (Declaration of Dottie Morris ("Morris Decl.")) ¶¶ 3, 8–10. KSC also removed the contents of its website entitled "Justice, Equity, Diversity, and Inclusion." *See Exhibit 19* (KSC's Pre-HB2 websites); *Exhibit 20* (KSC's July 10, 2025 website). Similar websites promoting the value of diversity, equity, and inclusion were pulled by UNH, UNH Law, Plymouth State University, River Valley Community College, among others, and were replaced on the UNH and UNH Law websites with the following statement:

> The recently enacted state budget includes a prohibition on "DEI-related initiatives, programs, training, or policies." In response to these provisions, the university's Diversity, Equity, Access & Inclusion webpages have been temporarily taken offline to permit a thorough review of university programs, policies, and online materials as we plan for how best to foster a campus culture that supports access, belonging, and student success in a way that fully complies with state law.

*See, e.g.*, *Exhibit 23* (UNH's May 2025 website); *Exhibit 24* (UNH's July 10, 2025 websites); *Exhibit 25* (UNH Law's Jan. 2025 website); *Exhibit 26* (UNH Law's Aug. 4, 2025 website); *see*

*also Exhibit 27* (PSU April 2025 website); *Exhibit 28* (PSU's July 2025 website); *Exhibit 29* (River Valley Community College "You Belong Here" website as of March 2025); *Exhibit 30* (removal of that website as of July 2025).  With the removal of this information, it is unclear (i) what programs these public colleges and universities believe are covered under HB2, and (ii) what specific services and educational opportunities will remain or will now be removed because of the law.

UNH also temporarily stripped the title of its chief diversity officer, who had been in this role since 2020.  Her title was changed to associate vice president for community, civil rights, and compliance. UNH President Elizabeth Chilton announced these changes to the university community on July 1, 2025 and explained that these steps were being taken to avoid possible financial repercussions under HB2.  *See Exhibit 21* (UNH July 1, 2025 Letter).[15]

Compounding the fear and chill that educators will experience under HB2, on July 2, 2025, leaders of the New Hampshire House of Representatives responded to the changes made at UNH in response to HB2 and made clear that they viewed HB2's provisions broadly to cover "radical leftist indoctrination," and that UNH will "effectively defund itself if it presses ahead" with this indoctrination.  *See* Compl. ¶ 153, ECF No. 1.  The message is clear: if educators do not restrict educational instruction and opportunities under HB2's vague terms in ways that comply with the subjective assessments of the law's proponents, then they will lose all public funds.

NHDOE did not hesitate to begin enforcing HB2.  On July 11, 2025 and July 17, 2025, NHDOE began demanding and/or requesting that public school districts and public/private colleges and universities, respectively, provide information on "DEI" contracts they hold, as well as certify compliance under the pains and penalties of perjury by ***September 5, 2025***.  *See Exhibit*

---

[15] *See* Ian Lenehan, *Under Threat From State, UNH Makes DEI-related Changes*, Seacoast Online (July 1, 2025).

*2* (NHDOE July 11, 2025 Letter); *Exhibit 3* (NHDOE July 17, 2025 Letter and College/University Report List).   NHDOE's July 11, 2025 and July 17, 2025 letters provide no guidance as to what HB2's anti-DEI provisions mean beyond reciting the provisions of the law.  When asked by one school district to provide further guidance on what HB2 means after receiving the July 11, 2025 letter, then-NHDOE Commissioner Frank Edelblut declined and instead referred that district to its outside counsel.  *Exhibit 31* (NHDOE July 15, 2025 Grantham Response).  A small number of public school districts (25 out of 180 as of August 11, 2025) have already begun submitting certifications under the NHDOE's September 5, 2025 deadline, and NHDOE has begun posting those certifications on a public website for public school districts.[16] Furthermore, on July 23, 2025, Defendant New Hampshire Department of Administrative Services directed state agencies to identify all contracts that include DEI-related provisions and submit that information to the Department by October 1, 2025.  *See Exhibit 4* (July 23, 2025 Department of Administrative Services Email, With Spreadsheet Altered For Size).  Finally, while RSA 21-I:116 states that NHDOJ "shall establish a process by which all political subdivisions review their existing contracts for the presence of DEI-related provisions," it appears that this process has not yet been developed, even while the September 5, 2025 certification deadline for public school districts quickly approaches and while districts have started submitting certifications under the law.  Plaintiffs, and educators throughout the State, have been left in the dark as to what the law's enforcers think the law means.

---

[16]  *See* NHDOE, *Public School Certified Reports*, https://www.education.nh.gov/who-we-are/deputy-commissioner/office-governance/legislation/prohibition-diversity-equity-and-inclusion-public-schools/public-schools-certified (last visited Agu. 11, 2025).

## ARGUMENT

Plaintiffs meet the requirements for a preliminary injunction.  They are "likely to succeed on the merits" and are "likely to suffer irreparable harm in the absence of preliminary relief, . . . the balance of equities tips in [their] favor, and [ ] an injunction is in the public interest."  *Together Emps. v. Mass Gen. Brigham Inc.*, 32 F.4th 82, 85 (1st Cir. 2022) (quoting *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008) (quotation marks omitted)).  "When, as here, the defendants are government entities or officials sued in their official capacities, the balance of equities and public interest factors merge."  *See Nat'l Educ. Ass'n*, 2025 U.S. Dist. LEXIS 77874, at *4.

## I.    Plaintiffs are Likely to Succeed on the Merits.

"[L]ikelihood of success on the merits is the 'main bearing wall' of [a court's] analysis."  *Ocean State Tactical, LLC v. Rhode Island*, 95 F.4th 38, 42 (1st Cir. 2024) (citation omitted).  Here, Plaintiffs are likely to succeed on the merits of their constitutional and pre-emption claims.

### A.    Plaintiffs are Likely to Succeed on the Merits of Their Claim that HB2 Violates the Fourteenth Amendment's Prohibition on Vagueness (Count I).

The Fourteenth Amendment prohibits vagueness as "an essential of due process, required by both ordinary notions of fair play and settled rules of law."  *Sessions v. Dimaya*, 584 U.S. 148, 155 (2018) (internal quotations and citation omitted).  A rule is impermissibly vague if it either "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or "authorizes or even encourages arbitrary and discriminatory enforcement."  *Hill v. Colorado*, 530 U.S. 703, 732 (2000).  This principle applies to administrative, civil, and criminal prohibitions.  *See, e.g.*, *FCC v. Fox TV Stations, Inc.*, 567 U.S. 239, 253–54 (2012) (civil fines); *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1048–51 (1991) (state bar rule).

Where, as here, a vague rule "abuts upon sensitive areas of basic First Amendment freedoms . . . [u]ncertain meanings inevitably lead citizens to steer far wider of the unlawful zone."

16

*Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972) (internal quotations omitted).  For this reason, "[t]he general test of vagueness applies with particular force."  *Hynes v. Mayor & Council of Oradell*, 425 U.S. 610, 620 (1976).  Likewise, a rule is "subject to the most exacting vagueness review" when, as here, it imposes severe consequences such as penalties "that strip persons of their professional licenses and livelihoods."  *See Local 8027, AFT-N.H.*, 2024 U.S. Dist. LEXIS 94052, at *18–20 (quoting *Sessions*, 584 U.S. at 184 (Gorsuch, J., concurring in part)); *see also Nat'l Educ. Ass'n*, 2025 U.S. Dist. LEXIS 77874, at *69 (same); *Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65, 95–96 (1st Cir. 2004) ("[V]agueness concerns are more pressing when there are sanctions (such as expulsion) attached to violations of a challenged regulation.").  Even where a more stringent test for vagueness does not apply, "[v]ague laws in any area suffer a constitutional infirmity."  *Ashton v. Kentucky*, 384 U.S. 195, 200 n. 1 (1966) (collecting cases).

1.  **HB2 is Devoid of Objective Guidelines, and Educators are Left Without Notice and Chilled in Their Ability to Educate Consistent With the Standards of Their Profession and Other State and Federal Regulations.**

HB2 purports to prohibit the implementation or "promot[ion]" of, or engagement in, "initiatives, programs, training, or policies" in public entities and "public schools" that are "related" to "diversity, equity, or inclusion" (or "DEI").  *See* RSA 21-I:112–14; RSA 186:71–73. DEI is defined as "any program, policy, training, or initiative that classifies individuals based on a characteristic identified under RSA 354-A:1"—namely, age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, or national origin—"for the purpose of achieving demographic outcomes, rather than treating

individuals equally under the law." *See* RSA 21-I:112, II; RSA 186:71, I.  HB2 is replete with vagueness for each of the reasons explained below.

**"Achieving Demographic Outcomes"**: "Classif[ying]" and "achieving demographic outcomes" are undefined under HB2, leaving educators to guess what is covered.  "Classify" is defined in the dictionary to mean "to consider (someone or something) as belonging to a particular group."[17]  And "demographic" is defined to refer to "the statistical characteristics of human populations (such as age or income) used especially to identify markets."[18]  Because all of the characteristics in RSA 354-A:1 are, of course, "statistical characteristics of human populations," HB2 would appear to prohibit public schools, and by extension their educators, from "considering" any such characteristics for the purpose of achieving any outcomes related to those characteristics. "Programs" and "initiatives"—as well as the term "promote"—too are undefined terms in HB2, but would include "programs of study" which capture curricular instruction.  <u>*Exhibit 38*</u> (Declaration of Dr. Robert Shaps ("Shaps Decl.")) ¶ 6 ("'Programs' and 'initiatives' also are undefined terms in HB2, but presumably include 'programs of study' which capture curricular instruction."); <u>*Exhibit 39*</u> (Declaration of Christine Boston ("Boston Decl.")) ¶ 16 (same).[19]

HB2's application of the "DEI" definition to protected classes under RSA 354-A:1 makes the law's prohibitions particularly indecipherable and at least arguably covers well-established (and legally-mandated) "programs" and "initiatives" that school administrators, school districts, and their educators employ every day to make certain "demographic" groups feel more welcome

---

[17]      Merriam-Webster          Dictionary,          *Classify*,          https://www.merriam-webster.com/dictionary/classify#:~:text=1,belonging%20to%20a%20particular%20group (last visited July 31, 2025).

[18] Merriam-Webster Dictionary, *Demographic*, https://www.merriam-webster.com/dictionary/demographic (last visited July 31, 2025).

[19] New Hampshire's Administrative Rules for Education broadly define "program" as "a grouping of interrelated activities, opportunities, and resources designed to implement a particular goal."  N.H. Code Admin. R. Ed 306.02(z).

and able to access education on equal terms.  As several declarants have explained, these "programs" or "initiatives" could include, just to name a few:

- A school district's tracking—consistent with Section 1111(c)(2) of the federal Elementary and Secondary Education Act ("ESSA") of 1965 (*see* 20 U.S.C. § 6311(c)(2))—of racial and ethnic groups, which appears to constitute classifications designed to "achieve demographic outcomes."  *Exhibit 40* (Declaration of John Shea ("Shea Decl.")) ¶ 21; *Exhibit 38* (Shaps Decl.) ¶¶ 20, 30; *Exhibit 41* (Declaration of Christine Downing ("Downing Decl.")) ¶¶ 24–26[20];

- A school district's tracking of "children with disabilities" or "English learners" under federal law—paired with the targeted interventions that may be legally required for these groups—which too seem to constitute classifications based on disability or national origin designed to "achieve demographic outcomes" for these groups.  *Exhibit 40* (Shea Decl.) ¶¶ 21–22; *Exhibit 38* (Shaps Decl.) ¶¶ 26, 28; *Exhibit 39* (Boston Decl.) ¶ 46; *Exhibit 41* (Downing Decl.) ¶¶ 24–26[21];

- To comply with Title IX, a public high school creating school sports teams for girls[22] or adding education programs designed to increase the representation of girls in STEM classes.[23]  *Exhibit 38* (Shaps Decl.) ¶ 31; and

- A high school social studies course covering historical topics where an educator is viewed as "promoting" the concept of "systemic racism" despite the educator's obligation to help students understand "the history of the United States through multiple perspectives" and the "on-going struggle to realize" our "founding principles."  N.H. Code Admin. R. Ann.

