# Exhibit 37

**DECLARATION OF MEMBER C**

I, _____, pursuant to 28 U.S.C. §1746, depose and say as follows:

1. I am NEA-NH Member C as identified in the Complaint.
2. I am a high school Science teacher in _____, New Hampshire at _____ _____. In the fall, I am starting my 23rd year of teaching and my 3rd year of teaching in New Hampshire at my current position.
3. I am a member of NEA-NH and the _____.
4. I am offering this Declaration in my individual capacity and not on behalf of the District that employs me.
5. The facts set forth in this Declaration are based on my personal knowledge, and if called a witness, I could and would competently testify to the following matters under oath.
6. I have been directly impacted and harmed by the passage of HB2, as I have experienced chill and confusion regarding my teaching practices and extracurricular school activities in the upcoming school year. I am fearful that my classroom initiatives and programs to assist students with special education needs —as well as DEI-related initiatives and programs I engage in to include students with disabilities in athletics —could be construed as violating HB2's anti-DEI prohibitions.
7. Pursuant to RSA 189:14-a, I am not a tenured teacher and have no guarantee of continuing employment in comparison to my tenured peers. This lends to my fear that, in light of the passage of HB2, by continuing my teaching practices, I may be subjected to complaints or investigations that are especially likely to lead to discipline or adverse employment action.
8. In addition, as a parent of an adult child who went through the public education system and had special education needs, I am also fearful that many of the services my child received during his time in public education —which are mandated under state and federal laws, as well as school initiatives —may not be available to other children with special needs, as these services could be construed as violating the vague and confusing language of HB2. In addition, my adult child now receives vocational services through the State, and

New Hampshire Department of Education. I am concerned regarding whether those vital services would be impacted by HB2, as they "achieve demographic outcomes" for persons with disabilities.

**Concerns regarding the language in HB2**

9. In New Hampshire, free appropriate public education ("FAPE") for students with disabilities is mandated by both federal and state laws.

10. I am also expected to comply with Individualized Education Plans ("IEP"), and federal and state laws relative to students with physical and intellectual disabilities.

11. My District does an exceptional job with our programs and initiatives providing a classroom environment that is inclusive for our special education students. I am so proud to work in a community that prioritizes these initiatives and the success of these students. As with many public schools, our District has students with significant needs. As such, we employ integrated learning systems (ISL) which are instructional tools designed to provide personalized learning experiences and assessments for different student populations. We also provide emotional support programs (ESP) for students with emotional needs to encourage individualized support.

12. Our special education students are amazing children who can succeed in our District because of the support we are able to provide them, support which is different than the support provided to traditional learners. I cannot treat each student identically because no two students are the same. Accordingly, inclusion and equity are the baseline of public education when traditional learners and students with special education needs are taught within the same classroom.

13. My role as a high school science teacher is to educate all students and meet them where they are. In the last two years that I have taught at my current position, approximately 30 percent of my students required special educational support. Thus, to ensure I comply with state and federal law and provide an inclusive and equitable environment to ensure student success regardless of need, I must tailor my curriculum, provide accommodations where necessary, and, in some cases, treat students with special education needs differently than traditional learners to achieve a demographic outcome to support students who may have disabilities in that population.

14. I have reviewed the language in HB2 and find it confusing, and vague. Specifically, I am confused regarding the vague language in HB2 of "programs" "initiatives" and

"demographic outcomes," and I am unsure of whether I could be subject to adverse employment action for accommodating students with special education needs in my science class which is a program of study.

15. I also fear that my professional development efforts will violate HB2's anti-DEI prohibitions. For example, in our District, we have professional development days where my colleagues and administrators suggest different trainings and initiatives. One such initiative proposal was a discussion regarding how to ensure that children with learning disabilities feel included and integrated within our classrooms. The idea was to discuss different ways to encourage inclusion amongst these student populations but also develop tactics to ensure that we are providing accommodations in a confidential and inclusive manner within the classroom so that students with individualized needs can succeed in step with their non-disabled peers. Under the vague and broad language of HB2, it would seem these efforts are trainings or "DEI-related" "initiatives" or "programs" and their purpose is clearly to "achieve" "demographic outcomes" for students with disabilities. If a similar training occurred with respect to ensuring inclusivity in the classroom for underrepresented populations, I have the same concern that my colleagues and I could face allegations of violating the law.

**Implications of HB2 and my ability to accommodate students with disabilities and participate in inclusive activities and initiatives**

16. HB 2 defines the terms "diversity, equity, and inclusion" as meaning "any program, policy, training, or initiative that classifies individuals based on" characteristics such as race, sex, and importantly physical or mental disability or other legally-protected protected group characteristics for "the purpose of achieving demographic outcomes, rather than treating individuals equally under the law."

17. In my daily instruction as a science teacher, I use research-based analysis of our special needs students to improve demographic outcomes. I must use data related to special education students to develop and improve our parallel curriculum to impact outcomes for this population. If we do not look at the data related to special education students, how do you know whether it is best to use certain resources or whether to adjust the parallel curriculum?

