# Exhibit 38

## DECLARATION OF DR. ROBERT SHAPS

I, Dr. Robert Shaps, pursuant to 28 U.S.C. § 1746, depose and say as follows:

1. I am the Superintendent of Schools for the Oyster River Cooperative School District ("ORCSD" or SAU5), which educates students in Lee, Madbury, and Durham, New Hampshire. Our district currently enrolls approximately 2,072 students. I became superintendent on July 1, 2024. I submit this declaration in my capacity as superintendent of SAU5.

2. I have over 30 years of experience as an educator. I have served in the following positions and schools: high school teacher and assistant principal for the Londonderry, New Hampshire Public School District; Middle/High School Principal and Superintendent of Schools for the Manchester-Essex Regional School District, in Manchester-by-the-Sea, Massachusetts; Superintendent of Schools for the Hastings-on-Hudson Union Free School District in Hastings-on-Hudson, New York; and Superintendent of Schools of the Mamaroneck Union Free School District in Mamaroneck, New York from 2010 to 2023.

3. I am certified in New Hampshire as a superintendent of schools.

4. I have an Ed.D. in Educational Administrative Leadership from the University of Pennsylvania.

5. I am aware of the anti-"DEI" provisions of House Bill 2 ("HB2"), which became effective on July 1, 2025. These provisions, located at RSA 21-I:112-116 and RSA 186:71-77, seek to prohibit diversity, equity, and inclusion (or "DEI")-"related" "initiatives, programs, training, or policies" in public entities and public schools. *See* RSA 21-I:113-14; RSA 186:72-73. In addition to its anti-DEI prohibitions, HB2 requires public schools to report any contracts that include DEI provisions to the New Hampshire Department of Education ("NHDOE"). This report shall include contract descriptions, the specific-DEI provisions, and the total obligation of

each contract. RSA 186:75, II. Public schools must "sign" and "certify" their report by "[n]o later than September 30, 2025." *See* RSA 186:75, II.

6. In HB2, DEI is defined as "any program, policy, training, or initiative that classifies individuals based on a characteristic identified under RSA 354-A:1"—age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion or national origin—"for the purpose of achieving demographic outcomes, rather than treating individuals equally under the law." *See* RSA 21-I:112, II; RSA 186:71, I. "Classif[ying] and "achieving demographic outcomes" are undefined under HB2. "Programs" and "initiatives" also are undefined terms in HB2, but presumably include "programs of study" which capture curricular instruction.

7. HB2 also seeks to label and ban certain undefined concepts as "DEI-related," including "implicit bias training," "critical race theory," and "DEI assessments". *See* RSA 21-I:113; RSA 186:72.

8. The penalties imposed on districts like mine for a violation of HB2's anti-DEI provisions are significant, including for violations that are "unknowing." If NHDOE believes that my district has violated any part of HB2's anti-DEI provisions, "either knowingly *or unknowingly*," NHDOE "*shall* immediately halt all sources of public funding to that public school, until such time as the school comes into compliance with all sections of this subdivision." *See* RSA 187:77, I (emphasis added). Further, NHDOE "*shall* notify the state treasurer if a public school is not in compliance with this subdivision, at which time the treasurer shall halt all forms of public funding to the school until the commissioner has certified the school [has] come into compliance with this subdivision." *See* RSA 187:77, II (emphasis added). In other words, for any violation—whether knowing or not—my district *shall* lose "all sources of public funding to

2

that public school," which would even include the $4,100 base adequacy aid amount the state provides per student under RSA 198:40-a, II(a).

9. I am also aware that NHDOE has begun enforcing HB2's anti-DEI provisions and has not disavowed its enforcement as to my district or other districts. On July 11, 2025, NHDOE wrote to all school districts, including mine, informing them that "each public school (as defined by RSA 186:71, II) must review all program, policy, training, or initiative to identify DEI-related provisions" and certify compliance ***by September 5, 2025***. NHDOE's certification form includes language where the district must certify compliance "*under the pains and penalties of perjury* to the best of my knowledge and belief, that all of the information contained in this document is true, accurate and complete." *Id.* (emphasis added). Thus, districts like mine must swear compliance "under the pains and penalties of perjury" with a law that can be violated "unknowingly." This perjury language also raises the prospect of criminal liability under RSA 641:1 if a district like mine incorrectly believes that it has not implemented, promoted, or engaged in any DEI-related initiatives, training, assessments, or policies.

