# Exhibit 41

## **DECLARATION OF CHRISTINE DOWNING**

I, Christine Downing, pursuant to 28 U.S.C. § 1746, depose and say as follows:

1. I am the Superintendent of Schools for the Grantham School District SAU #75. Our district currently enrolls approximately 450 students. I submit this declaration in my capacity as superintendent of Grantham School District.

2. I have over 30 years of experience as an educator. During this time, I have served as a Middle School Teacher in the Newport and Nashua school districts, a New Hampshire Department of Education Mathematics Content Specialist, Director of Curriculum, Instruction, & Assessment for the Lebanon School District, and an Elementary School Principal at the Sutton Central School in Sutton, New Hampshire.

3. I am certified in New Hampshire as a superintendent of schools. I also have certifications in elementary education, elementary mathematics specialist, middle level mathematics, principal, and curriculum administration.

4. I have a Master's of Education in Curriculum & Instruction from Rivier College, a Bachelor's of Science degree in Elementary Education from Kansas State University, and a Certification of Advanced Graduate Studies in Educational Leadership from Plymouth State University.

5. The Grantham School District has one school, Grantham Village School, which educates students from pre-kindergarten through the sixth grade. The Grantham Village School was recognized by the U.S. Department of Education as a National Blue Ribbon School in 2021.

1

6. The Grantham School District has an Authorized Regional Enrollment Area ("AREA") Agreement that allows older students to attend Lebanon District schools for middle school and high school.

7. I am aware of the anti-"DEI" provisions of House Bill 2 ("HB2"), which became effective on July 1, 2025. These provisions, located at RSA 21-I:112-116 and RSA 186:71-77, seek to prohibit diversity, equity, and inclusion (or "DEI")-"related" "initiatives, programs, training, or policies" in public entities and public schools. *See* RSA 21-I:113-14; RSA 186:72-73. In addition to its anti-DEI prohibitions, HB2 requires public schools to report any contracts that include DEI provisions to the New Hampshire Department of Education ("NHDOE"). This report shall include contract descriptions, the specific-DEI provisions, and the total obligation of each contract. RSA 186:75, II. Public schools must "sign" and "certify" their report by "[n]o later than September 30, 2025." *See* RSA 186:75, II.

8. In HB2, DEI is defined as "any program, policy, training, or initiative that classifies individuals based on a characteristic identified under RSA 354-A:1"—age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, or national origin—"for the purpose of achieving demographic outcomes, rather than treating individuals equally under the law." *See* RSA 21-I:112, II; RSA 186:71, I. "Classif[ying] and "achieving demographic outcomes" are undefined under HB2. "Programs" and "initiatives" also are undefined terms in HB2, but presumably include "programs of study" which capture curriculum and instruction offered at a school.

9. HB2 also seeks to label and ban certain undefined concepts as "DEI-related," including "implicit bias training," "critical race theory," and "DEI assessments." *See* RSA 21-I:113; RSA 186:72.

10. The penalties imposed on districts like mine for a violation of HB2's anti-DEI provisions are significant, including for violations that are "unknowing." If NHDOE believes that my district has violated any part of HB2's anti-DEI provisions, "either knowingly *or unknowingly*," NHDOE "*shall* immediately halt all sources of public funding to that public school, until such time as the school comes into compliance with all sections of this subdivision." *See* RSA 187:77, I (emphasis added). Further, NHDOE "*shall* notify the state treasurer if a public school is not in compliance with this subdivision, at which time the treasurer shall halt all forms of public funding to the school until the commissioner has certified the school [has] come into compliance with this subdivision." *See* RSA 187:77, II (emphasis added). In other words, for any violation—whether knowing or not—my district *shall* lose "all sources of public funding to that public school," which would even include the $4,182 base adequacy aid amount the state provides per student under RSA 198:40-a, II(a). The loss of these funds would create a ripple effect across many components of our educational system that would reduce the quality of educational programs for our students.

11. I am also aware that NHDOE has begun enforcing HB2's anti-DEI provisions and has not disavowed its enforcement as to my district or other districts. On July 11, 2025, NHDOE wrote to all school districts, including mine, informing them that "each public school (as defined by RSA 186:71, II) must review all program, policy, training, or initiative to identify DEI-related provisions" and certify compliance ***by September 5,***

*2025*. NHDOE's certification form includes language where the district must certify compliance "*under the pains and penalties of perjury* to the best of my knowledge and belief, that all of the information contained in this document is true, accurate and complete." *Id.* (emphasis added). Thus, districts like mine must swear compliance "under the pains and penalties of perjury" with a law that can be violated "unknowingly." This perjury language also raises the prospect of criminal liability under RSA 641:1 if a district like mine incorrectly believes that it has not implemented, promoted, or engaged in any DEI-related initiatives, training, programs, assessments, or policies.

