# Exhibit 42

## **DECLARATION OF DR. DOTTIE MORRIS**

I, Dottie Morris, pursuant to 28 U.S.C. § 1746, depose and say as follows:

1. I am the Associate Vice President for Community and Belonging at Keene State College ("KSC"), which receives state and federal funding. I formerly was the Associate Vice President for Institutional Equity and Diversity at KSC, but my title changed to its current form on or around June 30, 2025 because of HB2's anti-DEI provisions. I am also an Associate Professor of Psychology at KSC. I am filing this lawsuit only in my individual capacity, and I understand that KSC does not believe that its current practices or policies conflict with HB2. This declaration or this lawsuit is not being brought by (or on behalf of) KSC or the University System of New Hampshire ("USNH"). Nothing herein reflects KSC's or USNH's position.

2. I received my doctorate in clinical psychology from Washington State University. I hold a master's degree in counseling psychology from Texas Southern University, and I earned my bachelor's degree in psychology from Dillard University.

3. My focus was and is providing support and direction to the Executive, Academic Affairs, Enrollment and Student Engagement, Advancement, and Finance and Administration divisions of KSC to promote the mission, vision, and values of KSC, though this work will have to change in some ways with the enactment of HB2. Indeed, it has already changed my work, with some of these changes even being made in anticipation of HB2 being enacted. For example, because of the law, my performance goals have changed and the terminology we use has changed.

4. For years, I also have worked with undergraduate and graduate students in the capacity of counselor, teacher, academic advisor, and advisor of student groups. I have demonstrated a consistent and persistent dedication and devotion to diversity, equity, inclusion, and social justice for almost three decades. I am dedicated and devoted to this work because I

1

know it creates environments that are beneficial to all. I also know that the way we are able to address social challenges is by assuring that all voices, perspectives, and beliefs are heard, honored, and respected.

5.      Prior to my position as KSC, I served as the Associate Dean for Student Learning at World Learning School for the International Training Institute ("SIT") in Brattleboro, VT, the Director of Student Affairs for the Clinical Mental Health Counseling Program at Antioch University New England in Keene, staff counselor at the Colorado State University ("CSU") Counseling Center, and a coordinator of the Employee Assistance Program at CSU. At each of those institutions I served in some academic capacity.

6.      I previously served as chair of the board of the American Civil Liberties Union of New Hampshire and the American Civil Liberties Union Foundation of New Hampshire.

7.      HB2 strikes at the core of what I am trying to do in my role at KSC, which is to help give students a better understanding of the world around them so that they can better engage with others after graduation as responsible participants in our civic society.

8.      For example, while at KSC, I have regularly engaged students on concepts like implicit bias that are targeted under HB2. Some of the trainings with college orientation leaders and resident assistants involve having these student leaders examine how individual conscious and unconscious biases can have an impact on how we relate to others. This engagement is done to help deepen the quality of experience of the students they serve in their important role. These discussions help these leaders and assistants understand how biases impact their engagement of students. Biases do not only impact how people interact with those different from them but also those like them. These concepts help students understand how the environment and world around them influences interactions with others. These discussions are developed based on research in

the field that is informed by best practices and that shows that discussions like these help build inclusive communities where people better recognize how their own behavior can influence their fellow community members. I also have conducted these trainings on biases for KSC staff to ensure that staff are effective in their role of serving all students in a compassionate and understanding way that appreciates all students' lived experiences.

9. With the enactment of HB2, my work in my current role is now in question. I do not know whether I can reference implicit bias either to students or fellow staff members out of fear of being accused of violating the law—an accusation that could cause KSC to lose vital public funding. I likely will omit the important terms "implicit" or "unconscious" altogether in discussing bias because of HB2. I also am concerned that any discussion about bias may be viewed as falling under the law even when the terms "implicit" and/or "unconscious" are not used. With these omissions, it will be challenging to help students and staff navigate the complexities associated with addressing the origins of our assumptions about others and how these assumptions can lead to harmful stereotypes and discriminatory behavior. Our lived experience is often unexamined, and we may not be aware of how this experience influences what we do, why we do it, or how we do it.

10. I similarly fear mentioning concepts like "systemic racism." I have encountered this concept when considering how college practices may have historically, whether intended or not, uniquely impacted marginalized communities. For example, I have examined systemic racism in the context of how colleges have addressed misconduct, particularly in the context of when people may subjectively feel "threatened"—a perception that is often viewed through the lens of White dominant culture. But now I fear to even engage the topic of "systemic racism" because many (albeit incorrectly) consider such terminology as an extension of "critical race theory." I

likely will avoid using this terminology going forward, which will chill my involvement in important discussions on how college policies, practices, and procedures will be developed or expanded to take into consideration how historical realities remain a part of how an institution is currently operating.

