**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| NATIONAL EDUCATION ASSOCIATION-NEW HAMPSHIRE; OYSTER RIVER COOPERATIVE SCHOOL DISTRICT; DOVER SCHOOL DISTRICT; SOMERSWORTH SCHOOL DISTRICT; GRANTHAM SCHOOL DISTRICT; DOTTIE MORRIS; JAMES T. MCKIM, JR.; and NEW HAMPSHIRE OUTRIGHT<br><br>     Plaintiffs,<br><br>  v.<br><br>JOHN M. FORMELLA, in his official capacity only as the Attorney General of the State of New Hampshire;<br><br>CAITLIN DAVIS, in her official capacity only as the Commissioner of the New Hampshire Department of Education;<br><br>CHARLIE ARLINGHAUS, in his official capacity only as the Commissioner of the New Hampshire Department of Administrative Services; and<br><br>MONICA MEZZAPELLE, in her official capacity only as the State Treasurer of New Hampshire,<br><br>     Defendants. | Case No.: 1:25-cv-293-LM<br><br>**[\*\*\*TO BE PUBLICLY FILED\*\*\*]** |

**PLAINTIFFS' ASSENTED-TO MOTION TO SEAL THREE DECLARATIONS IN THE COMPLAINT AND IN SUPPORT OF PLAINTIFFS'**
**EMERGENCY MOTION FOR PRELIMINARY INJUNCTION**

**INTRODUCTION**

Pursuant to Local Rule 83.12 and Administrative Procedure for Electronic Case Filing 3.3,

Plaintiffs request to seal at Level II unredacted versions of three declarations filed by educators

1

and NEA-NH members—Members A, B, and C—in their August 8, 2025 Complaint and in support of Plaintiffs' August 11, 2025 Emergency Motion for Preliminary Injunction that contain personally identifiable information.  *See* ECF Nos. 1-35 and 15-35 (Member A Decl., Ex. 35), 1-36 and 15-36 (Member B Decl., Ex. 36), 1-37 and 15-37 (Member C Decl., Ex. 37) (public, redacted versions).

Plaintiff National Education Association-New Hampshire ("NEA-NH") brings this action not only on its own behalf as an organization injured by the anti-DEI provisions in House Bill 2—which, effective July 1, 2025, purport to prohibit the implementation or "promot[ion]" of, or engagement in, "initiatives, programs, training, or policies" in public entities and "public schools" that are "related" to "diversity, equity, or inclusion" (or "DEI")—but also on behalf of its allegedly injured members who have standing in their own right.  To show its members' injuries, NEA-NH has submitted declarations from three members as exhibits to Plaintiffs' Complaint and in support of their Emergency Motion for a Preliminary Injunction.  These declarations are from members who wish to remain anonymous in public filings with the Court due to their fear of potential adverse employment action, as well as of doxing, harassment, and threats, for challenging HB2.

These declarants are not parties.  However, even if the standard governing the question of whether a party can litigate a case pseudonymously applies to these declarants, this standard has been met to justify the submission of anonymous declarations.  Accordingly, Plaintiff NEA-NH asks for this Court's leave to file under seal at Level II unredacted versions of these three declarations that contain the name and personally identifiable information of these declarants.  Plaintiffs have publicly filed redacted versions of these declarations that do not identify these declarants by name and, instead, use pseudonyms in place of those members' legal names and redact any identifiable information.  *See* ECF Nos. 1-35 and 15-35 (Member A Decl., Ex. 35), 1-

36 and 15-36 (Member B Decl., Ex. 36), 1-37 and 15-37 (Member C Decl., Ex. 37). The United States District Court for the District of New Hampshire granted a motion to seal similar declarations from NEA-NH members in *National Education Association, et al. v. U.S. Dep't of Ed.*, No. 25-cv-091-LM (D.N.H. Apr. 8, 2025) (ECF No. 44) (McCafferty, C.J.), which challenged similar anti-DEI policies promulgated by the U.S. Department of Education.

