# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| NATIONAL EDUCATION ASSOCIATION-NEW HAMPSHIRE; OYSTER RIVER COOPERATIVE SCHOOL DISTRICT; DOVER SCHOOL DISTRICT; SOMERSWORTH SCHOOL DISTRICT; GRANTHAM SCHOOL DISTRICT; DOTTIE MORRIS; JAMES T. MCKIM, JR.; and NEW HAMPSHIRE OUTRIGHT, <br><br> Plaintiffs, <br><br><br> v. <br><br><br><br> JOHN M. FORMELLA, in his official capacity only as the Attorney General of the State of New Hampshire; <br><br> CAITLIN DAVIS, in her official capacity only as the Commissioner of the New Hampshire Department of Education; <br><br> CHARLIE ARLINGHAUS, in his official capacity only as the Commissioner of the New Hampshire Department of Administrative Services; and <br><br> MONICA MEZZAPELLE, in her official capacity only as the State Treasurer of New Hampshire, <br><br> Defendants. | **Case No.: 1:25-cv-293** <br><br><br><br><br><br><br><br><br> **DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' EMERGENCY MOTION FOR PRELIMINARY INJUNCTION** |

TABLE OF CONTENTS

INTRODUCTION .................................................................................................................. 3

BACKGROUND .................................................................................................................... 4

I.    The State Statutes.................................................................................................... 4

II.   The Plaintiffs........................................................................................................... 6

III.  Plaintiffs' Request for Injunctive Relief................................................................. 7

STANDARD OF REVIEW ................................................................................................... 9

ARGUMENT ....................................................................................................................... 10

IV.   Plaintiffs have not established that there is a substantial likelihood that they have standing.................................................................................................................... 10

V.    To the extent a plaintiff has standing, those plaintiffs have not demonstrated a likelihood of success on the merits. ....................................................................................... 13

a.    The challenged provisions do not violate the Fourteenth Amendment's Prohibition on Vagueness. ............................................................................................................. 13

i.    Application and Analysis............................................................................ 17

b.    The challenged provisions do not violate the First Amendment. ................................ 29

i.    Primary and Secondary School Teachers .................................................. 30

ii.   Higher Education ....................................................................................... 35

c.    The challenged provisions do not conflict with the ADA, the IDEA, or Section 504 and, even if it did, that does not render it facially unconstitutional or justify the broad relief sought by NEA-NH and the School Districts. ....................................................... 36

i.    Preemption Standard.................................................................................. 37

ii.   The challenged provisions do not conflict with the ADA, Section 504, or the IDEA. 38

VI.   The plaintiffs have not demonstrated that they will suffer irreparable harm absent an injunction. ............................................................................................................... 41

VII.  The balance of the equities and public interest favors denying injunctive relief.......... 43

VIII. If the Court issues injunctive relief, that relief cannot be any broader than is necessary to redress the actual harms the plaintiffs can demonstrate. ...................................... 44

CONCLUSION.................................................................................................................... 45

## INTRODUCTION

The plaintiffs are not entitled to the preliminary injunctive relief that they seek for at least the following reasons.

First, the plaintiffs have not shown (and cannot show) that they there is a substantial likelihood that they have standing to maintain the claims on which they have premised their motion for preliminary injunction.

Second, the plaintiffs are not likely to succeed on the merits.  RSA 21-I:112-116 and RSA 186:71-77 make clear what they prohibit and preclude and are therefore not unconstitutionally vague in violation of the Fourteenth Amendment.  The statutes also do not violate the First Amendment rights of any plaintiff because, to the extent they regulate speech at all, they regulate government speech.   Finally, no preemption issue exists.  The IDEA, ADA, and the Rehabilitation Act are federal statutes that place certain obligations on public entities and public schools; they are not initiatives, policies, or programs within the meaning of RSA 21-I:112-116 and RSA 186:71-77, and they do not require public entities or public schools to have initiatives, policies, programs, or trainings that classify individuals "based on a characteristic identified under RSA 354-A:1 for the purpose of achieving demographic outcomes."

Third, the plaintiffs have shown no immediate risk of irreparable harm.  RSA 21-I:112-116 and RSA 186:71-77 apply to entities, not individuals.  They prohibit those entities from implementing, promoting, and engaging in certain DEI-related initiatives, policies, programs, and trainings.  They further prohibit the use of "state funds" for certain "DEI-activities."  No plaintiff has shown how these prohibitions cause them to face immediate irreparable harm.

Fourth, the balance of the equities and the public interest do not tip in plaintiffs favor. There is a substantial interest in ensuring that laws duly enacted in the name of the people by their elected representatives are followed and enforced. The government faces irreparable harm

any time a duly enacted law is enjoined. These interests far outweigh any interest the plaintiffs

may have in an injunction, particularly given the plaintiffs' delay in seeking relief.

Accordingly, for all of the above reasons, and the reasons explained in further detail

below, the plaintiffs are not entitled to the preliminary injunctive relief that they seek.

## BACKGROUND

I.     **The State Statutes**

During the 2025 legislative session, after debate, negotiation, and amendments, the state

legislature passed and Governor Kelly Ayotte signed into law House Bill 2, which added into

RSA chapter 21-I and RSA chapter 186 provisions that prohibit public entities and public

schools from "implement[ing], promot[ing], or otherwise engag[ing] in any DEI-related

initiatives, programs, training, or policies." RSA 21-I:113; RSA 186:72. Both statutes define

"DEI" to mean "any program, policy, training, or initiative that classifies individuals based on a

characteristic identified under RSA 354-A:1 for the purpose of achieving demographic

outcomes, rather than treating people equally under the law."  RSA 21-I:113 and RSA 186:72

therefore prohibit public entities and public schools from implementing, promoting, or otherwise

engaging in initiatives, programs, training, or policies that classify persons "based on a

characteristic identified under RSA 354-A:1 [such as race or gender] for the purpose of

achieving demographic outcomes, rather than treating people equally under the law"  The word

"demographic" means of or relating to demographics, and "demographics" means the statistical

characteristics of human populations (such as age or income) used especially to identify

markets.[1]  The word "outcome" means "something that follows as a result or consequence."[2]

---

[1] https://www.merriam-webster.com/dictionary/demographic.
[2] https://www.merriam-webster.com/dictionary/outcome

These prohibitions are clear.  Under them, a public entity may not implement a policy or initiative that seeks to staff itself internally with a certain number or percentage of persons of a certain age, race, or gender.  A public school may not implement a policy or initiative that seeks to place a certain number or percentage of students based on their race or gender into honors courses.  The plain language of RSA 21-I:113 and RSA 186:72 recognize that such initiatives, programs, trainings, and policies do not "treat[] people equally under the law" but instead provide certain benefits or privileges for the purpose of achieving a demographic outcome.

RSA 21-I:113 also forbids the use of "state funds" for "DEI-related activities" such as "implicit bias training, DEI assessments, critical race theory, or race-based hiring, promotion, or contracting preferences."  For public entities controlled and operated entirely by the State, this prohibition functionally bars these activities.  For other public entities like municipalities, however, this prohibition only bars the use of "state funds" for those activities.   RSA 186:76 contains slightly different language.  It specifies that "[n]o state funds shall be expended to public schools for DEI-related activities, including but not limited to implicit bias training, DEI assessments, critical race theory, or race-based hiring, promotion, or contracting preferences."   It does not prohibit public schools from using other sources of funding for such activities.  These prohibitions are also clear.

RSA 21-I:114 and RSA 186:73 also regulate public entity and public-school contracts.  RSA 21-I:114 prohibits agencies and political subdivisions from "enter[ing] into or renew[ing] any contract that includes DEI-related provisions, including requirements for contractors to implement DEI programs, conduct DEI training, or comply with DEI-related reporting obligations."  RSA 186:73 contains a similarly worded prohibition that applies to public schools. These prohibitions do not require public entities or public schools to cancel existing contracts.

RSA 21-I:115 requires state agencies to review and report on contracts containing DEI-related provisions.  RSA 21-I:116 requires the department of justice to establish "a process by which all political subdivisions review their existing contracts for the presence of DEI-related provisions."

RSA 186:75 requires the commissioner of the department of education to establish a process by which all public schools shall conduct a review of existing contracts for DEI-related provisions and must filed a report so identifying any contract containing DEI-related provisions no later than September 30, 2025.  RSA 186:76 requires the commissioner of the department of education to eventually produce a final compliance report based on the reporting done through RSA 186:75.  Finally, under RSA 187:77, if a public school fails to abide any section of RSA 186:71-:77, either knowingly or unknowingly, the commissioner of the department of education shall immediately halt all sources of public funding to that public school until the school comes into compliance with the subdivision.  RSA 187:77, I.  The commissioner of the department of education must notify the state treasurer if a public school is not in compliance with the subdivision, and the treasurer must thereafter halt all forms of public funding to the school until the commissioner has certified that the school has come into compliance with the subdivision. RSA 187:77, II.

