# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| NATIONAL EDUCATION ASSOCIATION-NEW HAMPSHIRE; OYSTER RIVER COOPERATIVE SCHOOL DISTRICT; DOVER SCHOOL DISTRICT; SOMERSWORTH SCHOOL DISTRICT; GRANTHAM SCHOOL DISTRICT; DOTTIE MORRIS; JAMES T. MCKIM, JR.; and NEW HAMPSHIRE OUTRIGHT, | Case No.: 1:25-cv-293-LM |
| Plaintiffs, | |
| v. | |
| JOHN M. FORMELLA, in his official capacity only as the Attorney General of the State of New Hampshire; | **PLAINTIFFS' REPLY TO DEFENDANTS' OPPOSITION TO PLAINTIFFS' EMERGENCY MOTION FOR PRELIMINARY INJUNCTION** |
| CAITLIN DAVIS, in her official capacity only as the Commissioner of the New Hampshire Department of Education; | |
| CHARLIE ARLINGHAUS, in his official capacity only as the Commissioner of the New Hampshire Department of Administrative Services; and | |
| MONICA MEZZAPELLE, in her official capacity only as the State Treasurer of New Hampshire, | |
| Defendants. | |

## **TABLE OF CONTENTS**

I.    All Plaintiffs Have Standing…………………………………………….....................1

II.    Plaintiffs Are Likely to Succeed on Their Vagueness Claim (Count I)………………….4

    A.    Defendants' Effort to Rewrite the Law's Scope…………………………………..5

    B.    The Law Fails to Give a Person of Ordinary Intelligence a Reasonable
        Opportunity to Know What is Prohibited ………………………………………...6

    C.    The Law Leads to Arbitrary Enforcement…………………………………………10

III.    Plaintiffs Are Likely to Succeed on Their First Amendment Claim (Count II)………….12

IV.    Plaintiffs Are Likely to Succeed on Their Pre-emption Claim (Count III)……………...14

    A.    This Court Can Enjoin Enforcement of a Pre-empted Statute ……………….......14

    B.    The ADA, Section 504, and IDEA Pre-empt HB2………………………………16

V.    Plaintiffs Suffer Irreparable Harm……………………………………………………...19

VI.    A Statewide Injunction Is Appropriate…………………………………………………...20

Plaintiffs' Reply addresses the following points:

## I.     All Plaintiffs Have Standing.

Defendants' Objection suggests that none of Plaintiffs have sufficiently established standing for any of the claims asserted.[1]  Defendants make this challenge without legal analysis and without engaging Plaintiffs' Complaint or declarations.  Instead, Defendants contend that Plaintiffs did not preemptively address standing in their briefing.  Defs.' Mem. of Law in Opp. to Pls.' Mot. For Prelim. Inj. ("Obj."), ECF No. 26, at 12.  Plaintiffs' evidence establishes standing. *See, e.g.*, Complaint, ECF No. 1 ¶¶ 26–35, 211–12, 218–22, 236–37.

As to Plaintiff NEA-NH's claims in Count I, II, and III, NEA-NH easily establishes both organizational and associational standing.  To establish organizational standing, the organization must show that it has itself suffered, or will suffer, an injury in fact which has been caused by the defendant and is redressable by the relief requested.  *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 393–94 (2024); *see also Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79 (1982); *Mass. Delivery Ass'n v. Coakley*, 671 F.3d 33, 44 n.7 (1st Cir. 2012).  As Plaintiffs' memorandum of law explains at pages 50–51, HB2 interferes with NEA-NH's ability to perform its core services and activities.  NEA-NH cannot properly advise its membership as to how or if these members must adjust their collective bargaining agreements to account for HB2's edicts due to the law's vague nature.  *See Exhibit 34* (NEA-NH Decl.) ¶ 23.  HB2's vague nature has made it impossible for NEA-NH to provide meaningful professional development programming about the law to its members despite the demand from its membership to do so.  *Id.* at 26.  Nor can NEA-NH advise members regarding whether and when their instruction, programs, or DEI-related discussions may

---

[1] *See Valentin v. Hosp. Bella Vista*, 254 F.3d 358, 363 (1st Cir. 2001) (addressing standard for sufficiency challenge to standing).

rise to a level of referral for investigation by NHDOE under the Educator Code of Conduct. *Id.* at 24. These injuries to NEA-NH's core functions are no different from the core function injuries that this Court previously found sufficient to establish standing for NEA-NH. *See Nat'l Educ. Ass'n v. United States Dep't of Educ.*, 779 F. Supp. 3d 149, 174–80 (D.N.H. 2025) (McCafferty, C.J.); *see also United States v. Texas*, 144 F.4th 632, 642–51 (5th Cir. 2025) (organizational standing in pre-emption claim).

NEA-NH also has associational standing.

> [A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*United Food & Com. Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 553 (1996) (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)); *see also Playboy Enters. v. Pub. Serv. Comm'n*, 906 F.2d 25, 36 (1st Cir. 1990). The last two elements cannot seriously be disputed here. As to the first element, this element too has easily been satisfied. As to Count I, three NEA-NH members have submitted declarations chronicling how HB2's vagueness directly impacts them. *Exhibit 35, 36, and 37*. With respect to Count II, NEA-NH explains in its declaration that two members at the University of New Hampshire Franklin Pierce School of Law ("UNH Law") have conveyed to NEA-NH that they do not see how they can comply with both ABA Standard 303(c) and HB2's restrictions. *Exhibit 34* (NEA-NH Decl.) ¶ 8. And, with respect to Count III, NEA-NH Members B and C explain in their declaration how HB2 could impact services for students with disabilities. *See Exhibit 36* (NEA-NH Member B Decl.) ¶

10; *Exhibit 37* (NEA-NH Member C Decl.) ¶¶ 12–14, 17, 20, 26; *see also Nat'l Educ. Ass'n*, 779 F. Supp. 3d at 180–82 (finding associational standing).

Plaintiff School Districts too have standing to bring the pre-emption claim in Count III. While a state may not be "bound by substantive fourteenth amendment limitations (due process and equal protection) when dealing with its municipalities," *see Santiago Collazo v. Franqui Acosta*, 721 F. Supp. 385, 393 (D.P.R. 1989), political subdivisions can still "sue their states on constitutional grounds when the right asserted is protected." *Id.* (emphasis omitted); *see also Municipality of San Sebastian v. Puerto Rico*, 89 F. Supp. 3d 266, 277 (D.P.R. 2015). Here, as courts repeatedly have found, such a protected right exists to be free from state laws that conflict with federal mandates.[2] With this threshold issue having been addressed, Plaintiff School Districts have standing to assert this claim. They are obligated to comply with the federal civil rights laws that protect students with disabilities, but that conflict with HB2's terms and its funding penalties.

