# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| NATIONAL EDUCATION ASSOCIATION-NEW HAMPSHIRE; OYSTER RIVER COOPERATIVE SCHOOL DISTRICT; DOVER SCHOOL DISTRICT; SOMERSWORTH SCHOOL DISTRICT; GRANTHAM SCHOOL DISTRICT; DOTTIE MORRIS; JAMES T. MCKIM, JR.; and NEW HAMPSHIRE OUTRIGHT, <br><br> Plaintiffs, <br><br> v. <br><br> JOHN M. FORMELLA, in his official capacity only as the Attorney General of the State of New Hampshire; <br><br> CAITLIN DAVIS, in her official capacity only as the Commissioner of the New Hampshire Department of Education; <br><br> CHARLIE ARLINGHAUS, in his official capacity only as the Commissioner of the New Hampshire Department of Administrative Services; and <br><br> MONICA MEZZAPELLE, in her official capacity only as the State Treasurer of New Hampshire, <br><br> Defendants. | **Case No.: 1:25-cv-293** <br><br><br><br><br><br> **DEFENDANTS' SURREPLY IN OPPOSITION TO PLAINTIFFS' EMERGENCY MOTION FOR PRELIMINARY INJUNCTION** |

I. **DEFENDANTS DID NOT REWRITE THE LAW.**

Despite the zealous advocacy on the part of the Plaintiffs, State Defendants do not "seek to rewrite the law's scope." *See* ECF 36 at 5. State Defendants simply put forth a textual, mechanical, and reasonable analysis of the contested statutes to show to this Court, and the Plaintiffs, that the law is narrow, objective, and sufficiently clear. By contrast, the Plaintiffs have advanced an all-encompassing interpretation that shirks elementary principles of statutory construction in an attempt to force the statute into conflict with the constitution and federal law. Between these options, this Court must endorse the defendants' interpretation.

The New Hampshire Supreme Court does not construe statutes "to lead to an absurd result that the legislative body could not have intended." *Working Stiff Partners, LLC v. City of Portsmouth*, 172 N.H. 611, 620 (2019). "Thus, as between a reasonable and unreasonable meaning of the language used, the reasonable meaning is to be adopted." *Petition of Poulicakos*, 160 N.H. 438, 444 (2010). Likewise, the New Hampshire Supreme Court construes statutes "so as to avoid bringing it into conflict with the constitution." *State v. Paul*, 167 N.H. 39, 45 (2014). This Court, too, has a "duty to avoid constitutional difficulties" when interpreting statutes "if such a construction is fairly possible." *Boos v. Barry*, 485 U.S. 312, 331 (1988).

As discussed at length in its Opposition, the challenged provisions provide that no "public entity," "political subdivision,", or "public school" is permitted to "implement, promote, or otherwise engage in any DEI[1]-related initiatives, programs, training, or policies." RSA 21-I:113; RSA 186:72. The law further provides that "[n]o state funds shall be expended for DEI-related activities, including but not limited to implicit bias training, DEI assessments, critical

---

[1] DEI is defined as: "any program, policy, training, or initiative that classifies individuals based on a characteristic identified under RSA 354-A:1 for the purpose of achieving demographic outcomes, rather than treating individuals equally under the law."

2

race theory, or race-based hiring, promotion, or contracting preferences." *Id*. The challenged provisions also prohibit public entities, political subdivisions, state agencies, and public schools from entering into or renewing any contract "that includes DEI-related provisions, including requirements for contractors to implement DEI programs, conduct DEI training, or comply with DEI-related reporting obligations." RSA 21-I:114; RSA 186:73.

Plaintiffs take issue with defendants not answering each and every as-applied hypothetical used throughout their hundreds of pages of filings. Defendants do not bear the burden in this case, and the Supreme Court and numerous federal courts of appeals have recognized that a facial vagueness claim cannot be sustained through a series of hypotheticals, even if those hypotheticals present close cases. *United States v. Williams*, 553 U.S. 285, 306 (2008); *Hernandez v. City of Phoenix*, 43 F.4th 966, 983 (9th Cir. 2022); *Platt v. Bd. of Cmmr's on Grievances & Discipline of the Oh. Sup. Ct.*, 894 F.3d 235, 241 (6th Cir. 2018); *Act Now to Stop War & End Racism Coal., et al. v. District of Columbia*, 846 F.3d 391, 412 (D.C. Cir. 2017); *Keepers, Inc. v. City of Milford*, 807 F.3d 24, 27, 31 (2d Cir. 2015). Plaintiffs' proof-by-hypothetical argument is therefore a red herring.

