# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW HAMPSHIRE

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

National Education
Association-New Hampshire, et al.,

      Plaintiff,

v.

John M. Formella, New Hampshire
Attorney General, et al.,

      Defendants.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Civil No. 1:25-cv-00293-LM

## DEFENDANTS' ANSWER TO COMPLAINT AND STATEMENT OF DEFENSES AND DEMAND FOR JURY TRIAL

Defendants, John M. Formella, New Hampshire Attorney General, Catlin Davis, Commissioner of New Hampshire Department of Education, Charlie Arlinghaus, Commissioner of New Hampshire Department of Administrative Services, and Moncia Mezzapelle, State Treasurer of New Hampshire (collectively "Defendants"), by and through counsel, the New Hampshire Office of the Attorney General, hereby move and state as follows:

**Please note that for ease of reading, the allegations in the Plaintiff's August 7, 2025 Complaint (ECF 1) are repeated below with responses following immediately thereafter in bold-faced print.**

**The within Answers are provided on behalf of all Defendants unless explicitly stated.**

**General Denial: Defendants generally deny the allegations set forth in the Complaint. Any allegations not expressly admitted or denied herein are denied. Defendants reserve the right to amend or supplement their Answer.**

## INTRODUCTION

1. "The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967). Our schools cannot fulfill their role as the nation's "nurseries of democracy," *Mahanoy Area Sch. Dist. v. B.L. ex rel. Levy*, 594 U.S. 180, 190 (2021), without teaching students about the world, including the historical and lived experiences of people of different races, genders, and abilities. Providing inclusive and expansive educational opportunities is critical to giving students an education that prepares them to succeed in a pluralistic democratic society. An inclusive education means ensuring that students with disabilities receive the access to which they are entitled under federal law. An inclusive education means ensuring that transgender students are protected from discrimination. An inclusive education means ensuring that girls are provided meaningful sports opportunities. In New Hampshire, the State has called into question all of these vital—and legally mandated—practices that help students feel seen, heard, and included.

   **ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied.**

2. Effective July 1, 2025, New Hampshire enacted RSA 21-I:112-116 and RSA 186:71-77 in House Bill 2 ("HB2") purporting to prohibit the implementation or "promot[ion]" of, or engagement in, "initiatives, programs, training, or policies" in public entities and "public schools" that are "related" to "diversity, equity, or inclusion" (or "DEI"). *See* RSA 21-I:113-14; RSA 186:72-73. "DEI" is defined as "any program, policy, training, or

initiative that classifies individuals based on a characteristic identified under RSA 354-A:1"—namely, age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, or national origin—"for the purpose of achieving demographic outcomes, rather than treating individuals equally under the law." *See* RSA 21-I:112, II; RSA 186:71, I. "Classif[ying]" and "achieving demographic outcomes" are undefined under HB2. The law also does not define how "related" to "DEI" a program must be before it becomes unlawful. HB2 also seeks to categorically ban "implicit bias training," "critical race theory," and "DEI assessments," each of which is undefined, leaving educators and public employees to guess what is covered. The law does not provide any provision authorizing state agencies to interpret its terms through rulemaking. This law is attached as *Exhibit 1*.

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied.**

3. HB2's anti-DEI provisions are hopelessly vague in violation of the Fourteenth Amendment and Part I, Article 15 of the New Hampshire Constitution. As with other prior state and federal efforts to ban "DEI" that have been either preliminarily or permanently enjoined, HB2's definition of "DEI as a concept is broad: one can imagine a wide range of viewpoints on what the values of diversity, equity, and inclusion mean when describing a program or practice." *See Nat'l Educ. Ass'n v. United States Dep't of Educ.*, No. 25-cv-091-LM, 2025 U.S. Dist. LEXIS 77874, at *61 (D.N.H. Apr. 24, 2025) (McCafferty, C.J.); *see also Local 8027, AFT-N.H. v. Edelblut*, No. 21-cv-1077-PB, 2024 U.S. Dist.

LEXIS 94052, at *12 (D.N.H. May 28, 2024) (holding that the prohibitions in a New

Hampshire law "against teaching banned concepts are unconstitutionally vague".)

(Barbadoro, J.) (appeal filed July 26, 2024; 1st Cir. Argued Apr. 8, 2025). [1]

> [1] *See also Miss. Ass'n of Educators v. Bd. of Trs. of the State Insts. of Higher Learning*, No. 3:25-cv-00417-HTW-LGI, 2025 U.S. Dist. LEXIS 140078, at *8 (S.D. Miss. July 22, 2025) (granting temporary restraining order with respect to Mississippi law imposing "restrictions on Mississippi public institutions of education, prohibiting speech and programming related to so-called 'divisive concepts,'" with withdrawal of all state funding after two violations); *AFT v. Dep't of Educ.*, No. SAG-25-628, 2025 U.S. Dist. LEXIS 77811, at *70, __ F. Supp. 3d __ (D. Md. Apr. 24, 2025) ("The Dear Colleague Letter of February 14, 2025 is stayed pursuant to 5 U.S.C. § 705 pending final resolution by this Court."); *NAACP v. United States Dep't of Educ.*, No. 25-cv-1120 (DLF), 2025 U.S. Dist. LEXIS 78302, at *25, __ F. Supp. 3d __ (D.D.C. Apr. 24, 2025) ("ORDERED that pending a further order by the Court, the defendants, as well as their officers, employees, and agents, are PRELIMINARILY ENJOINED from implementing and enforcing the Certification."); *Pernell v. Fla. Bd. of Governors of the State Univ. Sys.*, 641 F. Supp. 3d 1218, 1287 (N.D. Fla. 2022) (preliminarily enjoining Florida's H.B. 7's prohibition on college instruction in part because it was "impermissibly vague"), *appeal filed and stay of injunction denied*, Nos. 22-13992-J, 22-13994-J, 2023 U.S. App. LEXIS 6591 (11th Cir. Mar. 16, 2023); *Honeyfund.com, Inc. v. DeSantis*, 622 F. Supp. 3d 1159, 1180-84 (N.D. Fla. 2022) (enjoining, in part, on vagueness grounds a Florida law that sought to bar employers from holding mandatory meetings for their employees if those meetings endorsed viewpoints that the state found offensive), *aff'd*, 94 F.4th 1272, 1283 n.6 (11th Cir. 2024) (declining to address vagueness claim); *Black Emergency Response Team v. Drummond*, 737 F. Supp. 3d 1158 (W.D. Okla. 2024) (preliminarily enjoining portions of similar state law) (appeal filed July 16, 2024); *Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*, 508 F. Supp. 3d 521, 529, 543-45 (N.D. Cal. 2020) (holding unconstitutional an executive order that prohibited the promotion of "divisive concepts" within federal trainings, including the idea that "the United States is fundamentally racist or sexist").

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion,**

**and/or a request for relief, and therefore no response is required. To the extent a**

**response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied.**

4. The scope of HB2 is broad. Under this new law, a "public school" is broadly defined as "any school, academic institution, or institution of higher education in this state supported by public funds." *See* RSA 186:71, II.[2] This means that HB2 applies not only to public school districts serving students in grades K–12, but also to private (including religious) K–12 schools that receive "public funds," including through Education Freedom Accounts ("EFAs").[3] HB2 further applies to public colleges and universities in New Hampshire. This includes the University of New Hampshire Franklin Pierce School of Law ("UNH Law").

[2] Significantly, HB2's definition of "public school" is materially different—and more expansive—than how a "public school" is defined elsewhere in New Hampshire law. *See* N.H. Code Admin. R. Ed 401.01(f) ("'Public school' means a school which is established and operated by a school district, maintained primarily by public funds, and administered by a school board whose members are elected as provided under the laws of the state of New Hampshire.").

[3] During the 2022-23 academic year, the top ten private school recipients of EFA funds included the following: Laconia Christian Academy; Concord Christian Academy; Portsmouth Christian Academy; Mount Royal Academy, Inc.; Trinity Christian School-Concord; Trinity High School; Dublin Christian Academy, Inc.; Claremont Christian Academy; St. Joseph Regional School Keene; and Cardinal Lacroix Academy. *See* Jeremy Margolis, *Inside EFAs: A Quarter of All Education Freedom Account Tuition Dollars Went to Five Christian Schools, Monitor Analysis Finds*, Concord Monitor (Dec. 19, 2024), https://www.concordmonitor.com/education-freedom-account-funding-analysis-new-hampshire-tuition-religious-schools-58220424; *see also* Ethan Dewitt and William Skipworth, *Ayotte Signs Universal EFA Bill, Parental Bill of Rights*, N.H. Bulletin (June 10, 2025), https://newhampshirebulletin.com/2025/06/10/ayotte-signs-universal-efa-bill-parental-bill-of-rights/; Kevin Landrigan, *EFA Enrollment Nearly Doubles, Hits Cap in New Law*, Union Leader (Aug. 4, 2025), https://www.unionleader.com/news/education/efa-enrollment-nearly-doubles-

hits-cap-in-new-law/article_1bf9793f-0634-4528-8638-c8faf670ca61.html?block_id=868819.

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied.**

5. Significantly, HB2's "public school" definition also means that the law, in unprecedented fashion, applies to private (including religious) colleges and universities in New Hampshire that are "supported by public funds," including those that receive state-funded scholarships to help specific New Hampshire residents attend. Consistent with this interpretation, on July 17, 2025, Defendant NHDOE directed a letter to both public *and private* colleges and universities in New Hampshire—including Dartmouth College, Southern New Hampshire University, Saint Anselm College, Thomas More College of Liberal Arts, among others—demanding compliance with HB2 on the ground that these institutions "receive[] public support" through state-funded scholarships provided to students under the UNIQUE Program (both Annual and Endowment)2025 Letter and College/University Report List).[4] and the Governor's Scholarship Program.[5] *See Exhibit 3* (NHDOE July 17, 2025 Letter and College/University Report List).

[4] According to the University of New Hampshire, "[t]he UNIQUE programs provide increased, equal access and choice for deserving, high-need New Hampshire residents seeking the benefits of postsecondary education at a New Hampshire institution." *See* University of New Hampshire, College of Professional Studies, *Federal and State Grants*, https://cps.unh.edu/online/tuition-aid/types-aid/federal-state-grants (last visited July 31, 2025). For the UNIQUE Endowment Program, the annual award is up to $2,000 per semester. To be eligible, the student must, among other things, be a New Hampshire resident, have financial need, and meet certain academic progress requirements. *Id.* For the UNIQUE Allocation Program, the annual award is up to $1,250 per semester based on available funding. To be eligible, the student must, among other things,

also be a New Hampshire resident, have financial need, and meet certain academic progress requirements. *Id.*

[5] According to the New Hampshire State Treasurer, "[t]he Governor's Scholarship Program provides scholarships of up to $2,000 a year to eligible New Hampshire students toward the cost of a postsecondary educational or training program." *See* N.H. State Treasury, *Governor's Scholarship Program*, https://www.nh.gov/treasury/scholarship-program/index.htm (last visited July 31, 2025). Requirements of the Governor's Scholarship Program are described in RSA 195-H:13.

**ANSWER: The allegations in the foregoing paragraph are admitted to the extent that NHED transmitted an email to public and private colleges and universities on July 17, 2025, including but not limited to Dartmouth College, Southern New Hampshire University, Saint Anselm College, Thomas More College of Liberal Arts. To the extent this paragraph contains any legal arguments or legal conclusions, same are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied. To the extent this paragraph contains representations as to the content or meaning of a document, same are denied and Plaintiffs are put to their burden of proof thereof. Defendants submit that the document itself is the best evidence of its content and meaning.**

6. HB2's "DEI-related" prohibitions do not just apply to "public schools"; these prohibitions also independently apply to any "public entity" (which also would include public K–12 school districts). *See* RSA 21-I:113-114. In other words, HB2 includes "programs" and "initiatives"—which are undefined terms—of "public entities" like public libraries, Defendant NHDOJ, Defendant NHDOE, the state police, the Police Standards and Training Council ("PSTC"), municipalities, every police department in

New Hampshire, and the Department of Health and Human Services, among many others.

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied.**

7. In addition to its categorical anti-DEI prohibitions, HB2 requires public entities and "public schools" to report any contracts that include "DEI" provisions to Defendants New Hampshire Department of Administrative Services and Defendant NHDOE, respectively. This report shall include contract descriptions, the specific DEI provisions, and the total obligation of each contract. *See* RSA 21-I:115; RSA 186:75, II. "Public schools" in particular must "sign" and "certify" their report by "[n]o later than September 30, 2025." *See* RSA 186:75, II. Notwithstanding HB2's September 30, 2025 statutory deadline, NHDOE is demanding that "public schools" complete this certification under the pains and penalties of perjury ***by September 5, 2025***. *See Exhibit 2* (NHDOE July 11, 2025 Letter); *see also Exhibit 3* (NHDOE July 17, 2025 Letter). This upcoming deadline demands emergency relief from this Court.

**ANSWER: The allegations in the foregoing paragraph are admitted to the extent that, at one point, NHDOE requested that any signed, certified report of compliance and Addendum listing the identified contract be submitted to NHED no later than September 5, 2025. Any remaining allegations are denied. To the extent this paragraph contains any legal arguments or legal conclusions, same are denied to the extent they are inconsistent with applicable law. To the extent this paragraph**

**contains representations as to the content or meaning of a document, same are denied and Plaintiffs are put to their burden of proof thereof. Defendants submit that the document itself is the best evidence of its content and meaning.**

8. The penalties for a violation of HB2's terms are massive. HB2 does not just seek to prohibit "DEI" in public entities and "public schools"; it also seeks to strip away millions of dollars in critical "public funding" for these schools if they fail to comply with or violate the law's ambiguous anti-DEI provisions, *even if the violation is "unknowing."* *See* RSA 187:77, I-II. As one New Hampshire district court has concluded in a similar case, this lack of scienter is fatal. *See Local 8027, AFT-N.H.*, 2024 U.S. Dist. LEXIS 94052, at *40 ("Because teachers can be found to have crossed that indistinct line without any finding of scienter, the vagueness of the Amendments is compounded rather than mitigated."). HB2 imposes these penalties all while providing no process—let alone process that is due—to contest the unilateral decision of NHDOE that a "knowing" or "unknowing" violation has occurred. With critical funding in the balance, NHDOE serves as the judge, jury, and executioner as to whether all public funding is revoked.

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied.**

9. Because a violation can occur "unknowingly," HB2 creates a situation where every person that speaks for a school district exposes the district and its public funding to risk. With millions of dollars and the fate of public education at risk, the stakes could not be higher for school districts, their educators, and their students if an educator "unknowingly" runs

afoul of HB2.  As one court recently explained, "[t]he chilling effect is compounded in the academic context, where the fear of losing state funding compels institutions to over-correct in ways that suppress constitutionally protected speech censorship." *See Miss. Ass'n of Educators v. Bd. of Trs. of State Insts. of Higher Learning*, No. 3:25-cv-00417-HTW-LGI, 2025 U.S. Dist. LEXIS 140078, *13 (S.D. Miss. July 22, 2025).  Indeed, "[t]he Supreme Court repeatedly has held that the government may not condition access to public benefits on the relinquishment of constitutional rights." *Id.* at *14–15 (citing *Perry v. Sindermann*, 408 U.S. 593, 597 (1972)). This is precisely the problem with HB2.

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied.**

10. "Public funding" under HB2 also is broad and includes state funds, and possibly even federal funds where NHDOE acts as a "pass through" in distributing these funds to local public school districts. Only "public schools" are subject to these penalties in the event of a violation; other "public entities" are excluded from these funding penalties.  *See* RSA 21-I:112-117. For K–12 public school districts, the collective amount of annual state funding on the line could be over $1 billion. *See Exhibit 5* (N.H. School Funding Fairness Project, "Vague Language in Budget Threatens State Funding for Schools" (June 13, 2025)).  This includes the $4,182 per pupil base adequacy aid amount and other per pupil differentiated aid amounts (including for students who receive free or reduced meals, who are English language learners, and who receive special education services) that the state provides to school districts under RSA 198:40-a, II.[6] This can amount to millions of

dollars for an individual public school district. Yet, under the New Hampshire

Constitution, disbursement of these state funds to public school districts is not optional or

conditional; the State is obligated to disburse these funds so districts can provide an

adequate education consistent with Part II, Article 83 of the New Hampshire

Constitution.

> [6] *See* NHDOE, *FY 2025 Adequate Education Aid* (2025),
> https://www.education.nh.gov/sites/g/files/ehbemt326/files/inline-
> documents/sonh/fy2025-adequacy-grants-explained-september-2024.pdf.

**ANSWER: The allegations in the foregoing paragraph are admitted to the extent**

**that NHDOE distributes Title I-IV funds and IDEA funds to school districts.  The**

**remaining allegations in this paragraph appear to contain a legal argument, a legal**

**conclusion, and/or a request for relief, and therefore no response is required. To the**

**extent a response is required, the allegations in this paragraph are denied to the**

**extent they are inconsistent with applicable law. Any remaining allegations are**

**denied.**

11. For public and private colleges and universities in New Hampshire, too, the funding

    penalties are significant. The annual state funds at stake include millions of dollars the

    State provides public colleges and universities to support operating costs,[7] and at least

    over $22 million in UNIQUE Program state scholarships (both Annual and Endowment)

    disbursed through June 30, 2025, and over $2 million in Governor's Scholarship Program

    state funds disbursed in fiscal year 2025. *See also Exhibit 3* (NHDOE July 17, 2025

    Letter).   In other words, HB2 effectively conditions state scholarship aid to New

    Hampshire-resident students on their college complying with HB2.  If the college does

not comply (even unknowingly), HB2 appears to cruelly rip away that student's aid through no fault of the student.

> [7] Under the previous budget that ended in June 2025, the University System of New Hampshire ("USNH") received $95 million in state aid per year, though the legislature recently reduced that amount in the current budget for 2026 and 2027. *See* Ian Lenehan, *UNH, Other Public Colleges Could Lose Tens of Millions in State Budget Cuts*, Granite State News Collaborative (Apr. 3, 2025), https://www.nhpr.org/education/2025-04-03/unh-usnh-university-system-new-hampshire-budget-cuts-state-funding ("USNH receives $95 million in state aid per year under the current state budget, according to USNH spokesperson Lisa Thorne."). Under the current budget that the legislature enacted in June 2025, two-year funding was cut by about $17.5 million. *See* Josh Rogers, *Funding Losses and Declining Enrollment Prompt UNH to Seek $17.5 Million in Fresh Cuts*, NHPR (July 2, 2025), https://www.nhpr.org/nh-news/2025-07-02/unh-budget-cuts-funding-losses-declining-enrollment.

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied.**

12. HB2 is replete with vagueness. To start, "classif[ying]" and "achieving demographic outcomes" are undefined under HB2. "Classify" is defined in the dictionary to mean "to consider (someone or something) as belonging to a particular group."[8] And "demographic" is defined to refer to "the statistical characteristics of human populations (such as age or income) used especially to identify markets."[9] Because all of the characteristics in RSA 354-A:1 are, of course, "statistical characteristics of human populations," HB2 would appear to prohibit public schools, and by extension their educators, from "considering" any such characteristics for the purpose of achieving any outcomes related to those characteristics.

"Programs" and "initiatives"—as well as the term "promote"—too are undefined terms in

HB2, but would include "programs of study" which capture curricular instruction.[10]

> [8] *Merriam-Webster* Dictionary, *Classify*, (last visited July 31,
> 2025).https://www.merriam-
> webster.com/dictionary/classify#:~:text=1,belonging%20to%20a%20particular%
> 20group (last visited July 31, 2025).
> [9] *Merriam-Webster* Dictionary, *Demographic*, https://www.merriam-
> webster.com/dictionary/demographic (last visited July 31, 2025).
> [10] New Hampshire's Administrative Rules for Education broadly define
> "program" as "a grouping of interrelated activities, opportunities, and resources
> designed to implement a particular goal." N.H. Code Admin. R. Ed 306.02(z).

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion,**

**and/or a request for relief, and therefore no response is required. To the extent a**

**response is required, the allegations in this paragraph are denied to the extent they**

**are inconsistent with applicable law. Any remaining allegations are denied.**

13. Indeed, HB2's application of the "DEI" definition to protected classes under RSA 354-

A:1 makes the law's prohibitions particularly indecipherable and at least arguably covers

well-established (and legally-mandated) "programs" and "initiatives" that school

administrators, school districts, and their educators employ every day to make certain

"demographic" groups feel more welcome and able to access education on equal terms.

These could include:

- A public school district establishing non-discrimination policies under RSA 193:39 to protect the civil rights of transgender students that are enumerated under RSA 193:38 and RSA 354-A:27-28.[11] Similar policies are required to "achieve demographic outcomes" by preventing bullying for protected groups (*see* RSA 193-F:2, II) under RSA 193-F:8;
- A public high school creating school sports teams for girls to comply with Title IX;
- A public middle or high school making "menstrual hygiene products available at no cost in all gender neutral bathrooms and bathrooms designated for females" consistent with RSA 189:16-a;

- A public middle school engaging in instruction designed to comply with RSA 189:11, I-c(j), which requires instruction on "[h]ow intolerance, bigotry, antisemitism, and national, ethnic, racial, or religious hatred and discrimination have evolved in the past, and can evolve, into genocide and mass violence, such as the Holocaust, and how to prevent the evolution of such practices";
- A state college (i) targeting older, life-long learners aged 50 and older for recruitment,[12] (ii) targeting senior citizen students who are age 65 and older for enrollment through tuition waivers,[13] or (iii) providing opportunities for religious students through spiritual activities[14]; or
- Executing a settlement agreement where a school district, to remedy alleged violations of Title VI of the Civil Rights Act of 1964, agrees to take steps aimed at providing greater access to college and career preparatory courses for Black and Latino students.[15]

The list goes on and on. Given HB2's vague and far-reaching scope in the education context, enforcers undoubtedly will arbitrarily decide when HB2 applies and when it does not. To the extent enforcers believe that any of this conduct is exempt from HB2, this merely underscores the vague, irrational, and incomprehensible parameters of the law.

[11] Nicholas A. Suarez, et al, "Disparities in School Connectedness, Unstable Housing, Experiences of Violence, Mental Health, and Suicidal Thoughts and Behaviors Among Transgender and Cisgender High School Students — Youth Risk Behavior Survey, United States, 2023," *CDC Morbidity and Mortality Weekly Report* (Oct. 10, 2024), http://dx.doi.org/10.15585/mmwr.su7304a6 (In 2023, "[t]ransgender and questioning students experienced a higher prevalence of violence, poor mental health, suicidal thoughts and behaviors, and unstable housing, and a lower prevalence of school connectedness than their cisgender peers. Compared with 8.5% of cisgender male students, 25.3% of transgender students and 26.4% of questioning students skipped school because they felt unsafe. An estimated 40% of transgender and questioning students were bullied at school, and 69% of questioning students and 72% of transgender students experienced persistent feelings of sadness or hopelessness, a marker for experiencing depressive symptoms.").

[12] University of New Hampshire, *About Us: Welcome to OLLI (Osher Lifelong Learning Institute)*, https://www.unh.edu/olli/about-us (last visited July 31, 2025) ("OLLI at UNH is a vibrant, member-driven educational program designed for lifelong learners aged 50 and over. Our focus is on learning for the sheer enjoyment of it, within a supportive and relaxed environment. Here, you'll explore a wide range of ideas and interests alongside a community of peers— without any tests, grades, or college prerequisites!").

[13] University of New Hampshire, College of Professional Studies, *Tuition Waivers & Discounts*, https://cps.unh.edu/online/tuition-aid/tuition-waivers-discounts (last visited July 31, 2025) ("New Hampshire residents who are age

65 or older and are not enrolled in a degree program are eligible to take a maximum of two credit-bearing courses per academic year tuition-free. Students are responsible for all other costs of attendance, including fees. Prospective students who will be age 65 or older as of the first day of the semester or term in which they wish to take a course may register on a space-available basis and must provide proof of age and New Hampshire residency.").

[14] University of New Hampshire, *Student Life Chaplain and Spiritual Life Association*, https://www.unh.edu/dean-of-students/student-life-chaplain-spiritual-life-association (last visited July 31, 2025) ("The UNH Chaplain and Spiritual Life Association is a spiritual community of associated chaplains, representing many of the world's religious, spiritual, and faith traditions, who share a collective commitment to serving the spiritual needs of the students, faculty, and staff of The University of New Hampshire.").

[15] U.S. Dep't of Educ., *U.S. Department of Education Announces Resolution of Manchester, N.H., School District Civil Rights Investigation: Agreement Provides Greater Access to College and Career Prep Courses for Black, Latino Students* (Apr. 10, 2014), https://cdn.ymaws.com/copaa.site-ym.com/resource/resmgr/SREC_Files/Resolution_Agreements/OCR_ResolutionNH.pdf.

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied.**

14. These contradictions are particularly evident in the context of disability where HB2's provisions directly contradict federal and state civil rights laws that guarantee integration and inclusion for individuals with disabilities. HB2 specifically incorporates "physical or mental disability" into its definition, thereby prohibiting public schools from "classify[ing]" people with disabilities "for the purpose of achieving demographic outcomes." Based on the dictionary definitions of these terms, HB2 prohibits schools from considering a person's disability for the purpose of achieving disability-related

outcomes. But federal disability rights laws—including the Americans with Disabilities Act ("ADA"), Section 504 of the Rehabilitation Act ("Section 504"), and the Individuals with Disabilities Education Act ("IDEA")—*require* exactly the conduct that HB2 *prohibits*: (i) identifying (or "classifying" under HB2) students with disabilities; and (ii) providing accommodations, services, and supports to disabled students (or "implementing programs or initiatives" that treat disabled students differently instead of "equally" under HB2) in order to achieve disability-based outcomes, such as access, participation, inclusion, and integration (or "achieving demographic outcomes" for disabled students under HB2). The concepts of individualized education plans and reasonable accommodations are foundational to disability rights laws. These concepts are, at their core, about addressing the individualized needs of specific disabled people—namely, providing individualized services, accommodations, and supports that, by definition, are not provided to others. Thus, under HB2's artificial dichotomy between "demographic outcomes" or "treating individuals equally under the law," nearly all compliance with disability rights laws could be considered in the former, prohibited category.

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied.**

15. The vagueness of the law is further demonstrated by the fact that its same general prohibitions are intended to be applied across "programs" and

"initiatives" outside the education context. Would a police department engaging in training—consistent with last year's enactment of HB596[16]—to reduce racial profiling of Black and Hispanic people to alleviate racial disparities in policing[17] and to address judicial decisions implicating the stops of "non-Caucasian males"[18] be covered under HB2 as seeking to "achieve" a "demographic outcome," as such training would be designed to ensure that people of color are not subjected to discriminatory police practices? Would HB2 prevent a law enforcement agency from engaging in efforts—including the efforts of the Manchester, Portsmouth, and University of New Hampshire police departments through the "30 x 30" initiative—to expand the number of women represented in their agencies?[19] Does HB2 eliminate physical fitness standards set forth by the PSTC and state police that must be satisfied by police officers, but that differ based on gender and age—standards designed to ensure the continued representation of women, as well as older men, in law enforcement?[20] Does HB2 overturn the policy of the New Hampshire State Park system where New Hampshire residents over the age of 65 can enter state parks for free, which would be a "program" that "classifies individuals based on "age" "for the purpose of achieving a demographic outcome"—here, to encourage those over 65 years old to use state parks?[21] Amidst a pandemic, would HB2 encompass a policy prioritizing vaccine distribution for the elderly as an improper classification based on "age"? Does HB2 undo New Hampshire's statutory regime providing for walking disability plates and placards under RSA 261:88—a program designed to "achieve" the "demographic outcome" of ensuring that people with walking

disabilities have access to public accommodations and other public spaces? This list, too, goes on and on. HB2 is indecipherable and unclear on all these important questions, leaving enforcers to selectively apply HB2's prohibitions.

[16] 2024 HB596 can be found here: https://gc.nh.gov/bill_status/legacy/bs2016/billText.aspx?sy=2024&id=543&txtFormat=pdf&v=current.

[17] Paul Cuno-Booth, *How Pretextual Traffic Stops by N.H. Police Disproportionately Affect Black and Latino Drivers,* NHPR (May 17, 2022), https://www.nhpr.org/nh-news/2022-05-17/pretextual-traffic-police-stops-racial-disparities-black-latino-drivers-nh.

[18] *See United States v. Hernandez*, 470 F. Supp. 3d 114, 128 (D.N.H. 2018) (addressing stop of "a non-Caucasian male" where trooper was suspicious, in part, because the defendant's "hands on the steering wheel" were at "ten and two") (McCafferty, J.); *State v. Perez*, Nos. 218-2018-CR-334, 218-2018-CR-335, 2019 N.H. Super. LEXIS 19, at *2-3 (N.H. Super. Ct. Rockingham Cty. Oct. 4, 2019) (Schulman, J.) (addressing stop of a "non-Caucasian male" where the driver, in part, had his hands at "ten and two" on the wheel, as drivers are trained to do, yet the trooper found this "odd") (citing *Hernandez*, 470 F. Supp. at 127-28).