---

[20] *See* NHDOE, *Consolidated State Plan, The Elementary and Secondary Education Act of 1965, as amended by the Every Student Succeeds Act*, at 16 (Revised Submission V.3 ~ February 1st, 2023), https://www.education.nh.gov/sites/g/files/ehbemt326/files/inline-documents/sonh/nh-state-plan-2023_used_0.pdf.
[21] *See id.*
[22] *See* 44 Fed. Reg. 71413, 71418 (1979) (establishing three-part test to determine whether an educational institution is considered to be in compliance with Title IX).
[23] *See* Tara P. Nicola, *STEM Gender Gaps Significant Among Gen Z*, *Gallup Blog* (Dec. 5, 2023), https://news.gallup.com/opinion/gallup/544772/stem-gender-gaps-significant-among-gen.aspx#:~:text=Women%20make%20up%20half%20of,fields%20such%20as%20computer%20science ("Female Gen Z youth report learning about fewer technical STEM concepts in their middle and high school coursework than their male counterparts do."); Matthew McLaughlin, *Can Title IX Change STEM Culture*, Nat'l Soc'y of Pro. Eng'rs (May 2017), https://www.nspe.org/career-growth/pe-magazine/may-2017/can-title-ix-change-stem-culture.

Ed 306.23(f)(3)(f)(1); _Exhibit 38_ (Shaps Decl.) ¶¶ 32, 35; _see also_ _Exhibit 39_ (Boston Decl.) ¶¶ 37–38; _Exhibit 40_ (Shea Decl.) ¶ 27.

Other examples of policies or laws that arguably conflict with HB2 include:

- A public middle or high school making "menstrual hygiene products available at no cost in all gender neutral bathrooms and bathrooms designated for females" consistent with RSA 189:16-a;

- A state college (i) targeting older, life-long learners aged 50 and older for recruitment,[24] (ii) targeting senior citizen students who are age 65 and older for enrollment through tuition waivers,[25] or (iii) providing opportunities for religious students through spiritual activities[26]; and

- Executing a settlement agreement where a school district, to remedy alleged violations of Title VI of the Civil Rights Act of 1964, agrees to take steps aimed at providing greater access to college and career preparatory courses for Black and Latino students.[27]

The list goes on and on. Given HB2's vague and far-reaching scope in the education context, enforcers undoubtedly will arbitrarily decide when HB2 applies and when it does not. To the

---

[24] University of New Hampshire, _About Us: Welcome to OLLI (Osher Lifelong Learning Institute)_, https://www.unh.edu/olli/about-us (last visited July 31, 2025) ("OLLI at UNH is a vibrant, member-driven educational program designed for lifelong learners aged 50 and over. Our focus is on learning for the sheer enjoyment of it, within a supportive and relaxed environment. Here, you'll explore a wide range of ideas and interests alongside a community of peers—without any tests, grades, or college prerequisites!").

[25] University of New Hampshire, College of Professional Studies, _Tuition Waivers & Discounts_, https://cps.unh.edu/online/tuition-aid/tuition-waivers-discounts (last visited July 31, 2025) ("New Hampshire residents who are age 65 or older and are not enrolled in a degree program are eligible to take a maximum of two credit-bearing courses per academic year tuition-free. Students are responsible for all other costs of attendance, including fees. Prospective students who will be age 65 or older as of the first day of the semester or term in which they wish to take a course may register on a space-available basis and must provide proof of age and New Hampshire residency.").

[26] University of New Hampshire, _Student Life Chaplain and Spiritual Life Association_, https://www.unh.edu/dean-of-students/student-life-chaplain-spiritual-life-association (last visited July 31, 2025) ("The UNH Chaplain and Spiritual Life Association is a spiritual community of associated chaplains, representing many of the world's religious, spiritual, and faith traditions, who share a collective commitment to serving the spiritual needs of the students, faculty, and staff of The University of New Hampshire.").

[27] U.S. Dep't of Educ., _U.S. Department of Education Announces Resolution of Manchester, N.H., School District Civil Rights Investigation: Agreement Provides Greater Access to College and Career Prep Courses for Black, Latino Students_ (Apr. 10, 2014), https://cdn.ymaws.com/copaa.site-ym.com/resource/resmgr/SREC_Files/Resolution_Agreements/OCR_ResolutionNH.pdf.

extent enforcers believe that any of this conduct is exempt from HB2, this merely underscores the vague, irrational, and incomprehensible parameters of the law.

In light of the fact that HB2's obligations seem to conflict with existing legal obligations for educators, educators do not know which obligations prevail or how to harmonize these competing requirements. As NEA-NH Member A explains, it is not clear whether educators can comply with RSA 189:11, I-c(j)'s requirement to include instruction on "[h]ow intolerance, bigotry, antisemitism, and national, ethnic, racial, or religious hatred and discrimination have evolved in the past, and can evolve, into genocide and mass violence, such as the Holocaust, and how to prevent the evolution of such practices" when this instruction helps "achieve" the "demographic outcome" of protecting Jewish students from discrimination. _Exhibit 34_ (Declaration of NEA-NH ("NEA-NH Decl.")) ¶ 18; _Exhibit 35_ (Declaration of NEA-NH Member A ("NEA-NH Member A Decl.")) ¶¶ 14–17. As a result, "teachers could . . . be left with 'an impermissible Hobson's choice': shirking their responsibilities under RSA § 189:11, or teaching what RSA § 189:11 requires and potentially violating the prohibition[s]" in HB2's anti-DEI provisions. _See Local 8027, AFT-N.H. v. Edelblut_, 651 F. Supp. 3d 444, 462 (D.N.H. 2023) (Barbadoro, J.). Plaintiff School Districts have expressed similar uncertainty about how to comply with both HB2 and RSA 189:11, I-c(j). _See, e.g._, _Exhibit 40_ (Shea Decl.) ¶ 26; _Exhibit 38_ (Shaps Decl.) ¶ 35; _Exhibit 39_ (Boston Decl.) ¶ 38.

As explained in more detail in Section I.C _infra_, these ambiguities are especially pronounced in the context of disability—a classification specifically covered in HB2's prohibitions through its incorporation of RSA 354-A:1—where federal law requires that both public entities,

schools, and educators implement individualized programs that improve integration and outcomes for this demographic group.

Finally, this confusion is no less present outside the education context, including in the context of the trainings that Plaintiff James T. McKim conducts for law enforcement employed by "public entities" under HB2.  *See Exhibit 43* (Declaration of James T. McKim ("McKim Decl.")) ¶¶ 3–4.  Would a police department engaging in training—consistent with last year's enactment of HB596[28]—to reduce racial profiling of Black and Hispanic people to alleviate racial disparities in policing[29] and to address judicial decisions implicating the stops of several "non-Caucasian males"[30] be covered under HB2 as seeking to "achieve" a "demographic outcome," as such training would be designed to ensure that people of color are not subjected to discriminatory police practices?  Would HB2 prevent a law enforcement agency from engaging in efforts—including the efforts of the Manchester, Portsmouth, and UNH police departments through the "30 x 30" initiative—to expand the number of women represented in their agencies?[31]  Does HB2 eliminate physical fitness standards set forth by the PSTC and state police that must be satisfied by police

---

[28] H.B. 596, 2024 N.H. Legis. (2024), https://gc.nh.gov/bill_status/legacy/bs2016/billText.aspx?sy=2024&id=543&txtFormat=pdf&v=current.

[29] Paul Cuno-Booth, *How Pretextual Traffic Stops by N.H. Police Disproportionately Affect Black and Latino Drivers*, NHPR (May 17, 2022), https://www.nhpr.org/nh-news/2022-05-17/pretextual-traffic-police-stops-racial-disparities-black-latino-drivers-nh.

[30] *See United States v. Hernandez*, 470 F. Supp. 3d 114, 128 (D.N.H. 2018) (addressing stop of "a non-Caucasian male" where trooper was suspicious, in part, because the defendant's "hands on the steering wheel" were at "ten and two") (McCafferty, J.); *State v. Perez*, Nos. 218-2018-CR-334, 218-2018-CR-335, 2019 N.H. Super. LEXIS 19, at *2–3 (N.H. Super. Ct. Rockingham Cty. Oct. 4, 2019) (Schulman, J.) (addressing stop of a "non-Caucasian male" where the driver, in part, had his hands at "ten and two" on the wheel, as drivers are trained to do, yet the trooper found this "odd") (citing *Hernandez*, 470 F. Supp. at 127–28).

[31] *See* 30x30, *About* 30x30, https://30x30initiative.org/about-30x30 (last visited July 31, 2025) ("The 30×30 Initiative is based on evidence indicating the importance of achieving at least 30% representation to empower a group to influence an organization's culture."; indicating participating New Hampshire agencies); *MPD Takes 30×30 Pledge: The Goal is a 30% Female Police Force by 2030, Manchester Ink Link* (Mar. 26, 2021), https://manchester.inklink.news/mpd-takes-30x30-pledge-the-goal-is-a-30-female-police-force-by-2030 ("By 2030, women will hopefully comprise 30 percent of officers in the Manchester Police Department.  Police Chief Allen D. Aldenberg, at a news conference Thursday outside headquarters on Valley Street, said the department is the first in the state—and one of the few large departments nationwide—to sign on to the 30×30 Pledge, an initiative affiliated with the Policing Project at NYU School of Law and the National Association of Women Law Enforcement Executives.").

officers, but that differ based on gender and age—standards designed to ensure the continued representation of women, as well as older men, in law enforcement?[32]  Does HB2 implicate efforts by the New Hampshire Department of Health and Human Services to address racial disparities in health insurance coverage?[33]  Does HB2 overturn policies where New Hampshire residents over the age of 65 can enter state parks for free[34] or receive an elderly tax exemption under RSA 72:39-a, which would be "programs" that "classify" individuals based on "age" "for the purpose of achieving demographic outcomes"—here, outcomes for those over 65 years old?  Amidst a pandemic, would HB2 encompass a policy prioritizing vaccine distribution for the elderly as an improper classification based on "age"?  Does HB2 undo New Hampshire's statutory regime providing for walking disability plates and placards under RSA 261:88—a program designed to "achieve" the "demographic outcome" of ensuring that people with walking disabilities have access to public accommodations and other public spaces?  This list, too, goes on and on.  HB2 is indecipherable and unclear on all these important questions, leaving enforcers to selectively apply HB2's prohibitions.

        **"DEI"-"related" and "Promote"**: Adding to this confusion, HB2 does not just prohibit "DEI"; it also prohibits DEI-"*related*" initiatives, programs, training, or policies.  *See* RSA 21-I:113–14 (emphasis added); RSA 186:72–73 (emphasis added).  Nowhere does HB2 explain how "related" a program must be to HB2's definition of "DEI" at RSA 21-I:112, II and RSA 186:71, I

---

[32] *See* N.H. Police Standards and Training Council, *Physical Agility Test*, https://www.joinstatepolice.nh.gov/hiring-process/physical-agility-test (last visited July 31, 2025).

[33] *See* State Plan Advisory Work Group, *Plan to Address Health Disparities and Promote Health Equity in N.H., Prepared for the N.H. Health & Equity Partnership*, at p. 6 (Mar. 2011), *available at* https://www.migrationpolicy.org/sites/default/files/language_portal/New%20Hampshire%20Health.pdf  ("For example, statewide studies by the NH Minority Health Coalition show dramatic differences in health insurance coverage by race, with 89% of non-Hispanic Whites reporting having coverage in 2002, and only 62% of African descendants and 38% of Latinos reporting health insurance coverage.").

[34] *See* N.H. State Parks, "Parking & Entry Fees," https://www.nhstateparks.org/fees-reservations/parking-entry-parking-fees.

for that program to now be unlawful. *See S.F. A.I.D.S. Found. v. Trump*, No. 25-cv-01824-JST, 2025 U.S. Dist. LEXIS 109281, at *68, __ F. Supp. 3d __ (N.D. Cal. June 9, 2025) (appeal filed Aug. 7, 2025) ("Indeed, the DEI-1 Order does not define what 'equity' or *'equity-related'* means at all . . . . This lack of definition is particularly problematic given the broad nature and applications of the term 'equity,' *let alone with the additional modifier of '-related.* ") (emphasis added).

For example, would a Black history student group or a Christian student group be DEI-"related" solely because it mentions a protected characteristic like race or religion? Would a guidance counselor's informational course on gender violence be considered DEI-"related" because of its focus on gender? And would a counselor recommending resources for a group of students at higher risk of depression or suicide[35] be "related" to "DEI" if that grouping of students or the recommended resources implicate mental disabilities or another characteristic listed in RSA 354-A:1? HB2 says nothing about whether these programs or initiatives are sufficiently "related" to DEI to now be unlawful.