18. For example, recently I had a student with a dyslexia diagnosis in my classroom and this student also had low literacy levels. For any child with low literacy levels or dyslexia, written tests and reading assignments are extremely challenging. I used the resources available to me

based on research and data and developed parallel testing accommodation for this student and for other students with similar learning disabilities, I needed to modify the curriculum. Thus, I created a verbal testing model to assess the student's knowledge, allowing them to answer test questions verbally so that I could assess whether the student understood the science curriculum; not whether the student could read or write. This modification, which I would use for any student with similar concerns, undoubtedly uses a DEI-related concept to engage in a classification based on the student's disability to achieve and improve demographic outcomes for students with disabilities. I fear that this type of accommodation may violate the vague language of HB2.

19. It is common to hear from students and parents that they are upset or just curious as to why certain students in my classroom receive accommodations, such as alternative testing or additional time for testing. Students will ask me "why does student X get an easier test" or sometimes a parent will inquire because a student complained about a peer's accommodations and ask whether that accommodation is available for their child. Before HB2, I could keep this information confidential and indicate that I could not address another student's education. However, the language in HB2 invites further questioning, criticism, and inquisition regarding these inclusive practices. Under HB2, I am worried that I would need to disclose FERPA-protected information to defend myself against an allegation that I am violating HB2. This would undoubtedly lead to employment discipline.

20. This leaves me in an untenable position: in accordance with our FAPE obligations and with federal and state law regarding disabled students, I want to and find it necessary to continue my classroom practices with respect to students with disabilities. However, my compliance with federal and state law will leave me vulnerable to allegations that I am violating the anti-DEI prohibitions of HB2 by ensuring we "achieve demographic outcomes" for disabled students. At a minimum, it is fundamentally unfair to provide a classroom experience that does not accommodate 30 percent of my students' needs.

21. Furthermore, many of my students with special needs also have paraeducators available in the classroom to assist with instructional support. Paraeducators are vital to the success of these students, and they assist me with my goal of providing an inclusive experience in my classroom. The role of paraeducators in my classroom could be construed as seeking to achieve a demographic outcome for students with disabilities. My classroom could not function without these hard-working individuals and my students need them.

22. I am also concerned that my involvement in district events such as our efforts with the Special Olympics would be construed as violating HB2. Currently, I am the assistant coach for a track team through my district for students with special needs. It is my understanding that the team is made possible in some manner through funding from the Special Olympics via a third-party, Unified Athletics. It is my assumption that there is a contract between my District for this funding. This is a vital initiative in the District. Each student requires individual attention, and we have adult volunteers to assist students to the starting position for a relay or run with the students. This is an initiative that I am involved in which is aimed at a "demographic outcome" —namely, to include disabled children in sports that are traditionally only available to non-disabled peers. This initiative means a lot to our community, our disabled students, and my own son who benefited from similar programs during his public education. I am deeply afraid that programs such as these could be eliminated under the vague language of HB2's anti-DEI prohibitions.

**Concerns about adverse employment actions and licensing**

23. My instruction is directly impacted by the passage of HB2, and there is a threat to me that I could be subject to enforcement for failing to follow the provisions of HB2 that I fear will harm disabled students. An appropriate education under FAPE contemplates meeting disabled students' needs in the classroom and ensuring inclusivity. Based on the Department of Education's July 11, 2025, enforcement letter to school districts mandating compliance with HB2 by September 5, 2025, I have real concerns that if I violated HB2, I would face investigation by my District, and potential discipline or adverse employment action. Regardless of whether my District supports my work, the statute's prohibitions and remedy through loss of funding incentivizes District's to be overly cautious and militant in compliance. Being that I am not a teacher with tenure status, I have very few options when it comes to defending myself against adverse employment action including termination and, thus, my fear is amplified, especially where I am confused about what conduct could rise to an actionable violation under HB2.

24. With the passage of HB2, and my experience with parents and students curiosity regarding inclusive practices in the classroom, I am also fearful and concerned that a complaint will be made by a parent, administrator, student or colleague to the Department of Education that I have attempted to "achieve demographic outcomes" by providing programs and initiatives for special education students or encouraging programs for students with disabilities that ensure

inclusivity in athletics. I am concerned that any professional development effort I undertake to educate myself and/or my colleagues to ensure an inclusive classroom experience for a given group, for example disabled or minority students, could violate HB2 as these efforts are attempts to achieve a "demographic outcome."

25. Moving into the school year, I fear that I would be required to eliminate alternative and parallel curricula for disabled students to comply with the provisions of HB2. This would be a drastic and burdensome task. These changes would be time-consuming and extremely disruptive to students as well. I would be unable to accommodate special education learners if I am not permitted to offer a parallel curriculum that meets their needs.

26. Further, I am deeply concerned about the personal repercussions of HB2 for my career. I find myself in a moral quandary. To comply with HB2, I must compromise my morals and cease classroom instruction that is vital to ensure academic success of my students with special education needs. On the other hand, if I fail to comply with HB2 and continue my inclusive instruction, I fear I may lose my job or suffer adverse employment and action against my teaching credential. I have a household to support and have dedicated my life to this career. I do not want to have to compromise my morals or what is right for New Hampshire students.

27. Finally, I wish to have personally identifiable information concerning this declaration not made public. I am concerned that I could be harassed or experience unwarranted employment consequences, especially given that I am not a tenured educator and I do not have status as a continuing contract employee.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 29th day of July, 2025.