10. NHDOE's July 11, 2025 letter to school districts provides no guidance as to what HB2's anti-DEI provisions mean beyond reciting the provisions of the law.

11. The Oyster River Cooperative School District promotes a safe and nurturing community where the uniqueness of each member is valued and appreciated. To this end, we seek to honor the diversity of our students, families, and staff through a range of educational opportunities and experiences including the exchange of ideas, freedom of expression and thought, and the exploration of topics and subject matter that reflect our commitment to a broad and comprehensive education.

12. I am unsure whether the district's programs and compliance with federal laws violate HB2's anti-DEI provisions, as the district has sought to incorporate inclusivity, equity, and justice into teaching, learning, practices, policies, and procedures.

13. For example, during the 2022-2023 school year, the district created the Coordinator of Diversity, Equity, Inclusion, & Justice ("DEIJ") leadership position to guide district-wide DEIJ efforts and create opportunities to define, assess, and promote diversity, equity, inclusion and justice. The role of Coordinator of DEIJ is to facilitate professional development and promote curricular initiatives and experiences that:

- Provide faculty/staff professional learning experiences to promote culturally responsive sustaining curricular frameworks;

- Promote the effort to center concepts of inclusivity, equity, and justice across the district to help shape compassionate, equitable practices, policies, and procedures in all areas of teaching and learning; and

- Support school-community partnerships to advance opportunities for student access to programs, stakeholder engagement, and student community groups.

14. One important role of the Coordinator of DEIJ is to lead the District Community & Belonging Group to promote a space where students, staff, faculty, parents, administrators, and community members can come together to foster a culture of belonging, dignity, and inclusion in our schools and community. Inherent in this work is the effort to promote meaningful educational conversations about identity, multiculturalism, and shared histories that strengthen our commitment to creating a welcoming and inclusive environment for all.

15. DEIJB (Diversity, Equity, Inclusion, Justice, and Belonging) initiatives and the Coordinator of DEIJ position are paramount to our district missions and values, and we are unsure if we can continue with any of the initiatives underway given HB2's anti-DEI provisions, as this work could be perceived as classifying groups protected under RSA 354-A to "achiev[e]

4

demographic outcomes." As of June 30, 2025, the DEIJ position is open, and we are assessing how to ensure this important work continues with a new employee in light of HB2's provisions. The previous DEIJ Coordinator's efforts are still being implemented in the curriculum; for example, the coordinator's work to create safe spaces for students is still in place.

16. Indeed, Oyster River Cooperative School District's mission is "Working Together To Engage Every Learner." The district's vision is to provide a place where students, parents, staff and community members work together to foster a lifelong passion for learning and engage all students in developing the skills and knowledge they need to further their education; participate as citizens, succeed in the work-place; live healthy lives; and, thrive in the 21st century.

17. In this district, students, teachers, and community members take pride in our schools and understand that each of us has a role to play in ensuring their success. We create safe, stimulating learning environments where all students are challenged and excited by the opportunities to learn; where students and teachers alike feel it is safe to take creative risks; and where every member of our community is known and valued.

18. During their time at ORCSD, students become strong, independent, critical thinkers with a commitment to living ethically and a belief that each of them can and should make a difference in our world.

19. Given HB2's directives, we are unsure if a range of programs offered to students can continue as they could be deemed "DEI." This includes our social and emotional curriculum and programs (Caring School Community and Open Circle) in K-12, instruction for English for Speakers of Other Languages ("ESOL"), instruction and academic support for students with disabilities, students of low socio-economic status, and the use/implementation of culturally response sustaining curriculum frameworks, Advanced Placement courses, a range of textbooks,

5

and high school English and social studies courses that focus on diverse literature and historical topics that may be deemed DEI-related subject matter. Similarly, we promote the NH Seal of Biliteracy—a state recognized award for students who meet competencies in two or more languages and cultural competencies—involving bilingual and multicultural learning. HB2 calls these programs into question. We adopted all of these programs, among other reasons, to close the achievement gap between students of different demographics. All these activities also help "achieve demographic outcomes" insofar as they may help a White student learn about more diverse perspectives, help improve representation of perspectives of minority groups to better reach minority students, or help students with disabilities or from different nationalities better access language and other support services. Thus, we are worried that any of these efforts may be deemed as violating HB2. Indeed, continuing efforts to build inclusive communities among students that are accessible to all may violate U.S. Education Department mandates.