12. NHDOE's July 11, 2025, letter to school districts provides no guidance as to what HB2's anti-DEI provisions mean beyond reciting the provisions of the law.

13. The Grantham School District strives to cultivate a safe and supportive environment where every individual's uniqueness is recognized and celebrated. In pursuit of this goal, we embrace the rich diversity of our students, families, and staff by offering a wide array of educational experiences. These include open dialogue, the freedom to express and explore ideas, and engagement with topics that reflect our dedication to providing a well-rounded and inclusive education.

14. I am unsure whether the District's programs and compliance with federal laws violate HB2's anti-DEI provisions, as the District has sought to incorporate inclusivity, equity, and diversity into teaching, learning, practices, policies, and procedures.

15. As explained in the Grantham School District's Mission Statement, adopted by the School Board in December 2012 and reaffirmed in November 2024, the District's mission is to work with the community to "provide excellence in education," engaging

all students in developing the skills and knowledge they need to further their education and "make positive contributions within a diverse global society."

16. The Mission Statement also recognizes that "students learn in different ways and require different methods of learning and instruction."

17. Students, educators, and community members share a deep sense of pride in our school and recognize the importance of their individual contributions to our collective success. We foster safe and engaging learning environments where students are inspired and challenged, where creativity is encouraged, and where both students and teachers feel empowered to take thoughtful risks. Every member of our community is seen, heard, and valued.

18. At Grantham Village School, we work to help our students grow into thoughtful, independent individuals who think critically, act with integrity, and believe in their ability and responsibility to positively impact the world around them.

19. Given HB2's directives, we are unsure if a range of programs offered to students can continue as they could be deemed "DEI." For example:

- Each year Grantham Village School selects a theme for the year, which it builds school programming around. For the upcoming 2025-2026 school year, the Grantham Village School's theme is Acceptance and Kindness. This includes programming meant to encourage classroom discussions on topics such as including and respecting others who are different from oneself, understanding and helping those with different abilities, and standing up for others who may be targeted for having different backgrounds such as people who may speak with an

accent or bring unique food to lunch. I worry that this theme could be seen as specifically supporting students in certain groups and therefore deemed unlawful.

- In preparing for the 2025-2026 academic year, the District contracted with national experts on neurodiversity, to provide trainings on learning strategies for differently abled students. I am concerned these efforts may be deemed as efforts to "achieve demographic outcomes."

- The District recently spent approximately $39,527 developing a new literacy program that highlights diverse perspectives and important historical topics. Some books that are used in this program have been listed on book bans in other states, and I worry could be interpreted as "DEI." The District has long engaged students and families in a variety of activities that celebrate and reflect the rich diversity of our community. These include observances such as Black History Month, and Hispanic Heritage Month, which highlight the achievements, cultural contributions, and lived experiences of many.

20. I am not sure if these programs are prohibited under HB2, particularly in light of concerns that these initiatives might be interpreted as classifying individuals based on characteristics outlined in RSA 354-A:1—such as race or gender identity—for the purpose of achieving demographic outcomes, rather than ensuring equal treatment under the law.

21. I am also afraid that HB2 prohibits all of our policies and practices to serve students with disabilities under the Americans with Disabilities Act ("ADA"), Section 504 of the Rehabilitation Act ("Section 504"). HB2's language prohibits a district from engaging in programs that "classif[y] individuals based on a characteristic identified under RSA

6

354-A:1"—including mental or physical disability—"for the purpose of achieving demographic outcomes." As I understand the District's obligations under the ADA and Section 504, we must provide accommodations to students with disabilities to help them access education in an integrated environment. This requires us to (1) determine whether a student has a disability under the ADA and Section 504, which includes physical and mental disabilities; and (2) treat that student differently by providing accommodations and supports that we would not provide to a student without a disability; (3) to "achiev[e] demographic outcomes," including access, participation, inclusion, and integration. We implement a range of measures every day to comply with the ADA and Section 504. For example, the District provides the following accommodations to students with disabilities:

- To ensure students with disabilities are educated in "integrated environments," placing a specific number of students with disabilities in our general education classrooms to maintain a ratio of students with disabilities to students without disabilities;
- To ensure students with hearing impairments can participate in classroom instruction, providing assistive technology such as a frequency modulation system or a remote microphone to students;
- When multiple students have behavioral disabilities that require a paraprofessional (or behavioral aide) to help them access instruction, we may place some of those students in the same classroom with that paraprofessional;
- Create a designated space for students with behavioral disabilities to regulate their emotions and behaviors before returning to classroom instruction;

7

- Providing extra time or a quiet place to take a test to a student with attention deficit hyperactivity disorder to help the student achieve a better score;

- Train teachers to provide behavioral accommodations and de-escalation techniques to avoid the use of restraints on students with behavioral disabilities;

- Modify classroom and outside spaces (such as playgrounds) to ensure staff or students who use wheelchairs can access work and learning environments;

- Allow a student with severe food allergies to collect their school lunch from a location separate from where standard lunches are served, to avoid any possible cross contamination;

- Modify a general "no pets" policy at a school to permit a student to bring her service dog into the school; and

- Provide an ASL interpreter for one Deaf student whose primary language is ASL, and providing a different Deaf student real-time captioning, rather than providing all Deaf students identical auxiliary aids and services.

22. To ensure that our policies and practices properly meet the needs of students with disabilities, we also track data reflecting how students with disabilities perform academically, socially, and emotionally. If this data indicates that students with disabilities are not accessing their education or are not in an integrated environment, we will change our policies and practices to address these outcomes. For example, if our data reveals that students with attention deficit hyperactivity disorder have lower test scores, then we will explore options for accommodating those students, such as changing seating arrangements to move those students closer to the teacher.

23. We are also afraid that HB2 prohibits us from meeting our duties under the Individuals with Disabilities Education Act ("IDEA"). The IDEA is a complex law that requires the District to implement many programs, policies, practices, and trainings to "achiev[e[ demographic outcomes" for students with disabilities. We have four main duties under the IDEA. The first is called "Child Find," which requires the school district to locate students we suspect of having a disability and administer assessments to determine if that is true. Second, if our assessments show that the student meets one or more of thirteen listed disabilities, then we must develop an Individualized Education Program ("IEP") for the student. The IEP talks about the special education services and supports that the District must provide students with disabilities to make sure they receive a Free Appropriate Public Education ("FAPE"). This means that we have to provide services and supports that help the student meet challenging goals and advance from grade to grade. Third, we must educate these students in the Least Restrictive Environment ("LRE"). This means we must provide services and supports that allow disabled students to participate in the general education classroom alongside students without disabilities. And fourth, we must provide services and supports so that students with disabilities are not disciplined for behaviors that are manifestations of their disabilities.

24. The IDEA also requires the District to track data to ensure we are meeting these requirements. We must track the number and percentage of: (1) children identified as having a disability, including within particular eligibility criteria; (2) children with disabilities placed in general education classrooms, special education classrooms, or separate schools; and (3) children with disabilities subject to specific disciplinary actions. Based on this data, if the NHDOE determines that the District has "disproportionately"

9

identified, segregated, or disciplined disabled children of a particular race or ethnicity above a specific threshold, it will require the District to implement policies, practices, and trainings to reduce disproportionality.

25. As with the ADA and Section 504, the IDEA requires us to implement measures that are now illegal under HB2. We have to (1) determine whether a student has a disability under the IDEA, which includes physical and mental disabilities; (2) and treat that student differently by providing special education services and supports that we would not provide to a student without a disability; (3) to "achiev[e] demographic outcomes," including academic achievement, integration, and avoiding disciplinary actions. We implement these measures every hour of every school day to comply with the IDEA. For example, the District provides the following special education services and supports to students with disabilities:

- Draft IEP "goals" for a student with autism stating that, by the end of the school year, the student will be able to read a full sentence that contains first grade-level words;

- Adopt an evidence-based literacy curriculum designed to improve literacy rates among students with dyslexia and train teachers to teach that curriculum; and

- Create a schoolwide behavioral framework that provides tiered support to students with behavioral disabilities to make sure that students with disabilities are not disproportionately suspended.