11. I also do not understand what it means for a program or training to "classif[y] individuals"—based, for example, on race, gender, sexual orientation, gender identity, or disability—"for the purpose of achieving demographic outcomes." I am not sure what New Hampshire intends to cover by these terms, but because my work involves discussions of protected characteristics, I fear that the state (and complainants) could view this work as impermissibly "classifying" to "achieve demographic outcomes."

12. For example, my work aims to provide opportunities for all students—including White students, students of color, LGBTQ+ students, etc.—to have a wide range of experiences that prepare them for when they graduate. This work does, by necessity, include creating spaces and opportunities for those students to have interactions where they engage people who may not have had similar lived experiences. But because the creation of these experiences, either directly or indirectly, is designed to "achieve demographic outcomes" insofar as these experiences seek to create engagement opportunities for White students, students of color, and other groups, I do not know whether this work is covered by HB2.

13. Every March, I also help organize a "spring break civil rights tour" to the South (mainly, Alabama, Tennessee, and Georgia) that is designed not only to help educate students on the United States's history of racial discrimination and how people from all lived experiences came together to address the impact of racial discrimination, but also to provide a space for students to have interactions with others not like them so that these students can acquire a deeper

understanding of the world. Even though no state or federal funds are used to support this experience (all funds are donated), I do not know if HB2 covers this student opportunity, as this opportunity is designed to "achieve[] demographic outcomes" insofar as it exposes White students to (i) people who may not have had similar experiences, and (ii) students of color who may be given a chance to volunteer their own lived experiences.

14. HB2 has impacted me in other ways. It is not clear to me if I can provide specific resources for students based on their lived experiences. When we consider equity, we are thinking about ways to ensure that all students have what they need to be successful based on their individual and group circumstances. Given these individual and group circumstances, each student and their individual communities do not need the same things. For example, given the current realities experienced by LGBTQ+ students who are struggling with how to obtain resources to meet their needs, we will often engage with the LGBTQ+ student community, in particular, if there is a bias incident. These bias incidents have included students putting a derogatory term on a white board directed to LGBTQ+ community members, and students being subjected to derogatory terms in public. If I engage in outreach to LGBTQ+ students to provide unique resources to them in response to such an incident, am I engaging in an "initiative" that classifies individuals based on sexual orientation or gender identity for the purposes of "achieving demographic outcomes" as to them under HB2? I do not know, but I am confident that some may interpret HB2 that way.

15. I have the same concern with how to reach students with disabilities, which is similarly designed to "achieve demographic outcomes" for that community. Mental health is an important issue on college campuses. I have helped develop systems to address the concerns of those who are struggling, and I meet with others in the college community to assess how we can meet these students' needs. But how can we, under HB2, create targeted approaches to address—

and even meaningfully consider—mental illness given the law's prohibitions on using mental "disability" classifications to "achieve demographic outcomes" for this community? My same question applies to whether reasonable accommodations can be provided for students with mental disabilities as part of college programming. This could be perceived as giving someone an unfair advantage under HB2, though we are simply giving that person what they need to be successful.

16. I also wonder how I can engage certain students who are lawful immigrants to see if I can meet their unique needs in transitioning to the college community. Could this "achieve demographic outcomes" based on national origin? I do not know.

17. These questions go directly to my ability to meet students' individualized needs to help them be successful. If I, instead, adopt a non-tailored "fire hose" approach to trying to meet these needs, then some students and community groups will be lost in the shuffle and not receive the tailored attention and education to which they are entitled.

18. Furthermore, HB2 will directly impact my teaching as a non-tenured Associate Professor of Psychology, as I teach one psychology class (and sometimes two classes when needed) each semester. For example, KSC has a course that teaches students basic skills around counseling. I have taught it previously, and I have been asked to teach it in the Spring of 2026. HB2 would make it incredibly difficult for me to teach certain concepts in this class, including concepts of bias. It would be virtually impossible to provide students with effective counseling skills if I cannot discuss, as a professor, what is beneath the behavior of counselors and what is beneath the behaviors of those being counseled. Understanding bias is integral to understanding these behaviors, and counselor bias can even impact diagnosis and treatment.[1] The core values