At this preliminary phase in the litigation, Plaintiffs request sealing at Level II, meaning that these unredacted declarations containing personally identifiable information "may be reviewed only by the filer or, in the case of an order, the person to whom the order is directed without prior leave of court." *See* L.R. 83.12(b)(2). Upon the entry of an agreed-upon protective order governing Defendants' handling of these unredacted declarations, Plaintiffs anticipate that the sealing could be shifted to Level I under Local Rule 83.12(b)(1), giving Defendants' counsel access to these unredacted declarations pursuant to any protective order's terms.

The unredacted declarations will be conventionally filed, provisionally under seal under Local Rule 83.12(d). Pursuant to Local Rule 83.12(c)(4) requiring Plaintiffs to inform the Court whether they "seek[] to seal the motion to seal and/or all related docket text entries," Plaintiffs do *not* ask that this Motion be sealed. Plaintiffs have no objection, upon sealing, to separate docket entries being entered that state "The Unredacted Declaration of Member [A/B/C]. Filed Under Seal."

## I.    GOVERNING LAW[1]

As other courts of appeals have done,[2] the First Circuit has recently articulated a framework for assessing whether a party may litigate a case using a pseudonym.  *See Doe v. Mass. Inst. of Tech.*, 46 F.4th 61, 72 (1st Cir. 2022) ("*MIT*"); *Doe v. Town of Lisbon*, 78 F.4th 38 (1st Cir. 2023) (applying *MIT* standard to affirm denial of motion to unseal and reveal name of pseudonymous litigant).  The *MIT* court recognized that a district court "enjoys broad discretion to quantify the need for anonymity in the case before it" and to make the "ultimate determination as to whether that need outweighs the public's transparency interest."  46 F.4th at 67, 72.  The court stressed that, when exercising this broad discretion, a "district court . . . should balance the interests asserted by the movant in favor of privacy against the public interest in transparency, taking all relevant circumstances into account."  *Id.* at 72.

As to the circumstances that are relevant to this balancing, the *MIT* court offered four general scenarios "in which party anonymity ordinarily will be warranted," namely cases in which (1) the party "reasonably fears" that disclosure of their name will result in "unusually severe physical or mental harm"; (2) disclosure of the party's name will likely lead to disclosure of a nonparty's identity, with consequent harm to such an "innocent" non-party; (3) "anonymity is

---

[1] As shown in Part II below, it is clear that Members A, B, and C satisfy the balancing test described below, which by its terms applies where a *party* seeks to litigate a case anonymously.  Should the Court agree, there will be no need to determine whether a less demanding approach should obtain where a *non-party* seeks to submit evidence relevant to a party's claim, as is the case here.  That said, the three courts of appeal that have squarely addressed the issue held that a membership organization can rely on pseudonymous declarations to support its standing to sue in a representative capacity, with no mention of a need to satisfy any balancing test first.  *See Am. All. for Equal Rts. v. Fearless Fund Mgmt., LLC,* 103 F.4th 765 (11th Cir. 2024) (holding that "identification of [organization's] affected members by the pseudonyms Owner A, Owner B, and Owner C poses no bar to its standing to sue"); *Speech First, Inc. v. Shrum*, 92 F.4th 947, 951 (10th Cir. 2024) ("[O]rganizational standing is proper even when the qualifying member of the plaintiff organization is anonymous."); *Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 41 F.4th 586, 594 (D.C. Cir. 2022) (holding, in case in which union relied on survey of unnamed members to establish injury, that "anonymity is no barrier to [organizational] standing").

[2] *See, e.g.*, *In re: Chiquita Brands Int'l, Inc.*, 965 F.3d 1238, 1247 (11th Cir. 2020); *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 190 (2d Cir. 2008); *Doe v. Megless*, 654 F.3d 404 (3d Cir. 2011); *James v. Jacobson*, 6 F.3d 233, 238 (4th Cir. 1993).

necessary to forestall a chilling effect on future litigants who may be similarly situated"; and (4) the lawsuit is bound up with a prior proceeding subject by law to confidentiality protections. *Id.* at 71.