## II.    The Plaintiffs

The plaintiffs consist of the "Organizational Plaintiffs" –  National Education Association-New Hampshire (NEA-NH), a non-profit that acts on behalf of its members, including teachers and educators, and  is  concerned about vague statutory language and ambiguous statutory terms particularly around whether they are allowed to discuss race and diversity in education (*see* ECF 1 at ¶¶21-35); and New Hampshire Outright, a non-profit

organization focused on serving, supporting, and advocating for LGBTQ+ youth and their families in New Hampshire, who are concerned that RSA 21-I:112-16 and RSA 186:71-77 (hereinafter, "challenged provisions")may lead to censorship and cancellation of some of their training programs offered to schools (*see id*. at ¶¶100-106). The "School District Plaintiffs" are four distinct school districts, who are primarily concerned with steering clear of any language or initiative that could be construed as breaching HB 2 (*see id*. at ¶¶36-75). The "Individual Plaintiffs" consist of a Keene State College educator, suing in her individual capacity, who is also concerned about her own perceptions that the law restricts the use of certain language, fearing that using terms like "implicit bias" and "systemic racism" in an educational setting may lead to legal repercussions against her, ultimately hindering her ability to engage in discussions about diversity and inclusivity (*see id.* at ¶¶76-90); and a private organizational performance speaker who is concerned that the challenged provisions will force him to alter his training programs and consulting work on inclusion, diversity, equity, and accessibility, as it is his perception that the law's vague terms may restrict his ability to discuss concepts like gender, race, and bias (*see id*. at ¶¶91-99).

Effectively, all plaintiffs bring this case because they fear that HB 2's broad language compels them to steer clear of particular terms—such as "implicit bias," "systemic racism," "DEI," "equity," or any reference to race, gender, or disability. But, where they are wrong is that the statutory scheme is precisely intended to preserve a neutral, non-ideological curriculum and to protect public funding from being tied to contested sociopolitical concepts.

### III.    Plaintiffs' Request for Injunctive Relief

Plaintiffs advance three distinct theories on which they seek injunctive relief.  (*see* ECF 14 [cover motion] at 2) – plaintiffs NEA-NH, Dottie Morris, James McKim., Jr., and New

Hampshire Outright (*but not* the School Districts) argue that the state statutes at issue are void for vagueness under the  Fourteenth Amendment, ECF 1 at ¶¶204-214; NEA-NH and Dottie Morris (*but not* the School Districts, New Hampshire Outright, or James McKim, Jr.) argue that the state statutes at issue  violate the right to free speech and association under the First Amendment, *id.* at ¶¶215-224; and NEA-NH, School Districts, Dottie Morries, and James T. McKim, Jr. (*but not* New Hampshire Outright) argue that the state statutes at issue are  pre-empted by the ADA, Section 504, and IDEA. *Id.* at ¶¶225-239. *See Table 1.*

| Claim | Plaintiffs who assert it |
|---|---|
| **14th Amendment (vagueness)** | NEA-NH, Dr. Morris, James McKim, Jr., New Hampshire Outright |
| **1st Amendment (free speech & association)** | NEA-NH, Dr. Morris |
| **Pre-empted by ADA/§504/IDEA** | NEA-NH, School Districts, Dr. Morris, James T. McKim, Jr. |

*Table 1*

Yet, the collective plaintiffs fail to make a reasonable argument as to how they have standing to bring their specific claims. Moreover, this is not a class action. As such, if any injunction should issue, which it should not, it should issue solely relating to the specific plaintiff(s) where they have met the preliminary injunction standard based on specific grounds for a specific cause of action within this specific case itself. *See Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2548 (2025) ("Traditionally, courts issued injunctions prohibiting executive officials from enforcing a challenged law or policy only against the plaintiffs in the lawsuit. [The proposed

injunction] reflect[s] a more recent development: district courts asserting the power to prohibit enforcement of a law or policy against *anyone*. These injunctions—known as 'universal injunctions'—likely exceed the equitable authority that Congress has granted to federal courts.").

## STANDARD OF REVIEW

"[A] preliminary injunction is an extraordinary remedy that may be granted only by a clear demonstration by a plaintiff of the merits of such a request." *Dupont v. Dubois*, Nos. 97-1167, 97-1786, 97-2134, 1998 U.S. App. LEXIS 16313, *2-3 (1st Cir. July 15, 1998) (quoting 13 Moore's Fed. Prac. § 65.20, at 65-29 (3d ed. 1998)) (internal quotations omitted). The bar is a high one. This "extraordinary form of relief" requires a plaintiff to show that the party "is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Brox v. Hole*, 83 F.4th 87, 91 (1st Cir. 2023) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)) (internal quotations omitted).

The first factor, likelihood of success, is "[t]he sine qua non of [the] four-part inquiry," *New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002), and the second factor, irreparable harm, also "constitutes a necessary threshold showing for an award of preliminary injunctive relief," *González-Droz v. González-Colon*, 573 F.3d 75, 79 (1st Cir. 2009). The third factor focuses upon the "hardship to the movant if an injunction does not issue as contrasted with the hardship to the nonmovant if it does." *Rosario-Urdaz v. Rivera-Hernandez,* 350 F.3d 219, 221 (1st Cir. 2003). The final factor concerns "the effect, if any, that an injunction (or the withholding of one) may have on the public interest." *Corp. Techs., Inc. v. Harnett*, 731 F.3d 6, 9 (1st Cir. 2013). The plaintiffs bear the burden with respect to each element. *March v. Mills*, 867 F.3d 46, 52–53 (1st Cir. 2017).

## ARGUMENT

**IV.    Plaintiffs have not established that there is a substantial likelihood that they have standing.**

Federal courts presume that causes of action lie outside their limited Article III constitutional authority, so plaintiffs have the burden to establish subject-matter jurisdiction by a preponderance of the evidence.  *See Spencer v. Doran*, 560 F. Supp. 3d 648, 651 (D.N.H. 2021) (citing *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)).  "[S]tanding is a prerequisite to a federal court's subject matter jurisdiction."  *Hochendoner v. Genzyme Corp.*, 823 F.3d 724, 730 (1st Cir. 2016).  jurisdiction."  *Id.* (citing *Valentin v. Hosp. Bella Vista*, 254 F.3d 358, 363 (1st Cir. 2001)).

"Each element of Article III standing must be supported with the manner and degree of evidence required at the successive stages of the litigation." *Pietrangelo v. Sununu*, 2021 DNH 067, 13 (cleaned up). "The 'merits' on which plaintiff must show a likelihood of success encompass not only substantive theories but also establishment of jurisdiction, including standing." *Id.* at 13–14 (cleaned up; collecting cases). "In other words, a party who seeks a preliminary injunction 'must show a "substantial likelihood" of standing.'" *Id.* at 14 (quoting *Food & Water Watch, Inc. v. Vilsak*, 808 F.3d 905, 913 (D.C. Cir. 2015)). "This is so because an affirmative burden of showing likelihood of success on the merits necessarily includes a likelihood of the court's *reaching* the merits, which in turn depends on a likelihood that plaintiff has standing." *Id.* (cleaned up; emphasis in original). "A party who fails to show a substantial likelihood of standing is not entitled to a preliminary injunction." *Id.* (citation and quotation marks omitted).

"At the preliminary injunction stage, a plaintiff's burden to demonstrate standing will normally be no less than that required on a motion for summary judgment." *Green Haven Prison*

*Preparative Meeting of the Religious Soc'y of Friends v. N.Y. State Dep't of Corr. & Cmty. Supervision*, 16 F.4th 67, 78 (2d Cir. 2021) (citation and quotation marks omitted). "Accordingly, to establish standing for a preliminary injunction, a plaintiff cannot rest on mere allegations but must set forth by affidavit or other evidence specific facts that establish the three familiar elements of standing: injury in fact, causation, and redressibility." *Id.* (cleaned up).

"'[S]tanding is not dispensed in gross.'" *Hochendoner v. Genzyme Corp.*, 823 F.3d 724, 733 (1st Cir. 2016) (quoting *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996)). "The appropriate inquiry must be whether each particular plaintiff is entitled to have a federal court adjudicate each particular claim he asserts." *Id.* (citation omitted). The standing inquiry is therefore "both plaintiff-specific and claim-specific." *Pagan v. Calderon*, 448 F.3d 16, 26 (1st Cir. 2006). Each plaintiff must have standing at the time the suit was commenced and maintain standing throughout the suit. *Carney v. Adams*, 592 U.S. 53, 60 (2020).

In this case, different plaintiff groups are subject to different standing requirements. The organizational plaintiffs, for example, must show that they either have organizational standing to sue on their own behalf, *see Food & Drug Admin. v. All. for Hippocratic Med.,* 602 U.S. 367, 393 (2024), or associational standing to sue on behalf of their members, *Equal Means Equal v. Ferriero*, 3 F.4th 24, 29 (1st Cir. 2021). The individual plaintiffs must show that *they themselves* satisfy each of the requirements of standing. And while the First Circuit has never addressed whether political subdivisions of the State like school districts have standing *at all* to challenge state law, other circuits are split on that question. *City of Hugo v. Nichols*, 656 F.3d 1251, 1268 n.4 (10th Cir. 2011) (addressing split). And even if they can overcome this threshold obstacle, each school district must also show that it satisfies the standing elements.

As outlined above in Table 1, to complicate matters further, not every plaintiff brings every claim. The school district plaintiffs only bring federal preemption claims. One individual plaintiff—Dr. Morris—brings all three claims, but the other—James McKin, Jr.—only brings two. Similarly, NEA-NH brings all three claims, but New Hampshire Outright brings only a vagueness claim. At the same time, all plaintiffs collectively seek the same relief: a preliminary injunction enjoining the implementation of RSA 21-I:112–116 and RSA 186:71–77 in their entirety, without any differentiation between plaintiffs or claims. *See* ECF 14-2 (proposed order).

Each plaintiff must therefore establish that it has standing, under the operative standard, to bring each claim that it asserts. At the preliminary injunction stage, each plaintiff must meet this burden by pointing to affidavits and evidence satisfying each requirement of standing. Notably, though, the plaintiffs do not address standing anywhere in their 60-page memorandum in support of their motion for a preliminary injunction. They do not explain in that filing how each of the standing requirements is satisfied for any plaintiff. Nor do they point to any affidavits or evidence establishing a substantial likelihood that every plaintiff has standing.