Plaintiff New Hampshire Outright has established organizational standing as to Count I's vagueness claim. Its core activities are directly impacted by HB2, as New Hampshire Outright conducts trainings for public educational staff that include discussion of "biases" arguably impacted by HB2, and has had one training cancelled because of the law. *Exhibit 44* (N.H. Outright Decl.) ¶¶ 4–9, 11–13; *see also Havens Realty Corp.*, 455 U.S. at 378–79; *Nat'l Educ. Ass'n*, 779 F. Supp. 3d at 176 (finding standing given CBED's educational programs). With respect to Count I, Plaintiff James T. McKim similarly has established standing as someone who

---

[2] *See, e.g., Tweed-New Haven Airport Auth. v. Tong*, 930 F.3d 65, 73 (2d Cir. 2019) (holding that "a subdivision may sue its state under the Supremacy Clause"); *see also Rogers v. Brockette*, 588 F.2d 1057, 1071 (5th Cir. 1979) (reaching the merits of a pre-emption challenge by a local school district against state education authorities); *San Diego Unified Port Dist. v. Gianturco*, 457 F. Supp. 283, 290 (S.D. Cal. 1978) (explaining that "[i]f the Supremacy Clause is to be effective in achieving its purpose, its dictates must be enforceable by political subdivisions of states as well as by individuals"), *aff'd*, 651 F.2d 1306 (9th Cir. 1981) (same); *City of Hugo v. Nichols*, 656 F.3d 1251, 1268 n.4 (10th Cir. 2011) (collecting cases).

conducts trainings related to diversity and equity for public entities and public schools; as a result, HB2's anti-DEI provisions irreparably harm his core work. _Exhibit 43_ (McKim Decl.) ¶¶ 4–5, 14 (noting "one public body" that has already backed out because of HB2). As to Count III, Mr. McKim's work is also impacted by the conflict between HB2 and disability laws, as he regularly addresses disability in his presentations. _Id._ at 5.

As to Counts I, II, and III, it also cannot reasonably be disputed that Dr. Dottie Morris has standing. As to Count I, as an educator and administrator at Keene State College, she is subjected to the law's ambiguities, especially insofar as she addresses the concepts of race and implicit bias in both her administrative and classroom work. She already has had her title changed because of this law, and she immediately began discussing with colleagues the ways in which HB2 would change her equity work and her course instruction. _Exhibit 42_ (Morris Decl.) ¶¶ 1, 3, 8–10, 18–19. As to Count II, HB2 also directly impacts her curricular work, and she reasonably fears that NHDOE or her employer will investigate, discipline, or take other adverse action against her if she continues to discuss with students issues pertaining to race, diversity, equity, or inclusion. _Id_. at 7–22; _see also Nat'l Educ. Ass'n_, 779 F. Supp. 3d at 180 (finding associational standing where "one of NEA's members" employed by a college). As to Count III, Dr. Morris frequently discusses the importance of providing equitable outcomes for people with disabilities in her work, which aids her college in complying with federal law. _Exhibit 42_ (Morris Decl.) ¶ 15.

## II.    Plaintiffs Are Likely to Succeed on Their Vagueness Claim (Count I).

The standard to be applied in a facial vagueness claim has been addressed by this District in _Local 8027 v. Edelblut_, 651 F. Supp. 3d 444, 457–59 (D.N.H. 2023) (Barbadoro, J.) and _Nat'l Educ. Ass'n_, 779 F. Supp. 3d at 185–86 (adopting standard in _Local 8027_). "[T]he void-for-vagueness doctrine does not require a showing that a statute is vague in all of its applications,

4

especially where, as here, the law subjects a violator to serious consequences, lacks a scienter requirement, and implicates First Amendment rights." *Local 8027*, 651 F. Supp. 3d at 459.

### A. Defendants' Effort to Rewrite the Law's Scope.

At the outset, Defendants seek to rewrite the law's scope, arguing that "'DEI assessment[s],' 'implicit bias training[s],' and 'critical race theory' are not necessarily prohibited by the challenged provisions, *but the expenditure of state funds on any of those activities is prohibited*." Obj. at 25 (emphasis added).[3] This is wrong. HB2's restrictions on schools that are "supported by public funds"—which would include private schools that receive public funds—are categorical and exist even where *no state funds* are actually used to engage in the prohibited program or initiative. *See* RSA 186:72 ("No public school shall implement, promote, or otherwise engage in any DEI-related initiatives …."); RSA 186:73 ("No public school shall enter into, renew, or amend any contract that includes DEI-related provisions …."). This interpretation is confirmed by the law's certification requirement for "public schools," which requires reporting of "*all* existing contracts containing DEI-related provisions in public schools" regardless of whether state funds are used as part of these contracts. RSA 186:74 (emphasis added); *see also* RSA 186:75, II. HB2's penalty provisions also reflect this broad scope where it is not just state funding tethered to a prohibited activity that can be halted; rather, it is *all* "public funding." *See* RSA 187:77.[4] If there was any further doubt, Defendants' narrower interpretation exists nowhere in NHDOE's July 11 and 17, 2025 enforcement letters, *see Exhibits 2[5] and 3*, and is rebutted by the law's legislative

---

[3] *See also* Obj. at 5 (further arguing that the law "does not prohibit public schools from using other sources of funding for such activities").

[4] Defendants assert that "there clearly is no prohibition on private institutions from spending their own capital on any type of training they so choose." Obj. at 24. But this is not true for private schools supported by "public funds" for the same reasons that it is not true for K-12 public schools that satisfy the same definition of "public school" under RSA 186:71, II.

[5] NHDOE's proposed certification form, in fact, confirms this broad scope without any "use of state funds" limitation, asking school districts to certify that they (i) "will not enter into, renew, or amend any contract that includes DEI-related provisions, including requirements for contractors to implement DEI programs, conduct DEI training, or

history seeking to broadly impact even some private schools. *See Exhibit 10*, at 15:7–23. Lastly, the same categorical prohibition exists for "public entities" under RSA 21-I:112–116 even where no state funds are used. *See* RSA 21-I:113; RSA 21-I:114. This Court cannot "rewrite a law to conform it to constitutional requirements." *See Local 8027 v. Edelblut*, No. 21-cv-1077-PB, 2024 U.S. Dist. LEXIS 94052, at *21–22 (D.N.H. May 28, 2024).

**B.    The Law Fails to Give a Person of Ordinary Intelligence a Reasonable Opportunity to Know What is Prohibited.**

Defendants' Objection doubles down on the broad scope of HB2's anti-DEI provisions, all while failing to address this Court's decision in *Nat'l Educ. Ass'n v. United States Dep't of Educ.*, 779 F. Supp. 3d 149 (D.N.H. 2025). *See also AFT v. Dep't of Educ.*, No. SAG-25-628, 2025 U.S. Dist. LEXIS 157166, at *94 (D. Md. Aug. 14, 2025). Defendants effectively concede that the law applies to curricular instruction in "public schools" as defined under RSA 186:71, II. Obj. at 24; *see also Exhibit 38* (Shaps Decl.) ¶ 6 (noting that "programs" under HB2 "presumably include 'programs of study' which capture curricular instruction"). And Defendants concede that HB2, without exception, "provides for *no circumstance* in which it is permissible to classify people based on characteristics in RSA 354-A:1 for the purpose of achieving outcomes based on demographics." Obj. at 22 (emphasis added); *see also id.* at 19. However, Defendants later say that the law effectively exempts disability and cannot be interpreted in such an "unnecessarily strict" manner in this context. *Id.* at 40. Which is it? This confusion and selective application confirm what educators already know: that HB2 is hard to understand, is easy to violate, is arbitrary, and imposes massive penalties for violations.