It bears noting, though, that at least some of Plaintiffs' hypotheticals do not present close cases. "Demographic outcome" most readily means a policy objective that deliberately aims to produce, change, or maintain specific group-level numbers or proportions (e.g., a target percentage of students of a particular sex, race, or other protected characteristic). *See* ECF 26 at 19-20. That includes quotas or explicit targets established to alter the composition of participants. *See id*. In other words, demographic outcomes, under the contested statutes, relate to things that are for the ***purpose*** of obtaining a targeted result that changes who is represented in a program by protected characteristics (race, sex, religion, etc.) rather than by neutral criteria like

3

skill, interest, or membership.

To address some of Plaintiffs hypotheticals: Plaintiffs ask about girls' sports teams and ask whether under the contested statutes a school could even create such a team. *See* ECF 36 at 8. Of course, they can – creating a school sports team for girls is a program or policy "for the purpose of . . . treating individuals equally under the law", not an action "for the purpose of achieving demographic outcomes." In other words, it remedies unequal access and protects individual opportunities rather than manipulating group statistics. If a school makes the team so girls have a place to play (purpose = access), that's ordinary single-sex programming and is allowed under the contested statutes. By contrast, if the school creates a co-ed sports team and requires it to be comprised of 50% girls, that is against the prohibitions contained in the contested statute; its purpose is to create a demographic outcome. In other words, it is about the *intent* of the program, not the derivative result.

As for whether schools can "track . . . racial and ethnic groups in its student population" – of course they can. *See* ECF 36 at 8. Tracking statistical date related to specific demographic groups can be, and frequently is, consistent with treating people equally under the law and does not, by itself, go against the definitions within the contested statutes unless it is used to impose demographic outcomes. *Cf Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.* 600 U.S. 181, 230-231 (2023).

As for whether a UNH law professor can endorse Justice Sotomayor's dissent in *Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.,* - again, of course, so long as the professor follows pedagogical norms – for instance, contextualizing the endorsement, encouraging debate, and avoiding coercion of their students to adopt the dissent as their life's mission for fear of retaliation.

4

Plaintiffs also ask whether schools can "establish a non-discrimination policy" to protect the civil rights of "transgender students." *See* ECF 36 at 8. This question is closer than the other questions only insofar as it lacks appropriate context to determine whether it violates the challenged laws. A nondiscrimination policy that treats all persons equally, including transgender students, would not violate the statute. A policy that specifically protects the civil rights of transgender students by placing them in a position of preference compared to other students would violate the policy. The fact that a school would have to consider context in determining whether a policy violates the law does not render that law facially vague. *See Williams*, 553 U.S. at 306.

## II. PLAINTIFFS HAVE NOT ESTABLISHED THAT THERE IS A SUBSTANTIAL LIKELIHOOD OF SUCCESS

### a. Plaintiffs have failed to show that they have standing.

Again, Plaintiffs focused the standing section of their complaint nearly entirely on the purported injuries they allege that they will suffer if the contested statutes go into effect. *See* ECF 1 ¶¶ 21–105. They do not trace these purported injuries to specific claims nor do they explain why these injuries are caused by specific provisions of the laws they challenge. They instead refer to both portions of the code they challenge simply as "HB2," without identifying which law (let alone which part of each law) causes the harm they allege.

Plaintiffs did not address standing at all in their Emergency Motion for Preliminary Injunction. They devote only a handful of pages to this issue in their reply brief, without tracing their alleged injuries, per plaintiff and per claim, to the specific potions of the statutes they contest. This is insufficient to establish standing for any of the plaintiffs, and it does not come

close to meeting the "heightened specificity" required for organizations to establish standing. *Draper*, 827 F.3d at 3 (quoting *AVX Corp.*, 962 F.2d at 115).

Again, it is manifestly not Defendants' burden to *disprove* that Plaintiffs have standing. Plaintiffs' must meet that burden, and they must do so through affidavits and evidence. Plaintiffs' effort to shift that burden to Defendants serves only as tacit acknowledgment that they have not satisfied it. For this reason alone, they cannot obtain a preliminary injunction.