[19] *See* 30x30, *About 30x30*, https://30x30initiative.org/about-30x30 (last visited July 31, 2025) ("The 30×30 Initiative is based on evidence indicating the importance of achieving at least 30% representation to empower a group to influence an organization's culture."; indicating participating New Hampshire agencies); *MPD Takes 30×30 Pledge: The Goal is a 30% Female Police Force by 2030*, *Manchester Ink Link* (Mar. 26, 2021), https://manchester.inklink.news/mpd-takes-30x30-pledge-the-goal-is-a-30-female-police-force-by-2030 ("By 2030, women will hopefully comprise 30 percent of officers on the Manchester Police Department. Police Chief Allen D. Aldenberg, at a news conference Thursday outside headquarters on Valley Street, said the department is the first in with the Policing Project at NYU School of Law and the National Association of Women Law Enforcement Executives.").

[20] *See* N.H. Police Standards and Training Council, *Physical Agility Test*, https://www.joinstatepolice.nh.gov/hiring-process/physical-agility-test (last visited July 31, 2025).

[21] *See* N.H. State Parks, "Parking & Entry Fees," https://www.nhstateparks.org/fees-reservations/parking-entry-parking-fees.

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied.**

16. HB2's provisions present yet another constitutional problem: they violate the First Amendment and Part I, Article 22 of the New Hampshire Constitution. HB2 chills the free speech and scholarship of academics and educators at institutions of higher education by reaching into curriculum that is part of a "program" or "initiative." *See Nat'l Educ. Ass'n*, 2025 U.S. Dist. LEXIS 77874, at *84–85 ("[P]laintiffs are likely to succeed on the merits of their First Amendment claim with respect to NEA's members in higher education."); *Miss. Ass'n of Educators*, 2025 U.S. Dist. LEXIS 140078, at *13–15, 20 (issuing temporary restraining order, in part, on First Amendment grounds where divisive concepts law impacted public colleges). This chill at institutions of higher education impacts Plaintiff Dr. Dottie Morris, who discusses implicit bias concepts in her work at Keene State College ("KSC"), and members of Plaintiff National Education Association-New Hampshire ("NEA-NH") who teach at UNH Law, which must comply with American Bar Association ("ABA") Standard 303(c)'s requirement to "provide education to law students on bias, cross-cultural competency, and racism."[22]

> [22] ABA Standards and Rules of Procedure for Approval of Law Schools 2022-2023, Standard 303(c) (Am. Bar Ass'n 2022); *see also* Neil W. Hamilton and Louis D. Bilionis, *Revised ABA Standards 303(b) and (c) and the Formation of a Lawyer's Professional Identity,*

*Part 1: Understanding the New Requirements*, National Association for Law Placement, Inc. Bulletin (Mar. 2022), https://www.nalp.org/revised-aba-standards-part-1.

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Defendants are without sufficient information to admit or deny any factual allegations which may be contained in the foregoing paragraph, and therefore deny same and put Plaintiffs to their burden of proof thereof.**

17. HB2's threats are made that much more concrete by NHDOE's robust enforcement, which has included the publication of letters on July 11, 2025 and July 17, 2025, respectively, directed to K–12 public school districts and public/private colleges that receive "public funds" demanding a certification of compliance with the law under the pains and penalties of perjury ***by September 5, 2025***. *See Exhibit 2* (NHDOE July 11, 2025 Letter); *Exhibit 3* (NHDOE July 17, 2025 Letter and College/University Report List). NHDOE also recently established a website entitled "Prohibition on Diversity, Equity, and Inclusion in Public Schools" that publishes NHDOE's enforcement efforts, which schools have been directed to submit certifications, which schools have returned certifications, and the contents of the returned certifications.[23] In addition to this enforcement by NHDOE—and apart from HB2's funding penalties for "public schools"—school districts themselves have an independent obligation to enforce the blanket "DEI-related" prohibitions in RSA 21-I:113 and RSA 186:72, including against

individual educators. Furthermore, on July 23, 2025, Defendant New

Hampshire Department of Administrative Services directed state agencies to

identify all contracts that include DEI-related provisions and submit that

information to the Department by October 1, 2025. *See Exhibit 4* (July 23,

2025 Department of Administrative Services Email, With Spreadsheet Altered

For Size).

> [23] *See* NHDOE, *Prohibition on Diversity, Equity, and Inclusion in Public Schools*, https://www.education.nh.gov/who-we-are/deputy-commissioner/office-governance/legislation/prohibition-diversity-equity-and-inclusion-public-schools.

**ANSWER: The allegations in the foregoing paragraph are admitted to the extent that NHDOE sent correspondence dated July 11, 2025, and July 17, 2025, and that, at one point in time, NHDOE had a webpage which discussed "Prohibition on Diversity, Equity, and Inclusion in Public Schools[.]" The allegations are further admitted to the extent that NHDAS sent correspondence dated July 23, 2025. Any remaining allegations are denied. By way of further answer, the above-referenced NHDOE webpage is not presently published nor is it available through NHDOE's website. To the extent this paragraph contains any legal arguments or legal conclusions, same are denied to the extent they are inconsistent with applicable law. To the extent this paragraph contains representations as to the content or meaning of a document, same are denied and Plaintiffs are put to their burden of proof thereof. Defendants submit that the document itself is the best evidence of its content and meaning.**

18. The numerous problems with HB2's anti-DEI provisions stem, at least in part, from the fact that they were added to HB2—which is the policy trailer bill

accompanying the state budget—as part of a rushed and unvetted legislative

process. There was no public hearing dedicated specifically to HB2's anti-DEI

provisions. These provisions did not originate, as is customary, as a

standalone bill considered at the beginning of a legislative session by a policy

committee with the benefit of stakeholder and expert feedback.  These

provisions were not heard by policy specialists at the House or Senate

Education Committees. Rather, the House Finance Committee rushed a vote to

approve in the budget these anti-DEI provisions—which were initially intended

to be modeled after President Trump's January 20, 2025 Executive Order

14151[24]—on the eve of the deadline when that Committee needed to finalize

HB2 for full consideration before the House of Representatives. Moreover,

during this budget process, the legislature was repeatedly told that these

provisions were vague and conflicted with federal disability laws. The

legislature passed it anyway.

---

[24]     Executive Order 14151, in part, directed all executive branch
agencies to "terminate . . . 'equity-related' grants or contracts." Exec.
Order No. 14151, *Ending Radical and Wasteful Government DEI
Programs and Preferencing*, Executive Order of January 20, 2025, 90
Fed. Reg. 8339, 8339 (Jan. 29, 2025), *available at*
https://www.whitehouse.gov/presidential-actions/2025/01/ending-
radical-and-wasteful-government-dei-programs-and-preferencing/;
https://public-inspection.federalregister.gov/2025-01953.pdf.
        HB2's anti-DEI proposal also may have been influenced by
Executive Order 14173, which was signed on January 21, 2025 and
entitled "Ending Illegal Discrimination and Restoring Merit-Based
Opportunity." This Order (i) directed all executive agencies to
"include in every contract or grant award" a certification, enforceable
through the False Claims Act, that the contractor and grantee "does not
operate any programs promoting DEI that violate any applicable
Federal antidiscrimination laws," and (ii) directed the Attorney

General to take "appropriate measures to encourage the private sector to end illegal discrimination and preferences, including DEI," to "deter" such "programs or principles," and to "identify . . . potential civil compliance investigations" to accomplish such "deter[rence]." Exec. Order No. 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, Executive Order of January 21, 2025, 90 Fed. Reg. 8633, 8634-35 (Jan. 31, 2025), *available at* https://www.whitehouse.gov/presidential-actions/2025/01/ending-illegal-discrimination-and-restoring-merit-based-opportunity/; https://www.govinfo.gov/app/details/FR-2025-01-31/2025-02097.

Executive Orders 14151 and 14173 have been the subject of extensive litigation. *See, e.g., Am. Pub. Health Ass'n v. NIH*, No. 25-10787-WGY, 2025 U.S. Dist. LEXIS 125988, at *19 (D. Mass. July 2, 2025) ("EO 14151 does not define DEI. Additionally, and pertinent here, EO14151 directs each federal agency head to 'terminate, to the maximum extent allowed by law, all 'equity-related' grants or contracts' within 60 days. This too has broad, undefined contours."); *San Francisco A.I.D.S. Found. v. Trump*, No. 25-CV-01824-JST, __ F. Supp. 3d __, 2025 WL 1621636, 2025 U.S. Dist. LEXIS 109281, at *66 (N.D. Cal. June 9, 2025) (appeal filed Aug. 7, 2025) ("The vagueness of the term 'equity-related' grants or contracts invites arbitrary and discriminatory enforcement and does not provide sufficient notice to grantees as to what types of speech or activity they must avoid to prevent termination of their grants or contracts— compelling grantees and grant applicants to steer far too clear of the forbidden area of anything related to the broad and undefined term of 'equity.'") (cleaned up).

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Defendants are without sufficient information to admit or deny any factual allegations which may be contained in the foregoing paragraph, and therefore deny same and put Plaintiffs to their burden of proof thereof.**

19. The result of this slapdash legislative process is that NHDOE's new commissioner—who was sworn in on August 4, 2025—has now unfortunately been saddled with the unenviable task of being compelled to enforce a law that is incomprehensible. The new Commissioner has also inherited NHDOE's already-existing practice of arbitrarily enforcing HB2. At the outset, NHDOE has deviated from HB2 in imposing a September 5, 2025 deadline for public schools to submit certifications of compliance. HB2, however, explicitly provides a deadline of September 30, 2025. *See* RSA 186:57, II. Moreover, NHDOE has decided to aggressively enforce HB2 against private (including religious) colleges and universities that receive public funds through state scholarship grants, but apparently *not* enforce HB2 against private K-12 institutions (including religious schools) that receive public funds through EFAs. Under HB2's definition of "public school," there is no basis for NHDOE's arbitrary distinction.

**ANSWER: The allegations in the foregoing paragraph are admitted to the extent that, at one point in time, NHDOE requested that certifications be submitted by September 5, 2025 and NHDOE transmitted correspondence to that effect to public K-12 schools and public and nonpublic universities and colleges that receive public dollars through the UNIQUE Program (both Annual and Endowment), and/or through the Governor's Scholarship Program, and that such correspondence was not transmitted to nonpublic K-12 schools. Any remaining allegations are denied. To the extent this paragraph contains any legal arguments or legal conclusions, same are denied to the extent they are inconsistent with applicable law. To the**

**extent this paragraph contains representations as to the content or meaning of a document, same are denied and Plaintiffs are put to their burden of proof thereof. Defendants submit that the document itself is the best evidence of its content and meaning.**

20. HB2 infringes on Plaintiffs' legal rights, causing immediate and irreparable injury which cannot be outweighed by any legitimate governmental interest. As the United States District Court for the District of New Hampshire has explained, prohibiting diversity, equity, or inclusion, requiring certification, and threatening enforcement actions for violations combine to threaten "the 'supremely precious' yet 'delicate and vulnerable' nature of the right to free speech in our country," *Nat'l Educ. Ass'n*, 2025 U.S. Dist. LEXIS 77874, at *56 (quoting *NAACP v. Button*, 371 U.S. 415, 433 (1963)), particularly given that these prohibitions "sweep in a wide swath of conduct while leaving individual enforcement decisions to the subjective determinations of enforcement authorities." *Id.* at *60 (citing *Kolender v. Lawson*, 461 U.S. 352, 353–54 (1983)). In passing and enforcing HB, New Hampshire has failed to adhere to these principles.

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied.**

# PARTIES

I.    **Plaintiffs**

21. **National Education Association-New Hampshire**: NEA-NH is a non-profit

    organization and affiliate of the National Education Association ("NEA").

    NEA-NH is incorporated as a domestic non-profit under New Hampshire law

    and headquartered in Concord, New Hampshire. It was founded in 1854, then

    as New Hampshire State Teachers Association. NEA-NH consists of more

    than 17,000 member educators in New Hampshire representing the majority of

    all public school employees in the state.  NEA-NH is one of the "founding

    ten" state education associations that formed NEA in 1857. *See Exhibit 34*

    (Declaration of NEA-NH ("NEA-NH Decl."), ¶¶ 4–5, 11).

    **ANSWER: Defendants are without sufficient knowledge or information to admit or**

    **deny the allegations in the foregoing paragraph, and therefore deny same and put**

    **Plaintiffs to their burden of proof thereof. Any remaining allegations are denied.**

22. NEA-NH's seeks to strengthen and support public education and serve their

    members' professional, political, economic, and advocacy needs.  *Id.* at 6.

    **ANSWER: Defendants are without sufficient knowledge or information to admit or**

    **deny the allegations in the foregoing paragraph, and therefore deny same and put**

    **Plaintiffs to their burden of proof thereof. Any remaining allegations are denied.**

23. NEA-NH is suing on its behalf and on behalf of its members.  NEA-NH

    members are public school educators including classroom teachers, and other

    certified professionals, education support personnel, instructors and staff at

    public higher education institutions, as well as students preparing for a

teaching career, and those retired from the profession. NEA-NH members also

include special education teachers who act on behalf of school districts to

ensure that educational opportunities for students with disabilities are realized

as required under state and federal law—obligations which conflict with

HB2's anti-DEI provisions insofar as this instruction and these services

classify students based on disability and seek to "achieve" a "demographic

outcome" for this group. *Id.* at 7.

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion,**

**and/or a request for relief, and therefore no response is required. To the extent a**

**response is required, the allegations in this paragraph are denied to the extent they**

**are inconsistent with applicable law. Defendants are without sufficient information**

**to admit or deny any factual allegations which may be contained in the foregoing**

**paragraph, and therefore deny same and put Plaintiffs to their burden of proof**

**thereof.**

24. NEA-NH members also include higher education instructors and faculty,

including adjunct instructors and faculty members at KSC and law faculty at

UNH Law. *Id.* at 8.[25]

> [25] The collective bargaining agreement for law faculty states that
> "[a]cademic freedom is an essential tenet of the University. As
> members of the UNH faculty, Law Faculty in all ranks are subject to
> the principles of academic freedom and its full protections." *See*
> https://www.nh.gov/pelrb/collective/documents/unh_law_faculty2.pdf.

**ANSWER: Defendants are without sufficient knowledge or information to admit or**

**deny the allegations in the foregoing paragraph, and therefore deny same and put**

**Plaintiffs to their burden of proof thereof. Any remaining allegations are denied.**

25. NEA-NH operates in accordance with requirements of equity and inclusion as
set out in civil rights laws, as well as encourages and educates members of
NEA-NH on these issues. NEA-NH has incorporated issues of race, diversity,
equity, and inclusion in its operations, and NEA-NH has encouraged the same
with respect to teaching, training, and supporting all educators. *Id.* at 10.

**ANSWER: Defendants are without sufficient knowledge or information to admit or**
**deny the allegations in the foregoing paragraph, and therefore deny same and put**
**Plaintiffs to their burden of proof thereof. Any remaining allegations are denied.**

26. NEA-NH has standing to pursue this action both in its own right
(organizational standing) and on behalf of its members (associational
standing).

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion,**
**and/or a request for relief, and therefore no response is required. To the extent a**
**response is required, the allegations in this paragraph are denied to the extent they**
**are inconsistent with applicable law. Any remaining allegations are denied.**

27. As to organizational standing, HB2 impacts the ability of NEA-NH and its
members to provide core educational and special education services. HB2's
anti-DEI provisions have frustrated NEA-NH's core work of advocating for
public school employees and for the kind of robust public education that will
prepare the children of New Hampshire as citizens and members of a diverse
society. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79 (1982)
(describing the requirements for direct organizational standing). NEA-NH
believes that all students have the human and civil right to quality public

education, and that public education is vital to building respect for the worth, dignity, and equality of every individual in our diverse society. In addition to advocating for education professionals, NEA-NH's mission is to unite its members and the nation to fulfill the promise of public education, to break down the barriers to racial equity, and to prepare every student to succeed in a diverse and interdependent world. To that end, NEA-NH's vision of a great public school for every child cannot be realized without adequate funding and education that encompasses inclusive practices. Any cuts or decrease in state funding to public schools contemplated in HB2 as a remedy for violating its vague and confusing language would be devastating.

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied.**

28. Moreover, as to associational standing, NEA-NH members adversely affected by HB2 would have standing to sue, the interests at stake in this suit are germane to NEA-NH's purpose, and neither the claims asserted nor the relief sought requires participation of NEA-NH's individual members to adjudicate the claims. *See Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977) (describing the requirements for representational/associational standing); *see also Int'l Union v. Brock*, 477 U.S. 274 (1986); *Playboy Enters. v. Pub. Serv. Comm'n*, 906 F.2d 25, 36 (1st Cir. 1990.

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied.**

29. With respect to advocating for public school employees, NEA-NH provides services to members by assisting with collective bargaining of contracts with local school districts, job security, termination of employment, discipline, evaluation, and academic freedom.  These are bargained-for concepts. NEA-NH cannot properly advise its membership as to how, or if, members need to adjust their collective bargaining agreements to account for the language of HB2 considering these are agreements or contracts with public entities. *Exhibit 34* (NEA-NH Decl.) ¶23.

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Defendants are without sufficient information to admit or deny any factual allegations which may be contained in the foregoing paragraph, and therefore deny same and put Plaintiffs to their burden of proof thereof.**

30. Further, NEA-NH provides its members with the benefit of extensive professional development programming which will be affected by HB2's vague terms and prohibitions. For example, NEA-NH engages members in an annual professional development and leadership program which typically

spans a week during the summer. During this programming, members are trained on a variety of topics, including the New Hampshire Code of Conduct, what conduct in the classroom may give rise to employment discipline, and other topics to avoid liability in schools and comply with federal, state, and local laws. This year, NEA-NH is also coordinating a presentation involving special education law. NEA-NH has already received questions regarding whether books that highlight concepts of race, diversity, equity, and inclusion could be construed as an effort to "achieve demographic outcomes" which may violate the law. NEA-NH has also received questions regarding whether educators can continue initiatives such as the Special Olympics and what accommodations educators can make for students with special education needs (as required by state and federal law) without running afoul of HB2 and its apparent prohibition on "achieving demographic outcomes" for students with disabilities. Due to the vague and confusing prohibitions in HB2, NEA-NH is impaired in its ability to counsel members on steps to take to comply with the law. NEA-NH will need to divert resources to develop appropriate training, guidance and ensure it can advise members to the best of its ability regarding compliance with HB2. *Id.* at 26.

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Defendants are without sufficient information to admit or deny any factual allegations which may be contained in the foregoing**

**paragraph, and therefore deny same and put Plaintiffs to their burden of proof thereof.**

31. NEA-NH also represents members in matters before the State Board of Education—both in licensure actions contesting alleged violations of the Educator Code of Conduct and in actions representing educators appealing the non-renewal of their teaching contracts.  HB2's anti-DEI provisions have frustrated NEA-NH's efforts to assist its members in employment matters and with questions related to licensure. This is because, given the vague terms and prohibitions in HB2, NEA-NH is unable to sufficiently advise members regarding whether and when their instruction, programs, or "DEI-related" discussions may rise to the level of violating HB2 which, in turn, would undoubtedly lead to investigation of the employee by their district and potential adverse employment action. *Id.* at 12, 24.

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Defendants are without sufficient information to admit or deny any factual allegations which may be contained in the foregoing paragraph, and therefore deny same and put Plaintiffs to their burden of proof thereof.**

32. Members of NEA-NH are directly subjected to the anti-DEI provisions of HB2. *Id.* at 17.

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Defendants are without sufficient information to admit or deny any factual allegations which may be contained in the foregoing paragraph, and therefore deny same and put Plaintiffs to their burden of proof thereof.**

33. For example, NEA-NH Member A teaches 8th Grade Social Studies in New Hampshire, including United States history from the Civil War to modern day. Member A, as an educator who teaches as part of a "program," is concerned that classroom discussions about matters of race, religion, and discrimination (which are important parts of teaching certain aspects of American history) could be construed to violate HB2's anti-DEI prohibitions, leaving Member A vulnerable to allegations that Member A and their district have violated the law. For example, instruction addressing instances of use of the "N word" could be negatively impacted, as such instruction educates White students on the impact of that word on Black people and helps create a more welcoming environment for Black students. Through this instruction, Member A is aiming to improve and "achieve demographic outcomes" for these communities. Similarly, HB2 impacts Member A's ability to address antisemitism in instruction. When one student drew a swastika in school, this triggered instruction on the Holocaust designed to help, in part, educate non-Jewish students about the experiences of Jewish people—an outcome which is

premised on demographics. Member A also does not know how to comply with RSA 189:11, I-c(j)—which requires instruction on "[h]ow intolerance, bigotry, antisemitism, and national, ethnic, racial, or religious hatred and discrimination have evolved in the past, and can evolve, into genocide and mass violence, such as the Holocaust, and how to prevent the evolution of such practices"—in light of HB2. Complying with RSA 189:11, I-c(j) requires teaching about identity and demographic outcomes, but HB2 seems to say that Member A cannot do so. *See Exhibit 34* (NEA-NH Decl.) ¶ 18; *Exhibit 35* (Declaration of NEA-NH Member A ("NEA-NH Member A Decl.")).

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Defendants are without sufficient information to admit or deny any factual allegations which may be contained in the foregoing paragraph, and therefore deny same and put Plaintiffs to their burden of proof thereof.**

34. NEA-NH Member B teaches high school Social Studies, Geography and World Cultures, United States History, Sociology, and Street Law. Member B, an educator who teaches as part of a "program," is concerned that classroom discussions involving the civil rights movement, current events, and structural racism could risk violating HB2's ambiguous terms. Member B fears that someone could view Member B as "promoting" "critical race theory" or DEI-related ideas that are designed to "achieve demographic outcomes."

Member B teaches in a school district with a diverse population with many new American communities.  Member B is concerned that providing accommodations to ensure success for these populations may be perceived as using a "DEI-related" classification to "achieve a demographic outcome" for minority students.  Member B also has concerns that HB2 will impact Member B's ability to address historical events under her current curriculum, as well as impact Member B's ability to teach Social Studies.  Member B discusses systemic racism and historical oppression of certain groups in United States History as part of the program of study regarding the Reconstruction Era and the Civil Rights Movement. These discussions open students' minds to how structural racism has impacted modern society, as well as helping students learn from examples in history of oppression to create a more inclusive environment for different groups within the classroom.  Member B is concerned that efforts to use history to help students understand the experience of communities of color, for example, could be construed as "achieving a demographic outcome" or "critical race theory."  *See Exhibit 34* (NEA-NH Decl.) ¶ 19; *Exhibit 36* (Declaration of NEA-NH Member B ("NEA-NH Member B Decl.")).

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Defendants are without sufficient information to admit or deny any factual allegations which may be contained in the foregoing**

**paragraph, and therefore deny same and put Plaintiffs to their burden of proof thereof.**

35. NEA-NH Member C teaches high school Science. Member C, an educator who teaches as part of a "program," is concerned that developing parallel curricula for students with special needs could violate the vague language of HB2 and put Member C in an untenable position of having to choose between violating state and federal special education laws, which could lead to discipline, investigation, and the loss of funding to Member C's District. Member C is concerned that they could violate HB2 by providing alternative testing for a child with a dyslexia diagnosis and low literacy levels, as this could be construed as "achieving demographic outcomes" based on disability. Member C also is deeply concerned that district contracts with third parties who promote inclusive athletics, such as the Special Olympics, could be impacted and eliminated under the vague language of HB2. Member C is involved in such initiatives and programs as a coach in their district, and these initiatives achieve "demographic outcomes"—namely, the outcome of including children with disabilities in sports that are traditionally only available to non-disabled peers. *See* *Exhibit 34* (NEA-NH Decl.) ¶ 20; *Exhibit 37* (Declaration of NEA-NH Member C ("NEA-NH Member C Decl.")).

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Defendants are without sufficient information**

**to admit or deny any factual allegations which may be contained in the foregoing paragraph, and therefore deny same and put Plaintiffs to their burden of proof thereof.**

36. **School District Plaintiffs**: The School District Plaintiffs' instruction, programming, professional development, and other activities are subject to NHDOE's enforcement authority and the requirements set forth in HB2's anti-DEI provisions. Their work could be construed to (i) involve "DEI," (ii) include topics that implicate "achieving demographic outcomes" for groups protected under RSA 354-A:1, and/or (iii) otherwise fall within the broad prohibitions of HB2. The Districts also employ special educators and implement a wide range of programs to ensure that educational opportunities for students with disabilities are realized as required under federal law— obligations which conflict with HB2's anti-DEI provisions that bar efforts to classify students based on disability for the purpose of "achieving demographic outcomes" for these students. If the School District Plaintiffs guess wrong as to what HB2 means as they seek to serve their students, they risk losing "public funding," including millions of dollars in state funding.

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Defendants are without sufficient information to admit or deny any factual allegations which may be contained in the foregoing**

**paragraph, and therefore deny same and put Plaintiffs to their burden of proof thereof.**

37. **(A) Oyster River School District**: The Oyster River Cooperative School District has over 2,000 students from Lee, Madbury, and Durham, New Hampshire. *See Exhibit 38* (Declaration of Dr. Robert Shaps ("Shaps Decl."), ¶ 1). The District's mission is working together to engage every learner. *Id.* at 11. It seeks to instill a lifelong passion for learning and to engage all students to develop skills and knowledge. *Id.*

**ANSWER: Defendants are without sufficient knowledge or information to admit or deny the allegations in the foregoing paragraph, and therefore deny same and put Plaintiffs to their burden of proof thereof. Any remaining allegations are denied.**

38. The District promotes a safe and nurturing community that honors the diversity of its students, families, and staff through a range of educational experiences and opportunities. *Id.* The District's approach may be construed as violative of HB2's anti-DEI provisions, as the District incorporates inclusivity, equity, and justice into teaching, learning, practices, policies, and procedures. *Id.* at 11–37.

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Defendants are without sufficient information to admit or deny any**

**factual allegations which may be contained in the foregoing paragraph, and therefore deny same and put Plaintiffs to their burden of proof thereof.**

39. For example, the District created a Coordinator of Diversity, Equity, Inclusion, & Justice ("DEIJ") leadership position during the 2022–23 school year. *Id.* at 13. The DEIJ Coordinator does the following: trains faculty and staff to promote culturally sustaining curricular frameworks; shapes compassionate, equitable practices, policies, and procedures that center concepts of inclusivity, equity, and justice in learning; and, advances opportunities for student access to programs, among other things. *Id.* The DEIJ Coordinator fosters a culture of belonging, dignity, and inclusion in Oyster River's schools and community. *Id.* at 14.

**ANSWER: Defendants are without sufficient knowledge or information to admit or deny the allegations in the foregoing paragraph, and therefore deny same and put Plaintiffs to their burden of proof thereof. Any remaining allegations are denied.**

40. The District also has invited guest speakers and community organizations to engage in conversations with students about race, diversity, public policy, and social history that demonstrate the struggles of specific demographic groups and individuals. *Id.* at 24.

**ANSWER: Defendants are without sufficient knowledge or information to admit or deny the allegations in the foregoing paragraph, and**

**therefore deny same and put Plaintiffs to their burden of proof thereof.**
**Any remaining allegations are denied.**

41. Even though the District does not engage in discrimination, HB2's anti-DEI
    provisions restrict its ability to meet its obligation to fully deliver curriculum
    and instruction to students, to uphold its mission to engage every learner, and
    to prepare students to live and work in a multicultural and global society. *Id.* at
    35.

   **ANSWER: The foregoing paragraph contains a legal argument, a legal**
   **conclusion, and/or a request for relief, and therefore no response is**
   **required. To the extent a response is required, the allegations in this**
   **paragraph are denied to the extent they are inconsistent with applicable**
   **law. Any remaining allegations are denied.**

42. The District is not sure whether Defendants would consider its range of
    programs to violate HB2. For example, the District does the following: uses
    social and emotional curriculum and programs; provides English for Speakers
    of Other Languages ("ESOL") instruction; offers instruction and academic
    support for students with disabilities and students of low socio-economic
    status; and, implements culturally responsive sustaining curriculum
    frameworks. *Id.* at 19. Its Advanced Placement courses, range of textbooks,
    and high school English and social studies courses focus on diverse literature
    and historical topics that relate to race, diversity, equity, and/or inclusion. *Id.*
    These all help "achieve demographic outcomes" insofar as they could help a
    White student learn about more diverse perspectives, help improve

representation of perspectives of minority groups to better reach minority students, and/or help students with disabilities better access language and other support services. *Id.*

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied.**

43. The District does not know if it can continue leadership opportunities that, while open to all students, recruit students from different backgrounds— activities one may decide to perceive as seeking to "achieve "demographic outcomes" based on race, national origin, or disability, among other categories. *Id.* at 22. The District does not know if any effort to provide additional support for certain demographic student groups, such as low socio-economic status or ESOL, will be deemed engaging in racial classifications under HB2. *Id.* at 19, 30.