Public entities and "public schools" are now not allowed to "implement, promote, or otherwise engage in"—also undefined terms—these DEI-"related" activities. It is unclear if simply mentioning the existence of "DEI" programs in a classroom would be considered impermissible "promotion." The word "promotes" has been specifically identified by the Supreme Court as being "susceptible of multiple and wide-ranging meanings." *See United States v. Williams*, 553 U.S. 285, 294 (2008). For example, could a professor at UNH Law teach key constitutional law cases addressing affirmative action—including endorsing Justice Sotomayor's

---

[35] *See* New Hampshire Outright, "Culturally Responsive Engagement with LGBTQ+ Students & Families," Slide 18 entitled "The Impact of Discrimination on LGBTQ+ Youth," attached to Declaration of New Hampshire Outright ("N.H. Outright Decl.") (noting that "Nationally, 39-40% of LGBTQ+ youth seriously considered suicide in the past year & 12-19% [attempted]"); *see also* Trevor Project, *2024 U.S. National Survey on the Mental Health of LGBTQ+ Young People* ("39% of LGBTQ+ young people seriously considered attempting suicide in the past year"; "12% of LGBTQ+ young people attempted suicide in the past year").

dissent in *Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.*, 600 U.S. 181, 318 (2023), which states that the Fourteenth Amendment's guarantee of racial equality "can be enforced through race-conscious means"—without potentially being accused of "promoting" a "DEI" "related" "program"?  The law is unclear.  *See Local 8027, AFT-N.H.*, 2024 U.S. Dist. LEXIS 94052, at *33 (noting that the text of New Hampshire's banned concepts law "provides no hint" of whether a teacher can teach court cases on affirmative action, thereby "leaving the teacher's fate subject only to an enforcing agency's subjective interpretation of what was taught").

**"Implicit Bias Training," "Critical Race Theory," and "DEI Assessments"**: HB2 also is ambiguous in purporting to label certain undefined concepts like "implicit bias training," "critical race theory," and "DEI assessments" as unlawfully "DEI-related."  *See* RSA 21-I:113 ("No state funds shall be expended for DEI-related activities, including but not limited to . . . ."); RSA 186:72 (same).

At the outset, this list of topics that are apparently (and categorically) deemed "related" to "DEI" is not an exclusive list, meaning that there could be other, unspecified topics that are sufficiently "related" to "DEI" to be unlawful.  *See Bellevue v. Miller*, 536 P.2d 603, 607 (Wash. 1975) (noting that a law's inclusive list of examples which may be considered unlawful cannot save the law where "there are plainly no actual limitations placed on the exercise" of discretion). And HB2's explicit recitation of topics that are categorically "DEI-related" suggests that these topics are prohibited even if they do *not* meet the law's definition of "DEI" under RSA 21-I:112, II and RSA 186:71, I.  In other words, "implicit bias training," "critical race theory," and "DEI assessments" confusingly appear barred even where the concepts themselves—or the inclusion of

them in a classroom discussion or other "program"—do *not* explicitly "classif[y] individuals based on a characteristic identified under RSA 354-A:1" to "achieve demographic outcomes."

HB2 also does not define the terms "implicit bias training," "critical race theory" or "DEI assessments" themselves, leaving educators like Plaintiff Dr. Dottie Morris and those who give trainings to public entities (like Plaintiffs James T. McKim, Jr., and New Hampshire Outright) to wonder where the line is between what is allowed and what may be punishable. *See Exhibit 42* (Morris Decl.) ¶ 9 ("I do not know whether I can reference implicit bias either to students or fellow staff members out of fear of being accused of violating the law—an accusation that could cause KSC to lose vital public funding."); *Exhibit 43* (McKim Decl.) ¶¶ 5–6 ("I am especially confused about what the phrase 'achieving demographic outcomes' means in HB2's definition of 'DEI.'"); *Exhibit 44* (Declaration of New Hampshire Outright ("N.H. Outright Decl.")) ¶¶ 6, 11 ("Because HB2 does not define the term 'implicit bias training' or explain what 'achieving demographic outcomes' means, New Hampshire Outright has to wonder where the line is between what is allowed and what is punishable, all while often being contractually required to comply with New Hampshire law during these trainings."). Where some courts have found as impermissibly vague efforts at defining "critical race theory" in seeking to ban certain concepts from being taught in schools, HB2 abandons that effort altogether in leaving this term undefined, further enhancing how this law can be arbitrarily enforced. *See Miss. Ass'n of Educators*, 2025 U.S. Dist. LEXIS 140078, at *14 ("Terms like 'divisive concepts' are undefined, granting enforcers unbounded discretion."); *Local 8027, AFT-N.H.*, 2024 U.S. Dist. LEXIS 94052, at *23 n.6 (noting that the legislative intent in banning four concepts in New Hampshire schools was, in part, to ban "critical race theory"); *Mae M. v. Komrosky*, 111 Cal. App. 5th 198 (2025) (holding that the trial court erred in denying preliminary injunctive relief to bar enforcement of a school board's resolution prohibiting the

teaching of critical race theory because success on the merits was likely in establishing the resolution was unconstitutionally vague on its face).

Indeed, the vague and undefined terms "implicit bias training" and "DEI assessments" may encompass a large range of common employment and educational practices, including things like testing accommodations or assessments regarding language acquisition and readiness.  And is the mere mention of "systemic" or "structural" racism against communities of color in classrooms and trainings throughout New Hampshire now covered as illegal "implicit bias" or "critical race theory," including at KSC or UNH Law, which is subject to ABA Standard 303(c) requiring law schools to provide "education to law students on bias, cross-cultural competency, and racism"? ABA Standards, Standard 303(c).  The answer is far from clear.  With this lack of clarity, NEA-NH higher education members at UNH Law who discuss race in their work are particularly concerned given that "discussion of race is critical to educating law students not only in the legacy of race in how the law has developed, but also how to effectively represent clients from diverse communities." _Exhibit 34_ (Declaration of NEA-NH ("NEA-NH Decl.")) ¶ 8.  Moreover, in recent years, "critical race theory" has become a phrase that can mean whatever one wants it to mean, including any mention of the view that race-conscious approaches may assist in remedying past discrimination.  Former NHDOE Commissioner Edelblut, himself, has decried "critical race theory" in the context of race-conscious remedies, and argued that New Hampshire's 2021 (and now enjoined) banned concepts law was necessary to prevent its instruction in schools.  *See Local 8027, AFT-N.H.*, 2024 U.S. Dist. LEXIS 94052, at *23 n.6 (noting Commissioner Edelblut "op-

ed asserting that the law will address 'those who promote Critical Race Theory or similar concepts'"); _Exhibit 32_ (Edelblut June 13, 2025 op-ed).

For higher education instructors in particular, for example, these undefined prohibitions raise the specter that they include researching, writing on, or teaching—including as part of a Human Rights/Social Justice class or other "program" of study—books like Michelle Alexander's _The New Jim Crow: Mass Incarceration in the Age of Colorblindness_ (2010) or articles on "systemic racism" in the United States' immigration laws.[36]  This concern is made even more real by the fact that NHDOE is already enforcing HB2 against colleges and universities, and where one of the legislators who supported the law cited instruction on "socioeconomic factors" (including posing questions like "why is it that you have better health outcomes in white neighborhoods") in higher education as an example for why the law was necessary.  _See Exhibit 10_ (April 1, 2025 Transcript, With Margin Note By Pls.' Counsel), at 15:7–23.  With this context in mind, Plaintiff Dr. Dottie Morris's work at KSC is in question, including her instruction on implicit biases in her psychology classroom.  _See Exhibit 42_ (Morris Decl.) ¶¶ 18–19.  She adds that, at KSC, she is "seeing significant stress from" her "colleagues who do not know what HB2 means and do not know how to comply.  Some are so afraid of making a mistake that will be costly to the college that they are telling [her] that they likely will err on the side of not including certain content that may be considered covered."  _Id._ at 22.  Similar fears exist for NEA-NH members who are on the UNH Law faculty.  _See Exhibit 34_ (NEA-NH Decl.) ¶ 8.

Implicit bias also is a concept regularly addressed in law enforcement trainings (including those conducted by the New Hampshire Department of Justice[37]) to help ensure that New

---

[36] _See_ Kevin R. Johnson, _The Jerome Hall Lecture: Systemic Racism in the U.S. Immigration Laws_, 97 Ind. L.J. 1455, 1460 (2022).

[37] _See Exhibit 6_ (Implicit Bias Training Hosted by the New Hampshire Attorney General's Office on Nov. 20, 2020 (addressing concepts like "structural/systemic discrimination" and "white privilege" in slides 11–12, 33 of James T.

Hampshire's enforcement of the laws is fair following the May 2020 murder of George Floyd and the racial justice movement that followed.  Implicit bias trainings for law enforcement were embraced by Governor Chris Sununu and the Commission on Law Enforcement Accountability, Community, and Transparency ("LEACT"), which recommended in August 2020 that police be trained on implicit bias.  This training has subsequently occurred throughout New Hampshire.[38] Plaintiff James T. McKim regularly conducts these trainings for public entities and public schools throughout New Hampshire, and he helped develop the implicit bias training for the PSTC.  *Exhibit 43* (McKim Decl.) ¶¶ 3–4, 7–9.  Plaintiff Dr. Dottie Morris too regularly addresses these topics in trainings and in her classes as a psychology professor.  *Exhibit 42* (Morris Decl.) ¶¶ 8, 18.  And NEA-NH Member B also taught implicit bias in a high school sociology class, though Member B recently removed it from the curriculum given the current climate.  *Exhibit 36* (Declaration of NEA-NH Member B ("NEA-NH Member B Decl.")) ¶ 17.

HB2's viewpoint-based inclusion of topics like "critical race theory" also demonstrates that the law's prohibitions—consistent with its broad terms implicating "programs" and "initiatives," and consistent with the intent of one of its legislative proponents, *see Exhibit 10* (April 1, 2025 Transcript, With Margin Notes By Pls.' Counsel), at 12:25–13:1, 15:7–23—go

---

McKim's presentation "Are You Your Implicit Bias?"); *see also* Organizational Ignition, *Implicit Bias Training*, https://organizationalignition.com/event/implicit-bias-training/ (last visited Aug. 9, 2025).

[38] *See Commission on Law Enforcement Accountability, Community as Transparency*, New Hampshire governor Chris Sununu, https://www.governor.sununu.nh.gov/accountability; *see also LEACT Recommendations Completed & In Progress as of 9/21/21*, New Hampshire Governor Chris Sununu, https://www.governor.sununu.nh.gov/sites/g/files/ehbemt336/files/inline-documents/sonh/20210830-leact-recommendations-completed-and-in-progress-final.pdf (noting in Sept. 2, 2021 LEACT Tracking Report completion of the following: "1-B. Mandate NH PSTC training on implicit bias and cultural responsiveness, ethics and de-escalation"; "2. Encourage all law enforcement agencies to require implicit bias and cultural responsiveness, ethics and de-escalation training"; and "18. Require implicit bias training for all prosecutors, criminal defense attorneys and judges."); *LEACT Dashboard*, New Hampshire Governor Chris Sununu, (June 9, 2021) https://www.governor.sununu.nh.gov/sites/g/files/ehbemt336/files/inline-documents/sonh/060921-dashboard.pdf (noting in LEACT May 2021 Dashboard that "State Police completed additional training on de-escalation and is in progress on training on ethics and implicit bias").

beyond mere hiring and contracting decisions, but also include "programs" of study that impact curricular instruction in both public schools and higher educational institutions that receive public funding. This broad curricular scope directly impacts the members of NEA-NH, especially those who regularly wrestle with issues concerning disability, race, and other classifications in providing programmatic and special education services, as well as curricular instruction at colleges and universities. *See Exhibit 34* (NEA-NH Decl.) ¶¶ 17–20; *Exhibit 35* (NEA-NH Member A Decl.) ¶¶ 5, 9, 13–18; *Exhibit 36* (NEA-NH Member B Decl.) ¶¶ 7, 8, 12–13; *Exhibit 37* (Declaration of NEA-NH Member C ("NEA-NH Member C Decl.")) ¶¶ 15, 17–19, 22.