20. Further, Oyster River, like all school districts, has reporting requirements under ESSA and other federal laws that require us to track and report certain data, including data disaggregated by characteristics identified under HB2. It is unclear how the district can comply with these mandates without running afoul of HB2's requirements.

21. Also at stake is the district's practice to engage in a variety of student and family activities that promote our community's diverse background and experiences. This includes honoring the tradition of Black History Month, Hispanic History Month, Pride Month, highlighting the achievements, cultural underpinnings, and unique experiences of stakeholders. We are unsure if our hosting of student community groups—PRIDE Student Spaces, Multicultural Student Spaces, the High School DEI Student Club, and the Community and Belonging Group—would be allowed to continue to create spaces where all students can discuss their common experiences and

differences or show films that promote the exchange of cultural forms and open dialogue regarding our diverse world. I am not sure if these programs are prohibited under HB2 or if NHDOE might conclude that they impermissibly "classif[y] individuals based on a characteristic identified under RSA 354-A:1"—namely, age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion or national origin—"for the purpose of achieving demographic outcomes, rather than treating individuals equally under the law."

22. Similarly, we are unsure if it continues to be proper for our DEIJ Coordinator, once the position is filled, to share existing student leadership opportunities with students—such as the University of New Hampshire True Leaders in Equity, NH EoC Student Leadership Conference and Retreat, Racial Unity Team Annual Art & Poetry Challenge, or other social justice initiatives—because, while these are open to all students, they recruit students from specific backgrounds to participate in leadership activities, and thus could be construed as "classif[ying] individuals based on a characteristic identified under RSA 354-A:1 for the purpose of achieving demographic outcomes, rather than treating individuals equally under the law."

23. We also fear that, to comply with HB2, we might not be able to continue a practice of utilizing restorative justice conferences in response to student disciplinary incidents that are specific to the use of racial epithets, as a core of the restorative practice is to highlight the historical oppression and use of dehumanizing language to humiliate or degrade a group of individuals defined by color or race.  Here too, HB2 opens us up to accusations that this practice "classifies individuals based on a characteristic identified under RSA 354-A:1"—here, by race—"for the purpose of achieving demographic outcomes, rather than treating individuals equally under the law."

7

24. Finally, we are similarly unsure if the district can continue to invite guest speakers and community organizations to engage students in conversations about race, diversity, public policy, and social history that highlight the struggles and challenges of specific demographic groups and individuals—groups that are protected under RSA 354-A and where such events could be construed as "achieving demographic outcomes" by educating certain groups about these lived experiences.

25. I do not understand what HB2 means, and its terms are impossible to apply to what my district does given HB2's lack of definition. HB2 does not define, for example, "critical race theory," nor has NHDOE provided guidance as to precisely what is (or is not) legal based on its interpretation of HB2. Given HB2's vague assertion that anything DEI-"related" violates the law, I am fearful that NHDOE and others could view goals central to the District's work as violating HB2.

26. We are afraid that HB2 prohibits all of our policies and practices to serve students with disabilities under the Americans with Disabilities Act ("ADA"), Section 504 of the Rehabilitation Act ("Section 504"). HB2's language prohibits a district from engaging in programs that "classif[y] individuals based on a characteristic identified under RSA 354-A:1"—including mental or physical disability—"for the purpose of achieving demographic outcomes." As I understand the District's obligations under the ADA and Section 504, we must provide accommodations to students with disabilities to help them access education in an integrated environment. This requires us to **1)** determine whether a student has a disability under the ADA and Section 504, which includes physical and mental disabilities; **2)** and treat that student differently by providing accommodations and supports that we would not provide to a student without a disability; **3)** to "achieve demographic outcomes," including access, participation,

8

inclusion, and integration. We implement a range of measures every day to comply with the ADA and Section 504. For example, the District provides the following accommodations to students with disabilities:

- Modify the standard grading policy with respect to attendance for a student who misses classes frequently to receive cancer treatment;

- Install wheelchair ramps to increase the number of wheelchair-using student who can access school facilities;

- Provide materials in Braille only for those students who are blind or low vision and can read Braille;