26. We also fear that HB2 prohibits the District from complying with its duties under Title I of the Elementary and Secondary Education Act. Title I aims to ensure that all students, especially those from low-income backgrounds, have the support they need to meet

10

rigorous academic standards. The law not only requires equitable distribution of federal resources but also demands that these resources be used strategically to improve outcomes for historically underserved groups, including English learners, students with disabilities, and students of color. It mandates the disaggregation of academic performance data by demographic subgroup and requires action when disparities are identified. Through targeted interventions, evidence-based teaching, and ongoing progress monitoring, we are accountable for closing achievement gaps and ensuring that every student, regardless of background, has a fair opportunity to succeed.

27. After receiving NHDOE's July 11, 2025 letter seeking compliance certifications by September 5, 2025, on that same day I asked then-NHDOE Commissioner of Education Frank Edelblut several questions about what HB2 means. Commissioner Edelblut provided no further guidance, stating instead the following: "Thank you for your questions. For clarification on the application of RSA 186:71 through 186:77, we recommend reaching out to your local district counsel. They are best positioned to interpret how this statute applies to your specific circumstances."

28. Even after conferring with my counsel, I do not understand what is required by the law.

29. Furthermore, I have received inquiries from administrators and teachers in the district seeking clarification on the law and have been unable to provide them clarity.

30. Grantham administrators and educators are concerned when it comes to teaching our board approved curriculum for fear that it would violate HB2, unknowingly, and what those consequences may mean to our programming, as well as their own licensing. I share their concerns.

31. These concerns are compounded by the fact that HB2 requires me to certify that the district is in compliance with HB2, with NHDOE requiring this certification by September 5, 2025 and that it be done under the pains and penalties of perjury. And if the district guesses wrong as to whether it is compliance with—even if unknowingly— the district risks losing vital state funds that the district depends on.

32. I do not understand what HB2 means, and its terms are impossible to apply to what my district does given HB2's lack of definition. HB2 does not define, for example, "critical race theory," nor has NHDOE provided guidance as to precisely what is (or is not) legal based on its interpretation of HB2. Given HB2's vague assertion that anything DEI- "related" violates the law, I am very concerned that NHDOE and others could view goals central to the District's work as violating HB2.

33. The district expects to receive $1,162,471 in state funds for the 2026 fiscal year. The district received $186,735 in federal funds for the 2024-2025 school year, with $94,326 of those funds coming from the IDEA and $8,115 coming from Title I. The district relies heavily on state and federal funding to support essential staffing, programs, and resources that address students' educational needs. Losing this funding would result in a significant budget crisis as it accounts for over 10% of the District's budget. In such a scenario, the district would likely be forced to implement deep cuts in programs, resources, and staffing that is likely to reduce the high quality educational experiences that our families and communities have come to expect and that Grantham School District is known for in its region.

34. Unless HB2 is blocked, the district and educators will be irreparably harmed. The vague and generalized limitations set forth in HB2 will greatly reduce our District's and

educators' capacity to fulfill our shared commitment to delivering a well-rounded and effective curriculum. It undermines our mission to engage every student, prepare them for participation in a diverse society, and support the development of social and emotional skills that foster understanding of different viewpoints. It also places limits on teachers' ability to fully address important themes and historical events in subjects such as World History, American History, and literature, as fear of potential consequences may lead to self-censorship. Furthermore, it jeopardizes the continuation of programs that nurture students' academic, social, and cultural growth. Because HB2 prohibits both knowing *and* unknowing violations of the statute, we will have to thoroughly audit our programs and practices to eliminate anything that could violate the law. Even a misstatement from a teacher could cause a parent to file a complaint with the NHDOE, which could lead to an investigation that halts our state funding. To prevent this, we will need to create an internal mechanism to monitor our programs, including reviewing teachers' lesson plans. If teachers do not comply with HB2, the District may be forced to discipline them to prevent the District from losing state funds. Implementing these measures would require thousands of dollars of staff time and attorneys' fees.

35. The community of Grantham strongly supports the School Board and administration's efforts to create the conditions whereby all students feel valued, appreciated, and respected. Central to our commitment to students and families is the implementation of culturally responsive and sustaining curriculum and classroom experiences. We aim to connect students' backgrounds and lived experiences to their learning, helping them appreciate their cultural heritage while engaging with diverse ideas, complex historical topics, and factual content. This approach encourages students to view differences,

including differing opinions, as opportunities to broaden their understanding of people, societies, nations, and the global community. We view the diversity within our community as a strength and are dedicated to fostering inclusion and equitable learning experiences to ensure that every student has the opportunity to thrive.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 5th day of August, 2025.

*/s/ Christine L. Downing*