---

[1] *See Dipesh P. Gopal, et al.,* "Implicit bias in healthcare: clinical practice, research and decision making," *Future Healthcare Journal* (Mar. 2021), https://pmc.ncbi.nlm.nih.gov/articles/PMC8004354/ ("Bias can have a major impact on the way that clinicians conduct consultations and make decisions for patients but is not covered in the medical field outside clinical reasoning.").

integrated into the Code of Ethics for the National Board for Certified Counselors acknowledges that certified counselors and candidates should "demonstrate their commitment to ethical behaviors by demonstrating, and represent[] to their clients, sensitivity to multicultural issues, avoiding discrimination, oppression, and/or any form of social injustice."[2] Accordingly, it is essential for our future counselors to understand ethical counseling, including how to try to relate to the lived experiences of people from demographic groups, whether it be LGBTQ+ people or people of color. Without this instruction on bias in this counseling course, students will be at a disadvantage, as they will not have the necessary skills when they later enter into additional counseling educational opportunities.

19.     I also am teaching two sections of a psychology class this fall (Fall of 2025). There is a portion of this class that addresses social psychology—a field that covers, in part, prejudice and biases, including implicit bias/prejudice. This portion of the class directly helps students understand their own personal biases.[3] Discussing and teaching about biases is integral to teaching this course, and I do not understand how I can provide an ethical education to these students without providing this information. Moreover, "characteristics"—including those identified in RSA 354-A:1 like race, gender, sexual orientation, and the like—are essential for psychologists to consider. Psychology is everywhere. Everything in the environment impacts how people think about the world, including the communities that we are from. The field of psychology acknowledges that people are different, that these differences cannot be denied, and that these differences impact how people experience the world.

---

[2] NBCC Code of Ethics (Approved May 2023; Revised August 24, 2023), at p. 1, https://nbcc.org/assets/ethics/nbcccodeofethics.pdf.

[3] Find attached copies of two pages from the textbook Introduction to Psychology: Gateways to Mind & Behavior by Coon, Mitterer & Martini, which I will be using for an Introduction to Psychology during the Fall 2025 semester. These pages directly address prejudice, and specifically "implicit prejudice."

7

20. Unless HB2 is blocked, I will be irreparably harmed. Given HB2's anti-DEI provisions, my current role at KSC is now in question, and I do not know, for example, whether I can reference implicit bias either to students or fellow staff members out of fear of being accused of violating the law—an accusation that could cause KSC to lose resources.

21. As I am engaged in work and instruction that seem directly implicated by HB2—and I know the New Hampshire Department of Education is actively enforcing its provisions through its July 17, 2025 letter directed to higher education leaders demanding certifications of compliance—I am worried about HB2 being enforced against me, as well as potential employment consequences for being accused of violating its terms. I fear that the New Hampshire Department of Education will investigate, discipline, or take other adverse action against me if I continue to discuss with students issues pertaining to race, diversity, equity, or inclusion. My employer has an obligation to enforce this law, including against me if I violate it. In this climate, I fear losing my job or being disciplined if I do the work I am required to do, even if I think I am not violating the law. Others may think that I am given HB2's vague terms. In this hostile climate against educators, there are groups of people that likely would file complaints in light of HB2. For example, I am aware of one prior complaint made against KSC because of an award it gives to honor women. I have also fielded a complaint about an assignment that addressed classifications of race and class groups in the context of health equity. Given this history, future complaints are likely in light of HB2, and responding to these complaints will take time and money.

22. HB2 is creating significant uncertainty as we speak. I am receiving requests from faculty and staff seeking direction due to HB2's anti-DEI provisions, as semester planning is already well underway. These educators are concerned about whether HB2 covers the content of courses (including the contents of health and business courses that address community groups) and

trainings. I have even had a conversation about whether HB2 covers college awards, including the award that was the subject of the prior complaint referenced above. I am seeing significant stress from my colleagues who do not know what HB2 means and do not know how to comply. Some are so afraid of making a mistake that will be costly to the college that they are telling me that they likely will err on the side of not including certain content that may be considered covered. In making these decisions, the educators have expressed sadness because they feel that this decision is in conflict with their values and the needs of their students. To avoid this conflict, some are even considering leaving the field of education altogether because they are being put in a situation where they are forced to choose between what is best for the college (in seeking to comply with the law) and what is best for their students (who are entitled to an education that meets them where they are).

23. In short, HB2 limits my ability to do my job. But this is not just a job. It is my life's work.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 6th day of August, 2025.