The court hastened to add that these four "paradigm[atic]" categories do not "capture the entire universe of cases in which pseudonymity may be appropriate" but instead "are rough cuts" and that "a party whose case for pseudonymity appears weak when each paradigm is analyzed separately may nonetheless make a persuasive showing when multiple paradigms are implicated." *Id.* at 72. Indeed, the court's reasoning makes clear that it chose against attempting to establish a comprehensive list of relevant factors precisely "[b]ecause the problem is complex and the cases are not all cut from the same cloth," making it "inevitable" that courts will have to weigh, from a multitude of potentially relevant factors, those that are relevant to the cases before them. *Id.* at 70 (quoting *In re Sealed Case*, 931 F.3d at 97, for the proposition that a "precise list of factors matters less than whether court took proper account of 'the factors relevant to the case before it' that 'inform the ultimate balancing of the public and private interests at stake'"). Because "the appropriate test must center on the totality of the circumstances," the court stressed that, "[i]n the last analysis, district courts enjoy broad discretion to identify the relevant circumstances in each case and to strike the appropriate balance between the public and private interests." *Id.* at 70.

## II.    ARGUMENT

Pursuant to Local Rule 83.12(c)(2) requiring Plaintiff NEA-NH to provide "the factual and legal basis to justify sealing the filing," sealing is justified here. These three declarants seeking pseudonymity are not parties. However, even if the standard governing the question of whether a party can litigate a case pseudonymously applies to these declarants, this standard has been met to justify the submission of anonymous declarations.

The totality of the relevant circumstances here militates decisively in favor of allowing the three NEA-NH members (Members A, B, and C) identified in the Complaint and in their declarations in support of Plaintiffs' Emergency Motion for a Preliminary Injunction to proceed pseudonymously. These members have well founded fears of suffering serious harms—the loss of their livelihoods as well as doxing, harassment, and threats—if they are identified by name in support of litigation opposing the New Hampshire legislature's ban on programs that are "DEI related." *See Doe v. United States Sec'y of State*, 707 F. Supp. 3d 142, 144 (D.N.H. 2023) (applying the *MIT* factors, holding that "Doe reasonably fears that disclosure of his identity in this action will cause him severe physical and psychological harm"). At the same time, there is no appreciable public interest to be served by naming these declarants and no prejudice to Defendants that could arise from preventing disclosure of the declarants' names in public filings with the court.

## A.    Members A, B, and C Reasonably Fear Serious Harms if Their Identities are Revealed in Public Filings

Members A, B, and C are New Hampshire public school teachers. All three declarants teach subjects, and employ teaching methodologies, that can be understood to fall within the loose conception of "DEI" set out in HB2. Member A Decl. ¶ 6 (ECF Nos. 1-35 and 15-35, Ex. 35); Member B Decl. ¶ 5 (ECF Nos. 1-36 and 15-36, Ex. 36); Member C Decl. ¶ 6 (ECF Nos. 1-37 and 15-37, Ex. 37). All three declarants fear that being publicly named as supporting Plaintiffs' challenge to HB2 will expose them to potential reprisals by current or future employers and to doxing (*i.e.*, wide dissemination of personally identifying information such as their addresses and employers), harassment, and threats from supporters of HB2 or members of the public. Member A Decl. ¶ 22 (ECF Nos. 1-35 and 15-35, Ex. 35); Member B Decl. ¶ 18 (ECF Nos. 1-36 and 15-36, Ex. 36); Member C Decl. ¶ 27 (ECF Nos. 1-37 and 15-37, Ex. 37). Those fears are well founded.

It is, first of all, entirely reasonable for Members A, B, and C—whose work could be considered to fall within HB2's conception of "DEI-related" programs—to fear for their livelihoods if they are identified by name in support of a challenge to HB2 and Defendant New Hampshire Department of Education's ("NHDOE") enforcement. And this holds true regardless of whether their employers agree or disagree with the legislature's prohibition on impermissible "DEI-related" "programs." That is because education institutions can reasonably be expected to believe that continuing to employ such educators will make their institutions targets for enforcement action. The public record is rife with examples of educators who lost their jobs for teaching about race as states began passing laws threatening public education funding to schools for maintaining instruction or other programs involving "divisive concepts."[3]