While the plaintiffs do devote a substantial portion of their complaint to standing, they have not satisfied their burden in that pleading. Again, the standing requirement at the preliminary injunction stage is not a pleading requirement. In any event, the plaintiffs focus the standing section of their complaint nearly entirely on the purported injuries they allege that they will suffer. *See* ECF 1 ¶¶ 21–105. They do not trace these purported injuries to specific claims. They do not explain why these injuries are caused by specific provisions of the laws they challenge. They do not explain what relief they believe is necessary to redress the alleged harms, much less why the laws must be enjoined in their entirety to give the plaintiffs complete relief.

This last point is particularly critical, because the Supreme Court recently emphasized that federal courts may not reflexively issue universal injunctions, and instead must curtail any remedy to nothing more than is necessary to "offer complete relief *to the plaintiffs before the court*." *Trump*, 145 S. Ct. at 2557 (emphasis in original). The plaintiffs' burden therefore extends not only to establishing, through affidavits and evidence, a substantial likelihood that each plaintiff has standing to bring each claim it asserts, but that the sweeping remedy they seek would go no further than to redress the harms the plaintiffs actually allege they suffer on each claim.

It is not up to the defendants or the Court to untangle the jurisdictional knot the plaintiffs have presented. The plaintiffs bear the burden of establishing that there is a substantial likelihood that they have standing to proceed. They must also establish that the injunction they seek would do nothing more than offer complete relief to the plaintiffs themselves. They have not satisfied these burdens here, and for this reason alone their motion for a preliminary injunction must be denied.

**V.     To the extent a plaintiff has standing, those plaintiffs have not demonstrated a likelihood of success on the merits.**

    **a.  THE CHALLENGED PROVISIONS DO NOT VIOLATE THE FOURTEENTH AMENDMENT'S PROHIBITION ON VAGUENESS.**

A duly enacted statute may be declared unconstitutional by a court that finds the law to be impermissibly vague.  *United States v. Davis*, 588 U.S. 445, 447 (2019) ("In our constitutional order, a vague law is no law at all.").  "A statute can be impermissibly vague for either of two independent reasons." *Hill v. Colorado*, 530 U.S. 703, 732 (2000). A statute is vague "if it fails to provide people of ordinary intelligence a reasonable opportunity to

understand what conduct it prohibits" or "if it authorizes or even encourages arbitrary and discriminatory enforcement." *Id.*

The vagueness doctrine "rests on the twin constitutional pillars of due process and separation of powers."[3] *United States v. Davis*, 588 U.S. 445, 451 (2019) (internal citation omitted).  Vague laws run afoul of substantive due process when they fail to give individuals "fair notice of what the law demands of them"; they run afoul of separation of powers principles when they "threaten to hand responsibility for defining crimes to relatively unaccountable police, prosecutors, and judges, eroding the people's ability to oversee the creation of the laws they are expected to abide." *Id.*  "Only the people's elected representatives in the legislature are authorized to make an act a crime." *Id.* (internal citation omitted).

The Supreme Court generally focuses on how these basic constitutional principles caution against courts enforcing vague laws. *See generally Davis*, 588 U.S. at 451.  However, this Court should also consider how the available remedy – invalidating laws duly enacted by the legislative branch – presents its own separation of powers and federalism concerns. *See generally Johnson v. United States*, 576 U.S. 591, 621 (2015) (Thomas, J. concurring) ("[W]e as a Court have a bad habit of using indefinite concepts — especially ones rooted in "due process"—to invalidate democratically enacted laws.").  Courts should be careful not to violate separation of powers principles through widespread invalidation of the laws enacted by the people's elected representatives. *Cf.  Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2548 (2025) (Where the Supreme

---

[3] Because this case involves a request for a federal court to invalidate a state law, these "separation of powers" concerns can be more accurately described as federalism concerns. *See Bond v. United States*, 564 U.S. 211, 220-21 (2011) (describing how our federal system "serves to grant and delimit the prerogatives and responsibilities of the State and the National Government vis-à-vis one another" in order to "preserve the integrity, dignity, and residual sovereignty of the States.").

Court stated that "'universal injunctions'—likely exceed the equitable authority that Congress has granted to federal courts.").

Furthermore, it is important for courts to remember that "words are rough-hewn tools, not surgically precise instruments" and, as such, "some degree of inexactitude" is acceptable and likely inevitable within statutory language. *Draper v. Healey*, 827 F.3d 1, 4 (Souter, Circuit Justice, 1st Cir. 2016) (quoting *URI Student Senate v. Town of Narragansett*, 631 F.3d 1, 14 (1st Cir. 2011)). Even with relation to criminal statutes, where the dangers of vagueness are at their highest and one's substantive due process rights at their strongest, statutes are not unconstitutional simply because they "call for the application of a qualitative standard . . . to real world conduct[.]" *Johnson v. United States*, 576 U.S. 591, 604 (2015) (citations and quotation marks omitted). "[T]he law is full of instances where a man's fate depends on his estimating rightly . . . some matter of degree." *Id*.

Determining whether the challenged provisions are vague will, of course, require this Court to engage in statutory interpretation. In interpreting state statutes, this Court should be mindful that state courts are the final arbiters of state law. *See United States v. Taylor*, 596 U.S. 845, 859 (2022) ("Appreciating the respect due state courts as the final arbiters of state law in our federal system, this Court reasoned that it made sense to consult how a state court would interpret its own State's laws."). As such, "[w]hen interpreting state law, a federal court employs the method and approach announced by the state's highest court." *Cahoon v. Shelton*, 647 F.3d 18, 22 (1st Cir. 2011). Also, this Court must remain mindful of the duty to construe statutes as constitutional whenever possible. *See Boos v. Barry*, 485 U.S. 312, 331 (1988) ("[T]he federal courts have the duty to avoid constitutional difficulties by doing so if such as construction is fairly possible."); *State v. Ploof*, 162 N.H. 609, 620, 34 A.3d 563, 572 (2011) (explaining that it

is "a basic principle of statutory construction" within New Hampshire "that a legislative enactment will be construed to avoid conflict with constitutional rights wherever reasonably possible").

The New Hampshire Supreme Court is clear that, when interpreting statutes, judges must "first look to the language of the statute itself, and, if possible, construe that language according to its plain and ordinary meaning." *Petition of Lafasciano*, 175 N.H. 518, 521–22, 293 A.3d 1164, 1168 (2022) (citation and quotation marks omitted).  In doing so, New Hampshire courts consider "the statute as written and will not consider what the legislature might have said or add language that the legislature did not see fit to include." *Id.* at 522 (same omissions).  When a statute "does not define the meaning of the terms [used] within [it]," the New Hampshire Supreme Court "look[s] to the dictionary for guidance as to the ordinary meaning of those terms." *Natal v. GMPM Co.*, 175 N.H. 74, 78, 280 A.3d 782, 786 (2022).

Finally, vagueness analyses are objective, text-bound analyses that present "pure questions of law" and "turn[] on the tools of statutory interpretation[.]" *United States v. Bronstein*, 849 F.3d 1101, 1104 (D.C. Cir. 2017). A statutory term is not "unconstitutionally vague because it does not mean the same thing to all people, all the time, everywhere."  *Id*. at 1107. Rather, a statute is unconstitutionally vague only if, after "applying the rules of interpreting legal texts, its meaning specifies no standard of conduct at all."  *Id*.

Thus, a vagueness claim based on an arbitrary enforcement theory does not turn on "the mere fact that close cases can be envisioned," but rather on whether the statutory *language* is indeterminate.  *United States v. Williams*, 553 U.S. 285, 305-06 (2008). "What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it established has been proved; but rather the indeterminacy of precisely what

that fact is." *Id.* at 306. Likewise, when assessing a vagueness claim based on a lack-of-notice

theory, "[t]he determination whether a . . . statute provides fair warning of its prohibitions must

be made on the basis of the statute itself and other pertinent law, rather than on the basis of an ad

hoc appraisal of the subjective expectations of particular defendants." *Bouie v. City of*

*Columbia*, 378 U.S. 347, 355 n.5 (1964).

In sum, a facial vagueness claim requires the Court to analyze the language of the

challenged provision and determine whether it is sufficiently clear to provide notice of what

conduct is prohibited to a person of ordinary intelligence and to guard against arbitrary

enforcement. But the plaintiffs cannot satisfy their burden by demonstrating that the statute is not

a model of clarity or that close cases may arise under the statute.

### i. APPLICATION AND ANALYSIS

Under the challenged provisions, no "public entity", "political subdivision", or "public

school" is permitted to "implement, promote, or otherwise engage in any DEI-related initiatives,

programs, training, or policies." RSA 21-I:113; RSA 186:72. The law further provides that "[n]o

state funds shall be expended for DEI-related activities, including but not limited to implicit bias

training, DEI assessments, critical race theory, or race-based hiring, promotion, or contracting

preferences." *Id.* The challenged provisions also prohibit public entities, political subdivisions,

state agencies, and public schools from entering into or renewing any contract "that includes

DEI-related provisions, including requirements for contractors to implement DEI programs,

conduct DEI training, or comply with DEI-related reporting obligations." RSA 21-I:114; RSA

186:73.