---

comply with DEI-related reporting obligations," and (ii) have or have not "implemented, promoted, or engaged in any DEI-related initiatives, training, assessments, or policies." *See Exhibit 2*.

Much of Defendants' argument that HB2's anti-DEI provisions are not vague rests on a rigid theory of statutory interpretation that employs dictionary definitions in a vacuum instead of reading the statute in context and examining it in the real world in which it applies. The clarity of a statutory provision "does not turn solely on dictionary definitions of its component words." *Yates v. United States*, 574 U.S. 528, 537 (2015). Rather, "'[t]he plainness or ambiguity of statutory language is determined [not only] by reference to the language itself, [but as well by] the specific context in which that language is used, and the broader context of the statute as a whole.'" *Id.* at 537 (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)). And using "real words found in an English dictionary does not magically extinguish vagueness concerns." *Honeyfund.com, Inc. v. DeSantis*, 622 F. Supp. 3d 1159, 1181 (N.D. Fla. 2022), *aff'd*, 94 F.4th 1272, 1283 n.6 (11th Cir. 2024) (declining to address vagueness claim). "If that were true, the Due Process Clause would tolerate laws containing the most incomprehensible stream-of-consciousness word salads so long as they used actual words." *Id.* When taken in context—and even when using Defendants' own dictionary definitions—HB2 remains vague and indecipherable.

**"Classifying" and "Achieving Demographic Outcomes."** Defendants ignore the multitude of ways in which educators are unsure whether the routine practices they engage in are covered under HB2's prohibition on engaging in "classifi[cations]" of individuals based on characteristics under RSA 354-A:1 "for the purpose of achieving demographic outcomes," including those required under state and federal law. Defendants address this language mainly through the prism of using quotas based on demographic groups[6] with a few other examples, *see*

[6] Defendants misread the definition of "demographic"—meaning "the statistical characteristics of human populations (such as age or income) used especially to identify markets"—to suggest that HB2 applies only to quotas and other initiatives that seek "to place a certain number or percentage of students based on their race or gender into honors courses." Obj. at 4–5; *see id.* at 19, 24. Defendants seem to read the term "demographic" as being synonymous with "statistical" to conclude that HB2 prohibits "statistical outcomes," and that this equates to the "number or percentage of persons." *Id.* But the definition uses the word "statistical" as an *adjective* to modify the phrase "characteristics of

Obj. at 5, 19–20, and do not engage with Plaintiffs' numerous examples of uncertainty, including, for example, whether a public school district (i) can create school sports teams for girls,[7] (ii) can establish a non-discrimination policy under RSA 193:39 specifically to "achieve the demographic outcome" of protecting the civil rights of transgender students, *see* Compl. ¶ 13, or (iii) can track— consistent with Section 1111(c)(2) of the federal Elementary and Secondary Education Act of 1965 (*see* 20 U.S.C. § 6311(c)(2))—racial and ethnic groups in its student population.[8]  Defendants' dictionary definitions of "demographic," "achieve," and "outcome" do nothing to answer these questions that educators confront.  When hard questions that highlight these ambiguities are raised—including whether, for example, a professor at UNH Law can "endors[e] Justice Sotomayor's dissent" in *Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.*, 600 U.S. 181, 318 (2023), in a classroom—Defendants do not even apply their own dictionary definitions to this scenario, but instead argue that such question "has no place in a facial vagueness challenge."  Obj. at 23.  If Defendants do not know the answers to these questions even with their dictionary definitions in hand, then how can an educator be expected to?

**"DEI"-"related"**:  Defendants acknowledge that HB2's "prohibitions apply to all 'initiatives, programs, training, or policies' that are <u>*related to*</u> the defined term 'DEI.'"  Obj. at 21 (emphasis added).  This confirms HB2's ambiguity, as those subject to its prohibitions and penalties must not only decipher what "DEI" means, but also what is sufficiently "related to" "DEI" to fall under the law's prohibitions.  Defendants seek to avoid this result by arguing that

---

a population," not as a noun that itself defines "demographic."  Indeed, the exemplary parenthetical clarifies that, read together, the phrase "statistical characteristics of a population" refers to *types* of characteristics like "age or income"— not to the number or percentage of those characteristics.

[7] *See* 44 Fed. Reg. 71413, 71418 (1979) (establishing three-part test to determine whether an educational institution is considered to be in compliance with Title IX).

[8] *See* NHDOE, *Consolidated State Plan, The Elementary and Secondary Education Act of 1965, as amended by the Every Student Succeeds Act*, at 16 (Revised Submission V.3 ~ February 1st, 2023), https://www.education.nh.gov/sites/g/files/ehbemt326/files/inline-documents/sonh/nh-state-plan-2023_used_0.pdf.

"DEI-related" effectively means the same thing as "DEI." *Id.* This cannot be the case, as it would read out of the law the term "related," which must "have meaning" and "be given effect." *See Lopez-Soto v. Hawayek*, 175 F.3d 170, 173 (1st Cir. 1999). Indeed, the independent significance of the term "related" and its intended broader meaning are confirmed by the law's prohibition of "critical race theory" and "implicit bias trainings" even when those terms do not fit within the statutory definition of "DEI."

**"Implicit Bias Training," "Critical Race Theory," and "DEI Assessments."** Defendants argue that HB2's prohibitions of "implicit bias training," "critical race theory," and "DEI assessments" "are simply examples" of "DEI-related" activities and would "not necessarily" be prohibited unless "the purpose of the class were [] to produce a demographic outcome" under the definition of "DEI." Obj. at 24. This interpretation ignores the plain language of HB2. It is true that the law lists these prohibitions as examples of "DEI-related" activities, but the law makes clear through the use of the term "including" that they are examples that categorically satisfy the definition of "DEI-related." In effect, Defendants attempt to read into the law narrowing language that does not exist in the law, nor in any of the enforcement letters sent by NHDOE and NHDAS.[9] Proving this point further, as explained above, the legislature deliberately intended the scope of the law to broadly include not just defined "DEI," but also activities "related" to DEI. And if there was any further doubt, we know that one legislator intended the law to capture a class at Southern New Hampshire University that addressed "socioeconomic factors," including questions like "why is it that you have better health outcomes in white neighborhoods?" *See Exhibit 10*, at 15:7–23. No legislator mentioned Defendants' narrowing instruction.