### b. The contested statutes are not pre-empted.

The plaintiffs argue that the presumption against preemption should not be applied in this case, but they do not explain why. The plaintiffs do not even attempt to dispute, nor can they in earnest, that laws regulating the policies and programs adopted by state entities and the expenditure of state funds are traditionally left to the states.

Rather, Plaintiffs appear to largely assume that even if the presumption against preemption does apply, it cannot save the challenged provisions because the challenged provisions "unambiguously conflict[] with and frustrate[] the purpose of federal law." ECF 36 at 18. But that runs headlong into the plaintiffs' vagueness argument. If the plaintiffs can interpret the challenged provisions well enough to discern that they "unambiguously conflict[]" with federal statutes, then the challenged provisions are not vague. Which is it?

Whichever it is, the result is the same — the challenged provisions are not preempted by the ADA, the IDEA, or Section 504. Those statutes require *individualized* accommodations for the purpose of ensuring that disabled individuals are treated equally under the law. To the extent that that can be construed as a "demographic outcome," it is either one that the statute permits or is specifically exempted from the statute's definition of that phrase per the last clause of the definition of DEI, which reads "rather than treating individuals equally under the law." RSA 21-

I:112, II; RSA 186:71, I. Accordingly, the challenged provisions expressly and unambiguously permit compliance with the requirements of the ADA, the IDEA, and Section 504.

Further, the plaintiffs' assertion that "Congress clearly intended to regulate traditional areas of state concern" in passing the ADA, the IDEA, and Section 504, *see* ECF 36 at 18-19, is untenable. Those statutes do not include express preemption provisions, and it certainly is not clear from those statutes that Congress intended to preempt state statutes that regulate the kind of programs, trainings, and initiatives that state agencies may implement or expend funds on. Such an argument, if taken to its logical conclusion, would mean that States were not free to pass their *own* antidiscrimination provisions that mirror or exceed the protections contained in federal law. Presumably, Plaintiffs do not believe that Congress has so occupied the field of antidiscrimination law that States lack the power to legislate in this area.

Additionally, the Supremacy Clause does not contain an implied cause of action for a private party to enjoin a state statute. *See Armstrong v. Exceptional Child Ctr., Inc*, 575 U.S. 320, 327 (2015). The ADA, the IDEA, and Section 504 all allow for private parties to bring lawsuits to enforce their provisions. Accordingly, if the State were ever to adopt the plaintiffs' contorted construction of the challenged provisions and apply them to disabled people in the way that the plaintiffs fear — there is no reason to believe that will happen — then the harmed individual will have an adequate remedy at law. Equitable relief is not proper here just because the plaintiffs have put forth certain thorny hypotheticals under their far-fetched interpretation of the challenged provisions.

    **c. Plaintiffs have failed to show that they will face irreparable harm absent an injunction.**

The plaintiffs fail to show that contested statutes and, more importantly, which specific of their provisions provide irreparable harm. "A showing of irreparable harm requires an actual, viable, presently existing threat of serious harm that cannot adequately be remedied through money damages alone." *PC Connection Inc. v. Sillich*, 673 F. Supp. 3d 131, 137 (D.N.H. 2023) (citations omitted). Plaintiffs effectively argue that their speech is chilled and the law is vague, which frustrates their core missions. However, and as discussed throughout defendants' papers, so defendants will not reiterate it – such is simply not true.

### III. THE PLAINTIFFS HAVE FAILED TO JUSTIFY A "STATEWIDE INJUNCTION."

The plaintiffs offer three arguments for why the Court should preliminarily enjoin RSA RSA 21-I:112-116 and RSA 187:71-77 in their entirety statewide. First, they contend that the Supreme Court's decision in *Trump v. CASA, Inc.* does not apply to facial First Amendment claims, and that they should receive a "statewide" injunction at least on that claim. Second, they contend that they are entitled to a "statewide" injunction on their preemption claims because any more limited relief would be unworkable. Finally, and in the alternative, they contend that "any injunction should at least include all Plaintiffs, including any non-party public schools and public entities that employ or contract/work with them or their members." ECF Doc. No. 36 at 24–25. None of these arguments are persuasive.