**ANSWER: Defendants are without sufficient knowledge or information to admit or deny the allegations in the foregoing paragraph, and therefore deny same and put Plaintiffs to their burden of proof thereof. Any remaining allegations are denied.**

44. The District also fears that HB2 prohibits compliance with its duties under the ADA, Section 504, and the IDEA to accommodate disabled students and employees and provide special education services to disabled students. *Id.* at

26–29. The ADA and Section 504 also cover visitors who require accommodations. *Id.* at 26. These activities seek to "achieve demographic outcomes" based on individuals' physical and mental disabilities, including the "outcomes" of access, integration, and academic achievement, among others. *Id.* For example, to educate disabled students in an integrated environment, the District places students with disabilities in general education classrooms to maintain a ratio of disabled to non-disabled students. *Id.* at 26, 29. To improve the academic outcomes of students with attention deficit hyperactivity disorder, the District provides those students extra time on tests. *Id.* at 26. To ensure students with behavioral disabilities have access to a paraprofessional, the District places those students in the same classroom with that paraprofessional. *Id.* at 29. To improve the literacy rates of students with dyslexia, the District provides them evidence-based literacy instruction in small groups with more individualized attention. *Id.* To increase access to school facilities, the District modifies classroom layouts to allow staff with wheelchairs to access the classroom. *Id.* at 26. To ensure disabled students can access the school, the District modifies its general "no pets" policy at school to permit a student to bring her service dog into the school. *Id.* To ensure students with attention deficit hyperactivity disorder can achieve better test scores, the District provides them extra time or a quiet place to take a test. *Id.* To ensure students with physical disabilities can access physical education activities, the District provides adaptive sports equipment. *Id.*

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Defendants are without sufficient information to admit or deny any factual allegations which may be contained in the foregoing paragraph, and therefore deny same and put Plaintiffs to their burden of proof thereof.**

45. The District further fears that HB2 prohibits compliance with its duties under Title I of the Elementary and Secondary Education Act ("ESSA") and Title IX the Education Amendments of 1972, which also seek to "achieve demographic outcomes" based on characteristics prohibited by HB2. *Id.* at 30–31. For example, Title I requires the District to use its resources to improve measurable outcomes for English language learners, students with disabilities, and students of color. *Id.* at 30. The District thus provides evidence-based instruction and other targeted support to close achievement gaps for children of that demographic. *Id.* Title IX similarly requires the District to monitor gender and sex disparities in areas like advanced coursework, athletics, discipline, and participation in Science Technology Engineering and Mathematics ("STEM") programs, and to take effective steps to address those disparities. *Id.* at 31.

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is**

**required. To the extent a response is required, the allegations in this**
**paragraph are denied to the extent they are inconsistent with applicable**
**law. Defendants are without sufficient information to admit or deny any**
**factual allegations which may be contained in the foregoing paragraph,**
**and therefore deny same and put Plaintiffs to their burden of proof**
**thereof.**

46. The District received $9,766,211 in state funds for the 2025 fiscal year. *Id.* at

38. The District is entitled to receive $721,798 in federal funds for the 2025

fiscal year, with $504,590 of those funds coming from the IDEA. *Id.* The

District expects to receive $597,793 in federal funds for the 2026 fiscal year,

with $499,676 coming from the IDEA and $48,117 coming from Title I. *Id.*

The District cannot afford to lose state or federal funding, which it uses for

staffing, programs, and resources to meet student educational needs. *Id.*

**ANSWER: Defendants are without sufficient knowledge or information**
**to admit or deny the allegations in the foregoing paragraph, and**
**therefore deny same and put Plaintiffs to their burden of proof thereof.**
**Any remaining allegations are denied.**

47. Because HB2 prohibits both knowing *and* unknowing violations of the statute,

the District will have to thoroughly audit its programs and practices to

eliminate anything that could violate the law. *Id.* at 40. Even a misstatement

from a teacher could cause a parent to file a complaint with NHDOE, which

could lead to an investigation that halts the District's state funding. *Id.* To

prevent this, the District will need to create an internal mechanism to monitor

its programs, including reviewing teachers' lesson plans. *Id.* If teachers do

not comply with HB2, the District may be forced to discipline them to prevent

the District from losing state funds. *Id.* Implementing these measures would

require thousands of dollars of staff time and attorneys' fees. *Id.* In other

words, the District cannot ignore allegations that HB2 has been violated by an

educator and have to act as enforcers of its prohibitions.

**ANSWER: The foregoing paragraph contains a legal argument, a legal**

**conclusion, and/or a request for relief, and therefore no response is**

**required. To the extent a response is required, the allegations in this**

**paragraph are denied to the extent they are inconsistent with applicable**

**law. Defendants are without sufficient information to admit or deny any**

**factual allegations which may be contained in the foregoing paragraph,**

**and therefore deny same and put Plaintiffs to their burden of proof**

**thereof.**

48. **(B) Dover School District**: The Dover School District serves approximately

3,500 students in Dover, New Hampshire. The District strives to produce

learners who have critical thinking, collaboration, communication, character,

and life skills. The District endeavors for its students to become well-rounded

individuals who are prepared for the challenges of the future. Its students learn

to seek cultural understanding to enable them to work effectively and

respectfully with diverse teams. *See Exhibit 39* (Declaration of Christine

Boston ("Boston Decl."), ¶¶ 8, 12).

**ANSWER: Defendants are without sufficient knowledge or information to admit or deny the allegations in the foregoing paragraph, and therefore deny same and put Plaintiffs to their burden of proof thereof. Any remaining allegations are denied.**

49. The District provides relevant and engaging learning experiences and curricula to each student, which could violate HB2's anti-DEI provisions where such individualized instruction is for the purpose of "achieving demographic outcomes" and classifies students based on the groups listed in RSA 354-A:1. The District celebrates the diversity of its student body, pursues equity to provide an individualized education, and creates inclusive learning environments. *Id.* at 26.

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Defendants are without sufficient information to admit or deny any factual allegations which may be contained in the foregoing paragraph, and therefore deny same and put Plaintiffs to their burden of proof thereof.**

50. The District's best practices include the use of a variety of instructional strategies to meet the needs of diverse learners and the establishment of specific achievement goals, including resources to reduce achievement gaps. *Id.* at 24. The District uses varied instructional practices to meet the needs of

all learners and establishes specific achievement goals, including resources to reduce opportunity gaps. It follows a learning framework that begins with teaching students to recall and reproduce facts, to process skills and concepts more deeply and ask questions, to think strategically using evidence, and finally, to engage in extended thinking and to transfer knowledge from one context to solve problems in another. The District aims for all students to reach the highest levels of learning. *Id.* at 21–24.

**ANSWER: Defendants are without sufficient knowledge or information to admit or deny the allegations in the foregoing paragraph, and therefore deny same and put Plaintiffs to their burden of proof thereof. Any remaining allegations are denied.**

51. Dover's district-wide equity plan includes five goals: (i) increase the equity literacy of teachers, administrators, and staff; (2) improve school culture in all schools to be inclusive, safe, and welcoming; (3) ensure equitable achievement of all students; (4) expand family and community engagement; and (5) recruit, retain, and promote educators who are representative of the growing diversity in the schools and communities. *Id.* at 30.

**ANSWER: Defendants are without sufficient knowledge or information to admit or deny the allegations in the foregoing paragraph, and therefore deny same and put Plaintiffs to their burden of proof thereof. Any remaining allegations are denied.**

52. The District introduces adaptive sports opportunities so students learn how to use wheelchairs and engage in inclusive play together—an opportunity

designed to "achieve" a "demographic outcome" to ensure (i) that students with disabilities are treated are treated fairly, and (ii) that students without disabilities treat those with disabilities with the respect they deserve. *Id.* at 34. Special Olympics New Hampshire has recognized Dover High School with a Certificate of Inclusion for four consecutive years.  *Id.* at 33.

**ANSWER: Defendants are without sufficient knowledge or information to admit or deny the allegations in the foregoing paragraph, and therefore deny same and put Plaintiffs to their burden of proof thereof. Any remaining allegations are denied.**

53. Even though the District does not engage in discrimination, HB2's vaguely worded anti-DEI provisions restrict the District's programs of instruction and have a chilling effect on teachers as they encourage students to move beyond rote memorization and into higher levels of thinking, including application of knowledge in novel situations. *Id.* at 37.  Teachers in the Dover School District do not know what instructional techniques or topics are permissible after HB2's enactment, including discussions of systemic racism that could be construed as improper "critical race theory" or "implicit bias."  *Id.*

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Defendants are without sufficient information to admit or deny any factual allegations which may be contained in the foregoing paragraph,**

**and therefore deny same and put Plaintiffs to their burden of proof thereof.**

54. The District fears that it would need to water down or alter its courses to follow HB2, which is a disservice to students. It cannot teach students how to engage in civil discourse around topics that Defendants might consider to improperly address "DEI." *Id.*

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Defendants are without sufficient information to admit or deny any factual allegations which may be contained in the foregoing paragraph, and therefore deny same and put Plaintiffs to their burden of proof thereof.**

55. The District's confusion about how to comply with HB2's anti-DEI provisions is compounded because the law conflicts with other laws and local requirements. The Dover School Board approves the District's curriculum and considers whether it is accessible, including whether the content is relevant to the diverse abilities and needs of the students, and accessible to a diverse range of students. *Id.* at 27.

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this**

**paragraph are denied to the extent they are inconsistent with applicable law. Defendants are without sufficient information to admit or deny any factual allegations which may be contained in the foregoing paragraph, and therefore deny same and put Plaintiffs to their burden of proof thereof.**

56. The District received approximately $3.1 million for the 2024–25 academic year in direct federal funding grant support, which includes Titles I-IV and IDEA financial support.  This funding is recurring based on qualifications. This federal public funding is given to the District through NHDOE, which acts as a "pass through" in distributing funds between the federal government and local school districts.  *Id.* at 14.

**ANSWER: The allegations in the foregoing paragraph are admitted to the extent that NHDOE distributes Title I-IV funds and IDEA funds to school districts.  Given the present stage of litigation, NHDOE is without sufficient knowledge or information to admit or deny Plaintiffs' representations regarding the exact amount of district funding referenced in this paragraph. Defendants therefore deny the remaining allegations and put Plaintiffs to their burden of proof thereof. To the extent this paragraph contains legal arguments or conclusions, same are denied to the extent inconsistent with applicable law.**

57. The District uses Title I grants, which support students and families in high-poverty communities and low-income families, to provide valuable reading and writing interventions.  The District stocked a van to drive through

neighborhoods and bring books for students, hosted summer programming for eligible elementary and middle school students, and hosted family engagement events that demonstrated activities families can do at home to support their children's learning. The District also conducted professional development on the academic, behavioral, mental, and socio-emotional wellbeing of students, including training on innovative literacy strategies. Finally, the District used Title I funds to increase staffing so it was able to provide extra assistance with reading, writing, and math to students. *Id.*

**ANSWER: Defendants are without sufficient knowledge or information to admit or deny the allegations in the foregoing paragraph, and therefore deny same and put Plaintiffs to their burden of proof thereof. Any remaining allegations are denied.**

58. Dover School District uses Title III funds to ensure the proficiency of English Language ("EL") learners. It purchased instructional materials, provided professional learning for teachers, and supported language-building activities for EL students. *Id.*

**ANSWER: Defendants are without sufficient knowledge or information to admit or deny the allegations in the foregoing paragraph, and therefore deny same and put Plaintiffs to their burden of proof thereof. Any remaining allegations are denied.**

59. The District uses Title IV funds to execute its plan for educational and racial equity, develop programming and opportunities for social emotional learning, and support drug and alcohol involved students. This racial equity work is

specifically designed to ensure that communities of color "achieve the demographic outcome" of succeeding in this District. *Id.*

**ANSWER: Defendants are without sufficient knowledge or information to admit or deny the allegations in the foregoing paragraph, and therefore deny same and put Plaintiffs to their burden of proof thereof. Any remaining allegations are denied.**

60. Dover School District uses IDEA funds to provide instruction and services to students with disabilities. It extended the school year for students who would fall behind over the summer without continuity of services, hired occupational therapists to provide therapy necessary for students with disabilities to be included in the general education setting, and hired three special education teachers and three special education administrators. *Id.*

**ANSWER: Defendants are without sufficient knowledge or information to admit or deny the allegations in the foregoing paragraph, and therefore deny same and put Plaintiffs to their burden of proof thereof. Any remaining allegations are denied.**

61. The District received over $21,099,601.88 in state funds for the 2024–2025 academic year, which includes $18,344,078.13 in adequacy grants and SWEPT (uniform statewide education property tax) grants. The district expects to receive $20,924,937.00 in state funds for the 2025–2026 academic year. *Id.* at 13. The district cannot afford to lose state funding, which it uses for staffing, programs, and resources to meet student educational needs. The District would have to look at all expenses that are not contractual expenses (where

funding is already committed) and the programs at risk would include field

trips, alcohol and drug counseling, mental health counseling, and other

programs that are not required by law. The District would be forced to restrict

general the curricular materials that it orders.  In the following year, the

District would be forced to cut staff.  *Id.* at 51.  Taxes are capped in Dover

because the City Charter includes a cap that restricts growth in the District's

budget based on factors like the Consumer Price Index so the District would

not be able to bridge the gap in revenue with higher taxes.  The same is true for

the federal funds the District receives.  The loss of federal funds would be

devastating and would be roughly equivalent to losing the entire staffing

budget for one of its elementary schools.  *Id.* at 52.

**ANSWER: Defendants are without sufficient knowledge or information to admit or deny the allegations in the foregoing paragraph, and therefore deny same and put Plaintiffs to their burden of proof thereof. Any remaining allegations are denied.**

62. **(C) Somersworth School District**: The Somersworth School District is

committed to providing an inclusive and complete education to its

approximately 1,300 students, as well as to eliminating gaps in opportunities

and barriers to access—gaps which may sometimes correlate with, for

example, a student's race, gender, gender identity, or disability.  NHDOE

might construe this commitment as violating HB2's anti-DEI provisions. *See*

*Exhibit 40* (Declaration of John Shea ("Shea Decl."), ¶ 1).

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Defendants are without sufficient information to admit or deny any factual allegations which may be contained in the foregoing paragraph, and therefore deny same and put Plaintiffs to their burden of proof thereof.**

63. The District believes that equitable opportunity for all students includes the provision of appropriate services, accommodations, and modifications (per relevant law) for students with disabilities and learning differences. In other words, equity and inclusion are the core of special education. But, under HB2, this work that the District must do, however, may be perceived as seeking to "achieve demographic outcomes" for students with disabilities. Moreover, the District struggles to understand what precisely might be the meaningful difference, if there is one at all, between (a) providing a service to multiple disabled students as part of a common program to increase the educational opportunities for each of these students individually (which the District is required to do by law) and (b) a "program" that classifies individuals based on disability "for the purpose of achieving a demographic outcome" for students with disabilities (which is now barred under HB2). Just as the District measures and reviews how students are performing as a whole to evaluate the effectiveness of our schools, the District regularly does the same in looking at

how special needs students are performing as a whole to ensure that the District

is providing services effectively. *Id.* at 21.

**ANSWER: The foregoing paragraph contains a legal argument, a legal**

**conclusion, and/or a request for relief, and therefore no response is**

**required. To the extent a response is required, the allegations in this**

**paragraph are denied to the extent they are inconsistent with applicable**

**law. Defendants are without sufficient information to admit or deny any**

**factual allegations which may be contained in the foregoing paragraph,**

**and therefore deny same and put Plaintiffs to their burden of proof**

**thereof.**

64. The District, as one of the most diverse school districts in New Hampshire,

also is unsure about whether its work serving immigrant communities is

covered under HB2. In seeking to ensure that the District's students from

immigrant communities have equal access to educational opportunities, the

District engages in specific outreach to these communities to ensure that their

needs are met and they are aware of the opportunities that this District has to

offer. These include the District's ESOL programs, as well as evening events

offered several times a year for ESOL students and their families. The goal

of these events, for ESOL students, and their families is inclusiveness—to

make sure that these students (who often come from immigrant communities)

feel welcome and at home. The District wants these students to bring their

families into the school so that they know that the District can be a resource

for them. These interactions increase engagement and connection with the

school when language can sometimes be an obstacle for this engagement. The District is concerned that this work could be perceived as seeking to "achieve demographic outcomes" for students based on national origin. *Id.* at 22.

**ANSWER: Defendants are without sufficient knowledge or information to admit or deny the allegations in the foregoing paragraph, and therefore deny same and put Plaintiffs to their burden of proof thereof. Any remaining allegations are denied.**

65. The District does not engage in any kind of illegal discrimination, but it does fear that Defendants would consider work it does to provide an inclusive learning environment as violating HB2's anti-DEI's provisions. For example, the District fears that classroom discussions on the evolution of racism or bigotry—particularly in the context of addressing antisemitism as required by New Hampshire law (*see* RSA 189:11, I-c(j))—could be construed under HB2 as a "DEI" "program" of instruction designed to "achieve demographic outcomes," particularly to ensure that non-Jewish students are sensitive to the historic discrimination Jewish groups have suffered. *Id.* at 4, 26.

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Defendants are without sufficient information to admit or deny any factual allegations which may be contained in the foregoing paragraph, and therefore deny same and put Plaintiffs to their burden of proof thereof.**

66. The District received approximately $10.3 million in state funds for the 2024–25 fiscal year. Of that $10.3 million, more than $9.1 million was in the form of the state adequacy grant.  The remainder of the $10.3 million consisted of building aid, special education aid, Career Technical Center ("CTC") tuition and transportation funding, charter school special education differentiated aid, and Education Freedom Account phase out aid.  For the 2025–26 fiscal year, the District expects to receive approximately $10.1 million in state funds, with just under $9.1 million of that coming via the state adequacy grant. *Id.* at 6.

**ANSWER: Defendants are without sufficient knowledge or information to admit or deny the allegations in the foregoing paragraph, and therefore deny same and put Plaintiffs to their burden of proof thereof. Any remaining allegations are denied.**

67. The District also directly received federal grants totaling just over $2 million for the 2024–25 fiscal year, which included IDEA grants, Title I grants (focused on students in high- poverty communities and low-income families), and Title II, III, and IV financial support. These grants are generally recurring based on year-to-year qualifications. The $2 million figure, however, for the 2024–25 year also included school safety grants and other nonrecurring (or periodically recurring) grants. The District is expecting less federal funding support for the 2025–26 academic year. *Id.* at 7.

**ANSWER: Defendants are without sufficient knowledge or information to admit or deny the allegations in the foregoing paragraph, and therefore deny same and**

**put Plaintiffs to their burden of proof thereof. Any remaining allegations are denied.**

68. The District cannot afford to lose this state and federal funding support. The District is not an affluent community.  The District does not have a large property tax base. State aid (currently just over $10 million per year) represents almost 30% of the District's overall annual budget. Losing this would be nothing short of catastrophic to the District. It would not be hyperbole to classify it as an existential threat.  The District is not certain how it would—or if it could—comply with the many and varied school laws and regulations foundational to our operation under such a circumstance. *Id.* at 9.

   **ANSWER: Defendants are without sufficient knowledge or information to admit or deny the allegations in the foregoing paragraph, and therefore deny same and put Plaintiffs to their burden of proof thereof. Any remaining allegations are denied.**

69. **(D) Grantham School District**: The Grantham School District serves approximately 450 students and strives to cultivate a safe and supportive environment where every individual's uniqueness is recognized and celebrated.  *Exhibit 41* (Declaration of Christine Downing ("Downing Decl."), ¶¶ 1, 13). In pursuit of this goal, the District embraces the rich diversity of its students, families, and staff by offering a wide array of educational experiences, including open dialogue, the freedom to express and explore ideas, and engagement with topics that reflect our dedication to providing a well-rounded and inclusive education. *Id.* at 13. As explained in the District's Mission Statement, adopted by the School Board in December 2012 and reaffirmed in

November 2024, the District's mission is to work with the community to "provide excellence in education," engaging all students in developing the skills and knowledge they need to further their education and "make positive contributions within a diverse global society." *Id.* at 15. The Mission Statement also recognizes that "students learn in different ways and require different methods of learning and instruction." *Id.* at 16.

**ANSWER: Defendants are without sufficient knowledge or information to admit or deny the allegations in the foregoing paragraph, and therefore deny same and put Plaintiffs to their burden of proof thereof. Any remaining allegations are denied.**

70. The District has one school, Grantham Village School, which educates students from pre-kindergarten through the sixth grade. The Grantham Village School was recognized by the U.S. Department of Education as a National Blue Ribbon School in 2021. The District has an Authorized Regional Enrollment Area ("AREA") Agreement that allows older students to attend Lebanon District schools for middle school and high school. *Id.* at 6–7.

**ANSWER: Defendants are without sufficient knowledge or information to admit or deny the allegations in the foregoing paragraph, and therefore deny same and put Plaintiffs to their burden of proof thereof. Any remaining allegations are denied.**

71. Each year Grantham Village School selects a theme for the year. The School then builds school programming around this theme. For the upcoming 2025–2026 school year, the Grantham Village School's theme is Acceptance and Kindness. This includes

programming meant to encourage classroom discussions on topics such as including and respecting others who are different from oneself, understanding and helping those with different abilities, and standing up for others who may be targeted for having different backgrounds, such as people who may speak with an accent or bring unique food to lunch.  The District is concerned that this theme could be seen as specifically supporting students in certain groups and therefore deemed unlawful.  *Id.* at 19.

**ANSWER: Defendants are without sufficient knowledge or information to admit or deny the allegations in the foregoing paragraph, and therefore deny same and put Plaintiffs to their burden of proof thereof. Any remaining allegations are denied.**

72. In preparing for the 2025–2026 academic year, the District contracted with national experts on neurodiversity to provide trainings on learning strategies for differently abled students. The District is concerned these efforts may be deemed as efforts to "achieve demographic outcomes." *Id.*  In addition, the District recently spent approximately $39,527 developing a new literacy program that highlights diverse perspectives and important historical topics.  Some books that are used in this program have been listed on book bans in other states, and the District is concerned that this literacy program could be interpreted as "DEI" under HB2.  *Id.*

**ANSWER: Defendants are without sufficient knowledge or information to admit or deny the allegations in the foregoing paragraph, and therefore deny same and put Plaintiffs to their burden of proof thereof. Any remaining allegations are denied.**

73. The District is further concerned that the language of HB2 prohibits the District from complying with its obligations under federal law including the ADA, the IDEA, and Title I of the ESSA. *Id.* at 21–27.

**ANSWER: Defendants are without sufficient knowledge or information to admit or deny the allegations in the foregoing paragraph, and therefore deny same and put Plaintiffs to their burden of proof thereof. Any remaining allegations are denied.**

74. After receiving NHDOE's July 11, 2025 letter seeking compliance certifications by September 5, 2025, the Grantham School District superintendent, on that same day, asked then-NHDOE Commissioner of Education Frank Edelblut several questions about what HB2 means. Commissioner Edelblut provided no further guidance, stating instead the following: "Thank you for your questions. For clarification on the application of RSA 186:71 through 186:77, we recommend reaching out to your local district counsel.  They are best positioned to interpret how this statute applies to your specific circumstances."  *Id.* at 27; *see also Exhibit 31* (NHDOE July 15, 2025 Grantham Response).

**ANSWER: At the present stage of this litigation, NHDOE is without sufficient knowledge or information to admit or deny the allegations in the foregoing paragraph. Defendants therefore deny the allegations in this paragraph and put Plaintiffs to their burden of proof thereof.**

75. The District received $186,735 in state funds for the 2024–2025 academic year, which includes $94,326 of those funds coming from the IDEA and $8,115 coming from Title I. The District expects to receive $1,162,471 in state funds for the 2025–2026

academic year.  The District cannot afford to lose this money.  The District relies

heavily on state and federal funding to support essential staffing, programs, and

resources that address students' educational needs. Losing this funding would result

in a significant budget crisis as it accounts for over 10% of the District's budget.  In

such a scenario, the District would likely be forced to implement deep cuts in

programs, resources, and staffing that are likely to reduce the high-quality educational

experiences that our families and communities have come to expect and that

Grantham School District is known for in its region. *Exhibit 41* (Downing Decl.) ¶

33.

**ANSWER: Defendants are without sufficient knowledge or information to admit
or deny the allegations in the foregoing paragraph, and therefore deny same and
put Plaintiffs to their burden of proof thereof. Any remaining allegations are
denied.**

76. **Dr. Dottie Morris**: Dr. Dottie Morris resides in Bellows Falls, Vermont, and she is

the Associate Vice President for Community and Belonging at Keene State College

("KSC"), which receives state funding. She formerly was the Associate Vice

President for Institutional Equity and Diversity at KSC, but her title changed to its

current form on or around June 30, 2025 because of HB2's anti-DEI provisions.  She

also is an Associate Professor of Psychology at KSC. Dr. Morris is filing this lawsuit

only in her individual capacity.  She understands that KSC does not believe that its

current practices or policies conflict with HB2. This lawsuit is not being brought by

(or on behalf of) KSC or the University System of New Hampshire ("USNH").

Nothing herein reflects KSC's or USNH's position.  *Exhibit 42* (Declaration of Dr. Dottie Morris ("Morris Decl."), ¶ 1).

**ANSWER: Defendants are without sufficient knowledge or information to admit or deny the allegations in the foregoing paragraph, and therefore deny same and put Plaintiffs to their burden of proof thereof. Any remaining allegations are denied.**

77. Dr. Morris's focus was and is providing support and direction to the Executive, Academic Affairs, Enrollment and Student Engagement, Advancement, and Finance and Administration divisions of KSC to promote the mission, vision, and values of KSC, though this work will have to change with the enactment of HB2.  Indeed, it has already changed her work, with some of these changes even being made in anticipation of HB2 being enacted.  For example, because of the law, her performance goals have changed and the terminology she uses has changed. *Id.* at 3.

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Defendants are without sufficient information to admit or deny any factual allegations which may be contained in the foregoing paragraph, and therefore deny same and put Plaintiffs to their burden of proof thereof.**

78. HB2 strikes at the core of what Dr. Morris is trying to do in her role at KSC, which is to help give students a better understanding of the world around them so that they can

better engage with others after graduation as responsible participants in our civic society. *Id.* at 7.

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Defendants are without sufficient information to admit or deny any factual allegations which may be contained in the foregoing paragraph, and therefore deny same and put Plaintiffs to their burden of proof thereof.**

79. For example, while at KSC, Dr. Morris has regularly engaged students on concepts like implicit bias that are targeted under HB2. Some of the trainings with college orientation leaders and resident assistants involve having these student leaders examine how individual conscious and unconscious biases can have an impact on how people relate to others. This engagement is done to help deepen the quality of experience of the students they serve in their important role. These discussions help these leaders and assistants understand how biases impact their engagement of students. Biases do not only impact how people interact with those different from them but also those like them. These concepts help students understand how the environment and world around them influences interactions with others. These discussions are developed based on research in the field that is informed by best practices and that shows that discussions like these help build inclusive communities where people better recognize how their own behavior can influence their fellow community members. Dr. Morris also has conducted these trainings on biases for

KSC staff to ensure that staff are effective in their role of serving all students in a

compassionate and understanding way that appreciates all students' lived experiences.

*Id.* at 8.

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Defendants are without sufficient information to admit or deny any factual allegations which may be contained in the foregoing paragraph, and therefore deny same and put Plaintiffs to their burden of proof thereof.**

80. With the enactment of HB2, Dr. Morris's work in her current role is now in question. She does not know whether she can reference implicit bias either to students or fellow staff members out of fear of being accused of violating the law—an accusation that could cause KSC to lose vital public funding. She likely will omit the important terms "implicit" or "unconscious" altogether in discussing bias because of HB2. She also is concerned that any discussion about bias may be viewed as falling under the law even when the terms "implicit" and/or "unconscious" are not used.  With these omissions, it will be challenging to help students and staff navigate the complexities associated with addressing the origins of peoples' assumptions about others and how these assumptions can lead to harmful stereotypes and discriminatory behavior.  *Id.* at 9.

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to**

**the extent they are inconsistent with applicable law. Defendants are without**

**sufficient information to admit or deny any factual allegations which may be**

**contained in the foregoing paragraph, and therefore deny same and put**

**Plaintiffs to their burden of proof thereof.**

81. Dr. Morris similarly fears mentioning concepts like "systemic racism." She has

encountered this concept when considering how college practices may have

historically, whether intended or not, uniquely impacted marginalized communities.