**2.    HB2's Arbitrary Enforcement and Lack of a Scienter Requirement.**

The open-ended and subjective nature of HB2's prohibitions allow for arbitrary and discriminatory enforcement, leaving enforcers like NHDOE with the ability to pick and choose how to apply its terms. As explained above, what constitutes "implicit bias," "critical race theory," or a "program" that "classifies individuals based" on a protected characteristic "for the purpose of achieving demographic outcomes" turns on subjective judgments—including the subjective assessments of legislators who may believe that such topics constitute "radical leftist indoctrination," *see* Compl. ¶ 153, ECF No. 1—and incorporates the same types of vague terms and viewpoint discriminatory prohibitions that have been found constitutionally suspect in other laws. *See, e.g.*, *Local 8027, AFT-N.H.*, 2024 U.S. Dist. LEXIS 94052, at *50; *Black Emergency Response Team v. Drummond*, 737 F. Supp. 3d 1136, 1149 (W.D. Okla. 2024); *Nat'l Educ. Ass'n*, 2025 U.S. Dist. LEXIS 77874, at *75.

Although HB2's requirements are not clear, NHDOE's intent to enforce them is. On July 11, 2025, NHDOE wrote to school districts informing them that "each public school (as defined by RSA 186:71, II) must review all program, policy, training, or initiative to identify DEI-related

provisions," as well as demanding that they certify compliance with the law under the pains and penalties of perjury.  *See* *Exhibit 2* (NHDOE July 11, 2025 Letter).  On July 17, 2025, NHDOE directed a similar letter to public and private colleges and universities, including private colleges that, in NHDOE's view, receive state funding through individual state-funded scholarships.  *See* *Exhibit 3* (NHDOE July 17, 2025 Letter and College/University Report List).  NHDOE, in these July 11, 2025 and July 17, 2025 letters, makes clear the penalties for noncompliance consistent with RSA 187:77, I–II in HB2: "Should a public school . . . fail to abide by any section of the DEI provisions to HB 2, either knowingly or unknowingly, the Commissioner of the Department of Education shall immediately **halt all sources of public funding to that public school**, until such time as the school comes into compliance with all sections of this subdivision."  *Id.* (emphasis in original by NHDOE).  These letters correctly explain that, consistent with HB2's terms, the law can be violated even unknowingly, further enhancing the discretion NHDOE has to enforce the law's provisions.  As one New Hampshire district court has concluded in a similar case, this lack of scienter is fatal.  *See Local 8027, AFT-N.H.*, 2024 U.S. Dist. LEXIS 94052, at *40.  Defendant Department of Administrative Services has similarly required compliance from state entities.  *See* *Exhibit 4* (July 23, 2025 Department of Administrative Services Email).

In the wake of these enormous financial penalties that would destroy a school district's ability to educate its students, HB2's anti-DEI provisions critically provide *no process* for school districts or educators to contest the unilateral decision of NHDOE that a "knowing" or "unknowing" violation has occurred.  NHDOE is the judge, jury, and executioner, with millions of dollars of state (and possibly even federal) funding on the line that NHDOE can either (i) revoke altogether in imposing a *de facto* "death penalty" for a district, or (ii) coercively hold hostage until a district complies with NHDOE's unilateral interpretation of HB2's vague provisions.  As a result,

any teaching or other education programs that NHDOE views as impermissibly "DEI-related" can be targeted. There is no check on NHDOE's ability to target and pull state funding from a school district. And NHDOE's enforcement decisions have, in the past, been influenced by "personal opinions on what is appropriate instruction, as expressed in [the Commissioner's] op-ed articles, to guide their efforts." *Local 8027, AFT-N.H.*, 2024 U.S. Dist. LEXIS 94052, at *41.

Further compounding the chill educators will experience, NHDOE's July 11, 2025 and July 17, 2025 letters provide no guidance as to what HB2's anti-DEI provisions mean beyond reciting the provisions of the law. When the superintendent of one school district, on July 11, 2025 after receiving the letter, asked then-NHDOE Commissioner of Education Frank Edelblut several questions about what HB2 means—including "What school actions meet 'the purpose of achieving demographic outcomes'?" and "What is the definition of 'program' under this subdivision?"— Commissioner Edelblut provided no further guidance. Instead, Commissioner Edelblut stated the following: "Thank you for your questions. For clarification on the application of RSA 186:71 through 186:77, we recommend reaching out to your local district counsel. They are best positioned to interpret how this statute applies to your specific circumstances." *Exhibit 31* (NHDOE July 15, 2025 Grantham Response); *see also Exhibit 41* (Downing Decl.) ¶¶ 27–28. With millions of dollars of public funding in the balance if a district unknowingly fails to comply with HB2, NHDOE decided to leave districts in the dark.

Further demonstrating HB2's ambiguities and the prospect of arbitrary enforcement, NHDOE has already selectively applied HB2's anti-DEI provisions in two ways, all while it asks school districts to comply with the law to the letter.

*First*, NHDOE insists that public school districts submit certifications by September 5, 2025. However, HB2 makes clear that districts need only submit their certification by "[n]o later

than *September 30, 2025*." *See* RSA 186:75, II (emphasis added). Here, NHDOE is, for its convenience in complying with its own October 1, 2025 deadline to submit a report to the legislature under RSA 186:74, simply ignoring the districts' September 30, 2025 deadline that the legislature specified. On July 14, 2025, the ACLU-NH wrote to NHDOE informing NHDOE that the September 5, 2025 deadline was inconsistent with the statute. *See Exhibit 33* (ACLU-NH July 14, 2025 Email to NHDOE). NHDOE never substantively responded.

*Second*, while NHDOE is aggressively seeking to apply HB2 to private (including religious) colleges and universities in New Hampshire that receive state scholarship funds for individual students through the UNIQUE Program (both Annual and Endowment) and/or the Governor Scholarship Program, *see Exhibit 3* (NHDOE July 17, 2025 Letter and College/University Report List), NHDOE apparently (and selectively) is *not* applying HB2's anti-DEI provisions to private K–12 schools that receive public funds either through EFAs or through RSA 193:3 where a student may be placed in a private school if it is in their best interest. *See* RSA 193:3(h).[39] There is no credible basis for NHDOE's position that HB2 applies to a private college that receives state scholarship funds, but *not* a private K–12 school that receives state funds through EFAs. The EFA program allows New Hampshire students to direct state funded per-pupil education adequacy grants (which are "public funds") to private schools. And HB2 explicitly defines "public school" broadly to include "*any school*, academic institution, or institution of higher education in this state *supported by public funds*." RSA 186:71, II (emphasis added). Thus, private schools that receive EFA funds would, through the plain meaning of HB2, be included.

---

[39] "Private providers of special education" may also satisfy this definition of "public school" under HB2. *See* RSA 186-C:5.

**B.    Plaintiffs are Likely to Succeed on the Merits of their First Amendment Claim (Count II).**

In the context of institutions of higher education, HB2 also violates the First Amendment rights of academics and educators in these settings by discriminating against specific viewpoints— including viewpoints that "promote" "critical race theory" or "implicit bias training," or viewpoints that "classify" groups to "achieve demographic outcomes" for these groups—that are part of a "program" or "initiative." These prohibitions at institutions of higher education impact Plaintiff Dr. Dottie Morris, who discusses implicit bias concepts in her work at KSC, and members of Plaintiff NEA-NH who teach at UNH Law, which must comply with American Bar Association ("ABA") Standard 303(c)'s requirement to "provide education to law students on bias, cross-cultural competency, and racism."

"The Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth out of a multitude of tongues, rather than through any authoritative selection." *Keyishian*, 385 U.S. at 603 (cleaned up). For this reason, academic freedom is "a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom." *Id.*; *see also, e.g.*, *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957) ("The essentiality of freedom in the community of American universities is almost self-evident. . . . To impose any strait jacket upon the intellectual leaders in our colleges and universities would imperil the future of our Nation."). Courts throughout the country hold that the First Amendment forbids censoring academic speech in the nation's colleges and universities. This includes protecting professors who are public employees, where a government employer would otherwise have broad authority. *See, e.g.*, *Kilborn v. Amiridis*, 131 F.4th 550, 558 (7th Cir. 2025) (declining "to extend [*Garcetti v. Ceballos*, 547 U.S. 410 (2006)] to speech involving university teaching and scholarship when the Supreme Court was unwilling to do so" and noting

34

that "[e]very other circuit to decide the issue has recognized that *Garcetti* does not apply . . . .") (collecting cases).

The Supreme Court has repeatedly reaffirmed the "bedrock First Amendment principle" that "[s]peech may not be banned on the ground that it expresses ideas that offend." *Matal v. Tam*, 582 U.S. 218, 223 (2017). Viewpoint discrimination, including in the provision of public funds for private expression, is always impermissible. *See, e.g.*, *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 587 (1998) ("[E]ven in the provision of subsidies, the Government may not aim at the suppression of dangerous ideas," especially if doing so "result[s] in the imposition of a disproportionate burden calculated to drive certain ideas or viewpoints from the marketplace." (cleaned up)); *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 837 (1995) (holding that a public university may not discriminate against religious viewpoints in the provision of funds for student groups). "The dangers of viewpoint discrimination are *heightened* in the university setting," *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1127 n.6 (11th Cir. 2022) (emphasis in original), where a legislature's suppression of specific views undermines the universities' "chief mission . . . to equip students to examine arguments critically and, perhaps even more importantly, to prepare young citizens to participate in the civic and political life of our democratic republic," *id.* at 1128.

"The essence of a viewpoint discrimination claim is that the government has preferred the message of one speaker over another." *McGuire v. Reilly*, 386 F.3d 45, 62 (1st Cir. 2004). Here, again, HB2 announces that "DEI-related" "initiatives, programs, training, or policies" cannot be "implement[ed]," "promote[d]," or "otherwise engage[d] in." *See* RSA 21-I:113; RSA 186:72. This includes categorical bans on "implicit bias training," "critical race theory," and "DEI assessments." *Id.* One prominent legislative supporter explained that HB2's prohibitions exist

because of "radical leftist indoctrination." *See* Compl. ¶ 153, ECF No. 1. Another asserted that HB2's prohibitions helped address curriculum presented in a class at Southern New Hampshire University that addressed "socioeconomic factors," including questions like "why is it that you have better health outcomes in white neighborhoods?" *See Exhibit 10* (April 1, 2025 Transcript, With Margin Note By Pls.' Counsel), at 15:7–23. In other words, legislators specifically targeted viewpoints in higher education programs and curriculum, including programs and curriculum at private colleges receiving any public funding. Courts have found similar laws prohibiting teaching or discussing concepts related to race, diversity, or equity to be viewpoint discriminatory. *See Pernell v. Fla. Bd. of Governors of the State Univ. Sys.*, 641 F. Supp. 3d 1218, 1277 (N.D. Fla. 2022) ("[T]he State of Florida says that to avoid indoctrination, the State of Florida can impose its own orthodoxy and can indoctrinate university students to its preferred viewpoint. This extravagant doublespeak flies in the face of 'the invaluable role academic freedom plays in our public schools, particularly at the post-secondary level.'" (quoting *Bishop v. Aronov*, 926 F.2d 1066, 1075 (11th Cir. 1991))); *Nat'l Educ. Ass'n*, 2025 U.S. Dist. LEXIS 77874, at *84–85; *Miss. Ass'n of Educators*, 2025 U.S. Dist. LEXIS 140078, at *13–15, 20.

HB2's ambiguities add to this First Amendment violation. Because HB2 uses an indecipherable definition of "DEI," does not define terms like "critical race theory"/"implicit bias"/"DEI assessments," and fails to explain what it means to be "related" to "DEI," colleges and universities must guess—on pain of the imminent loss of all public funding—what speech concerning race, equity, diversity, or inclusion is now prohibited. With the Sword of Damocles hanging over their heads, administrators will broadly suppress any speech that is even potentially implicated by HB2, including the constitutionally protected academic speech of Plaintiffs Dottie Morris and NEA-NH Members at UNH Law. Already two NEA-NH members at UNH Law have

conveyed that they do not see how they can comply both with ABA Standard 303(c) and with HB2's restrictions given their obligation to train lawyers who will represent diverse segments of our communities. *Exhibit 34* (NEA-NH Decl.) ¶ 8. Similarly, professor and belonging administrator Dottie Morris reports that some educators "are so afraid of making a mistake that will be costly to the college that they are telling" her "that they likely will err on the side of not including certain content that may be considered covered." *Exhibit 42* (Morris Decl.) ¶ 22. The First Amendment exists to prevent these very harms.

### C. Plaintiffs are Likely to Succeed on the Merits of their Pre-emption Claim, as HB2 Conflicts with Foundational Disability Civil Rights Laws (Count III).