- To ensure students with disabilities are educated in "integrated environments," we place a specific number of students with disabilities in our general education classrooms to maintain a ratio of students with disabilities to students without disabilities;

- Modify a general "no pets" policy at a school to permit a student to bring her service dog into the school;

- To ensure students with hearing impairments can participate in classroom instruction, we provide assistive technology such as a frequency modulation system or a remote microphone students;

- When multiple students have behavioral disabilities that require a paraprofessional (or behavioral aide) to help them access instruction, we may place some of those students in the same classroom with that paraprofessional;

- Create a designated space for students with behavioral disabilities to regulate their emotions and behaviors before returning to classroom instruction;

- Provide extra time or a quiet place to take a test to a student with attention deficit hyperactivity disorder to help the student achieve a better score;

- Train teachers to provide behavioral accommodations and de-escalation techniques to avoid the use of restraints on students with behavioral disabilities;

- Modify classroom layouts to increase the number of staff who use wheelchairs that can access classrooms; and

- Provide adaptive sports equipment only for students with physical disabilities who require such equipment.

To ensure that our policies and practices properly meet the needs of students with disabilities, we also track data reflecting how students with disabilities perform academically, socially, and emotionally. If this data indicates that students with disabilities are not accessing their education or are not in an integrated environment, we will change our policies and practices to address these outcomes. For example, if our data reveals that students with attention deficit hyperactivity disorder have lower test scores, then we will explore options for accommodating those students, such as changing seating arrangements to move those students closer to the teacher.

27. We are also afraid that HB2 prohibits us from meeting our duties under the Individuals with Disabilities Education Act ("IDEA"). The IDEA is a complex law that requires the District to implement many programs, policies, practices, and trainings to "achiev[e[ demographic outcomes" for students with disabilities. We have four main duties under the IDEA. The first is called "Child Find," which requires the school district to locate students we suspect of having a disability and administer assessments to determine if that is true. Second, if our assessments show that the student meets one or more of thirteen listed disabilities, then we must develop an Individualized Education Program ("IEP") for the student. The IEP talks about the special education services and supports that the District must provide students with disabilities to make sure they receive a Free Appropriate Public Education ("FAPE"). This means that we have to provide services and supports that help the student meet challenging goals and advance from grade to grade. Third, we must educate these students in the Least Restrictive Environment ("LRE"). This means we must provide services and supports that allow disabled students to participate in the general education classroom alongside students without disabilities. And fourth, we must provide services and supports so that students with disabilities are not disciplined for behaviors that are manifestations of their disabilities.

28. The IDEA also requires the District to track data to ensure we are meeting these requirements. We must track the number and percentage of: **(1)** children identified as having a disability, including within particular eligibility criteria; **(2)** children with disabilities placed in general education classrooms, special education classrooms, or separate schools; and **(3)** children with disabilities subject to specific disciplinary actions. Based on this data, if the NHDOE determines that the District has "disproportionately" identified, segregated, or disciplined disabled children of a particular race or ethnicity above a specific threshold, it will require the District to implement policies, practices, and trainings to reduce disproportionality.

29. As with the ADA and Section 504, the IDEA requires us to implement measures that are now illegal under HB2. We have to **1)** determine whether a student has a disability under the IDEA, which includes physical and mental disabilities; **2)** and treat that student differently by providing special education services and supports that we would not provide to a student without a disability; **3)** to "achiev[e] demographic outcomes," including academic achievement, integration, and avoiding disciplinary actions. We implement these measures every hour of every school day to comply with the IDEA. For example, the District provides the following special education services and supports to students with disabilities:

- Draft IEP "goals" for a student with autism stating that, by the end of the school year, the student will be able to read a full sentence that contains first grade-level words;

- Include in an IEP of a student with anxiety that the student will receive twice as much time as other students to take tests;

- Include in an IEP of a student with ADHD that the student may take tests in a quiet setting, outside of the regular classroom and without other students present;

- Include in the IEP of an autistic student a Behavioral Intervention Plan which implements a series of positive behavioral supports and interventions that teachers and staff will comply with if the student displays specific behaviors;

11

- Include in the IEP that a student with an intellectual disability will receive 1:1 paraprofessional support so that they can participate in a general education classroom with their nondisabled peers;

- Adopt an evidence-based literacy curriculum designed to improve literacy rates among students with dyslexia and train teachers to teach that curriculum to dyslexic students in small reading groups; and

- Create a schoolwide behavioral framework that provides tiered support to students with behavioral disabilities to make sure that students with disabilities are not disproportionately suspended.