*/s/ Dottie Morris*_____
Dottie Morris

# Forms of Prejudice

Distinguished psychologist Gordon Allport (1958) concluded that there are two important sources of prejudice. *Personal prejudice* arises when members of another ethnic group are perceived as a threat to one's own interests. For example, members of another group may be viewed as competitors for jobs. *Group prejudice* arises when a person conforms to group norms. Let's say, for instance, that you have no personal reason for disliking out-group members. Nevertheless, your friends, acquaintances, or coworkers expect it of you.

When group prejudice becomes institutionalized in the policies of organizations such as police departments, schools, or governments, it is generally referred to as systemic prejudice or, more specifically, systemic racism, sexism, ageism, or heterosexism, depending on the group affected (Harrell & Medford, 2012).

Prejudice is easy to notice when it is *explicit* and out in the open (Payne et al., 2010). However, because many people realize that crude and obvious expicit prejudice is no longer socially acceptable, the public expression of explicit prejudice has become much less common. As a consequence, prejudice is now often disguised as **symbolic prejudice**—the expression of prejudice in subtly veiled forms (Anderson, 2010; Neville et al., 2013). For example, modern racists must find ways to rationalize their prejudice so that it seems to be based on issues other than raw racism. One common way to disguise then is to offer subtly racist opinions framed in terms of topics such as affirmative action, busing, immigration, crime, and so on.

In a similar vein, suppose a European-American candidate and an equally qualified African-American candidate apply for a job. Both are only moderately qualified for the position. If the person making the hiring decision is European American, who gets the job? As you might guess, the European-American candidate is much more likely to be hired. In other words, the European-American candidate will be given "the benefit of the doubt" about his or her abilities, whereas the African-American candidate won't. People making such decisions often believe that they aren't being prejudiced, but they nevertheless unconsciously discriminate against minorities (Berg, 2013). While it is an admirable step, making a conscious decision to forsake prejudice does not immediately eliminate **implicit prejudice**—unconscious prejudiced thoughts and feelings about members of other groups (Anderson, 2010; Nosek, Greenwald, & Banaji, 2005; Waller, Lampman, & Lupfer-Johnson, 2012).

## Implicit Prejudice—I'm Not Prejudiced Right?

How could you tell if someone is being unconsciously prejudiced? Let's try an example. Are you prejudiced against women working outside the family home? Keep in mind your conscious answer to this question as you complete the categorization task in ▲ Table 17.2.

Many people notice that it takes longer to do the second list and that they make more mistakes. Even people who claim they are not prejudiced against women working outside the home tend nevertheless be slower and less accurate in classifying words into the categories *Male or Family* as opposed to *Female or Career*.

▲ **Table 17.2 The Implicit Association Test**

Below you will find two list of 12 words. Your job is to categorize them. Let's begin with List 1. Suppose, for example, that one of the words is *factory*. If you feel that *factory* belongs in the category "Male or Career," then you would touch (or mark) the O to the left of the word. Otherwise, you would mark the O to the right of *factory*. Now, take 20 seconds to classify each of the words in List 1. Place them into the correct categories as quickly and accurately as you can. Got the idea? Ready, set, go! Now try it again with the 12 new words in List 2. The only difference is that the categories have changed. Ready, set, go!

| Male or Career | List 1 | Female or Family | Male or Family | List 2 | Female or Career |
|---|---|---|---|---|---|
| | | | O | Home | O |
| O | Daniel | O | O | Manager | O |
| O | Sally | O | O | Domestic | O |
| O | House | O | O | Andrew | O |
| O | Kitchen | O | O | In-laws | O |
| O | Merchant | O | O | Jane | O |
| O | Company | O | O | Workplace | O |
| O | Emily | O | O | Sarah | O |
| O | Relatives | O | O | Office | O |
| O | Employment | O | O | Corporation | O |
| O | Baby | O | O | Siblings | O |
| O | Steven | O | O | John | O |
| O | Executive | | | | |

Source: Project Implicit, https://implicit.harvard.edu/implicit/

Coon, D., Mitterer, J., + Martini, T. (2019) Introduction to Psychology: Gateways to Mind & Behavior.

Why is there a difference? For many people, *Female* and *Family* seem to go together better than *Female* and *Career* do.

You just completed a version of an *implicit association test* (adapted from Nosek, Greenwald, & Banaji, 2005). If you Google the web, you will find that similar tests have been constructed for race, age, religion, ethnicity, disability, sexual orientation, weight, and many other stereotyped categories of people (Hofmann et al., 2005; Kite et al., 2005; Waller, Lampman, & Lupfer-Johnson, 2012). Apparently, we can harbor implicit (hidden) prejudices even when we do not explicitly own up to them (Anderson, 2010).