Members A, B, and C have well-founded fears that being identified by name in public court filings opposing HB2 will expose them to doxing, harassment, and threats. Here, too, a raft of public reporting amply supports the reasonableness of these fears.[4] One article has reported such conduct as: death threats delivered to school administrators' homes; the allegation that an educator

---

[3] *See, e.g.*, Hannah Natanson and Moriah Balingit, "Caught in the culture wars, teachers are being forced from their jobs," *Washington Post* (June 16, 2022) (documenting 160 public-school educators who lost their jobs because of political debates of teaching concerning race and other issues), https://www.washingtonpost.com/education/2022/06/16/teacher-resignations-firings-culture-wars/; Claudette Riley, "Southwest Missouri high school teacher accused of using critical race theory loses job," *Springfield News-Leader* (April 7, 2022), https://www.news-leader.com/story/news/education/2022/04/07/greenfield-missouri-teacher-kim-morrison-accused-teaching-critical-race-theory-crt-loses-job/7264924001/; Hannah Natanson, "A White teacher taught White students about White privilege. It cost him his job," *Washington Post* (Dec. 6, 2021), https://www.washingtonpost.com/education/2021/12/06/tennessee-teacher-fired-critical-race-theory/; Tyler Kingkade "Critical race theory battles are driving frustrated, exhausted educators out of their jobs," *NBC News* (July 12, 2021) (reporting that "[b]attles over diversity and equity initiatives in public schools have resulted in administrators and teachers being fired or resigning over discussions about race").

[4] *See, e.g.*, Lois Beckett, "Outrage as Anti-LGBTQ+ Protest at California School Board Turns Violent," *The Guardian* (June 7, 2023), https://www.theguardian.com/us-news/2023/jun/07/lgbtq-violence-protest-glendale-unified-school-district; Kiara Alfonseca, "Teachers, Librarians Targeted by Angry Parents Over LGBTQ Books Speak Out," ABC News (May 19, 2023), https://abcnews.go.com/US/teachers-librarians-targeted-angry-parents-lgbtq-books-speak/story?id=99390577; Evie Blad, "School Boards Are Limiting Public Comment," *Education Week* (Jan. 18, 2023), https://www.edweek.org/leadership/school-districts-are-limiting-public-comment-will-that-erode-trust/2023/01; Eesha Pendharkar, "Backlash, Hostility, and Safety Fears: What It's Like to Be a Chief Equity Officer in the Anti-CRT Era," *Education Week* (July 19, 2022), https://www.edweek.org/leadership/backlash-hostility-and-safety-fears-what-its-like-to-be-a-chief-equity-officer-in-the-anti-crt-era/2022/07.

is a "sexual predator" because of their work with LGBTQ+ students; and physical confrontations and assaults at board meetings, including one at which "angry parents attempted to make a 'citizen's arrest' of a school principal, using zip ties as handcuffs."[5]  We also have seen such harassment in New Hampshire.  After a political group in New Hampshire published an educator's name for signing an online petition pledging to teach "honest history," he was subjected to "online harassment, threats and obscenities."  He left the profession after the police department sent patrols to his home in light of these threats.  *See* Plaintiffs' Statement of Undisputed Facts in Support of Their Joint Memo. of Law in Support of Their Mot. for Summary Judgment in *Local 8027, et al. v. Edelblut, et al.*, No. 1:21-cv-01077-PB (ECF No. 85-111, ¶ 157, at pp. 71-72).  This case is likely to generate media attention and public scrutiny which further amplifies the necessity of anonymity.

Two comprehensive reports show that school board meetings have resulted in parents targeting teaching and instructional materials that deal with issues of race, as well as educators' and school officials' efforts to create safe and welcoming learning and working environments for students.[6]

A 2023 report by the non-profit investigative journalism organization ProPublica also examined public records and hundreds of hours of footage—from school board meeting feeds, social media, and police bodycam videos—showing how "protesters have derailed school board meetings across the country," turning the meetings into "polarized battlegrounds over COVID-19 safety measures, LGBTQ+ student rights, 'obscene' library books and attempts to teach children