The statute defines "diversity, equity and inclusion" or "DEI" to "mean any program,

policy, training, or initiative that classifies individuals based on a characteristic identified under

RSA 354-A:1[4] for the purpose of achieving demographic outcomes, rather than treating individuals equally under the law." RSA 21-I:112, II; RSA 186:71, I. "Public school" is defined as "any school, academic institution, or institution of higher education in this state supported by public funds." RSA 186:71, II. "Public entity" is not defined by the statute, but "[a]gency" and "[p]olitical subdivision" are, and include, *inter alia*, any department, office, commission, board, village district, school district, town, city, county, or unincorporated place. RSA 21-I:112, I, III. The plaintiffs contend that the challenged provisions are "replete with vagueness." ECF 14 at 18.

### 1. "CLASSIFIES" AND "ACHIEVING DEMOGRAPHIC OUTCOMES"

First, the plaintiffs argue that the word "classifies" and the phrase "achieving demographic outcomes," *see* RSA 21-I:112, II; RSA 186:71, I, are unconstitutionally vague. ECF 14 at 18-23. The plaintiffs are mistaken on both fronts, as exhibited by their own analysis and admissions.

Neither "classifies" nor "achieving demographic outcomes" is defined by the statutes. Accordingly, the plaintiffs, as would the New Hampshire Supreme Court, turned to a dictionary for guidance. *See* ECF 14 at 18; *Natal*, 175 N.H. at 78; 280 A.3d at 786. "Classify" means "to consider (someone or something) as belonging to a particular group." ECF 14 at 18 (citing Merriam-Webster's Online-Dictionary). We all classify things every day and the meaning of the word "classifies" does not elude an ordinary person of reasonable intelligence. Indeed, the law frequently makes classifications of people and things, and the Equal Protection Clause serves to ensure that such classifications are constitutionally permissible. Ordinary people of reasonable intelligence are familiar with all of that — there is nothing vague about the word "classifies."

---

[4] RSA 354-A:1 identifies the following characteristics: "age, sex, gender identity, race, creed, color, marital status, familial status, physical or mental disability or national origin[.]"

The word "demographic" is defined as "the statistical characteristics of human populations (such as age or income) used especially to identify markets." ECF 14 at 18 (citing Merriam-Webster's Online-Dictionary). The plaintiffs apparently do not encounter any confusion over the terms "achieving" or "outcomes" because they did not consult the dictionary to define them. Nevertheless, "achieve" means "to succeed at reaching or accomplishing (a goal, result, etc.) especially through effort"[5] and "outcome" means "something that follows as a result or consequence."[6]

Piecing these words together, the plaintiffs conclude that the challenged provisions "appear[s] to prohibit public schools . . . from 'considering' any such characteristics for the purpose of achieving any outcomes related to those characteristics." ECF 14 at 18. Defendants would phrase that sentence a bit differently, but the plaintiffs are more or less correct. The challenged provisions prohibits public schools from implementing, promoting, or engaging in any activity that classifies individuals based on a characteristic identified under RSA 354-A:1 for the purpose of achieving a specific outcome for the identified demographic. Accordingly, despite their claims to the contrary, the plaintiffs seem to understand statute's language just fine — because the statute is not vague.

After defining statutory terms and seemingly discerning the meaning of the statute's prohibitive language in just one paragraph, *see* ECF 14 at 18, the remainder of the plaintiffs' analysis dreams up as-applied hypotheticals that present thorny questions and point out the ways in which the challenged provisions *might* conflict with other laws. *See* ECF 14 18-23. Some of

---

[5] Merriam-Webster Dictionary, *Achieve*, https://www.merriam-webster.com/dictionary/achieve (last visited August 18, 2025).

[6] Merriam-Webster Dictionary, *Outcome*, https://www.merriam-webster.com/dictionary/outcome (last visited August 18, 2025).

these examples — programs for students who do not speak English, for example, *see* ECF 14 at 19 — are non-starters because they identify characteristics that are not identified by RSA 354-A:1.[7] Others because they assume erroneous premises. For example, the plaintiffs worry that lessons on the Holocaust will violate the challenged provisions because such lessons are taught for the purpose "of protecting Jewish students from discrimination[.]" ECF 14 at 21.

As an initial matter, it is not clear how a history lesson on the Holocaust, or any other atrocity in history, "classifies" people. Further, history lessons on events like the Holocaust serve the primary purpose of raising up an educated citizenry that can avoid ignorantly repeating history's genocidal atrocities upon *any* class of people. Lessons about the Holocaust may carry the incidental and desirable benefit of learning empathy for Jewish people, but that is not the primary purpose of such lessons in public schools, and they are not banned by the challenged provisions.

Admittedly, the plaintiffs have put forth some hypotheticals that present more complicated questions of law. *See* ECF 14 at 19-23. But a parade of hypothetical as-applied challenges is not a means of proving a facial vagueness claim. The prohibitions in the challenged provisions are sufficiently clear from the text of the law such that a reasonable person of ordinary intelligence could discern them. The word "classifies" and the phrase "achieving demographic outcomes" do not render HB2 unconstitutionally vague, notwithstanding "the mere fact that close cases can be envisioned[.]" *Williams*, 553 U.S. 285, 305-06.

### 2. "DEI-RELATED" AND "PROMOTE"

Second, the plaintiffs argue that the statute's use of the terms "DEI-related" and "promote" are vague to the point of constitutional infirmity. *See* ECF 14 at 23-25. The plaintiffs

---

[7] RSA 354-A:1 does not identify people who do not speak English as a protected class.

contend that the challenged provisions do "not just prohibit 'DEI'; it also prohibits DEI-'*related*'

initiatives, programs, training, or policies." ECF 14 at 23 (emphasis in original). But the

distinction that the plaintiffs seek to draw does not exist in the statute's text. Although RSA 21-

I:113 is titled "Prohibition on DEI Initiatives[,]" the provision expressly prohibits

implementation, promotion, or engagement "in any DEI-related initiatives, programs, training, or

policies." *See* RSA 186:72 (same). Accordingly, there are not two distinct prohibitions — one on

DEI and one on anything DEI-related — rather, the prohibitions apply to all "initiatives,

programs, training, or policies" that are related to the defined term, "DEI."

      Whether an initiative, program, training, or policy is related to DEI is, naturally, guided

by the statute's definition of DEI. *See* RSA 21-I:112, II; RSA 186:71, I. Since DEI is defined by

the challenged provisions, this case is not like the one relied upon by the plaintiffs in which the

term "equity" was undefined, thereby lending significant confusion to the term "equity-related."

*See* ECF 14 at 23-24. Using the definition of DEI, it is clear that "DEI-related initiatives,

programs, trainings, or policies" are those which classify individuals based on a characteristic

identified in RSA 354-A:1 for the purpose of achieving outcomes specific to that demographic.

Since DEI is defined in a way that can be understood by a reasonable person of ordinary

intelligence, it follows that "DEI-related" can be as well.

      The plaintiffs complain that the challenged provisions do not "explain how 'related' a

program must be to [the] definition of 'DEI' to be unlawful." ECF 14 at 23-24. The answer is, at

all. An initiative, policy, or program either classifies people based on certain characteristics for

the purpose of achieving outcomes based on demographics, or it does not. If it does, even if the

impermissible classification were subtle and the intended demographic outcome unremarkable,

then it violates the challenged provisions. That much is made clear by the statutes' lack of

exceptions. The statute provides for no circumstance in which it is permissible to classify people based on characteristics identified in RSA 354-A:1 for the purpose of achieving outcomes based on demographics.

Once again, the plaintiffs seek to muddy the clarity of the statutes with as-applied hypotheticals. While, again, this is not a means to proving a vagueness claim and should not be entertained by this Court, the defendants will address one of them for the sake of argument. The plaintiffs ask whether a "Black history student group" would violate the challenged provisions "solely because it mentions a protected characteristic[.]" ECF 14 at 24. Answer: Of course not.

No part of the challenged provisions' text can be interpreted in earnest to prohibit the mere mentioning of protected characteristics. If the purpose of the hypothetical student group was to educate any student who wished to learn about Black history, then it would not have a purpose to achieve a demographic outcome, and it would not violate the challenged provisions. But if the purpose of the group were to educate only Black students about Black history, then it would have a purpose of achieving an outcome based on a demographic, namely, race, and would violate the challenged provisions. The statute's prohibitions are clear and they enforce the familiar principle of equality of opportunity by prohibiting policies and programs that seek to artificially produce specific outcomes for certain demographics of people.

The plaintiffs also take issue with the word "promote," noting that the Supreme Court has identified that word as one that is "susceptible of multiple and wide-ranging meanings." ECF 14 at 24 (quoting *Williams*, 553 U.S. at 294). "Promote" means "to contribute to the growth or prosperity of."[8] Accordingly, HB2's use of the word "promote" effectuates a prohibition on contributing to the growth or prosperity of any "DEI-related initiatives, programs, training, or

---

[8] Merriam-Webster's Dictionary, *Promote*, https://www.merriam-webster.com/dictionary/promote (last visited August 18, 2025).

policies." *See* RSA 21-I:113. There is nothing vague about that, and an unnamed professor at UNH law would not run afoul of the challenged provisions by teaching "key constitutional law cases addressing affirmative action—including endorsing Justice Sotomayor's dissent in" a particular case, which asserts that the Fourteenth Amendment "can be enforced through race-conscious means[.]" ECF 14 at 24-25.

The purpose of teaching law students constitutional law cases, including affirmative action cases, is so that people who earn Juris Doctorates understand constitutional law and its historical development. Since the purpose of such activity is not to achieve demographic outcomes, it does not violate the challenged provisions. Whether a professor could violate the challenged provisions by endorsing Justice Sotomayor's dissent in a particular case is such a fact-intensive hypothetical that it has no place in a facial vagueness challenge.