---

[9] *See Gwyn v. Loot Mt. Corp.*, No. 01-00214-P, 2002 U.S. Dist. LEXIS 24625, at *18 (D.N.H. Dec. 19, 2002) ("I will not read into the statute words or phrases that the legislature has chosen not to include."); *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972) ("[I]t is not within our power to construe and narrow state laws.").

Defendants' attempt to address "critical race theory" also is unhelpful. Defendants simply define "critical race theory" using not one, but two, definitions—definitions that are absent from NHDOE's enforcement letters—and leave it at that. But Defendants fail to explain how educators can interpret and apply these definitions in real-world classroom situations. The Merriam-Webster's dictionary definition Defendants cite even states that this theory includes a "group of concepts," with only one example being "the idea that race … is a sociological rather than biological designation, and that racism … pervades society and is fostered and perpetuated by the legal system." Obj. at 27. Setting aside the fact that these definitions prove that HB2 is seeking to ban *ideas*, does this include teaching books like Michelle Alexander's *The New Jim Crow: Mass Incarceration in the Age of Colorblindness* (2010)? Can an educator even say (and, be viewed as "promoting") that "race is a social construct"? And what are the other examples beyond the example cited in the definition that are covered? Defendants will not say beyond merely reciting two very different and wide-reaching definitions.[10]

### C.    The Law Leads to Arbitrary Enforcement.

Defendants' lack of meaningful engagement with educators' numerous examples of uncertainty confirms how this legal regime is really intended to operate—with enforcers given the discretion to pick and choose what will be covered based on subjective judgments and political calculations. Because of current political realities, enforcers may let slide, for example, efforts to promote outcomes for K-12 public school students with disabilities, *see* Obj. at 36–40[11], but may—

---

[10] As to "implicit bias training," Defendants again resort to dictionary definitions without any real-world application. Do Defendants, who enforce this law and can revoke public funding, interpret this term to apply to Plaintiff James T. McKim's very trainings addressing biases that he conducted for the New Hampshire Department of Justice? *Exhibit 6.* We do not know.

[11] It is unclear whether Defendants will apply HB2, for example, to politically popular efforts to promote outcomes for (i) public higher education students who are older than 65 through tuition waivers, *see* Univ. of New Hampshire, *Tuition Waivers & Discounts*, https://cps.unh.edu/online/tuition-aid/tuition-waivers-discounts (last visited Aug. 25, 2025), and (ii) older men who are subject to lower fitness requirements as they get older in their law enforcement careers, *see* N.H. Police Standards and Training Council, *Physical Agility Test*,

especially in this current climate where legislators supporting HB2 are closely scrutinizing how the law is enforced, *see* Compl. ¶¶ 153–54—aggressively (and subjectively) construe efforts to promote outcomes for students of color or transgender students as being "for the purpose of achieving demographic outcomes." This arbitrariness is precisely what the Fourteenth Amendment prohibits. It also is this mere prospect of arbitrariness that creates the law's intended chill and self-censorship, even without actual enforcement. Educators know that, if they guess wrong as to how enforcers may use their unfettered discretion, their schools stand to lose all public funding, even for an "unknowing" violation. Defendants concede, as they must, "the serious consequences a public school or other entity could face for violating the challenged provisions." Obj. at 28. Defendants do not dispute "that there is no process by which a public school can challenge the Education Department's determination that the challenged provisions were violated." *Id.* And Defendants also concede the law's lack of scienter requirement. All of these deficiencies raise the specter of arbitrary enforcement.

Defendants' objection further confirms this specter of arbitrary enforcement with their view that the law does not conflict with federal disability rights statutes. *Id.* at 38–39. Setting aside Defendants' attempt to extract RSA 186:71, II's "equally under the law" phrase from the full context of how "DEI" is defined, Defendants' interpretation excluding disability from HB2's scope both has no limiting principle and exists nowhere in NHDOE's July 11 and July 17, 2025 communications to "public schools" (*see Exhibits 2 and 3*) and NHDAS's July 23, 2025 communications to state entities (*Exhibit 4*).[12] And if classifications based on disability are

---

https://www.joinstatepolice.nh.gov/hiring-process/physical-agility-test"https://www.joinstatepolice.nh.gov/hiring-process/physical-agility-test (last visited Aug. 25, 2025).

[12] Demonstrating the scope of enforcement, NHDAS's enforcement email was sent to the New Hampshire state court system as a "state agency" via Judge Christopher M. Keating, who is the Interim Director of the Administrative Office of the Courts. *See* Annmarie Timmins, *As NH Republicans Aim to Ban DEI, Disability Advocates and Others Soun the Alarm*, NHPR (Apr. 3, 2025) https://www.nhpr.org/nh-news/2025-04-03/dei-ban-diversity-equity-inclusion-new-

permitted because they are designed to ensure that this group is treated "equally under the law," then why would not such classifications and remedies based on race that are similarly designed to ensure that people of color receive equality—especially given the historic discrimination they have faced—similarly be covered? Defendants have no answer. Highlighting this confusion further, one lawyer from the legislature's Office of Legislative Services has informed one legislator seeking guidance on how to draft a bill that HB2 *does* "in effect prohibit[] schools from identifying individuals based on disability." *Exhibit 45*.[13] HB2 is subject to conflicting interpretations.[14]

## III.    Plaintiffs Are Likely to Succeed on Their First Amendment Claim (Count II).

Defendants assert that HB2's anti-DEI provisions do not violate the First Amendment because "they regulate government speech." Obj. at 3. At the outset, this clearly is not true with respect to private institutions who are subjected to HB2 if they are merely "supported by public funds." *See* RSA 186:71, II. Defendants also argue that, "to the extent that the plaintiffs mean to make an argument related to K-12 public school teachers," such speech is not protected. Obj. at 29. Plaintiffs do not raise such independent speech claims at this injunctive relief stage. Rather, Plaintiffs' First Amendment claim here is focused on educators at colleges and universities.

Courts throughout the country have held that the First Amendment forbids censoring academic speech in the nation's colleges and universities. This includes protecting professors at public colleges and universities even though they are public employees. *See, e.g.*, *Kilborn v.*

---

hampshire-gop-republicans-disabilities-access (noting "[t]he New Hampshire Judicial Branch's Steering Committee on Diversity and Inclusion calls for similar training for judges and staff. It also calls for increasing the diversity of the workforce to reflect the community it serves").

[13] This exhibit is attached to the accompanying August 25, 2025 Second Declaration of Gilles Bissonnette in Support of Plaintiffs' Emergency Motion for a Preliminary Injunction.

[14] While Defendants have not raised the issue, Plaintiffs wish to make clear that the Supreme Court's recent decisions in *Nat'l Institutes of Health v. Am. Pub. Health Ass'n*, No. 25A103, 2025 WL 2415669 (U.S. Aug. 21, 2025) and *Department of Ed. v. California*, 604 U.S. __, 145 S. Ct. 966 (2025), have no bearing on the case at hand, as Plaintiffs are neither suing the federal government nor seeking reinstatement of any federal grants, obviating any concerns regarding the Tucker Act.