The plaintiffs' First Amendment-based argument fails for several reasons. As a threshold matter, the plaintiffs have not explained anywhere in their filings which provisions of RSA 21-I:112-116 and/or RSA 187:71-77 they believe violate the First Amendment. They appear to premise their First Amendment challenge on how the statutes affect schools and educators, and they do not explain how that challenge extends to portions of the statutes that do not, on their

face, appear to apply in that context. It is the plaintiffs' burden to demonstrate that they are entitled to the injunction they seek, and they have not demonstrated that their First Amendment claim even reaches all the statutes they challenge, much less must extend "statewide."

Even setting that aside, however, the plaintiffs do cite any binding authority that would exempt First Amendment claims from *CASA*'s reach. To the extent the plaintiffs rely on concurring opinions, those are not binding decisions, and they predate the holding in *CASA* in any event. And footnote 12 in the *CASA* decision does not support the weight the plaintiffs place on it. The citation in the footnote is not a First Amendment case. *See* 145 S. Ct. 2540, 2557 n.12 (2025) (citing *Shaw v. Hunt*, 517 U.S. 899 (1996). The plaintiffs' contention that it would be "all but impossible for courts to craft relief that is complete *and* benefits only the named plaintiffs," *id.*, because the facial First Amendment standard is less exacting than other facial claims is a non sequitur. Declarations and injunctions are different remedies. *See Brito v. Garland*, 22 F.4th 240, 251 (1st Cir. 2021) (discussing the differences between the remedies). Thus, whether a court has a basis to declare a law facially unconstitutionally does not answer the scope of appropriate injunctive relief. The Supreme Court made clear in *CASA* that universal injunctions could not be justified on the grounds that they are "an appropriate remedy to preserve equal treatment among individuals when the [government] adopts a facially unlawful policy" or "forcing plaintiffs to proceed on an individual basis can result in confusion or piecemeal litigation that imposes unnecessary costs on courts and others." *Id.* The plaintiffs have not explained in this case why it is not *possible* to craft injunctive relief on their First Amendment claim that is limited to the plaintiffs themselves.

The plaintiffs' reliance on their preemption claims fails for similar reasons. As with their First Amendment claim, the plaintiffs fail to explain how their preemption claims reach every

portion of the laws they challenge. And the plaintiffs again do not explain why it would be *impossible* to issue an injunction on their preemption claims limited only to the plaintiffs. They argue, instead, that such an injunction would be cumbersome or lead to confusion. The Supreme Court made clear in *CASA* that these are not justifications for extending injunctive relief beyond the parties to a dispute. *Id.*

The plaintiffs' alternative argument also runs headlong into *CASA*. The workability concerns the plaintiffs' express are essentially just policy justifications for relief extending to nonparties. However weighty these arguments may be in the abstract, the Supreme Court made clear that "policy pros and cons are beside the point." *Id.* The plaintiffs do not dispute that they are seeking relief that extends beyond the parties to this case. *See* ECF Doc. No. 36 at 25. This is precisely the type of injunction that, in the wake of *CASA*, a district court may not issue.

## CONCLUSION

For the foregoing reasons, the Court should deny the plaintiffs' motion for a preliminary injunction.

                Respectfully submitted,

                JOHN M. FORMELLA, in his
                official capacity only as Attorney General
                of the State of New Hampshire,

                CAITLIN DAVIS, in her official capacity as
                Commissioner of the Department of Education,

                CHARLIE ARLINGHAUS, in his official
                capacity as the Commissioner of the New
                Hampshire Department of Administrative
                Services,

                *and*

                                      MONICA MEZZAPELLE, in her official capacity as the State Treasurer of New Hampshire

                                      By their attorney,

                                      JOHN M. FORMELLA
                                      ATTORNEY GENERAL

Date: August 26, 2025                  */s/ Brandon F. Chase*
                                      Brandon F. Chase, Bar #270844
                                      Senior Assistant Attorney General
                                      Civil Bureau
                                      Sam Gonyea, Bar # 273264
                                      Assistant Attorney General
                                      Office of the Solicitor General
                                      New Hampshire Dept. of Justice
                                      1 Granite Place
                                      Concord, NH 03301
                                      (603) 271-3650
                                      Brandon.F.Chase@doj.nh.gov
                                      Sam.M.Gonyea@doj.nh.gov

## Certificate of Service

     I hereby certify that a copy of the foregoing was served on all counsel of recording using the Court's electronic-filing service.

                                        */s/ Brandon F. Chase*
                                        Brandon F. Chase