For example, she has examined systemic racism in the context of how colleges have

addressed misconduct, particularly in the context of when people may subjectively

feel "threatened"—a perception that is often viewed through the lens of White

dominant culture. But now she fears to even engage the topic of "systemic racism"

because many (albeit incorrectly) consider such terminology as an extension of

"critical race theory." She likely will avoid using this terminology going forward,

which will chill her involvement in important discussions on how college policies,

practices, and procedures will be developed or expanded to take into consideration

how historical realities remain a part of how an institution is currently operating. *Id.* at

10.

**ANSWER: Defendants are without sufficient knowledge or information to admit**

**or deny the allegations in the foregoing paragraph, and therefore deny same and**

**put Plaintiffs to their burden of proof thereof. Any remaining allegations are**

**denied.**

82. Dr. Morris also does not understand what it means for a program or training to

"classif[y] individuals"—based, for example, on race, gender, sexual orientation,

gender identity, or disability—"for the purpose of achieving demographic outcomes."
Because her work involves discussions of protected characteristics, she fears that the
state (and complainants) could view this work as impermissibly "classifying" to
"achieve demographic outcomes." *Id.* at 11.

**ANSWER: The foregoing paragraph contains a legal argument, a legal
conclusion, and/or a request for relief, and therefore no response is required. To
the extent a response is required, the allegations in this paragraph are denied to
the extent they are inconsistent with applicable law. Defendants are without
sufficient information to admit or deny any factual allegations which may be
contained in the foregoing paragraph, and therefore deny same and put
Plaintiffs to their burden of proof thereof.**

83. For example, her work aims to provide opportunities for all students—including White
students, students of color, LGBTQ+ students, etc.—to have a wide range of
experiences that prepare them for when they graduate.  This work does, by necessity,
include creating spaces and opportunities for those students to have interactions
where they engage people who may not have had similar lived experiences.  But
because the creation of these experiences, either directly or indirectly, is designed to
"achieve demographic outcomes" insofar as these experiences seek to create
engagement opportunities for White students, students of color, and other groups, she
does not know whether this work is covered by HB2.  *Id.* at 12.

**ANSWER: The foregoing paragraph contains a legal argument, a legal
conclusion, and/or a request for relief, and therefore no response is required. To
the extent a response is required, the allegations in this paragraph are denied to**

**the extent they are inconsistent with applicable law. Defendants are without**

**sufficient information to admit or deny any factual allegations which may be**

**contained in the foregoing paragraph, and therefore deny same and put**

**Plaintiffs to their burden of proof thereof.**

84. HB2 has impacted Dr. Morris in other ways.  It is not clear to her if she can provide

specific resources for students based on their lived experiences.  When she considers

equity, she is thinking about ways to ensure that all students have what they need to

be successful based on their individual and group circumstances. Given these

individual and group circumstances, each student and their individual communities do

not need the same things. For example, given the current realities experienced by

LGBTQ+ students who are struggling with how to obtain resources to meet their

needs, she will often engage with the LGBTQ+ student community, in particular, if

there is a bias incident. These bias incidents have included students putting a

derogatory term on a white board directed to LGBTQ+ community members, and

students being subjected to derogatory terms in public. If she engages in outreach to

LGBTQ+ students to provide unique resources to them in response to such an

incident, is she engaging in an "initiative" that classifies individuals based on sexual

orientation or gender identity for the purposes of "achieving demographic outcomes"

as to them under HB2? She does not know, but she is confident that some may

interpret HB2 that way. *Id.* at 14.

**ANSWER: The foregoing paragraph contains a legal argument, a legal**

**conclusion, and/or a request for relief, and therefore no response is required. To**

**the extent a response is required, the allegations in this paragraph are denied to**

**the extent they are inconsistent with applicable law. Defendants are without**

**sufficient information to admit or deny any factual allegations which may be**

**contained in the foregoing paragraph, and therefore deny same and put**

**Plaintiffs to their burden of proof thereof.**

85. Dr. Morris has the same concern with how to reach students with disabilities, which is similarly designed to "achieve demographic outcomes" for that community.  Mental health is an important issue on college campuses.  She has helped develop systems to address the concerns of those who are struggling, and she meets with others in the college community to assess how she can meet these students' needs. But how can she, under HB2, create targeted approaches to address—and even meaningfully consider—mental illness given the law's prohibitions on using mental "disability" classifications to "achieve demographic outcomes" for this community?  Her same question applies to whether reasonable accommodations can be provided for students with mental disabilities as part of college programming.  This could be perceived as giving someone an unfair advantage under HB2, though she is simply giving that person what they need to be successful.  *Id.* at 15.

**ANSWER: The foregoing paragraph contains a legal argument, a legal**

**conclusion, and/or a request for relief, and therefore no response is required. To**

**the extent a response is required, the allegations in this paragraph are denied to**

**the extent they are inconsistent with applicable law. Defendants are without**

**sufficient information to admit or deny any factual allegations which may be**

**contained in the foregoing paragraph, and therefore deny same and put**

**Plaintiffs to their burden of proof thereof.**

86. Dr. Morris also wonders how she can engage certain students who are lawful immigrants to see if she can meet their unique needs in transitioning to the college community. Could this "achieve demographic outcomes" based on national origin? She does not know. *Id.* at 16.

   **ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Defendants are without sufficient information to admit or deny any factual allegations which may be contained in the foregoing paragraph, and therefore deny same and put Plaintiffs to their burden of proof thereof.**

87. These questions go directly to Dr. Morris's ability to meet students' individualized needs to help them be successful. If she, instead, adopts a non-tailored "fire hose" approach to trying to meet these needs, then some students and community groups will be lost in the shuffle and not receive the tailored attention and education to which they are entitled. *Id.* at 17.

   **ANSWER: Defendants are without sufficient knowledge or information to admit or deny the allegations in the foregoing paragraph, and therefore deny same and put Plaintiffs to their burden of proof thereof. Any remaining allegations are denied.**

88. Furthermore, HB2 will directly impact Dr. Morris's teaching as a non-tenured Associate Professor of Psychology, as she teaches one psychology class (and sometimes two classes when needed) each semester.  For example, KSC has a course

that teaches students basic skills around counseling. She has taught it previously, and she has been asked to teach it in the Spring of 2026.  HB2 would make it incredibly difficult for her to teach certain concepts in this class, including concepts of bias. It would be virtually impossible to provide students with effective counseling skills if she cannot discuss, as a professor, what is beneath the behavior of counselors and what is beneath the behaviors of those being counseled. Understanding bias is integral to understanding these behaviors, and counselor bias can even impact diagnosis and treatment.[26]  The core values integrated into the Code of Ethics for the National Board for Certified Counselors acknowledge that certified counselors and candidates should "demonstrate their commitment to ethical behaviors by demonstrating, and represent[] to their clients, sensitivity to multicultural issues, avoiding discrimination, oppression, and/or any form of social injustice."[27] Accordingly, it is essential for future counselors to understand ethical counseling, including how to try to relate to the lived experiences of people from demographic groups, whether it be LGBTQ+ people or people of color. Without this instruction on bias in this counseling course, students will be at a disadvantage, as they will not have the necessary skills when they later enter into additional counseling educational opportunities. *Id.* at 18.

[26] *See* Dipesh P. Gopal, et al., *Implicit Bias in Healthcare: Clinical Practice, Research and Decision making*, Future Healthcare Journal (Mar. 2021), https://pmc.ncbi.nlm.nih.gov/articles/PMC8004354/  ("Bias can have a major impact on the way that clinicians conduct consultations and make decisions for patients but is not covered in the medical field outside clinical reasoning.").

[27] Nat'l Bd. for Certified Counselors, *NBCC Code of Ethics* (Approved May 2023; Revised August 24, 2023), at 1, https://nbcc.org/assets/ethics/nbcccodeofethics.pdf.

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Defendants are without sufficient information to admit or deny any factual allegations which may be contained in the foregoing paragraph, and therefore deny same and put Plaintiffs to their burden of proof thereof.**

89. Dr. Morris also is teaching two sections of a psychology class this fall (Fall of 2025). There is a portion of this class that addresses social psychology—a field that covers, in part, prejudice and biases, including implicit bias/prejudice. This portion of the class directly helps students understand their own personal biases.[28] Discussing and teaching about biases is integral to teaching this course, and she does not understand how she can provide an ethical education to these students without providing this information. Moreover, "characteristics"—including those identified in RSA 354-A:1 like race, gender, sexual orientation, and the like—are essential for psychologists to consider. Psychology is everywhere. Everything in the environment impacts how people think about the world, including the communities that people are from. The field of psychology acknowledges that people are different, that these differences cannot be denied, and that these differences impact how people experience the world. *Id.* at 19.

[28] Attached to Dr. Morris's declaration is a copy of two pages from the textbook *Introduction to Psychology: Gateways to Mind & Behavior* by Coon, Mitterer & Martini, which she will be using for an Introduction to Psychology during the Fall 2025 semester. These pages directly address prejudice, and specifically "implicit prejudice."

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Defendants are without sufficient information to admit or deny any factual allegations which may be contained in the foregoing paragraph, and therefore deny same and put Plaintiffs to their burden of proof thereof.**

90. Dr. Morris previously served as chair of the board of the American Civil Liberties Union of New Hampshire and the American Civil Liberties Union Foundation of New Hampshire. *Id.* at 6.

**ANSWER: Defendants are without sufficient knowledge or information to admit or deny the allegations in the foregoing paragraph, and therefore deny same and put Plaintiffs to their burden of proof thereof. Any remaining allegations are denied.**

91. **James T. McKim, Jr.**: James T. McKim resides in Goffstown, New Hampshire. He is an organizational performance speaker, consultant, trainer, and author of the 2022 book *The Diversity Factor: Igniting Superior Organizational Performance*. Over his 35+ year career, he has helped small and large organizations (for-profit and non-profit) spark efficiency and growth through the aligning of people, process, and technology. His professional focus is on inclusion, diversity, equity, and accessibility. The concepts of inclusion, diversity, equity, and accessibility are central to his work, and he believes that these concepts have been proven to be a cornerstone in organizations that outperform those that do not incorporate these concepts.[29] He also

has held senior leadership roles at, or worked with, organizations such as Hewlett-Packard Enterprise, Fidelity, Dartmouth Hitchcock, and the Massachusetts Partnership for Diversity in Education in defining and executing strategic plans with an eye toward organizational performance.  *See* *Exhibit 43* (Declaration of James T. McKim ("McKim Decl."), ¶ 1).

> [29] *See* McKinsey & Company, *Diversity Matters Even More: The Case for Holistic Impact*, https://www.mckinsey.com/featured-insights/diversity-and-inclusion/diversity-matters-even-more-the-case-for-holistic-impact.

**ANSWER: Defendants are without sufficient knowledge or information to admit or deny the allegations in the foregoing paragraph, and therefore deny same and put Plaintiffs to their burden of proof thereof. Any remaining allegations are denied.**

92. Mr. McKim is the First Vice President of the Manchester NAACP.  He also chaired the Episcopal Church National Executive Council Committee on Anti-Racism & Reconciliation. He is currently a member of the New Hampshire Department of Justice's Diversity and Inclusion Advisory Council.  However, he brings this lawsuit only in his individual capacity.  *Id.* at 2.

**ANSWER: Defendants are without sufficient knowledge or information to admit or deny the allegations in the foregoing paragraph, and therefore deny same and put Plaintiffs to their burden of proof thereof. Any remaining allegations are denied.**

93. Mr. McKim was appointed by Governor Chris Sununu to be a member of the New Hampshire Commission on Law Enforcement Accountability, Community, and Transparency ("LEACT"), which Governor Sununu established through an Executive

Order in June 2020 after the murder of George Floyd.  Through that work, the

LEACT Commission, in August 2020 (and with  Mr.  McKim's  support),

recommended  that  local  law  enforcement  receive  implicit  bias  training  in  order

that law enforcement professionals better understand how to interact with people of

varying backgrounds. That recommendation has been implemented, and he helped

develop that implicit bias training for the PSTC. *Id.* at 3.

**ANSWER: Defendants are without sufficient knowledge or information to admit or deny the allegations in the foregoing paragraph, and therefore deny same and put Plaintiffs to their burden of proof thereof. Any remaining allegations are denied.**

94. Mr. McKim is directly impacted by HB2.  He works regularly with state and local

government bodies to improve operations.  This has included conducting training and

engaging in consulting/speaking on inclusion, diversity, equity, accessibility, and bias

throughout New Hampshire, including for NHDOJ, the New Hampshire Lottery

Commission, multiple public school districts, public libraries, and the public

university system.  *See, e.g., Exhibit 6* (Implicit Bias Training Hosted by the New

Hampshire Attorney General's Office on Nov. 20, 2020; addressing concepts like

"structural/systemic discrimination" and "white privilege" in slides 11, 12, 33 of

James McKim's presentation "Are You Your Implicit Bias?").  Given that he

conducts training programs and engages in consulting and speaking work related to

diversity and equity to public entities and public schools, he is directly impacted by

HB2's anti-DEI provisions, as he now needs to try to alter his training programs and

consulting/speaking work to comply with HB2's vague terms. *Exhibit 43* (McKim Decl.) ¶ 4.

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Defendants are without sufficient information to admit or deny any factual allegations which may be contained in the foregoing paragraph, and therefore deny same and put Plaintiffs to their burden of proof thereof.**

95. Mr. McKim is engaged in multiple conversations with various state and local government clients (including a school district) impacted by HB2. These discussions are about how the work of inclusion of all people regardless of gender, race, ability, or background—discussions which are critical to these clients' success—can continue without running afoul of HB2's terms. These discussions include how these entities can continue to engage him in this work. Carrying on this work of improving organizational performance is made exceptionally difficult given the law's ambiguous phrasing. Mr. McKim does not know how he can meaningfully train and advise his clients if he cannot mention, for example, "gender" or "race," which are among the specific "demographic" groups that the law mentions. The same is true regarding discussions of disability, which he frequently includes in his work to address this community's need for equitable access and opportunity given that, according to the U.S. Centers for Disease Control and Prevention, over 28% of individuals report having a functional disability (an estimated 70 million Americans).[30] *Id.* at 5.

[30] *See* U.S. Centers for Disease Control and Prevention, *Disability and Health Data Now* (Apr. 8, 2025), https://www.cdc.gov/disability-and-health/articles-documents/disability-and-health-data-now.html#:~:text=Key%20findings%20from%20the%20new,the%20year%20prior%20(21.2%25).

**ANSWER: Defendants are without sufficient knowledge or information to admit or deny the allegations in the foregoing paragraph, and therefore deny same and put Plaintiffs to their burden of proof thereof. Any remaining allegations are denied.**

96. Mr. McKim is especially confused about what the phrase "achieving demographic outcomes" means in HB2's definition of "DEI."  For example, this definition of DEI is confusing to him insofar as this framing is not how DEI is typically defined by professional trainers and consultants that work in this space. DEI is typically defined and discussed by trainers and consultants as a practice or policy that creates a sense of belonging for every stakeholder, which includes everyone from White men to people of color like him.  Because of its vagueness, he does not know how to apply HB2's DEI definition to the DEI concepts that he regularly employs in his training and consulting work that focuses on belonging more broadly, though these concepts obviously have the intended effect of alleviating discrimination of all "demographic" groups. *Id.* at 6.

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Defendants are without sufficient information to admit or deny any factual allegations which may be**

**contained in the foregoing paragraph, and therefore deny same and put Plaintiffs to their burden of proof thereof.**

97. Bias training and consulting advice are vital to all of Mr. McKim's clients, but especially to his government clients, as these clients' purpose is to serve all people. However, these clients recognize that it may be difficult to serve all people—including those groups that are protected under RSA 354-A (individuals of color, women, members of the LGBTQ+ community, and individuals with disabilities, etc.)—because of their biases. There are many types of biases, and bias can be implicit or explicit. With respect to implicit bias, many people and organizational clients with whom he works do not understand the various manifestations of such implicit bias, which can include interpersonal bias, group/systemic bias, and structural bias. This work is vital in education settings to ensure that educators understand how their interactions may reflect bias in their engagement of students of certain demographic groups (race, gender, disability, etc.), leading to—albeit unintended—discrimination. This leads to a negative impact on educators' performance. He believes that research has shown that this discrimination leads to a lack of trust in teachers and adults, which leads to poor academic performance.[31] *Id.* at 7.

[31] For example, research indicates that students of color, particularly Black students, receive harsher discipline than their White peers for similar behaviors. *See* United Negro College Fund, Inc., *Education Inequality: K-12 Disparity Facts*, https://uncf.org/pages/k-12-disparity-facts-and-stats ("Black students are nearly two times as likely to be suspended without educational services as white students. Black students are also 3.8 times as likely to receive one or more out-of-school suspensions as white students."); The Journal of Blacks in Higher Education, *Study Uncovers More Evidence That Black Students Are Overrepresented in School Discipline* (Feb. 10, 2025), https://jbhe.com/2025/02/study-uncovers-more-evidence-that-black-students-are-overrepresented-in-school-discipline-and-exclusion/ ("In American

alternative schools, Black students are 3.1 times more likely to be arrested and 15.3 times more likely to experience corporal punishment than their White peers. In the country's wealthiest schools, where less than 25 percent of students receive free or reduced-priced lunch, Black students are 5.3 times more likely to be suspended and 7.8 times more likely to be expelled than White students.").

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Defendants are without sufficient information to admit or deny any factual allegations which may be contained in the foregoing paragraph, and therefore deny same and put Plaintiffs to their burden of proof thereof.**

98. In Mr. McKim's view, the same is true for law enforcement. Without training on biases, police officers may engage members of the public from certain demographic groups in a discriminatory manner without having any idea that this discrimination is occurring. These diversity, equity, and inclusion trainings—which specifically address biases and how acknowledging these biases can reduce discrimination for specific demographic groups (communities of color, people with disabilities, women, etc.)—are vital to making sure that law enforcement do not act in a discriminatory manner. Addressing biases can also improve police performance. Biases can cause less than productive interactions, including misunderstandings. These misunderstandings can lead to justice not being served, as well as to a lack of trust in law enforcement. *Id.* at 9.[32]

> [32] *See also* Paul Cuno-Booth, *How Pretextual Traffic Stops by N.H. Police Disproportionately Affect Black and Latino Drivers,* NHPR (May 17, 2022),

https://www.nhpr.org/nh-news/2022-05-17/pretextual-traffic-police-stops-racial-disparities-black-latino-drivers-nh.

**ANSWER: Defendants are without sufficient knowledge or information to admit or deny the allegations in the foregoing paragraph, and therefore deny same and put Plaintiffs to their burden of proof thereof. Any remaining allegations are denied.**

99. Mr. McKim believes that HB2 is motivated by fear, particularly the fear of the "other" or those "not like us." He believes that laws like HB2 reflect a desire to keep the status quo where people of color and those of different personality or demographic characteristics (including women, individuals with disabilities, LGBTQ+ individuals, etc.)[33] are discriminated against intentionally and/or unintentionally in violation of the Constitution and state and federal laws. While, on the surface, HB2 states that it supports treating groups equally, Mr. McKim believes that HB2 fosters inequality by not recognizing how equity and the tailoring of support for specific communities are critical to creating a more equal society. In other words, equal treatment does not always provide equal access or opportunity. Sometimes, different treatment is the best way to serve people of different personality/demographic characteristics. HB2's attempt to eliminate equity, in Mr. McKim's view, denies the humanity of every single person. For example, research shows that girls in school settings are statistically more likely than boys to experience anxiety disorders and emotional symptoms such as worries, nervousness, and various fears.[34] Mr. McKim believes that HB2 does not recognize these types of personal experiences—including his own personal experiences as a person of color—or the need to educate people about how to

navigate interactions with those with different personality or demographic characteristics. *Id.* at 11.

[33] In Mr. McKim's field, such characteristics are often called "personality dimensions." *See* Diversity Wheel (Loden et al. 1991; Gardenswartz et al. 2003), https://www.researchgate.net/figure/Diversity-Wheel-Loden-et-al-1991-Gardenswartz-et-al-2003_fig1_352706084.

[34] Johny Daniel and Hsin Wang, "Gender Differences in Special Educational Needs Identification," *Review of Education* (2023), https://durham-repository.worktribe.com/OutputFile/1925862 ("Recently, in a sample of 28,000 adolescents in England, Deighton et al. (2019) reported that females were three times more likely than boys to be identified with emotional symptoms (e.g., worries, nervousness, various fears, etc.).").

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Defendants are without sufficient information to admit or deny any factual allegations which may be contained in the foregoing paragraph, and therefore deny same and put Plaintiffs to their burden of proof thereof.**

100. **New Hampshire Outright**: New Hampshire Outright is a non-profit headquartered in Portsmouth, New Hampshire that has a mission to serve, support, and advocate for LGBTQ+ youth and their families in New Hampshire. New Hampshire Outright also is a community where those young people and their allies can find strength, guidance, and hope. From its roots as Seacoast Outright, New Hampshire Outright has grown into a statewide movement committed to ensuring access to programs, groups, and resources for LGBTQ+ young people. *Exhibit 44* (Declaration of New Hampshire Outright ("Outright Decl."), ¶ 2).

**ANSWER: Defendants are without sufficient knowledge or information to admit or deny the allegations in the foregoing paragraph, and therefore deny same and put Plaintiffs to their burden of proof thereof. Any remaining allegations are denied.**

101. In seeking to create an environment where LGBTQ+ youth find strength and guidance, New Hampshire Outright frequently provides trainings to educators and school staff at K-12 public schools in New Hampshire. These trainings have also occurred at public colleges and universities, as well as private K-12 schools in New Hampshire. These trainings consist of a well-researched and well-reviewed program designed to build stronger communities for everyone, including and especially LGBTQ+ youth. The curriculum is rooted in more fully understanding LGBTQ+ identity, as well as how to create safe and welcoming spaces for everyone. Schools are spaces rooted in learning and the free exchange of information and ideas. *Id.* at 4.

**ANSWER: Defendants are without sufficient knowledge or information to admit or deny the allegations in the foregoing paragraph, and therefore deny same and put Plaintiffs to their burden of proof thereof. Any remaining allegations are denied.**

102. Under HB2, these trainings could be viewed as "achieving the demographic outcome" of ensuring that LGBTQ+ students are protected in school environments and, thus, may be covered under HB2. As a result, for organizational standing purposes, New Hampshire Outright's core function of performing these vital trainings is directly impacted by HB2, as these presentations could be construed as implicating impermissible "DEI." Indeed, New Hampshire Outright needs to comply with HB2

when giving these presentations (especially where districts often contractually require
that New Hampshire Outright's presentations comply with New Hampshire law) but
does not know whether the subject matter of these presentations are covered under the
law. *Id.* at 6.

**ANSWER: The foregoing paragraph contains a legal argument, a legal
conclusion, and/or a request for relief, and therefore no response is required. To
the extent a response is required, the allegations in this paragraph are denied to
the extent they are inconsistent with applicable law. Defendants are without
sufficient information to admit or deny any factual allegations which may be
contained in the foregoing paragraph, and therefore deny same and put
Plaintiffs to their burden of proof thereof.**

103. New Hampshire Outright also has been directly injured by HB2. Because of HB2's
ambiguities, school districts, understandably fearing risk, are likely to cancel or
censor these presentations out of fear of violating the law and being subject to its
funding penalties. For example, New Hampshire Outright already had one district
cancel a training because of HB2. In May 2025, New Hampshire Outright's
Education and Training Director started communications with a district to conduct a
90-minute in-person training for district administrators (not all staff) to occur during
the district's August retreat. In early July 2025, the district generated and sent New
Hampshire Outright a contract to provide this training in exchange for $300, and New
Hampshire Outright signed it on July 6, 2025. The contract specifically states that
New Hampshire Outright "*shall comply with* FERPA, *State of New Hampshire law*,

and all District policies, procedures, and rules, as outlined in this Contract." *Id.* at 7

(emphasis added).

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Defendants are without sufficient information to admit or deny any factual allegations which may be contained in the foregoing paragraph, and therefore deny same and put Plaintiffs to their burden of proof thereof.**

104. The contract specified a presentation on "Culturally Responsive Engagement with LGBTQ+ Students and Families Presented by New Hampshire Outright's Educational Outreach Team." The contract further specified the following "learning objectives":

- Create shared language by increasing knowledge of foundational concepts relevant to the conversation of supporting LGBTQ+ young people, and their families
    o Topic include: Gender expression & family composition
- Assist participants with recognizing the role of bias on mental health and academic outcomes and the importance of inclusion in the school setting to foster more positive outcomes
- Equip participants with practical strategies to support the wellbeing of LGBTQ+ students, families, and coworkers both in the classroom and in the wider school community
    o Topics include: Recognizing stereotypes, inclusive language, forms/applications that recognize the diversity of families, and other action steps
- Create space for attendees to talk about the application of this material to their spaces, discuss challenges, and ask questions

*Id* at 8.

**ANSWER: Defendants are without sufficient knowledge or information to**

**admit or deny the allegations in the foregoing paragraph, and therefore deny same and put Plaintiffs to their burden of proof thereof. Any remaining allegations are denied.**

105. On July 29, 2025, New Hampshire Outright received an email from the district stating: "*After consult with council [sic], we need to pause on our work planned for next week's Administrative Retreat. We are seeking clarification on HB 2*.  We can discuss later, my apologies[.]" *Id.* at 9 (emphasis added). In subsequent conversations, the district was understandably concerned about HB2 and made clear to New Hampshire Outright that this "pause" was because of NHDOE's July 11, 2025 letter demanding that school districts certify by September 5, 2025 that they are complying with HB2 and that they are not engaging in "DEI" programs. The district conveyed that this July 11, 2025 letter pushed the district to the point where it could no longer do the training. The district's concerns were understandable. In the conversations with this district, the district made no suggestions about edits New Hampshire Outright could make to its standard slides that would make the district feel comfortable both doing the training and/or signing the certification of compliance with HB2 that the district needs to submit by September 5, 2025 to NHDOE. Because of the cancellation New Hampshire Outright did not receive $300. *Id.*

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Defendants are without sufficient information to admit or deny any factual allegations which may be**

**contained in the foregoing paragraph, and therefore deny same and put Plaintiffs to their burden of proof thereof.**

106. The slides New Hampshire Outright usually uses for these presentations—which include topics like "[t]he importance of inclusive educational settings & the role of bias on outcomes"—not only potentially implicate concepts like "implicit bias" that are barred by HB2, but also are intended to "achieve demographic outcomes" by improving the educational environment for LGBTQ students. *Id.* at 10.

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Defendants are without sufficient information to admit or deny any factual allegations which may be contained in the foregoing paragraph, and therefore deny same and put Plaintiffs to their burden of proof thereof.**

107. Defendant John M. Formella is the Attorney General of the State of New Hampshire and heads the NHDOJ. He is named only in his official capacity. His office is located at 1 Granite Place, Concord, NH 03301. The Attorney General is the chief legal officer and chief law enforcement officer of the State. He "shall act as attorney for the state in all criminal and civil cases in the supreme court in which the state is interested …." *See* RSA 7:6. Independent of the Attorney General's supervisory authority over the enforcement of all laws in New Hampshire, the Attorney General also has specific enforcement authority over HB2's anti-DEI provisions. For example, RSA 21-I:116 states that NHDOJ "shall establish a process by which all political subdivisions review

their existing contracts for the presence of DEI-related provisions." RSA 21-I:116. This process does not appear to have been developed yet.

**ANSWER: The allegations in the foregoing paragraph are admitted to the extent that John M. Formella is the Attorney General of the State of New Hampshire, that he heads the NHDOJ, that his office is located at 1 Granite Place, Concord, NH 03301, and that the Attorney General is the chief legal officer and chief law enforcement officer of the State. Any remaining allegations are denied. By way of further answer, as of this filing, the NHDOJ has developed a formal process "by which all political subdivisions review their existing contracts for the presence of DEI-related provisions." To the extent this paragraph contains legal arguments or conclusions, same are denied to the extent inconsistent with applicable law.**

108. NHDOJ receives federal financial assistance within the meaning of 29 U.S.C. §794.[35]

[35] *New Hampshire Attorney General Federal Funding Summary*, USASPENDING.gov (last visited July 28, 2025), https://www.usaspending.gov/search?hash=9cb49b6eeef5ad52c5307dd1bfb3e3af.

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied.**

109. Defendant Caitlin Davis is the Commissioner of the New Hampshire Department of Education ("NHDOE"). She assumed this role on August 4, 2025. She is named only in her official capacity. Her office is located at 101 Pleasant Street, Concord, NH

03301. Defendant Commissioner Davis has enforcement authority over HB2's anti-DEI provisions through RSA 186:71–77, including through NHDOE's unilateral decision making as to whether a public school has engaged in "DEI" initiatives and whether that school should lose all public funding.  RSA 186:77, I-II. Further, under RSA 21-N:2, II(a), NHDOE, "through its officials, shall be responsible for … [p]roviding general supervision for elementary and secondary schools, teachers and administrators."