The ADA, 42 U.S.C. § 12101 *et seq.*, Section 504, 28 U.S.C. 794, and IDEA 20 U.S.C. § 1400 *et seq.*, each pre-empt HB2. Because these federal laws *require* precisely the conduct that HB2 *prohibits*, HB2 "must yield." *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 108 (1992).

The Supreme Clause of the United States Constitution "prevents the states from impinging on federal law and policy," *KKW Ents. Inc. v. Gloria Jean's Gourmet Coffees Franchising Corp.*, 184 F.3d 42, 49 (1st Cir. 1999) (citing U.S. Const., Art. VI), and requires that "any state law . . . which interferes with or is contrary to federal law, must yield," *Gade*, 505 U.S. at 108; *Green Enters., LLC v. Hiscox Syndicates Ltd. at Lloyd's of London*, 68 F.4th 662, 665 (1st Cir. 2023) ("Generally, a federal statute preempts any state law with which the federal statute directly conflicts."). Conflict pre-emption occurs where either: (1) compliance with both federal and state law is a physical impossibility, or (2) state law "stands as an obstacle to the full accomplishment and execution of the full purposes and objectives of Congress." *KKW*, 184 F.3d at 49 (internal citations omitted). HB2 is pre-empted by the ADA, Section 504, and the IDEA under both theories.

The court's "ultimate task in any pre-emption case is to determine whether state regulation is consistent with the structure and purpose of the [federal] statute as a whole." *Id.* Where "explicit pre-emption language does not appear, . . . nonspecific statutory language [may] nonetheless reveal a clear, but implicit, pre-emptive intent." *Philip Morris Inc. v. Harshbarger*, 122 F.3d 58, 67–68 (1st Cir. 1997). Under this framework, the First Circuit has found pre-emption based on "[a] direct, facial contradiction between state and federal law." *KKW*, 184 F.3d at 49. In *KKW*, the Court held that a Rhode Island statute was pre-empted by the Federal Arbitration Act ("FAA") because it voided any arbitration clause restricting jurisdiction to a forum outside Rhode Island. *Id.* Because the FAA requires courts to enforce arbitration in accordance with "the terms of the agreement," *id.* at 49 (quoting 9 U.S.C. § 3), the state statute sought to "override" these arbitration terms and thus conflicted with the FAA, *id.* at 50, 52.

Courts have also found that state laws are pre-empted because they frustrate the purpose of federal disability rights laws where they "diminish[ ] . . . incentive to ensure compliance" with the mandates of the federal laws. *Equal Rts. Ctr. v. Niles Bolton Assocs.*, 602 F.3d 597, 602 (4th Cir. 2010). In *Equal Rights Center*, the Fourth Circuit found that a state law indemnity claim was pre-empted by Section 504 and the ADA because it undermined Congressional intent that parties bear liability for their discriminatory acts. *Id.* The First Circuit has similarly found pre-emption based on frustration of purpose where state law imposes additional regulations that question the wisdom of federally approved activities. *Algonquin Gas Transmission, LLC v. Weymouth, Massachusetts*, 919 F.3d 54, 64 (1st Cir. 2019). In *Algonquin Gas Transmission*, the Court held that a city ordinance that led to the denial of a permit for a natural gas compressor station conflicted with the Federal Energy Regulatory Commission's ("FERC") approval of the project. *Id.* at 64–65. Because FERC thoroughly considered the same environmental concerns that led to the denial, the

ordinance posed "an effectively complete obstacle" to FERC's opposing conclusion that the station would "serve the public interest" and not harm the environment. *Id.* at 65.

HB2 prohibits schools in New Hampshire from meeting their specific legal obligations under the ADA, Section 504, and the IDEA. At minimum, compliance with these laws is frustrated by HB2. It threatens to stop funding any school that implements a "program, policy, training, or initiative that classifies individuals based on characteristics identified under RSA 354-A:1 for the purposes of achieving demographic outcomes, rather than treating individuals equally under the law." *See* RSA 186:71, I; RSA 186:72. RSA 354-A:1 lists the following characteristics: "age, sex, gender identity, race, creed, color, marital status, familial status, physical or mental disability or national origin . . . [and] sexual orientation." The term "classif[y]" is defined in the dictionary to mean "to arrange in classes" or "to consider (someone or something) as belonging to a particular group."[40] And "demographic" means "the statistical characteristics of human populations (such as age or income) used especially to identify markets."[41] Physical and mental disability, of course, constitute a statistical characteristic of human populations. Combining these meanings, HB2 prohibits schools from considering someone as disabled for the purposes of achieving disability-related outcomes.

HB2 creates liability for virtually everything school districts must do to serve disabled students under the ADA, Section 504, and the IDEA. Every attempt to provide accommodations or special education services to a disabled child necessarily requires the three components prohibited by HB2. Public schools must: (1) consider the person disabled under the ADA, Section 504, or the IDEA; (2) treat them differently by providing accommodations or special education

---

[40] Merriam-Webster Dictionary, *Classify*, https://www.merriam-webster.com/dictionary/classify#:~:text=1,belonging%20to%20a%20particular%20group (last visited July 31, 2025).
[41] Merriam-Webster Dictionary, *Demographic*, https://www.merriam-webster.com/dictionary/demographic (last visited July 31, 2025).

services not provided to others; and (3) achieve individualized and widespread disability-based outcomes, including access, participation, integration, improving academic achievement, or avoiding discipline. Contrary to HB2's mandate that schools "treat people equally," these measures provide disabled students a "preference . . . necessary to achieve the [ADA's] basic equal opportunity goal." *See U.S. Airways v. Barnett*, 535 U.S. 391, 397 (2002). HB2 also prohibits a wide range of conduct that schools must undertake to avoid discrimination against staff, teachers, and visitors with disabilities, as this conduct, too, requires public schools and other public entities to take disability into account, and make changes to general practices and procedures, to ensure access and inclusion.

### 1.     HB2 Conflicts with the ADA and Section 504.

The purpose of the ADA, according to Congress, is "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities" through "clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities," which "the Federal Government" would "play[] a central role in enforcing[.]"  42 U.S.C. § 12101(b)(1)–(3). Similarly, the predecessor to Section 504 was described as "a national commitment to eliminate the 'glaring neglect' of the handicapped." *Alexander v. Choate*, 469 U.S. 287, 296 (1985) (quoting 118 Cong. Rec. 526 (1972)).[42]

In drafting and passing the ADA, Congress made extensive findings about the history and ongoing predominance of disability discrimination in the United States, including in the "critical area[ ]" of "education." 42 U.S.C. § 12101(a)(2)–(3), (5). Congress relied on "census data, national polls, and other studies [which] have documented" the impact of disability discrimination,

---

[42] Because the ADA and Section 504 impose the same duties, Plaintiffs discuss their pre-emptive effect on HB2 together. *Theriault v. Flynn,* 162 F.3d 46, 48 n.3 (1st Cir. 1998) ("Title II of the ADA was expressly modeled after Section 504 of the Rehabilitation Act, and is to be interpreted consistently with that provision.").

revealing that "people with disabilities, as a group, occupy an inferior status in our society, and are severely disadvantaged, socially, vocationally, economically, and educationally."  42 U.S.C. § 12101(a)(6).  Similarly, in passing Section 504 of the Rehabilitation Act, "[d]iscrimination against the handicapped was perceived by Congress to be most often the product, not of invidious animus, but rather of thoughtlessness and indifference—of benign neglect."  *Alexander*, 469 U.S. at 295. In passing the ADA, Congress concluded that "the Nation's proper goals regarding individuals with disabilities are to assure the equality of opportunity, full participation, independent living, and economic self-sufficiency[.]"  42 U.S.C. § 12101(a)(7).

To remedy this widespread discrimination and exclusion, the ADA and Section 504 each create an overlapping network of requirements and prohibitions that aim to achieve integration and inclusion predicated on taking disability into account.  These requirements include two key categories of conduct that are prohibited, or, at the very least, frustrated, by HB2—treating disabled individuals differently and achieving widespread demographic outcomes.

> a.    **The ADA and Section 504 Require Schools to Treat Disabled Individuals Differently.**

This structure is based on requirements, like the familiar concept of "reasonable accommodations," to treat individuals with disabilities *differently* from the general population, and to make individualized decisions and changes *because* of the person's disability to avoid discrimination and achieve disability-related outcomes of integration and equity.

For example, the ADA and Section 504 require covered public entities, like schools, to make "reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability[.]" 28 C.F.R. § 35.130(b)(7)(i); *Pollack v. Reg'l Sch. Unit 75*, 886 F.3d 75, 80–81 (1st Cir. 2018) ("[R]equired modifications, or what we more customarily call 'accommodations' include those reasonably necessary 'to provide

meaningful access to a public service.'").  Public entities must also provide auxiliary aids and services to ensure effective communication with a disabled person, based on the individual's communication method and needs.[43]  In determining which auxiliary aids and services it provides, public entities must give "primary consideration" to the request of the individual with disabilities. 28 C.F.R. § 35.160(b)(2); *Garcia-Castro v. Puerto Rico*, No. 3:20-CV-01065-JAW, 2024 U.S. Dist. LEXIS 115984, at *26 (D.P.R. June 26, 2024) (same).  Public entities are only required to comply with each of these requirements with respect to "qualified individual[s] with a disability" as defined under the laws.  *See* 28 C.F.R. §§ 35.103 (ADA); 35.130 (ADA); 42.503 (Section 504). Public schools and entities thus are required to "classify" individuals with disabilities to fulfill these duties.

Public schools might comply with these requirements by, for example:

- Providing an American Sign Language ("ASL") interpreter only in settings where a Deaf student is present, and not providing interpreters in classrooms where no student requires them; *see Exhibit 39* (Boston Decl.) ¶ 43; *Exhibit 38* (Shaps Decl.) ¶ 26; *Nieves-Marquez*, 353 F.3d at 121;

- Adjusting the physical layout of a classroom for a teacher who uses a wheelchair; *see Exhibit 38* (Shaps Decl.) ¶ 26; *Exhibit 41* (Downing Decl.) ¶ 21;

- Developing a testing accommodation for a student with dyslexia; *see Exhibit 37* (NEA-NH Member C Decl.) ¶ 18;

- Providing adaptive sports equipment only for students with physical disabilities who require such equipment; *see Exhibit 38* (Shaps Decl.) ¶ 26; *Exhibit 39* (Boston Decl.) ¶ 43; *c.f. Reaves v. Dep't of Correction*, 195 F. Supp. 3d 383, 426 (D. Mass. 2016) (holding the ADA and Section 504 required prison to provide prisoner with physical disabilities adaptive physical equipment to access outdoor recreation and social opportunities);

- Modifying the standard grading policy with respect to attendance for a student who misses classes frequently to receive cancer treatment; *see Exhibit 38* (Shaps Decl.) ¶ 26; *Exhibit 39* (Boston Decl.) ¶ 43; *c.f. S.T. v. Los Angeles Unified Sch. Dist.*, 545 F. Supp. 3d 840,

---

[43] 28 C.F.R. §§ 35.160(b)(1)–(2) (ADA), 42.503(f) (Section 504); *see Nieves-Marquez v. Puerto Rico*, 353 F.3d 108, 121 (1st Cir. 2003) (holding the ADA and Section 504 requires school to provide deaf student a sign language interpreter as an accommodation to function effectively in class).

853–54 (C.D. Cal. 2021) (finding triable issue of fact as to whether the District must allow student to leave class early for a snack and provide remote or other physical instruction outside the classroom to accommodate student whose disability prevented her from attending class);

- Providing materials in Braille only for those students who are blind or low vision and can read Braille; *see Exhibit 38* (Shaps Decl.) ¶ 26; *Exhibit 39* (Boston Decl.) ¶ 43;

- Allowing a student with severe food allergies to collect their school lunch from a location separate from where standard lunches are served, to avoid any possible cross contamination; *Exhibit 39* (Boston Decl.) ¶ 43; *Exhibit 41* (Downing Decl.) ¶ 21;

- Modifying a general "no pets" policy at a school to permit a student to bring her service dog into the school; *see Exhibit 38* (Shaps Decl.) ¶ 26; *Exhibit 39* (Boston Decl.) ¶ 43; *Exhibit 41* (Downing Decl.) ¶ 21; *see Doucette v. Georgetown Pub. Sch.*, 936 F.3d 16, 24–25 (1st Cir. 2019) ("But here the section 504 claim, grounded in the refusal of the school district to reasonably accommodate B.D.'s use of the service dog (that is the allegation), involves the denial of non-discriminatory access to a public institution[.]");

- Providing an ASL interpreter for one Deaf student whose primary language is ASL, and providing a different Deaf student real-time captioning, rather than providing all Deaf students identical auxiliary aids and services; *see Exhibit 39* (Boston Decl.) ¶ 43; *Exhibit 41* (Downing Decl.) ¶ 21; 28 C.F.R. § 35.160(b)(1)(2) ("The type of auxiliary aid or service necessary to ensure effective communication will vary in accordance with the method of communication used by the individual"); *c.f. Argenyi v. Creighton University*, 703 F.3d 441, 447, 451 (8th Cir. 2013) (finding genuine issue of material fact as to whether defendant denied a student with a hearing disability meaningful access by refusing to provide real-time transcription for lectures and a cued speech interpreter for labs); and

- Providing extra time or a quiet place to take a test for a student with attention deficit hyperactivity disorder; *see Exhibit 38* (Shaps Decl.) ¶ 26; *Exhibit 41* (Downing Decl.) ¶ 21.