30. We also fear that HB2 prohibits the District from complying with its duties under Title I of the Elementary and Secondary Education Act. Title I is designed to ensure that all children–particularly those from low-income famlies–meet challenging academic standards. The law requires us not only to allocate federal resources equitably, but to use those resources strategically to improve measurable outcomes for historically underserved groups. This includes English learners, students with disabilities, and students of color. Title I mandates that we assess academic performance disaggregated by demographic subgroup and intervene when disparities arise. Through targeted support, evidence-based instruction, and continuous progress monitoring, we are held accountable for closing achievement gaps and ensuring that every child, regardless of background, has the opportunity to succeed.

31. Similarly, we fear that HB2 will prevent the District from adhering to Title IX of the Education Amendments of 1972, which prohibits discrimination on the basis of sex in any education program. Title IX requires our district to ensure all students have equal access to educational opportunities, free from bias, barriers, or harassment on the basis of their sex or gender. This means we must actively monitor disparities in areas like enrollment in advanced coursework, access to athletics, discipline, and participation in Science Technology Engineering and Mathematics (STEM) programs. Where these inequities exist, we are legally obligated to take

prompt, effective steps to address them. Title IX is not just about responding to incidents of sex-based harassment; it compels us to proactively remove systemic obstacles that impede educational outcomes.

32. It is also difficult for me to apply HB2's anti-DEI provisions to curriculum choices that my district has to regularly make. As set forth in New Hampshire law, the criteria for an "Adequate Public Education" includes: "Knowledge of civics and government, economics, geography, history, and Holocaust and genocide education to enable them to participate in the democratic process and to make informed choices as responsible citizens." *See* RSA 193-E:2, IV. It also includes "Grounding in … literature to enable them to appreciate our cultural heritage and develop lifelong interests and involvement in these areas." *See* RSA 193-E:2, V. Chapter Ed 300 of New Hampshire's Education Rules also addresses the "Minimum Standards for Public School Approval." Under these rules, which were adopted on December 12, 2024, graduation requirements in social studies——which includes United States and New Hampshire history, government and civics, economics, personal finance, and world history—shall require students to demonstrate and apply competencies in:

> 1. Understanding the history of the United States through multiple perspectives, including founding principles and the on-going struggle to realize those principles."; …
>
> 3. Understanding processes of civic engagement in a democratic society, including tolerance and well-mannered engagement across differences of perspective, philosophy, culture, race, and heritage;
>
> 4. Understanding important events marking world history and how those events have shaped cultural, political, and other aspects of civilization through multiple perspectives; …
>
> 8. Researching, inquiring, analyzing, and explaining historical, civic, government, geographic, and economic developments including interaction and interdependence through multiple perspectives."

N.H. Code Admin. R. Ann. Ed 306.23(f)(3)(f) (emphasis added).

13

33. New Hampshire's promulgated "K-12 Social Studies New Hampshire Curriculum Framework" (last approved by the N.H. DOE in July 2006), also sets forth specific topics ("Strands") in Civics, Economics, Geography, New Hampshire and United States History, and World History and Contemporary Issues, that must be taught for each grade level. *See* K-12 Social Studies New Hampshire Curriculum Framework, https://www.education.nh.gov/sites/g/files/ehbemt326/files/inline-documents/standards-socialstudies-framework.pdf (June 2006) (last accessed July 24, 2025). The framework sets forth a set of standards for teaching social studies to different grade levels so that students have "knowledge and skills needed to participate intelligently and responsibly in our ongoing democratic experiment and in an interdependent world." *Id.* at 5. To that end, the New Hampshire guide states that "[a]n effective study of social studies must focus on conceptual frameworks and themes rather than solely an examination of facts." *Id.* For example, themes for U.S. History topics include: "slavery; racism; 'Jim Crow'; Darwinism; eugenics." *Id.* at 11. For grades 9-12 and grades 7-8, respectively, students should be analyzing the impact of various labor systems, including "slavery, the medieval guilds, or wage labor" or how "suffrage expanded to various groups of citizens" (like African Americans and women). *Id.* at 100, 62.