## Discrimination

Because it is so prevalent and damaging, let's focus on racism (Miller & Garran, 2008). Both racial prejudice and racism lead to **discrimination**—unfair actions toward people based on stereotyping and prejudice (Kassin, Fein, & Markus, 2017). Discrimination prevents people from doing things they should be able to do, such as buying a house, getting a job, or attending a high-quality school (Whitley & Kite, 2010). For example, in many cities, African Americans have been the targets of "racial profiling," in which police stop them without reason. Sometimes, they are merely questioned, but many are cited for minor infractions, such as a cracked taillight or an illegal lane change. For many law-abiding citizens, being detained in this manner is a rude awakening (Plous, 2003). It's also one reason many African Americans and other minority people in the United States distrust police and the legal system (Dovidio et al., 2002). As distinguished African-American psychologist Kenneth Clark said, "Racial prejudice ... debases all human beings—those who are its victims, those who victimize, and in quite subtle ways, those who are merely accessories."

## Becoming Prejudiced

*How do prejudices develop?* One major theory suggests that prejudice is a form of **scapegoating**, or blaming a person or a group for the actions of others or for conditions not of their making. Scapegoating is a type of **displaced aggression** in which hostilities triggered by frustration are redirected at "safer" targets (Glick, 2008; Reijntjes et al., 2013a).

One interesting classic test of this hypothesis was conducted at a summer camp for young men. The men were given a difficult test that they were sure to fail. In addition, completing the test caused them to miss a trip to the movies, which was normally the high point of their weekly entertainment. Attitudes toward Mexicans and Japanese were measured before the test and after the men had failed the test and missed the movie. Participants in this study, all European Americans, consistently rated members of the two ethnic groups lower after being frustrated (Miller & Bugelski, 1948). This effect has been easy to observe since the September 11, 2001, terrorist attacks in the United States, as people who look "foreign" have become targets for displaced anger and hostility (Ahluwalia & Pellettiere, 2010).

At times, the development of prejudice (like other attitudes) can be traced to direct experiences with members of the rejected group. A child who is repeatedly bullied by members of a particular ethnic group might develop a lifelong dislike for all members of the group. Yet even subtle influences, such as parents' attitudes, the depiction of people in books and on television, and exposure to children of other races can have an impact. By the time they are three years old, many children show signs of race bias (Katz, 2003). Sadly, once prejudices are established, they prevent us from accepting more positive experiences that could reverse the damage (Jackson, 2011).

## The Prejudiced Personality

Other research suggests that prejudice can be a general personality characteristic. Theodor Adorno and his associates (1950) described what they called the *authoritarian personality*. These researchers started out by studying anti-Semitism. In the process, they found that people who are prejudiced against one group tend to be prejudiced against *all* out-groups (Hodson, MacInnis, & Busseri, 2017; Kteily, Sidanius, & Levin, 2011).

*What are the characteristics of the prejudice-prone personality?* The **authoritarian personality** is marked by rigidity, inhibition, prejudice, and oversimplification (black-and-white thinking, so to speak). In addition, authoritarians exhibit *right-wing authoritarianism*, placing a highly value on social conformity. Authoritarians also tend to be very *ethnocentric*. **Ethnocentrism** refers to placing one's own group "at the center," usually by rejecting all other groups. In fact, authoritarians have a general *social dominance orientation* and think they are superior to everyone who is different, not just other ethnic groups (Bilewicz, 2017; Duckitt & Sibley, 2010).

To measure these qualities, the *F scale* was created (the *F* stands for *fascism*). This scale is made up of statements such as the ones that follow—to which authoritarians readily agree (Adorno et al., 1950):

**Authoritarian Beliefs**

- Obedience and respect for authority are the most important virtues that children should learn.
- People can be divided into two distinct classes: the weak and the strong.

---

**Systemic prejudice** Prejudice that has become institutionalized (that is, it is reflected in government policy, schools, and so forth) and that is enforced by the existing social power structure.

**Symbolic prejudice** Prejudice that is expressed in a disguised fashion.

**Implicit prejudice** Unconscious prejudiced thoughts and feelings about members of other groups.

**Discrimination (in social behavior)** Unfair actions based on stereotyping and prejudice.

**Scapegoating** Blaming a person or a group for the actions of others or for conditions not of their making.

**Displaced aggression** Redirecting aggression to a target other than the actual source of one's frustration.

**Authoritarian personality** A personality pattern characterized by rigidity, inhibition, prejudice, and an excessive concern with power, authority, and obedience.

**Ethnocentrism** Placing one's own group or race at the center—that is, tending to reject all other groups but one's own.