---

[5] Blad, "School Boards Are Limiting Public Comment," *supra* note 5.
[6] *See* Nicole Carr & Lucas Waldron, "How School Board Meetings Became Flashpoints for Anger and Chaos Across the Country," *ProPublica* (July 19, 2023), https://projects.propublica.org/school-board-meetings-flashpoints-for-anger-chaos/; Gabriella Borter, *et al.*, "School Boards Get Death Threats Amid Rage Over Race, Gender, Mask Policies," *Reuters* (Feb. 15, 2022), https://www.reuters.com/investigates/special-report/usa-education-threats/.

about systemic racism in America."[7]  ProPublica's analysis "identified nearly 90 incidents in 30 states" involving "[a]ssaults, threats, and disruption, including an instance in which attendees took over the meeting," many of which "escalated into not just shouting matches and threats but also arrests and criminal charges."[8]  The report found that "at least 59 people were arrested or charged" over the course of the 18-month period from May 2021 to November 2022.[9]

Similarly, a 2022 report from Reuters, based on public records and interviews with dozens of school board members from 15 states, uncovered 220 examples of threats and intimidation directed at school officials.[10]  The report also found the same trajectory of protest activity as that documented by ProPublica, as illustrated by the experience of school board members in Loudon County, Virginia: "The board in Loudoun County, a Washington suburb, first came under fire in 2020 over pandemic school closures.  Anger built as the district implemented anti-racism efforts in August of that year, including teacher training.  By June 2021, many parents were also incensed by a proposed policy to allow transgender students to use bathrooms matching their preferred gender identity."[11]

In sum, the foregoing shows that the fears of doxing, harassment, and threats articulated by Members A, B, and C—along with their fears of losing their livelihoods—if they are identified by name in public court filings in this case are eminently reasonable and well founded regardless of the districts employing Members A, B and C express support of this lawsuit.  This conclusion

---

[7] *Id.*

[8] *Id.*

[9] *Id.*

[10] Borter, *et al.*, "School Boards Get Death Threats Amid Rage Over Race, Gender, Mask Policies," *supra* note 7.  *See also* Joe Heim, *et al.*, "Residents left fuming, fearful after contentious Loudoun County school board meeting," *Washington Post* (June 24, 2021), https://www.washingtonpost.com/local/education/loudoun-schools-transgender-critical-race-theory/2021/06/23/1691dfc2-d453-11eb-ae54-515e2f63d37d_story.html ("Anger and frustration boiled over at the Tuesday meeting where a full house of parents, students and other residents grew increasingly rancorous during a public comment session on the district's transgender rights policy and racial equity plans.").

[11] Borter, *et. al.*, "School Boards Get Death Threats Amid Rage Over Race, Gender, Mask Policies," *supra* note 7.

places their request to proceed pseudonymously squarely within the *MIT* court's first paradigmatic

scenario in which party anonymity ordinarily will be warranted."

**B.    No Appreciable Public Interest Would Be Served by Naming Members A, B, and C and No Prejudice to the Defendants Could Arise from Preventing Disclosure of their Names in Public Filings with the Court.**

On the other side of the balance, there is neither any appreciable public interest in

compelling disclosure of the names of Members A, B, and C nor any prejudice to the Defendants

from their proceeding under pseudonyms.

As to the former, there is a "weak public interest in knowing the litigant's identities" where,

as here, the case raises issues of a "purely legal nature."  *Doe v. Megless*, 654 F.3d 404, 409 (3d

Cir. 2011).  This already weak public interest is all the more insubstantial here, given that Members

A, B, and C are not parties but <u>*declarants*</u> who are providing evidence of HB2's allegedly injurious

effects in support of NEA-NH's standing and entitlement to injunctive relief.

Moreover, given the declarants' well-founded fears of doxing, harassment, and abuse if

their names were to be publicly disclosed, there is a public interest <u>*favoring*</u> anonymity here:

inasmuch as the *MIT* court recognized that anonymity is apt to be warranted when "necessary to

forestall a chilling effect on" other potential litigants, 46 F.4th at 71, it is very much to the point

that, for all the reasons adduced in Part II.A. above, not only Members A, B, and C but other

similarly situated educators would almost certainly be deterred from providing evidence (much

less participating as parties) in challenges to New Hampshire's anti-DEI efforts if doing so meant

that their identities must be made part of the public record.