The fact that the plaintiffs have conjured up a very specific scenario in which a law-school professor could, arguably, under a strained definition of "promote" and "DEI," violate the statute does not demonstrate that it is unconstitutionally vague. "[W]ords are rough-hewn tools, not surgically precise instruments" and, as such, "some degree of inexactitude" is acceptable and likely inevitable within statutory language. *Draper*, 827 F.3d at 4 (Souter, Circuit Justice, 1st Cir. 2016) (quoting *URI Student Senate*, 631 F.3d at 14. Accordingly, the phrase "DEI-related" and the word "promote," as they are used in the challenged provisions, are not unconstitutionally vague.

### 3.    "IMPLICIT BIAS TRAINING," "CRITICAL RACE THEORY," AND "DEI ASSESSMENTS"

Third, the plaintiffs contend that the statute's reference to "implicit bias training," "critical race theory," and "DEI assessments" are unconstitutionally vague. ECF 14 at 25-30. Like other sections of the plaintiffs' memorandum, this section is flush with head-scratching as-

applied hypotheticals. For example, the plaintiffs again wonder if "mere mention of 'systemic' or 'structural' racism against communities of color in classrooms and trainings throughout New Hampshire [are] now covered as illegal 'implicit bias' or 'critical race theory[.]'" ECF 14 at 27. The plaintiffs pose this question without even attempting to discern what the phrases they take issue with mean.

To be clear, the challenged provisions do not prohibit the "mere mention" of anything. If systemic or structural racism is referenced in any program or training, but the training does not classify individuals based on certain characteristics for the purpose of achieving outcomes based on demographics, then it does not violate the challenged provisions. It is entirely unclear to the defendants how mentioning a concept, on its own, could classify individuals for the purpose of achieving an outcome related to said classification. *See* RSA 21-I:113. The level of confusion and alarm raised by the plaintiffs borders on hyperbolic.

Further, the phrases that plaintiffs complain of are simply examples of "DEI-related activities" on which "[n]o state funds shall be expended." RSA 21-I:113. Those activities do not necessarily meet the definition of "DEI." For example, an implicit bias training would not necessarily violate the challenged provisions if the purpose of the class were not to produce a demographic outcome. The statute is intended to prohibit categorizing people based on a characteristic for the purpose of attaining demographic (or statistical) outcomes, not to prohibit any discussion of subjects that involve human characteristics or demographics. Thus, the challenged provisions may permit a municipality to put on an implicit bias training for all of its employees so long as its purpose is not to achieve demographic outcomes, and it does not expend state funds to do so. And there clearly is no prohibition on private institutions from spending their own capital on any type of training they so choose.

24

In sum, the phrases that the plaintiff argues are unconstitutionally vague are not intended to identify prohibited "DEI-related initiatives, programs, training, or policies." RSA 186:72. They only identify "DEI-related activities" for which "[n]o state funds shall be expended[.]" RSA 186:72. Thus, "DEI assessment[s]," "implicit bias training[s]," and "critical race theory" are not necessarily prohibited by the challenged provisions, but the expenditure of state funds on any of those activities is prohibited. Moreover, the fact that the legislature chose not to specifically define those phrases does not render them unconstitutionally vague. In fact, they are clear enough for a reasonable person of ordinary intelligence to understand.

Beginning with "DEI assessments," "DEI" is defined by the statute. *See* RSA 21-I:112, II; RSA 186:71, I. The word "assessment" means "the action or an instance of making a judgment about something : the act of assessing something : APPRAISAL."[9] Accordingly, the challenged provisions prohibit expending state funds on anything that is intended to evaluate or make a judgment about any program, initiative, training, or policy that classifies individuals based on a certain characteristic for the purpose of achieving an outcome based on demographics. Simply put, New Hampshire is seeking to distance itself from DEI-related programs entirely and has prohibited the expenditure of public funds on any initiative that seeks to evaluate programs, policies, or trainings, for desirability, efficacy, or anything else.

The phrase "implicit bias training" is even more clear. Indeed, plaintiff Morris apparently, "instruct[s] on implicit biases in her psychology classroom," ECF 14 at 28, "NEA-NH Member B also taught implicit bias in a high school sociology class," and plaintiff McKim "helped develop the implicit bias training for the PSTC," ECF 14 at 29. That the plaintiffs work with the concept of implicit bias in their professions but find the phrase so unclear as to be

---

[9] Merriam-Webster's Dictionary, *Assessment*, https://www.merriam-webster.com/dictionary/assessment (last visited August 18, 2025).

unconstitutionally vague unless it is defined by the legislature is astounding. Also, the plaintiffs explain for multiple pages that implicit bias is a concept that is currently prevalent in curricula from high school through college and in trainings held by many state agencies as if that somehow makes the challenged provisions vague. *See* ECF 14 at 27-30. But the point of the statute, as is clear from its text, is to remove implicit bias training from state agencies and public school lesson plans. The plaintiffs' disagreement with the policy behind the statute does not render it vague.

Lest there be any doubt, "training" means "the act, process, or method of one that trains" or "the skill, knowledge, or experience acquired by one that trains."[10] "Implicit bias" means "a bias or prejudice that is present but not consciously held or recognized."[11] Accordingly, a process by which one systematically acquires knowledge of the theory that people are unconsciously biased and prejudiced but just doesn't know it, or of how to put that theory into practice, is an "implicit bias training." The phrase is not vague, and plaintiffs know that.

In 2025, a reasonable person of ordinary intelligence can discern what "critical race theory" means. "Critical Race Theory originated as a movement addressing racism against African Americans[.]" *Walls v. Sanders*, 740 F. Supp. 3d 766, 802 (E.D. Ark. 2024) (citing Linda S. Greene, *Critical Race Theory: Origins, Permutations, and Current Queries*, 2021 WIS. L. REV. 259, 259 (2021)). It is an academic theory that has its roots in the late 1960s, and which developed over the ensuing decades. *See Critical Race Theory: Origins, Permutations, and Current Queries*, 2021 WIS. L. REV. 259, 259.

---

[10] Merriam-Webster's Dictionary, *Training*, https://www.merriam-webster.com/dictionary/training (last visited August 18, 2025).

[11] Merriam-Webster's Dictionary, *Implicit Bias*, https://www.merriam-webster.com/dictionary/implicit%20bias (last visited August 18, 2025).

Critical Race Theory, as defined by those who contributed to creating it, "aims to reexamine the terms by which race and racism have been negotiated in American consciousness, and to recover and revitalize the radical tradition of race-consciousness among African Americans and other peoples of color – a tradition that was discarded when integration, assimilation and the ideal of colorblindness became the official norms of racial enlightenment." *Id*. at 263 n. 32 (quoting Critical Race Theory: The Key Writings That Formed the Movement at xiv (Kimberle Crenshaw, Neil Gotanda, Gary Peller & Kendall Thomas eds., 1995)). Thus, the theory quite intentionally classifies individuals based on race and seeks to achieve specific outcomes amongst racial demographics.

Critical Race Theory is a well-developed academic theory that has subtly gained a strong foothold in classrooms across America in recent decades, and the plaintiffs are more than likely aware of that. The theory is mainstream enough to have an entry in Merriam-Webster's Online Dictionary. Critical Race Theory is defined as "a group of concepts (such as the idea that race . . . is a sociological rather than biological designation, and that racism . . . pervades society and is fostered and perpetuated by the legal system) used for examining the relationship between race and the laws and legal institutions of a country and especially the United States."[12] The average American likely has an understanding of "critical race theory" that aligns more with Merriam-Webster's definition than Kimberle Crenshaw's more academically precise definition, though plaintiffs may be familiar with the latter as academics themselves. In any event, the phrase "critical race theory" is in the public lexicon and it is not vague.

---

[12] Merriam-Webster's Dictionary, *Critical Race Theory*, https://www.merriam-webster.com/dictionary/critical%20race%20theory (last visited August 18, 2025).

### 4. Arbitrary Enforcement

The plaintiffs argue that the challenged provisions are susceptible to arbitrary and discriminatory enforcement because its employs "vague terms and viewpoint discriminatory prohibitions" and its enforcement "turns on subjective judgments[.]" ECF 14 at 30. However, for the reasons previously explained, the prohibitions in the challenged provisions on DEI-related activities are not vague. The laws prohibition is clear. Public entities, including state agencies, political subdivisions, and public schools, are prohibited from engaging in any DEI-related activity in any way. *See* RSA 21-I:112-16; RSA 186:71-76. DEI-related activities are initiatives, policies, and programs that classify individuals based on a characteristic identified in RSA 354-A:1 for the purpose of achieving an outcome based on demographics. *See* RSA 21-I:112, II; RSA 186:71, I. Thus, the statute contains intelligible, objective standards and is not easily subjected to arbitrary enforcement.

The plaintiffs observe that the penalty for a "public school" that fails to abide by the statute, "either knowingly or unknowingly," is that "the commissioner of the department of education shall immediately halt all sources of public funding to that public school, until such time as the school comes into compliances with all sections of this subdivision." RSA 187:77, I; *see* ECF 14 at 30-31. They argue that there is no process by which a public school can challenge the Education Department's determination that the challenged provisions were violated. ECF 14 at 31.

The defendants acknowledge the serious consequences a public school or other entity could face for violating the challenged provisions. Nevertheless, it is a democratically enacted law that uses clear language in stating its prohibitions and the consequences for violating it reflect the seriousness with which the legislature is pursuing its purpose. The lack of a scienter requirement is not an issue here because the statute's language is not vague. Similarly, the

severity of the penalties has no impact on the clarity of the statute's language. Moreover, once a public school comes back into compliance with the challenged provisions, the funding returns. *See* RSA 187:77, I-II. In other words, the public school does not lose its funding forever and always, it only loses for the duration of time that the school falls out of compliance with HB2.