*Amiridis*, 131 F.4th 550, 558 (7th Cir. 2025) (declining "to extend [*Garcetti v. Ceballos*, 547 U.S. 410 (2006)] to speech involving university teaching and scholarship when the Supreme Court was unwilling to do so" and noting that "[e]very other circuit to decide the issue has recognized that *Garcetti* does not apply . . . .") (collecting cases).  The scholarship and academic work of professors in public higher education is a special concern of the First Amendment because of the "transcendent value" of speech in the university setting.  *See Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967).  In the academic freedom context, viewpoint discrimination is presumptively unconstitutional, especially where coercive financial penalties are involved.  *See Nat'l Educ. Ass'n*, 779 F. Supp. 3d at 194 (preliminarily enjoining Dear Colleague Letter, in part, where it "targets speech based on viewpoint"); *Miss. Ass'n of Educators v. Bd. of Trs. of State Insts. of Higher Learning*, No. 3:25-cv-00417-HTW-LGI, 2025 U.S. Dist. LEXIS 140078, at *13–15 (S.D. Miss. July 22, 2025) (same).

But even if, as Defendants suggest, this Court were to apply the framework from *Connick v. Myers*, 461 U.S. 138, 146 (1983), with respect to HB2's impact on higher education curricular instruction, HB2's anti-DEI provisions are unconstitutional on their face.  This is because the law categorically and uniformly suppresses curricular speech—for example, "critical race theory" or "implicit bias trainings"—even where, under the *Connick* framework, (i) such speech was a matter of public concern, and (ii) the State has minimal interest in suppressing the speech.  Such a claim can be brought in a pre-enforcement context, and a plaintiff need not wait to undergo a prosecution before seeking facial relief; otherwise, chill would be allowed to permeate.  *See Pernell v. Fla. Bd. of Governors of State Univ. Sys.*, 641 F. Supp. 3d 1218, 277–78 (N.D. Fla. 2022) (weighing "the State of Florida's weak interest in employing viewpoint-based restrictions targeting pure expression to combat racism, versus the weighty interest in academic freedom to instruct university

students free from the State's chosen orthodoxy of viewpoint"), *appeal filed and stay of inj. denied*, Nos. 22-13992-J, 22-13994-J, 2023 U.S. App. LEXIS 6591 (11th Cir. Mar. 16, 2023); *see also Local 8027*, 651 F. Supp. 3d at 453 (declining to dismiss pre-enforcement First Amendment challenge to law's impact on extracurricular K-12 educator speech under the *Pickering-Connick* balancing test); *Project Veritas Action Fund v. Rollins*, 982 F.3d 813, 829 (1st Cir. 2020) (noting "the Supreme Court's consistent admonition that we avoid putting First Amendment plaintiffs to the stark choice of having their speech chilled or committing a crime"). As to the State's interests, Defendants' brief only provides a three-sentence justification for why such suppression of curricular instruction is necessary—namely, to eliminate "textbook discrimination." Obj. at 36. But HB2 does not just seek to bar the practice of "discrimination"—which already is prohibited under RSA 354-A:27-28 and RSA 193:38, as well as Title VI of the Civil Rights Act of 1964 with respect to programs that receive federal financial assistance. Rather, HB2 goes further and prophylactically bars ideas and speech in the classroom that the legislature dislikes even where such ideas are relevant to approved courses. Here, it is the legislature censoring views, <u>not</u> the university ensuring that its professors teach the subject matter they are assigned. And even if this state interest has any validity—and it does not—this state interest cannot be "satisfied by the assertion of abstract interests" without actual evidence. *See Rideout v. Gardner*, 838 F.3d 65, 72 (1st Cir. 2016). None has been presented here.

## IV.    Plaintiffs Are Likely to Succeed on Their Pre-emption Claim (Count III).

### A.    This Court Can Enjoin Enforcement of a Pre-empted Statute.

Plaintiffs' pre-emption claim is brought in equity, and not under 42 U.S.C. § 1983. Because Plaintiffs do not bring a claim under Section 1983, the Supreme Court's holding in *Golden*

*State Transit Corp. v. City of Los Angeles*—that "the Supremacy Clause of its own force, does not create rights enforceable" under Section 1983—does not apply here. 493 U.S. 103, 107 (1989).

Plaintiffs' equitable claim arises under the traditional "power of federal courts of equity" to enjoin enforcement of unconstitutional state laws. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327–28, 331–32 (2015). Equitable pre-emption challenges have deep roots, *see id.* at 327 (noting the "long history of judicial review of illegal executive action, tracing back to England"), and are a mainstay of federal courts' vital role policing the federal-state boundaries central to our constitutional structure, *see Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 n.14 (1983); *Georgia Latino All. for Hum. Rts. v. Governor of Georgia*, 691 F.3d 1250, 1260–62 (11th Cir. 2012). As the Supreme Court recognized, "if an individual claims federal law immunizes him from state regulation, the court may issue an injunction upon finding the state regulatory actions preempted." *Armstrong*, 575 U.S. at 326 (citing *Ex Parte Young*, 209 U.S. 123, 155–56 (1908)).

The Supreme Court further explained that equitable relief on the basis of pre-emption is available unless Congress has *acted* to "preclude the availability of equitable relief." *Id.* at 327–28. The Congressional action required to demonstrate displacement of the longstanding availability of equity must be robust. In *Armstrong*, the Court found that Congress had precluded such relief under the Medicaid Act only because: (1) Congress had created an explicit and exclusive enforcement mechanism, *and* (2) the federal rule in that case was too vague for judicial administration. *See id.* at 326–29. The Court was clear that both of these conditions were necessary. *Id.* at 328; *see also Farmworker Ass'n of Fla., Inc. v. Uthmeier*, No. 23-cv-22655-RAR, 2025 U.S. Dist. LEXIS 73220, at *8–20 (S.D. Fla. Apr. 17, 2025). Since *Armstrong*, courts have repeatedly found that plaintiffs have a "cause of action . . . at equity" to seek "relief on preemption grounds" absent a robust showing of Congressional intent to displace the longstanding

availability of equity as to a particular statute.[15]  There is no suggestion here that Congress intended

to foreclose equitable relief under the ADA, Section 504, or IDEA.  Unlike the Medicaid statute

in *Armstrong*, none of these laws establish a sole mechanism for enforcement.  And none of these

statutes impose anything like the inchoate legal standard that was at issue in *Armstrong*.  For these

reasons, this Court may enjoin HB2 on pre-emption grounds.