**ANSWER: The allegations in the foregoing paragraph are admitted to the extent that Caitlin Davis is the Commissioner of the New Hampshire Department of Education ("NHDOE") and that she was sworn in to that role on August 4, 2025. Any remaining allegations are denied. By way of further answer, NHDOE notes that its permanent offices are located at 25 Hall Street, Concord, NH 03301. To the extent this paragraph contains legal arguments or conclusions, same are denied to the extent inconsistent with applicable law.**

110. NHDOE receives federal financial assistance within the meaning of 29 U.S.C. §794.[36]

> [36] *NHDOE Federal Funding Summary*, USASPENDING.gov (last visited July 28, 2025),
> https://www.usaspending.gov/search?hash=c4428b4a2da11120409cf4d5ee571db8.

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied.**

111. Defendant Charlie Arlinghaus is the Commissioner of the New Hampshire Department of Administrative Services. He is named only in his official capacity. His office is located

at 25 Capitol Street, Concord, NH 03301. Defendant Commissioner Arlinghaus has

enforcement authority under HB2's anti-DEI provisions, as the New Hampshire

Department of Administrative Services is required under the law to collect a report from

all state agencies, by no later than October 1, 2025, that identifies all contracts under an

agency's control that "include DEI-related provisions." RSA 21-I:155. This report "shall

include descriptions of each contract, the specific DEI-related provisions contained

therein, and the total financial obligation associated with each contract." *Id.* The

Department of Administrative Services shall then "combine and submit a consolidated

report to the governor, speaker of the house of representatives, and the president of the

Senate." *Id.*

**ANSWER: The allegations in the foregoing paragraph are admitted to the extent
that Charlie Arlinghaus is the Commissioner of the New Hampshire Department of
Administrative Services and that his office is located at 25 Capitol Street, Concord,
NH 03301. To the extent this paragraph contains legal arguments or conclusions,
same are denied to the extent inconsistent with applicable law. Any remaining
allegations are denied.**

112. The Department of Administrative Services receives federal financial assistance within
the meaning of 29 U.S.C. § 794.[37]

> [37] *New Hampshire Department of Administrative Services Federal Funding
> Summary*, USASPENDING.gov (last visited July 28, 2025),
> https://www.usaspending.gov/search?hash=aa478ec6b66c4c88ff7d8f4ddeddae1e.

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion,
and/or a request for relief, and therefore no response is required. To the extent a**

**response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied.**

113. Defendant Monica Mezzapelle is the State Treasurer of New Hampshire. She is named only in her official capacity.  Her office is located at 25 Capitol Street, Room 121, Concord, NH 03301.  The Treasurer has enforcement authority under HB2's anti-DEI provisions.  For example, RSA 187:77 states that, when NHDOE notifies "the state treasurer [that] a public school is not in compliance with [RSA 186:71-77]," the Treasurer "shall halt all forms of public funding to the school until the commissioner [of NHDOE] has certified the school [has] come into compliance" with this law. RSA 187:77, II.

**ANSWER: Admitted to the extent that Monica Mezzapelle is the State Treasurer of New Hampshire and that her office is located at 25 Capitol Street, Room 121, Concord, NH 03301. To the extent this paragraph contains legal arguments or conclusions, same are denied to the extent inconsistent with applicable law. Any remaining allegations are denied.**

114. The State Treasurer receives federal financial assistance within the meaning of 29 U.S.C. § 794.[38]

[38] *New Hampshire State Treasurer Federal Funding Summary*, USASPENDING.gov (last visited July 28, 2025) https://www.usaspending.gov/search?hash=adf2b98058ff4c7a79af90ad8a0d9a95.

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied.**

**JURISDICTION AND VENUE**

115. This action arises under the Fourteenth and First Amendments to the United States Constitution, the Supremacy Clause, and 42 U.S.C. § 1983. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343. The Court has subject-matter jurisdiction over Plaintiffs' additional claims under 28 U.S.C. § 1367.

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied.**

116. Declaratory relief is authorized by 28 U.S.C. § 2201 and 28 U.S.C. § 2202.

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied.**

117. Defendants are public officials of the State of New Hampshire.  Defendants reside within this District and/or perform official duties within the State of New Hampshire. This Court, accordingly, has personal jurisdiction over the Defendants.

**ANSWER: The allegations in the foregoing paragraph are admitted to the extent that Defendants are public officials of the State of New Hampshire and that Defendants reside within this District and/or perform official duties within the State of New Hampshire. To the extent this paragraph contains legal arguments or conclusions, same are denied to the extent inconsistent with applicable law. Any**

**remaining allegations are denied.**

118. Venue in the District of New Hampshire is based on 28 U.S.C. § 1391(b).

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied.**

## BACKGROUND ON HB2'S ANTI-DEI PROVISIONS AND THEIR ENFORCEMENT

### I.    The Origins of HB2 and its Legislative History.

119. The anti-DEI provisions in HB2 were the product of a rushed and unvetted legislative process.

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied.**

120. On March 31, 2025, during the full House Finance Committee's executive session on HB2, proponents presented the anti-DEI provisions to the Committee for the first time through an amendment dated March 28, 2025. *See Exhibit 7* (Mar. 28, 2025 Proposal Presented on Mar. 31, 2025). Finance Committee Vice Chairman Representative Dan McGuire sponsored and introduced the provisions, explaining that they were the idea of Finance Committee members Representatives Rich Nalevanko and Susan DeRoy. He explained that the proposal "removes contract provisions for—that favor or impose DEI type of requirements in state contracts. Similar to what the federal government has

been doing via executive orders." *See* *Exhibit 8* (Mar. 31, 2025 Transcript), at 2:18–21.[39]

> [39] *See also* House Finance Committee Executive Session (Mar. 31, 2025), https://www.youtube.com/watch?v=2KwDZwPg-CQ (1:59:30–2:09:22, 3:03:15–3:10:05).

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Defendants are without sufficient information to admit or deny any factual allegations which may be contained in the foregoing paragraph, and therefore deny same and put Plaintiffs to their burden of proof thereof.**

121. The proposed language, like the final version ultimately enacted into law, sought to prohibit "DEI" in public entities and public schools, including in institutions of higher education that received public funding. "DEI" was not defined in this original version. Consistent with Representative McGuire's remarks that the provisions were modeled after presidential executive orders, the proposal contained language explicitly stating that it "shall be interpreted and enforced in a manner consistent with Executive Order 14151, signed by President Donald J. Trump on January 20, 2025, which prohibited federal spending on DEI-related programs." *See* *Exhibit 7* (Mar. 28, 2025 Proposal Presented on Mar. 31, 2025).

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to**

**the extent they are inconsistent with applicable law. Defendants are without**
**sufficient information to admit or deny any factual allegations which may be**
**contained in the foregoing paragraph, and therefore deny same and put Plaintiffs**
**to their burden of proof thereof.**

122. Representative Mary Hakken-Phillips, a Finance Committee member and attorney, immediately explained the many problems with this language, including concerns that "DEI" was not defined, that its provisions were vague, and that the proposal would conflict with various state and federal laws, including special education laws:

> My question to the drafters of—the sponsors of this amendment is whether blind students in New Hampshire or other special education students here would be permissible to receive accommodations under this law change. And if we are in noncompliance with those accommodation requirements, would the State of New Hampshire be in conflict with federal law, our own state law, and would it disrupt any federal funding that would come to the State normally under those important title grants?

**ANSWER: The foregoing paragraph contains a legal argument, a legal**
**conclusion, and/or a request for relief, and therefore no response is required. To**
**the extent a response is required, the allegations in this paragraph are denied to**
**the extent they are inconsistent with applicable law. Defendants are without**
**sufficient information to admit or deny any factual allegations which may be**
**contained in the foregoing paragraph, and therefore deny same and put Plaintiffs**
**to their burden of proof thereof.**

123. Procedural concerns were also raised given the last-minute introduction of these provisions with no public hearing or opportunity for policy specialists, lawyers, or educators to provide input. Representative Rosemarie Rung explained that, "to have this come before the full finance committee without having it being vetted in a division,

I feel is a betrayal to everyone who has really worked hard to get beyond our differences and have an open and honest discussion." *Id.* at 6:12–18. Representative Laura Telerski added: "This is a five-page amendment that was just distributed five minutes ago, at five minutes before the lunch hour. I think this is far too complicated and has wide-ranging reach, and I feel that a further, much longer discussion is needed considering we had six weeks to review this and it just came in five minutes ago." *Id.* at 7:13–22. Representative Mary Jane Wallner, the ranking House Democrat on the House Finance Committee, further summed up the process flaws with the amendment being considered without proper vetting:

> I'm very disappointed that we have an amendment like this coming to us at the last minute. None of us had seen it. It did not go to a division. The way most of the Finance Committee works is by division, and we talk through issues, and then we make recommendations to the full finance committee. I think there is a lot here that people need to take a long look at, and really think about whether or not this is something you want to include in the budget. It really doesn't feel like a budget item to me at all.

*Id.* at 8:18–9:2.

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Defendants are without sufficient information to admit or deny any factual allegations which may be contained in the foregoing paragraph, and therefore deny same and put Plaintiffs to their burden of proof thereof.**

124. At the close of the March 31, 2025 discussion of these provisions, Representative McGuire stated that "[t]he Speaker has just requested of us that we delay action on this amendment until tomorrow," as a question was raised as to whether the proposal was

germane to HB2. *Id.* at 13:24–14:2. Representative McGuire stated that "I know we think of everything as germane to House Bill 2 because everything involves money, but it's a question that he's wrestling with, and he would like a little more time." *Id.* at 14:2–6.

**ANSWER: Defendants are without sufficient knowledge or information to admit or deny the allegations in the foregoing paragraph, and therefore deny same and put Plaintiffs to their burden of proof thereof. Any remaining allegations are denied.**

125. The next day, on April 1, 2025, the House Finance Committee reconvened to discuss a new, modified version of the anti-DEI proposal that was prepared by House Deputy Majority Leader Joe Sweeney and Representative Rich Nalevanko. April 1, 2025 was the deadline for the Committee to complete its work on HB2. This new version was similar to the prior version, but was intended to only focus on future contracts. The new version also now contained language defining "DEI" as "any program, policy, training, or initiative that classifies individuals based on race, sex, ethnicity, or other group characteristics for the purpose of achieving demographic outcomes, rather than treating individuals equally under the law." *See Exhibit 9* (Apr. 1, 2025 Revised Proposal). Further, the new proposal omitted the language tying its interpretation and enforcement to President Trump's Executive Order 14151. Finance Committee Chairman Ken Weyler informed the Committee that "the Speaker's explanation was [that the amendment] refers to funds, so that makes it germane for the budget." *See Exhibit 10*, at 4:16–18 (Apr. 1, 2025 Transcript, With Margin Notes By Pls.' Counsel).[40]

[40] *See also* House Finance Committee Executive Session (Apr. 1, 2025), https://www.youtube.com/watch?v=EePBKd9GENc, 3:44:35–4:30:06, 6:49:36–7:06:57).

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Defendants are without sufficient information to admit or deny any factual allegations which may be contained in the foregoing paragraph, and therefore deny same and put Plaintiffs to their burden of proof thereof.**

126. Once again, several committee members pointed out concerns with the new version. Representative Mary Hakken-Phillips noted that the phrase "other group characteristics" could "include people with disabilities." *Id.* at 6:4–7. She added later the potential severe impact this proposal would have on this community:

> So I think it's worth just recognizing who will be affected by this language. If it is—if you vote to pass this amendment, I do believe that people with disabilities will be covered under this language, given its vagueness. People with disabilities, as we know, are grouped together all the time in society and here in the State of New Hampshire. When you vote for this amendment, you will be excluding students with disabilities from receiving their special education. If you vote for this amendment, you will be excluding people with walking disabilities eligible for parking permits. When you vote for this amendment, you will be excluding people with print disabilities from their entitlement to an accessible voting machine in order to have equal access to vote on voting day.

*Id.* at 22:10–24. Calling the language a "rush job" and encouraging the Committee to "pump the brakes," she explained that, "when the State of New Hampshire has passed legislation in the past that has looked similar to this, we have gone to court, and we've had to defend a policy position that was known ahead of time would be problematic and expensive for the State to defend." *Id.* at 8:4–10. She was referring to *Local 8027, AFT-*

*N.H. v. Edelblut*, No. 21-cv-1077-PB, 2024 U.S. Dist. LEXIS 94052 (D.N.H. May 28,

2024) (Barbadoro, J.), which struck down a New Hampshire law banning certain

concepts in public schools and that too was passed through the HB2 budget process. She

added that "I do not think the State of New Hampshire is prepared to possibly defend

[this] in a court of law." *Exhibit 10* (Apr. 1, 2025 Transcript, With Margin Notes By

Pls.' Counsel), at 23:2–3.

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion,**

**and/or a request for relief, and therefore no response is required. To the extent a**

**response is required, the allegations in this paragraph are denied to the extent they**

**are inconsistent with applicable law. Defendants are without sufficient information**

**to admit or deny any factual allegations which may be contained in the foregoing**

**paragraph, and therefore deny same and put Plaintiffs to their burden of proof**

**thereof.**

127. Representative Chris Muns highlighted additional ambiguities with the amended

proposal:

> You know, demographic outcome, what does that mean? I could argue that a
> demographic outcome is to have a population in a school that has nobody with
> a disability. So what does demographic outcome mean? What is implicit bias
> training? What is that? Does anybody know? It hasn't been defined …. DEI
> assessments. What is a DEI assessment? Critical race theory. Oh, my God.
> Probably the most misunderstood term in, you know, our political lexicon
> over the last four years. So this bill still doesn't have the kind of—if we're
> going to move forward with something like this, it needs to have more—much
> more clarity than it has right now.

*Id.* at 12:18-13:7. He added later that, given some legislators' concerns with "DEI," "why

wasn't a bill introduced during the normal course of business where there could be a full

public hearing and full discussion within a committee with ample opportunity for amendments? Why is this being introduced … literally on the last day?" *Id.* at 17:11–18.

**ANSWER: Defendants are without sufficient knowledge or information to admit or deny the allegations in the foregoing paragraph, and therefore deny same and put Plaintiffs to their burden of proof thereof. Any remaining allegations are denied.**

128. Representative Jess Edwards explained why he believed DEI was a problem, citing and targeting viewpoints expressed as part of curriculum in a class at Southern New Hampshire University. He explained:

> [T]he United States has settled on equal opportunity. We all seem to have embraced Martin Luther King and his words. But what has happened in the aftermath of DEI, if you just look at Southern New Hampshire University as an example, they have said that they are committed to implementing DEI principles in the classroom and in the curriculum. And as an example, they were doing a class on, you know, socioeconomic factors. And the questions that they were putting into the curriculum were things like, you know, why is it—or you know—why is it that you have better health outcomes in white neighborhoods? And it's that calling out of a demographic to assign a group characteristic that doesn't make any sense when you put it back into individual terms, it causes one to think aren't we supposed to be judged by the content of our character and not of our skin?

*Id.* at 15:7–23.

**ANSWER: Defendants are without sufficient knowledge or information to admit or deny the allegations in the foregoing paragraph, and therefore deny same and put Plaintiffs to their burden of proof thereof. Any remaining allegations are denied.**

129. Representative Edwards later added that the anti-DEI language was a worthwhile proposal, but expressed procedural concerns about its last-minute introduction. He stated that, while he "understand[s] the motivation behind this bill," he would prefer that this bill be retained by the Committee because of the things that he had heard and

because of what he "heard said in previous budgets that we should not use the HB 2 process as an end run around policy committee." *Id.* at 25:22–26:5. Recognizing that he "may be bucking a trend" with his Republican colleagues, he added that he believes that "this is a substantial policy that's worth a full and proper hearing," but that he "can't vote to pass this," though he "could vote to support" that the Committee retain the provisions for later review. *Id.* at 26:5–7.

**ANSWER: Defendants are without sufficient knowledge or information to admit or deny the allegations in the foregoing paragraph, and therefore deny same and put Plaintiffs to their burden of proof thereof. Any remaining allegations are denied.**

130. At the close of the debate, at approximately 2:29 p.m., the Committee then voted on a motion to adopt the new anti-DEI proposal. The motion failed by a vote of 12 to 13. Two Republicans—Representatives Jess Edwards and Brian Seaworth—voted with Democrats to not adopt the proposal. *Id.* at 28:7–31:4.

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Defendants are without sufficient information to admit or deny any factual allegations which may be contained in the foregoing paragraph, and therefore deny same and put Plaintiffs to their burden of proof thereof.**

131. Representative Edwards stated after the vote: "I would recommend that it's a pretty solid bill, and we ought to get it in the hands of a policy committee so that the—so that

this—we could have a proper public discussion on it.  I think those who are in favor of the bill will prevail, but I do think that there's a process here, and that's my comment." *Id.* at 31:6–14.

**ANSWER: Defendants are without sufficient knowledge or information to admit or deny the allegations in the foregoing paragraph, and therefore deny same and put Plaintiffs to their burden of proof thereof. Any remaining allegations are denied.**

132. The Committee then continued its work until approximately 4:48 p.m.

**ANSWER: Defendants are without sufficient knowledge or information to admit or deny the allegations in the foregoing paragraph, and therefore deny same and put Plaintiffs to their burden of proof thereof. Any remaining allegations are denied.**

133. As the Committee's work came to a close that day, Representative Daniel Popovici-Muller asked Chairman Weyler whether the Republicans on the House Finance Committee could caucus for ten minutes. Chairman Weyler agreed. Representative Mary Jane Wallner asked Chairman Wyler what items the Committee would take up after the Republican caucus, as it was close to the end of the day.  Chairman Weyler responded, without specifying, that "[o]ne of them is something that Representative McGuire [who sponsored the original anti-DEI provisions from the day before] wants to bring up, that we'll find out when we come back in from our caucus." *Id.* at 33:6–10. The Committee then recessed.

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to**

**the extent they are inconsistent with applicable law. Defendants are without sufficient information to admit or deny any factual allegations which may be contained in the foregoing paragraph, and therefore deny same and put Plaintiffs to their burden of proof thereof.**

134. After an approximately ten-minute caucus, the Committee reconvened at around 4:58 p.m. It was now over two hours after the original vote in which the Committee had rejected the anti-DEI language, and Democratic Representative Karen Ebel had left, as it was now the end of the day.

   **ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Defendants are without sufficient information to admit or deny any factual allegations which may be contained in the foregoing paragraph, and therefore deny same and put Plaintiffs to their burden of proof thereof.**

135. **The Reversal**: What happened during the caucus is unknown, but what happened next was a striking reversal. Upon reconvening after the Republican caucus, Representative Jess Edwards—who previously voted against adopting the anti-DEI provisions—had now changed his mind and asked the Committee to reconsider the 12 to 13 vote. In the subsequent vote that followed, Representatives Edwards and Seaworth switched their votes. With Representative Ebel having departed, the vote to reconsider the anti-DEI proposal was adopted by a vote of 14 to 10. The Committee then turned to a debate on whether the proposal should be adopted. *Id.* at 33:20–

38:14.[41] After a brief debate, the Committee voted to include these anti-DEI

provisions in HB2 by the same vote of 14 to 10. *Id.* at 41:1–43:22.

> [41] *See also* Paula Tracy, *After a Democrat Leaves, House Republicans Vote To Eliminate DEI in State Contracts*, InDepthNH.org (Apr. 1, 2025), https://indepthnh.org/2025/04/01/after-a-democrat-leaves-house-republicans-vote-to-eliminate-dei-in-state-contracts/.

**ANSWER: The foregoing paragraph contains a legal argument, a legal**

**conclusion, and/or a request for relief, and therefore no response is required. To**

**the extent a response is required, the allegations in this paragraph are denied to**

**the extent they are inconsistent with applicable law. Defendants are without**

**sufficient information to admit or deny any factual allegations which may be**

**contained in the foregoing paragraph, and therefore deny same and put**

**Plaintiffs to their burden of proof thereof.**

136. On April 10, 2025, the full House of Representatives voted on amending HB2 to

include the House Finance Committee's proposal and its anti-DEI provisions

(Amendment #2025-1488h). Voicing opposition to HB2, Representative Mary

Hakken-Phillips, once again, reiterated the legal problems with HB2's anti-DEI

language, its impact on students with disabilities, and the fact that it was not properly

vetted:

> [T]his amendment includes a sweeping, vaguely defined ban on diversity, equity, [and] inclusion efforts across our public institutions. A policy change inserted with no public hearing, no clear definitions, and no fiscal analysis. This so-called ban puts New Hampshire at great legal risk and financial risk while threatening programs that support students with learning disabilities, disabled individuals needing accessible voting or parking, low-income residents seeking legal aid or housing, veterans accessing their earned benefits, and religious communities who need accommodations. Not only is this ban an unfunded mandate, it opens the door to lawsuits for breach of contract, discrimination, and noncompliance with federal law. *See Exhibit 11* (Apr. 10, 2025 Transcript), at 5:18–6:7.[42]  Despite these objections, the House voted to amend HB2 to

include the House Finance Committee's full proposal, including the anti-DEI provisions, by a vote of 200 to 175.

[42] *See also* House of Representatives Full Session (Apr. 10, 2025), https://www.youtube.com/live/_6YHln7DHp8?t=15983s, 4:25:09–4:47:00, 5:26:04–5:55:05).

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Defendants are without sufficient information to admit or deny any factual allegations which may be contained in the foregoing paragraph, and therefore deny same and put Plaintiffs to their burden of proof thereof.**

137. Later in the day, as the full House was continuing its consideration of HB2, an amendment was proposed by Representative Mary Jane Wallner (Amendment #2025-1543h) that would have removed the anti-DEI provisions and other provisions from HB2. Representative Laura Telerski explained how the amendment sought to remove anti-DEI provisions that could harm the services provided to people with disabilities:

> Finally, this proposal removes a harmful, unconstitutional, and fiscally irrelevant attack on diversity, equity, and inclusion. The policy was introduced at the last hour of the last day without a hearing, and if enacted, would cost taxpayers millions of dollars in lawsuits and jeopardize school funding. An unintended consequence of this policy, as written, would likely target programs that support veterans and members of the developmental disability community. This is not what Granite Staters want. This is not how we govern.

*Id.* at 22:18–23:3. The amendment failed by a vote of 166 to 204. *Id.* at 33:14–15.

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To**

**the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Defendants are without sufficient information to admit or deny any factual allegations which may be contained in the foregoing paragraph, and therefore deny same and put Plaintiffs to their burden of proof thereof.**

138. After considering all amendments, the House voted 185 to 175 to approve HB2 and its various amendments, which included the anti-DEI language. *See Exhibit 12* (HB2 Docket).

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Defendants are without sufficient information to admit or deny any factual allegations which may be contained in the foregoing paragraph, and therefore deny same and put Plaintiffs to their burden of proof thereof.**

139. HB2 then went to the New Hampshire Senate, where the Senate Finance Committee held a public hearing on the entire bill on May 6, 2025. At the public hearing, various members of the public expressed opposition to HB2's anti-DEI provisions. For example, one member of a school board testified that these provisions "undercut[] students and [will] lead[] to them not being supported." *See Exhibit 13* (Report on May 6, 2025 Senate Public Hearing), at 56.

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To**

**the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Defendants are without sufficient information to admit or deny any factual allegations which may be contained in the foregoing paragraph, and therefore deny same and put Plaintiffs to their burden of proof thereof.**

140. Following this public hearing, the Senate Finance Committee held a work session on May 27, 2025 in which the anti-DEI provisions in HB2 were discussed.  At this session, Senator Tim Lang sponsored and proposed amended language, drafted on May 23, 2025, that would adopt the House's proposal, but with a change to the definition of "DEI."  *See Exhibit 14* (Lang May 23, 2025 Amendment Presented on May 27, 2025).[43] Rather than using the House's definition of "DEI"—which would have covered classifications "based on race, sex, ethnicity, or other group characteristics"—Senator Lang's new "DEI" definition would cover classifications "based on a characteristic identified under RSA 354-A:1." *Id.* The Committee's packet containing this proposed language listed then-NHDOE Commissioner Edelblut as a "Contact" on the anti-DEI provisions, along with Senator Lang. *Id.*

[43] *See also Senate Finance Committee Work Session (May 27, 2025),* https://www.youtube.com/live/D2ZYKlymodY?t=2588s, *42:51–48:15.*

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Defendants are without sufficient information to admit or deny any factual allegations which may be contained in the foregoing paragraph, and therefore deny same and put**

**Plaintiffs to their burden of proof thereof.**

141. During the work session, Senator David Watters, like many legislators before him, highlighted how these provisions would still conflict with federal law, including laws protecting people with disabilities.  He explained that, if the Senate Finance Committee was going to adopt Senator Lang's language incorporating the classifications in RSA 354-A, then the Committee should at least "add[] a sentence to say that this policy should not apply to federal or state statutes which identifies services for people with group characteristics" because otherwise "this would go to court and it would be just— almost immediately done with."  *See Exhibit 15* (May 27, 2025 Transcript), at 4:15– 19.  He added that he hoped the Committee would consider the "possibility of providing some language that says that we could still provide services to people with disabilities, potentially veterans, and so on, rather than this, which will ban us from doing those things."  *Id.* at 4:22–5:1.

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Defendants are without sufficient information to admit or deny any factual allegations which may be contained in the foregoing paragraph, and therefore deny same and put Plaintiffs to their burden of proof thereof.**

142. Senator Rosenwald added that the State has "already lost in court on one DEI case"— presumably referring to *Local 8027, AFT-N.H. v. Edelblut*—and that, under civil rights laws, "[w]e don't treat people equally as it is."  *Id.* at 5:7–13.  She explained the impact

Senator's Lang's version would have on those with disabilities:

> If you have a disability, you get—you can get a handicapped parking spot. That is not equal, but that is equitable. If you need special education services, that is not equal, but it's equitable. And if you're in a nursing home on Medicaid or on a developmental disability waiver, the waiver language itself means that not the entire population gets access to that service. So by its very nature, those Medicaid services are based on equity and not equality. So I don't want to get my—our state sued again.

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Defendants are without sufficient information to admit or deny any factual allegations which may be contained in the foregoing paragraph, and therefore deny same and put Plaintiffs to their burden of proof thereof.**

143. The rest of the Senate Finance Committee did not respond to these comments or add the language that Senator Watters requested. Instead, the Committee swiftly approved Senator Lang's amendment without further discussion over these objections. *Id.* at 6:5–11.

**ANSWER: Defendants are without sufficient knowledge or information to admit or deny the allegations in the foregoing paragraph, and therefore deny same and put Plaintiffs to their burden of proof thereof. Any remaining allegations are denied.**

144. Following the Senate Finance Committee's May 27, 2025 vote, the American Civil Liberties Union of New Hampshire ("ACLU-NH") and the Disability Rights Center-Hampshire wrote the Governor's office (and copied the Senate's counsel and NHDOJ)

explaining both how HB2 would impact students with disabilities, how HB2 was vague and ambiguous, how HB2 violated the First Amendment through its application to colleges and universities, and how HB2's definition of "public schools" may even encompass private schools that both receive public EFA funds and engage in religious instruction. The letter "urge[d] the Governor's Office to work with the New Hampshire Senate to remove" these sections. *See Exhibit 16* (ACLU-NH/DRC-NH May 30, 2025 Letter). No response was received, and the Senate made no changes to HB2's anti-DEI provisions. At around that time, other respected organizations and advocacy groups wrote letters to both the Senate and Governor's Office expressing similar concerns, including the New Hampshire Center for Justice and Equity, NAMI (National Alliance on Mental Illness) New Hampshire, New Hampshire Businesses for Social Responsibility, the New Hampshire Municipal Association, and the New Hampshire Charitable Foundation. *See, e.g., Exhibits 17 and 18* (Advocacy Letters).