Each of these commonsense adaptations treat the disabled person differently *because* of their status as a "qualified individual with a disability" to achieve disability-related, equitable outcomes, such as access, integration, and inclusion. HB2's prohibition on "classification" runs directly contrary to these obligations. HB2's apparent acceptance of conduct that "treat[s] individuals equally" would not apply here because, in each of these examples, schools are providing *different* treatment, not available to other students, based on a "classification" as a qualified individual with a disability, in order to achieve a demographic outcome.

**b.  The ADA and Section 504 Require Schools to Implement Systems to Achieve "Demographic Outcomes."**

Another key aspect of the structure of the ADA and Section 504 is the requirement that public entities, including public schools, consider the systemic impact of their policies and procedures and ensure that these systems do not, as applied to disabled people as a whole, tend to discriminate against them or exclude them. This set of obligations requires public entities to consider whether, as to the "class" of people with disabilities, their policies, practices, or procedures tend to have a discriminatory outcome, and, if they do, treat disabled people differently to change those outcomes.

For example, the ADA and Section 504 prohibit public entities from "utiliz[ing] criteria or methods of administration [. . . t]hat have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities," 28 C.F.R. §§ 35.130(b)(3)(ii), 42.503(b)(3), or that "screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying a service, program, or activity," *id.* § 35.130(b)(8); *Guckenberger v. Bos. Univ.*, 974 F. Supp. 106, 135 (D. Mass. 1997) ("[A] university cannot impose upon such individuals documentation criteria that unnecessarily screen out or tend to screen out the truly disabled."). Public entities are also required to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities," 28 C.F.R. §§ 35.130(d) (ADA), 42.503(d) (Section 504); *Parker v. Universidad de Puerto Rico*, 225 F.3d 1, 6 (1st Cir. 2000) ("Such access must be provided in the 'most integrated setting appropriate.'"). They must also "operate each service, program, or activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals

with disabilities." 28 C.F.R. §§ 35.150(a) (ADA), 42.521 (Section 504); *see also* 28 C.F.R. §

35.130(b)(4) (ADA).

Public schools might comply with these requirements by, for example:

- Ensuring their classrooms educate disabled students in "the most integrated setting" by placing a specific number of students with disabilities in general education classrooms to maintain a ratio of disabled to non-disabled students; *see Exhibit 38* (Shaps Decl.) ¶ 26; *Exhibit* 39 (Boston Decl.) ¶ 14; *Exhibit 41* (Downing Decl.) ¶ 21; 28 C.F.R. § 35.130(d);

- Installing wheelchair ramps to ensure that the school is "readily accessible" to students, teachers, and visitors with mobility disabilities; *see Exhibit 38* (Shaps Decl.) ¶ 26; *Exhibit 41* (Downing Decl.) ¶ 21; and

- Ensuring their discipline systems do not "defeat or impair[] accomplishment of" the school's purpose of educating students or screen disabled students out of the classroom by implementing de-escalation programs and techniques to prevent disproportionate use of restraints on autistic students; *see Exhibit 38* (Shaps Decl.) ¶ 26; *Exhibit 41* (Downing Decl.) ¶ 21; *cf. C.B. v. Moreno Valley Unified Sch. Dist.*, No. 5:21-CV-00194-JGB (SPx), 2024 U.S. Dist. LEXIS 118098, at *3–4 (C.D. Cal. June 28, 2024) (ordering district to bring policies "into compliance with the ADA and Section 504" by "develop[ing] and implement[ing] new policies, practices, and customs . . . to ensure MVUSD's students with disabilities are not disproportionately removed [or] restrained").

Each of these adaptations ensures that schools meet the "demographic outcomes" of

inclusion, integration, and full participation and access to public schools' programs, as required by

the ADA and Section 504 by treating the "class" of disabled people differently. At the same time,

each of these adaptations appears to run afoul of HB2 by assessing impact based on people

classified as disabled and making changes to improve outcomes on the basis of that

"demographic."

Because school districts cannot comply with the express requirements of both HB2 and the

ADA and Section 504, HB2 is pre-empted and invalid. In the alternative, because HB2 frustrates

the purpose and structure of the ADA and Section 504, which require both individualized and

systemic review and changes to policies and practices to improve outcomes for disabled students,

HB2 is pre-empted and invalid.

### 2. HB2 Conflicts with the IDEA.

The IDEA similarly requires public schools to treat children with disabilities differently and achieve individualized and widespread academic outcomes on the basis of disability. The purpose of the IDEA is "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs[.]" 20 U.S.C. § 1400(d)(1)(A).

In passing the predecessor to the IDEA, the Education for All Handicapped Children Act of 1975, Congress considered startling demographics, finding that "more than half of the handicapped children in the United States do not receive appropriate educational services[,]" that "one million of the handicapped children in the United States are excluded entirely from the public school system," and that "there are many handicapped children throughout the United States [. . .] whose handicaps prevent them from having a successful educational experience because their handicaps are undetected[.]"[44]

### a. The IDEA Requires Identifying Disabled Students and Providing Individualized Education Plans that Treat Them Differently.

To address this widespread exclusion of disabled students from public education, the IDEA imposes obligations on public schools to identify and educate disabled students. First, schools must identify, locate, and evaluate all children with suspected disabilities (a process known as "child find") to determine whether they meet eligibility criteria for special education services. 20 U.S.C. § 1412(a)(3); 34 C.F.R. § 300.111(a). Second, schools must design an individualized education program ("IEP") for eligible students—the "most important" component of the IDEA—

---

[44] Pub. L. No. 94-142, § 3, 89 Stat. 773, 774 (1975), available at  https://www.govinfo.gov/content/pkg/STATUTE-89/pdf/STATUTE-89-Pg773.pdf  (codified as amended at 20 U.S.C. § 1401).

that provides special education services and supports necessary to deliver a Free Appropriate Public Education ("FAPE").  20 U.S.C. § 1412(a)(1)(A); 34 C.F.R. § 300.101(a); *Dracut Sch. Comm. v. Bureau of Special Educ. Appeals of the Massachusetts Dep't of Elementary & Secondary Educ.*, 737 F. Supp. 2d 35, 41 (D. Mass. 2010).  A FAPE requires "individualized special education calculated to achieve advancement from grade to grade."  *Endrew F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 401 (2017).   Third, schools must educate disabled students in the least restrictive environment, preferably in general education classrooms alongside their non-disabled peers.  20 U.S.C. § 1412(a)(5)(A); 34 C.F.R. § 300.114(a).  And fourth, schools must provide behavioral supports and services to prevent discipline based on manifestations of students' disabilities.  20 U.S.C. § 1415(k)(1); 34 CFR §§ 300.530–536.

Compliance with the IDEA's obligations to provide a FAPE may include:

- Including in the IEP of a student with anxiety that the student will receive twice as much time as other students to take tests; *see Exhibit 38* (Shaps Decl.) ¶ 29;

- Including in the IEP of a student with ADHD that the student may take tests in a quiet setting, outside of the regular classroom and without other students present; *see Exhibit 38* (Shaps Decl.) ¶ 29;

- Including in the IEP of an autistic student a Behavioral Intervention Plan which implements a series of positive behavioral supports and interventions that teachers and staff will comply with if the student displays specific behaviors; *see Exhibit 38* (Shaps Decl.) ¶ 29;

- Including in the IEP of a student with an intellectual disability that she will receive 1:1 paraprofessional support so that she can participate in a general education classroom with her nondisabled peers; *see Exhibit 38* (Shaps Decl.) ¶ 29;

- Including in an IEP that a student will read complete sentences with first-grade vocabulary words by the end of the academic year; *see Exhibit 38* (Shaps Decl.) ¶ 29; *Exhibit 41* (Downing Decl.) ¶ 25;

- Creating a schoolwide behavioral framework that provides tiered support to students with behavioral disabilities to make sure that students with disabilities are not disproportionately suspended; *see Exhibit 38* (Shaps Decl.) ¶ 29; *Exhibit 41* (Downing Decl.) ¶ 25;

- Pulling dyslexic students out of the regular classroom to join a reading group that uses an evidence-based curriculum designed to improve literacy rates for that demographic; *see Exhibit 38* (Shaps Decl.) ¶ 30; *Exhibit 41* (Downing Decl.) ¶ 25.

Each of these common aspects of special education involves treating disabled students differently in order to achieve disability-based outcomes of integration, academic achievement, and inclusion. Put another way, this foundational structure of the IDEA requires public schools to identify ("classify") disabled students, and then requires schools to provide disabled students with an *individualized* education plan that, by definition, differs from the general education plan applied to all students (not "equal treatment"), in order to improve academic achievement and reduce disability-based discipline for disabled students ("demographic outcomes"). The familiar, "most important" aspect of schools' obligations under the IDEA—to create and implement IEPs—appears to be directly prohibited by HB2. *Dracut Sch. Comm.*, 737 F. Supp. 2d at 41.

### b.    The IDEA Requires Data Collection and Reporting to Achieve "Demographic Outcomes."

In addition to the individualized requirements for students, the IDEA also includes a range of data and reporting requirements on schools, districts, and states. The IDEA requires collection and reporting of data regarding the provision of a FAPE and Child Find, and the creation of a plan that sets "measurable and rigorous targets" with respect to the provision of a FAPE and Child Find. 20 U.S.C. §§ 1412(a)(16)(D), 1413(a)(7), 1416(a)(3)(A)–(B), (b)(1)–(2), 1418(a). These plans and evaluations can include numerical data about the number of students the school has identified and statistical goals to bring the school into compliance with the law. *See DL v. D.C.*, 860 F.3d 713, 730 (D.C. Cir. 2017) ("[I]t makes perfect sense to use such [statistical] evidence where, as here, the violations amount to a systemic failure to find children.").

These data and reporting requirements, too, run directly contrary to HB2. They mandate that school districts gather information based on students' disabilities and, where necessary, to

make changes based on that data to improve demographic outcomes for those populations—namely, to reduce disproportionality and overrepresentation among disabled students in segregated settings and disciplinary processes.

## II.    Plaintiffs Suffer Irreparable Harm Because of HB2.

Plaintiffs have and will continue to suffer irreparable harm, justifying preliminary injunctive relief.  Where, as here, "the likelihood of success on the merits is great," Plaintiffs may "show somewhat less in the way of irreparable harm." *Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 485 (1st Cir. 2009) (quoting *Gately v. Massachusetts,* 2 F.3d 1221, 1232 (1st Cir. 1993)).  Even without this reduced burden, Plaintiffs would establish a clear imminent and irreparable harm.  In addition to the present chilling of free speech, the imminence of their injuries is evident from the terms of HB2 itself and NHDOE's subsequent enforcement.  Plaintiffs' injuries are, in turn, substantial: HB2 infringes on Plaintiffs' constitutional rights, chills basic educator practices, hinders the ability to provide services to students with disabilities, jeopardizes the livelihoods of Plaintiffs, puts at risk the budgets of school districts, and interferes with the core activities of Plaintiffs NEA-NH, New Hampshire Outright, and James T. McKim.  Independent of HB2's funding penalties, school districts themselves have an independent obligation to enforce HB2's prohibitions at RSA 21-I:113 and RSA 186:72 against individual educators, including fielding complaints and conducting investigations.  *See Exhibit 38* (Shaps. Decl.) ¶ 40 ("If teachers do not comply with HB2, the District may be forced to discipline them to prevent the District from losing state funds."); *Exhibit 41* (Downing Decl.) ¶ 34 (same); *see also Exhibit 39* (Boston Decl.) ¶ 41; *Exhibit 40* (Shea Decl.) ¶ 31.  These injuries are "not accurately measurable or adequately compensable by money damages," *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 217 F.3d 8, 13 (1st Cir. 2000), and there are "inadequate remedies at law" to address them absent preliminary

relief, *Together Emps.*, 32 F.4th at 85; *see also Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1019 (1984). There are numerous, independent harms created by HB2, each of which is irreparable.