34. Further, as required under state law, my district currently offers instruction and curriculum under RSA 189:11, I(j) addressing "[h]ow intolerance, bigotry, antisemitism, and national, ethnic, racial, or religious hatred and discrimination have evolved in the past, and can evolve, into genocide and mass violence, such as the Holocaust, *and how to prevent the evolution of such practices*." (emphasis added).

35. While the district does not engage in discrimination, HB2's anti-DEI provisions can be read to constrain or restrain this instruction already offered by the district, and hampers the

14

district's efforts to fully implement this curriculum as required by state law, as well as to uphold its mission to engage every learner, and to prepare students to live and work in a multicultural and global society. For example, the instruction could be interpreted as teaching "critical race theory" if it discusses "systemic racism or oppression" in seeking to help students understand (i) "the history of the United States through multiple perspectives" and the "on-going struggle to realize" our "founding principles" those principles under N.H. Code Admin. R. Ann. Ed 306.23(f)(3)(f)(1), or (ii) how "bigotry . . . can evolve" under RSA 189:11, I(j).

36. Oyster River's high school English and social studies courses also incorporate diverse perspectives in literature and cover historical topics that NHDOE may consider to be DEI-related subjects in contravention of HB2 where such topics could be construed as "achieving demographic outcomes" by helping White students understand these perspectives while helping provide a greater sense of belonging for students whose backgrounds may relate to these perspectives. Thus, teachers cannot fully explore concepts and historical facts in World History, American History, and literature courses due to HB2.

37. These fears are compounded by the fact that HB2s requires me to certify that the district is in compliance with HB2, with NHDOE requiring this certification by September 5, 2025 and that it be done under the pains and penalties of perjury. And if the district guesses wrong as to whether it is in compliance with—even if unknowingly—the district risks losing vital state funds that the district depends on.

38. The district received $9,766,211 in state funds for the 2025 fiscal year. The district expects to receive $9,726,994 in state funds for the 2026 fiscal year. The district is entitled to receive $721,798 in federal funds for the 2025 fiscal year, with $504,590 of those funds coming from the IDEA. The district expects to receive $597,793 in federal funds for the 2026 fiscal year,

15

with $499,676 coming from the IDEA and $48,117 coming from Title I. The district cannot afford to lose state or federal funding, which it uses for staffing, programs, and resources to meet student educational needs. Without this funding, we would face a catastrophic budget shortfall. In that scenario, the district would likely need to make severe cuts, including to extracurricular activities, advancement placement programs, field trips and non-core electives, paraprofessionals, library specialists, counselors, and administrative staff, to name a few.

39. Unless HB2 is blocked, the district and educators will be irreparably harmed. The vague and generalized limitations set forth in HB2 will limit the ability of our district and its educators to meet our collective obligation to fully deliver curriculum and instruction, uphold our mission and value statement to engage every learner, prepare students to live and work in a multicultural and global society, gain the necessary social and emotional skills that recognize the diverse and unique perspectives of others. It will limit teachers' ability to explore concepts and historical facts about World History, American History, and literature as educators and administrators fear penalties and limit our ability to continue programs that support all students both academically, socially, and culturally.

40. Because HB2 prohibits both knowing *and* unknowing violations of the statute, we will have to thoroughly audit our programs and practices to eliminate anything that could violate the law. Even a misstatement from a teacher could cause a parent to file a complaint with the NHDOE, which could lead to an investigation that halts our state funding. To prevent this, we will need to create an internal mechanism to monitor our programs, including reviewing teachers' lesson plans. If teachers do not comply with HB2, the District may be forced to discipline them to prevent the District from losing state funds. Implementing these measures would require thousands of dollars of staff time and attorneys' fees.

41.     The communities of Durham, Lee, and Madbury that make up the ORCSD strongly support the School Board and administration's efforts to create the conditions whereby all students feel valued, appreciated, and respected.  At the heart of our commitment to students and families is the effort to implement culturally responsive sustaining curriculum and classroom experiences where student background and experiences are tied to the learning, to allow students to appreciate their cultural heritage and explore diverse ideas, complicated historical themes and facts, and develop the capacity to see differences and differences of opinions as a means to internalize a broader perspective of people, societies, nations, and our global community. We see our diverse community as an asset and seek to promote inclusion and equitable experiences as a means to ensure all students thrive and succeed.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 5th day of August, 2025.


                                        /s/ Robert Shaps_____
                                        Robert Shaps