Nor will the filing of anonymous declarations from Members A, B, and C interfere with

this court's administrative need to check for potential conflicts of interest, as Plaintiffs will file the

names of the declarants provisionally under seal under Local Rule 83.12(d)—just as the *MIT*

decision requires.  *See* 46 F.4th at 77 (noting that "courts tasked with resolving pseudonymity

motions must be afforded the anonymous party's true name under seal" and that district courts may make provision for this requirement "either formally (by adoption of a local rule or a publicly available operating procedure) or informally (by apprising counsel, on an ad hoc basis, of the need to submit the anonymous party's name, under seal, to the court)").

Finally, Defendants face no prejudice by reason of the NEA-NH member declarants' proceeding anonymously. The presumption against anonymity is weaker in cases against the government, as they "involve no injury to the Government's 'reputation,'" as opposed to claims against private parties, "the mere filing [of which] may cause damage to their good names and reputation and may also result in economic harm." *S. Methodist Univ. Ass'n of Women L. Students v. Wynne & Jaffe*, 599 F.2d 707, 713 (5th Cir. 1979). In any event, upon the entry of an agreed-upon protective order governing Defendants' handling of these unredacted declarations, Plaintiffs anticipate that this sealing can be shifted to Level I under L.R. 83.12(b)(1), which would give Defendants' counsel access to these unredacted declarations pursuant to the protective order's terms.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request the that the Court seal at Level II the unredacted versions of three declarations filed by educators—Members A, B, and C—in Plaintiffs' Complaint and in support of Plaintiffs' Emergency Motion for Preliminary Injunction that contain personally identifiable information.

## CERTIFICATE OF CONCURRENCE

Pursuant to Local Rule 7.1(c), undersigned counsel for Plaintiffs certify that Plaintiffs have made a good faith attempt to obtain concurrence in the relief sought. Plaintiffs sought concurrence

on August 11, 2025, and Defendants indicated their assent to the relief requested on August 15, 2025.

WHEREFORE, Plaintiffs respectfully request that this Court:

(a) Seal at Level II the unredacted versions of three declarations filed by educators—Members A, B, and C—in Plaintiffs' Complaint and in support of Plaintiffs' Emergency Motion for Preliminary Injunction that contain personally identifiable information. *See* ECF Nos. 1-35 and 15-35 (Member A Decl., Ex. 35), 1-36 and 15-36 (Member B Decl., Ex. 36), 1-37 and 15-37 (Member C Decl., Ex. 37) (public, redacted versions); and

(b) Grant all other relief that it deems just and equitable.

Dated: August 15, 2025

Respectfully submitted,

/s/ Gilles R. Bissonnette

Zoe Brennan-Krohn*
Malhar Shah*
Disability Rights Program
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
425 California Street
San Francisco, CA 94104
(415) 343-0769
zbrennan-krohn@aclu.org
mshah@aclu.org

Gilles R. Bissonnette (N.H. Bar No. 265393)
Henry R. Klementowicz (N.H. Bar No.
21177)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NEW HAMPSHIRE
18 Low Avenue
Concord, NH 03301
(603) 224-5591
gilles@aclu-nh.org
henry@aclu-nh.org

Sarah Hinger*
Alexis Alvarez*
Racial Justice Program
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 519-7882
shinger@aclu.org
alexisa@aclu.org

Callan E. Sullivan┬ (N.H. Bar No. 20799)
Lauren Snow Chadwick┬ (N.H. Bar No.
20288)
NATIONAL EDUCATION ASSOCIATION-NEW
HAMPSHIRE
9 South Spring Street
Concord, NH 03301
(603) 224-7751
csullivan@nhnea.org
lchadwick@nhnea.org

Chris Erchull (N.H. Bar No. 266733)
Hannah Hussey*
GLBTQ LEGAL ADVOCATES & DEFENDERS
18 Tremont, Suite 950
Boston, MA 02108
(617) 426-1350
cerchull@gladlaw.org
hhussey@gladlaw.com

* *pro hac vice* applications pending
┬ appearing only on behalf of NEA-NH