In summary, the prohibitions contained in the challenged provisions are stated with sufficient clarity for a reasonable person of ordinary intelligence to understand them. The fact that the plaintiffs have dreamt up as-applied hypothetical cases in which application of the challenge provisions might be unclear is insufficient to carry the heavy burden of proving their facial vagueness claims. Therefore, the plaintiffs are unlikely to succeed on the merits of their vagueness claim.

### b. THE CHALLENGED PROVISIONS DO NOT VIOLATE THE FIRST AMENDMENT.

NEA-NH and Dr. Morris contend that the challenged provisions violate the First Amendment rights of educators because they discriminate against certain speech based on viewpoint. *See* ECF  14 at 34. The plaintiffs do not appear to raise this argument in relation to K-12 public school teachers. *See* ECF 14 at 34. However, to the extent that the plaintiffs mean to make an argument related to K-12 public school teachers, since the only three members that NEA-NH has named are K-12 educators[13], their claims are not likely to succeed on the merits because the curricular speech of primary and secondary school teachers is not protected by the First Amendment.

---

[13] Although, as noted above, each named member is bringing their claim solely within their individual capacity only, untethered from their educator status.

### i. PRIMARY AND SECONDARY SCHOOL TEACHERS

In *Garcetti v. Ceballos*, the Supreme Court held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." 547 U.S. 410, 421 (2006). In reaching this holding, the Court observed that "[r]estricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen." *Id*. at 421–22. Rather, such speech "simply reflects the exercise of employer control over what the employer itself has commissioned or created" because "[w]hen [the employee] went to work and performed the tasks [the employee] was paid to perform, [the employee] acted as a government employee." *Id*. "The fact that [the employee's] duties sometimes require[] [the employee] to speak or write does not mean [the employee's] supervisors were prohibited from evaluating [the employee's] performance." *Id*.

The threshold question under *Garcetti* is whether the speech at issue is "made pursuant to the employee's official duties." *Id.* at 413. If the answer is yes, then the speech is not protected by the First Amendment. *See id.* at 421. The First Circuit has adopted a "two-step, context-specific inquiry" to assist in making this determination. *Decotiis v. Whittemore*, 635 F.3d 22, 31 (1st Cir. 2011) (quotation omitted). "First, a court must ask, 'what are the employee's official responsibilities?'" *Id.* In resolving this question, "the proper inquiry is practical rather than formal, focusing on the duties an employee is actually expected to perform, and not merely those formally listed in the employee's job description." *Id.* (citation and quotation marks omitted).

Second, a court must ask "'was the speech at issue made pursuant to those responsibilities?'" *Id.* The First Circuit has identified "several non-exclusive factors" that "are instructive" when resolving this question: (1) "whether the employee was commissioned or paid

to make the speech in question"; (2) "the subject matter of the speech"; (3) "whether the speech was made up the chain of command"; (4) "whether the employee spoke at [the employee's] place of employment"; (5) "whether the speech gave objective observers the impression that the employee represented the employer when [the employee] spoke (lending it 'official significance')"; (6) "whether the employee's speech derived from special knowledge obtained during the course of . . . employment"; and (7) "whether there is a so-called citizen analogue to the speech." *Id*. at 32 (citations omitted).

Applying this two-step inquiry demonstrates that the speech of primary and secondary school teachers, while performing their function of teaching, is "made pursuant to [their] official duties." *Garcetti*, 547 U.S. at 421. The institutional plaintiff—NEA-NH—alleges that its members consist of "more than 17,000 member educators in New Hampshire representing the majority of all public school employees in the state," ECF 1 ¶ 21, all of whom are "public school educators including classroom teachers, and other certified professionals, education support personnel, instructors and staff at public higher education institutions, as well as students preparing for a teaching career, and those retired from the profession." *Id*. at 23. In other words, they are all public employees.

Further, teaching is quintessentially one of "the duties [an educator] is actually expected to perform" such that it would constitute an "official responsibilit[y]." *Decotiis*, 635 F.3d at 32. To the extent teaching involves speech, it is speech that an "educator" is "commissioned or paid to make," typically occurring at the educator's "place of employment," and relating to the specific "subject matter" that the educator is authorized to teach. *See id.* Because an educator's curriculum is set by a combination of state statute, *see, e.g.*, RSA 193-E:2-a, Board of Education regulation, *see, e.g.*, N.H. Admin. R. Ed 306.26, 306.27, and the local education unit, *see, e.g.*,

N.H. Admin. R. Ed 302.01, 302.02, 303.01, an "objective observer[]" would be hard-pressed to believe that an educator's speech in the classroom is made in the capacity as a "citizen" rather than "pursuant to their official duties," *Decotiss*, 635 F.3d at 32.

It is also apparent that an educator's speech in the classroom—which is often subject-matter specific—can derive from "special knowledge obtained during the course of [an educator's] employment," *Decotiss*, 634 F.3d at 32. And there is no clear "citizen analog" to the act of teaching in a public-school classroom, *see id.* Indeed, educators have to be certified by the State Board of Education and hired by schools to perform their official roles, *see* RSA 189:39. In short, nearly all of the factors set forth in *Decotiss* weigh in favor of the conclusion that a primary or secondary school teacher's curricular choices are "made pursuant to [that educator's] official duties." *Garcetti*, 547 U.S. at 413, 421.  Those choices are not entitled to First Amendment protection. *Id.* at 421. Notably, Judge Barbadoro reached this precise conclusion in *Local 8027 v. Edelblut*, 651 F. Supp. 3d 444 (2023).

This conclusion also finds significant support in the decisions of several courts of appeals. For instance, in *Evans-Marshall v. Board of Education of Tipp City Exempted Village School District*, the Sixth Circuit held that "the First Amendment does not protect primary and second school teachers' in-class curricular speech[.]" 624 F.3d 332, 342 (6th Cir. 2010). In reaching this holding, the court observed that, "[a]s with any other individual in the community, [teachers have] no more free-speech right to dictate the school's curriculum than [they have] to obtain a platform—a teaching position—in the first instance for communicating [their] preferred list of books and teaching methods." *Id*. at 340. For this reason, the court observed, "no relevant analogue exists between [a teacher's] in-class curricular speech and speech by private citizens." *Id.* at 340–41 (citation, quotation marks, and bracketing omitted).

The court further recognized that, under state law, curriculum-related decisions are prescribed by elected officials, which provides a degree of public accountability regarding those decisions. *Id.* at 341. The court explained that teachers may speak or write routinely during the course of their work but that fact alone does not make them "sovereigns unto themselves" when it comes to making curriculum-related decisions for their classrooms. *Id.* (quotation and brackets omitted). The court thus concluded that in light of *Garcetti*, the First Amendment does not "insulate" teachers from employer discipline, "even discipline prompted by [the teacher's] curricular and pedagogical choices." *Id.*

Similarly, in *Mayer v. Monroe County Community School Corporation*, the Seventh Circuit held that "the first amendment does not entitle primary and secondary teachers, when conducting the education of captive audiences, to cover topics, or advocate viewpoints, that depart from the curriculum adopted by the school system." 474 F.3d 477, 480 (7th Cir. 2007). The Seventh Circuit emphasized that a case involving a teacher's curricular choices is "easier [to resolve] than *Garcetti*" because "teachers hire out their own speech and must provide the service for which employers are willing to pay." *Id.* at 479. While the court acknowledged that "[m]ajority rule about what subjects and viewpoints will be expressed in the classroom has the potential to turn into indoctrination," it observed that "if indoctrination is likely, the power should be reposed in someone the people can vote out of office, rather than tenured teachers." *Id.* at 479–80. The court noted that the teacher was permitted under the school's policy to "draw[] out arguments from all perspectives, as long as she kept her opinion to herself." *Id.* at 480. The court emphasized, however, that "[t]he Constitution does not entitle teachers to present personal views to captive audiences against the instructions of elected officials." *Id.*

As the Sixth Circuit observed in *Evans-Marshall*, several other circuits have applied pre-*Garcetti* precedents to conclude that "[a] teacher's curricular and pedagogical choices are categorically unprotected" by the First Amendment. 625 F.3d at 342; *see id.* at 642–43 (citing *Panse v. Eastwood*, 303 F. App'x 933, 935 (2d Cir. 2008); *Lee v. York County Sch. Div.*, 484 F.3d 687, 694 n.11, 695, 697 (4th Cir. 2007); *Edwards v. Cal. Univ. of Pa.*, 156 F.3d 488, 491 (3d Cir. 1998) (Alito, J.)). Several circuits have likewise concluded that *Garcetti* applies to elementary- and secondary-school employees in other contexts, including: to a school teacher's speech about curriculum, *see Brammer-Hoetler v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1204 (10th Cir. 2007); to the filing of union grievances related to student discipline, *see Weintraub v. Board of Educ. Of City School Dist. of New York*, 593 F.3d 196, 201–02 (2d Cir. 2010); to writing memoranda requesting information about the use of funds, *see Williams v. Dallas Indep. Sch. Dist.*, 480 F.3d 689, 693–94 (5th Cir. 2007); and to placing signs or banners in the classroom or on school bulletin boards, *see, e.g.*, *Johnson v. Poway Unified School Dist.* 658 F.3d 954, 970 (9th Cir. 2011); *Lee v. York County School Div.*, 484 F.3d 687, 698-99 (4th Cir. 2007). As the Sixth Circuit noted, "[t]he common thread through all of these cases is that, when it comes to in-class curricular speech at the primary and secondary school level, no other court of appeals has held that such speech is protected by the First Amendment." *Evans-Marshall* 624 F.3d at 343. The defendants have not identified any decision post-dating *Evans-Marshall* that reaches a contrary conclusion.