### B.    The ADA, Section 504, and IDEA Pre-empt HB2.

Plaintiffs have advanced two independent bases for finding HB2 pre-empted: (1) that HB2

directly conflicts with federal disability rights laws; and (2) that HB2 stands as an obstacle to the

objectives of those laws.  But Defendants do not engage with these theories' central contention:

that the plain meaning of HB2 prohibits public schools from doing exactly what the ADA, Section

504, and IDEA each require—treating disabled students differently by "considering [them] as

disabled for the purposes of achieving disability-related outcomes," such as access, integration,

---

[15] *See Crown Castle Fiber, L.L.C. v. City of Pasadena, Texas*, 76 F.4th 425, 434−35 (5th Cir. 2023) (plaintiffs have "a cause of action . . . at equity" to seek "relief on preemption grounds" even where the relevant federal statute "does not confer a private right") (internal quotation marks omitted); *see also, e.g.*, *United States v. Texas*, 144 F.4th 632, 660−62 (5th Cir. 2025) (same; holding state immigration law likely was pre-empted, and affirming issuance of preliminary injunction); *Newton v. Duke Energy Fla., LLC*, 895 F.3d 1270, 1276 (11th Cir. 2018) (same); *King v. Youngkin*, 122 F.4th 539, 547 (4th Cir. 2024) cert. denied sub nom. *O'Bannon v. King*, No. 24-964, 2025 WL 1727393 (U.S. June 23, 2025) (Congress did not intend to foreclose equitable relief where it did not make an "express provision" of a sole remedy); *Bellsouth Telecomms., LLC v. Louisville/Jefferson Cnty. Metro Gov't*, No. 3:16-CV-124-TBR, 2016 WL 4030975, at *3 (W.D. Ky. July 26, 2016) (holding that, under *Armstrong*, a preemption plaintiff "may invoke a federal court's equitable jurisdiction [to enjoin allegedly pre-empted state action] even when no private cause of action exists"); *Spectrum Pac. W. LLC v. City of Yuma*, 507 F. Supp. 3d 1186, 1192 (D. Ariz. 2020) (referring to the defendant's "argument that Section 556 [of the Cable Communications Policy Act] does not confer a private right of action" as "irrelevant" because, "[e]ven in the absence of an explicit statutory provision establishing a cause of action, a private party may ordinarily seek declaratory and injunctive relief against state action on the basis of federal preemption") (cleaned up); *see also Ctr. for Biological Diversity v. Env't Prot. Agency*, 56 F.4th 55, 71 (D.C. Cir. 2022) ("If Congress does seek to restrict courts' equitable powers, it must do so by the clearest command.") (internal quotations omitted); *Owner Operator Indep. Drivers Ass'n, Inc. v. Swift Transp. Co. (AZ)*, 367 F.3d 1108, 1112 (9th Cir. 2004) ("[W]e do not lightly assume that Congress has intended to depart from established principles [of equitable discretion].") (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982)); *Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton*, 841 F.3d 133, 144 (2d Cir. 2016) (collecting cases and stating that "the Supreme Court has consistently recognized federal jurisdiction over declaratory- and injunctive-relief actions to prohibit the enforcement of state or municipal orders alleged to violate federal law"); *Mathis v. United States Parole Comm'n*, 749 F. Supp. 3d 8, 22−23 (D.D.C. 2024) (holding federal courts have inherent equitable power to enjoin violations of Section 504); *cf. Indiana Prot. & Advoc. Servs. Comm'n v. Indiana Fam. & Soc. Servs. Admin.*, No. 24-2633, 2025 WL 2301382, at *16−17 (7th Cir. Aug. 11, 2025) (holding *Armstrong* did not limit relief available under the ADA).

and improving academic achievement. Pls.' Memo. at 39–40; 46–47; *see* Obj. at 19, 22 (confirming Plaintiffs' interpretation of HB2, without exception). Instead, Defendants limit their analysis to Plaintiffs' first pre-emption theory, arguing that HB2's directive to "treat[ ] individuals equally" saves the statute from a direct conflict because it aligns with the ADA, Section 504, and IDEA's purpose of ensuring "equality of opportunity." Obj. at 38–39.

But this argument erroneously conflates equal *opportunities* with equal *treatment*, a conflation that finds no purchase in federal disability rights laws. Indeed, as Plaintiffs explain at length, the ADA, Section 504, and the IDEA recognize that *different treatment* may be required to allow people with disabilities to achieve *equal opportunities*. Pls.' Memo. at 40–49. It is this foundational concept of disability rights laws, explicit in the statutes themselves and confirmed by the Supreme Court, that runs directly contrary to HB2.[16]

Plaintiffs have cited numerous statutory and regulatory provisions alongside real-world examples to show how the structure of these laws requires schools to *treat* disabled students differently from the general population by providing accommodations or special education services not provided to others in order to achieve equal *outcomes*. Pls.' Memo. at 39, 41–43, 46–47. Defendants ignore this key distinction between equal treatment and equal outcomes and fail to explain how the structure of disability rights laws could be harmonized with the text of HB2. Defendants further fail to explain why, even under their generous reading of HB2's "equal

---

[16] *See U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 397 (2002) ("[P]references will sometimes prove necessary to achieve the [ADA's] basic equal opportunity goal."); *Lartigue v. Northside Indep. Sch. Dist.*, 100 F.4th 510, 521 (5th Cir. 2024) ("[T]he ADA . . . shifts away from similar treatment to different treatment of the disabled by accommodating their disabilities. Of course, children with disabilities receive different treatment, that is the point of an 'accommodation.'") (internal quotations omitted); *McGary v. City of Portland*, 386 F.3d 1259, 1267 (9th Cir. 2004) ("The purpose of the ADA's reasonable accommodation requirement is to guard against the facade of 'equal treatment' when particular accommodations are necessary to level the playing field.").

treatment" clause, HB2 does not frustrate a core objective of federal disability rights law—improving demographic outcomes. *Id.* at 44–45, 48–49.

Moreover, HB2 "cannot be saved by invoking the State's traditional power to regulate" state funds, schools, and state entities. *Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312, 325 (2016); Obj. at 39–40. The Supreme Court has nearly always invoked this heightened presumption against pre-emption only where "federal law is said to bar state action in *fields* of traditional state regulation," not where it impliedly conflicts with state law.[17] Even if this presumption applies, courts have readily found pre-emption where, as here, a traditional state regulation unambiguously conflicts with and frustrates the purposes of federal law, including the ADA.[18] Defendants cite only a dissenting opinion in a case where the majority of the Supreme Court found that traditional common-law remedies *were* pre-empted. *See* Obj. at 39–40 (quoting *Riegel v. Medtronic, Inc.*, 552 U.S. 312, 334 (2008)). HB2 presents a direct conflict that Defendants cannot mend by simply raising the presumption against pre-emption.