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Defendants are without sufficient information to admit or deny any factual allegations which may be contained in the foregoing paragraph, and therefore deny same and put Plaintiffs to their burden of proof thereof.**

145. Once again, the legislature did not heed these repeated concerns. On June 3, 2025, the Senate Finance Committee, by a vote of 6 to 2, recommended Senate approval of HB2 in its entirety, which included these amended anti-DEI provisions. *See Exhibit*

*12* (HB2 Docket).  On June 5, 2025, by a vote of 14 to 10, the full Senate approved

HB2 and its amended anti-DEI provisions. *Id.*

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Defendants are without sufficient information to admit or deny any factual allegations which may be contained in the foregoing paragraph, and therefore deny same and put Plaintiffs to their burden of proof thereof.**

146. To resolve the differences between the different versions of HB2 passed by the House and Senate, multiple conference committee meetings were held during the week of June 16, 2025. *Id.* Senate and House conferees ultimately reached agreement, with the final conference committee report drafted on June 19, 2025 containing HB2's proposed final language. *Id.* This report contained the anti-DEI provisions as originally passed by the House and then amended by the Senate.  *Id.*

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Defendants are without sufficient information to admit or deny any factual allegations which may be contained in the foregoing paragraph, and therefore deny same and put Plaintiffs to their burden of proof thereof.**

147. On June 26, 2025, by a vote of 16 to 8, the full Senate adopted the conference

committee's HB2 language and its anti-DEI language. *Id.* That same day, the full House of Representatives adopted the conference committee's HB2 language by a vote of 185 to 180. *Id.*

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Defendants are without sufficient information to admit or deny any factual allegations which may be contained in the foregoing paragraph, and therefore deny same and put Plaintiffs to their burden of proof thereof.**

148. The Governor signed HB2 into law on June 27, 2025, and the anti-DEI provisions became effective on July 1, 2025. *Id.*

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Defendants are without sufficient information to admit or deny any factual allegations which may be contained in the foregoing paragraph, and therefore deny same and put Plaintiffs to their burden of proof thereof.**

149. Out of fear of losing public funds, educational institutions immediately began changing their practices in an effort to comply with HB2. Plaintiff Dr. Dottie Morris had her title changed by KSC from Associate Vice President for Institutional Equity and Diversity to Associate Vice President for Community and Belonging, and she immediately began

fearing the ways in which HB2 would change her equity work and her course instruction.  *See* _Exhibit 42_ (Morris Decl.) ¶¶ 7–22.  KSC also removed the contents of its website entitled "Justice, Equity, Diversity, and Inclusion," which previously stated the following mission:

> Keene State College values diversity in community, curriculum, and co-curriculum. These values are intimately connected with our priorities of academic excellence and student success and institutional effectiveness, sustainability, and financial stability.
>
> Diversity in perspective, community, ideas, and thoughts are core aspects of innovation and advancement. As our world becomes more interconnected, it will require creative, innovative thinkers rooted in an understanding of diversity.
>
> Keene State is committed to providing educational opportunities to prepare students to meet these challenges.

_Exhibit 19_ (KSC's Pre-HB2 Website). The website also previously explained that KSC's "Office of Justice, Equity, Diversity, and Inclusion provides institutional leadership of diversity initiatives; policy and practice development; programming; recruitment and retention efforts of underrepresented faculty, staff, and students; and creation of a strategic inclusive excellence plan for the campus." *See id.* After HB2, as of July 2025, KSC's website now says:

> The recently enacted state budget includes a prohibition on "DEI-related initiatives, programs, training, or policies." In response to this new law, selected college webpages have been temporarily taken offline to permit a thorough review of the college's programs, policies, and online materials as we plan for how best to foster a campus culture that supports access, belonging, and student success in a way that fully complies with state law.

*See* _Exhibit 20_ (KSC's July 10, 2025 website).

**ANSWER: Defendants are without sufficient knowledge or information to admit or deny the allegations in the foregoing paragraph, and**

**therefore deny same and put Plaintiffs to their burden of proof thereof.**

**Any remaining allegations are denied.**

150. Similarly, the University of New Hampshire ("UNH") within the USNH temporarily stripped the title of its chief diversity officer, who had been in this role since 2020. Her title was changed to Associate Vice President for Community, Civil Rights, and Compliance. UNH also "temporarily" removed its primary diversity, equity, access and inclusion webpages, as well as prohibited the use or request of diversity statements in hiring and promotion processes. UNH President Elizabeth Chilton announced these changes to the university community on July 1, 2025 and explained that these steps were being taken to avoid possible financial repercussions under HB2. *See Exhibit 21* (UNH July 1, 2025 Letter).[44] UNH's changes were not cosmetic Before HB2, in a May 2022 remarks, for example, then UNH President James Dean highlighted the importance of diversity, equity, and inclusion to UNH, as well as the numerous initiatives the university was engaging in. *See Exhibit 22* (May 9, 2022 Faculty Senate Meeting Minutes). Before HB2, UNH's website also made clear that it had a "Division of Diversity, Equity and Inclusion" that was "pleased to offer our community this compilation of UNH DEAI offices, resources, events, and information." The website went on to explain:

> The University of New Hampshire is committed to building and nurturing an environment of inclusive excellence where all students, faculty, and staff can thrive. We also are committed to providing open and inclusive access for all alumni, volunteers, learners, employees, and visitors seeking to participate in our programs and activities. We venture to sustain a campus environment that fosters mutual respect and understanding. We believe diversity, equity, accessibility, and inclusion are foundational values inextricably linked to achieving our core educational mission and embrace the many characteristics of our community members that make them uniquely themselves. Here, you

belong, and all are welcome.

*Exhibit 23* (UNH's May 2025 website). This information too is now gone, replaced

with the following:

> The recently enacted state budget includes a prohibition on "DEI-related
> Initiatives, programs, training, or policies." In response to these provisions,
> the university's Diversity, Equity, Access & Inclusion webpages have been
> temporarily taken offline to permit a thorough review of university programs,
> policies, and online materials as we plan for how best to foster a campus
> culture that supports access, belonging, and student success in a way that fully
> complies with state law.

*Exhibit 24* (UNH's July 10, 2025 website). With this removal, it is unclear what

programs UNH believes are covered under HB2 and what specific services and

educational opportunities will remain or will now be removed because of the law.

[44] *See* Ian Lenehan, *Under Threat From State, UNH Makes DEI-related
Changes*, Seacoast Online (July 1, 2025).

**ANSWER: The foregoing paragraph contains a legal argument, a legal
conclusion, and/or a request for relief, and therefore no response is required. To
the extent a response is required, the allegations in this paragraph are denied to
the extent they are inconsistent with applicable law. Defendants are without
sufficient information to admit or deny any factual allegations which may be
contained in the foregoing paragraph, and therefore deny same and put Plaintiffs
to their burden of proof thereof.**

151.UNH Law made similar changes. As of January 2025, UNH Law had a "Diversity &

Inclusion" page that announced that "UNH Franklin Pierce is the most racially and

ethnically diverse college in the USNH system. Since 2017 we have experienced a

fivefold increase in students of color. We're making progress, but there is more to do and

we're committed to the active pursuit of this positive change." This website included

resources for sexual misconduct and resources for bias and discrimination, as well as a

"land, water, and life acknowledgment" recognizing the indigenous origins of New

Hampshire. This "Diversity & Inclusion" page also contained the first edition of UNH

Law's Diversity, Equity, and Inclusion Digest, dated May 3, 2022, which explained the

various "DEI" initiatives of the law school, including the establishment of two funds (the

DEI Fund and the DEI Scholarship Fund) and the hiring of a DEI Faculty Fellow. This

Digest also included the law school's "Diversity, Equity, and Inclusion Statement":

> The University of New Hampshire Franklin Pierce School of Law is committed to building and sustaining a diverse, equitable, and genuinely inclusive environment for all students, staff, applicants, and visitors. We believe that to foster diversity and inclusiveness in our school means to acknowledge the intrinsic worth of varied experiences and to promote equality of respect and opportunity for every member of our community. We seek to encourage greater mutual understanding of the ways that individual differences have shaped personal identities. We aim to celebrate the differences that make each of us unique and to support the growth and talent of our community members to ensure that all may reach their full potential. We recognize that this climate of inclusion is vital to our continued success in attaining the highest quality research, scholarship, teaching, engagement, and all other strategic goals of our school. We accept and welcome the responsibility of teaching and learning in a diverse democracy where social justice serves as a bridge between a quality education and civic engagement.

*See Exhibit 25* (UNH Law's Jan. 2025 website). This information is now gone, replaced with the following:

> The recently enacted state budget includes a prohibition on "DEI-related initiatives, programs, training, or policies." In response to these provisions, the university's Diversity, Equity, Access & Inclusion webpages have been temporarily taken offline to permit a thorough review of university programs, policies, and online materials as we plan for how best to foster a campus culture that supports access, belonging, and student success in a way that fully complies with state law.

*See Exhibit 26* (UNH Law's Aug. 4, 2025 website).

**ANSWER: Defendants are without sufficient knowledge or information to admit or**

**deny the allegations in the foregoing paragraph, and therefore deny same and put**

**Plaintiffs to their burden of proof thereof. Any remaining allegations are denied.**

152. Plymouth State University ("PSU") also made these changes. PSU redesignated its Chief Diversity Officer and Director of Inclusion, Diversity, Equity, and Access ("IDEA"), changing the title to "Director of the IDEA Center." PSU also removed specific information regarding diversity programming and work from this employee's public profile. PSU scrubbed its websites related to diversity in much the same way that KSC, UNH, and UNH Law did. *Compare Exhibit 27* (PSU April 2025 website) with *Exhibit 28* (PSU's July 2025 website); *see also Exhibit 29* (River Valley Community College "You Belong Here" website as of March 2025) and *Exhibit 30* (removal of that website as of July 2025). For example, PSU removed a statement emphasizing the university's commitment to diversity and removed a section of the site called "IDEA in the Curriculum."45

> [45] *See* Elyse Goncalves, *Plymouth and Keene State Follow UNH, Remove Language on Diversity from Websites*, Union Leader (July 10, 2025), https://www.unionleader.com/news/education/plymouth-and-keene-state-follow-unh-remove-language-on-diversity-from-websites/article_cd432b44-6e97-4929-b4ff-28613ef787c5.html.

**ANSWER: Defendants are without sufficient knowledge or information to admit or deny the allegations in the foregoing paragraph, and therefore deny same and put Plaintiffs to their burden of proof thereof. Any remaining allegations are denied.**

153. Compounding the fear and chill educators will experience under HB2, on July 2, 2025, leaders of the New Hampshire House of Representatives responded to UNH's actions by making clear that they viewed HB2's provisions broadly to cover "radical leftist indoctrination," and that UNH will "effectively defund itself if it presses ahead" with this indoctrination:

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Defendants are without sufficient information to admit or deny any factual allegations which may be contained in the foregoing paragraph, and therefore deny same and put Plaintiffs to their burden of proof thereof.**

154. That same day, another legislator, Representative Sam Farrington, tweeted that UNH is warned that "any effort to ram this [DEI] through the backdoor will also lead to the stripping of all state funds" pursuant to HB2:

**ANSWER: Defendants are without sufficient knowledge or information to admit or deny the allegations in the foregoing paragraph, and therefore deny same and put Plaintiffs to their burden of proof thereof. Any remaining allegations are denied.**

155. The message is clear: if educators do not restrict educational instruction and opportunities under HB2's vague terms in ways that comply with the subjective assessments of the law's proponents, then they will lose all public funds.

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied.**

**III. Defendants' Immediate Enforcement and Failure to Provide Guidance.**

156. NHDOE has already begun enforcing HB2's anti-DEI provisions, including demanding that public school districts and both public and private colleges and

universities provide information on "DEI" contracts and certify compliance under the pains and penalties of perjury by September 5, 2025. *See Exhibit 2* (NHDOE July 11, 2025 Letter); *Exhibit 3* (NHDOE July 17, 2025 Letter and College/University Report List).

**ANSWER: The allegations in the foregoing paragraph are admitted to the extent that NHDOE sent correspondence dated July 11, 2025 and July 17, 2025. To the extent this paragraph contains any legal arguments or legal conclusions, same are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied. To the extent this paragraph contains representations as to the content or meaning of a document, same are denied and Plaintiffs are put to their burden of proof thereof. Defendants submit that the document itself is the best evidence of its content and meaning.**

157. NHDOE's July 11, 2025 and July 17, 2025 letters provide no guidance as to what HB2's anti-DEI provisions mean beyond reciting the provisions of the law. When asked by one school district to provide further guidance on what HB2 means, NHDOE declined and instead referred that district to its outside counsel. *Exhibit 31* (NHDOE July 15, 2025 Grantham Response).

**ANSWER: The allegations in the foregoing paragraph are admitted to the extent that NHDOE sent correspondence dated July 11, 2025 and July 17, 2025. To the extent this paragraph contains any legal arguments or legal conclusions, same are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied. To the extent this paragraph contains representations as to the content or meaning of a document, same are denied and Plaintiffs are put to**

**their burden of proof thereof. Defendants submit that the document itself is the best evidence of its content and meaning.**

158. As part of its enforcement effort, NHDOE has established a website entitled "Prohibition on Diversity, Equity, and Inclusion in Public Schools" that publishes NHDOE's enforcement efforts, what schools have been targeted to submit certifications, who has returned certifications, and the contents of the returned certifications.[46]

> [46] *See* NHDOE, *Prohibition on Diversity, Equity, and Inclusion in Public Schools*, https://www.education.nh.gov/who-we-are/deputy-commissioner/office-governance/legislation/prohibition-diversity-equity-and-inclusion-public-schools.

**ANSWER: The allegations in the foregoing paragraph are admitted to the extent that, at one point in time, NHDOE had a webpage which discussed "Prohibition on Diversity, Equity, and Inclusion in Public Schools[.]" Any remaining allegations are denied. By way of further answer, said webpage is not presently published nor is it available through NHDOE's website. To the extent this paragraph contains representations as to the content or meaning of a document, same are denied and Plaintiffs are put to their burden of proof thereof. Defendants submit that the document itself is the best evidence of its content and meaning.**

159. A small number of school districts (12 out of 180 as of August 6, 2025) have already begun submitting certifications under the NHDOE's September 5, 2025 deadline, and NHDOE has begun posting those certifications on a public website for public school districts, though not private K-12 schools that may receive public funding. NHDOE provides no explanation as to why the K-12 compliance website does not include private institutions, while the higher education compliance website includes private institutions that may receive public funding.[47] NHDOE provides no explanation as to why the K-12

compliance website does not include private institutions, while the higher education

compliance website includes private institutions that may receive public funding.

> [47] *See* NHDOE, *Public School Certified Reports*,
> https://www.education.nh.gov/who-we-are/deputy-commissioner/office-
> governance/legislation/prohibition-diversity-equity-and-inclusion-public-
> schools/public-schools-certified (last visited July 31, 2025).

**ANSWER: The allegations in the foregoing paragraph are admitted to the extent**

**that some school districts have submitted certifications. At the present stage of this**

**litigation, NHDOE is without knowledge or information as to the exact number of**

**school districts which have submitted certifications. Any remaining allegations are**

**denied. By way of further answer, NHDOE notes that the above-noted webpage is**

**no longer published. To the extent this paragraph contains representations as to the**

**content or meaning of a document, same are denied and Plaintiffs are put to their**

**burden of proof thereof. Defendants submit that the document itself is the best**

**evidence of its content and meaning.**

160. Furthermore, on July 23, 2025, Defendant New Hampshire Department of

Administrative Services directed state agencies to identify all contracts that include DEI-

related provisions and submit that information to the Department by October 1, 2025. *See*

*Exhibit 4* (July 23, 2025 Department of Administrative Services Email).

**ANSWER: The allegations in the foregoing paragraph are admitted to the extent**

**that NHDAS sent correspondence dated July 23, 2025. Any remaining allegations**

**are denied. To the extent this paragraph contains representations as to the content**

**or meaning of a document, same are denied and Plaintiffs are put to their burden of**

**proof thereof. Defendants submit that the document itself is the best evidence of its**

**content and meaning.**

161. Finally, RSA 21-I:116 states that NHDOJ "shall establish a process by which all political subdivisions review their existing contracts for the presence of DEI-related provisions." RSA 21-I:116. It appears that this process has not yet been developed, even while the September 5, 2025 certification deadline quickly approaches and while districts have started submitting certifications under the law.

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied. By way of further answer, as of this filing, the NHDOJ has developed a formal process "by which all political subdivisions review their existing contracts for the presence of DEI-related provisions."**

## FACTUAL AND LEGAL ALLEGATIONS

## I. HB2's Anti-DEI Provisions Are Vague and Viewpoint-Discriminatory, with Massive Penalties for Public Schools and Their Employees Who Guess Wrong as to What HB2 Means and How the Law Will Be Enforced.

### A. HB2's Ambiguous Terms.

162. Effective July 1, 2025, New Hampshire enacted RSA 21-I:112-116 and RSA 186:71-77 in HB2 purporting to prohibit the implementation or "promot[ion]" of, or engagement in, "initiatives, programs, training, or policies" in public entities and "public schools" that are "related" to "diversity, equity, or inclusion" (or "DEI"). *See* RSA 21-I:113-14; RSA 186:72-73. A "public school" is broadly defined as "any school, academic institution, or institution of higher education in this state supported by public funds." *See* RSA 186:71,

II. This means that HB2 applies not only to public school districts serving students in grades K–12, but also to public colleges and universities in New Hampshire, including UNH Law, UNH, KSC, and PSU. This "public school" definition also means that HB2 applies to private K–12 schools and colleges/universities in New Hampshire that are "supported by public funds."

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied.**

163. HB2's anti-DEI provisions are vague and violate due process. DEI is defined as "any program, policy, training, or initiative that classifies individuals based on a characteristic identified under RSA 354-A:1"—namely, age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, or national origin—"for the purpose of achieving demographic outcomes, rather than treating individuals equally under the law." *See* RSA 21-I:112, II; RSA 186:71, I. HB2 is replete with vagueness for each of the reasons explained below.

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied.**

164. **"Achieving Demographic Outcomes"**: "Classif[ying]" and "achieving demographic outcomes" are undefined under HB2, leaving educators to guess what is covered. HB2's application of the "DEI" definition to protected classes under RSA 354-A:1 makes the

law's prohibitions particularly indecipherable and arguably covers well-established (and

legally-mandated) "programs" and "initiatives" that school administrators, school

districts, and their educators employ every day to make certain "demographic" groups

feel more welcome and able to access education on equal terms.

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion,**

**and/or a request for relief, and therefore no response is required. To the extent a**

**response is required, the allegations in this paragraph are denied to the extent they**

**are inconsistent with applicable law. Any remaining allegations are denied.**

165. For example, would education programs designed to increase the representation of girls

in STEM classes[48] or adding female sports teams[49] be violative as seeking to "achieve a

demographic outcome"? Such efforts to increase female representation, in some

circumstances, could be mandated by Title IX of the Education Amendments of 1972 to

address past gender discrimination.[50] Does a school district's tracking—consistent with

Section 1111(c)(2) of the federal Elementary and Secondary Education Act ("ESSA") of

1965 (*see* 20 U.S.C. § 6311(c)(2))—of racial and ethnic groups constitute classifications

designed to "achieve demographic outcomes"?[51] Similarly, does a school district's

tracking of "children with disabilities" or "English learners" under federal law—paired

with the targeted interventions that may be legally required for these groups—constitute

classifications based on disability or national origin designed to "achieve demographic

outcomes" for these groups?[52] This is unclear.

[48] *See* Tara P. Nicola, *STEM Gender Gaps Significant Among Gen Z*, Gallup Blog
(Dec. 5, 2023), https://news.gallup.com/opinion/gallup/544772/stem-gender-gaps-
significant-among-
gen.aspx#:~:text=Women%20make%20up%20half%20of,fields%20such%20as%
20computer%20science ("Female Gen Z youth report learning about fewer

technical STEM concepts in their middle and high school coursework than their male counterparts do.").

[49] *See* 44 Fed. Reg. 71413, 71418 (1979) (establishing three-part to determine whether an educational institution is considered to be in compliance with Title IX).

[50] *See* Matthew McLaughlin, *Can Title IX Change STEM Culture*, Nat'l Soc'y of Pro. Eng'rs (May 2017), https://www.nspe.org/career-growth/pe-magazine/may-2017/can-title-ix-change-stem-culture.

[51] *See* NHDOE, *Consolidated State Plan, The Elementary and Secondary Education Act of 1965, as amended by the Every Student Succeeds Act*, at 16 (Revised Submission V.3 ~ February 1st, 2023), https://www.education.nh.gov/sites/g/files/ehbemt326/files/inline-documents/sonh/nh-state-plan-2023_used_0.pdf.

[52] *Id.* at 14; *see also Exhibit 40* (Shea Decl.) ¶ 22; *Exhibit 38* (Shaps Decl.) ¶¶ 26, 28.

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied.**

166. And, as NEA-NH Member A explains, it is not clear whether educators can comply with RSA 189:11, I-c(j)'s requirement to include instruction on "[h]ow intolerance, bigotry, antisemitism, and national, ethnic, racial, or religious hatred and discrimination have evolved in the past, and can evolve, into genocide and mass violence, such as the Holocaust, and how to prevent the evolution of such practices" when this instruction helps "achieve" the "demographic outcome" of protecting Jewish students from discrimination. *Exhibit 34* (NEA-NH Decl.) ¶ 18; *Exhibit 35* (NEA-NH Member A Decl.) ¶¶ 14–16. As a result, "teachers could … be left with 'an impermissible Hobson's choice': shirking their responsibilities under RSA § 189:11, or teaching what RSA § 189:11 requires and potentially violating the prohibition[s] in HB2's anti-DEI

provisions. *See Local 8027, AFT-N.H. v. Edelblut*, 651 F. Supp. 3d 444, 462 (D.N.H. 2023) (Barbadoro, J.). Plaintiff School Districts have similar uncertainty about how to comply with HB2 and RSA 189:11, I-c(j). *See, e.g.*, *Exhibit 40* (Shea Decl.) ¶ 26; *Exhibit 38* (Shaps Decl.) ¶ 35.

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Defendants are without sufficient information to admit or deny any factual allegations which may be contained in the foregoing paragraph, and therefore deny same and put Plaintiffs to their burden of proof thereof.**

167. As explained in more detail in Section III *infra*, these ambiguities are especially pronounced in the context of disability—a classification specifically covered in HB2's prohibitions through its incorporation of RSA 354-A:1—where federal law requires that both public entities, schools, and educators implement individualized programs that improve integration and outcomes for this demographic group.

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied.**

168. **"DEI"-"related" and "Promote"**: Adding to this confusion, HB2 does not just prohibit "DEI"; it also prohibits DEI-"*related*" initiatives, programs, training, or policies. *See* RSA 21-I:113-14 (emphasis added); RSA 186:73 (emphasis added). Nowhere does HB2

explain how "related" a program must be to HB2's definition of "DEI" at RSA 21-I:112, II and RSA 186:71, I for that program to now be unlawful. *See S.F. A.I.D.S. Found. v. Trump*, No. 25-CV-01824-JST, 2025 U.S. Dist. LEXIS 109281, at *68, __ F. Supp. 3d __ (N.D. Cal. June 9, 2025) (appeal filed Aug. 7, 2025) ("Indeed, the DEI-1 Order does not define what 'equity' *or 'equity-related'* means at all …. This lack of definition is particularly problematic given the broad nature and applications of the term 'equity,' *let alone with the additional modifier of '-related.'*") (emphasis added).

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied.**

169. For example, would a Black history student group or a Christian student group be DEI-"related" solely because it mentions a protected characteristic like race or religion? Would a guidance counselor's informational course on gender violence be considered DEI-"related" because of its focus on gender? And would a counselor recommending resources for a group of students at higher risk of depression or suicide be "related" to "DEI" if that grouping of students or the recommended resources implicate mental disabilities or another characteristic listed in RSA 354-A:1? HB2 says nothing about whether these programs or initiatives are sufficiently "related" to DEI to now be unlawful.

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a**

**response is required, the allegations in this paragraph are denied to the extent they**

**are inconsistent with applicable law. Any remaining allegations are denied.**

170. Public entities and "public schools" are now not allowed to "implement, promote, or

otherwise engage in"—also undefined terms—these DEI-"related" activities. It is unclear

if simply mentioning the existence of "DEI" programs in a classroom would be

considered impermissible "promotion." The word "promotes" has been specifically

identified by the Supreme Court as "susceptible of multiple and wide-ranging meanings."

*See United States v. Williams*, 553 U.S. 285, 294 (2008). Could a UNH Law professor

teach key constitutional law cases addressing affirmative action—including endorsing

Justice Sotomayor's dissent in *Students for Fair Admissions, Inc. v. President & Fellows*

*of Harv. Coll.*, 600 U.S. 181, 318 (2023), which states that the Fourteenth Amendment's

guarantee of racial equality "can be enforced through race-conscious means"—without

potentially being accused of "promoting" a "DEI" "related" "program"? The law is

unclear. *See Local 8027, AFT-N.H.*, 2024 U.S. Dist. LEXIS 94052, at *33 (noting that the

text of New Hampshire's classroom censorship law "provides no hint" of whether a

teacher can teach court cases on affirmative action, thereby "leaving the teacher's fate

subject only to an enforcing agency's subjective interpretation of what was taught").

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion,**

**and/or a request for relief, and therefore no response is required. To the extent a**

**response is required, the allegations in this paragraph are denied to the extent they**

**are inconsistent with applicable law. Any remaining allegations are denied.**

171. **"Implicit Bias Training," "Critical Race Theory," and "DEI Assessments"**: HB2

also is ambiguous in purporting to label certain undefined concepts like "implicit bias

training," "critical race theory," and "DEI assessments" as unlawfully "DEI-related." *See* RSA 21-I:113 ("No state funds shall be expended for DEI-related activities, including but not limited to …."); RSA 186:72 (same).

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied.**

172. At the outset, this list of topics that are apparently (and categorically) deemed "related" to "DEI" is not an exclusive list, meaning that there could be other, unspecified topics that are sufficiently "related" to "DEI" to be unlawful. *See Bellevue v. Miller*, 536 P.2d 603, 607 (Wash. 1975) (noting that a law's inclusive list of examples which may be considered unlawful cannot save the law where "there are plainly no actual limitations placed on the exercise" of discretion). And HB2's explicit recitation of topics that are categorically DEI-"related" suggests that these topics are prohibited even if they do *not* meet the law's definition of "DEI" under RSA 21-I:112, II and RSA 186:71, I. In other words, "implicit bias training," "critical race theory," and "DEI assessments" confusingly appear barred even where the concepts themselves—or the inclusion of them in a classroom discussion or other "program"—do not explicitly "classif[y] individuals based on a characteristic identified under RSA 354-A:1 for the purpose of achieving demographic outcomes."

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a**

**response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied.**

173. HB2 also does not define the terms "implicit bias training," "critical race theory" or "DEI assessments" themselves, leaving educators like Plaintiff Dr. Dottie Morris and those who give trainings to public entities (like Plaintiffs James T. McKim, Jr. and New Hampshire Outright) to wonder where the line is between what is allowed and what may be punishable. *See Exhibit 42* (Morris Decl.) ¶ 9 ("I do not know whether I can reference implicit bias either to students or fellow staff members out of fear of being accused of violating the law—an accusation that could cause KSC to lose vital public funding."); *Exhibit 43* (McKim Decl.) ¶¶ 5–6 ("I am especially confused about what the phrase 'achieving demographic outcomes' means in HB2's definition of 'DEI.'"); *Exhibit 44* (New Hampshire Outright Decl.) ¶¶ 6, 11 (noting bias training it conducts and the fact that, "[b]ecause HB2 does not define the term 'implicit bias training' or explain what 'achieving demographic outcomes' means, New Hampshire Outright has to wonder where the line is between what is allowed and what is punishable, all while often being contractually required to comply with New Hampshire law during these trainings").

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied.**

174. Where some courts have found as impermissibly vague efforts at defining "critical race theory" in seeking to ban certain concepts from being taught in schools, HB2 abandons that effort altogether in leaving this term undefined, further enhancing how this law can

be arbitrarily enforced. *See Miss. Ass'n of Educators*, 2025 U.S. Dist. LEXIS 140078, at *14 ("Terms like 'divisive concepts' are undefined, granting enforcers unbounded discretion."); *Local 8027, AFT-N.H.*, 2024 U.S. Dist. LEXIS 94052, at *23 n.6 (noting that the legislative intent in banning four concepts in New Hampshire schools was, in part, to ban "critical race theory"); *Mae M. v. Komrosky, 111 Cal. App. 5th 198 (2025) (holding that the trial court erred in denying preliminary injunctive relief to bar enforcement of a school board's resolution prohibiting the teaching of critical race theory because success on the merits was likely in establishing the resolution was unconstitutionally vague on its face).*

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied.**

175.Indeed, the vague and undefined terms "implicit bias training" or "DEI assessments" may encompass a large range of common employment and educational practices, including things like testing accommodations or assessments regarding language acquisition and readiness. And is the mere mention of "systemic" or "structural" racism against communities of color in classrooms and trainings throughout New Hampshire now covered as illegal "implicit bias" or "critical race theory," including at KSC or UNH Law, which is subject to ABA Standard 303(c) requiring law schools to provide "provide education to law students on bias, cross-cultural competency, and racism"? The answer to this question is far from clear. NEA-NH higher education members at UNH Law who engage in instruction and work that arguably impacts HB2 do not see how they can

comply with both HB2 and ABA Standard 303(c), especially where "discussion of race is critical to educating law students not only in the legacy of race in how the law has developed, but also how to effectively represent clients from diverse communities." *Exhibit 34* (NEA-NH Decl.) ¶ 8. In recent years, "critical race theory" has become a phrase that can mean whatever one wants it to mean, including any mention of the view that race-conscious approaches may assist in remedying past discrimination. Former NHDOE Commissioner Edelblut, himself, has decried "critical race theory" in the context of race conscious remedies, and argued that New Hampshire's 2021 (and now enjoined) classroom censorship law was necessary to prevent its instruction in schools. *See Local 8027, AFT-N.H.*, 2024 U.S. Dist. LEXIS 94052, at *23 n.6 (noting Commissioner Edelblut "op-ed asserting that the law will address 'those who promote Critical Race Theory or similar concepts'"); *Exhibit 32* (Edelblut June 13, 2025 op-ed).