*First*, Plaintiffs have shown a strong likelihood of success on their constitutional claims, *see supra*, and "the prospect of an unconstitutional enforcement" alone "'supplies the necessary irreparable injury.'" *Air Evac EMS, Inc. v. McVey*, 37 F.4th 89, 103 (4th Cir. 2022) (citing *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381–82 (1992)). Moreover, "in the context of the First Amendment, finding a likelihood of success on the merits is coextensive with finding irreparable harm." *Silva v. Univ. of N.H.*, 888 F. Supp. 293, 326 (D.N.H. 1994); *see also Elrod v. Burns*, 427 U.S. 347, 373 (1976); *Sindicato Puertorriqueno de Trabajadores v. Fortuno*, 699 F.3d 1, 15 (1st Cir. 2012). Here, Plaintiff NEA-NH members and Dottie Morris have already felt the impact of HB2 in their higher education work. *See, e.g.*, <u>Exhibit 34</u> (NEA-NH Decl.) ¶ 8; <u>Exhibit 42</u> (Morris Decl.) ¶¶ 7–23. Plaintiffs have therefore established irreparable harm.

*Second*, Plaintiff NEA-NH is irreparably injured through HB2's interference with its ability to perform its core services and activities. *See Nat'l Educ. Ass'n*, 2025 U.S. Dist. LEXIS 77874, at *93–94 (finding irreparable harm to NEA-NH and other organizational plaintiffs where defendants' action "diminishes or eliminates the value of much of their programming and grants designed to advance educators' abilities to prepare students to succeed in a diverse and interdependent society") (citing *S.A. v. Trump,* No. 18-cv-03539-LB, 2019 U.S. Dis. LEXIS 990680, at *21–22 (N.D. Cal. Mar. 1, 2019) ("[A]n organizational plaintiff's suffering 'ongoing harms to [its] organizational missions' can constitute irreparable harm." (*quoting Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013))). NEA-NH cannot properly advise its membership as to how or if these members must adjust their collective bargaining agreements to account for HB2's edicts due to its vague nature. *See* <u>Exhibit 34</u> (NEA-NH Decl.) ¶ 23. HB2's

vague nature also has made it impossible for NEA-NH to provide meaningful professional development programming about the law to its members despite the demand from its membership to do so. *Id.* at 24–26. Nor can NEA-NH advise members regarding whether and when their instruction, programs, or DEI-related discussions may rise to a level of referral for investigation by NHDOE under the Educator Code of Conduct. *Id.* at 24. Plaintiff New Hampshire Outright's core activities also are irreparably harmed, as New Hampshire Outright conducts trainings for public educational staff, in part, addressing "biases" arguably impacted by HB2, and has had one training cancelled because of the law. *Exhibit 44* (N.H. Outright Decl.) ¶¶ 6, 9, 11. The same is true of Plaintiff James. T. McKim, who conducts trainings related to diversity and equity for public entities and public schools; as a result, HB2's anti-DEI provisions irreparably harm his core work. *Exhibit 43* (McKim Decl.) ¶¶ 4–5.

*Third*, Plaintiff NEA-NH, its members, and the School District Plaintiffs face imminent and irreparable harm because of the impossible and burdensome choices HB2 forces them to make. Educators, including NEA-NH members and those employed by the Plaintiff School Districts, have invested in practicing their profession in compliance with state and federal law, including in their own training and professional development and in designing their courses and curriculum. Indeed, laws, regulations, and other guidance and interpretation address the provision of equal educational opportunity and inclusion in many ways, including programs for students based on race, national origin, sex, and for students with disabilities, English learners, and students experiencing homelessness. However, under the rules set out by HB2, educators and school districts, as well as NEA-NH and its members, face significant uncertainty about (i) what they can teach in light of the inconsistencies between HB2 and these pre-existing regulations, (ii) how they can teach, (iii) how they can interact with their students, (iv) what programming or initiatives may

trigger investigation under HB2 and potential adverse employment action, and (v) what educational programs they can operate and how. *See, e.g.*, <u>*Exhibit 34*</u> (NEA-NH Decl.) ¶¶ 17–27.

For example, in the curricular context, an adequate public education as defined by New Hampshire law requires schools to provide the types of instruction and pedagogical strategies that HB2 may prohibit. "Knowledge of civics and government, economics, geography, history, and Holocaust and genocide education [is required] to enable [students] to participate in the democratic process and to make informed choices as responsible citizens." RSA 193-E:2, IV. The K-12 Social Studies New Hampshire Curriculum Framework sets standards for teaching social studies to develop students' knowledge and skills. According to the guide, "[a]n effective study of the social studies must focus on conceptual frameworks and themes rather than solely an examination of facts."[45] The themes for U.S. History include "slavery; racism; 'Jim Crow'; Darwinism; eugenics." *Id.* at 11. Seventh and eighth graders must learn how "suffrage expanded to various groups of citizens," including African Americans and women. *Id.* at 62. High schoolers must analyze the impact of various labor systems, including "slavery, the medieval guilds, or wage labor." *Id.* at 100. New Hampshire law further requires a "[g]rounding in . . . literature to enable [students] to appreciate our cultural heritage and develop lifelong interests and involvement in these areas." *See* RSA 193-E:2, V. And educators must teach about the evolution of "intolerance, bigotry, antisemitism, and national, ethnic, racial, or religious hatred and discrimination," as well as "how to prevent the evolution of these practices." RSA 189:11, I-c(j). NHDOE also tracks—consistent with its obligations under Section 1111(c)(2) of ESSA—racial and ethnic groups, "children with disabilities," and "English learners" as part of NHDOE's Statewide Accountability

---

[45] N.H. Dep't of Educ., *New Hampshire K-12 Social Studies Framework* 5 (2006), https://www.education.nh.gov/sites/g/files/ehbemt326/files/inline-documents/standards-socialstudies-framework.pdf.

System and School Support Improvement Activities.[46]  The State of New Hampshire's *Guiding Principles: The Code of Ethics for New Hampshire Educators* also directs educators to communicate with colleagues and students in a culturally sensitive manner.  According to the *Guiding Principles*, educators have a responsibility to "commit[] to equality, equity, and inclusion of colleagues, staff, students, parents or guardians and other members of the school community; [and] respect[] diversity amongst colleagues, staff, students, parents or guardians, and other members of the school community."[47]

Educators are already feeling tension between HB2 and these and other existing requirements.  *See, e.g.*, *Exhibit 38* (Shaps Decl.) ¶¶ 32, 35 (noting inability to reconcile HB2 with N.H. Code Admin. R. Ann. Ed 306.23(f)(3)(f)(1), which requires graduating high school students to demonstrate competencies in "[u]nderstanding the history of the United States through multiple perspectives, including founding principles and the on-going struggle to realize those principles"); *see also Exhibit 39* (Boston Decl.) ¶¶ 37–38; *Exhibit 40* (Shea Decl.) ¶ 27.  For example, in the last two years after several instances of students using the "N word" in school, NEA-NH Member A incorporated instruction into their curriculum to educate White students on the historical use of the "N word" and the impact of this word on Black people today.  Through this instruction, Member A is aiming to improve and "achieve demographic outcomes" for these communities of students.  Member A is concerned that, given the vague language in HB2, they must cease this important instruction and avoid using these instances as a learning experience, informed by history, for their students for fear of violating the vague language in HB2.  *See Exhibit 34* (NEA-NH Decl.)

---

[46] *See* N.H. Dep't of Educ., *Consolidated State Plan, The Elementary and Secondary Education Act of 1965, as amended by the Every Student Succeeds Act*, at 16 (Revised Submission V.3 ~ February 1st, 2023), https://www.education.nh.gov/sites/g/files/ehbemt326/files/inline-documents/sonh/nh-state-plan-2023_used_0.pdf.
[47] *See* N.H. Dep't of Educ., *New Hampshire Code of Ethics for Educational Professionals* iii (2018) https://www.education.nh.gov/sites/g/files/ehbemt326/files/inline-documents/code-of-ethics-code-of-conduct.pdf.

¶ 18; *Exhibit 35* (NEA-NH Member A Decl.) ¶ 13; *see also Exhibit 39* (Boston Decl.) ¶ 45 (discussing similar 2018 incident). Similarly, one student drew a swastika in school, which was disturbing for Jewish and non-Jewish colleagues and students. Using this as a teachable moment for students, Member A included this example in their instruction regarding the Holocaust. This instruction is designed to educate non-Jewish students about the experiences of Jewish people, and the weight of the use of certain symbols based on the historical experience of Jews. This could be construed as seeking to "achieve" a "demographic outcome" for students that fit these classifications (e.g., classifications based on race and/or religion). *See Exhibit 34* (NEA-NH Decl.) ¶ 18; *Exhibit 35* (NEA-NH Member A Decl.) ¶ 15. In addition, Member A does not know how to comply simultaneously with HB2 and RSA 189:11, I-c(j) given that the two laws conflict. *See Exhibit 34* (NEA-NH Decl.) ¶ 18; *Exhibit 35* (NEA-NH Member A Decl.) ¶¶ 14, 16; *see also Exhibit 40* (Shea Decl.) ¶ 26 (same concern raised regarding RSA 189:11, I-c(j)). The same is true for Member B, who is concerned that classroom discussions involving the civil rights movement, current events, and structural racism could risk violating HB2's ambiguous terms and fears that someone could view Member B as "promoting" "critical race theory" or DEI-"related" ideas that are designed to "achieve demographic outcomes." *See Exhibit 34* (NEA-NH Decl.) ¶ 19; *Exhibit 36* (NEA-NH Member B Decl.) ¶ 11. And Member C, similarly, is concerned that developing parallel curricula for students with special needs could violate the vague language of HB2 and put Member C in an untenable position of having to choose between either violating HB2 or violating state and federal special education laws—all of which could lead to discipline and investigation, as well as the loss of funding to Member C's District. *See Exhibit 34* (NEA-NH Decl.) ¶ 20; *Exhibit 37* (NEA-NH Member C Decl.) ¶¶ 12–14, 17, 20, 26.

This tension created by HB2 also exists outside the classroom with respect to school district practices that are specifically designed to engage students regarding racial, sexual orientation, disability, and other forms of identity, thereby irreparably harming Plaintiff School Districts. For example, Grantham School District Superintendent Christine Downing "fear[s] that HB2 prohibits the District from complying with its duties under Title I of the" ESSA where "Title I aims to ensure that all students, especially those from low-income backgrounds, have the support they need to meet rigorous academic standards." *Exhibit 41* (Downing Decl.) ¶ 26. As she explains:

> The law not only requires equitable distribution of federal resources but also demands that these resources be used strategically to improve outcomes for historically underserved groups, including English learners, students with disabilities, and students of color. It mandates the disaggregation of academic performance data by demographic subgroup and requires action when disparities are identified. Through targeted interventions, evidence-based teaching, and ongoing progress monitoring, we are accountable for closing achievement gaps and ensuring that every student, regardless of background, has a fair opportunity to succeed.

*Id.* In addition, the Somersworth School District—though it has an obligation under federal law to ensure that English learners can participate meaningfully and equally in educational programs[48]—fears that its programming for English for Speakers of Other Languages ("ESOL") families and targeted outreach to immigrant communities concerning this programming could be construed as "achieving demographic outcomes" based on national origin under HB2. *Exhibit 40* (Shea Decl.) ¶ 22. With funding on the line, school districts already have had to contemplate creating processes to monitor and review educators, which will only compound HB2's chill. *See Exhibit 38* (Shaps Decl.) ¶ 40; *Exhibit 41* (Downing Decl.) ¶ 34 (also noting limits HB2 will place on educators given its funding penalties).

---

[48] U.S. D.O.J., *Ensuring English Learner Students Can Participate Meaningfully and Equally in Educational Programs*, https://www.ed.gov/sites/ed/files/about/offices/list/ocr/docs/dcl-factsheet-el-students-201501.pdf.