In sum, to the extent that NEA-NH means to assert their First Amendment claim on behalf of any of its members who are primary or secondary school teachers, such as the three that are specifically identified, their claim is unlikely to succeed on the merits because their curricular speech and choices are not protected by the First Amendment.

###### ii. HIGHER EDUCATION

The defendants acknowledge that several circuits have declined to extend *Garcetti* to the higher education context, instead concluding that the speech and scholarship of professors is afforded First Amendment protection. *See e.g.*, *Killborn v. Amiridis*, 131 F.4th 550, 558 (7th Cir. 2025); *Heim v. Daniel*, 81 F.4th 212, 226 (2nd Cir. 2023); *Meriwether v. Hartop*, 992 F.3d 492, 505 (6th Cir. 2021). Instead, those Courts apply the balancing test formulated by the Supreme Court in *Connick v. Myers*, 461 U.S. 138 (1983) and *Pickering v. Board of Education*, 391 U.S. 563 (1968). *See Killborn*, 131 F.4th at 554; *Heim*, 81 F.4th at 226, 228; *Meriwether*, 992 F.3d at 507-08. Even under *Pickering-Connick*, however, the plaintiffs have not demonstrated that the laws they challenge here are facially unconstitutional.

Under *Pickering-Connick* standard, determining whether a public employee's speech is protected by the First Amendment requires the Court to ask whether the employee was speaking on a matter of "public concern." *Heim*, 81 F.4th at 228; *Meriwether*, 992 F.3d at 509. If so, determining whether the law restricting speech violates the First Amendment requires the Court to balance "the interests of the [professor], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Meriwether*, 992 F.3d at 509.

This is a highly fact- and context-specific inquiry. In conducting *Pickering-Connick* balancing, a court must consider, among other things, "the time, place and manner of the [person's] speech" and whether "the [person] faced only those speech restrictions that are necessary for his employer to operate efficiently and effectively." *Bruce v. Worcester Reg'l Transit Auth.*, 34 F.4th 129, 138 (1st Cir. 2022) (citation and quotation marks omitted). The balancing test is therefore applied with respect to a specific person's speech, and not in a vacuum

in the context of a facial challenge. This case-specific application is reflected in *Heim*, *Kilborn*, and *Meriweather*.

The plaintiffs' claims here do not present case- and fact-specific applications of *Pickering-Connick*. The plaintiffs instead ask this Court to wield *Pickering-Connick* in the abstract to preliminarily enjoin a law in its entirety. The *Pickering-Connick* analysis is especially ill-suited for this type of challenge, and the plaintiffs have not shown that they are likely to succeed on a claim that requires *Pickering-Connick* to be wielded in this way.

Even if such an application were possible, however, the defendants have a compelling interest in prohibiting public entities from classifying people based on protected characteristics for the purpose of achieving outcomes based on demographics. A simpler way of characterizing such conduct is: discrimination. Programs that have the primary purpose of achieving a positive or negative outcome for a particular demographic necessarily, even if impliedly, have the purpose of achieving a different outcome for everyone outside of that demographic. That is textbook discrimination, and the defendants have a compelling interest in rooting it out of public life.

c. **THE CHALLENGED PROVISIONS DO NOT CONFLICT WITH THE ADA, THE IDEA, OR SECTION 504 AND, EVEN IF IT DID, THAT DOES NOT RENDER IT FACIALLY UNCONSTITUTIONAL OR JUSTIFY THE BROAD RELIEF SOUGHT BY NEA-NH AND THE SCHOOL DISTRICTS.**

The plaintiffs (NEA-NH and the School Districts) argue that they are likely to succeed on the merits of their claim that the challenged provisions conflict with, and is therefore preempted by, federal statutes that are intended to protect the civil rights of disabled people, namely, the ADA, the IDEA, and Section 504 of the Rehabilitation Act. *See* ECF 14 at 37-49.

At the outset, even if this Court were to find that the plaintiffs are likely to succeed on this claim, that would only provide a basis for this Court to enjoin the statute to the extent that it

applies to people with mental and physical disabilities, characteristics identified by RSA 354-A:1. As explained previously, courts generally try to limit the solution to the problem when confronting a constitutional flaw in a statute and "the normal rule is that partial, rather than facial, invalidation is the required course, such that a statute may be declared invalid to the extent that it reaches too far, but otherwise left intact." *Ayotte*, 546 U.S. at 329 (cleaned up).

Setting that aside, the plaintiffs have not demonstrated a likelihood of success on the merits of their preemption claim because the challenged provisions are not preempted by the ADA, the IDEA, or Section 504.

### i.   PREEMPTION STANDARD

A state statute that conflicts with a federal statute may be preempted if the conflict between them renders compliance with both statutes physically impossible or where the state statute "stands as an obstacle to the full accomplishment and execution of the full purposes and objectives of Congress." *KKW Ents. Inc. v. Gloria Jean's Gourmet Coffees Franchising Corp.*, 184 F.3d 42, 49 (1st Cir. 1999). "The latter instances constitute so-called 'obstacle preemption,' and [t]o determine whether obstacle preemption exists, the Supreme Court has instructed that [Courts] employ [their] 'judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." *United States v. California*, 921 F.3d 865, 879 (9th Cir. 2019).

However, the Supreme Court "has emphasized that '[i]mplied preemption analysis does not justify a 'freewheeling judicial inquiry into whether a state statute is in tension with federal objectives'; such an endeavor 'would undercut the principle that it is Congress rather than the courts that preempts state law.' . . . [A] high threshold must be met if a state law is to be

preempted for conflicting with the purposes of a federal Act." *Id*. (quoting *Chamber of Commerce of the United States v. Whiting*, 563 U.S. 582, 607 (2011)).

### ii. The challenged provisions do not conflict with the ADA, Section 504, or the IDEA.

The ADA and Section 504 were adopted by Congress to address a shameful reality — that disabled people were, practically speaking, excluded from meaningful participation in our society. *See* 29 U.S.C. § 794(a); 42 U.S.C. § 12101(a)-(b).  The ADA states that "the Nation's proper goals regarding individuals with disabilities are to assure equality of opportunity, full participation, independent living and economic self-sufficiency for such individuals[.]" 42 U.S.C. § 12101(a)(7). Section 504 prohibits disabled individuals from being denied the benefits of or subjected to discrimination under any program or activity that receives Federal funding or that is conducted by an Executive agency.  *See* 29 U.S.C. § 794(a). The IDEA is intended to "ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A).

The challenged provisions do not stand as an obstacle to any of those objectives. The purpose of the ADA, Section 504, and the IDEA are to ensure that disabled people are treated equally under the law, *see* 20 U.S.C. § 1400(d)(1)(A); 29 U.S.C. § 794(a); 42 U.S.C. § 12101(a)-(b), and it is plain from the text of the statute that it does not prohibit treating people under the law, *see* RSA 21-I:112, II; RSA 186:71, I. Indeed, the final clause of the definition of DEI reads: "rather than treating individuals equally under the law." *See* RSA 21-I:112, II; RSA 186:71, I. That clause plainly signals that the statute's definition of "DEI" should not be interpreted to prohibit programs, policies, or initiative that classify people based on a characteristic identified

in RSA 354-A:1 for the purpose of ensuring that all individuals are treated equally under the law. Moreover, the New Hampshire Supreme Court would not accept the plaintiffs' invitation to read the provisions to require discrimination and thereby impliedly conflict with the ADA, Section 504, and the IDEA. Such a construction would interpret words and phrases in a statute in isolation, instead of "within the context of the statute as a whole," which the New Hampshire Supreme Court will not do. *Olson v. Town of Grafton*, 168 N.H. 563, 568 (2016).

The legislature's use of the phrase, "rather than treating individuals equally under the law," *see* RSA 21-I:112, II; RSA 186:71, I, clearly expresses an intent to treat people equally under the law and cannot be ignored. *See N.C. v. N.H. Bd. Of Psychologists*, 169 N.H. 361, 366 (2016) (the New Hampshire Supreme Court "presume[s] that the legislature does not waste words or enact redundant provisions and, whenever possible, [the Court] give[s] effect to every word of a statute."). Therefore, interpreting the challenged provisions to require less protection for disabled people than the ADA, Section 504, or the IDEA, is to interpret the definition of DEI while ignoring its final clause. This Court should resist any such "freewheeling judicial inquiry into whether a state statute is in tension with federal objectives" because "such an endeavor would undercut the principle that it is Congress rather than the courts that preempts state law." *California*, 921 F.3d at 879.

Moreover, the presumption against preemption should apply in this case. *See New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 654 (1995) (stating that implied preemption analysis typically begins with the "presumption that Congress does not intend to supplant state law.") Even laws "containing a preemption clause" — which the ADA, the IDEA, and Section 504 do not — "do not automatically escape the presumption against preemption." *Riegel v. Medtronic, Inc.*, 552 U.S. 312, 334 (2008). "The presumption

against preemption is heightened where federal law is said to bar state action in fields of traditional state regulation." *Id*.

The provisions of the statute that the plaintiffs complain of address the expenditure of state funds and impose a prohibition on certain kinds of programs, policies, and initiatives that may be implemented or promoted by state agencies and entities, including public schools and political subdivisions. The expenditure of state funds and the regulation of state entities are undoubtedly fields that are traditionally regulated by the states; indeed, principles of federalism and the Tenth Amendment to the United States Constitution require as much. Therefore, the presumption against preemption should apply with particular force in this case. *See id*.