In any event, Congress "certainly contemplated the pre-emption of substantial areas of traditional state regulation." *Gobeille*, 577 U.S. at 325. Congress passed the IDEA and Section 504 pursuant to its spending powers to ensure the nondiscriminatory use of funds in public entities, including schools. *See* 20 U.S.C. § 1412(a)(17)(C) ("[F]unds paid to a State under this subchapter will be used to supplement the level of Federal, State, and local funds . . . expended for special education[.]"); 29 U.S.C. § 794(a). And the ADA prohibits disability discrimination in "anything

---

[17] *See, e.g.*, *New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995) (emphasis added); *Hillsborough Cnty., Fla. v. Automated Med. Lab'ys, Inc.*, 471 U.S. 707, 715 (1985); *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 541–42 (2001).
[18] *See, e.g.*, *Equal Rts. Ctr. v. Niles Bolton Assocs.*, 602 F.3d 597, 602 (4th Cir. 2010) (finding traditional common-law indemnity claims pre-empted because they "diminish[ ] . . . incentive to ensure compliance" with the ADA); *Independent Living Center v. City of Los Angeles*, 973 F.Supp.2d 1139 (C.D. Cal. 2013) (same); *Algonquin Gas Transmission, LLC v. Weymouth, Massachusetts*, 919 F.3d 54, 64 (1st Cir. 2019) (finding local environmental health and safety ordinance frustrated the purpose of federal law).

a public entity does." *Lee v. City of Los Angeles*, 250 F.3d 668, 691 (9th Cir. 2001). Because Congress clearly intended to regulate traditional areas of state concern, the State cannot invoke its police powers to justify a law that unambiguously undermines federal law.

## V.      Plaintiffs Suffer Irreparable Harm.

Defendants argue that there is no irreparable harm here, as the challenged provisions "apply to entities, not individuals." Obj. at 3. At the outset, four "public schools" as defined under the law are plaintiffs in this case.[19] But public entities and schools consist of people who also need to enforce and conform their conduct to HB2 every day, with the prospect of employment consequences and funding loss if they fail to comply. This harm not only goes to NEA-NH's core functions, *see Nat'l Educ. Ass'n*, 779 F. Supp. 3d at 200, but also has direct employment consequences for individual educators. School districts themselves have an independent obligation to enforce HB2's categorical prohibitions at RSA 21-I:113 and RSA 186:72 against individual educators, and cannot simply ignore their prohibitions. *See Exhibit 38* (Shaps Decl.) ¶ 40; *Exhibit 41* (Downing Decl.) ¶ 34. NHDOE also has taken a broad view of its enforcement powers under the Educator Code of Conduct. *See Exhibit 34* (NEA-NH Decl.) ¶ 25.

Defendants' assertion that there is no irreparable harm because Plaintiffs filed their lawsuit on August 7, 2025—37 days after the law's July 1, 2025 effective date—similarly fails. Plaintiffs filed this lawsuit 29 days before the September 5, 2025 certification deadline that NHDOE is unilaterally imposing on K-12 public school districts, and 54 days before the law's actual September 30, 2025 certification deadline mandated in RSA 186:75, II. With NHDOE sticking to its self-imposed September 5 deadline memorialized in its July 11, 2025 enforcement letter,

---

[19] Funding penalties for school districts even exist for not complying with the certification process. *See* RSA 187:77, I (noting funding penalties "[s]hould a public school fail to abide by any section of this subdivision," which include the certification section at RSA 186:75, II).

Plaintiffs acted with speed in filing their lawsuit on August 7, 2025—which was filed within 27 days of NHDOE's July 11 letter (*Exhibit 2*), 21 days of NHDOE's July 17, 2025 letter (*Exhibit 3*), and 15 days of NHDAS's July 23, 2025 enforcement email (*Exhibit 4*).  It also should go without saying that a lawsuit like this cannot be filed hastily, but must be the product of deliberation to evaluate how the challenged law is being enforced.[20]

## VI.    A Statewide Injunction Is Appropriate.

A statewide injunction is appropriate here.  This Court has previously issued injunctions enjoining enforcement of facially unconstitutional practices or laws consistent with the well-established principle that a "facial challenge … means a claim that the law is invalid *in toto*—and therefore incapable of any valid application."  *See Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 494 n.5 (1982) (internal quotation marks and citation omitted); *see also Saucedo v. Gardner*, 335 F. Supp. 3d 202 (D.N.H. 2018); *Petrello v. City of Manchester*, No. 16-cv-008-LM, 2017 U.S. Dist. LEXIS 144793 (D.N.H. Sep. 7, 2017).

A statewide injunction is appropriate here for two reasons.  *First*, facial claims brought under the First Amendment satisfy the exception to *CASA*'s bar on universal injunctions given the unique doctrine that grounds such claims.  *See Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2548, 2557 n.12, 2565 (2025) (without addressing statewide injunctions specifically, explaining that "[a]n indivisible remedy is appropriate only when it would be 'all but impossible' to devise relief that reaches only the plaintiffs").  Justices of the Supreme Court (including Justice Barrett, who authored the *CASA* majority opinion) have recognized that certain facial claims may "present[] [their] own doctrinal complexities about the scope of relief" making them "an imperfect vehicle

---

[20] As to the balance of the equities, "the public interest in protecting constitutional rights is more profound than the public interest in carrying out the will of the voters through the implementation of state laws."  *NetChoice, LLC v. Reyes*, 748 F. Supp. 3d 1105, 1131 (D. Utah 2024) (internal quotations omitted).

for considering the general question of whether a district court may enjoin a government from enforcing a law against non-parties to the litigation." *Griffin v. HM Fla.-ORL, LLC*, 144 S. Ct. 1, 2 (2023) (Kavanaugh., J., *concurring in denial of a stay*). The question of scope of relief is of special concern in cases like this one bringing facial First Amendment claims. A less exacting standard applies to facial challenges under the First Amendment as compared to other types of facial suits "[t]o 'provide breathing room for free expression.'" *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024) (citation modified) (quoting *United States v. Hansen*, 599 U.S. 762, 769 (2023)). Here, only a statewide remedy would redress the statute's broader harms of chilling expression, including in higher education.[21]

*Second*, Plaintiff School Districts cannot obtain complete relief on their pre-emption claim absent a statewide injunction because they rely on other public entities throughout the State to help fulfill their duties under the IDEA, ADA, and Section 504. In passing the IDEA, Congress anticipated that not every school district will have the funds, capacity, or expertise to meet the unique academic and social needs of every disabled child. Thus, several provisions authorize or require school districts, private schools, public agencies, the State, and other institutions to share responsibility for delivering special education services under the IDEA and, by extension, related accommodations required by the ADA and Section 504. For example, if a district cannot provide appropriate special education services, placements, or accommodations in-district, it must coordinate with these entities to provide them.[22] In some circumstances, districts must rely on the

---

[21] *Labrador v. Poe by & through Poe*, 144 S. Ct. 921 (2024)—where the Supreme Court stayed a district court injunction pending disposition of an appeal that applied to non-plaintiffs—is inapposite where, unlike here, that case was not premised on First Amendment rights.

[22] 20 U.S.C. § 1413(a)(4)(A)(iii) (authorizing use of IDEA funds for "cost or risk sharing funds, consortia, or cooperatives for the local educational agency itself, or for local educational agencies working in a consortium of which the local educational agency is a part"); 34 C.F.R. § 300.103(a) ("if it is necessary to place a child with a disability in a residential facility, a State could use joint agreements between the agencies involved for sharing the cost of that placement."); 34 C.F.R. § 300.223(a) (authorizing state educational agency to require school districts to jointly establish programs for students with disabilities where each could not effectively meet the students' needs); 20 U.S.C.