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Defendants are without sufficient information to admit or deny any factual allegations which may be contained in the foregoing paragraph, and therefore deny same and put Plaintiffs to their burden of proof thereof.**

176. For higher education instructors in particular, for example, these undefined prohibitions raise the specter that they include researching, writing on, or teaching—including as part of a Human Rights/Social Justice class or other "program" of study—books like Michelle Alexander's *The New Jim Crow: Mass Incarceration in the Age of Colorblindness* (2010)

or articles on "systemic racism" in the United States' immigration laws.[53] This concern

more real by the fact that NHDOE is already enforcing HB2 against colleges and

universities, and where one of the legislators who supported the law cited instruction on

"socioeconomic factors" (including posing questions like "why is it that you have better

health outcomes in white neighborhoods") in higher education as an example for why the

law was necessary. *See Exhibit 10* (April 1, 2025 Transcript, With Margin Notes By Pls.'

Counsel), at 15:7–23. With this context in mind, Plaintiff Dr. Dottie Morris's work at

KSC is in question, including her instruction on implicit biases in her psychology

classroom. *See Exhibit 42* (Morris Decl.) ¶¶ 18–19. She adds that, at KSC, she is "seeing

significant stress from" her "colleagues who do not know what HB2 means and do not

know how to comply. Some are so afraid of making a mistake that will be costly to the

college that they are telling [her] that they likely will err on the side of not including

certain content that may be considered covered." *Id.* at 22.

> [53] *See* Kevin R. Johnson, *The Jerome Hall Lecture: Systemic Racism in the U.S.
> Immigration Laws*, 97 Ind. L.J. 1455, 1460 (2022).

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion,**
**and/or a request for relief, and therefore no response is required. To the extent a**
**response is required, the allegations in this paragraph are denied to the extent they**
**are inconsistent with applicable law. Defendants are without sufficient information**
**to admit or deny any factual allegations which may be contained in the foregoing**
**paragraph, and therefore deny same and put Plaintiffs to their burden of proof**
**thereof.**

177. Implicit bias also is a concept regularly addressed in law enforcement trainings

(including those conducted by NHDOJ[54]) to help ensure that New Hampshire's

enforcement of the laws is fair following the May 2020 murder of George Floyd and the racial justice movement that followed. Implicit bias trainings for law enforcement were embraced by Governor Chris Sununu and the LEACT Commission, which recommended in August 2020 that police be trained on implicit bias—training that has subsequently occurred throughout New Hampshire.[55] Plaintiff James McKim regularly conducts these trainings for public entities and public schools throughout New Hampshire, and he helped develop the implicit bias training for the PSTC. *Exhibit 43* (McKim Decl.) ¶¶ 3–4, 7–9. Plaintiff Dr. Dottie Morris too regularly addresses these topics in trainings and in her classes as a psychology professor. *Exhibit 42* (Morris Decl.) ¶¶ 8, 18. And NEA-NH Member B also taught implicit bias in a high school sociology class, though Member B recently removed it from the curriculum given the current climate. *Exhibit 36* (NEA-NH Member B Decl.) ¶ 17.

[54] *See Exhibit 6* (Implicit Bias Training Hosted by the New Hampshire Attorney General's Office on Nov. 20, 2020 (addressing concepts like "structural/systemic discrimination" and "white privilege" in slides 11-12, 33 of James McKim's presentation "Are You Your Implicit Bias?"); *see also* https://organizationalignition.com/event/implicit-bias-training.

[55] *See Commission on Law Enforcement Accountability, Community as Transparency*, New Hampshire Governor Chris Sununu, https://www.governor.sununu.nh.gov/accountability; *see also LEACT Recommendations Completed & In Progress as of 9/21/21*, New Hampshire Governor Chris Sununu, https://www.governor.sununu.nh.gov/sites/g/files/ehbemt336/files/inline-documents/sonh/20210830-leact-recommendations-completed-and-in-progress-final.pdf (noting in Sept. 2, 2021 LEACT Tracking Report completion of the following: "1-B. Mandate NH PSTC training on implicit bias and cultural responsiveness, ethics and de-escalation"; "2. Encourage all law enforcement agencies to require implicit bias and cultural responsiveness, ethics and de-escalation training"; and "18. Require implicit bias training for all prosecutors, criminal defense attorneys and judges."); *LEACT Dashboard,* New Hampshire Governor Chris Sununu, (June 9, 2021) https://www.governor.sununu.nh.gov/sites/g/files/ehbemt336/files/inline-

documents/sonh/060921-dashboard.pdf (noting in LEACT May 2021 Dashboard that "State Police completed additional training on de-escalation and is in progress on training on ethics and implicit bias").

**ANSWER: Defendants are without sufficient knowledge or information to admit or deny the allegations in the foregoing paragraph, and therefore deny same and put Plaintiffs to their burden of proof thereof. Any remaining allegations are denied.**

178. HB2's viewpoint-based inclusion of topics like "critical race theory" also demonstrate that the law's prohibitions—consistent with its broad terms implicating "programs" and "initiatives" and consistent with the intent of one of its legislative proponents, *see Exhibit 10* (April 1, 2025 Transcript, With Margin Notes By Pls.' Counsel), at 12:25–13:1, 15:7–23—go beyond mere hiring and contracting decisions, but also include "programs" of study that impact curricular instruction in both public schools and higher educational institutions that receive public funding. This broad curricular scope directly impacts the members of NEA-NH, especially those who regularly wrestle with issues concerning disability, race, and other classifications in providing programmatic and special education services, as well as curricular instruction at colleges and universities. *See Exhibit 34* (NEA-NH Decl.) ¶¶ 17–20; *Exhibit 35* (NEA-NH Member A Decl.) ¶¶ 5, 9, 13–18; *Exhibit 36* (NEA-NH Member B Decl.) ¶¶ 7, 8, 12, 13; *Exhibit 37* (NEA-NH Member C Decl.) ¶¶ 15, 17–18, 19, 22.

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Defendants are without sufficient information to admit or deny any factual allegations which may be contained in the foregoing**

**paragraph, and therefore deny same and put Plaintiffs to their burden of proof thereof.**

**B. HB2's Massive Funding Penalties and Lack of a Scienter Requirement.**

179. The stakes are especially high for "public schools," including the School District Plaintiffs in this case. If NHDOE believes there has been a violation of any part of HB2's anti-DEI provisions, "either knowingly *or unknowingly*," NHDOE "*shall* immediately halt all sources of public funding to that public school, until such time as the school comes into compliance with all sections of this subdivision." *See* RSA 187:77, I (emphasis added). Further, NHDOE "*shall* notify the state treasurer if a public school is not in compliance with this subdivision, at which time the treasurer shall halt all forms of public funding to the school until the commissioner has certified the school [has] come into compliance with this subdivision." *See* RSA 187:77, II (emphasis added). For any violation—whether knowing or not—public schools *shall* lose "all sources of public funding to that public school."

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied.**

180. "Public funding" is broad. This loss of "public funding" includes state funds, and possibly even federal funds where NHDOE acts as a "pass through" in distributing federal funds to public school districts. For public school districts, the state funds that hang in the balance include per pupil base adequacy aid that the state provides to school districts under RSA 198:40-a, II. This amount can collectively be in the millions of

dollars for an individual public school district. Disbursement of these state funds to public school districts is not optional; the State is obligated to disburse these funds so districts can provide an adequate education consistent with Part II, Article 83 of the New Hampshire Constitution. The New Hampshire Supreme Court recently held that the unadjusted $4,100 per pupil amount (adjusted to $4,182 for the current year) provided by the State is already unconstitutionally low. *See Contoocook Valley Sch. Dist. v. State*, No. 2024-0121, 2025 N.H. LEXIS 170, at *1 (July 1, 2025) (holding that the unadjusted $4,100 per pupil amount is facially unconstitutional, as it fails to provide sufficient funding for a constitutionally adequate education). And now, under HB2, a school district *shall* lose that unconstitutionally-low amount of funding if NHDOE believes that the district—even unknowingly—violated the law's vague terms. As one New Hampshire district court has concluded, this lack of scienter is fatal. *See Local 8027, AFT-N.H.*, 2024 U.S. Dist. LEXIS 94052, at *40. The stakes could not be higher for school districts, their educators, and their students if an educator "unknowingly" runs afoul of HB2.

**ANSWER: The allegations in the foregoing paragraph are admitted to the extent that NHDOE distributes Title I-IV funds and IDEA funds to school districts.  The remaining allegations in this paragraph appear to contain a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied.**

181. NEA-NH's members, as well as the educators employed by the School District Plaintiffs, cannot continue to deliver the quality of instruction, programming, and

professional development that their school communities deserve without "public funds" under HB2, which includes state (and possibly even federal) funds. Educators, including NEA-NH members and those employed by the Plaintiff School Districts, have invested in practicing their profession in compliance with state and federal law, including in their own training and professional development, in designing their courses and curriculum, and otherwise. Indeed, laws, regulations, and other guidance and interpretation address the provision of equal educational opportunity and inclusion in many ways, including programs for students based on race, national origin, sex, and for students with disabilities, English learners, and students experiencing homelessness. Compliance with these civil rights obligations and other federal statutory obligations like ESSA is deeply woven into the practice of teaching and education. HB2 introduces new and uncertain requirements in educators' work that may even conflict with these civil rights obligations without affording any opportunity to prepare and plan to incorporate these new requirements—a particularly thorny problem, as HB2's requirements appear to conflict with many other professional requirements, best practices, and other federal laws. This places educators and the organizations that serve them in an immediate bind and interferes with the education that students receive. *See Exhibit 34* (NEA-NH Decl.) ¶¶ 7, 14 20–21, 26 (discussing concerns about impact on special education services); *Exhibit 36* (NEA-NH Member B Decl.) ¶¶ 9--10 (discussing impact of HB2 on services for multi-language learners and students with disabilities); *Exhibit 37* (NEA-NH Member C Decl.) ¶¶ 12, 15–22 (same).

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a**

**response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied.**

182. Penalties also exist for public and private (including religious) colleges and universities that fail to comply with HB2's vague terms—namely, loss of all "public funds." This too includes state funds, and possibly even federal funds. NHDOE has already effectively threatened colleges and universities that do not comply with HB2's vague terms with loss of over $22 million in annual UNIQUE Program state grants (both Annual and Endowment) disbursed through June 30, 2025 and over $2 million in annual Governor's Scholarship Program state grants disbursed in fiscal year 2025—grants that are distributed based on merit and need to New Hampshire residents who attend private or public colleges or universities. *See Exhibit 3* (NHDOE July 17, 2025 Letter and College/University Report List).

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied. To the extent this paragraph contains representations as to the content or meaning of a document, same are denied and Plaintiffs are put to their burden of proof thereof. Defendants submit that the document itself is the best evidence of its content and meaning.**

**II. HB2 Invites Arbitrary and Discriminatory Enforcement, Especially Given Its Lack of Process.**

183. Although HB2's requirements are not clear, NHDOE's intent to enforce them is.

**ANSWER: The allegations in the foregoing paragraph are admitted to the extent that NHDOE intends to comply with applicable law. Any remaining allegations are denied.**

184. On July 11, 2025, NHDOE wrote to school districts informing them that "each public school (as defined by RSA 186:71, II) must review all program, policy, training, or initiative to identify DEI-related provisions," as well as demanding that they certify compliance with the law under the pains and penalties of perjury. *See Exhibit 2* (NHDOE July 11, 2025 Letter). On July 17, 2025, NHDOE directed a similar letter to public and private colleges and universities, including private colleges that receive state funding through individual state-funded scholarships. *See Exhibit 3* (NHDOE July 17, 2025 Letter and College/University Report List). NHDOE, in these July 11, 2025 and July 17, 2025 letters, also makes clear the penalties for noncompliance: "Should a public school … fail to abide by any section of the DEI provisions to HB 2, either knowingly or unknowingly, the Commissioner of the Department of Education shall immediately **halt all sources of public funding to that public school**, until such time as the school comes into compliance with all sections of this subdivision." *Id.* (emphasis in original by NHDOE). Defendant Department of Administrative Services has similarly required compliance from state entities. *See Exhibit 4* (July 23, 2025 Department of Administrative Services Email).

**ANSWER: The allegations in the foregoing paragraph are admitted to the extent that NHDOE sent correspondence dated July 11, 2025, and July 17, 2025, and to the extent that NHDAS sent correspondence dated July 23, 2025. Any remaining allegations are denied. To the extent this paragraph contains representations as to**

**the content or meaning of a document, same are denied and Plaintiffs are put to their burden of proof thereof. Defendants submit that the document itself is the best evidence of its content and meaning.**

185. In the wake of these enormous financial penalties that would cripple a school district's ability to educate its students, HB2's anti-DEI provisions provide *no process* for school districts to contest the unilateral decision of NHDOE that a "knowing" or "unknowing" violation has occurred. NHDOE is the judge, jury, and executioner, with millions of dollars of state (and possibly even federal) funding on the line that NHDOE can either (i) revoke altogether in imposing a *de facto* "death penalty" for a district, or (ii) coercively hold hostage until a district complies with NHDOE's unilateral interpretation of HB2's vague provisions. Because of this lack of process for an aggrieved district to challenge a decision of NHDOE under this law—a process that makes enforcement swift and at the whims of NHDOE—this lawsuit and immediate relief are especially necessary.

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied.**

186. Further compounding the chill educators will experience, NHDOE's July 11, 2025 and July 17, 2025 letters provide no guidance as to what HB2's anti-DEI provisions mean beyond reciting the provisions of the law. When the superintendent of one school district, after receiving the July 11, 2025 letter, asked then-NHDOE Commissioner of Education Frank Edelblut several questions about what HB2 means—including "What school actions meet 'the purpose of achieving demographic outcomes'?" and "What is the

definition of 'program' under this subdivision?"—Commissioner Edelblut provided no further guidance. Instead, Commissioner Edelblut stated the following: "Thank you for your questions. For clarification on the application of RSA 186:71 through 186:77, we recommend reaching out to your local district counsel. They are best positioned to interpret how this statute applies to your specific circumstances." *Exhibit 31* (NHDOE July 15, 2025 Grantham Response). With millions of dollars of state funding in the balance if a district unknowingly fails to comply with HB2, NHDOE decided to leave educators in the dark when NHDOE holds the power to revoke public state (and perhaps even federal) funds based on its unilateral view of what HB2 means.

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied. To the extent this paragraph contains representations as to the content or meaning of a document, same are denied and Plaintiffs are put to their burden of proof thereof. Defendants submit that the document itself is the best evidence of its content and meaning.**

187. The open-ended and subjective nature of HB2's prohibitions allow for arbitrary and discriminatory enforcement. Any teaching or other education programs that NHDOE views as impermissibly "DEI-related" can be targeted. There is no check on NHDOE's ability to target and pull public funding from a school district in NHDOE's crosshairs. And NHDOE's enforcement decisions have, in the past, been influenced by "personal opinions on what is appropriate instruction, as expressed in [the Commissioner's] op-ed

articles, to guide their efforts." *Local 8027, AFT-N.H.*, 2024 U.S. Dist. LEXIS 94052, at *41.

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied.**

188. Moreover, as explained in Paragraphs 171–178 *supra*, what constitutes "implicit bias," "critical race theory," or a "program" that "classifies individuals based" on a protected characteristic "for the purpose of achieving demographic outcomes" turns on subjective judgments—like the subjective assessments of legislators who may believe that such topics constitute "radical leftist indoctrination"—and incorporates the same types of vague terms and viewpoint discriminatory prohibitions that have been found constitutionally suspect in other laws. *See, e.g.*, *id.* at *50; *Black Emergency Response Team v. Drummond*, 737 F. Supp. 3d 1136, 1149 (W.D. Okla. 2024); *Nat'l Educ. Ass'n*, 2025 U.S. Dist. LEXIS 77874, at *36.

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied.**

189. Further demonstrating HB2's ambiguities and the prospect of arbitrary enforcement, NHDOE has already selectively applied HB2's anti-DEI provisions in two ways, all while it asks school districts to comply with the law to the letter.

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied.**

190. *First*, NHDOE insists that school districts submit certifications by September 5, 2025. However, HB2 makes clear that districts need only submit their certification by "[n]o later than *September 30, 2025*." *See* RSA 186:75, II (emphasis added). Here, NHDOE is, for its convenience in complying with its own October 1, 2025 deadline to submit a report to the legislature under RSA 186:74, simply ignoring the districts' September 30, 2025 deadline that the legislature specified. On July 14, 2025, the ACLU-NH wrote to NHDOE informing NHDOE that the September 5, 2025 deadline was inconsistent with the statute. *See Exhibit 33* (ACLU-NH July 14, 2025 Email to NHDOE). NHDOE never substantively responded.

**ANSWER: The allegations in the foregoing paragraph are admitted to the extent that, at one point, NHDOE requested certifications by September 5, 2025, and to the extent that NHDOE received a July 14, 2025 email purporting to be sent on behalf of ACLU-NH. Any remaining allegations are denied. To the extent this paragraph contains representations as to the content or meaning of a document, same are denied and Plaintiffs are put to their burden of proof thereof. Defendants submit that the document itself is the best evidence of its content and meaning.**

191. *Second*, while NHDOE is aggressively seeking to apply HB2 to private (including religious) colleges and universities in New Hampshire that receive state scholarship funds for individual students through the UNIQUE Program (both Annual and Endowment)

and/or the Governor Scholarship Program, *see Exhibit 3*, NHDOE apparently (and selectively) is *not* applying HB2's anti-DEI provisions to private K-12 schools that receive public funds either through EFAs or through RSA 193:3 where a student may be placed in a private school if it is in their best interest. *See* RSA 193:3(h).[56] There is no credible basis for NHDOE's position that HB2 applies to a private college that receives state scholarship funds, but *not* a private K-12 school that receives state funds through EFAs. The EFA program allows New Hampshire students to direct state funded per-pupil education adequacy grants (which are "public funds") to private schools. And HB2 explicitly defines "public school" broadly to include "*any school*, academic institution, or institution of higher education in this state *supported by public funds*." RSA 186:71, II (emphasis added). Thus, private schools that receive EFA funds would, through the plain meaning of HB2, be included.

> [56] "Private providers of special education" may also satisfy this definition of "public school" under HB2. See RSA 186-C:5.

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied.**

**III. HB2 Conflicts with Federal Civil Rights Laws That Protect People With Disabilities.**

192. HB2 prohibits public entities and public schools from implementing, promoting, or engaging in any program, training, or initiative that classifies individuals on the basis of physical or mental disability for the purpose of "achieving demographic outcomes, rather than treating individuals equally under the law." *See* RSA 21-I:112, II; RSA 186:71, I.

Given the dictionary definitions of "classify" and "demographic," and the inclusion of "physical or mental disability" as a specified "characteristic" in RSA 354-A:1, HB2 prohibits schools from identifying individuals based on disability in order to achieve disability-related outcomes.

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied.**

193. But federal disability rights laws *require* exactly what HB2 appears to *prohibit*: they require schools to identify students with disabilities and to develop and treat them differently by implementing programs—often based on individualized assessments and need—to increase access, participation, integration, and achievement for these disabled students. By definition, these programs are not "treating" disabled people "equally"— rather, they are providing unique, individualized supports that non-disabled people do not receive. These laws also cover staff and guests with disabilities who require accommodations to access school facilities and programs. Plaintiff School Districts and educators, including NEA-NH's members, reasonably interpret compliance with these federal obligations to be prohibited by HB2.

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied.**

194. In passing the Americans with Disabilities Act ("ADA"), Congress took note of the exclusion of disabled people from every aspect of society, relying on statistical data to illustrate the disadvantaged status of people with disabilities. The ADA includes Congress's finding that "census data, national polls, and other studies have documented that people with disabilities, as a group, occupy an inferior status in our society, and are severely disadvantaged socially, vocationally, economically, and educationally." 42 U.S.C. § 12101(a)(6); *see also* Sen. Committee on Labor and Human Resources, Rep. 101-116 at 8 (Aug. 30, 1989) (considering statistical evidence, including that: "[f]orty percent of all adults with disabilities did not finish high school—three times more than non-disabled individuals;" and quoting President Bush's conclusion that "[t]he statistics consistently demonstrate that disabled people are the poorest, least educated and largest minority in America.").

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Defendants are without sufficient information to admit or deny any factual allegations which may be contained in the foregoing paragraph, and therefore deny same and put Plaintiffs to their burden of proof thereof.**

195. Core requirements of the ADA, established to treat disabled people differently to remedy these "demographic" harms, would appear to be prohibited by HB2. The ADA and Section 504 of the Rehabilitation Act, for example, require covered public entities, including public schools, to make "reasonable modifications in policies, practices, or

procedures when the modifications are necessary to avoid discrimination on the basis of disability." 28 C.F.R. § 35.130(b)(7)(i); *Theriault v. Flynn,* 162 F.3d 46, 48 n. 3 (1st Cir.1998) ("Title II of the ADA was expressly modeled after Section 504 of the Rehabilitation Act, and is to be interpreted consistently with that provision."). Public entities must also provide auxiliary aids and services to ensure effective communication with a disabled person, based on the individual's communication method and needs. 28 C.F.R. § 35.160(b)(1), (2). In determining which auxiliary aids and services it provides, public entities must give "primary consideration" to the request of the individual with disabilities. 28 C.F.R. § 35.160(b)(2). Each of these requirements treat the disabled person different because of their status as a "qualified individual with a disability." 28 C.F.R. §§ 35.103, 35.130.

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied.**

196. The ADA also requires public entities, including schools, to consider the systemic impact of their policies and procedures to prevent discrimination and exclusion of disabled people. For example, the ADA prohibits public entities, including public schools, from "utiliz[ing] criteria or methods of administration" or selecting facility locations "[t]hat have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability; [t]hat have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities; [or t]hat screen out or tend to screen out an

individual with a disability or any class of individuals with disabilities from fully and equally enjoying any service, program, or activity." 28 C.F.R. § 35.130(b)(3)(i)–(ii), (4)(i)–(ii). Section 504 also requires public schools to evaluate and periodically re-evaluate disabled students to identify a placement appropriate to their needs in the most integrated environment. 34 C.F.R. § 104.35. By prohibiting conduct on the basis of its impact on disabled people in general, the ADA and Section 504 therefore *require* public entities (including public schools) to consider the "demographic" impact of their policies and procedures to ensure that they are avoiding outcomes prohibited by federal law, *i.e.*, "defeating or substantially impairing accomplishment of the objectives of the . . . program with respect to individuals with disabilities." But HB2 prohibits the exact consideration and knowledge that the ADA and Section 504 require.

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied.**

197. The IDEA, too, was passed in response to Congress's consideration of statistics and demographics of disabled students. When it originally enacted the IDEA as the Education for All Handicapped Children Act ("EHA") in 1975, Congress expressly took into account statistics and demographics of disabled students and the public school student body as a whole to ensure that disabled students have an equal opportunity to education. Congress noted that "more than half of the handicapped children in the United States do not receive appropriate educational services which would enable them to have full equality of opportunity" and one million "are entirely excluded from the public school

system and will not go through the educational process with their peers." Education for
All Handicapped Act of 1975, Pub. L. No. 94-142, 3, 89 Stat. 773 (1975).

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion,
and/or a request for relief, and therefore no response is required. To the extent a
response is required, the allegations in this paragraph are denied to the extent they
are inconsistent with applicable law. Defendants are without sufficient information
to admit or deny any factual allegations which may be contained in the foregoing
paragraph, and therefore deny same and put Plaintiffs to their burden of proof
thereof.**

198. Like the ADA and Section 504, the IDEA requires public schools to treat children with
disabilities differently to remedy these demographic disadvantages among disabled
students. The IDEA requires that public schools, *inter alia*, identify all children with
suspected disabilities, 20 U.S.C. § 1412(a)(3); 34 C.F.R. § 300.111(c), evaluate their
present level of academic and functional achievement, 20 U.S.C. §1414(c)(1)(B)(ii); 34
C.F.R. § 300.320(a)(1), develop an Individualized Education Program that contains a
"statement of measurable [academic and functional] annual goals" and "how the child's
progress toward meeting the annual goals . . . will be measured," 20 U.S.C. §
1414(d)(1)(A)(i)(I)-(II); 34 C.F.R. § 300.320(a)(2)(i), and provide individualized special
education services, instruction, and support to help students with disabilities meet their
individualized goals in the "least restrictive environment." 20 U.S.C. § 1412(a)(1)(A);
*Endrew F v. Douglas Cnty.*, 580 U.S. 386, 401 (2017); 20 U.S.C. § 1412(a)(5)(A).

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion,
and/or a request for relief, and therefore no response is required. To the extent a**

**response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied.**

199. The IDEA also imposes a range of requirements to report data regarding the provision of a FAPE and Child Find, and to create a plan that sets "measurable and rigorous targets" with respect to the provision of a FAPE and Child Find. 20 U.S.C. §§ 1412(a)(16)(D), 1413(a)(7), 1416(a)(3)(A)–(B), (b)(1)–(2), 1418(a). This conduct, required by the IDEA, appears to be prohibited by HB2, because it requires identifying disabled students and taking steps to ensure that they receive special education services and achieve academic outcomes—all of which would appear to fit into the plain meaning of achieving a "demographic outcome."

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied.**

200. HB2 prohibits schools from meeting the specific legal obligations that the ADA, Section 504, and the IDEA require. The plain meaning of HB2 sweeps in everything a school district or college must do to serve disabled students. The foundational purpose of the ADA, Section 504, and the IDEA is to require a public entity to identify ("classify") people with disabilities and treat them differently in order to achieve a disability-based ("demographic") outcome, such as integration, access, participation, or improved academic achievement.

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a**

**response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied.**

201. Further, core mechanisms of the ADA, Section 504, and the IDEA—individualized education plans, and reasonable accommodations—are frustrated, if not outright banned, by HB2. HB2 permits classification only for the purposes of "treating individuals equally under the law." But the foundational principles of *individualized* education plans under the IDEA, and reasonable accommodations under the ADA and Section 504, are to provide disabled people with treatment, services, or support that are *not* available to others. By definition, reasonable accommodations under the ADA and Section 504, and special education services under IDEA, do *not* "treat individuals equally"—rather, they provide services, supports, or accommodations that are not provided to others.

   **ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied.**

202. Plaintiff School Districts would appear to be in violation of HB2 by implementing measures every day that are required by federal disability rights laws, from installing a ramp to increase access for students and staff who use wheelchairs, to providing positive behavioral interventions and supports via federally required behavioral intervention plans for disabled students to avoid disciplinary involvement, to providing individualized support to a disabled student, as required by her IEP, and complying with court or administrative orders to comply with the IDEA.

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied.**

203. Because HB2 prohibits conduct that federal disability rights laws require, it renders compliance with both state and federal law physically impossible and is pre-empted under the United States Constitution Supremacy Clause. This conflict "diminishes [schools'] incentive to ensure compliance with discrimination laws." *Equal Rights Ctr. v. Niles Bolton Assocs.*, 602 F.3d 597, 602 (4th Cir. 2010).

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied.**

## CLAIMS FOR RELIEF

### First Cause of Action

### Fourteenth Amendment – Due Process, Void for Vagueness

### (Plaintiffs NEA-NH, Dottie Morris, James T. McKim, Jr., New Hampshire Outright v. Defendants John M. Formella, Caitlin Davis, Charlie Arlinghaus, and Monica Mezzapelle)

204. Plaintiffs incorporate the above paragraphs as if fully set forth herein.

**ANSWER: The foregoing paragraph restates and incorporates previous paragraphs of the Complaint, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied.**

205. The Fourteenth Amendment prohibits vagueness as "an essential of due process, required by both ordinary notions of fair play and settled rules of law." *Sessions v. Dimaya*, 584 U.S. 148, 155 (2018) (internal quotations and citation omitted). The prohibition on vagueness guarantees that ordinary people have fair notice of the conduct proscribed, and guards against arbitrary and discriminatory enforcement. *Id.*

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied.**

206. A law is "void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). This principle applies to administrative, civil, and criminal prohibitions. *See, e.g.*, *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253–54 (2012) (civil fines); *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1048–51 (1991) (state bar rule). And where First Amendment rights are at stake, "[t]he general test of vagueness applies with particular force." *Hynes v. Mayor of Oradell*, 425 U.S. 610, 620 (1976). Indeed, if a vague law merely "abut[s] upon sensitive areas of basic First Amendment freedoms," it "operates to inhibit the exercise of [those] freedoms." *Grayned*, 408 U.S. at 109. A law is impermissibly vague if it either "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or "authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000).