This conflict between HB2 and existing laws also exists in the context of disability. Compliance with civil rights laws that guarantee integration and inclusion for students with disabilities is deeply woven into the practice of teaching. However, HB2 introduces new and uncertain requirements in educators' work that may even conflict with these foundational disability civil rights obligations. This places educators and administrators in an immediate bind and interferes with the education that students receive. *See, e.g.*, *Exhibit 38* (Shaps Decl.) ¶ 26; *Exhibit 39* (Boston Decl.) ¶ 43; *Exhibit 41* (Downing Decl.) ¶ 21; *Exhibit 34* (NEA-NH Decl.) ¶¶ 7, 14 20–21, 26 (discussing concerns about impact on special education services); *Exhibit 36* (NEA-NH Member B Decl.) ¶¶ 9–10 (discussing impact of HB2 on services for multi-language learners and students with disabilities); *Exhibit 37* (NEA-NH Member C Decl.) ¶¶ 12, 15–22 (same).

Because of this conflict, this impossible dilemma—along with the self-censoring to protect livelihoods that this dilemma creates—will persist absent injunctive relief, and the resulting harms are irreparable. *See, e.g.*, *Nat'l Educ. Ass'n*, 2025 U.S. Dist. LEXIS 77874, at *93–94 (finding irreparable harm where "Plaintiffs' members are presently suffering First Amendment violations as a result of defendants' coercion of educational institutions into censoring their members' speech," and "[m]any more of plaintiffs' members have self-censored to protect their livelihoods," along with the fact that plaintiff organizations "face injuries to their organizational missions and core activities"); *Maine Forest Prods. Council v. Cormier*, 586 F. Supp. 3d 22, 62–63 (D. Me.), *aff'd*, 51 F.4th 1 (1st Cir. 2022) (finding irreparable harm where plaintiff had "to choose between following federal law, which opens him up to liability under state law, or complying with an unconstitutional state law"). Indeed, NHDOE already is seeking to enforce this law through certifications that must be signed under the pains and penalties of perjury. And New Hampshire's educators have seen similar enforcement in the past, including being subjected to a 2021 law

banning certain concepts in schools law and the complaints it invited. *Exhibit 34* (NEA-NH Decl.) ¶ 15. This 2021 law even triggered a bounty from the group New Hampshire Moms for Liberty offering "$500 for the person that first successfully catches a public school teacher breaking this law."[49] Judge Barbadoro documented this chill and fear extensively in the context of this earlier (now enjoined) law under which one complaint was formally docketed by the New Hampshire Commission for Human Rights. *See Local 8027, AFT-N.H.*, 2024 U.S. Dist. LEXIS 94052, at *41–42, 44–48.[50] Moreover, complaints regularly are made when educators and trainers aim to provide an inclusive education and environment for their community members, creating a culture of fear. New Hampshire Outright has experienced two high profile incidents in which complaints were made about its trainings. *Exhibit 44* (N.H. Outright Decl.) ¶¶ 14–17.[51] This is the climate of fear that laws like HB2 create for educators. Such fear is no less real with respect to HB2, especially given NHDOE's enforcement of its provisions in its July 11, 2025/July 17, 2025 letters.

*Fourth*, where HB2 conflicts with—and violates—the ADA, Section 504, and the IDEA, irreparable harm exists. "[W]hen a civil rights statute is violated, irreparable injury should be presumed from the very fact that the statute has been violated[.]" *E.E.O.C. v. Cosmair Inc., L'Oreal Hair Care Div.*, 821 F.2d 1085, 1090 (5th Cir. 1987) (internal quotations omitted); *e.g.*, *Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 827 (9th Cir. 2001)

---

[49] Pls.' Statement of Undisputed Facts ¶ 131, *Loc. 8027 v. Edelblut*, No. 21-cv-1077-PB, ECF No. 85-111 (D.N.H. Aug. 14, 2023).

[50] Pls.' Statement of Undisputed Facts ¶ 140, *Loc. 8027 v. Edelblut*, No. 21-cv-1077-PB, ECF No. 85-111 (D.N.H. Aug. 14, 2023).

[51] And, recently, when a professional development worksheet called "the Wheel of Power" was presented during a professional development workshop that took place at McLaughlin Middle School in Manchester in the spring of 2025, an uproar ensued even though the worksheet was not used in a class. *See* Andrew Sylvia, *School Committee Responds to Comments on 'Wheel of Power' Teaching Tool*, Manchester Ink Link (May 14, 2025), https://manchester.inklink.news/school-committee-responds-to-comments-on-wheel-of-power/ ("The worksheet, also known as 'the Wheel of Power and Privilege,' was created by Sylvia Duckworth of the Canadian Council of Refugees to visualize different subsets of people closer and further away to power and privilege that can create unintentional 'microaggressions' and destabilize social interactions between people occupying different tiers of privilege in society.").

("[W]here a defendant has violated a civil rights statute, we will presume that the plaintiff has suffered irreparable harm from the fact of defendant's violation."). These harms become increasingly permanent in the education context because, "[a]s students fall behind, it becomes harder to bring them back up." *New York v. McMahon*, No. 25-10601-MJJ, 2025 U.S. Dist. LEXIS 97722, at *109, 115 (D. Mass. May 22, 2025) (finding irreparable harm where financial uncertainty hindered school districts' long-term planning and "undermin[ed] their mission to provide high quality education to students."). "[A]t the rate at which a child develops and changes, especially one at the onset of biological adolescence," even "a few months [of education loss] can make a world of difference" in a child's educational development.[52]   Here, if not enjoined, HB2 will prohibit every accommodation, support, and special education service that disabled students need to access learning, *permanently* closing "the door of public education." *Endrew F.*, 580 U.S. at 398 (quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176, 200 (1982)).   Under the state's thumb, school districts would abandon all efforts to serve and integrate disabled students, who will attend institutions that, for them, are schools in name only. *Exhibit 38* (Shaps Decl.) ¶ 38; *Exhibit 40* (Shea Decl.). ¶ 9; *Exhibit 41* (Downing Decl.) ¶ 33.   In that regime, wheelchair-using students will be locked out of the school doors, dyslexic students will lack the services they need to learn how to read, and deaf students will not have interpreters to communicate with their teachers or peers. *See, e.g.*, *Exhibit 38* (Shaps Decl.) ¶¶ 26, 29; *Exhibit 39* (Boston Decl.) ¶¶ 43.   And the many disabled students shuttered in segregated classrooms and schools will carry the "intangible consequences" of isolation, such as

---

[52] *Nieves-Marquez v. Puerto Rico*, 353 F.3d 108, 121–22 (1st Cir. 2003) (finding denial of sign language interpreter required by ADA, Section 504, and IDEA in the immediate future would cause deaf child irreparable harm) (quoting *Blackman v. Dist. of Columbia*, 185 F.R.D. 4, 7 (D.C. C. 1999)).

"stigmatization and deprivation of opportunities for enriching interaction with fellow students." *J.S., III by & through J.S. Jr. v. Houston Cnty. Bd. of Educ.*, 877 F.3d 979, 987 (11th Cir. 2017).

_Finally_, the loss of state funding (and federal funding that is funneled through NHDOE)—as well as the potential penalties employed if school districts guess wrong on the certification due on September 5, 2025 that must be signed under the pains and penalties of perjury—would be a devastating blow to the School District Plaintiffs and is so great as to threaten their existence, especially where there is no process for a district to challenge the termination of such funding. *See Commodity Futures Trading Comm'n v. British Am. Commodity Options Corp.*, 434 U.S. 1316, 1322 (1977) (upholding stay of regulation on the grounds that the regulation would cause irreparable harm because it would have "potentially fatal consequences for a number of the firms" involved in the case). As the Somersworth Superintendent John Shea explains: "We cannot afford to lose our state and federal funding support. We are not an affluent community. We do not have a large property tax base. . . . State aid (currently just over $10 million per year) represents almost 30% of our overall annual budget. Losing this would be nothing short of catastrophic to our school district." *See Exhibit 40* (Shea Decl.) ¶ 9. The same is true for other districts. *See Exhibit 41* (Downing Decl.) ¶ 33 ("Losing this funding would result in a significant budget crisis as it accounts for over 10% of the District's budget. In such a scenario, the district would likely be forced to implement deep cuts in programs, resources, and staffing …."); *Exhibit 38* (Shaps Decl.) ¶ 38 (noting significant harms if funding is lost); *Exhibit 39* (Boston Decl.) ¶ 53 (same).

For all Plaintiffs, these injuries flow from the "predictable effect of Government action on the decisions of third parties." *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019). "Here, such decisions are more than predictable, they are already occurring." *New York v. United States Dep't of Homeland Sec.*, 475 F. Supp. 3d 208, 227 (S.D.N.Y. 2020) (granting preliminary injunction).

### III.    The Balance of Hardships Tilts in Plaintiffs' Favor and Relief Would Benefit the Public.

Defendants lack a legitimate interest sufficient to overcome Plaintiffs' substantial and irreparable injury, and the public interest favors a preliminary injunction.  Courts "must balance the competing claims of injury and must consider the effect on each party," *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 542 (1987), as well as whether the relief is in the public interest, *Does 1–6 v. Mills*, 16 F.4th 20, 29 (1st Cir. 2021).  These factors "merge when the [g]overnment is the opposing party."  *Does*, 16 F.4th at 37 (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

"[E]nforcement of an unconstitutional law is always contrary to the public interest." *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013); *see also Tirrell v. Edelblut*, 747 F. Supp. 3d 310, 319 (D.N.H. 2024).   By contrast, Defendants have "no interest in enforcing an unconstitutional law[.]"  *Tirrell*, 747 F. Supp. 3d at 319.  Moreover, where "a continuation of the status quo during the pendency of [] litigation will only shortly prolong the longstanding practice and policy of the United States government," and the "imposition of the [government policy] would impact the plaintiffs . . . [in] unnecessarily destabilizing and disruptive" ways, the balancing of equities and the public interest tilt in favor of plaintiffs. *N.H. Indonesian Cmty. Support v. Trump*, 765 F. Supp. 3d 102, 111–12 (D.N.H. 2025).   Here, HB2 destabilizes and disrupts Plaintiffs' ability to educate students and do their work.  In contrast, Defendants will not incur costs or expend additional effort to allow Plaintiffs to continue their work.  *See Doe v. Trump*, 766 F. Supp. 3d 266, 287 (D. Mass. 2025).  Because "preserv[ing] the relative position of the parties" will not injure Defendants and dissolving the status quo will impose unnecessary hardships on Plaintiffs' constitutional rights in the classroom and beyond, preliminary relief is both urgent and necessary.  *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).

Dated: August 11, 2025

Respectfully submitted,

*/s/ Gilles R. Bissonnette*

Zoe Brennan-Krohn*
Malhar Shah*
Disability Rights Program
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
425 California Street
San Francisco, CA 94104
(415) 343-0769
zbrennan-krohn@aclu.org
mshah@aclu.org

Gilles R. Bissonnette (N.H. Bar No. 265393)
Henry R. Klementowicz (N.H. Bar No.
21177)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NEW HAMPSHIRE
18 Low Avenue
Concord, NH 03301
(603) 224-5591
gilles@aclu-nh.org
henry@aclu-nh.org

Sarah Hinger*
Alexis Alvarez*
Racial Justice Program
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 519-7882
shinger@aclu.org
alexisa@aclu.org

Callan E. Sullivan┬ (N.H. Bar No. 20799)
Lauren Snow Chadwick┬ (N.H. Bar No.
20288)
NATIONAL EDUCATION ASSOCIATION-NEW
HAMPSHIRE
9 South Spring Street
Concord, NH 03301
(603) 224-7751
csullivan@nhnea.org
lchadwick@nhnea.org

Chris Erchull (N.H. Bar No. 266733)
Hannah Hussey*
GLBTQ LEGAL ADVOCATES & DEFENDERS
18 Tremont, Suite 950
Boston, MA 02108
(617) 426-1350
cerchull@gladlaw.org
hhussey@gladlaw.com

James A. O'Shaughnessy+ (N.H. Bar No.
19719)
Meghan S. Glynn+ (N.H. Bar No. 21168)
DRUMMOND WOODSUM & MACMAHON
670 N. Commercial Street, Suite 207
Manchester, NH 03101
(603) 792-7414
joshaughnessy@dwmlaw.com
mglynn@dwmlaw.com

* *pro hac vice* applications pending
┬ appearing only on behalf of NEA-NH
+ appearing only on behalf of the Oyster River
Cooperative School District, the Dover
School District, the Somersworth School
District, and the Grantham School District