Accordingly, this Court should conclude that the challenged provisions do not require public entities in New Hampshire to provide disabled individuals less protection than is required by the ADA, Section 504, or the IDEA. Adopting the plaintiffs' argument, *see* ECF  14 at 41-43, 46-49, requires an interpretation of the statute's definition of DEI that is unnecessarily strict, discordant with the statute's text and purpose, ignores part of the statute's text, and puts the statute in tension with federal law and the Constitution. In other words, the plaintiffs' position violates several cannons of statutory interpretation, and it should be rejected.

NEA-NH's and the School Districts' strained reading of the challenged provisions and their parade of as-applied hypothetical circumstances in which that reading would cause the statute to conflict with the ADA, Section 504, or the IDEA, simply does not meet the "high threshold" of showing that "a state law is to be preempted for conflicting with the purposes of [those] federal Act[s]." *California*, 921 F.3d at 879. The challenged provisions do not obstruct the fulfillment of the objectives of those federal statutes and the plaintiffs are unlikely to succeed on the merits of that claim.

**VI.    The plaintiffs have not demonstrated that they will suffer irreparable harm absent an injunction.**

Irreparable harm "constitutes a necessary threshold showing for an award of preliminary injunctive relief." *González-Droz v. González-Colon*, 573 F.3d 75, 79 (1st Cir. 2009). "A showing of irreparable harm requires an actual, viable, presently existing threat of serious harm that cannot adequately be remedied through money damages alone." *PC Connection Inc. v. Sillich*, 673 F. Supp. 3d 131, 137 (D.N.H. 2023) (citations omitted).

Courts have consistently held that a delay in seeking injunctive relief undermines a plaintiff's claim of irreparable harm. The First Circuit has explained that any presumption of irreparable harm that may arise upon a finding of likelihood of success on the merits of a "is inoperative if the plaintiff has delayed either in bringing suit or in moving for preliminary injunctive relief," because "the failure to act sooner undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury." *Voice of the Arab World*, 645 F.3d at 35 (quoting *Tough Traveler Ltd. v. Outbound Prods.*, 60 F.3d 964, 968 (2d Cir. 1995)); *see Media3 Techs., LLC v. Mail Abuse Prevention Sys., LLC*, 2001 U.S. Dist. LEXIS 1310, 2001 WL 92389, at *9 (D. Mass. Jan. 2, 2001) (delay of six month after learning of threatened harm demonstrated a lack of irreparable harm). Plaintiffs' actions, therefore, indicate there is not an immediate need for injunctive relief. *See Matos ex rel. Matos v. Clinton Sch. Dist.*, 367 F.3d 68, 74 (1st Cir. 2004) ("Absent something that indicates a need for *immediate* relief, a plaintiff's request for a preliminary injunction ordinarily ought to be rejected." (emphasis in original)); *Health New Eng., Inc. v. Trinity Health -- New Eng., Inc.*, Civil Action No. 15-30206-MGM, 2016 U.S. Dist. LEXIS 124946, at *15 (D. Mass. Sep. 14, 2016).

In this case, Plaintiffs' counsel were on notice of the potential implications of the challenged provisions as early as May 30 (if not earlier) when they sent a letter to DOJ, the bill was signed into law on June 27, and the law went into effect on July 1. Furthermore, the DOE provided the School District plaintiffs with a specific administrative deadline of September 5 on July 11. Despite these clear warnings, plaintiffs still waited over a month to file their motion for a preliminary injunction. Such a delay is significant and raises serious questions about the immediacy and urgency of the harm plaintiffs allege. The First Circuit has explicitly stated that "cries of urgency are sharply undercut by [plaintiffs'] own rather leisurely approach to the question of preliminary injunctive relief" *Charlesbank Equity Fund II, Ltd. P'ship v. Blinds To Go, Inc.*, 370 F.3d 151.

Moreover, no plaintiff can actually show any irreparable harm. Most of the plaintiffs' complaint is premised on fears of using certain words in a classroom or concern that they *may* have to change a lesson plan or *may* have their business opportunities with the state lessened. First, the challenged provisions do not attribute any penalties for any single teacher or any single professor from using certain words. In fact, there are no penalty provisions associated with RSA 21-I:112-116 whatsoever. The only penalties in the two statutory sections the plaintiffs take issue with would be against a "public school" for failing to abide by any section of RSA 187:71-77, yet no "public school" is making such a claim.

All plaintiffs bring this case because they fear that HB 2's broad language compels them to steer clear of particular terms—such as "implicit bias," "systemic racism," "DEI," "equity," or any reference to race, gender, or disability, or else they *may* face disciplinary action as a result of some lesson plan they may teach (Individual plaintiffs and NEA-NH) or potentially losing business due to contracting restrictions placed on public entities such that public entities no

longer use public monies in such a contract (NH Outright and James McKim). But they cannot point to any irreparable harm.

## VII.    The balance of the equities and public interest favors denying injunctive relief.

The balance of the equities and public interest "merge when the government is the opposing party." *Doe v. Mills*, 16 F.4th 20, 37 (1st Cir. 2021) (cleaned up). "[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *N.M. Dep't of Game & Fish v. United States DOI*, 854 F.3d 1236, 1254 (10th Cir. 2017) (quoting *Maryland v. King*, 567 U.S. 1301 (Roberts, C.J, in chambers)). Similarly, "'the public interest lies in . . . the will of the people [of a State] being effected in accordance with [that State's] law.'" *Priorities USA v. Nessel*, 860 F. App'x 419, 423 (6th Cir. 2021) (quoting *Coal. to Def. Affirmative Action v. Granholm*, 473 F.3d 237, 252 (6th Cir. 2006)). "Thus, the public interest necessarily weighs against enjoining a duly enacted statute," and this is particularly true when, as here, a plaintiff has not shown a likelihood of success on the merits. *Id.*

When balanced against the plaintiffs' delay in seeking relief, these interests weigh strongly in favor of denying preliminary injunctive relief. It is neither equitable nor in the public interest for a plaintiff to obtain a preliminary injunction enjoining the enforcement and implementation of duly enacted state legislation after waiting weeks to bring their lawsuit and requiring the defendants to respond to dozens of pages of briefing and hundreds of pages of exhibits in only a matter of days. To allow the plaintiffs to obtain a preliminary injunction under these circumstances would run headlong into notions of comity and federalism. To be sure, those concepts do not "mean blind deference to 'States' Rights,'" but they do embody a system where "there is sensitivity to the legitimate interests of both State and National Governments, and in which the National Government, anxious though it may be to vindicate and protect federal

interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the States." *Younger v. Harris*, 402 U.S. 37, 44 (1971).

**VIII.  If the Court issues injunctive relief, that relief cannot be any broader than is necessary to redress the actual harms the plaintiffs can demonstrate.**

The plaintiffs are not entitled to any preliminary injunction in this case for the reasons stated above. It bears emphasizing, however, that even if the plaintiffs could satisfy the preliminary injunction factors in some respect, the Court may not issue an injunction any broader than is necessary to provide complete relief to the plaintiffs. *Trump*, 145 S. Ct. at 2557 ("'Complete relief' is not synonymous with 'universal relief.'"). As discussed above, the plaintiffs' request for a preliminary injunction is essentially a mosaic of different claims brought by different plaintiffs challenging different subsections of RSA 21-I:112-116 and RSA 186:71-77. The Court may not reflexively issue the sweeping injunction the plaintiffs seek; it must curtail any relief to the specific plaintiffs who brought the claims, the specific provisions challenged on those claims, and the specific applications of those provisions found to be likely to violate federal law.

Thus, if the Court concludes that the plaintiffs are entitled to a preliminary injunction on their vagueness claim, any injunction must be limited only to those plaintiffs who have established that are substantially likely to have standing to bring that claim and can extend no further than the specific provisions of RSA 21-I:112-116 and RSA 186:71-77 that the plaintiffs can demonstrate are likely to be vague. Likewise, any preliminary injunction issued in relation to the First Amendment claim must be limited to those plaintiffs who have established a substantial likelihood of standing to bring that claim and must be limited to the specific provision and the specific *applications* of those provisions likely to violate the First Amendment. The same is true with respect to the preemption claim: any relief must be limited to plaintiffs that are substantially

44

likely to have standing to bring that claim and must go no further than is necessary to redress any preemption issue.

## CONCLUSION

For the foregoing reasons, the Court should deny the plaintiffs' motion for a preliminary injunction.

Respectfully submitted,

JOHN M. FORMELLA, in his
official capacity only as Attorney General
of the State of New Hampshire,

CAITLIN DAVIS, in her official capacity as
Commissioner of the Department of Education,

CHARLIE ARLINGHAUS, in his official
capacity as the Commissioner of the New
Hampshire Department of Administrative
Services,

*and*

MONICA MEZZAPELLE, in her official
capacity as the State Treasurer of New
Hampshire

By their attorney,

JOHN M. FORMELLA
ATTORNEY GENERAL

Date: August 21, 2025

*/s/ Brandon F. Chase*
Brandon F. Chase, Bar #270844
Senior Assistant Attorney General
Civil Bureau
Sam Gonyea, Bar # 273264
Assistant Attorney General
Office of the Solicitor General
New Hampshire Dept. of Justice
1 Granite Place
Concord, NH 03301

45

(603) 271-3650
Brandon.F.Chase@doj.nh.gov
Sam.M.Gonyea@doj.nh.gov


## Certificate of Service

I hereby certify that a copy of the foregoing was served on all counsel of recording using

the Court's electronic-filing service.

/s/ Brandon F. Chase
Brandon F. Chase