State to provide special education services and accommodations directly to a disabled child. 34 C.F.R. § 300.227(a)(1)–(2). Compliance with the IDEA, ADA, and Section 504 also requires cross-district data exchange, including evaluations, IEP documents, and placement and funding determinations that classify individuals as disabled and collect demographic outcomes. 34 C.F.R. § 300.323(e)–(g). This frequently arises when a disabled student transfers districts, requiring the new district to obtain all relevant records to immediately provide comparable special education services. 20 U.S.C. § 1414(d)(2)(C)(i)(I) (IDEA); U.S. Dep't Educ., *Frequently Asked Questions: Section 504 Free Appropriate Public Education (Section 504)*.[23] Thus, Plaintiff School Districts cannot comply with the IDEA, ADA, or Section 504 unless public entities throughout the state can also "classif[y]" disabled students to "achieve demographic outcomes" of inclusion, academic achievement, and access, without risking state funds. *See* <u>Exhibit 41</u> (Downing Decl.) ¶¶ 5–6 (Plaintiff Grantham School District sends older students to attend Lebanon District schools for middle and high schools).

Alternatively—setting aside the workability concerns with an injunction that is not statewide in scope[24]—the scope of any injunction should at least include all Plaintiffs, including

---

§ 1412(a)(10)(B)(ii), (12)(B)(i) (state must ensure children with disabilities placed in private schools by their local educational agency are provided a FAPE); 34 C.F.R. § 300.154(a) (requiring that the financial responsibility of noneducational public agencies, such as State Medicaid agency, to ensure a FAPE precedes the financial responsibility of the LEA); 34 C.F.R. § 300.115(a)–(b) (including hospitals and institutions as "alternative placements" that districts must make available to disabled children).

[23] *Available at* https://www.ed.gov/laws-and-policy/civil-rights-laws/disability-discrimination/frequently-asked-questions-section-504-free-appropriate-public-education-fape ("If a student with a disability transfers to a district from another school district with a Section 504 plan, the receiving district should review the plan and supporting documentation."). State law also codifies the interdependence of public entities in serving disabled students. School districts retain the duty to provide special education services and accommodations to students attending other school districts, charter schools, homes for children, health-care facilities, and must therefore coordinate with and rely on these entities to implement a child's IEP and provide reasonable accommodations. RSA 186-C:3-a; 193:27–29; 194-B:11, III. Districts must similarly coordinate with courts and law enforcement in juvenile justice and juvenile delinquency proceedings to assess a child's eligibility for special education services and accommodations. RSA 169-B:22, I; RSA 169-D:5, VI; 169-C:20, I; 169-D:18, I.

[24] For example, Plaintiff NEA-NH's membership is not static with educators moving from NEA-NH districts to non-NEA-NH districts. Further, any entity could become an entity that contracts with Plaintiffs James T. McKim and New Hampshire Outright at any time. *See Jackson Fed'n of Tchrs. v. Fitch*, No. 3:25-CV-417-HTW-LGI, 2025 U.S. Dist.

any non-party public schools and public entities that employ or contract/work with them or their members.  Without an injunction as to the non-party schools and public entities that employ members of Plaintiff NEA-NH and Dottie Morris—or that contract with James McKim and New Hampshire Outright—there would be significant workability issues where harm "is likely to occur" as to members of Plaintiff NEA-NH, Dottie Morris, James McKim, and New Hampshire Outright, as they would not obtain complete relief consistent with *CASA.  See Nat'l Educ. Ass'n*, 779 F. Supp. 3d at 202.  For example, if an injunction applies only to Plaintiff NEA-NH member educators (but not the non-party school districts themselves that employ them), the non-party school districts would be compelled to operate an unworkable dual system where NEA-NH members/employees would be covered by the injunction, but not the non-member administrators who control programming and who have the ability to discipline NEA-NH members for violating HB2's terms.[25]

---

LEXIS 159460, at *29–30 (S.D. Miss. Aug. 18, 2025) ("[I]t would be impracticable, if not impossible, to carve out an injunction that is distinctly limited to the named plaintiffs.  As an example, institutions may need to craft different classes, textbooks, and curricula to accommodate named Plaintiff teachers and students."); *Washington v. Trump*, 145 F.4th 1013, 1038 (9th Cir. 2025) (citing workability concerns).

[25] Modeled after the order issued in *Nat'l Educ. Ass'n v. United States Dep't of Educ.*, such a more limited preliminary injunction order would be as follows: Defendants and their agents are enjoined from enforcing and/or implementing HB2's "anti-DEI" provisions at RSA 21-I:112-116 and RSA 186:71-77 and their reporting and certification requirements against the Plaintiffs, their members, and any entity that employs, contracts with, or works with one or more Plaintiffs or one or more of Plaintiffs' members.

Dated: August 25, 2025

Respectfully submitted,

*/s/ Gilles R. Bissonnette*

Zoe Brennan-Krohn*
Malhar Shah*
Disability Rights Program
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
425 California Street
San Francisco, CA 94104
(415) 343-0769
zbrennan-krohn@aclu.org
mshah@aclu.org

Gilles R. Bissonnette (N.H. Bar No. 265393)
Henry R. Klementowicz (N.H. Bar No. 21177)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NEW HAMPSHIRE
18 Low Avenue
Concord, NH 03301
(603) 224-5591
gilles@aclu-nh.org
henry@aclu-nh.org

Sarah Hinger*
Alexis Alvarez*
Racial Justice Program
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 519-7882
shinger@aclu.org
alexisa@aclu.org

Callan E. Sullivan┬ (N.H. Bar No. 20799)
Lauren Snow Chadwick┬ (N.H. Bar No. 20288)
NATIONAL EDUCATION ASSOCIATION-NEW
HAMPSHIRE
9 South Spring Street
Concord, NH 03301
(603) 224-7751
csullivan@nhnea.org
lchadwick@nhnea.org

Chris Erchull (N.H. Bar No. 266733)
Hannah Hussey*
GLBTQ LEGAL ADVOCATES & DEFENDERS
18 Tremont, Suite 950
Boston, MA  02108
(617) 426-1350
cerchull@gladlaw.org
hhussey@gladlaw.com

James A. O'Shaughnessy+ (N.H. Bar No. 19719)
Meghan S. Glynn+ (N.H. Bar No. 21168)
DRUMMOND WOODSUM & MACMAHON
670 N. Commercial Street, Suite 207
Manchester, NH 03101
(603) 792-7414
joshaughnessy@dwmlaw.com
mglynn@dwmlaw.com

* admitted *pro hac vice*
┬ appearing only on behalf of NEA-NH
+ appearing only on behalf of the Oyster River Cooperative School District, the Dover School District, the Somersworth School District, and the Grantham School District