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a**

**response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied.**

207. HB2's anti-DEI provisions at RSA 21-I:112-116 and RSA 186:71-77 are impermissibly vague and violate the Fourteenth Amendment due process rights of Plaintiffs. All its prohibitions are unclear, broad in scope, and turn on subjective judgement. To take an example, although HB2 seeks to prohibit DEI "related" "programs" or "initiatives" that "classif[y] individuals based on a characteristic identified under RSA 354-A:1 for the purpose of achieving demographic outcomes," none of these phrases are defined. No criteria is provided for determining the circumstances under which programs might violate HB2. Nor does HB2 define or explain what "implicit bias," "critical race theory," or "DEI assessments" mean. As illustrated by the difficulties facing the Plaintiffs described above, HB2 fails to provide adequate notice about what speech and programming regarding race, diversity, equity, or inclusion is prohibited. The ambiguity permeating HB2 also invites arbitrary and selective enforcement against educational programs that advocate views inconsistent with those espoused by Defendants.

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied.**

208. Heightening the vagueness concerns presented by HB2, HB2 also "abuts" the First Amendment in several ways, including its restriction on academic freedom at public institutions of higher education.

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied.**

209. HB2 also infringes on the First Amendment-protected extracurricular speech of educators, including those at grades K-12 schools, where such speech could be construed as "promoting" a "DEI" "policy." *See Local 8027, AFT-N.H.*, 2024 U.S. Dist. LEXIS 94052, at *36 ("On their face, the Amendments apply whenever and wherever a teacher instructs a student on a banned concept and thus implicate constitutionally protected interactions between teachers and students."). NEA-NH members reasonably fear that Defendants will investigate or take other adverse action against them based on statements that could be perceived as promoting "DEI" during extracurricular activities, which would include, for example, coaching sporting events, acting as a faculty advisor, or supervising theater productions.

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied.**

210. HB2 also abuts First Amendment principles insofar as it suppresses private speech because of its content or viewpoint, including by students in discussions that are viewed as part of "programs" or "initiatives" being "promote[d]" that contain "DEI-related" information or instruction. *See Papish v. University of Missouri*, 410 U.S. 667, 670 (1973) (ordering reinstatement of a university student expelled for distributing an

underground newspaper containing an indecent cartoon on the grounds that "the mere dissemination of ideas—no matter how offensive to good taste—on a state university campus may not be shut off in the name alone of conventions of decency"). Further, in the context of K-12 public schools, laws regarding school curricula that impede the rights of students to receive information and ideas, without legitimate pedagogical justification, violate the First Amendment. HB2 lacks any such justification. *See Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988) ("It is only when the decision to censor a school-sponsored publication, theatrical production, or other vehicle of student expression has no valid educational purpose that the First Amendment is so directly and sharply implicated, as to require judicial intervention to protect students' constitutional rights.") (internal quotations and citation omitted); *see also Tinker v. Des Moines Independent Community School District*, 393 U.S. 503 (1969); *West Virginia Bd. of Ed. v. Barnette*, 319 U.S. 624, 637 (1943) ("Free public education, if faithful to the ideal of secular instruction and political neutrality, will not be partisan or enemy of any class, creed, party, or faction."). Further, the First Amendment protects "the right to receive information and ideas," which HB2 restricts. *Stanley v. Georgia*, 394 U.S. 557, 564 (1969); *Bd. of Educ. v. Pico*, 457 U.S. 853, 866–68 (1982) (plurality opinion).

**ANSWER: Defendants are without sufficient knowledge or information to admit or deny the allegations in the foregoing paragraph, and therefore deny same and put Plaintiffs to their burden of proof thereof. Any remaining allegations are denied.**

211. The members of NEA-NH and Dr. Dottie Morris are subject to compliance with state law in their teaching and professional practices. And Plaintiffs James McKim and New Hampshire Outright are subject to HB2 insofar as they need to comply with its terms

when conducting trainings for public entities and public schools. These Plaintiffs fear that their educational and training practices could be construed as impermissibly being "DEI-related" under HB2. Because HB2's anti-DEI provisions are vague, these Plaintiffs cannot effectively alter their practices to conform with the law and are left open to arbitrary and discriminatory enforcement.

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied.**

212. Plaintiffs NEA-NH, Dr. Dottie Morris, James McKim, and New Hampshire Outright fear that their actions could be construed to impermissibly involve "DEI" or otherwise violate the terms of HB2. Because HB2's anti-DEI provisions are vague, they cannot effectively alter their practices to conform with the law and, thus, they are left open to arbitrary and discriminatory enforcement.

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied.**

213. 213. Plaintiffs have a protected liberty interest in not only the ability to provide an adequate education under Part II, Article 83 of the New Hampshire Constitution, but also to the state funds that are necessary to do so. Plaintiffs also have a protected interest in their professional livelihoods and reputations that would be impacted by a violation of or complaint/investigation under HB2.

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied.**

214.214. As a result, Plaintiffs NEA-NH, Dr. Dottie Morris, James McKim, and New Hampshire Outright have suffered and will continue to suffer irreparable harm.

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied.**

<u>Second Cause of Action</u>

<u>First Amendment – Free Speech and Free Association</u>

<u>(Plaintiffs NEA-NH and Dottie Morris v.</u>

<u>Defendants John M. Formella, Caitlin Davis, Charlie Arlinghaus, and Monica Mezzapelle)</u>

215.Plaintiffs incorporate the above paragraphs as if fully set forth herein.

**ANSWER: The foregoing paragraph restates and incorporates previous paragraphs of the Complaint, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied.**

216.In the college and university context, government-sponsored censorship of disfavored ideas interferes with fundamental principles of academic freedom protected under Article 22. *See, e.g.*, *Keyishian*, 385 U.S. at 603; *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957); *cf. Bd. of Regents of Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 237 (2000) (Stevens, J., concurring) ("Our understanding of academic freedom has included not

merely liberty from restraints on thought, expression, and association in the academy, but also the idea that universities and schools should have the freedom to make decisions about how and what to teach.").

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied.**

217. HB2 infringes upon protected speech of educators in higher education by prohibiting schools from implementing, promoting, or otherwise engaging in any DEI-related initiatives and specifically prohibiting teaching "implicit bias training," "critical race theory," and "DEI assessments." A wide range of research and educational instruction falls under these prohibitions. For example, a researcher at a university studying Black student achievement might find themselves in violation of this law, as well as a college of education that teaches strategies for engaging students of different backgrounds. There is also no carveout for student groups. The law thus impermissibly regulates speech based on its content and viewpoint.

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied.**

218. The members of NEA-NH who teach at higher educational institutions and Plaintiff Dr. Dottie Morris engage in constitutionally protected expression on issues pertaining to race, diversity, equity, and inclusion, including in their curricular and extracurricular

interactions with students at higher educational institutions. The members of NEA-NH and Dr. Morris reasonably fear that their speech is subject to HB2's anti-DEI provisions at RSA 21-I:112-116 and RSA 186:71-77.

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied.**

219. HB2's anti-DEI provisions unconstitutionally penalize the protected speech of Plaintiff Dr. Dottie Morris—who formerly was the Associate Vice President of Institutional Equity and Diversity at KSC and who addresses concepts like implicit bias in her psychology classes—and NEA-NH members who teach at New Hampshire colleges and universities by threatening to withhold public funding if they engage in a "DEI" "program."

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied.**

220. Because Dr. Dottie Morris and the higher education members of NEA-NH are subject to compliance with state law in their teaching and professional practices, HB2's anti-DEI provisions also expose them to professional and legal penalties by declaring that their protected expression in higher education institutions violates state law, with the risk of those institutions losing some or all public funding and these educators losing their jobs. The loss of this public funding for colleges and universities will be devastating, as these

institutions would no longer be able to maintain the quality of the education they

currently provide. To avoid these costs, it is foreseeable that higher educational

institutions and individual educators will take steps to suppress or self-censor any

expression that could be construed as "DEI." *Exhibit 42* (Morris Decl.) ¶ 22. We have

already seen such steps, with titles being changed and websites being scrubbed. *See*

Paragraphs 149-155 *supra*. Because HB2 does not offer any guidance as to what

constitutes "DEI," any curricular speech at a college or university that conceivably runs

afoul of Defendants' positions on race, diversity, equity, or inclusion is at risk of being

censored or penalized.

> **ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion,
> and/or a request for relief, and therefore no response is required. To the extent a
> response is required, the allegations in this paragraph are denied to the extent they
> are inconsistent with applicable law. Any remaining allegations are denied.**

221. Plaintiff Dr. Dottie Morris reasonably fears that NHDOE or her employer will

investigate, discipline, or take other adverse action against her if she continues to discuss

with students issues pertaining to race, diversity, equity, or inclusion. *Exhibit 42* (Morris

Decl.) ¶¶ 7-22.

> **ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion,
> and/or a request for relief, and therefore no response is required. To the extent a
> response is required, the allegations in this paragraph are denied to the extent they
> are inconsistent with applicable law. Any remaining allegations are denied.**

222. Moreover, two UNH Law NEA-NH members who engage in instruction and work that

arguably impacts HB2 do not know how to comply with its provisions. These educators

are concerned that they may be subjected to adverse employment action and/or their school's funding affected if they continue to assign readings, engage in discussions with students, provide instruction, student programming, or professional development, or otherwise operate their programs in ways that are or could be construed to be related to race, diversity, equity, or inclusion. *Exhibit 34* (NEA-NH Decl.) ¶ 8.

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied.**

223. Further, while elementary and secondary school teachers' First Amendment rights are limited, after school hours and outside their official duties, their speech to students, even on school grounds, can be protected. *See Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 528–30 (2022). And government efforts to penalize or suppress private speech because of its content or viewpoint, including by threatening to withhold public funding from institutions that host disfavored speech or associate with disfavored speakers, are presumptively unconstitutional. *See Bantam Books v. Sullivan*, 372 U.S. 58, 67 (1963) (holding that a government entity's "threat of invoking legal sanctions and other means of coercion" against a third party "to achieve the suppression" of disfavored speech violates the First Amendment); *accord NRA v. Vullo*, 602 U.S. 175, 190–91 (2024).

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied.**

224. As a result, Plaintiffs NEA-NH and Dr. Dottie Morris have suffered and will continue to suffer irreparable harm.

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied.**

**Third Cause of Action**

**Preemption; Equity**

**(Plaintiffs NEA-NH, School Districts, Dottie Morris, and James T. McKim, Jr. v. All Defendants)**

225. Plaintiffs incorporate the above paragraphs as if fully set forth herein.

**ANSWER: The foregoing paragraph restates and incorporates previous paragraphs of the Complaint, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied.**

226. The Supremacy Clause, Article VI, Section 2, of the U.S. Constitution, provides that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land." *See also Tweed-New Haven Airport Auth. v. Tong*, 930 F.3d 65, 73 (2d Cir. 2019) ("If the Supremacy Clause means anything, it means that a state is not free to enforce within its boundaries laws preempted by federal law. Lawsuits invoking the Supremacy Clause are one of the main ways of ensuring that this does not occur.").

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied.**

227. Federal law preempts state law in any area over which Congress expressly or impliedly has reserved exclusive authority or which is constitutionally reserved to the federal government, or where state law conflicts or interferes with federal law.

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied.**

228. RSA 21-I:112-116 and RSA 186:71-77 purport to prohibit diversity, equity, and inclusion (or "DEI")-"related" "initiatives, programs, training, or policies" in public entities and "public schools." *See* RSA 21-I:113-14; RSA 186:72-73.

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied.**

229. DEI is defined as "any program, policy, training, or initiative that classifies individuals based on a characteristic identified under RSA 354-A:1"—which includes mental or physical disability—"for the purpose of achieving demographic outcomes, rather than treating individuals equally under the law." *See* RSA 21-I:112, II; RSA 186:71, I.

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied.**

230. HB2's anti-DEI provisions at RSA 21-I:112-116 and RSA 186:71-77 violate the Supremacy Clause because they conflict with the Americans with Disabilities Act, 42 U.S.C. § 12101 *et. seq.*, Section 504 of the Rehabilitation Act, 29 U.S.C. § 794; and the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 *et seq*. as a matter of law.

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied.**

231. Compliance with HB2 and each of these laws is a physical impossibility. *See Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98 (1992).

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied.**

232. The ADA requires school districts and other public identities to provide different, individualized services, supports, and accommodations to students, teachers, staff, and visitors with disabilities in order to achieve integration, inclusion, and access for disabled people. *See* 42 U.S.C. § 12101 *et seq.*; 28 C.F.R. §§ 35.130; 35.160. HB2 prohibits exactly this same conduct. For example, a school that complied with its obligation to

accommodate or educate a disabled student in the "most integrated setting," *see* 28 C.F.R. § 35.130(d), by building a wheelchair ramp, providing positive behavioral supports and interventions, or modifying instruction, would be violating HB2 by "classifying" students based on a prohibited characteristic and implementing a program to improve demographic outcomes, *i.e.*, ensure they can access an education in an integrated classroom.

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied.**

233. Section 504 of the Rehabilitation Act imposes identical barriers as the ADA. *Theriault v. Flynn,* 162 F.3d at 48 n. 3 ("Title II of the ADA was expressly modeled after Section 504 of the Rehabilitation Act, and is to be interpreted consistently with that provision.").

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied.**

234. Compliance with both the IDEA and HB2 is also impossible. For example, IDEA's "Child Find" obligation requires school districts to identify disabled students. 20 U.S.C. § 1412(a)(3); 34 C.F.R. § 300.111(a). Its "Individualized Education Plan" obligation requires schools to provide unique, personalized educational supports and plans designed to help students to achieve specific academic and functional goals. 20 U.S.C. § 1412(a)(1)(A); 34 C.F.R. § 300.101(a). These requirements are directly contradicted by

HB2, as they are requirements to "classify" students based on disability and then implement a program to improve outcomes for those students. The IDEA also imposes a range of requirements to report data regarding the provision of a FAPE and Child Find, and to create a plan that sets "measurable and rigorous targets" with respect to the provision of a FAPE and Child Find. 20 U.S.C. §§ 1412(a)(16)(D), 1413(a)(7), 1416(a)(3)(A)–(B), (b)(1)–(2), 1418(a). This, too, is prohibited by HB2, as it "classifies" students via data and reporting to achieve demographic outcomes.

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied.**

235. HB2 is also pre-empted because it stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress under the ADA, Section 504, and the IDEA. *See Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 52 (1st Cir. 2024).

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied.**

236. The purpose of each of these federal disability rights laws is to improve outcomes for people with disabilities in all aspects of society, including by providing accommodations and supports that are *not* equally available to everyone. HB2's restriction on considering demographics hollows and conflicts with this core objective. Both School District

Plaintiffs and NEA-NH, through its member educators (including special educators), provide critical educational services, including reasonable accommodations, implementation of IEP, and compliance with reporting requirements, to ensure that educational opportunities for students with disabilities are realized, as required under federal law—obligations which are frustrated by HB2's anti-DEI provisions.

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied.**

237. Plaintiff Dr. Dottie Morris and James McKim also frequently discuss the importance of providing equitable outcomes for people with disabilities in their work which aids entities in complying with federal law. *Exhibit 42* (Morris Decl.) ¶ 15; *Exhibit 43* (McKim Decl.) ¶ 5.

**ANSWER: Defendants are without sufficient knowledge or information to admit or deny the allegations in the foregoing paragraph, and therefore deny same and put Plaintiffs to their burden of proof thereof. Any remaining allegations are denied.**

238. As a result, all Plaintiffs have suffered and will continue to suffer irreparable harm.

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied.**

239. Plaintiffs may sue to obtain injunctive relief against HB2 in equity.

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied.**

### Fourth Cause of Action

### Part I, Article 15 of New Hampshire Constitution – Due Process; Vagueness

### (All Plaintiffs v. All Defendants)

240. Plaintiffs incorporate the above paragraphs as if fully set forth herein.

**ANSWER: The foregoing paragraph restates and incorporates previous paragraphs of the Complaint, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied.**

241. Part I, Article 15 of the New Hampshire Constitution provides, in relevant part: "No subject shall be … deprived of his property, immunities, or privileges, put out of the protection of the law, exiled or deprived of his life, liberty, or estate, but by the judgment of his peers, or the law of the land . . . ." N.H. Const. pt. I, art. 15. "Law of the land in this article means due process of law." *Petition of Harvey*, 108 N.H. 196, 198 (1967) (quotation and ellipsis omitted).

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied.**

242. HB2's anti-DEI provisions violate Part I, Article 15 in two distinct ways.

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied.**

243. *First*, HB2 is unconstitutionally vague.

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied.**

244. As the New Hampshire Supreme Court has explained, "[t]he vagueness doctrine, 'originally a due process doctrine, applies when the statutory language is unclear, and is concerned with notice to the potential wrongdoer and prevention of arbitrary or discriminatory enforcement.'" *Montenegro v. N.H. DMV*, 166 N.H. 215, 221 (2014) (quoting *United States v. Lambert*, 446 F. Supp. 890, 897 (D. Conn. 1978)). The New Hampshire Supreme Court has added that, "where a vague statute abuts upon sensitive areas of basic First Amendment freedoms, it operates to inhibit the exercise of those freedoms." *Id.* at 222 (quoting *Grayned*, 408 U.S. at 109). HB2 abuts First Amendment freedoms for the reasons explained above in Count 1.

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied.**

245. HB2's anti-DEI provisions at RSA 21-I:112-116 and RSA 186:71-77 are impermissibly vague and violate the Article 15 due process rights of all Plaintiffs. All its prohibitions are unclear, broad in scope, and turn on subjective judgement. To take an example, although HB2 seeks to prohibit DEI "related" "programs" or "initiatives" that "classif[y] individuals based on a characteristic identified under RSA 354-A:1 for the purpose of achieving demographic outcomes," none of these phrases are defined. No criteria is provided for determining the circumstances under which programs might violate HB2. Nor does HB2 define or explain what "implicit bias," "critical race theory," or "DEI assessments" mean. As illustrated by the difficulties facing the Plaintiffs described above, HB2 fails to provide adequate notice about what speech and programming regarding race, diversity, equity, or inclusion is prohibited. The ambiguity permeating HB2 also invites arbitrary and selective enforcement against educational programs that advocate views inconsistent with those espoused by Defendants.

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied.**

246. The members of NEA-NH, School District Plaintiffs, and Dr. Dottie Morris are subject to compliance with state law in their teaching and professional practices. School District Plaintiffs' programs and operations, including instruction, programming, and professional development, are subject to HB2's anti-DEI provisions. Plaintiffs James McKim and New Hampshire Outright are subject to HB2 insofar as they need to comply with its terms when conducting trainings for public entities and public schools. These Plaintiffs

fear that their educational and training practices could be construed as impermissibly being "DEI-related" under HB2. Because HB2's anti-DEI provisions are vague, Plaintiffs cannot effectively alter their practices to conform with the law and are left open to arbitrary and discriminatory enforcement.

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied.**

247. *Second*, HB2's anti-DEI provisions violate Article 15 by lacking any process for anyone—including the School District Plaintiffs—to challenge a decision by Defendants that a public body or school district has engaged in a "DEI" program or initiative, including any decision that funding should be pulled because of this engagement.

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied.**

248. "The ultimate standard for judging a due process claim is the notion of fundamental fairness." *Saviano v. Director, N.H. Div. of Motor Vehicles*, 151 N.H. 315, 320 (2004). "Fundamental fairness requires that government conduct conform to the community's sense of justice, decency and fair play." *Id.* The New Hampshire Supreme Court's threshold determination in a procedural due process claim is "whether the challenged procedures concern a legally protected interest." *State v. McLellan*, 146 N.H. 108, 113 (2001) (quotation omitted).

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied.**

249. Plaintiffs have a protected liberty interest in not only the ability to provide an adequate education under Part II, Article 83 of the New Hampshire Constitution, but also to the state funds that are necessary to do so. Plaintiffs also have a protected interest in their professional livelihoods and reputations that would be impacted by a violation of or complaint/investigation under HB2.

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied.**

250. In the wake of HB2's enormous financial penalties that would cripple a school district's ability to educate its students, HB2's anti-DEI provisions provide no process for school districts to contest the unilateral decision of NHDOE that a "knowing" or "unknowing" violation has occurred. NHDOE is the judge, jury, and executioner, with millions of dollars of state (and possibly even federal) funding on the line that NHDOE can either (i) revoke altogether in imposing a *de facto* "death penalty" for a district, or (ii) coercively hold hostage until a district complies with NHDOE's unilateral interpretation of HB2's vague provisions.

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a**

**response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied.**

251. As a result, all Plaintiffs have suffered and will continue to suffer irreparable harm.

   **ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied.**

**Fifth Cause of Action**

**Part I, Article 22 of the New Hampshire Constitution – Free Speech and Free Association**

**(Plaintiffs NEA-NH and Dottie Morris v.**

**Defendants John M. Formella, Caitlin Davis, Charlie Arlinghaus, and Monica Mezzapelle)**

252. Plaintiffs incorporate the above paragraphs as if fully set forth herein.

   **ANSWER: The foregoing paragraph restates and incorporates previous paragraphs of the Complaint, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied.**

253. Part I, Article 22 of the New Hampshire Constitution states: "Free speech and Liberty of the press are essential to the security of Freedom in a State: They ought, therefore, to be inviolably preserved." N.H. Const. pt. I, art. 22.

   **ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a**

**response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied.**

254. In the college and university context, government-sponsored censorship of disfavored ideas interferes with fundamental principles of academic freedom protected under Article 22. *See also* RSA 188-F:3, II ("The general court also recognizes the need to protect the institutions of the community college system of New Hampshire from inappropriate external influence which might threaten the academic freedom of faculty members or otherwise inhibit the pursuit of academic excellence. To this end, the general court has delegated broad authority to the board of trustees who shall be responsible for managing the community college system of New Hampshire in a manner which promotes academic excellence and serves the educational needs of the people of New Hampshire.").

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied.**

255. HB2 infringes upon protected speech of educators in higher education by prohibiting schools from implementing, promoting, or otherwise engaging in any DEI-related initiatives and specifically prohibiting teaching "implicit bias training," "critical race theory," and "DEI assessments." A wide range of research and educational instruction falls under these prohibitions. For example, a researcher at a university studying Black student achievement might find themselves in violation of this law, as well as a college of education that teaches strategies for engaging students of different backgrounds. There is

also no carveout for student groups. The law thus impermissibly regulates speech based on its content and viewpoint.

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied.**

256. The members of NEA-NH who teach at higher educational institutions and Plaintiff Dr. Dottie Morris engage in constitutionally protected expression on issues pertaining to race, diversity, equity, and inclusion, including in their curricular and extracurricular interactions with students at higher educational institutions. The members of NEA-NH and Dr. Dottie Morris reasonably fear that their speech is subject to HB2's anti-DEI provisions at RSA 21-I:112-116 and RSA 186:71-77.

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied.**

257. HB2's anti-DEI provisions unconstitutionally penalize the protected speech of Plaintiff Dr. Dottie Morris—who formerly was the Associate Vice President of Institutional Equity and Diversity at KSC and who addresses concepts like implicit bias in her psychology classes—and NEA-NH members who teach at New Hampshire colleges and universities by threatening to withhold public funding if they engage in a "DEI" "program."

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied.**

258. Because Dr. Dottie Morris and the higher education members of NEA-NH are subject to compliance with state law in their teaching and professional practices, HB2's anti-DEI provisions also expose them to professional and legal penalties by declaring that their protected expression in higher education institutions violates state law, with the risk of those institutions losing some or all public funding and these educators losing their job. The loss of this public funding for colleges and universities will be devastating, as these institutions would no longer be able to maintain the quality of the education they currently provide. To avoid these costs, it is foreseeable that higher educational institutions and individual educators will take steps to suppress or self-censor any expression that could be construed as "DEI." *Exhibit 42* (Morris Decl.) ¶ 22. We have already seen such steps, with titles being changed and websites being scrubbed. *See* Paragraphs 149-155 *supra*. Because HB2 does not offer any guidance as to what constitutes "DEI," any curricular speech at a college or university that conceivably runs afoul of Defendants' positions on race, diversity, equity, or inclusion is at risk of being censored or penalized.

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied.**

259. Plaintiff Dr. Dottie Morris reasonably fears that NHDOE or her employer will investigate, discipline, or take other adverse action against her if she continues to discuss with students issues pertaining to race, diversity, equity, or inclusion. *Exhibit 42* (Morris Decl.) ¶¶ 7-22.

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied.**

260. Moreover, two UNH Law NEA-NH members who engage in instruction and work that arguably impacts HB2 do not know how to comply with its provisions. These educators are concerned that they may be subjected to adverse employment action and/or their school's funding affected if they continue to assign readings, engage in discussions with students, provide instruction, student programming, or professional development, or otherwise operate their programs in ways that are or could be construed to be related to race, diversity, equity, or inclusion. *Exhibit 34* (NEA-NH Decl.) ¶ 8.

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied.**

261. As a result, Plaintiffs NEA-NH and Dr. Dottie Morris have suffered and will continue to suffer irreparable harm.

**ANSWER: The foregoing paragraph contains a legal argument, a legal conclusion, and/or a request for relief, and therefore no response is required. To the extent a**

**response is required, the allegations in this paragraph are denied to the extent they are inconsistent with applicable law. Any remaining allegations are denied.**

### PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court:

A. Declare that HB2's anti-DEI provisions at RSA 21-I:112-116 and RSA 186:71-77 are unlawful and unconstitutional under the United States and New Hampshire Constitutions;

**ANSWER: The foregoing paragraph includes a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied.**

B. Temporarily, preliminarily, and/or permanently restrain or enjoin Defendants—and their agents, employees, representatives, successors, and any other person acting directly or indirectly in concert with them—from enforcing and/or implementing HB2's anti-DEI provisions at RSA 21-I:112-116 and RSA 186:71-77 and their reporting and certification requirements;

**ANSWER: The foregoing paragraph includes a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied.**

C. Award Plaintiffs' costs of suit and reasonable attorneys' fees and other expenses under 42 U.S.C. § 1988; and

**ANSWER: The foregoing paragraph includes a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied.**

D. Grant all such other and further relief as the Court may deem just and proper.

**ANSWER:** The foregoing paragraph includes a request for relief, and therefore no response is required. To the extent a response is required, the allegations in this paragraph are denied.

## STATEMENT OF DEFENSES

a.  The Complaint fails to state a claim for which relief can be granted.

b.  Plaintiffs' claims may be barred by their lack of standing to bring said claims.

c.  Plaintiff's claims may be barred by applicable doctrines of immunity. Defendants are entitled to assert any applicable immunities, including but not limited to Eleventh Amendment immunity, sovereign immunity, qualified immunity, official immunity, and discretionary function immunity.

d.  Plaintiffs' claims may be barred in whole or in part by *Pullman* abstention because their federal constitutional challenges depend on open antecedent questions of state law.

e.  Plaintiffs' claims are barred to the extent brought by school districts because a political subdivision has no right to sue its own State.

f.  Plaintiffs are not entitled to relief beyond what is necessary to provide complete relief to the plaintiffs.

Plaintiffs are not entitled to an order invalidating the challenged provisions in their entirety when a narrow order would redress any constitutional harm or if any provisions deemed to be unconstitutional can be severed from the remainder of the challenged provisions. Because this action is in its inception, Defendants reserve the right to add to this Brief Statement and enumerate additional defenses as they become evident during the litigation process upon reasonable notice to the Court and Plaintiffs.

## JURY TRIAL DEMAND

Defendants hereby demand a trial by jury in this matter.

Respectfully submitted,

John M. Formella, New Hampshire Attorney General; Catlin Davis, Commissioner of New Hampshire Department of Education; Charlie Arlinghaus, Commissioner of New Hampshire Department of Administrative Services; and Moncia Mezzapelle, State Treasurer of New Hampshire

By their attorney,

THE OFFICE OF THE ATTORNEY GENERAL

Dated: January 9, 2026                   /s/ Shawna Bentley
                                          Shawna Bentley, Bar #270149
                                          Assistant Attorney General
                                          Sam M. Gonyea, Bar No. 273264
                                          Assistant Attorney General
                                          Civil Bureau
                                          NH Department of Justice
                                          1 Granite Place South
                                          Concord, NH 03301
                                          shawna.bentley@doj.nh.gov
                                          sam.m.gonyea@doj.nh.gov
                                          (603) 271-6836

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was sent, this day, to all parties and/or counsel of record via the Court's electronic filing system.

/s/ Shawna Bentley
Shawna Bentley